# EXHIBIT C

RETURN DATE: July 28, 2020

| | | |
|---|---|---|
| DECIMUS CAPITAL MARKETS, LLC | : | SUPERIOR COURT |
| | : | |
| | : | J.D. OF STAMFORD/NORWALK |
| v. | : | AT STAMFORD |
| | : | |
| | : | |
| LEVI & KORSINSKY, LLP | : | June 30, 2020 |
| | : | |

## COMPLAINT AND APPLICATION TO COMPEL ARBITRATION

COUNT ONE: (Declaratory Judgment pursuant to Conn. Gen. Stat. § 52-410)

1. Plaintiff, DECIMUS CAPITAL MARKETS, LLC ("Plaintiff"), is a Delaware limited liability company with a place of business at 11 Sea Beach Drive, Stamford CT 06902.

2. Defendant, LEVI & KORSINSKY, LLP ("Defendant"), is a New York limited liability partnership with a place of business at 1111 Summer Street, Suite 403 Stamford, CT 06905.

3. On or about August 12, 2016, Plaintiff and Defendant executed an agreement (the "Engagement Agreement") regarding Defendant's engagement of Plaintiff to provide certain services.

4. A copy of the Engagement Agreement is attached hereto as Exhibit A.

5. Among other things, the Engagement Agreement contains a provision which states in part that:

> "This letter agreement shall be governed by and construed in accordance with the laws of Fairfield County, Connecticut applicable to contracts made in Fairfield County, Connecticut. **Any dispute shall be subject to arbitration in the State of Connecticut, with arbitration handled by a mutually agreed upon professional arbitrator with binding authority**" (the "Arbitration Clause") (Emphasis added).

6. Plaintiff is owed approximately $347,000.00 plus interest under the Engagement Agreement and wishes to pursue a claim against Defendant to collect same.

7. Under the Arbitration Clause, the parties are to agree upon a professional arbitrator.

8. Plaintiff has made a demand for arbitration on Defendant, requesting that they agree to a professional arbitrator and proceed with arbitration pursuant to the Arbitration Clause, to which Defendant has not responded.

9. The Engagement Agreement is a valid contract between Plaintiff and Defendant.

10. The Engagement Agreement contains a valid and enforceable clause requiring the arbitration of all disputes between Plaintiff and Defendant under the Engagement Agreement.

11. The scope of the Engagement Agreement covers the parties' dispute, which include Plaintiff's breach of contract claim against Defendant and demand for fees owed under the Engagement Agreement.

12. Defendant has neglected and refused to fulfill its obligations under the Engagement Agreement to arbitrate this dispute, although Plaintiff is ready and willing to proceed.

13. The Plaintiff seeks an order compelling the defendant to immediately comply with the Arbitration Clause.

**WHEREFORE**, as to all Counts Plaintiff seeks:

1. A judgment declaring that Defendants must immediately agree upon an arbitrator and submit to arbitration to resolve the subject claim for fees owed between Plaintiff and Defendant under the Engagement Agreement;

2. Costs; and

3. Such other and further relief as the Court deems just and proper.

2

THE PLAINTIFF,
DECIMUS CAPITAL MARKETS, LLC

By:     /s/ Christina M. Volpe
        Scott S. Centrella
        Christina M. Volpe
        DISERIO MARTIN O'CONNOR &
        CASTIGLIONI LLP #102036
        One Atlantic Street
        Stamford, CT 06901
        (203) 358-0800
        scentrella@dmoc.com
        cvolpe@dmoc.com

| | | |
|---|---|---|
| DECIMUS CAPITAL MARKETS, LLC | : | SUPERIOR COURT |
| | : | |
| | : | J.D. OF STAMFORD/NORWALK |
| v. | : | AT STAMFORD |
| | : | |
| | : | |
| LEVI & KORSINSKY, LLP | : | June 30, 2020 |

## <u>STATEMENT OF AMOUNT IN DEMAND</u>

The amount in demand in the above-entitled action, exclusive of interest and costs, is more than FIFTEEN THOUSAND ($15,000.00) DOLLARS.

THE PLAINTIFF,
DECIMUS CAPITAL MARKETS, LLC


By:   /s/ Christina M. Volpe
Scott S. Centrella
Christina M. Volpe
DISERIO MARTIN O'CONNOR &
CASTIGLIONI LLP #102036
One Atlantic Street
Stamford, CT 06901
(203) 358-0800
scentrella@dmoc.com
cvolpe@dmoc.com

4

# Exhibit A

# Decimus Capital Markets, LLC



11 Sea Beach Drive
Stamford, CT 06902
203-359-2625 (p)
203-559-9128 (c)
haim@haimbodek.com
www.haimbodek.com

Nancy Kulesa
Levi & Korsinsky LLP
30 Broad Street, 24th Floor
New York, NY 10004

August 12, 2016

Dear Ms. Kulesa:

This letter constitutes the terms and objectives of our engagement and the nature and limitations of the services Decimus Capital Markets, LLC ("DCM" or "we") will provide to Levi & Korsinsky LLP ("CLIENT" or "you").

Our understanding that the chief goal of the engagement is to analyze transactions effected by TD Ameritrade Holding Corporation and other affiliated entities ("TD Ameritrade") from approximately 2011 to the present, or any other time period(s) as mutually agreed upon by CLIENT and DCM, in connection with potential breaches of the duty of best execution and related violations of securities laws and regulations by TD Ameritrade. We will provide the following services, to the extent explicitly requested by CLIENT, to be performed personally and exclusively by Mr. Haim Bodek ("Mr. Bodek"), Mr. Stanislav Dolgopolov ("Mr. Dolgopolov"), Mr. Neil Mark Shaw ("Mr. Shaw"), or any other qualified person specifically authorized by DCM:

1. review and assessment of relevant transactions for Klein v. TD Ameritrade Holding Corporation, Case No. 8:14-cv-396, or any other related lawsuit;
2. assistance with identification of sources of information and evidence requests;
3. regulatory review and assessment of the relevant issues;
4. testimonial services, provided that only Mr. Bodek shall serve as a testifying expert and that no other individual would be identified as an attributed source of the information provided to CLIENT by DCM;
5. additional consulting services as requested and mutually agreed upon in accordance with this letter agreement.

It is our understanding that such review and assessment of relevant transactions may cover various approaches and theories of investor harm, including, but not limited to, distortions of the duty of best execution by monetary inducements, inappropriate use of certain order types on trading venues, mishandling of orders by wholesale market makers and breaches of their own duty of best execution, inappropriate execution delays, inappropriate use of data feeds, inappropriate leakages of information relating to customer orders, and false and misleading execution quality reports.

With respect to the above-mentioned consulting services, which are to be generally supervised by Mr. Bodek and billed in a cost-efficient manner, CLIENT would agree to compensate DCM for Mr. Bodek's time at an hourly rate of $750/hr, Mr. Dolgopolov's time at an hourly rate of $350/hr, Mr. Shaw's time at an hourly rate of $350/hr, or any other qualified person specifically authorized by DCM at an hourly rate of $350/hr (such compensation for consulting services, the "Consulting Fee"). The Consulting Fee shall constitute the sole and entire remuneration to which DCM and/or anyone on its behalf is, and shall be,

August 12, 2016
Page 2 of 5

entitled to receive under this letter agreement in consideration for such services, provided that reasonable and customary travel expenses, as well as meals and lodging expense when traveling, for any of the above-mentioned individuals associated with DCM shall be reimbursable at par. Moreover, to the extent that any data cannot be obtained from TD Ameritrade or related parties, CLIENT shall be solely responsible for purchasing the required market data and related services, including but not limited to, data provided by individual trading venues, data vendors, or other providers, and additional data storage and computational costs for processing data (anticipated to be provided through cloud services), which may be significant.

The detailed scope of the engagement, including its phases, and estimates of total hours are shown in Appendix A. As agreed upon by DCM and CLIENT, the phase-by-phase billed time for Phases I and II shall be capped at $300,000 and $200,000 respectively, while such billed time for Phase III shall not be capped. DCM and CLIENT pledge to work in good faith to manage billable time in a cost-efficient manner that would fairly compensate DCM. Furthermore, for each increment of $50,000 in billable time, DCM and CLIENT agree to hold consultations to discuss this engagement's progress and its immediate and long-term goals and to prioritize various tasks for this engagement. Moreover, CLIENT shall retain the right to request additional consulting services relating to any phase or this engagement as a whole, and DCM shall provide a reasonable estimate for such additional consulting services and corresponding increases to any applicable billing cap.

Our invoices are due upon receipt, and we will charge a late fee of 1½% per month for invoices outstanding for more than thirty days. With respect to the above-mentioned consulting services, invoices will be presented monthly setting forth a detailed statement of the services rendered, the number of hours worked and by whom (in fifteen-minute increments), the related fees and any associated expenses.

For this engagement, DCM shall use its current analytical tools, including software and other intellectual property, which are likely to be modified as this engagement progresses. DCM shall retain all rights to any software or other type of intellectual property, including its future modifications, owned or developed by or licensed to DCM in connection with this engagement.

Any and all tax consequences, fees, and other liabilities and obligations (as applicable from time to time) arising from the payment of the Consulting Fee or deriving therefrom, shall be borne and paid solely by DCM.

The information provided to CLIENT by DCM through our advisory services reflects our views as well as prevailing conditions as of the date such services are rendered. DCM's opinions, interpretations, and estimates (with regard to technological, financial, regulatory and other areas of domain expertise, and including but not limited to information based upon or provided by third parties) constitute DCM's judgment and should be regarded as indicative, preliminary and for illustrative purposes only. In preparing the information provided in our advisory services, we have relied upon and assumed, without independent verification, the accuracy and completeness of certain information available from public sources or which was provided to us by third parties. In addition, our analyses are not and do not purport to be appraisals or forward looking statements with regard to any of the assets, securities, or businesses of CLIENT or of any other entity. DCM makes no representations as to the value, which may be paid or received in connection with any particular transaction, nor the legal, tax and/or accounting effects of consummating such a transaction.

Nothing in our advisory services should be construed as valuation, legal, tax, accounting or investment advice and it does not constitute a recommendation, solicitation, offer or commitment to purchase, sell or underwrite any securities to you, from you, or on your behalf, or to extend any credit or provide any insurance to you or to enter into any transaction. Unless otherwise agreed in writing, we are not acting as

August 12, 2016
Page 3 of 5

your financial adviser or fiduciary. Before you enter into any transaction you should ensure that you fully understand the potential risks and rewards of that transaction and you should consult with such advisers, as you deem necessary to assist you in making these determinations including but not limited to your accountants, investment advisors, legal and/or tax experts.

DCM represents that it has no conflict of interest that would adversely affect its ability to render professional consulting services pursuant to this letter agreement.  If a conflict does arise, DCM agree and represent that it will keep all communications and information learned from CLIENT confidential.  Likewise, DCM will apprise CLIENT in writing within seven days if any potential conflict of interest does arise.

This letter agreement shall be governed by and construed in accordance with the laws of Fairfield County, Connecticut applicable to contracts made in Fairfield County, Connecticut.  Any dispute shall be subject to arbitration in the State of Connecticut, with arbitration handled by a mutually agreed upon professional arbitrator with binding authority. The costs of arbitration shall be borne by both parties equally.

We are looking forward to a pleasant relationship with you and sincerely hope that we will be able to render the services that you require in a manner that will be of greatest assistance to you. Should you have any questions regarding this letter agreement or our services, please do not hesitate to contact us.

Sincerely,

Haim Bodek
Managing Principal
Decimus Capital Markets, LLC

**AGREED AND ACCEPTED:**

_____          9/9/2016
                                                           **Date**

August 12, 2016
Page 4 of 5

**Appendix A**

Appendix A delineates the goals of the anticipated phases of this project and the tasks that must be undertaken in order to complete each phase.

The purpose of Phase I is to determine whether there is enough evidence from the materials available to us to demonstrate inferior execution quality and hence breaches of the duty of best execution. The required materials would include the data subpoenaed from TD Ameritrade, as well as the data from private data feeds. The estimated range for work hours required to complete Phase I is estimated to be between 350 and 550 hours.

The principal tasks for Phase I include:

- Developing an agreed-upon approach on the measurement of damages, evidence of misleading data, analytical processes to be employed, metrics and data to be evaluated, etc.
- Formatting, processing, and analyzing the execution data and assessing it in the context of best execution reporting that TD Ameritrade has done, including alignment with the tick-by-tick data
- Assessing the execution quality of *non-marketable limit* orders, including measuring distortions created by monetary inducements offered by trading venues, such as liquidity rebates
- Providing further analysis of *non-marketable limit* orders in support of assessing routing/queue priority inefficiencies, as well calculating slippage/harm for estimating damages
- Assessing the executing quality of *market* and *marketable limit* orders and determine the magnitude of adverse selection and estimated harm due to inefficient execution, which is to be further used to request additional data from wholesale market makers
- Evaluating whether customers have received the benefit of monetization of liquidity rebates and whether pass-through features (if any) have been gamed
- Assessing whether harm to customers has been intentional, including possible additional discovery
- Assessing  whether execution quality reports and corresponding disclosures were misleading
- Providing additional expert analysis and advisory services as requested.

The purpose of Phase II is to further identify mishandling of orders by wholesale market makers that have acted on behalf of TD Ameritrade and how such parties have contributed to TD Ameritrade's breaches of its duty of best execution, a task which requires supplemental data from these market participants. The estimated range for work hours required to complete Phase II, which efficiently leverages analytical processes developed in Phase I, is estimated to be between 250 and 400 hours.

The principal tasks for Phase II include:

- Evaluating routing of customer orders by TD Ameritrade to wholesale market makers by analyzing whether TD Ameritrade, as a result of payment for order flow arrangements, has violated its duty of best execution
- Scrutinizing the decision-making process, such as routing decisions, of wholesale market makers themselves by analyzing whether these market participants have breached their own duty of best execution
- Comparing/contrasting individual wholesale market makers in terms of execution quality across different class of orders (e.g. *market* vs. *marketable* limit, internalized vs. routed, etc.)
- Evaluating potential order execution at inferior prices, as well as inefficient routing in terms of fill rates and the corresponding harm from adverse selection

August 12, 2016
Page 5 of 5

- Testing for inappropriate execution delays, inappropriate use of data feeds, inappropriate leakages of information relating to customer orders, and false and misleading execution quality reports
- Determining whether harm to customers has been intentional, including possible additional discovery
- Assessing whether execution quality reports and corresponding disclosures were misleading
- Providing additional expert analysis and advisory services as requested

*Note: In the case of not being able to obtain a complete dataset from wholesale market makers or other sources, the Phase II deliverables will be provided on a best efforts basis.*

The purpose of Phase III is producing specific deliverables for the litigation process. The estimated number of work hours for Phase III is 150 hours.

The principal tasks for Phase III include:

- Creating expert reports addressing issues in the complaint and other submissions
- Developing testimony that would anticipate and respond to potential counterarguments
- Scrutinizing best execution reports supported by quantitative analysis and visual aids
- Creating additional deliverables responding to actual arguments of TD Ameritrade and wholesale market makers
- Delivering testimony in court and responding to questions.