**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-81472-ROSENBERG-REINHART**

In re CELSIUS HOLDINGS, INC.                 CLASS ACTION
SECURITIES LITIGATION
                                            / DEMAND FOR JURY TRIAL

**AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................ 5

III.    THE PARTIES.................................................................................................... 5

      A.      LEAD PLAINTIFF ................................................................................ 5

      B.      DEFENDANTS ...................................................................................... 6

      C.      CONFIDENTIAL WITNESSES.............................................................. 7

      D.      OTHER RELEVANT NON-PARTIES .................................................... 8

IV.     BACKGROUND OF CELSIUS AND THE PEPSI DISTRIBUTION
      AGREEMENT.................................................................................................... 9

      A.      CELSIUS'S HISTORY OF RAPID GROWTH AND LACK OF PROPER
             MANAGEMENT .................................................................................... 9

      B.      CELSIUS ENTERS INTO A DISTRIBUTION PARTNERSHIP WITH PEPSI ....................... 13

      C.      DEFENDANTS PROMOTE THE BENEFITS OF THE PEPSI DEAL WHILE
             WITHHOLDING MATERIAL INFORMATION FROM THE PUBLIC................................. 14

      D.      DEFENDANTS HIDE THE IMPACT OF THE PEPSI DEAL AS ORDERS
             FROM PEPSI EVAPORATE ................................................................. 16

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS DURING THE CLASS PERIOD ..................................... 18

VI.     DEFENDANTS CONTINUED TO MISLEAD INVESTORS AS PARTIAL
      DISCLOSURES OF THE TRUTH BEGIN TO EMERGE ............................. 33

VII.    SUSPICIOUS INSIDER SELLING BY THE INDIVIDUAL DEFENDANTS
      AND OTHER CORPORATE INSIDERS FURTHER INDICATES SCIENTER ......... 39

      A.      EACH OF THE INDIVIDUAL DEFENDANTS ENGAGED IN INSIDER SELLING............... 41

      B.      INSIDER SELLING BY OTHER CORPORATE INSIDERS................................. 44

      C.      DELINQUENT INSIDER TRADING FILINGS AND VIOLATIONS OF THE
             LOCK-UP AGREEMENTS FURTHER INDICATE SCIENTER........................... 47

VIII.   LOSS CAUSATION........................................................................................... 49

IX.     CLASS ACTION ALLEGATIONS ................................................................. 50

X.      NO SAFE HARBOR ......................................................................................................... 52

XI.     PRESUMPTION OF RELIANCE................................................................................... 53

XII.    CAUSES OF ACTION .................................................................................................... 54

XIII.   PRAYER FOR RELIEF .................................................................................................. 57

XIV.    JURY DEMAND ............................................................................................................. 57

Lead Plaintiff the Zarabi Family Trust Dated September 3, 1992 ("Lead Plaintiff"), by and through its undersigned counsel, brings this action individually and on behalf of all others who purchased or otherwise acquired Celsius Holdings, Inc. ("Celsius" or the "Company") securities between May 9, 2023 and November 5, 2024, both dates inclusive (the "Class Period"), and were injured thereby (the "Class").

Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, an investigation conducted by and through its attorneys, which included, among other things, review and analysis of: (a) regulatory filings made by Celsius with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by Celsius; (c) analyst and media reports regarding the Company; and (d) investigative interviews with former Celsius employees. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.      Celsius is an energy drink business run by executives with little regard for following the federal securities laws or reporting truthful information to investors. Celsius has already been sued for securities fraud and as of the beginning of this year the Company is subject to a cease and desist order from the SEC as a result of its failure to maintain needed controls and accurately report information to investors.

2.      Celsius operates in the intensely competitive energy drink sector dominated by far more established and capable market leaders Red Bull and Monster Beverage. Celsius's products are high caffeine drinks that were originally marketed as weight loss beverages aimed at dieters.

1

3.      When Celsius went public in 2007, it struggled as a public company, and eventually was delisted from the NASDAQ in 2012.

4.      In 2008, Celsius attracted an investment from Carl DeSantis, an entrepreneur who previously ran and then sold Rexall Sundown.  Rexall Sundown was a diet pill and vitamin supplement business that found itself in the crosshairs of the FTC for falsely advertising that an herbal diet pill was able to eliminate cellulite without diet or exercise.

5.      Celsius successfully relisted on the NASDAQ in 2016.

6.      With the rise of the energy drink market, Celsius rebranded its products as fat-burning energy and fitness drinks with levels of caffeine that were far higher (sometimes double) than the levels found in comparable offerings from Red Bull and Monster.

7.      On August 1, 2022, Celsius announced a "transformational" distribution agreement whereby PepsiCo, Inc. ("Pepsi") would invest $550 million in the Company and become Celsius's primary U.S. distributor and exclusive Canadian distributor.  The agreement with Pepsi allowed Celsius to report record revenue of $653.6 million in 2022 and $1.3 billion in 2023.  But Celsius records revenue when Pepsi receives the product (the "sell-in"), leaving it to Pepsi to distribute the product to where it will actually be sold to consumers (the "sell-out").

8.      What Celsius insiders knew, but failed to disclose to investors, was that Pepsi had frontloaded a massive inventory – over a year's worth of the Company's drinks – that the Company would immediately report as increased revenue, but would only be distributed by Pepsi and sold to consumers over a much longer period of time.  Yet in their earnings calls and other discussions with analysts and investors, Defendants chose to conflate the sell-in to Pepsi with sell-out to consumers and intentionally misrepresent that the rate of their increase in sales was supported by a corresponding rate of increase in consumer demand.

2

9.      Defendants knew that the increase in sell-in was the result of Pepsi building up their initial inventory, or "pipe fill," because the Company had access to and monitored Pepsi's inventory of Celsius products.  Despite this knowledge, Celsius Chairman and CEO John Fieldly ("Fieldly") falsely told investors in May 9, 2023 that the increase in sales was "***not really a pipe fill***."

10.      Defendants also repeatedly and falsely told investors that the massive increase in sales was reflective of a corresponding increase in consumer demand.  For instance, when asked by an analyst about how much of these new sales were channel fill versus sell-through at retail, Fieldly responded that "the increase in ***distribution didn't slow the overall velocity*** [*i.e.*, sales to consumers].  The sales are moving quicker out of the register."  Similarly, Celsius Chief of Staff Toby David ("David") told investors that "our ***velocities have really maintained with this massive distribution*** that Pepsi has been able to get us out to[.]"

11.      Driven by these and other false statements from Defendants, Celsius stock doubled from $30 per share in May 2023 to $60 per share by August 2023, and continued to climb from $60 per share to over $90 per share by March 2024.

12.      At the same time that Defendants pumped the market with lies to investors, Fieldly, David, Chief Financial Officer Jarrod Langhans ("Langhans"), and other Company insiders collectively dumped nearly ***$1.5 billion*** of their personal holdings in Celsius common stock into the market at times when the price of Celsius's stock was hitting new all-time highs.  None of this massive insider trading was covered by a 10b5-1 trading plan, although many insiders had used such plans when trading prior to the Class Period.

13.      When information contrary to Defendants' growth story began to surface, Defendants stopped their insider selling and attempted to conceal their fraud by placing the blame

on Pepsi.  On May 7, 2024, Celsius announced Q1 2024 results that beat earnings estimates but failed to meet top-line revenue expectations.  Defendants blamed the revenue miss on "offsets" due to "inventory movements" at Pepsi, but falsely reassured investors that "***our partners are at really good inventory levels right now. . . . We feel confident in our inventory levels and confident in the Pepsi inventory levels supporting our growth***."

14.     Eventually, Defendants were forced to reveal that Pepsi had amassed a significant amount of unsold inventory that would materially impact the Company's sales going forward. This information was revealed piecemeal beginning on May 28, 2024, when a Nielsen report on recent retail store trends showed that Celsius's sales growth had slowed.  Celsius stock dropped almost 13% on May 28, 2024 in response to the report.

15.     Then, on September 4, 2024, Fieldly and David attended an analyst conference and dropped the bombshell that sales to Pepsi were ***$100 million to $120 million lower*** than they were a year prior and that Pepsi was "holding to ***several million more cases*** over the past 1.5 years than they really needed to hold[.]"  Celsius stock price dropped another 11.6% in response to the news.

16.     The glut of $100 million to $120 million inventory sitting unsold by Pepsi was staggering, known by Defendants who had access to and monitored Pepsi's inventory, yet withheld from disclosure to public investors.

17.     Assuming that Pepsi paid roughly a $1.15 per can of Celsius (which is in the middle range of estimates of what Pepsi paid), a $100 million shortfall would equate to 86,956,521 unsold cans.  Stacked end-to-end, that would cover 8,577 miles, which is longer than the distance from Boca Raton to New Zealand.

18.     Finally, before the opening of trading on November 6, 2024, Celsius released its third quarter 2024 financial results, which revealed the full impact of Pepsi's glut of inventory.

The slowdown in sales resulted in a 31% decrease in revenue of $119.1 million – close to the upper limit of $120 million that Fieldly and David had revealed on September 4 – from $384.8 million in the third quarter of the prior year to $265.7 million.  Gross profit decreased 37%, from $194.1 million in third quarter 2023 to $122.2 million.  Celsius stock dropped another 5% in response.

19.     As a result of Defendants' actions, billions of dollars of market value were wiped out, causing significant harm to investors.

## II.     JURISDICTION AND VENUE

20.     Lead Plaintiff's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

21.     This Court has jurisdiction over the claims asserted in this complaint pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

22.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act, 15 U.S.C. §78aa.  Celsius is headquartered in Boca Raton and certain acts and conduct complained of herein, including the dissemination to the investing public of materially false and misleading information, occurred in this District.

23.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE PARTIES

### A.     LEAD PLAINTIFF

24.     Lead Plaintiff Zarabi Family Trust is a family trust established on September 13, 1992.  The Zarabi Family Trust purchased Celsius common stock and sold Celsius puts at artificially inflated prices during the Class Period and was damaged thereby.  Lead Plaintiff's

purchases of Celsius common stock during the Class Period are detailed in Exhibit A filed together with this complaint.

       **B.**    **DEFENDANTS**

    25.    Defendant Celsius is a Nevada corporation headquartered in Boca Raton. Celsius develops, processes, markets, distributes, and sells energy drinks and liquid supplements in the United States and internationally. Celsius common stock trades on the NASDAQ under the ticker symbol "CELH," and as of July 30, 2024, the Company had more than 233 million shares issued and outstanding.

    26.    Defendant John Fieldly ("Fieldly") was Celsius's President, Chief Executive Officer ("CEO"), and the Chairman of its Board of Directors ("Board") during the Class Period. Fieldly joined the Company in January 2012 as its CFO, when he was just 31 years old. He served as CFO until March 2017, then interim-CEO and CFO until March 2018. He was named CEO in April 2018 and became Chairman in August 2020. Fieldly during the Class Period made false and misleading statements to investors while in possession of material, non-public adverse information about Celsius and profited from insider selling of Celsius common stock.

    27.    Defendant Jarrod Langhans ("Langhans") was Celsius's Chief Financial Officer ("CFO") during the Class Period. Langhans was hired by the Company as CFO in April 2022, following the retirement of the former CFO, Edwin Negron-Carballo. Langhans during the Class Period made false and misleading statements to investors while in possession of material, non-public adverse information about Celsius and profited from insider selling of Celsius common stock.

    28.    Defendant Toby David ("David") was Celsius's Executive Vice President ("EVP") from the beginning of the Class Period until March 2024, at which point he became Celsius's Chief of Staff. During the Class Period David made false and misleading statements to investors while in

possession of material, non-public adverse information about Celsius and profited from insider selling of Celsius common stock.

29.     Defendants Fieldly, Langhans, and David are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with Celsius, are collectively referred to as "Defendants."

C.     CONFIDENTIAL WITNESSES[1]

30.     CW1 worked as revenue manager in the Cash Management Department at Celsius from April 2023 until December 2024.  According to CW1, the Cash Management Department handled Celsius's accounts payable and accounts receivable.  CW1 worked on "anything revenue related," including pricing strategy and overseeing accounts receivable.  CW1 reported to Senior Vice President of Finance and Accounting Feng Liang, who in turn reported to Langhans.

31.     CW2 worked at Celsius from March 2021 until January 2024.  CW2 worked in the Finance Department as an accounts receivable coordinator[2] until June 2022, when he transferred to the Information Technology Department to work in a role that interfaced with the Finance, Operations, and Sales departments.  As part of his duties as an accounts receivable coordinator, CW2 processed order entries, invoiced customers, and applied payments.  In his role in the Information Technology Department, CW2 oversaw programs that coordinated order entry and invoicing functions.  During his time in the Finance Department, CW2 reported to Aida Washington, who was the Director of Accounts Receivable.  CW2's indirect superior when he

---

[1] Confidential Witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.).  All CWs will be described in the masculine regardless of their actual gender to protect their identities.

[2] As described in more detail below, at the time that CW2 worked as an accounts receivable coordinator, the Finance Department did not differentiate between various accounting functions such as order processing, invoicing, and cash management.

worked in Information Technology was Grace Clarke, who served as Celsius's Vice President of Information Technology.

32.     CW3 worked at Celsius performing inventory audits.  He worked at Celsius from the summer of 2022 until fall 2024.  CW3 worked remotely but travelled to Celsius headquarters for a few days approximately once a month for "training and reconciliation."  CW3's main responsibility involved performing monthly physical audits of warehouses that stored Celsius products for sale and distribution.  CW3 counted bins and pallets that held product, estimated the quantity of product stored, and then compared those numbers with reports from warehouse management.  CW3 also reviewed sales orders in Celsius's Enterprise Resource Planning ("ERP") software – Microsoft Dynamics GP (formerly called Great Plains) – to reconcile orders and shipments each month.  Additionally, CW3 provided audit reports to a third-party auditor for year-end audits.

### D.     OTHER RELEVANT NON-PARTIES

33.     Carl DeSantis was an investor who, starting in 2008, bankrolled Celsius and became the Company's largest stockholder through affiliated entities that he controlled.  By the start of the Class Period, C. DeSantis, though CD Financial, LLC ("CD Financial"), CDS Ventures, LLC ("CDS Ventures"), GRAT 1, LLC, the Carl DeSantis Retained Annuity Trust 2, and the Carl Angus DeSantis Foundation, beneficially owned just under 18 million Celsius shares of Celsius common stock, representing a 23.4% equity stake in the Company.  Carl DeSantis had previously founded Rexall Sundown, a vitamin supplement and diet pill business.  Carl DeSantis died on August 10, 2023.

34.     Damon DeSantis, Dean DeSantis, and Deborah DeSantis are Carl DeSantis's children.  Damon DeSantis is the former CEO of Rexall Sundown and has been a member of the Celsius Board since August 2021.  Damon DeSantis has shared control of the Celsius common

stock owned by CD Financial and CDS Ventures. Damon DeSantis, Dean DeSantis, and Deborah DeSantis are trustees of a trust that owns CD Financial.

35.     William H. Milmoe ("Milmoe") is the President of Carl DeSantis's family office, the manager of CD Financial, and a trustee of the trust that owns CD Financial. He was Chairman of Celsius's Board until 2021, when Fieldly became Chairman.

36.     Carl DeSantis, Damon DeSantis, Dean DeSantis, Deborah DeSantis, Milmoe, CD Financial, CDS Ventures, GRAT 1, LLC, and Carl DeSantis Retained Annuity Trust 2 are collectively referred to as the "DeSantis Affiliates."

## IV.    BACKGROUND OF CELSIUS AND THE PEPSI DISTRIBUTION AGREEMENT

### A.    CELSIUS'S HISTORY OF RAPID GROWTH AND LACK OF PROPER MANAGEMENT

37.     Celsius was incorporated in 2005 under the name "Vector Ventures, Inc." It changed its name to Celsius Holdings, Inc. in December 2006 and in January 2007 went public through a reverse merger with a publicly traded beverage company that had introduced Celsius-branded beverages in 2005.

38.     Carl DeSantis, through CDS Ventures, started investing in Celsius in August 2008. DeSantis founded Rexall Sundown, a business that was accused at various times of engaging in a multi-level marketing/Pyramid scheme and falsely advertising its vitamin supplements and diet pills. Carl DeSantis cashed out and sold Rexall Sundown in May 2000. In July 2000, Rexall Sundown was sued by the FTC for deceptive acts or practices in advertising and marketing an herbal diet pill supplement as formulated to "eliminate" cellulite "without diet or exercise." Rexall Sundown later paid a $12 million fine to the FTC and agreed to consent order and permanent injunction to settle the case.

39.     Carl DeSantis recruited a new management team to turn Celsius around, which included hiring Fieldly to join the Company in January 2012 as CFO.  At the time, Celsius was a penny stock operation tagged with a going concern opinion from its accountants and was delisted from the Nasdaq.  Celsius successfully re-registered in 2016.

40.     The turnaround included shifting the marketing strategy for the Company's products. Celsius's beverages have high levels of caffeine, for which the Company at different times claimed provided various health benefits.  Celsius originally marketed the beverages as weight loss drinks but then pivoted to a fitness and energy message.  The Company's flagship product is now promoted as a no-sugar beverage that claims to accelerate metabolism and burn body fat while providing energy. The Company distributes its products through direct-to-store delivery, supermarkets, convenience stores, drug stores, nutritional stores, and mass merchants, as well as health clubs, gyms, the military, and e-commerce websites such as Amazon.

41.     The energy drink segment that Celsius operates in is highly competitive and dominated by Monster Beverage and Red Bull, who collectively control more than 80% of the market. Over the past several years Celsius has been able to crack into the market by marketing its beverages as sugar-free, calorie-burning fitness drinks with caffeine levels far higher (sometimes double) than those found in comparable products from Red Bull and Monster.

42.     Since 2021, Celsius delivered average sales growth of over 100%.  Celsius's $314.3 million in revenues in 2021 was more than double the $130.7 million that it earned in 2020.  Then, in 2022, Celsius again more than doubled its sales to the tune of $653.6 million, which again doubled to $1.3 billion in 2023.  This trajectory delighted investors and financial analysts alike.

43.     But while having successfully reported recent year-over-year doubling in reported revenue, internally the Company was still operated in a manner that a former employee described as "super shady."

44.     As recently as 2022, Celsius and Fieldly were defendants in a securities fraud class action alleging violations of the Exchange Act for a scheme involving improper accounting. *City of Atlanta Police Officers' Pension Plan, et al., v. Celsius Holdings, Inc. et al.*, No. 22-80418-CV-MIDDLEBROOKS (S.D. Fla.).  After the Court mostly denied those defendants' motion to dismiss (*id*. at ECF No. 62), the parties settled the case for $7.9 million, which was approved in 2024 (*id*. at ECF No. 129).

45.     Celsius was also the defendant in state and federal consumer fraud class actions alleging that Celsius falsely advertised its products as "preservative free."  A $7.8 million settlement in that case was approved by the Court in April 2023, and also included Celsius's agreement to correct its deceptive advertising. *See Hezi et al v. Celsius Holdings, Inc*., No. 21-cv-9892-JHR (S.D.N.Y.) at ECF 56; *see also Prescod v. Celsius Holdings, Inc*., Case No. 19STCV09321 (Cal. Super. Ct.).

46.     In January 2025, Celsius entered into a cease-and-desist consent order with the SEC and paid a $3 million civil penalty to the SEC.  *See In the Matter of Celsius Holdings, Inc*., Administrative Proceedings File No. 3-22429 (Jan. 7, 2025).  The SEC determined, and the Company chose not to dispute, that "[f]rom at least September 2019 until August 2023, Celsius failed to maintain disclosure controls and procedures designed to ensure that non-financial information required to be disclosed in the company's reports was recorded, processed, summarized, and reported within the time periods specified in the Commission's rules and forms. During this period, Celsius did not have established or written controls or procedures relating to

the company's non-financial disclosures."  The violations included improper accounting for stock-based compensation expenses and failure to maintain internal accounting controls, among other things.

47.     Finally, in February 2025, Stephen George, who worked in Celsius's finance department until April 7, 2023, pleaded guilty to one count of securities fraud based on insider trading of Celsius stock and options.  *See U.S. v. Stephen George*, No. 25-CR-60011-WPD (S.D. Fla), ECF No. 14.

48.     Throughout the Class Period, Defendants continued to operate in a haphazard way with seemingly little to no regard for the potential for negative consequences.

49.     CW1 observed that the Company's Finance Department operated "like the Wild Wild West."  He noted that there was a "huge lack of professionalism," and that the "lack of leadership and the lack of professionalism makes it so the financials are inaccurate."

50.     CW2 echoed CW1's recollection of a lack of proper structure and controls in the Finance Department.  In his role as an accounts receivable coordinator, he was assigned to process order entries, invoice customers, and apply payments.  CW2 noted that standard accounting protocols should have precluded him from applying payments to orders that he took and that the fact that he was able to do so was a "big red flag" as well as a potential Sarbanes-Oxley Act violation.  CW2 remembered bringing the issue up to his supervisor Washington as well as then-CFO Edwin Negron.  CW2 eventually left Celsius because he did not think the Company was being well-managed.

51.     Celsius's lack of proper management also extended to the inventory side of its operations.  CW3 described Celsius as "super shady."  CW3 "questioned the demand planning" at Celsius because there was excessive inventory in many of the storage facilities.  CW3 recounted

that the warehouses were "overstuffed"; warehouse management would complain to him that the product "was not moving" and their facilities were at "110 percent capacity." According to CW3, some of the facilities had to improvise storage space for Celsius product, stacking it haphazardly in bins in the aisles because the designated storage space was full. When CW3 approached his superior, an accounting manager, to ask why "product was sitting there four, five, six months," the superior dismissed his question. CW3 noted that he had previously worked in the beverage and bottling industry and did not witness such a situation.

### B. CELSIUS ENTERS INTO A DISTRIBUTION PARTNERSHIP WITH PEPSI

52.     Celsius continued to race toward more sales and market share as it continued to fall behind in implementing necessary internal controls and procedures. The Company received a significant boost when it entered into a long-term distribution agreement and a separate transition agreement (together, the "Distribution Agreement") on August 1, 2022 with Pepsi. Under the Distribution Agreement, Pepsi would become Celsius's primary distributor in the United States and its exclusive distributor in Canada, using its extensive network of retail and foodservice channels. Pepsi also gained the option to become the preferred distribution partner for Celsius in other international markets. According to CW1, prior to the Distribution Agreement, Celsius distributed its products through a network of approximately 500 distributors in North America. In connection with the Distribution Agreement, Celsius terminated around 80% of its various agreements with existing distributors to transition certain territory rights to Pepsi.

53.     Pepsi also made a significant investment in Celsius as part of the Distribution Agreement, acquiring just under 1.5 million shares of convertible preferred stock – known as Series A Preferred Stock – for approximately $550 million, representing a roughly 8.5% ownership stake in Celsius on an as-converted basis and with the preferred shares entitled to a 5% annual dividend.

13

54.     Celsius would be able to use the $550 million cash to fund growth in the highly competitive market dominated by two far larger and more established brands.  Pepsi would be able to participate in any upside in the market value of Celsius by converting the Series A Preferred Stock into a direct 8.5% ownership interest.  Pepsi would also be protected against downside risk through Celsius's payment of the 5% annual dividend.  The transaction also resulted in Celsius increasing its Board size by one member to allow Pepsi to appoint Pepsi deputy CFO James Lee to serve on Celsius's Board.

55.     The Distribution Agreement included separate lock-up agreements (the "Lock-Up Agreements") whereby all of the Company's executive officers and Board members (other than the newly appointed Pepsi CFO James Lee) agreed not to sell any shares for until the after the one-year anniversary of the Distribution Agreement passed on August 1, 2023.  Because Fieldly and Langhans were contractually prevented from selling shares during this time, they had motive to keep Celsius's stock price inflated through the end of the lock-up period, when they would be able to sell their shares.

C.     **DEFENDANTS PROMOTE THE BENEFITS OF THE PEPSI DEAL WHILE WITHHOLDING MATERIAL INFORMATION FROM THE PUBLIC**

56.     After entering into the Distribution Agreement, Defendants touted the anticipated benefits to investors.  In a press release issued the same day that the Distribution Agreement was signed, Fieldly stated that the agreement "provides a strategic partnership that is expected to accelerate growth for both companies globally."  An attachment to a press release issued by Celsius eight days later on August 9, 2022 identified the deal as a "[t]ransformational opportunity to gain immediate scale and accelerate market share" and noted that the agreement was "expected to add significant topline scale and accelerate growth."

57.     The market responded positively to this news.  Roth Capital Partners noted that the deal would accelerate Celsius's expansion and "expect[ed] this deal to be accretive to CELH." Likewise, UBS noted that the Distribution Agreement "will accelerate market share gains across channels," and that there were "obvious top line implications from the transaction[.]"

58.     The impact of the deal with Pepsi was immediately noticeable.  Celsius's revenues grew from $653.6 million in 2022 to $1.318 billion in 2023, an increase of 102%.  The Company credited its rapid revenue growth to increased revenues from North America, where 2023 revenues were over $1.2 billion, an increase of $645.9 million, or 105%, from 2022.  During an earnings call on February 29, 2024 regarding Celsius's Q4 2023 and year end 2023 results, Langhans "attribute[d] our sales volume growth for the quarter compared to 2022 to several key drivers, including successful integration into the Pepsi distribution system, which has resulted in broader availability, increased SKU mix, and improved placement."[3]

59.     On this news, Celsius stock increased over 20%, from $67.77 to $81.62 per share. Analysts took note of the Company's strong results.  TD Cowen noted that Celsius was "well-positioned to drive continued top-line growth from increased velocity and depth of distribution," while Roth MKM noted that the results were "well above consensus, driven by . . . continued expansion of distribution, increased shelf space in existing customers, and high retail sales velocity."

60.     Because Celsius recognized revenue at the time that Pepsi received the product from Celsius rather than when Pepsi sold Celsius's products to customers, investors could not have known the extent to which this explosion in sales was the result not of organic customer demand, but rather a one-time buildup of inventory "sold" to Pepsi.

---

[3] SKU" means Stock-Keeping Unit.  Every type of product the Company sells has a unique SKU, so that Celsius can monitor and analyze the movement, storage, and sale of its various products.

61.     Unlike the public, Defendants knew that there was a massive glut of Celsius products sitting unsold in Pepsi's warehouses because Defendants had access to Pepsi's inventory data.  Pepsi used SAP[4] as its ERP platform, and CW1 and CW2 both confirmed that Celsius had access to Pepsi's ERP SAP.  According to CW1, Celsius's ERP (Microsoft Dynamics GP) was a "very antiquated system" that "did not speak with" SAP.  Therefore, considering the importance of providing Celsius personnel with on demand access to Pepsi's SAP in order to monitor inventory, Celsius finance employees were provided with direct "cloud logins for [Pepsi's] SAP."  CW1 recalled that through SAP, Zachary Lessman, who served in various senior roles in Celsius's Accounting Department, could monitor Pepsi's on-hand inventory of Celsius products.  CW2 recounted additional individuals who likely had access to Pepsi's SAP, including Washington, Customer Service Manager Justin Hudacko, and Vice President of Operations John Huston.  Fieldly himself acknowledged during Celsius's February 29, 2024 earnings call that Celsius "look[s] at [Pepsi's] inventory levels[.]"

### D.     DEFENDANTS HIDE THE IMPACT OF THE PEPSI DEAL AS ORDERS FROM PEPSI EVAPORATE

62.     Orders from Pepsi began to decline in 2023, presenting a challenge to Celsius's growth story.  CW3 recounted that when he started working at Celsius in August 2022, there was "a lot of talk" about Pepsi and that he was told Celsius was "getting a lot of Pepsi orders[.]"  However, CW3 noticed that discussion about fulfilling Pepsi orders "fizzled" after four or five months.

63.     CW2 related that in September or October 2023, Hudacko, who at the time was responsible for entering Pepsi orders into Microsoft Dynamics GP, mentioned that there had been a

---

[4] SAP is a software company known for its ERP software.

reduction in Pepsi orders.  According to CW2, Hudacko told him something to the effect of, "The orders are not coming in as they used to."  CW1 confirmed that the "inventory sat and didn't sell."

64.     Celsius's upper management, including each of the Individual Defendants, knew of the slowdown in orders from Pepsi.

65.     For example, CW1 attended monthly "All Call" meetings that were attended by Fieldly, Langhans, and finance managers.  During these meetings, Greg Caton, who was at the time the Financial Planning and Analysis Manager, would present slides that he prepared that contained year-over-year financial data, including revenue, EBITDA, and adjusted EBITDA.  According to CW1, this data was broken down by distribution channel, including a specific graph for Pepsi.

66.     Defendants were also made aware of the decline in sales to Pepsi through a "Daily Sales Report."  CW2 recalled that the "Daily Sales Report" was a spreadsheet that contained data on all of the orders that were entered into Microsoft Dynamics GP each day.  The report included a breakdown of sales by distributor, including Pepsi, and the email circulating the report occasionally included broader sales data or historical context.  CW2 knew from occasionally being copied on the email that sent the Daily Sales Report around that the "executive team," including Fieldly and Langhans, as well as most senior managers received the report on a daily basis.  CW2 said it was likely that David also received the Daily Sales Report because he was a senior "deal guy."

67.     Defendants also knew that Pepsi's orders had slowed and that Pepsi was sitting with a glut of inventory it had because Defendants monitored Pepsi's inventory through SAP.  Celsius was also aware of the amount of time that Celsius products sat in Pepsi's warehouses unsold.  According to CW1, the Operations Department would provide the Finance Department with an "aged inventory analysis" that documented product that had been sitting unsold in various distribution centers, including those of Pepsi.

68.     Despite these impediments, Defendants continued to tout the Company's partnership with Pepsi and the resulting (temporary) increase in sales.  Defendants concealed the true nature of Pepsi's early purchases and falsely told investors to believe that Celsius's sales represented an ongoing demand for the Company's products.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

69.     The Class Period begins on May 9, 2023, when Celsius announced its earnings and financial results for the first quarter of 2023.  The Company's earnings release announced "record first quarter revenue of $260 million, up 95% from $133 million in the prior year first quarter, driven predominantly by North American revenue, which increased 101% to $249 million, up from $124 million in the prior year first quarter."  After issuing the earnings release, Celsius held an earnings call with investors.  During the call, Langhans reiterated the financial results and noted that "*[t]he primary factors behind the increase in North American sales volume were related to our integration into the Pepsi distribution system*, where we saw increases across the board, including continued strong growth in traditional distribution channels including SKU increases, as well as distribution across a number of new channels within CNG and foodservice.  *We've also seen our velocity increase post our significant ACV growth*."[5]  In other words, Langhans attributed the Company's 101% growth in North American sales to the benefits of Pepsi's distribution system.

---

[5] "SKU increases" refers to the process of adding new variations of a product or new product lines, such as when a retailer or distributor increases the number of products (SKUs) that it offers to consumers.

"CNG" refers to convenience and grocery stores.

"Velocity" refers to sales per points of distribution, and is a metric used to measure consumer demand.

"ACV" means All Commodity Volume, and is a measure of distribution coverage to show how deeply a product has penetrated a particular geographic market.

These benefits included stores carrying a wider variety of Celsius products as well as new stores (such as convenience stores, groceries, and food service locations) selling Celsius. Langhans then noted that this increase in distribution resulted in increased sales to consumers.

70.     Langhans's statement attributing the increases in velocity and ACV growth to "our integration into the Pepsi system" was false and misleading when made. By May 2023, Pepsi had already completed or was in the height of infilling its inventory. Because Celsius records revenue at the time that Pepsi receives its orders, this boosted the Company's reported revenue as well as sales. Langhans's touting of the benefits of the Pepsi agreement together with his exhortation of Celsius's "increased velocity" was designed to mislead investors to believe that the rate of growth in velocity was the same as the rate of growth in revenue and sales. But the volume of sales to Pepsi ("sell-in") at this time far exceeded sales to consumers ("sell-out") and represented a one-time buildup of stock that would not be repeated in the future. As a result, Celsius's increased sales that Langhans was touting overrepresented the demand for Celsius's products at that time and concealed the massive glut of inventory that was sitting in Pepsi's warehouses to be sold over a much longer period of time. By electing to speak publicly about the Pepsi agreement, Celsius's growth in sales and other financial metrics resulting from sales to Pepsi pursuant to that agreement, and the increase in sales to consumers, Langhans failed to fully, completely, and truthfully disclose all material facts regarding the nature of those sales so as to not mislead investors.

71.     During the same call, an analyst with B. Riley asked Fieldly and Langhans about the Pepsi partnership, questioning "how much of the Q1 reacceleration of growth was initial channel fill for new stores, new doors call it, added SKUs, etc., *versus reorders derived from sell-through at retail*." The analyst continued, asking "how much [did] the initial channel fill impact[] new doors, new SKUs in the quarter? And then maybe what impact that phenomenon might have

in Q2?"  In response, Fieldly asserted that "***the increase in distribution didn't slow the overall velocity.  The sales are moving quicker out of the register***."

72.     Fieldly's response that "distribution didn't slow the overall velocity" and "sales are moving quicker out of the register" was false and misleading when made.  The analyst had directly questioned the differentiation between growth from the sell-in to Pepsi ("channel fill") versus sell-out to consumers ("sell-through at retail").  Fieldly's unqualified positive response was designed to mislead investors to believe that the rate of growth in sales was the result of a similar rate of increase in consumer demand, rather than Pepsi building up its inventory.  However, as Defendants later admitted, Pepsi was in fact holding on to over a hundred million dollars' worth of excess inventory.  At the time of Fieldly's statement, Pepsi had already completed or was in the height of infilling its inventory.  Fieldly's misrepresentation of the known magnitude of sales that were attributable to this infill misled investors into believing that the rate of growth of sell-out was the same as the rate of growth in revenue and sales.  The sell-in to Pepsi at this time far exceeded sell-out and represented a one-time buildup of stock that would not be repeated in the future.  Fieldly's response overrepresented the demand for Celsius's products at that time and concealed the massive glut of inventory that was sitting in Pepsi's warehouses.

73.     Later in the call, a Bank of America analyst asked about the impact of Pepsi filling their pipeline on Celsius's first quarter results.  Fieldly responded that "***It is <u>not</u> really a pipe fill*** in the quarter I would say, we just to continue to build upon the momentum."

74.     As with his response to the question from the B. Riley analyst, Fieldly's statement that sales to Pepsi were "not really a pipe fill" and that Celsius "continue[d] to build upon the momentum" was knowingly false and misleading when made.  The sell-in to Pepsi at the time Fieldly made this

20

statement far exceeded sell-out and represented a one-time buildup of stock that would not be repeated in the future, as Fieldly well knew.  It was exactly a "pipe fill."

75.     Furthermore, by denying that Celsius's sales to Pepsi were pipe fill and then stating that Celsius was "build[ing] upon the momentum[,]" Fieldly falsely led investors to believe that the rate of growth in sell-out was the same as the rate of growth in revenue and sales.

76.     On June 1, 2023, Celsius held its annual shareholders meeting where Defendants presented financial highlights from 2022 and Q1 2023.  The presentation noted that the Company's revenue in 2022 was $653.6 million, up 108% from $314 million in 2021, with domestic revenue increasing 126% from $273.0 million in 2021 to $617.5 million, and attributed the "transition to the Pepsi distribution network" as a "primary factor[] behind the increase in Domestic sales."  The presentation also reiterated the financial results that had been reported on May 9, 2023.

77.     During the meeting, Langhans said: "***The primary factors behind the increase in North American sales volume were related to our integration into the Pepsi distribution system*** where we saw increases across the board, including continued strong growth in traditional distribution channels, including SKU increases as well as distribution across a number of new channels within CNG and foodservice."  Langhans continued, "Q1 was the second quarter that we were operating within our new distribution system, and we continue to drive efficiencies and optimization within the system while maintaining our #1 goal of ***keeping the shelf stocked in order to meet the consumer demand***."

78.     Langhans's statement that Celsius was "maintaining our #1 goal of keeping the shelf stocked in order to meet the consumer demand" in relation to "operating within our new distribution system" was false and misleading when made.  Langhans began his statement by touting the Pepsi distribution system as "the primary factors [*sic*] behind the increase in North American sales volume

. . . ." He then referred back to this distribution system when he spoke of meeting consumer demand. By touting Celsius's financial achievements in sales and revenue, attributing those achievements to Pepsi's distribution system, and then noting how the distribution system contributed to consumer demand and "keeping the shelf stocked," Langhans misled investors into believing that Celsius's increased sales were reflective of a similar increase in sell-out. However, the truth was that Celsius's sales reflected a one-time buildup of stock that would not be repeated in the future. Celsius's increased sales that Langhans was touting thus overrepresented the demand for Celsius's products at that time and concealed the known massive glut of inventory that was sitting in Pepsi's warehouses.

79. During closing remarks, Fieldly stated: "Celsius continues to outpace the category growth. We completed a Pepsi distribution partnership, which has opened up and expanded upon opportunities. *We're seeing resounding consumer demand* on our trend-forward position in the energy category. *We're rapidly growing revenues and profits*."

80. Fieldly's statement that Celsius was "seeing resounding consumer demand" while it was "rapidly growing revenues and profits" was false and misleading when made. As was the case with Langhans's statement, Fieldly couched his mention of increased consumer demand in the context of the Distribution Agreement and its resulting growth in sales and revenue. But Fieldly concealed that the growth in sales and revenue were the result of Pepsi filling its warehouses far beyond what was necessary to meet consumer demand. As a result, Fieldly fraudulently caused investors to believe that the Company's growth in sales and revenue represented a corresponding growth in sales at the register, which was not the case.

81. On August 8, 2023, Celsius released its financial results for the second quarter of 2023. The release trumpeted "record second quarter revenue of $326 million, up 112% from $154

million in the prior year second quarter." It also heralded growth in North American revenue of 114% to $311 million from $145 million in the prior year's second quarter.

82.     In addition to the earnings release, the Company held an earnings call to discuss its Q2 2023 financials. During the prepared remarks, Fieldly touted Celsius's increase in ACV "to a record of 96.8% versus 79.8% in the year ago period, which is a tremendous achievement by our teams and our partner with PepsiCo." Langhans then stated during his prepared remarks:

> The acceleration of growth relative to Q1 in North America sales volume can be attributed to several key factors. ***A primary driver has been our successful integration into the Pepsi distribution system***, which has resulted in continued growth. Notably, we have experienced consistent and robust expansion in traditional distribution channels and club channels with SKU increases and SKU placement contributing significantly. Moreover, our products have found their way into several new channels within [CNG] and foodservice, further fueling the sales growth. Additionally, ***following substantial growth in our ACV, we have observed a notable increase in product velocity***.

83.     Langhans's statement was false and misleading when made. As he did in prior statements, Langhans referenced financial and sales metrics that had been reported to the market and then explicitly informed investors that those metrics were the result of Celsius's Distribution Agreement with Pepsi. Langhans then lauded the Company's growth in "velocity," *i.e.*, sales to consumers, signaling to the market that the rate of growth in velocity was apace with the rate of growth in Celsius's other reported metrics, including sales and ACV. By electing to speak publicly about the Distribution Agreement, Celsius's growth in financial and sales metrics resulting from the sales to Pepsi pursuant to that agreement, and the increase in sales to consumers, Langhans had a duty to fully, completely, and truthfully disclose the material facts regarding the nature of those sales so as to not mislead investors.

84.     Fieldly's and Langham's false statements and misleading responses to analyst questions regarding the first and second quarters of 2023 successfully hid truthful information from

the public in order to maintain and increase the price of Celsius stock past the expiration of the Lock-Up Agreements on August 1, 2023.

85.     Having pumped the market with false information, the Individual Defendants started to dump Celsius stock at fraud-inflated stock prices starting in August 2023.  After the Lock-Up Agreements expired, between August 21, 2023 and August 22, 2023, Fieldly sold 270,000 shares for almost $15.7 million; Langhans sold 15,807 shares for $944,333; and David sold over 164,000 shares for nearly $9.8 million on a split-adjusted basis.[6]  These amounts were enormous windfalls to the Individual Defendants.  Fieldly's compensation from Celsius in 2023, including all salary, bonus, stock/option awards, and incentive plan compensation, was just over $3.2 million in total.  His stock sales in August 2023 alone were nearly five times his total 2023 compensation.  Langhans's insider selling and David's insider selling were also significant in comparison to their total 2023 compensation of $1,685,144 and $867,903, respectively.  This insider selling – like all of the insider selling the Individual Defendants and others engaged in during the Class Period – was not conducted pursuant to a 10b5-1 trading plan.  Instead, it was a raw, opportunistic effort to sell shares at fraud-inflated prices.

86.     Fieldly and Langhans continued their pattern of keeping the market pumped with false information in order to allow for more insider selling.

87.     On November 7, 2023, Celsius released its financial results for the third quarter of 2023, reporting "record third quarter revenue of $385 million, up 104% from $188 million for the prior year third quarter, driven predominantly by North American revenue, which increased 107% to $371 million, up from $180 million for the prior year third quarter."

_____

[6] All figures relating to insider transactions throughout this complaint have been adjusted to reflect the three-for-one stock split Celsius announced on November 2, 2023, which became effective as of the close of trading on November 13, 2023.

88.     After issuing the earnings release, the Company hosted its Q3 2023 earnings call. During the call, Langhans assured investors that "Not only are we **continuing to benefit from the distribution system of Pepsi**, but we're also delivering on increased SKU count, improved placement, increased displays and **continuous improvement within velocities**." He continued:

> **We attribute our sales volume growth for the quarter compared to 2022 to several key drivers, including a successful integration into the Pepsi distribution system**, which has resulted in broader availability, increased SKU mix and improved placement.

89.     Langhans's statements were false and misleading when made because he once again attributed Celsius's increase in sales volume to the Distribution Agreement with Pepsi and further linked that growth to sales to consumers. By doing this, Langhans conflated Celsius's sell-in to Pepsi with sell-out, giving investors the misleading impression that Celsius was experiencing growth in sales to consumers at the cash register at the same rate as it was experiencing massive growth in sales because of the pipe fill to Pepsi. This was not the case, and Langhans's intentional failure to make this distinction provided the market a false impression of consumer demand for Celsius.

90.     On November 15, 2023, David attended the Stephens Investment Conference, where a Stephens analyst asked David to "offer us some thoughts on how that [Pepsi] partnership has helped fuel your growth and really kind of the incremental opportunity that, that brings to distributing the brand?" David replied that "being able to rotate is really the key, and that's where ultimately it comes down to your marketing. And I think what people have seen is **our velocities have really maintained with this massive distribution that Pepsi has been able to get us out to**, especially within the independents."

91.     On December 6, 2023, Celsius attended Morgan Stanley's Global Consumer Conference. During the conference, a Morgan Stanley analyst commented on "the strength in your velocity at the same time that you've massively increased distribution." The analyst continued,

"Pretty unusual in the CPG space to see that, after an initial dip, that it really accelerated as strongly as it did.  How do you explain that or **what do you think drove that acceleration in velocity** as you got into the second and third quarter of this year?"[7]  David replied, "[W]e've got a great marketing team, a great sales organization that was able to **wire into the Pepsi system** in a really fantastic way where we didn't see any disruption.  From a merchandising standpoint, **Pepsi is best-in-class, keeping us in-stock, inventory levels**, getting us incremental placements, whether it's helping on the displays or end caps, getting into the Pepsi coolers was really beneficial for us like when you go to a Walmart near the checkout."

92.     David's statements on November 15 and December 6, 2023 were false and misleading when made.  By announcing that the Company's velocities had "maintained" with Pepsi's "massive" distribution and attributing "acceleration in velocity" to Pepsi "keeping us in stock, [and] inventory levels," David equated Celsius's growth in sales to consumers with growth in the distribution of Celsius's products that resulted from the Distribution Agreement.  Unlike Defendants however, investors did not have knowledge of the amount of Celsius product that Pepsi was actually distributing to consumers.  The only information Celsius provided to the market was the Company's overall financial and sell-in figures.  The fact that an enormous portion of those sales was sitting unsold in Pepsi's warehouses was concealed.  David's touting of Celsius's "velocities" thus overrepresented the demand for Celsius's products at that time.

93.     Insider selling by the Individual Defendants continued along with their efforts to mislead investors about the Company's Q3 2023 performance.  Between December 5, 2023 and January 3, 2024, Fieldly sold 327,334 shares for over $17.3 million; Langhans sold 2,401 shares for

---

[7] "CPG" refers to Consumer Packaged Goods, which generally refers to merchandise that consumers use and replace on a frequent basis, and includes food and beverages, household cleaning products, and the like.

$136,185; and David sold 10,809 shares for over $613,000.  Once again, the Individual Defendants failed to conduct their trading pursuant to a 10b5-1 trading plan.

94.     On February 29, 2024, before trading opened, Celsius issued an earnings release announcing its financial results for the fourth quarter ended December 31, 2023 and full year 2023. The release highlighted 4Q 2023's record revenue of $347 million, up 95% from $178 million for the prior year fourth quarter, driven predominantly by North American revenue, which increased 97% to $333 million, up from $169 million the prior year.  The earnings release quoted Fieldly stating that the "record revenue" was "***driven by expanded availability of our products*** and increased consumer awareness.  We continued to drive growth of the category by ***bringing in new loyal consumers***, as well as increasing consumption occasions . . . ."

95.     The same day, the Company hosted a conference call to discuss its 4Q 2023 and full year 2023 results.  During the call, Langhans "***attribute[d] our sales volume growth for the quarter compared to 2022 to several key drivers, including successful integration into the Pepsi distribution system***, which has resulted in broader availability, increased SKU mix, and improved placement."

96.     Fieldly and Langhans again engaged in opportunistic insider selling just days after their false and misleading statements to analysts drove the price of Celsius common stock to all-time highs.  Celsius common stock jumped over 20% on February 29, 2024 in response to the announcement of 4Q 2023 and full year 2023 results, to close at $81.62 per share that day.

97.     On March 4, 2024, Fieldly and Langhans sold shares as Celsius common stock hit new all-time high prices: Fieldly sold 119,604 shares at an average price $85.07 per share for over $10.1 million in proceeds and Langhans sold 5,500 shares at an average price $85.61 per share for $407,855.  None of these trades were pursuant to a 10b5-1 trading plan.  This was also Fieldly's last Class Period sale, right before Celsius began disclosing information to the market that

27

incrementally revealed weaknesses in Celsius's deal with Pepsi, which ultimately led to the exposure of Defendants' fraud.

98.     Three weeks later, on March 26, 2024, the Company filed an 8-K with the SEC to disclose that Pepsi and Celsius had entered into an Amendment No. 1 to the Distribution Agreement (the "Incentive Amendment") on March 23, 2024.  Although the document is heavily redacted, Celsius announced that the Incentive Amendment "will provide [Pepsi] with an incentive program, as set forth in the Amendment, designed to incentivize and compensate [Pepsi] for its continued focus on and actions to support the Licensed Products in the Territory, as such terms are defined in the Agreement."  Notably, Celsius agreed to make the Incentive Agreement retroactive to January 1, 2024.  This means that the recent insider selling by Fieldly and Langhans on March 4, 2024 was completed at then all-time high prices in a market unaware of the need to better incentivize Pepsi and to do so retroactive to January 1.

99.     Before the opening of trading on May 7, 2024, Celsius issued an earnings release announcing its financial results for the first quarter ended March 31, 2024.  The release once again emphasized the Company's "[r]ecord first quarter revenue of $355.7 million, up 37% year over year," "[r]ecord first quarter gross profit of $182.2 million, up 60% year over year," and its "[f]irst quarter diluted EPS of $0.27, up 108% year over year."

100.    For the first time, Defendants partially revealed a discrepancy between the long-touted benefits of the Pepsi agreement and their reported financial results.  Despite the Company's record performance, the release disclosed that revenues were "offset" by "inventory movements" within Celsius's "largest distributor where first quarter 2024 inventory days on hand declined versus the fourth quarter resulting in an approximate $20 million impact, while first quarter 2023 revenue benefited from

an inventory buildup of approximately $25 million."[8]  However, Defendants continued to mislead investors as to the causes and significance of that discrepancy by continuing to perpetuate their (false) growth narrative.

101.    Langhans also stated in the earnings release that "Celsius' first quarter revenue of $356 million and year-over-year growth of 37 percent is a record, despite changes in days on hand inventory by our largest customer.  Our solid 51 percent first quarter gross margin reflects a balanced and disciplined approach to leveraging while simultaneously building the business and expanding globally[.]"

102.    Celsius also hosted a conference call the same day to discuss its financial results and outlook.  During the call, Fieldly opened his remarks by emphasizing Celsius's rapid growth, stating that "Celsius reported a 37% year-over-year increase in revenue for the first quarter of 2024, totaling $355.7 million for the period, a new first quarter revenue record for the company. . . . These results, on their own, are very strong, especially after growing at a triple digit for the past 3 consecutive years.  Even so, our first quarter ***revenue would have been higher, except that it was adversely affected due to inventory movements by our largest customer***, which is beyond our control."

103.    Fieldly's statement was knowingly false and misleading when made.  Fieldly attributed lower revenue to "inventory movements" by Pepsi, but concealed that those "inventory movements" were the result of Pepsi purchasing far more product than necessary over the past year and a half, that Celsius was aware of this glut of inventory, and that Pepsi still had far more inventory that it would need to continue to draw down.  Fieldly's decision to attribute lower

---

[8] Days on hand of inventory, or "DOH," measures how many days a business takes to sell its inventory stock.  Since DOH is used to determine the number of days inventory remains in stock, the DOH value represents inventory liquidity.

revenue to "inventory movements" was also deceptive obscured the truth. "Inventory movements" is an innocuous phrase that suggests the mere movement of inventory, as in from one location to another. Fieldly used this phrase in order to condition the market by selectively speaking about the state of Pepsi's inventory without actually disclosing the known magnitude of unsold inventory. By electing to speak publicly about the impact of Pepsi's inventory and the relationship between that inventory and Celsius's sales, Fieldly had a duty to truthfully disclose material facts regarding Pepsi's inventory, including that it was not mere "inventory movements" that resulted in lower revenue but that Pepsi was sitting on over a year's worth of unsold Celsius products that would take several quarters to sell.

104. Additionally, Fieldly's statement that "revenue would have been higher" was false and misleading because Celsius's increase in sales since August 2022 was the result of Pepsi infilling product, and not due to growth in consumer demand. Therefore, even if there had not been any "inventory movements," Celsius's revenue would not have been higher because there was not enough demand from Pepsi to warrant new sales at the rate Celsius had been reporting for the previous quarters.

105. Fieldly continued his comments, explaining that:

The year-over-year inventory variation is attributable to elevated first quarter 2023 restocking, which we believe was **meant to compensate for the fourth quarter 2022 destocking** and to prepare for a robust spring reset that were planned in 2023. However, no such first quarter restocking and spring reload in was observed this year. **Absent these effects, we would have seen a higher growth rate**.

Ongoing **inventory fluctuations may be expected in subsequent quarters** because our largest distributor constitutes approximately 62% of our total North America business during the first quarter of 2024. While these inventory fluctuations caused noise in our sequential quarterly revenue figures, what's important to focus on here is that Celsius is constantly on shelves, stocked cold, stacked high with a 98.4% ACV. And our category across all tracked channels and on track channels continues to grow.

106.    Fieldly's statement that there had been a "fourth quarter 2022 destocking" that prevented Celsius from seeing a "higher growth rate" in year-over-year inventory was false and misleading when made.  The "destocking" that Fieldly referenced was not due to any annually observed seasonal trend, which would constitute an expected inventory cycle that the Company knows how to manage.  Rather, the "destocking" was the result of Pepsi's unsustainable buildup of Celsius products in their warehouses that outstripped consumer demand, of which Celsius was aware but the market was not.  CW3 confirmed that it is a known pattern at Celsius and other businesses in the energy drinks sector that seasonal trends lead to higher, not lower, reserve stock inventory in the winter to prepare for the spring, when consumer demand accelerates.  This is the opposite of the "fourth quarter 2022 destocking" that Fieldly blamed for Celsius's inventory "variation."

107.    Fieldly's statement that investors can expect potential "fluctuations" in inventory due to Pepsi being Celsius's largest distributor in North America was similarly false and misleading in many ways.  First, this was not a circumstance of inventory "fluctuations," which implies movements both up and down.  Inventory was not going to increase – only decrease, as Pepsi would need several quarters to sell out the surplus.  Second, Fieldly's statement that "fluctuations may be expected" falsely characterized the inventory problem as future event.  But the inventory problem was a known historical fact.  Celsius knew of the surplus of inventory that Pepsi held because the Company had access to and monitored Pepsi's inventory data.  Fieldly knew with certainty not only that Pepsi would continue to draw down on its inventory, but also that the draw-down had already begun.  Thus, Fieldly was not making a statement about a future expectation, he was misrepresenting a known historical fact, even if that historical fact would have impact on results going forward.  Finally, Fieldly's characterization of the inventory "fluctuations" as having "caused noise" falsely downplayed Pepsi's massive inventory surplus.

108.     During the question and answer portion of the call, an analyst with Stifel brought up the issue of inventory stock again, asking, "Have you seen any impact from a service-level standpoint on how to stock and whatnot?  And kind of how do you work with [Pepsi] to make sure that you prevent that, assuming that you haven't seen it yet, but may, given where trends seem to be moving?" Fieldly responded that "*[O]ur partners are at really good inventory levels right now.  We're maintaining deliveries, we're keeping products in stock.  We're seeing scan data.*  We just broke a record on the share gain to 11.5.  *So product is flowing*."  He continued, "[W]e're in a really good place.  We have good inventory levels now.  *We feel confident in our inventory levels and confident in the Pepsi inventory levels supporting our growth*."

109.     Fieldly's statement was false and misleading when made.  Fieldly knew from the SAP data that Pepsi's inventory was bloated with unsold product, a far cry from "really good inventory levels."

110.     Additionally, Fieldly claimed that "product [was] flowing" immediately after assuring investors that Pepsi's inventory was at "really good" levels, which gave investors the false impression that Celsius's sales to Pepsi were supported by consumer demand.  Fieldly then doubled down on this misrepresentation by claiming that "Pepsi inventory levels" were "supporting our growth."  But in fact, the truth was that Pepsi had purchased far more product than was necessary to satisfy consumer demand, which had resulted in the surfeit of product sitting unsold in Pepsi's warehouses.

111.     A Piper Sandler analyst also asked about the inventory levels: "But should we expect any more destocking?  I know you said the inventory levels feel about right, but how low could it go? Is that something we should watch out for?"  Fieldly again minimized the impact of Pepsi's decrease in stock, noting that "*[S]ales are flowing, sales are strong at the register.  So it seems to be like the balancing has been finalized*."

112.     Fieldly's statement was false and misleading when made because he was fully aware that Pepsi was not finished "balancing" its inventory by selling off the extra product that had been sitting in its warehouses.  Because Celsius could access Pepsi's inventory data through SAP, Fieldly knew that Pepsi still held an enormous amount of product that it would need to deplete (*i.e.*, sell-out) in the coming quarters and that the draw down on inventory that Pepsi had done already was not close to sufficient to fully remediate the overstock.

## VI.    DEFENDANTS CONTINUED TO MISLEAD INVESTORS AS PARTIAL DISCLOSURES OF THE TRUTH BEGIN TO EMERGE

113.     On May 28, 2024, the price of Celsius stock dropped after Nielsen released a report on recent retail store trends.  In response to the report, a Morgan Stanley analyst noted that Celsius's sales growth slowed sequentially in weekly retail data – slowing to 39% year-over-year in the week ended May 18, down from 50% in the week ended May 4 – that its market share dipped, and that pricing for Celsius's products was down 7.2% year-over-year.

114.     Morgan Stanley cautioned that Celsius faced difficult sales comparisons over the next several quarters as it rolled over the anniversary of its Distribution Agreement with Pepsi.  Similarly, a Stifel analyst warned sales could be dramatically diminished as Pepsi reduced the amount of Celsius inventory it held, noting that Pepsi's reduction of its Celsius product inventories could result in "2Q24 sales below end-demand."

115.     The price of Celsius stock tumbled in response to the news.  After closing at $95.15 on May 24, 2024, Celsius stock dropped nearly 13%, or $12.23 per share, to close at $82.92 per share on May 28, 2024 (the next trading day), on unusually high trading volume of nearly 17.5 million shares traded.  The sudden drop erased roughly $2.9 billion of the Company's market value as the share price had its largest drop in more than two years.

116.    Yet despite this news, Defendants continued to hide the full impact of Celsius's lagging sales to Pepsi from the public.

117.    On June 4, 2024, Celsius participated at the William Blair Growth Stock Conference.  David commented that "***the inventory pullback wasn't in terms of total cases, it's on days on hand of inventory because our sales continue to grow***.  So that's how we track it as a days on hand.  ***So I think they're [Pepsi] just getting more efficient with the way that they operate***."

118.    Less than a week later, on June 11, 2024, Fieldly and Langhans attended the Evercore ISI Consumer & Retail Conference.  During the conference, an investor asked "about Pepsi inventory issues and how much that has played into your reported results and what that may, what kind of impact that may have in the second half of the year?"  Fieldly replied that "Pepsi did take their inventory up last year in turn.  They took their days on hand up last year.  We're new into their system.  We're growing fast.  We continue to grow well[.]"  He continued, "[D]epletions continue to grow and really looking at last week's solid depletions that's depletions out of the Pepsi system grew mid-single digits versus Q1 or sorry, mid 10s versus Q1.  And so ***we're still seeing good growth and good depletions out of there***.  They they've just optimize their business.  We've had a lot of conversations across the supply chains and all indications are that ***we're in a good place now.  So, I think we're kind of at that point where they fully optimize their business and we're in good shape***."

119.    On July 15, 2024, TD Cowen issued an industry update lowering their price target for Celsius from $85 per share to $68 per share due to "continued deceleration in sales growth and Pepsi inventory reductions."  The update cited to new Nielsen data and concluded that "CELH's velocity ($/TDP) has meaningfully decelerated[.]"

120.     The market reacted negatively to this news.  The price of Celsius stock fell from $58.90 per share on July 12, 2024 to $52.63 per share on July 15, 2024 – a 10.65% drop on unusually heavy trading.

121.     On September 4, 2024, Fieldly and David presented at the Barclays 17th Annual Global Consumer Staples Conference.  During the conference, Fieldly discussed the Company's Distribution Agreement with Pepsi, and dropped the bombshell that Celsius's sales to Pepsi were roughly $100 million to $120 million lower than the prior quarter.

122.     That disclosure was made when an analyst asked Defendants if they could "talk a bit more about . . . Pepsi reducing the amount of inventory it was carrying" and whether Defendants were "expecting to see more of that impact in the third quarter?"  In his reply, Fieldly revealed that "through the first half of this year, *we did see roughly over a $47 million decrease in orders* associated with [Pepsi] optimizing their inventory levels as they're gaining more efficiencies with their relationship. . . . *What we're seeing year-to-date, roughly around 100 million to 120 million of really of orders being reduced from what they ordered last quarter.  So we're still seeing these inventory levels being reduced*."

123.     This was a stunning revelation.  Fieldly, in the middle of the day at an analyst conference disclosed that Pepsi had $100 million to $120 million of overstocked, unsold product sitting in its warehouses.  Fieldly admitted that there was a "disconnect" between when Celsius was recognizing revenue and when product was being sold to consumers.  He stated: "[K]eep in mind, we recognize revenue when it delivers to Pepsi.  We're not recognizing revenue when it's selling through, through the scan data.  So we just have a really a disconnect.  That's unfortunate.  *It's disappointing we have a disconnect just because of the optimization that Pepsi is doing within the inventories, which is impacting us about 100 million, 120 million estimate this quarter*."

124.    David echoed Fieldly's statement: "[J]ust to be precise with the [$]100 million to [$]120 million figure, . . . *we're seeing approximately [$]100 million to [$]120 million less in orders to Pepsi in Q3 this year versus Q3 last year*."  He then stated that because Celsius recognizes revenue when Celsius products are delivered to Pepsi – not when sold in stores to consumers – that store-level sales were not capable of capturing the lost revenue.  David went on to say: "What we are seeing correlate is depletions out of the Pepsi warehouse" which "simply means that *they were holding to several million more cases over the past 1.5 years than they really needed to hold*, and they're optimizing their network now."  In other words, Celsius's sales to Pepsi far outstripped market demand for Celsius products, and Pepsi was drawing down excess inventory from its warehouses.  Without that excess inventory being sold to Pepsi, Celsius's reported financial results in prior periods would have been materially lower.

125.    That Defendants chose an industry conference to disclose a whopping $100 million to $120 million drop in orders from Pepsi as a result of the unsold inventory, rather than through a controlled announcement prior to the opening or after the close of public trading, meant that the price of Celsius common stock was dropping in real time on September 4 while the Individual Defendants were presenting live at the Barclays conference:



126.    After opening at $36.50 per share on September 4, and reaching an intra-day high of $37.60 per share, the price of Celsius stock began slumping shortly after noon in response to Fieldly's and David's disclosures at the conference.  By the close trading, Celsius common stock fell 11.6% to close at $32.39 per share on unusually high trading volume of more than 18.6 million shares traded.

127.    Finally, before the opening of trading on November 6, 2024, Celsius reported its third quarter 2024 results, revealing the full impact of Pepsi's early product loading on the Company's finances.  In the press release issued that day, Fieldly admitted that "***Pronounced supply chain optimization by our largest distributor, which we believe has largely stabilized, had an outsized and adverse impact on our operating results*** during an otherwise solid quarter."

128.    In the same press release, Langhans further revealed that "Gross and operating margins in the third quarter fell short due to significantly reduced orders because our largest distributor implemented a sizable, successful and efficient supply chain optimization program in the quarter[.]"

129.     As a result, Celsius's overall 3Q 2024 "revenue was approximately $265.7 million, compared to $384.8 million for the" 3Q23, a *31%* decline, Celsius's North American revenues fell *33%*, and its "[r]evenue from [Pepsi] declined $123.9 million[.]"  Celsius disclosed that its 3Q 2024 "gross profit decreased by $71.9 million, or *37%*, to $122.2 million from $194.1 million" in 3Q 2023, that its 3Q 2024 "[g]ross profit margin was 46.0% . . . , a 440 basis point decrease from 50.4% for the same period in 2023," and that the "decrease in gross profit was due to promotional allowances, incentives, and other billbacks as a percentage of gross revenue" resulting from Pepsi's drawdown.

130.     Later that afternoon, Celsius held an earnings call with analysts to further discuss its Q3 2024 results.  During the call, Langhans stated that the decrease in revenue was "primarily due to inventory optimization by our largest distributor, impacting revenue by around $124 million.  Promotional allowances from increased retail sales created revenue headwinds due to the imbalance that existed between the decreased selling to our distributor and increased sell through at retail."  This impact was even greater than the $100 million to $120 million estimate that Fieldly and David had given investors two months prior.  Langhans further admitted that Pepsi's optimization of inventory would continue to impact the following quarter, "potentially all the way up to maybe $15 million of pressure." In other words, there was the potential for an additional $15 million reduction in revenue due to Pepsi's infill of product.

131.     Langhans also acknowledged that the rate of growth in Celsius's sales to consumers had not been the same as the rate of growth in sales to Pepsi when he noted that the "correlation . . . between the inventory sell-in and depletions from our largest distributors' warehouses into retail" was "not fully matched yet."  This meant that, even by the time that Pepsi had cut back their

orders by $124 million, consumer demand still did not match the amount of stock Celsius was selling to Pepsi.

132.    In response to this news, the market price of Celsius common stock fell another $1.69 per share, or approximately 5%, on unusually high trading volume of more than 22.5 million shares, or more than 3.5 times the average daily volume over the preceding 10 trading days.

133.    By the end of the Class Period, the price of Celsius common stock had dropped massively.  In late May 2023, prior to the partial disclosure that demand for the Company's products had declined, Celsius common stock was trading at over $95 per share.  By November 6, 2024, Celsius common stock closed at $30.04 per share.  To date, the stock price has not recovered.

## VII.    SUSPICIOUS INSIDER SELLING BY THE INDIVIDUAL DEFENDANTS AND OTHER CORPORATE INSIDERS FURTHER INDICATES SCIENTER

134.    Celsius and the Individual Defendants acted with scienter in that they knew that the public statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Celsius and Pepsi, their control over, and/or receipt and/or modification of Celsius's materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Celsius, participated in the fraudulent scheme alleged herein.

135.     In addition to suspicious insider selling by every one of the Individual Defendants, eleven additional Company insiders sold Celsius shares during the Class Period, including other management executives, a majority of the Board, and several DeSantis Affiliates:[9]

| Name | Position | Shares | Amount | Percentage of Holdings Sold[10] |
|------|----------|--------|--------|----------------------------------|
| *Management* | | | | |
| Fieldly, John | CEO | 716,938 | $43,134,263 | 17% |
| David, Toby | Chief of Staff | 175,632 | $10,407,957 | 30% |
| Guilfoyle, Tony | Chief Commercial Officer | 76,119 | $4,803,624 | 100% |
| Watson, Kyle | Chief Marketing Officer | 40,000 | $3,566,800 | 35% |
| Langhans Jarrod | CFO | 27,787 | $1,834,537 | 44% |
| Storey, Paul | Chief Supply Chain Officer | 23,608 | $1,548,182 | 84% |
| **Management Total:** | | **1,060,084** | **$65,295,362** | |
| *Directors* | | | | |
| Castaldo, Nicholas | Director | 330,000 | $23,736,350 | 48% |
| Kravitz, Hal | Lead Director | 199,000 | $10,974,165 | 50% |
| Levy, Caroline | Director | 118,100 | $7,430,997 | 53% |
| Ruberti, Alexandre | Director | 35,000 | $2,613,910 | 57% |
| Miller, Cheryl | Director | 3,000 | $250,980 | 17% |
| **Directors Total:** | | **685,100** | **$45,006,402** | |

---

[9] The insider transactions alleged herein are based on Forms 4 filed with the SEC where the transaction was identified by the filer as a Code "S" transaction denoting an "Open market or private sale of non-derivative or derivative security."  All transactions identified by the filer as a Code "F" transaction denoting "Payment of exercise price or tax liability" have been excluded.

[10] Percentage of holdings sold was calculated for each individual by adding the number of shares they sold between May 9, 2023 and March 31, 2024 to their holdings identified in the 2024 Annual Proxy Statement, filed on April 12, 2024 (which listed holdings as of April 1, 2024).  Because Kyle Watson's and Alexandre Ruberti's holdings were not identified in the Annual Proxy Statement , their percentage of holdings sold was calculated by adding the total number of shares they sold during the Class Period to the number of beneficial shares owned after their last sale during the Class Period, as declared on their Form 4 filings.

| *DeSantis Affiliates* | | | | |
|---|---|---|---|---|
| CD Financial | | 21,000,000 | $1,346,472,300 | 52% |
| DeSantis, Dean | Owner/CD Financial Trustee | 153,880 | $14,575,953 | 37% |
| Milmoe, William | Owner/CD Financial Trustee | 174,000 | $11,291,600 | 49% |
| **DeSantis Affiliates Total:** | | **21,327,880** | **$1,372,339,853** | |
| **All Insiders Total:** | | **23,073,064** | **$1,482,641,617** | |

136.    The insider selling was massive, well-timed, and highly unusual in many respects. The sheer size of the selling was enormous: ***over 23 million shares were sold by insiders (including 12 million in a single trading day), representing 10% of the Company's total shares outstanding and generating nearly $1.5 billion in proceeds for the insiders***.

137.    DeSantis Affiliate CD Financial, after over a decade of holding shares, sold out half of its holding during the Class Period.  Members of the Board, who are paid total cash and stock-based director fees of less than $250,000 per year, collectively cashed out over $45 million. Importantly, none of these insiders traded as part of a 10b5-1 trading plan, even though many (including Fieldly and Langhans) had used 10b5-1 plans in the past.  Instead, this was an opportunistic cash grab to quickly sell shares at fraud-inflated prices.

138.    Examined individually and collectively, the insider selling by the Individual Defendants supports a strong inference of scienter and is further supported by several other insiders who also sold at fraud-inflated prices.

A.    EACH OF THE INDIVIDUAL DEFENDANTS ENGAGED IN INSIDER SELLING

139.    Every one of the Insider Defendants engaged in insider selling, and they collectively realized more than $55 million in insider trading proceeds from selling their personally held shares of Celsius common stock at fraud-inflated prices during the Class Period:

| Individual Defendants' Insider Selling | | | | | | |
|---|---|---|---|---|---|---|
| Defendant | Position | Date | Shares | Price | Proceeds | 10b5-1 Plan? |
| Fieldly, John | CEO | 08/21/23 | 270,000 | $58.12 | $15,691,149 | No |
| Langhans Jarrod | CFO | 08/21/23 | 12,642 | $59.71 | $754,850 | No |
| David, Toby | Chief of Staff | 08/22/23 | 164,823 | $59.43 | $9,794,870 | No |
| Langhans Jarrod | CFO | 08/22/23 | 3,165 | $59.87 | $189,483 | No |
| Fieldly, John | CEO | 12/05/23 | 286,158 | $52.41 | $14,997,541 | No |
| Fieldly, John | CEO | 12/06/23 | 13,842 | $52.05 | $720,476 | No |
| David, Toby | Chief of Staff | 01/03/24 | 10,809 | $56.72 | $613,086 | No |
| Fieldly, John | CEO | 01/03/24 | 27,334 | $56.72 | $1,550,384 | No |
| Langhans Jarrod | CFO | 01/03/24 | 2,401 | $56.72 | $136,185 | No |
| Fieldly, John | CEO | 03/04/24 | 119,604 | $85.07 | $10,174,712 | No |
| Langhans Jarrod | CFO | 03/04/24 | 5,500 | $85.61 | $470,855 | No |
| Langhans Jarrod | CFO | 04/19/24 | 4,079 | $69.42 | $283,164 | No |
| **Totals:** | | | **920,357** | | **$55,376,756** | |

140.    Fieldly's insider selling was the most significant and unusual:



141.    Fieldly's insider selling was suspicious in several respects.

142.    First, none of Fieldly's insider selling was pursuant to a 10b-5 trading plan.  Such

plans are designed to permit corporate insiders to set up a predetermined plan that specifies – in

advance – the share price, amount of shares, and time period for which shares will be sold or purchased.  Prior to the Class Period, Fieldly sold shares in December 2021, July 2022, and August 2022 pursuant to a 10b5-1 plan.  Yet during the Class Period, Fieldly engaged in massive insider selling that was not conducted under any trading plan.  Thus, none of Fieldly's Class Period insider selling was conducted in accordance with a standard pre-arranged trading plan, but rather was an opportunistic act to cash out shares at a stock price inflated by his fraudulent public statements.

143.    Second, Fieldly's sales were unusual in the amount of shares sold, the percentage of holdings that he sold, and the amount of proceeds he received from the sales.  In under seven months between August 2023 and March 2024, Fieldly sold 716,938 shares.  Including common shares underlying unexercised vested stock options, these shares represented approximately 17% of his holdings.  Excluding those options, the shares represented 70% of his direct common stock holdings.  The $43 million in proceeds was significant.  It represented an enormous windfall for Fieldly that was more than ten times his annual cash and stock-based compensation from the Company, which was roughly $3.2 million in 2023 and $3.6 million in 2022.

144.    Third, Fieldly's insider selling was unusually well timed.  Fieldly largely ended his insider selling on March 4, 2024 – a time when he knew that Pepsi was sitting on over $100 million in unsold inventory that was undisclosed to the public and just three weeks before the Incentive Amendment was publicly disclosed.  After that, and after May 2024, when the Company began to make limited and misleading disclosures of "inventory movements" at Pepsi, Fieldly only reported two non-Code S sales in September 2024, both of which were executed solely to pay tax liabilities and to exercise call options.

145.    Langhans's insider selling was also suspicious in timing and amount.

146.    Langhans sold 34,681 shares of Celsius stock during the Class Period, or approximately 44% of his holdings, and reaped over $1.8 million in trading proceeds.  Like Fieldly, Langhans's Class Period sales were not made pursuant to a 10b5-1 trading plan.

147.    After the Class Period and to date, Langhans has not made any further sales of shares of Celsius stock other than in Code F tax-related transactions.

148.    David's insider trades during the Class Period were likewise suspicious.

149.    David sold a total of 175,632 shares during the Class Period, or approximately 30% of his holdings, generating over $10.4 million in trading proceeds at fraud-inflated prices.  And as with the other Individual Defendants, none of David's Class Period Sales were made pursuant to a 10b5-1 trading plan.

150.    David's Class Period selling was the first time he had ever engaged in insider selling at Celsius.  To date, David has not sold any shares following the end of the Class Period.

B.    INSIDER SELLING BY OTHER CORPORATE INSIDERS

151.    Other corporate insiders also took advantage of the fraud-inflated market price by disposing or selling a significant number of shares during the Class Period in highly suspicious fashion.  Not including the Individual Defendants, these insiders' sales reaped nearly $10 million in Celsius common stock:

| Insider Selling by Other Senior Executives | | | | | | |
|---|---|---|---|---|---|---|
| Name | Position | Date | Shares | Price | Proceeds | 10b5-1 Plan? |
| Storey, Paul | Chief Supply Chain Officer | 05/12/23 | 5,142 | $44.00 | $226,231 | No |
| Guilfoyle, Tony | Chief Commercial Officer | 08/21/23 | 13,431 | $58.67 | $787,974 | No |
| Storey, Paul | Chief Supply Chain Officer | 08/22/23 | 3,165 | $59.87 | $189,483 | No |
| Guilfoyle, Tony | Chief Commercial Officer | 11/20/23 | 10,190 | $53.14 | $541,497 | No |
| Guilfoyle, Tony | Chief Commercial Officer | 12/05/23 | 17,332 | $53.00 | $918,596 | No |
| Storey, Paul | Chief Supply Chain Officer | 01/03/24 | 3,468 | $56.72 | $196,705 | No |
| Guilfoyle, Tony | Chief Commercial Officer | 01/03/24 | 10,809 | $56.72 | $613,086 | No |
| Storey, Paul | Chief Supply Chain Officer | 03/04/24 | 10,000 | $79.75 | $797,500 | No |
| Guilfoyle, Tony | Chief Commercial Officer | 03/04/24 | 24,357 | $79.75 | $1,942,471 | No |
| Watson, Kyle | Chief Marketing Officer | 03/12/24 | 40,000 | $89.17 | $3,566,800 | No |
| Storey, Paul | Chief Supply Chain Officer | 05/07/24 | 1,833 | $75.43 | $138,263 | No |
| **Total:** | | | **139,727** | | **$9,918,606** | |

152.    There was also rampant insider selling by a majority of the Board, including Hal
Kravitz, who served as Lead Director, and Nicholas Castaldo, who is the longest-tenured member
of the Board.  The only two Directors who did not sell were Joyce Russell and Pepsi CFO James
Lee:[11]

| Insider Selling by Celsius Board Members | | | | | | |
|---|---|---|---|---|---|---|
| Director | Position | Date | Shares | Price | Proceeds | 10b5-1 Plan? |
| Levy, Caroline | Director | 05/18/23 | 6,600 | $44.84 | $295,922 | No |
| Levy, Caroline | Director | 08/11/23 | 16,500 | $57.45 | $947,925 | No |
| Levy, Caroline | Director | 08/11/23 | 75,000 | $57.22 | $4,291,750 | No |
| Ruberti, Alexandre | Director | 08/11/23 | 12,000 | $58.42 | $701,000 | No |
| Kravitz, Hal | Lead Director | 08/11/23 | 10,500 | $57.39 | $602,630 | No |
| Castaldo, Nicholas | Director | 08/23/23 | 165,000 | $60.53 | $9,986,900 | No |
| Kravitz, Hal | Lead Director | 12/06/23 | 172,000 | $51.64 | $8,882,080 | No |
| Miller, Cheryl | Director | 03/04/24 | 3,000 | $83.66 | $250,980 | No |
| Ruberti, Alexandre | Director | 03/04/24 | 23,000 | $83.17 | $1,912,910 | No |
| Castaldo, Nicholas | Director | 03/04/24 | 165,000 | $83.33 | $13,749,450 | No |
| Levy, Caroline | Director | 03/13/24 | 20,000 | $94.77 | $1,895,400 | No |
| Kravitz, Hal | Lead Director | 05/14/24 | 16,500 | $90.27 | $1,489,455 | No |
| **Total:** | | | **685,100** | | **$45,006,402** | |

---

[11] Director Damon DeSantis sold through his control of CD Financial rather than as an individual.

153.    Excluding Fieldly as Chairman of the Board, the other Celsius Directors collectively sold over 685,000 shares at fraud-inflated prices during the Class Period, generating proceeds of over $45 million.

154.    CD Financial, which was controlled by Damon DeSantis (a member of the Board), Dean DeSantis, Deborah DeSantis, and former Board member and Chairman Milmoe, engaged in the largest amount of insider selling during the Class Period.  21 million shares owned by CD Financial were sold during the Class Period under unusual circumstances, generating proceeds of over $1.3 billion:

| Insider Selling by CD Financial | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| Mar 4, 2024 | 12,000,000 | $67.46 | $809,472,000 |
| Apr 29 - May 7, 2024 | 9,000,000 | $59.67 | $537,000,300 |
| Total: | 21,000,000 | | $1,346,472,300 |

155.    The insider selling by CD Financial was arranged earlier in the Class Period through agreements with third-party purchasers that allowed CD Financial to effectively get paid for the shares before they were later sold into the market.  (Any insider selling by CD Financial that may have been pre-arranged prior to the Class Period has been excluded.)  The 12 million shares sold on March 4, 2024 were sold pursuant to a forward contract dated January 12, 2024, allowing CD Financial to gain early certainty and reduce risk for the massive sale.  Similarly, the 9 million shares sold between April 29, 2024 and May 7, 2024 were the subject of call options CD Financial sold during the Class Period on October 25, 2023.

156.    In addition to the $1.3 billion in selling by CD Financial, Dean DeSantis and Milmoe engaged in heavy insider selling on their own behalf separate from CD Financial, selling Celsius shares for proceeds of $14.6 million and $11.3 million, respectively:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| *Dean DeSantis* | | | |
| 03/13/24 | 100,000 | $95.75 | $9,575,350 |
| 05/16/24 | 53,880 | $92.81 | $5,000,603 |
| **Total:** | **153,880** | | **$14,575,953** |
| | | | |
| *William Milmoe* | | | |
| 05/10/23 | 60,000 | $40.68 | $2,440,600 |
| 08/11/23 | 30,000 | $58.17 | $1,745,000 |
| 02/29/24 | 44,000 | $77.00 | $3,388,000 |
| 05/17/24 | 40,000 | $92.95 | $3,718,000 |
| **Total:** | **174,000** | | **$11,291,600** |

157.    In sum, the Individual Defendants and other insiders *sold over 23 million Celsius shares for proceeds close to $1.5 billion*:

| Insider | Shares | Proceeds |
|---|---|---|
| Individual Defendants | 920,357 | $55,376,756 |
| Other Senior Executives | 139,727 | $9,918,606 |
| Board Members | 685,100 | $45,006,402 |
| CD Financial/DeSantis Affiliates | 21,327,880 | $1,372,339,853 |
| **Total:** | **23,073,064** | **$1,482,641,617** |

158.    These insider sales were not only staggering in size, but were also highly suspicious in timing as they occurred when Celsius stock was highly inflated.  Furthermore, the inside traders' sales were exponentially larger than they had been previously.

C.    DELINQUENT INSIDER TRADING FILINGS AND VIOLATIONS OF THE LOCK-UP AGREEMENTS FURTHER INDICATE SCIENTER

159.    The insider selling described herein is based on Forms 4 that Celsius insiders are required to file with the SEC under Section 16(a) of the Exchange Act.  Section 16(a) mandates that the filings must be made within two business days after the transaction date.  Yet many of the Company's insiders exhibited little concern for following the Exchange Act.

160.    In April 2024, Celsius admitted in its Annual Proxy Statement that eleven Celsius insiders, including Fieldly and Langhans, failed to file timely and complete Forms 4.

161.    Specifically, Fieldly and Langhans violated Section 16(a) by failing to properly disclose Class Period transactions that took place in August 2023 and January 2023.

162.    In January 2024, Fieldly belatedly reported ten transactions that occurred as far back as October 2019 and Langhans reported a transaction from 2022 that had not previously been disclosed.   The other 16(a) violators included: every single member of the Board (Nicholas Castaldo, Carl DeSantis, Damon DeSantis, Hal Kravitz, Caroline Levy, Cheryl Miller, and Joyce Russell) other than Pepsi CFO James Lee, and Lee did not sell any shares; and Chief Commercial Officer/EVP North American Sales Tony Guilfoyle and Chief Supply Chain Officer/SVP Operations Paul Storey.   Given this track record, it is unknown at this time if there are additional Class Period transactions that insiders have failed to properly disclose.

163.    Certain insider selling also appears to have been completed in violation of the Lock-Up Agreements, which prohibited any insider transactions from August 1, 2022 through August 1, 2023 by Fieldly, Langhans, and every member of the Board other than Lee, except under limited circumstances that did not apply here.

164.    Despite these prohibitions, Fieldly broke his obligations under the Lock-Up Agreements.

165.    On August 1, 2022, the very first day of trading after the announcement of the Distribution Agreement, the price of Celsius stock jumped 11% in response to news of the deal. That same day, Fieldly sold 240,000 shares, reaping close to $8 million in proceeds.   Although Fieldly claimed that these shares were sold pursuant to a 10b5-1 trading plan, that plan was originally dated November 1, 2021 and then (even though no shares were ever sold under that version of the plan) on May 31, 2022 Fieldly amended the plan to include the August 1, 2022 sale – perfectly timed to the announcement of the Distribution Agreement.   Three weeks later, on

August 24, 2022, Fieldly sold an additional 210,000 shares for another $8 million in proceeds. The August 24 sales were not pursuant to a 10b5-1 trading plan and likewise appear to have violated the Lock-Up Agreements.  On January 2, 2023, Fieldly sold another 27,334 shares for $848,135 in proceeds.  The January 2, 2023 transactions were reported over a year late in a Form 4 filing dated January 6, 2024 as part of the delinquent disclosure of Fieldly's trading.

166.    Similarly, while the Lock-Up Agreements were in effect, Langhans sold 1,851 shares on August 26, 2022 for $66,303 and 1,806 shares on April 18, 2023 for $79,175.  While these shares were stated as being for tax purposes, they were not identified as Code F transactions and were not reported until over year later on a delinquent Form 4 filed on January 6, 2024.

167.    Certain members of the Celsius Board also broke the Lock-Up Agreements: Lead Director Hal Kravitz sold 15,000 shares on August 1, 2022 for $500,000 and 15,000 shares on November 23, 2022 for $550,000; Director Nicholas Castaldo sold 33,000 shares on November 23, 2022 for $1,111,315; and Director Caroline Levy sold 6,600 shares for $295,922 on May 18, 2023.

168.    The number of shares sold in violation of the Lock-Up Agreements are a small percentage of these individual's far larger insider trading during the Class Period.  But together with the delinquent Forms 4 filings and the SEC enforcement action over improper reporting of compensation, these acts exhibit Defendants' and other Celsius insiders' disregard for their contractual, statutory, and regulatory obligations.

## VIII.    LOSS CAUSATION

169.    Defendants during the Class Period made materially false and misleading statements and engaged in a scheme to deceive the market.  Defendants misled investors about the one-time nature of Pepsi's oversized purchases of Celsius product and the lack of sustainability of Celsius's financial growth that resulted therefrom.  This artificially inflated the price of Celsius securities and

operated as a fraud or deceit on the Class.  Later, when the truth concealed by Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Celsius securities fell significantly.  As a result of their purchases of Celsius common stock and options during the Class Period – and Defendants' material misstatements and omissions – Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.   CLASS ACTION ALLEGATIONS

170.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons who acquired Celsius securities during the Class Period.  Excluded from the Class (an "Excluded Person") are Defendants, the officers and directors of Celsius, the DeSantis Affiliates, the immediate family members of any Excluded Person, the legal representatives, heirs, successors or assigns of any Excluded Person, and any entity in which any Excluded Person has or had a controlling interest.

171.   The members of the Class are so numerous that joinder of all members is impracticable.  Celsius stock is actively traded on the NASDAQ, with more than 233 million shares outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, there are likely to be thousands of Class members.  Record owners and other members of the Class may be identified from records maintained by the Company and/or its transfer agent and may be notified of the pendency of this action by mail or electronic delivery, using a form of notice similar to that customarily used in securities class actions.  The disposition of the Class's claims in a class action will therefore provide substantial benefits to the parties and the Court.

172.   Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

173.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

174.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation may make it impossible for members of the Class to individually seek redress for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

175.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;

(b)     whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;

(c)     whether and to what extent the market price of Celsius's common stock and options were artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(d)     whether Celsius and the Individual Defendants acted with the requisite level of scienter;

(e)     whether Fieldly and Langhans violated Section 20(a) of the Exchange Act as controlling persons of Celsius;

(f)     whether reliance may be presumed; and

(g)    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of those damages.

## X.   NO SAFE HARBOR

176.    The Private Securities Litigation Reform Act's statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements alleged herein.

177.    None of the statements complained of herein were forward-looking.  Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

178.    To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

179.    To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.  As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

180.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, may be construed as forward-looking, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the

statement was false or misleading, or the statement was authorized and approved by an executive officer of Celsius who knew that such statement was false or misleading.

## XI.    PRESUMPTION OF RELIANCE

181.    At all relevant times, the market for Celsius common stock was efficient for the following reasons, among others:

(a)    Celsius common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)    As a regulated issuer, Celsius filed periodic public reports with the SEC;

(c)    Celsius regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of investor releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(d)    Celsius was followed by multiple securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and/or reported on and entered the public marketplace.

182.    As a result of the foregoing, the market for Celsius securities promptly digested current information regarding Celsius from all publicly available sources and reflected such information in the price of Celsius common stock and options.  Under these circumstances, all purchasers of Celsius securities during the Class Period suffered similar injury through their purchase of Celsius securities at artificially inflated prices and a presumption of reliance applies.

183.    Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied on Defendants to disclose material information as required by law and in the

Company's SEC filings.  Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Celsius common stock and options at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

## XII.   CAUSES OF ACTION

### COUNT I

**Against All Defendants for Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5**

184.   Lead Plaintiff repeats, incorporates, and realleges every allegation set forth above as if fully set forth herein.

185.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other members of the Class, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Celsius securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

186.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Celsius securities in an effort to maintain artificially high market prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as

primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons, as alleged below.

187.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Celsius's business operations and financial position, as alleged herein.

188.     Defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Celsius's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's business metrics and financial position in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Celsius securities during the Class Period.

189.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Celsius securities during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Celsius securities and experienced loses when the artificial inflation was released from the price of Celsius securities as a result of the partial revelations and price declines detailed herein.  Lead Plaintiff and the Class would not have purchased Celsius securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

190.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

191.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their acquisitions of Celsius securities during the Class Period.

**COUNT II**

**Against Fieldly and Langhans for Control Person Liability
Under Section 20(a) of the Exchange Act**

192.    Lead Plaintiff repeats, incorporates, and realleges every allegation set forth above as if fully alleged herein.

193.    The Individual Defendants each acted as a controlling person of Celsius within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and participation in and/or awareness of the true state of the Company's business metrics and financial position, the Individual Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the press releases concerning the Company's business metrics and financial position.

194.    As set forth above, Celsius and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act.

195.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their acquisitions of Celsius securities during the Class Period.

56

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment:

A.      Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative under the Private Securities Litigation Reform Act of 1995, and appointing Grant & Eisenhofer P.A. as class counsel under Rule 23(g) of the Federal Rules of Civil Procedure;

B.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.      Awarding such other and further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated: April 25, 2025

**JOSH DUBIN, P.A.**

By: *s/ Joshua E. Dubin*
Joshua E. Dubin (FL Bar #48865)
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Tel: 212-219-1469
josh@jdubinlaw.com

*Counsel for Lead Plaintiff and*
*Liaison Counsel for the Proposed Class*

**GRANT & EISENHOFER P.A.**
Karin Fisch (*pro hac vice*)
James S. Notis (*pro hac vice*)
Lauren J. Salamon (*pro hac vice*)
Timothy Clark Dauz (*pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: 646-722-8500
kfisch@gelaw.com
jnotis@gelaw.com
lsalamon@gelaw.com
tdauz@gelaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Class*