**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 24-CV-81472-ROSENBERG-REINHART

In re CELSIUS HOLDINGS, INC.
SECURITIES LITIGATION

<u>CLASS ACTION</u>

/

**DEFENDANTS' MOTION TO DISMISS**
**AND INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

Page

MOTION TO DISMISS ............................................................................................................... 1

MEMORANDUM OF LAW ........................................................................................................ 1

I.      FACTUAL BACKGROUND ............................................................................................ 3

        A.      The Pepsi Distribution Agreement Positions Celsius for Further Growth. ............ 3

                i.      Celsius disclosed how it would recognize revenue from sales to
                        Pepsi. ......................................................................................................... 4

                ii.     Celsius kept the market informed about Pepsi's inventory build. .............. 5

                iii.    Retail sales slow and Pepsi reduces 2024 orders. ..................................... 5

II.     APPLICABLE LEGAL STANDARD ............................................................................. 5

III.    ARGUMENT ..................................................................................................................... 6

        A.      The AC's Failure to Plead Scienter Adequately Requires Dismissal. ................... 6

                i.      The AC cannot shore up the holes in its fraud theory with vague
                        allegations by nameless former employees. .............................................. 6

                ii.     The stock sales alleged do not support a strong inference of
                        scienter. ..................................................................................................... 9

        B.      None of the Alleged Misstatements or Omissions Are Actionable. ..................... 13

                i.      The company's disclosures undercut the AC's allegations
                        concerning misleading investors regarding the impact of Pepsi's
                        orders on sales, revenue, or demand. ...................................................... 14

                ii.     Celsius's extensive risk disclosures invoke the PSLRA's safe
                        harbor. ...................................................................................................... 16

                iii.    The AC fails to plead why Defendants' statements were false. ............... 18

                iv.     Corporate optimism is not actionable. ..................................................... 20

        C.      The Section 20(a) Claim Against Mr. Fieldly and Mr. Langhans Also
                Fails. ..................................................................................................................... 20

IV.     CONCLUSION ............................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brophy v. Jiangbo Pharm., Inc.*,
  781 F.3d 1296 (11th Cir. 2015) .......................................................................................6

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) .......................................................................................6

*Carvelli v. Ocwen Fin. Corp.*,
  No. 17-cv-80500-RLR, 2018 WL 4941110 (S.D. Fla. Apr. 27, 2018)................................7, 18

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ....................................................................................6, 20

*City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*,
  649 F. Supp. 3d 1256 (S.D. Fla. 2022) ....................................................9, 10, 11, 18

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
  412 F. Supp. 3d 206 (E.D.N.Y. 2019) ...........................................................................20

*Druskin v. Answerthink, Inc.*,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004) .......................................................................9, 10

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..........................................................................................................6

*Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*,
  594 F.3d 783 (11th Cir. 2010) .......................................................................................10

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ...............................................................................14, 20

*Gonzalez v. Cano Health, Inc.*,
  No. 22-cv-20827, 2024 WL 4415216 (S.D. Fla. Oct. 4, 2024) ............................................17

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ..............................................................................16, 17, 18

*In re Astea Int'l Inc. Sec. Litig.*,
  No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 8, 2007) ....................................................12

*In re Floor & Decor Holdings, Inc.*,
  No. 19-cv-2270, 2020 WL 13543880 (N.D. Ga. Sep. 21, 2020)............................................10

*In re Galectin Therapeutics, Inc.*,
    843 F.3d 1257 (11th Cir. 2016) ..................................................................................20

*In re KLX, Inc. Sec. Litig.*,
    232 F. Supp. 3d 1269 (S.D. Fla. 2017) ...............................................................14, 19

*In re Mako Surgical Corp. Sec. Litig.*,
    No. 12-cv-60875, 2013 WL 2145661 (S.D. Fla. May 15, 2013)..................................7

*In re Molson Coors Bev. Co. Sec. Litig.*,
    No. 19-cv-00455, 2020 WL 13499995 (D. Colo. Dec. 2, 2020) ...............................13

*In re Ocwen Fin. Corp. Sec. Litig.*,
    No. 14-cv-81057, 2015 WL 12780960 (S.D. Fla. Sep. 4, 2015) ...........................8, 15

*In re Royal Caribbean Cruises Ltd.*,
    No. 11-cv-22855, 2013 WL 3295951 (S.D. Fla. Apr. 18, 2013)............................7, 9

*In re Teladoc Health, Inc. Sec. Litig.*,
    No. 22-cv-4687, 2025 WL 886934 (S.D.N.Y. Mar. 21, 2025)...........................11, 12

*Local No. 8 IBEW Ret. Plan v. Vertex Pharm., Inc.*,
    140 F. Supp. 3d 120 (D. Mass. 2015) .......................................................................13

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021).........................................................................9

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ...............................................................5, 6, 13, 20

*Mogensen v. Body Cent. Corp.*,
    15 F. Supp. 3d 1191 (M.D. Fla. 2014)...................................................................8, 20

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC
    Partners, Inc.*,
    No. 15-cv-6034, 2016 WL 5794774 (S.D.N.Y. Sep. 30, 2016) ...............................12

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ...........................................................................13

*Police & Fire Ret. Sys. of the City of Detroit v. Axogen, Inc.*,
    No. 19-cv-69-T-60AAS, 2020 WL 13547449 (M.D. Fla. Apr. 21, 2020) ...............17

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)......................................................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................................4

*Vitalone v. Logitech Int'l*,
   No. 11-cv-03855, 2012 WL 13041992 (N.D. Cal. July 13, 2012) ..............................18, 19, 20

*Waterford Twp. Gen. Emples. Ret. Sys. v. BankUnited Fin. Corp.*,
   No. 08-cv-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) ...............................................7

*Welgus v. TriNet Grp., Inc.*,
   No. 15-cv-03625, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)...........................................13

**RULES**

Federal Rule of Civil Procedure 9(b)...........................................................................................1, 6

Federal Rules of Civil Procedure 12(b)(6)...........................................................................1, 2, 5, 15

17 C.F.R. § 240.10b-5.................................................................................................................5, 6, 20

17 C.F.R. § 240.10b5-1....................................................................................................................11

**STATUTES**

15 U.S.C. § 78j(b) Section 10(b) .....................................................................................................16

15 U.S.C. § 78t(b) Section 20(a)......................................................................................................16

15 U.S.C. § 78u-5(i)..........................................................................................................................16

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) ......................................... passim

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730................................16

**MOTION TO DISMISS**

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, *et seq.* (the "PSLRA"), Defendants Celsius Holdings, Inc. ("Celsius"), John Fieldly, Jarrod Langhans, and Toby David (together, the "Individual Defendants") move to dismiss with prejudice the Amended Complaint for Violations of the Federal Securities Laws (ECF No. [57]) ("AC") of Lead Plaintiff Zarabi Family Trust ("Plaintiff").[1]   In support of the Motion, Defendants submit the following Memorandum of Law.

**MEMORANDUM OF LAW**

In this putative securities class action, Plaintiff alleges, purportedly on behalf of Celsius shareholders, that Celsius and the Individual Defendants violated the federal securities laws.  The AC contends these violations occurred when Defendants made statements concerning a distribution agreement announced August 1, 2022 (the "Distribution Agreement") between Celsius and an independent distributor of Celsius beverages, PepsiCo, Inc. ("Pepsi").  The AC alleges Defendants' statements misled the market by suggesting sales of product to Pepsi pursuant to the Distribution Agreement ("sell-in") and sales to end consumers ("sell-out") were growing at the same rate, misrepresenting consumer demand for Celsius products.  The statements were false, the AC alleges, because the growth in sales to Pepsi resulted from a one-time inventory build following the Distribution Agreement's execution, instead of from growing consumer demand.  In addition to a primary claim for securities fraud against all Defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* ("Exchange Act") and Rule 10b-5 (Count I), the AC includes a claim for control person liability against Messrs. Fieldly and Langhans pursuant to Section 20(a) of the Exchange Act (Count II).

Because the AC's allegations are muddled and, in some instances, contradictory, it is important to understand at the outset what is ***not*** alleged.  The AC does not allege that Celsius engaged in bogus or sham sales to Pepsi, a wholly separate company, or that Celsius wrongfully influenced Pepsi to take more product than Pepsi needed to prop up Celsius sales.  This is not a "channel stuffing" fraud case.  Nor are there allegations that Celsius wrongfully accounted for the millions in revenue it recognized from sales under the Distribution Agreement year over year.  The

---

[1] The AC is cited herein as ("¶_").

1

AC takes no issue with the financials reported by Celsius during the Class Period at all.  Instead, the AC's fraud theory rests on an alleged "glut" of inventory that developed in Pepsi warehouses at some point and that led Pepsi in 2024 to order less product from Celsius than anticipated.  This is not enough to sustain a securities fraud claim.  Securities fraud claims are subject to heightened pleading standards set forth by Congress in the PSLRA—a much higher bar than the Rule 12(b)(6) standard or even the Rule 9 fraud standard.  The PSLRA's high bar is one the AC cannot clear for the reasons set forth below.

*First, the AC fails to plead the requisite culpable state of mind, or scienter.*  The PSLRA requires a securities fraud complaint to specifically plead a *strong inference* of a culpable state of mind for each of the alleged participants in the purported fraud.  Put simply, the AC must show each defendant made the alleged misstatements with the intent to mislead investors.  The AC asserts Defendants misled investors by failing to foresee that a different company, Pepsi, would decide to order less Celsius product in 2024.  But the AC cannot show an intent to mislead based on Defendants' alleged statements and Pepsi's inventory decisions.  Celsius's public filings show that Pepsi placed its own orders for Celsius product, and that Pepsi determined how much product it would need for its own distribution network.  The AC does not allege any facts to show that Defendants knew Pepsi's future sales forecasts, or that Defendants could have otherwise divined that Pepsi would make the business decision to reduce orders in 2024.

The AC attempts to prop up its scienter allegations by claiming unnamed Celsius employees, referenced as confidential witnesses ("CWs"), had visibility into the Celsius inventory held by Pepsi.  These CWs are low-level former employees who are not alleged to have even spoken with the Individual Defendants.  Their descriptions of isolated reports and data do not provide any basis for knowledge by Defendants of a purported "glut" at Pepsi, much less of Pepsi's own sales forecasts or inventory planning.  In short, the CWs cannot connect the dots between inventory levels at Pepsi and the hypothesized scheme to mislead the market about demand for Celsius product.  Moreover, these allegations do not put the CWs in possession of any information contradicting Defendants' public statements, and they should be disregarded.

Without competent allegations about the Individual Defendants' state of mind, the AC references purportedly suspicious trading by the Individual Defendants and several non-parties.  But again, the AC cannot get from "A" to "B."  For example, the AC fails to allege the Individual Defendants' trades deviated from their historical trading patterns, a prerequisite in this Circuit to

2

find trading activity suspicious.  And the AC's remaining allegations concerning trading by non-parties have no relevance because the AC fails to allege those individuals had any involvement in the purported scheme.  Thus, the AC's failure to adequately allege a strong inference of scienter, a necessary element of a securities fraud claim, warrants dismissal of this action in its entirety.

*Even if scienter were alleged, the AC fails to plead falsity.*  In addition to scienter, pleading falsity—specifically setting forth what the contested material misstatements and omissions were and why they were false or misleading—is another PSLRA requirement. The AC alleges vaguely that Defendants "conflated" sell-in with sell-out, presenting a false picture of Pepsi's demand for Celsius's product. Viewing the contested statements in context, as the PSLRA requires, undermines any allegation that investors would somehow confuse these two separate metrics. Defendants repeatedly disclosed that Celsius recognized revenue from sales to Pepsi when Pepsi received the product, not when Pepsi ultimately sold it, or when a consumer purchased it. Importantly, as evidenced by the very documents the AC cites, Defendants also disclosed to the market throughout 2023 that Pepsi needed time to determine the appropriate inventory, and that Celsius benefited from Pepsi's initial inventory build. To the extent the AC complains that Defendants allegedly made false statements about the future sales growth, such allegations cannot support a securities fraud claim. It is hornbook law that statements about *future* demand are protected by the PSLRA's safe harbor for forward-looking statements.  Finally, the PSLRA further requires a complaint to demonstrate *why* the challenged statements were false when made—another hurdle the AC cannot clear.  The AC should be dismissed for this independent reason.

In sum, the AC asks this Court to sanction its "fraud-by-hindsight" theory and condone a lawsuit against a company and its executives for purportedly failing to predict how decisions made by a separate enterprise would affect the company's business.  The Court should decline this invitation to expand the scope of liability in securities lawsuits enshrined in federal statutes and upheld by the courts for decades.

## I.    FACTUAL BACKGROUND

### A.    The Pepsi Distribution Agreement Positions Celsius for Further Growth.

Celsius is an energy drink company based in Boca Raton, Florida, and sells its products in the U.S. and internationally.[2]  (Ex. A at 1, 5).  Its beverages are popular among a wide range of

---

[2] Exhibit A ("Ex.") to the Declaration of Elizabeth Clark ("Decl.") filed herewith.  For the sake of consistency, all pinpoint citations to Exhibits refer to PDF page numbers, excluding slipsheets.  On

consumers, including fitness enthusiasts. *Id.*

The Individual Defendants are current Celsius executives. Mr. Fieldly has served as Celsius's CEO since 2018 and as Chairman of the Board of Directors of Celsius since 2020. (¶ 26). Mr. Langhans is Celsius's CFO and has served in that role since April 2022. (¶ 27). Mr. David is Celsius's Chief of Staff, a position he assumed in March 2024. (¶ 28).

Celsius as a company has experienced tremendous success and growth. Its reported revenue in 2021 was nearly $314.3 million, more than double the $130.7 million reported the prior year. (Ex. K at 58). On August 1, 2022, after rigorous arm's-length negotiations, Celsius announced the Distribution Agreement. (Ex. B at 1, 14). By its terms, Pepsi would become Celsius's primary customer and distributor in the U.S. and its preferred distributor internationally. *Id.* at 5. The Distribution Agreement positioned Celsius to gain immediate scale and accelerate market share through access to Pepsi's well-developed distribution network. *Id.* at 5-8. In other words, access to Pepsi's distribution network would expand the availability of Celsius products in various channels, including food service, convenience, vending, college campuses, concession, and military installations. *Id.*

### i. Celsius disclosed how it would recognize revenue from sales to Pepsi.

Celsius never hid the ball from investors concerning how it would recognize revenue in connection with the sales of product to Pepsi. In fact, Celsius attached a copy of the Distribution Agreement to its quarterly filing following the transaction, and explained in subsequent filings that Celsius would *"recognize revenues when control of the underlying goods are transferred to Pepsi."* (Ex. C at 15) (emphasis added); (Ex. L). Per the Distribution Agreement, Pepsi also determined how much Celsius product it needed. (Ex. L at 239).[3] Put simply, Pepsi was responsible for ordering the amount of product that it deemed appropriate based on its knowledge of its own distribution network and of that network's future demand for product; Celsius was tasked with filling the orders but had no control over Pepsi's inventory levels or ordering practices.

---

a motion to dismiss, the Court may consider the full text of documents incorporated into the AC by reference and matters of which the Court may take judicial notice, such as public filings and public statements. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[3] "Distributor shall issue all purchase orders to Company in written form via electronic data interface, facsimile or email and cause all purchase orders to list (i) the Licensed Products to be purchased, including SKUs, (ii) the quantities ordered, (iii) the requested delivery date and (iv) the delivery location." (Ex. L at 239).

### ii.    Celsius kept the market informed about Pepsi's inventory build.

In Celsius's public SEC filings, press releases, and earnings calls throughout 2023, Celsius disclosed that, with the new Distribution Agreement, Pepsi exercised sole control of Pepsi's inventory and Pepsi would need time to determine the appropriate level of inventory to meet the demands of Pepsi's customers.  Celsius also disclosed that it benefited from "inventory building" by Pepsi because Celsius revenue increased as Pepsi filled its warehouses, and distribution chain, with Celsius product.  Even a cursory review of Celsius's public statements during the Class Period demonstrates the market was informed about these points:

- Celsius benefited from Pepsi increasing inventory levels in Q1 2023, and the market expected "distributor inventory levels" to "remain elevated at least over the next few months" (Ex. F at 8, 13);

- Pepsi, as an independent distributor, was responsible for "find[ing] the right inventory levels" (Ex. G at 15);

- Pepsi engaged in an "inventory build" in Q3 2023 that boosted Celsius's reported revenue (Ex. H at 6);

- Pepsi was responsible for determining whether it would engage in any "management around the inventory [] going into Q1 [2024]" *Id*. at 9; and

- Celsius did not control how Pepsi managed its inventory and could not make any "guarantees" to the market around its inventory levels as a result.  *Id*.

### iii.    Retail sales slow and Pepsi reduces 2024 orders.

On May 28, 2024, Nielsen released a report on weekly retail data.  (¶ 113).  Analysts digesting that report noted that the data indicated a slowdown in consumer sales (sell-out) and perceived that Pepsi might reduce its Celsius inventory as a result.  (¶¶ 113-114).  Three months after analysts had prognosticated that Pepsi could reduce orders following a slowdown in retail demand, Celsius disclosed on September 4, 2024, that Pepsi orders for the third quarter had declined.  (¶¶ 121-124).  Celsius's gross and operating margins allegedly fell as a result, as reflected in its third quarter 2024 financial results.  (¶¶ 128-129).  Seizing on the stock drop that followed, the present action was filed a few weeks later on November 22, 2024.  (ECF No. 57).

## II.    APPLICABLE LEGAL STANDARD

FRCP 12(b)(6) mandates dismissal when a complaint "[f]ails to state a claim upon which relief can be granted."  To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff must sufficiently plead, among other elements, (1) a material misrepresentation or omission; (2) made with scienter.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th

Cir. 2008) (*citing Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

A private securities plaintiff faces a "triple-layered pleading standard." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). This means that, "to survive a motion to dismiss, a securities-fraud claim brought under Rule 10b-5 must satisfy not only the run-of-the-mill federal notice-pleading requirements, but also the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4." *Id.* (internal citations omitted). Congress enacted the PSLRA's heightened pleading standards to address "significant evidence of abuse in private securities lawsuits," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer." H.R. Conf. Rep. No. 104-369, at 31 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730.

As explained in further detail *infra*, the AC's failure to clear the Rule 9(b) and PSLRA hurdles on scienter and falsity dooms this lawsuit.

## III.    ARGUMENT

### A.    The AC's Failure to Plead Scienter Adequately Requires Dismissal.

The AC attempts to plead scienter by relying on irrelevant statements by CWs and sweeping allegations of stock sales by the Individual Defendants and non-parties. This is not enough under the federal securities laws. The PSLRA requires that "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In this Circuit, that means the AC must allege, at a minimum, "particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999). And the AC must satisfy this heightened pleading standard separately as to each defendant and as to each alleged act or omission. *Mizzaro*, 544 F.3d at 1238. When the AC cannot adequately allege a strong inference of scienter, the Court "need not address the other elements of a Section 10(b) violation or the corollary Section 20(a) claim." *Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1307-08 (11th Cir. 2015).

### i.    The AC cannot shore up the holes in its fraud theory with vague allegations by nameless former employees.

The CW allegations fail to allege a plausible inference of scienter. The CW allegations are critically deficient because they fail to show: (1) the CWs ever directly interacted with the

6

Individual Defendants and, thus, knew their respective states of mind; and (2) what information purportedly known to the Individual Defendants specifically contradicted their allegedly false statements.

At most, the allegations suggest corporate mismanagement, not the indicia of fraud necessary to maintain a securities class action. *See Carvelli v. Ocwen Fin. Corp.*, No. 17-cv-80500-RLR, 2018 WL 4941110, at *7 (S.D. Fla. Apr. 27, 2018) ("allowing mismanagement claims to proceed under 10b-5 would pose a 'danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5'") (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478-79 (1977)).   Thus, allegations by CWs concerning Celsius's Finance Department and supposed lack of "professionalism" are irrelevant.  (¶¶ 49-51).

***The AC does not allege the CWs directly interacted with the Individual Defendants.***  As an initial matter, the AC describes the three CWs as low-level Celsius employees and fails to allege that they ever spoke with or otherwise interacted with the Individual Defendants, much less had insight into their state of mind.  The AC alleges that CW1 sat two levels below Mr. Langhans in Celsius's chain of reporting (¶ 30), but the "mere fact that CW1 reported to" someone who in turn reported to Mr. Langhans "does not establish" Mr. Langhans' awareness of fraud.  *In re Mako Surgical Corp. Sec. Litig.*, No. 12-cv-60875, 2013 WL 2145661, at *12 (S.D. Fla. May 15, 2013). Nor can allegations that CW1 attended meetings in which Messrs. Fieldly and Langhans were in attendance evidence scienter, without additional allegations showing the purported fraud was discussed.  *Waterford Twp. Gen. Emples. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-cv-22572, 2010 WL 1332574, at *16 (S.D. Fla. Mar. 30, 2010) (scienter not found where complaint was "missing . . . any specific allegation that any of the Defendants were approached" concerning details of the actual alleged fraud).  These allegations are insufficient.  Other omissions are even easier to spot.  The AC makes no attempt to allege any connection between CW2 and CW3 and any Individual Defendant, and it does not allege Mr. David had any overlap in function or reporting with the CWs, or any responsibility for inventory or accounting.[4]   The allegations of these unnamed low-level employees who never interacted with the Individual Defendants should be disregarded.  *In re Royal Caribbean Cruises Ltd.*, No. 11-cv-22855, 2013 WL, 3295951 at *11,

---

[4] The vague allegations that CW2 discussed an order-entry issue with a former Celsius executive (¶ 50)—who is not a defendant in this lawsuit and left Celsius prior to the start of the Class Period—have no bearing on Defendants' scienter.

*18 (S.D. Fla. Apr. 18, 2013) (disregarding allegations of confidential witnesses who did not "recount any interaction with the Individual Defendants").

*The substance of the CW allegations does nothing to create a strong inference of scienter*. Conclusory CW statements concerning alleged reports and meetings but devoid of any detail about the information conveyed cannot support a strong inference of scienter in this Circuit. *In re Ocwen Fin. Corp. Sec. Litig.*, No. 14-cv-81057, 2015 WL 12780960, at *10 (S.D. Fla. Sep. 4, 2015) (quoting *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1219-20 (M.D. Fla. 2014)) ("[C]onfidential witness allegations, to be accorded much weight, must 'flesh out at least some of the details of the conversations, meetings, and internal documents that they describe.'"). Here, those conclusory statements about reporting concern an inventory count from Pepsi's database (¶ 61), a Daily Sales Report (¶ 66), and an "aged inventory analysis" (¶ 67). Taken together or separately, the allegations concerning these reports and other allegations concerning the tracking of inventory do not raise a strong inference of scienter.

As to database reporting, at best, the AC claims that certain individuals at Celsius—not the Individual Defendants—could obtain a snapshot in time of "Pepsi's on-hand inventory of Celsius products" by accessing a Pepsi database. (¶ 61). But there are no corresponding allegations setting forth what information this on-hand inventory data would have shown about Pepsi's future orders or of its projected sales to retail customers, or how or why a numerical can count would have caused the challenged statements to be false or misleading. And, even if some Celsius employees drew inferences about future Pepsi orders or excessive inventory in Pepsi's warehouses from the database snapshots (the AC does not allege any that did), there are no allegations that the Individual Defendants themselves could or did access Pepsi's database, or that they drew similar inferences. In other words, the CW allegations lack any particularized facts specifying how Defendants became aware of a "glut" in Pepsi's warehouses when compared to projected demand for the Celsius products in Pepsi's inventory.

Separately, the AC alleges that Defendants were "made aware of the decline in sales to Pepsi through a 'Daily Sales Report.'" (¶ 66). The AC contains no explanation of how these reports would contradict Defendants' public statements. Courts have held that similar allegations that defendants "regularly tracked" inventory and "had access to daily sales reports" are insufficient where, as here, they "fail to specify exactly what information was contained in the report or how said information contradicted Defendants' public statements, as is required to show

scienter." *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021); *see also In re Royal Caribbean Cruises Ltd.*, 2013 WL 3295951, at *17-18. In addition, CW2, the alleged source of information concerning the Daily Sales Report, was only "occasionally" an indirect recipient of "the email that sent" it. (¶ 66). CW2 is alleged to have worked for Celsius from March 2021 until January 2024. (¶ 31). But there are no allegations to show his "occasional" receipt of the report occurred during the Class Period, which began in May 2023, much less during the time of the alleged "glut." (¶ 66). The alleged report was also "occasionally" accompanied by "broader sales data or historical context;" there is no attempt to link this "occasional" sales information to the alleged misstatements in the AC.

Similarly, the AC contains no allegations concerning recipients of the "aged inventory analysis" that supposedly "documented product that had been sitting unsold in various distribution centers, including those of Pepsi" beyond referencing CW1's belief that unnamed members of the "the Operations Department" would provide a copy to similarly unnamed members of the "Finance Department." (¶ 67). And there is no attempt to explain how meetings where "year-over-year financial data" was discussed relate to the alleged scheme presented in the AC. (¶ 65).

Finally, grasping for straws, the AC also alleges that Mr. "Fieldly himself acknowledged during Celsius's February 29, 2024 earnings call that Celsius 'look[s] at [Pepsi's] inventory levels.'" (¶ 61). This is a gross mischaracterization of Mr. Fieldly's statement, which compares inventory levels looking back quarter-over-quarter: "I think when we looked at our number one customer [Pepsi] and we look at their inventory levels, they're fairly consistent with Q3 to Q4." (Ex. I at 8). Taken in context, this statement addresses historic inventory and is not a projection of future sales to Pepsi, or of Pepsi's inventory levels.

In sum, the CW allegations are filler, merely reiterating the obvious fact that sales to Pepsi were significant to Celsius.[5]

> **ii.      The stock sales alleged do not support a strong inference of scienter.**

"Stock sales by insiders are only relevant to scienter when they are suspicious." *City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*, 649 F. Supp. 3d 1256, 1266 (S.D. Fla. 2022). "And they are suspicious if the level of trading is dramatically out of line with prior trading

---

[5] Allegations that there was a "lot of talk about Pepsi" and that Celsius was "getting a lot of Pepsi orders" cannot support an inference of scienter. (¶ 62). *See Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1333 (S.D. Fla. 2004) (allegations that information was "generally known" are "not sufficient").

practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id*. (internal citations and quotations omitted). To aid in this inquiry, courts in this Circuit consider "(1) the amount and percentage of shares sold, (2) the timing of the sales, and (3) the consistency between the sales and the insider's prior trading history." *Id*. The AC's allegations on insider stock sales fail because: (1) they exclude the requisite information on prior trading history; (2) the allegations concerning trading around the Lock-Up Agreements are contradictory; (3) the Individual Defendants' stock sales are not suspicious in timing or motive; and (4) alleged stock sales by non-defendants do not support an inference of scienter.

*The AC does not show any inconsistency between the stock sales and prior trading history.* Plaintiffs "bear the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing." *Druskin*, 299 F. Supp. 2d at 1335. The AC fails to carry that burden here. The AC does not "plead any information about any [] trading history before the class period." *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 793 (11th Cir. 2010). Therefore, "there is no way to determine from the complaint that the sales of [even] large numbers of shares [were] suspicious enough to add to an inference of scienter." *Id.* Such "conclusory allegations of insider trading" should be given "no weight in considering the inference of scienter raised by the complaint." *Id*. None of the alleged insider stock sales can support an inference of scienter in this Circuit because it is impossible to determine that the "level of trading is dramatically out of line with prior trading practices." *Citrix Sys., Inc.*, 649 F. Supp. 3d at 1266; *In re Floor & Decor Holdings, Inc.*, No. 19-cv-2270, 2020 WL 13543880, at *9-10 (N.D. Ga. Sep. 21, 2020) (affording allegations of stock sales "no weight in considering the question of scienter" because complaint failed to provide information regarding trading history). The stock sales allegations should be disregarded on this basis alone.

*The scienter allegations concerning the Lock Up Agreements are contradictory and illogical.* The AC makes contradictory allegations concerning the Lock-Up Agreements, which were executed in parallel with the Distribution Agreement and allegedly prohibited the Individual Defendants from selling Celsius stock prior to August 2023. The AC alleges that stock sales that occurred "in violation" of the Lock-Up Agreements evidence scienter. (¶¶ 163-168). In the same breath, the AC alleges that the Individual Defendants "had motive to keep Celsius's stock price inflated through the end of the lock-up period, when they would be able to sell their shares" (¶ 55) and that they made false statements during the first and second quarters of 2023 for the express

10

purpose of inflating the market in advance of the expiration of the Lock-Up Agreements. (¶¶ 84-85). Mischaracterization of the Lock-Up Agreements notwithstanding, both things cannot be true.[6] Defendants cannot have been motivated to keep Celsius stock artificially inflated through the expiration of the lock-up period while also allegedly trading in violation of the lock-up period. Such contradictory allegations cannot support an inference of scienter.

*The Individual Defendants' stock sales are not suspicious.* Setting aside the trades of non-parties, and the AC's failure to provide information concerning historical trading patterns, the allegations concerning trades by the Individual Defendants are also deficient.

Mr. Fieldly retained the majority of his shares and sold some for tax purposes. The AC alleges that Mr. Fieldly's insider selling was the "most significant and unusual" but acknowledges that he sold just 17% of his holdings of Celsius stock between May 9, 2023 and March 31, 2024. (¶¶ 140, 143). Even accepting the AC's baseline calculation as true, courts in the Eleventh Circuit have held stock sales in this amount are not suspicious. *Citrix Sys., Inc.*, 649 F. Supp. 3d at 1268 ("Courts have found that sales of 11% and 17% of an insider's stock holdings are insufficient to establish an inference of scienter."). An amount of sales this low relative to overall holdings means that *Mr. Fieldly maintained the majority of his Celsius shares*, and that he would have suffered a significant loss upon the alleged corrective disclosure and subsequent decline in stock value. This cuts against any inference that Mr. Fieldly was aware of the alleged fraud. Moreover, certain of these alleged trades were explicitly made for planned tax purposes. One of the publicly filed documents discussing the trades referenced in the AC, known as a Form-4, includes the following disclaimer: "The reporting person sold such shares solely to pay tax liability upon the vesting of RSUs." (Ex. M) (emphasis added). Courts have found that such stock sales are inherently not suspicious and cannot support an inference of scienter as a result, regardless of whether the sale occurred pursuant to a 10b5-1 trading plan. *In re Teladoc Health, Inc. Sec. Litig.*, No. 22-cv-4687, 2025 WL 886934, at *10 (S.D.N.Y. Mar. 21, 2025) (stock sales not made pursuant to Rule 10b5-1 plans that were "made to cover tax obligations" are "not suspicious"). Finally, the largest alleged trades by Mr. Fieldly occurred in August and December 2023 (¶ 139), months before Celsius stock reached its "all time high." (¶¶ 96-97). This timing is not suspicious.

The AC miscalculated Mr. Langhans' stock sales, and he sold shares for tax purposes. The

---

[6] Defendants dispute the AC's characterization of sales as violating the Lock-Up agreements.

AC alleges that Mr. Langhans sold Celsius stock in a suspicious manner five times. (¶ 139). One of those sales, on August 22, 2023, appears to have been erroneously attributed to Mr. Langhans, as there is no corresponding Form-4 for any sale by him on that date. Thus, the AC's allegations concerning the total amount and value of stock sales by Mr. Langhans are inaccurate and should be disregarded. Three of the four remaining trades at issue are associated with Form 4-s that state: "The reporting person sold such shares to pay tax liability upon the vesting of RSUs." (Ex. N at 1, 3, 5). To put it differently, *80%* of Mr. Langhans' trading activity complained of by the AC was made for the express purpose of paying tax obligations or was erroneously attributed to him. Because "information contained in the Forms 4[s] that reported [Mr. Langhans'] trades to the SEC suggests that the trades were executed for legitimate rather than fraudulent purposes," his trades cannot support a strong inference of scienter. *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15-cv-6034, 2016 WL 5794774, at *20 (S.D.N.Y. Sep. 30, 2016).

Mr. David made one sale for tax purposes and the timing of the other sale is not suspicious. The AC complains of only two trades by Mr. David. One of these trades, however, is explicitly identified in the corresponding Form-4 as a sale "solely to pay tax liability upon the vesting of RSUs" (Ex. O at 3) and is inherently not suspicious as a result. *In re Teladoc Health, Inc. Sec. Litig.*, 2025 WL 886934, at *10. The sole remaining trade on August 22, 2023, cannot support an inference of scienter. (Ex. O at 1). The timing of this trade is not suspicious, as it occurred early in the Class Period and well before the first purported disclosure of the alleged fraud. If Mr. David had "pumped the market with lies" to maximize his own profits (¶¶ 12, 85), he did a very bad job, selling stock many months before Celsius reached the March 2024 "all-time high" the AC alleges. (¶¶ 96-97). *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan*, 2016 WL 5794774, at *19 ("[S]tock sales occurring even a few months before the alleged revelation of the fraud do not raise a strong inference of scienter."); *In re Astea Int'l Inc. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, at *15 (E.D. Pa. Aug. 8, 2007) (gap between sale and corrective disclosure of "five months weakens the inference that the individual defendants were motivated to cash out before [the relevant disclosure]."). Further, based on the AC's own calculations, Mr. David maintained *70%* of his Celsius holdings (¶ 135), a factor that cuts against any inference of scienter.

Finally, Celsius's stock price reached significant highs during the Class Period. (¶¶ 96-97). "There is nothing unusual, or necessarily suspicious, about insider sales during periods of

rapid stock price increases . . . [T]he portfolios of corporate insiders are often heavily weighted with the stock of the company.  It is hardly surprising that such executives have a strong incentive to cash out at least some portion of their holdings when prices are high." *Local No. 8 IBEW Ret. Plan v. Vertex Pharm., Inc.*, 140 F. Supp. 3d 120, 136 (D. Mass. 2015).  Accordingly, there is nothing suspicious about the Individual Defendants' alleged stock sales.

> *Alleged stock sales by non-defendants do not support an inference of scienter.*  To distract from the deficient allegations about the Individual Defendants' innocuous trading, the AC hopes to drum up suspicion from the trading of non-parties.  The AC charts trading by several non-defendants characterized as "other corporate insiders."  (¶¶ 151-156).  The AC does not allege that these nonparties had any involvement in the alleged fraud, and, thus, their trading does not support an inference of scienter with respect to the "only individuals whose mental states matter," the Individual Defendants.  *Welgus v. TriNet Grp., Inc.*, No. 15-cv-03625, 2017 WL 6466264, at \*18 (N.D. Cal. Dec. 18, 2017)*; Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 550 (D.N.J. 2010) ("allegations that . . . [non-party, former executives] sold their stocks during the Class Period do not establish scienter on the part of [named Defendants]") (collecting cases).  The AC not only fails to allege these non-parties participated in the purported fraud, it fails to allege they were exposed to it in anyway.  It does not allege that these individuals possessed knowledge of Celsius's inventory at any given time, much less how they would have information concerning Pepsi's inventory or identified any "glut" in Pepsi's warehouses related to projected demand from its customers.  Because the AC contains no allegations to explain how the non-defendants that allegedly traded during the Class Period "had the opportunity to influence or to know about" the alleged fraud, the stock sales are "irrelevant."  *In re Molson Coors Bev. Co. Sec. Litig.*, No. 19-cv-00455, 2020 WL 13499995, at \*7 (D. Colo. Dec. 2, 2020).

In sum, the AC should be dismissed in its entirety because neither the CW allegations nor the purported stock sales can support the requisite strong inference of scienter.

### B.      None of the Alleged Misstatements or Omissions Are Actionable.

Even if the scienter allegations cleared the bar the PSLRA sets, and they do not for the reasons set forth *supra*, the AC cannot adequately allege falsity.  To state a claim under Section 10(b), the AC must plead an actionable misrepresentation or omission of a material fact with particularity. 15 U.S.C. § 78u-4(b)(1).  Alleged misstatements and omissions are actionable only if they are material.  *Mizzaro*, 544 F.3d at 1236.  In assessing materiality, courts assess whether

13

there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1275 (S.D. Fla. 2017) (citations and quotations omitted).

To plead a material misstatement or omission with particularity, a complaint "must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1262 (11th Cir. 2006) (quoting 15 U.S.C. § 78u-4(b)(1)). The alleged misstatements and omissions should also be considered in the context of the complete documents referenced. *In re KLX, Inc. Sec. Litig*., 232 F. Supp. 3d at 1275. As discussed in detail below, the AC's falsity allegations are completely undercut by Celsius's disclosures of revenue recognition and by Pepsi's responsibility for placing its own orders. The AC's allegations that misstatements were misleading because they gave investors an inaccurate picture of future demand also fail because those statements, if made, would be protected by the PSLRA's safe harbor provision. Finally, the AC fails to allege why certain statements were false, a threshold requirement to state a securities fraud claim.

### i. The company's disclosures undercut the AC's allegations concerning misleading investors regarding the impact of Pepsi's orders on sales, revenue, or demand.

The AC alleges that Defendants misled investors by conflating sales of Celsius products to Pepsi and sales to end consumers. (¶¶ 70, 72, 75, 83, 89, 92). But the very documents referenced in the AC demonstrate that Defendants repeatedly disclosed the way revenue recognition worked under the Distribution Agreement such that investors knew revenue was recognized upon delivery to Pepsi and not at the time of "sell out" to consumers. As discussed below, Defendants' statements revealed to investors that, during the Class Period, Pepsi needed to build inventory and determine the optimal inventory count for its distribution network's needs going forward.

*Celsius disclosed that it recognized sales revenue from Pepsi upon delivery.* The AC repeatedly alleges that investors did not know that inventory sold and delivered to Pepsi "would be immediately report[ed] as increased revenue but would only be distributed by Pepsi and sold to consumers over a much longer period of time." (¶8, *see also* ¶¶ 60, 70, 123-4). In fact, the overarching theory of the AC is that investors were misled into believing that Celsius's reported

14

growth in sales to Pepsi represented a corresponding growth in sales "out," or growth in Pepsi's sales to the retailers, or the retailer's sales to consumers. (¶¶ 69-72, 75, 77-80, 82-83, 88-92, 99-112). This allegation completely ignores that Celsius clearly and consistently disclosed the way it recognized revenue from Pepsi under the Distribution Agreement from the outset: "For product sales under the Distribution Agreement, the Company will recognize revenues when control of the underlying goods are transferred to Pepsi based on the contractual terms of noncancellable purchase orders issued by Pepsi."[7] (Ex. C at 15; Ex. D at 17; Ex. K at 71; *see also* Ex. E at 17; Ex. A at 58). As a result, investors were aware that the revenue Celsius reported from sales to Pepsi included product that remained in Pepsi's inventory, and that sales to Pepsi did not correspond to Pepsi's sales to retailers or the ultimate consumer. Thus, the AC fails to show statements alleged to have "conflated" Celsius's sell-in to Pepsi with sell-out were false or misleading.

   ***Celsius disclosed inventory building by Pepsi in 2023.*** The AC alleges that Defendants hid a "one-time buildup of stock" in 2023 from investors. (¶¶ 60, 70, 72, 74, 78, 102-104). But Celsius's public statements are replete with examples of discussions by Defendants of Pepsi building and independently managing its inventory in 2023:

| | |
|---|---|
| May 9, 2023 Earnings Call | • Analysts participating in the call distinguished between an "initial channel fill . . . versus reorders derived from sell through at retail" and said they understood "distributor inventory levels [were] going to remain elevated at least over the next few months." (Ex. F at 8). |
| | • "We did talk about in the quarter how *we saw Pepsi increase inventory levels*, which Jarrod talked about earlier in regards to approximately $20 million to $25 million, we feel is the average impact for the quarter with the increased inventory levels." (*Id.*) (emphasis added). |
| June 1, 2023 Shareholders Meeting | • "During the quarter, we also saw an increase in the days inventory outstanding within the mixing centers of our primary distributor [Pepsi] relative to the end of 2022." (Ex. J at 4). |
| August 8, 2023 Earnings Call | • An analyst explicitly referenced "distributor inventory levels" and the "$20 million to $25 million last quarter that was shipped into the Pepsi distribution system ahead of summer." The analyst further asked whether Pepsi was "still trying to find the right inventory levels" given the relativity short life of the Distribution Agreement. (Ex. G at 15). |

---

[7] "The usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in context." *In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *3 (internal quotation marks omitted). It is therefore appropriate for the Court to consider the alleged misstatements in the context of the complete filings and statements.

| | |
|---|---|
| | • "So, they are at [an inventory] level that we would prefer they stay. But obviously it's part of the partnership, so it's not just us. Now, will that change? It could. Again, right now, Q1 and Q2 has been consistent from a [days inventory outstanding] perspective. We'd expect that to continue on into Q3. When we get to Q4, I'm not sure that'll stay at its kind of, what I'll call, preferred run rate or if it would go down, that's something that our partner [Pepsi] will have to make that decision in terms of how they want to kind of end the year prior to moving into the Q1 2024." *Id.* |
| November 7, 2023 Earnings Call | • "In addition to these drivers, *we benefited from some inventory building within [Pepsi]* as well as from adjustments to our promotional allowances with some offsets to our growth as a result of mix within our SKUs and channels." (Ex. H at 6) (emphasis added).<br><br>• "As we look last year, it was difficult to really kind of peg whether inventories were pulled down or it was just a matter of seasonality. As we look now, we do have some innovation that we've filled the pipeline with, so we are ready from that perspective. But at the end of the day, *the Pepsi team would have to determine if they're going to do any kind of management around the inventory* as they're going into Q1. I will say we are excited as we move into 2024, *but there's no guarantees in terms of the inventory management from that perspective*." *Id.* |

These statements show that investors were aware not only of Pepsi building inventory in 2023, but of its positive impact on Celsius's financials. The repeated and consistent disclosure of information about Pepsi's inventory contradicts the AC's theory that Defendants sought to conceal an inevitable sales slowdown. The challenged statements cannot support a claim as a result.

          **ii.**          **Celsius's extensive risk disclosures invoke the PSLRA's safe harbor.**

The PSLRA provides a safe harbor from liability for certain "forward-looking statements." *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). This means "corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* (internal citations and quotations omitted). A "forward-looking" statement includes: "(A) a statement containing a projection of revenues . . . or other financial items;" "(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" "(C) a statement of future economic performance;" and "(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)." 15 U.S.C. § 78u-5(i). In sum, "[s]tatements about projections of

16

revenue, income, and other financial items and metrics" are forward-looking. *Gonzalez v. Cano Health, Inc.*, No. 22-cv-20827, 2024 WL 4415216, at \*8 (S.D. Fla. Oct. 4, 2024).

The AC's theory of liability rests on forward-looking statements. In other words, there are no allegations that the sales or revenue numbers reported in Celsius's financials were false. Instead, the AC's allegations hinge on the theory that Defendants misled investors concerning *future* demand, sales, and revenue. The AC alleges that the "sell-in . . . represented a one-time buildup of stock *that would not be repeated in the future*" (¶ 72) (emphasis added); that "the truth was that Celsius's sales reflected a one-time buildup of stock *that would not be repeated in the future*" (¶ 78) (emphasis added); and Defendants misrepresented that "inventory *was not going to* increase." (¶ 107) (emphasis added). In addition, the alleged misstatement "inventory fluctuations may be expected in subsequent quarters" is explicitly forward-looking. (¶¶ 105-107). Thus, the alleged misstatements fall squarely within the PSLRA's safe harbor because, while stated in the present tense, they were dependent upon future events before their truth or falsity could be decided. *See Harris*, 182 F.3d at 805; *Police & Fire Ret. Sys. of the City of Detroit v. Axogen, Inc.*, No. 19-cv-69-T-60AAS, 2020 WL 13547449, at \*14 (M.D. Fla. Apr. 21, 2020) (finding the PSLRA's safe harbor applied to statements not alleged "to be false on their own, but to be misleading due to the context in which they appear as part of the explanation underlying a forward-looking projection").

The AC conveniently omits Celsius's voluminous cautionary disclosures concerning its expectations with respect to revenue, profitability, demand, and distribution. In fact, Celsius repeatedly warned investors that "*forward-looking statements may include* . . . *statements about* . . . expectations regarding our business, including market opportunity, *consumer demand* and our competitive advantage" along with "*expectations regarding supply chains and distribution networks*." (Ex. C at 29) (emphasis added); (Ex. D at 32) (emphasis added); (Ex. E at 31) (emphasis added).

Here, the cautionary disclosures cover the challenged statements one-for-one. The AC alleges that Celsius failed to disclose "Pepsi had amassed a significant amount of unsold inventory *that would materially impact the Company's sales going forward*." (¶ 14) (emphasis added). Yet Celsius consistently warned in disclosures that "failure to accurately estimate demand for [its] products could adversely affect [its] business and financial results." (Ex. A at 12; Ex. K at 19). In addition, Celsius disclosed that *"[i]f the inventory of our products held by our distributors or retailers is too high, they will not place orders for additional products*, which could unfavorably

impact our future sales and have a material adverse effect on our business, financial condition, results of operations, and cash flows." (Ex. A at 12) (emphasis added); (Ex. K at 13) (emphasis added). These disclosures go to the very heart of the AC's allegations, and the AC's claims fail as a result.[8]

### iii. The AC fails to plead why Defendants' statements were false.

The AC must "specify each allegedly misleading statement *and explain why it is misleading*." *Citrix Sys., Inc.*, 649 F. Supp. 3d at 1265 (emphasis added). Statements that are on their face not false must be dismissed. *See Carvelli*, 2018 WL 4941110, at *6.

*The AC fails to allege why challenged statements allegedly concealing a glut of inventory at Pepsi are misleading.* The AC alleges many of Defendants' statements hid a "glut" of inventory in Pepsi warehouses. (¶¶ 69-72, 78, 102-03, 108-10). But the AC's own allegations on the supposed "glut" of inventory are inconsistent and undermine its entire theory of the supposed fraud. The AC asserts that by "May 2023, Pepsi had already completed or was in the height of infilling its inventory" (¶¶ 70, 72) but then notes that Celsius reported increases in sales and "record revenue" throughout the last two quarters of that year (¶ 94). If Pepsi had already accumulated an alleged "glut" of inventory by May 2023, under the AC's own theory, Celsius sales should have *decreased* from that point forward, as Pepsi could draw down on existing inventory and not purchase additional product from Celsius. Instead, the AC's own allegations suggest that sales did not even begin to decline until the first quarter of 2024 (¶ 100), well after the alleged "stock up" by Pepsi was complete. These inconsistent allegations undercut the AC's claims that Defendants' statements hid a supposed "glut" of inventory from the market.

*The AC fails to allege statements concerning velocity and demand were false when made.* To successfully state a claim for securities fraud, Plaintiff "must present facts showing statements were false when made, not that defendants learned of the falsity months later." *Vitalone v. Logitech Int'l*, No. 11-cv-03855, 2012 WL 13041992, at *5 (N.D. Cal. July 13, 2012). For the reasons discussed *supra*, the AC cannot demonstrate when or how Defendants knew that Pepsi was placing orders for more inventory than it needed, that Pepsi's warehouses had a "glut" of inventory, or that

---

[8] "Even if the forward-looking statement has no accompanying cautionary language, the plaintiff must prove that the defendant made the statement with actual knowledge that it was false or misleading." *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999) (citations and quotations omitted). As previously discussed, the AC cannot even show Defendants acted recklessly, much less that they had actual knowledge the challenged statements were false when made.

sales in 2024 would decline as a result.  The alleged disclosures concerning Pepsi's inventory levels in 2024, including the statement that Pepsi was holding more cases "than they really needed to hold" (¶ 124), are insufficient to demonstrate falsity as they cannot "establish the existence of unhealthy inventory months earlier." *Vitalone,* 2012 WL 13041992, at *5.  This is especially true in the case of alleged excess inventory levels held by a wholly separate entity, where there are no allegations to show that Defendants had information concerning Pepsi's plans for future orders.

***The AC cannot plead falsity by blatantly mischaracterizing Defendants' statements.***  When an allegation "mischaracterizes the plain language of the actual disclosures," it "need not be credited."  *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d at 1276.  In an attempt to plead fraud-by-hindsight, the AC creatively cuts and pastes excerpts of statements by the Individual Defendants to draw inferences that no reasonable investor would have made.

The AC alleges that Mr. Langhans' statement "touting . . . the benefits of the Pepsi agreement together with his exhortation of Celsius's 'increased velocity' was designed to mislead investors to believe that the rate of growth in velocity was the same as the rate of growth in revenue and sales."  (¶ 70).  The Q1 2023 earnings call transcript reveals, however, that he referenced several "primary factors behind the increase in North American sales volume . . . including continued strong growth in traditional distribution channels including SKU increases, as well as distribution across a number of new channels within CNG and foodservice."  (Ex. F at 4).  He did not reference velocity in the sentence addressing the primary factors.  Separately, he stated that Celsius had "also seen [its] velocity increase post our significant [all commodity volume] growth." *Id*.  Nothing in this statement, when read in context, suggests that the rate of growth in velocity was the same as the rate of growth in revenue and sales.  The AC similarly mischaracterizes Mr. Langhans' statement that includes integration into Pepsi's distribution network as one of "several key factors" driving sales on the second quarter earnings call.  (¶¶ 82-83).  The AC does not dispute that integration into the Pepsi distribution system was a driver of Celsius's growth.  Nor can it credibly suggest that Mr. Langhans' statement actually linked velocity and sales.  In fact, ***none*** of the statements in the AC alleged to have correlated sales growth with velocity actually link the two when read in context.  (¶¶ 69, 72, 82-83, 88-89, 91-92).  This Frankenstein pleading strategy cannot sustain a claim.

***Challenged statements without any corresponding falsity allegations must be dismissed.***  The AC identifies several alleged misstatements by Individual Defendants without providing any

19

supporting allegations as to why they were false or misleading when made.  (¶¶ 94-95, 99-101, 117-118).  This fails the PSLRA's exacting pleading standards.  *See Garfield*, 466 F.3d at 1262 (11th Cir. 2006).  These statements should be dismissed.

### iv.     Corporate optimism is not actionable.

The AC includes alleged misstatements that are corporate puffery and therefore not actionable under the securities laws.   Statements that Celsius "continued to build upon the momentum" (¶ 73), that Celsius was working towards its goal of "driv[ing] efficiencies and optimization within the system while maintaining [its] #1 goal of keeping the shelf stocked in order to meet the consumer demand" (¶ 77), that Pepsi had a "massive distribution" and was "best-in-class" (¶¶ 90, 91), that Celsius "felt confident" (¶ 108), that "sales were flowing" and sales and growth were "strong" (¶¶ 77, 111), and that Celsius was "in a good place" (¶ 118) are classic puffery.  This is exactly the sort of "generalized, vague, nonquantifiable statements of corporate optimism" that the Eleventh Circuit and other courts have found inactionable. *Carvelli*, 934 F.3d at 1318; *see also Mogensen,* 15 F. Supp. 3d at 1211 (statement that company "felt confident" was inactionable puffery); *see also Vitalone v. Logitech Int'l*, 2012 WL 13041992, at *6 (allegations that demand was "strong," and inventory levels were "healthy" were puffery); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 223-24 (E.D.N.Y. 2019) (descriptions of relationships with "world-class" vendors puffery).

### C.     The Section 20(a) Claim Against Mr. Fieldly and Mr. Langhans Also Fails.

Because the AC fails to allege adequately a primary violation of Section 10(b) or Rule 10b-5, the claim for controlling person liability under Section 20(a) must also be dismissed.  *See In re Galectin Therapeutics, Inc.,* 843 F.3d 1257, 1276 (11th Cir. 2016) ("Control person liability . . . cannot exist in the absence of a primary violation.") (quotation marks and citation omitted); *Mizzaro*, 544 F.3d at 1237.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion be granted, and the AC be dismissed in its entirety with prejudice.

20

Date: June 13, 2025                    Respectfully submitted,

                                       **JONES FOSTER P.A.**


                                       */s/   Scott G. Hawkins*
                                       SCOTT G. HAWKINS
                                       Florida Bar No. 460117
                                       505 South Flagler Drive
                                       Suite 1100
                                       West Palm Beach, Florida 33401
                                       Telephone: (561) 659-3000
                                       SHawkins@jonesfoster.com

                                              and

                                       *Additional Counsel (Admitted Pro Hac Vice)*

                                       **ALSTON & BIRD**
                                       JOSEPH G. TULLY
                                       ELIZABETH GINGOLD CLARK
                                       COURTNEY QUIRÓS
                                       1201 West Peachtree Street, Suite 4900
                                       Atlanta, Georgia 30309
                                       Telephone: (404) 881-7000
                                       Facsimile: (404) 881-7777
                                       joe.tully@alston.com
                                       elizabeth.clark@alston.com
                                       courtney.quiros@alston.com

                                       *Attorneys for Defendants Celsius Holdings, Inc., John
                                       Fieldly, Jarrod Langhans, and Toby David*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2025, I caused the foregoing to be filed electronically with the Court's Case Management/Electronic Filing System ("CM/ECF"). Notice of this filing was sent to all parties of record by operation of the Notice of Electronic Filing System, and the parties to this action may access the filing through CM/ECF.

/s/ Scott G. Hawkins
SCOTT G. HAWKINS

#6607302 v1 33851-00001