# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2023**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: **001-34611**



**CELSIUS HOLDINGS, INC.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **20-2745790** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2424 N Federal Highway, Suite 208, Boca Raton, Florida** | **33431** |
| (Address of principal executive offices) | (Zip Code) |

**(561) 276-2239**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Trading Symbol(s)** | **Name of Each Exchange on Which Registered** |
|---|---|---|
| Common Stock, $0.001 par value per share | CELH | Nasdaq Capital Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing

reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the common stock held by non-affiliates of the registrant was approximately $4.7 billion as of June 30, 2023, on the Nasdaq Capital Market. For purposes of the foregoing computation, all executive officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates.

There were 232,793,007 shares of common stock outstanding as of February 21, 2024.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Definitive Proxy Statement to be filed subsequent to the date hereof with the Securities and Exchange Commission (the "SEC") pursuant to Regulation 14A in connection with the registrant's 2024 Annual Meeting of Stockholders are incorporated by reference into Part III of this Report. Such Definitive Proxy Statement will be filed with the SEC no later than 120 days after the conclusion of the registrant's fiscal year ended December 31, 2023.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Cautionary Statements Regarding Forward-Looking Statements | | |
| | | |
| **Part I** | | 1 |
| | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 20 |
| Item 1C. | Cybersecurity | 20 |
| Item 2. | Properties | 21 |
| Item 3. | Legal Proceedings | 21 |
| Item 4. | Mine Safety Disclosures | 21 |
| | | |
| **Part II** | | 22 |
| | | |
| Item 5. | Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 22 |
| Item 6. | [Reserved] | 23 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 8. | Financial Statements and Supplementary Data | 30 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 30 |
| Item 9A. | Controls and Procedures | 30 |
| Item 9B. | Other Information | 32 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 32 |
| | | |
| **Part III** | | 33 |
| | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 33 |
| Item 11. | Executive Compensation | 33 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 33 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 33 |
| Item 14. | Principal Accountant Fees and Services | 33 |
| | | |
| **Part IV** | | 34 |
| | | |
| Item 15. | Exhibit and Financial Statement Schedules | 34 |
| Item 16. | Form 10-K Summary | 35 |
| | | |
| Signatures | | 36 |

**Cautionary Statements Regarding Forward-Looking Statements**

This Annual Report on Form 10-K (this "Report") contains forward-looking statements that are based on the current expectations of our Company and management about future events within the meaning of the United States Private Securities Litigation Reform Act of 1995 ("PSLRA"), Section 27A of the Securities Act of 1933, as amended (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and are made in reliance of the safe harbor protections provided thereunder. While we have specifically identified certain information as being forward-looking in the context of its presentation, we caution you that all statements contained in this Report that are not clearly historical in nature, including statements regarding the strategic investment by and long term partnership with PepsiCo, Inc. ("Pepsi"); anticipated financial performance; management's plans and objectives for international expansion and future operations globally; the successful development, commercialization, and timing of new products; business prospects; outcomes of regulatory proceedings; market conditions; the current and future market size for existing or new products; any stated or implied outcomes with regards to the foregoing; and other matters are forward-looking. Forward-looking statements are contained principally in the sections of this report entitled "Business," "Risk Factors," and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Without limiting the generality of the preceding sentences, any time we use the words "expects," "intends," "will," "anticipates," "believes," "confident," "continue," "propose," "seeks," "could," "may," "should," "estimates," "forecasts," "might," "goals," "objectives," "targets," "planned," "projects," and, in each case, their negative or other various or comparable terminology, and similar expressions, we intend to clearly express that the information deals with possible future events and is forward-looking in nature. However, the absence of these words or similar expressions does not mean that a statement is not forward-looking. Particular uncertainties that could cause our actual results to be materially different than those expressed in our forward-looking statements include, without limitation:

- Our ability to maintain a strong relationship with Pepsi or any of our other distributors;

- The impact of the consolidation of retailers, wholesalers and distributors in the industry;

- Our ability to maintain strong relationships with co-packers to manufacture our products;

- Our ability to maintain strong relationships with our customers;

- The impact of increases in cost or shortages of raw materials or increases in costs of co-packing;

- Our ability to successfully generate demand through the use of third-parties, including celebrities, social media influencers, and others, may expose us to risk of negative publicity, litigation, and/or regulatory enforcement action;

- Our failure to accurately estimate demand for our products;

- The impact of additional labeling or warning requirements or limitations on the marketing or sale of our products;

- Our ability to successfully expand outside of the United States ("U.S.") and the impact of U.S. and international laws, including export and import controls and other risk exposure;

- Our ability to successfully complete or manage strategic transactions;

- Our ability to protect our brand, trademarks, proprietary rights, and our other intellectual property;

- The impact of internal and external cyber-security threats and breaches;

- Our ability to comply with data privacy and personal data protection laws;

- Our ability to effectively manage future growth;

- The impact of global or regional catastrophic events on our operations and ability to grow;

- The impact of any actions by the U.S. Food and Drug Administration (the "FDA") regarding the manufacture, composition/ingredients, packaging, marketing/labeling, storage, transportation, and/or distribution of our products;

- The impact of any actions by the Federal Trade Commission (the "FTC") on our advertising;

- Our ability to effectively compete in the functional beverage product industry and the strength of such industry;

- The impact of changes in consumer product and shopping preferences;

- The impact of changes in government regulation and our ability to comply with existing regulation concerning energy drinks; and

- Other factors that are described in this Report under the heading "Risk Factors."

Forward-looking statements and information involve risks, uncertainties, and other factors that could cause actual results to differ materially from those expressed or implied in, or reasonably inferred from, such statements, including without limitation, the risks and uncertainties disclosed or referenced in Part I, Item 1A. *Risk Factors.* Therefore, caution should be taken not to place undue reliance on any such forward-looking statements. Much of the information in this Report that looks toward future performance is based on various factors and important assumptions about future events that may or may not actually occur. As a result, our operations and financial results in the future could differ materially and substantially from those we have discussed in the forward-looking statements included in this Report. We assume no obligation (and specifically disclaim any such obligation) to publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise, except as required by law.

**PART I**

**Item 1. Business.**

When used in this Report, unless otherwise indicated, the terms the "Company," "Celsius," "we," "us" and "our" refer to Celsius Holdings, Inc. and its subsidiaries.

**Overview**

Celsius is a fast-growing company in the functional energy drink category in the U.S. and internationally. We engage in the development, processing, marketing, sale, and distribution of functional energy drinks to a broad range of consumers. We provide differentiated products that offer clinically proven and innovative formulas meant to positively impact the lives of our consumers. Our brand has also proven to be attractive to a broad range of customers, including fitness enthusiasts.

Our flagship asset, CELSIUS®, is marketed as a fitness drink or supplement which, with exercise, is designed to accelerate metabolism and burn body fat while providing energy. This product line comes in two versions, a ready-to-drink form and an on-the-go powder form. During 2023, we introduced a new CELSIUS® Essentials line, available in 16-ounce cans. Our products are currently offered in major retail channels across the U.S., including conventional grocery, natural, convenience, fitness, mass market, vitamin specialty and e-commerce. Additionally, our products are currently offered in certain Canadian, European, Middle Eastern and Asia-Pacific markets.

During January 2024, we broadened our international expansion through the following arrangements:

- An expansion of our existing relationship with Pepsi to serve as our exclusive distributor in Canada, expanding the area served under the Pepsi distribution agreement established in the U.S. in 2022. Sales in Canada under this arrangement began in December 2023; and

- A new relationship with Suntory Beverage & Food to serve as our exclusive sales and distribution partner in the United Kingdom of Great Britain and Northern Ireland, the Channel Islands, the Isle of Man and the Republic of Ireland. Sales under this arrangement are expected to begin in the early second half of 2024.

We were incorporated in the State of Nevada on April 26, 2005. Our common stock is listed on the Nasdaq Capital Market, and on November 15, 2023, a three-for-one forward stock split of our common stock was made effective for stockholders of record at the close of business on November 13, 2023 (the "Forward Stock Split").

**Our Products**

We seek to combine nutritional science with mainstream beverages. Our innovative approach involves the use of our proprietary MetaPlus® formulation. This aligns with our aim to offer everyday refreshments by minimizing artificial additives. Unlike many traditional energy drinks or sodas, CELSIUS® products are free from aspartame and high fructose corn syrup and are very low in sodium.

Our product's formulation includes good-for-you ingredients and supplements such as green tea (EGCG), ginger (from the root), calcium, chromium, B vitamins and vitamin C. We use sucralose, a sugar-derived sweetener, found in Splenda®, to sweeten our products, making them low-calorie and an option suitable for consumers monitoring their sugar consumption.

We introduced our first CELSIUS® functional energy drinks to the marketplace in 2005.

We currently offer three functional energy drink lines:

- CELSIUS® Originals and Vibe: Our initial 12 fluid ounce product line, offered in various flavors and carbonated and non-carbonated forms. We tailor these beverages to meet a variety of consumer tastes and preferences.

- CELSIUS ESSENTIALS™: Introduced in 2023, this 16 fluid ounce line is formulated with aminos.

- CELSIUS® On-the-Go Powder: This line features the same ingredients contained in our functional energy drinks in a convenient powder form.

CELSIUS® ready-to drink products are packaged in a distinctive can that uses vivid colors and abstract patterns to create a strong on-shelf impact. The cans are sold in various packaging units and are designed to provide a clean, crisp and more modern look than our competitors' products. In addition to being sugar free, our original U.S. ready-to-drink product line is non-GMO, kosher and vegan certified and soy and gluten free.

1

**Manufacture and Supply of Our Products**

Our functional energy drinks, on-the-go powders, and supplements are produced by well-established third-party beverage co-packers. Utilizing these co-packers, strategically located across the U.S., enables us to efficiently produce and distribute our products. We procure most ingredients and all packaging materials, while our co-packers handle assembly and charge us a fee on a per-case basis. The shelf life of CELSIUS® products ranges from 15 to 24 months.

We, or our co-packers, purchase the raw materials used in our products in accordance with our specifications. Most ingredients are sourced from domestic suppliers, with several reliable options available to us for key components. The ingredients in CELSIUS® products include green tea (EGCG), ginger (from the root), caffeine, B vitamins, vitamin C, taurine, guarana, chromium, calcium, glucuronolactone, sucralose, natural flavors and natural colorings.

Packaging materials are sourced from multiple suppliers in the U.S. We believe that our co-packing arrangements and supply sources sufficiently meet our present requirements. Currently, we are not dependent upon any one supplier.

**Distribution**

*Pepsi Distribution Agreement*

On August 1, 2022, we entered into a distribution agreement with Pepsi (the "Distribution Agreement") relating to the sale and distribution of certain of the Company's beverage products in existing channels and distribution methods in the U.S., excluding certain existing customer accounts, sales channels, Puerto Rico and the U.S. Virgin Islands. Under the Distribution Agreement, the Company granted Pepsi the right to sell and distribute its existing beverage products in existing channels and distribution methods, as well as the right to sell and distribute future beverage products that are added from time to time as licensed products under the Distribution Agreement in defined territories. The Distribution Agreement is a master service agreement and can be cancelled without cause by either party in the 19th year of the term (i.e., 2041), the 29th year of the term (i.e., 2051) and in each 10th year thereafter (i.e., 2061, 2071, etc.) by providing twelve months' written notice on August 1st of the year preceding the year of termination. Except for a termination by the Company "with cause" or a termination by Pepsi "without cause" (each as defined in the Distribution Agreement), the Company is required to pay Pepsi certain compensation upon a termination as specified in the Distribution Agreement.

We agreed to provide Pepsi a right of first offer in the event we intend to (i) manufacture, distribute or sell products in certain additional countries as specified in the Distribution Agreement, or (ii) distribute or sell products in any future channels and distribution methods during the term of the Distribution Agreement. Furthermore, Pepsi agreed to meet and confer in good faith with us regarding the terms and conditions upon which Pepsi might be willing to sell or distribute products, either directly or through local sub-distributors, in certain other additional countries. The Distribution Agreement includes other customary provisions, including non-competition covenants in favor of the Company, representations and warranties, indemnification provisions, insurance provisions and confidentiality provisions. As agreed to with Pepsi, we began shipments to The Pepsi Bottling Group (Canada), ULC ("Pepsi Canada") in the fourth quarter of 2023 and distribution to the Canada market in January 2024. Additionally, under the terms of a channel transition agreement entered into with Pepsi (the "Transition Agreement"), we have been entitled to receive payments from Pepsi in exchange for the transition of certain existing distribution rights to Pepsi. In connection with the Distribution Agreement and Transition Agreement, we terminated supply agreements with existing suppliers to transition certain territory rights to Pepsi. In connection with entering into the foregoing agreements with Pepsi, we issued and sold to Pepsi approximately 1.5 million shares of our Series A Preferred Stock ("Series A" or "Series A Preferred Stock") in exchange for cash proceeds of $550 million, excluding transaction costs. For additional information about our agreements with Pepsi, see Note 4. *Revenue,* Note 13. *Related Party Transactions,* and Note 14. *Mezzanine Equity* to our consolidated financial statements contained elsewhere in this Report and the *Customers* section below.

*Domestic*

In the U.S. and Canada, we sell CELSIUS® products across many retail segments, including supermarkets, convenience stores, drug stores, nutritional stores, food service providers and mass merchants. We also sell to health clubs, gyms, the military and e-commerce websites. In the fourth quarter of 2023, we agreed to, along with Pepsi, expand our reach to Canada and began shipments to Pepsi Canada. Pepsi is our exclusive distributor in Canada under the Distribution Agreement.

We distribute our products domestically through direct-store delivery ("DSD"), distributors and direct sales to retailers.

Additionally, our products are sold online through e-commerce platforms such as Amazon, Instacart, and Walmart.com.

*International*

We distribute our products in various foreign regions through regional and country-specific distribution partners.

2

We market our products in the Asia-Pacific market through local distributors in Hong Kong and a license agreement with Qifeng Food Technology (Beijing) Co., Ltd. ("Qifeng"). Our partnership with Qifeng began in 2018 with local production and preliminary distribution of CELSIUS® products in China. In January 2019, we restructured our China distribution strategy, entering into two separate agreements with Qifeng: (i) a license agreement regarding the commercialization of CELSIUS® products, and (ii) an economic agreement regarding the repayment of certain marketing investments made in China.

Under the license agreement, Qifeng was granted the exclusive license rights to manufacture, market and commercialize CELSIUS® brand products in China. As a result, they are currently paying an annual royalty fee totaling $6.9 million combined for the first five years of the agreement term. Following this period, the royalty structure transitions to a volume-based variable fee with a fixed minimum amount continuing thereafter until the license agreement is terminated or canceled. Furthermore, under a separate economic agreement as described above, Qifeng is repaying the marketing investments we made in the China market through 2018. This repayment, formalized as a note receivable, is scheduled to be fully paid by December 31, 2024.

We have recently expanded into the United Kingdom and Ireland. These strategic moves grow our global presence and increases access to the CELSIUS® energy drink brand in these regions. In the United Kingdom, we expect sales to begin in the early second half of 2024. This expansion reflects our commitment to growth and leveraging strong partnerships to enhance our global market reach.

Our international expansion strategy leverages our partnership with Pepsi, capitalizing on their extensive distribution network. We currently utilize this network and plan to continue doing so as we continue to prioritize our future growth.

**Customers**

Our consumer base primarily consists of distributors, e-commerce retailers, and various brick-and-mortar outlets such as grocery and convenience stores, club stores, and health-focused locations such as gyms and nutrition stores. While a significant portion of our products are sold through third-party distributors, we also engage in direct sales to various consumer-facing retailers. To support and incentivize the distribution, sales and marketing of our products, we rely on and provide various financial incentives. These incentives include but are not limited to, volume-based rebates and promotions, placement fees, listing fees, and other discounts.

In 2023, sales to Pepsi constituted 59.4% of our total net revenue, and receivables from Pepsi represented 69.0% of our total receivables as of December 31, 2023. The loss of Pepsi as a customer could significantly adversely impact our operations, potentially resulting in a material adverse effect on our financial results.

**Sales and Marketing**

In our sales and marketing approach, we prioritize differentiation, ensuring our brands and products stand out visually and distinctively from other beverages on the shelves of retailers. We continuously review and refresh our products and packaging to maintain uniqueness and appeal. In addition to maximizing product visibility in stores, we focus on developing brand awareness through targeted marketing initiatives, such as sporting events, print, radio, and television advertising, alongside direct sponsorships and endorsements to promote our brands. Additionally, our branded vehicles are deployed at events for product sampling and enhancing consumer engagement.

**Seasonality**

As is typical in the functional energy drink industry, product sales are seasonal, with the highest sales volumes occurring in the second and third calendar quarters, which correspond to the warmer months of the year in our major markets. Conversely, the first quarter often records our lowest sales figures. Despite these seasonal variations, we have historically maintained consistent quarter-over-quarter growth. Over the course of a full year, seasonal fluctuations have had no material impact on our financial results.

**Competition**

Our products compete broadly with not only functional energy drinks and supplements, but all categories of non-alcoholic liquid refreshments. The functional energy drink, supplement and liquid refreshment markets are highly competitive, and include international, national, regional and local producers and distributors. Our direct competitors in the functional energy drink market include but are not limited to Monster Beverage Corporation, Red Bull GmbH, The Coca-Cola Company, Pepsi, Keurig Dr Pepper Inc., Nestlé S.A., BlueTriton Brands, Starbucks Corporation, and Congo Brands.

**Intellectual Property Rights**

We have registered the CELSIUS® and MetaPlus® trademarks, among others, with the U.S. Patent and Trademark Office, as well as a number of trademarks in other countries where our products are distributed and sold. Our trademarks are of considerable value and importance to our business, and we actively maintain and renew these registrations to ensure their continued validity.

To protect the proprietary nature of our MetaPlus® formulation and product formulas, we employ measures such as confidentiality agreements with our contract packers and ingredient suppliers. We maintain these formulas as trade secrets, which we believe is the preferable method of protection, as patenting would require disclosure. Our outsourcing production manager is the only entity, apart from ourselves, that has access to the complete formula.

In addition, we assert copyright ownership of the statements, graphics, and content on our product packaging and marketing materials. We actively pursue legal action against unauthorized use of our trademarks and copyrights. For simplicity, trademarks, service marks, logos, and trade names in this Report may appear without the ® and ™ symbols, but this does not imply a waiver of our rights or those of applicable licensors under the law.

### Government Regulation

The production, distribution and sale of our products in the U.S. are subject to numerous federal, state, and local statutes and regulations, including, without limitation the Federal Food, Drug and Cosmetic Act, the Federal Trade Commission Act, and the Occupational Safety and Health Act. Additionally, various environmental statutes and regulations apply to the production, transportation, sale, safety, advertising, labeling, packaging, and ingredients of our products. This includes adhering to data privacy and personal data protections laws and regulations, such as the California Consumer Privacy Act of 2018, in applicable jurisdictions.

We are also subject to various state laws, including California's Proposition 65, which requires that a specific warning appear on any product that contains a component listed by California as having been found to cause cancer or birth defects. While none of our products are required to display warnings under this law, we cannot predict whether an important component of any of our products might be added to the California list in the future. We also are unable to predict whether or to what extent, a warning under this law would have an impact on costs or sales of our products.

Internationally, we rely on outsourced manufacturing and distribution channels, which are subject to compliance with the laws and regulations in the foreign countries where our products are sold. Certain international markets, including countries in the European Union, have specific energy drink standards and ingredient restrictions that we closely monitor and with which we must comply.

### Compliance with Environmental Laws

The facilities of our co-packers in the U.S. are subject to federal, state and local environmental laws and regulations, including those relating to air emissions, the use of water resources and recycling. Similarly, our operations in other countries are governed by respective environmental laws. Changes in environmental compliance mandates, and any expenditures necessary to comply with such requirements, have not to date had a material adverse effect on our capital expenditures, financial results, competitive position or future growth.

*Container Deposits*

Measures have been enacted in various localities and states that require that a deposit be charged for certain non-refillable beverage containers. The precise requirements imposed by these measures vary by jurisdiction. We are required to collect deposits from our customers and to remit such deposits to the respective jurisdictions based upon the number of cans and bottles of certain carbonated and non-carbonated products sold in such states. In many instances, we rely on third party providers and distribution partners to assist with the requirements of these regulations.

Other deposit, recycling or product stewardship proposals have been introduced in certain states and localities and in Congress, and we anticipate that similar legislation or regulations may be proposed in the future at the local, state and federal levels, both in the U.S. and elsewhere.

### Human Capital Resources

As of December 31, 2023, the Company employed 765 people including its executive officers, in four different countries. This included 703 employees in the U.S., 57 employees in Europe and 5 employees in Hong Kong.

*Employees*

We believe people are our most important assets, and we strive to attract and retain high-performing talent. Through comprehensive and competitive compensation and benefits, ongoing employee learning and development, and a focus on health and well-being, we strive to support our employees in all aspects of their lives.

We believe we have a talented, motivated and dedicated team, and work to create an inclusive, safe and supportive environment for all team members.

As of December 31, 2023, none of our employees were represented by a labor union or have terms of employment that are subject to a collective bargaining agreement. We consider our relationships with our employees to be good and have not experienced any work stoppages.

4

*Diversity, Equity and Inclusion*

We believe a culture that celebrates diverse talent, individual identity, and different points of view empowers employees to contribute new ideas that support our continued and growing success. Women and racial and ethnic minorities collectively constitute a meaningful part of our overall workforce across all levels of our global organization.

*Culture and Engagement*

We believe open and honest communication among team members, managers and leaders helps create an open, collaborative work environment in which everyone can contribute, grow and succeed. Team members are encouraged to come to their managers with questions, feedback or concerns. We also encourage regular, live communication across the organization and host quarterly global town halls with our senior leadership.

*Leadership, Training and Development*

We focus on investing in inspirational leadership, learning opportunities and capabilities to equip our global workforce with the skills they need while improving engagement and retention. We provide formal and informal learning programs, which are designed to help our employees continuously grow and strengthen their skills throughout their careers. We offer a variety of programs that contribute to our leadership, training and development goals, and comprehensive coaching and mentoring programs that support leadership and employee development.

*Compensation and Benefits*

We believe that compensation should be competitive and equitable and should enable employees to share in the Company's success. The Company recognizes its people are most likely to thrive when they have the resources necessary to meet their needs and the time and support to succeed in their professional and personal lives. To support this, we offer a wide variety of benefits for our employees around the world and invest in tools and resources designed to support our employees' individual growth and development.

Our compensation programs are designed to reinforce our growth agenda and talent strategy, as well as to drive a strong connection between the contributions of our employees and their pay. We conduct annual pay equity analyses to help ensure our base pay structures are fair and to identify and address potential issues or disparities by adjusting base pay where appropriate. Also, as permitted by local law, we perform an annual adverse impact analysis on base pay, annual incentives, and long-term incentives to help ensure fairness. We provide compensation packages designed to attract and retain talent while maintaining alignment with the market. We believe the structure of our compensation packages provides the appropriate incentives to attract, retain and motivate our employees.

Our base pay aligns with employee positions, skill levels, experience, and geographic location. Additionally, we provide competitive employee benefits packages, which vary by country and region. These employee benefits packages may include: employee assistance programs, medical and dental insurance, vision insurance, well-being rewards programs, core and supplemental life insurance, long and short-term disability, accident and critical illness insurance, retirement savings plans, prepaid legal services, healthy rewards programs, identity theft assistance, financial courses and advisors, vacation and holiday pay, annual incentive awards, recognition programs, and equity awards for eligible employees.

The Compensation Committee of our Board of Directors (the "Board") provides oversight of our policies and strategies relating to talent, leadership and culture, including diversity, equity and inclusion, as well as the Company's compensation philosophies and programs. The Compensation Committee also evaluates and approves our compensation plans, policies and programs applicable to our senior executives. In addition, the Compensation Committee oversees succession planning and talent development for our senior executives.

We believe our approach to human capital resources has been instrumental in our growth and has made us a desirable destination for employees.

**Available Information and Use of Our Company Website to Disseminate Information**

This Report, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, Proxy Statements on schedule 14A and all amendments to those reports are made available free of charge through the Company's website, at www.celsiusholdingsinc.com, as soon as reasonably practicable after such material is electronically filed with, or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, with the SEC. Additionally, the foregoing reports and amendments thereto are available on the SEC's website at www.sec.gov.

We inform our investors and the public of material corporate information through various channels, including SEC filings, press releases, public conference calls, webcasts, and our official corporate website at www.celsiusholdingsinc.com. We have used, and expect to continue to use our website as a means of disclosing material information to the public in a broad, non-exclusionary manner, including for purposes of the SEC's Regulation Fair Disclosure (Reg FD). This information may include, without limitation, updates on our financial performance, significant personnel changes, brand developments, and other pertinent matters. We regard the content posted on our corporate website as potentially material to our investors. Therefore, we encourage our investors, the media, customers, consumers, business partners, and other stakeholders to regularly review the materials we disseminate through these platforms. Periodically, we may modify the list of communication channels for disseminating material information. Any such changes will be communicated and updated on our website. Information contained on, or accessible through, our website is not a part of, and is not incorporated by reference into, this Report or any other filings we make with the SEC.

## Item 1A. Risk Factors.

*In addition to the other information contained in this Report, including in Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and the consolidated financial statements and related notes thereto, you should carefully consider the following risks. The occurrence of any of the events discussed below could significantly and adversely affect our business, prospects, results of operations, financial condition, and cash flows.*

### Risk Factors Relating to Our Business

***We rely on distributors to distribute our products in the DSD sales channel and in international markets. If we are unable to maintain good relationships with our existing distributors, our business will suffer.***

We distribute CELSIUS® in the DSD sales channel by entering into agreements with direct-to-store delivery distributors having established sales, marketing and distribution organizations. During August 2022 we entered into an exclusive distribution agreement with Pepsi for certain parts of the U.S., and we extended this relationship during 2023 and 2024 to certain parts of Canada. Also during 2024, we entered into an exclusive distribution agreement with Lucozade Ribena Suntory Limited for the United Kingdom of Great Britain and Northern Ireland, the Channel Islands, the Isle of Man and the Republic of Ireland. We are substantially reliant on each of these multiyear arrangements for our distribution in the respective territories. We anticipate that we will extend these or establish additional distributor arrangements as we continue to expand our operations. These significant distributors are, and certain of our additional distributors may also be, affiliated with and manufacture or distribute other beverage products. In many cases, such products compete directly with our products. The sales and distribution efforts of our distributors are important for our success. If CELSIUS® proves to be less attractive to our distributors or if we fail to attract new or replacement distributors, or our distributors do not market and promote our products with greater or similar focus in preference to the products of our competitors, we may not have any meaningful recourse or be able to replace such distributors in a timely manner, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Consolidation of retailers, wholesalers and distributors in the industry may result in downward pressure on sales prices, and the changing landscape of the retail market, including the rapid growth in e-commerce, could adversely affect our results of operations.***

Our industry is being affected by the trend toward consolidation in retail channels, particularly in North America and Europe. Consolidation can cause significant downward pricing pressure and can impose additional costs on us. Retailers may seek lower prices from us, may demand increased marketing or promotional expenditures in support of their businesses, and may be more likely to use their distribution networks to introduce and develop private-label brands, any of which could negatively affect our profitability. As a result of increased consolidation of ownership and purchasing power in the retail industry, large retailers with increased purchasing power may impact our ability to compete in many markets. Consequently, our smaller customers' ability to compete may be impacted adversely, resulting in their inability to pay for our products, which, in turn, would reduce the amount of products we sell. Any inability to successfully manage the potential impact of these commercial changes, could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

Our industry is also being affected by the rapid growth in sales through e-commerce retailers, e-commerce websites, mobile commerce applications and subscription services, which may result in a shift away from physical retail operations to digital channels. As we build our e-commerce capabilities, we may not be able to develop and maintain successful relationships with existing and new e-commerce retailers without suffering a deterioration of our relationships with key customers operating physical retail channels. If we are unable to successfully adapt to the rapidly changing retail landscape, including the rapid growth in digital commerce, our share of sales, volume growth, and overall financial results could be negatively affected. In addition, our success depends in part on our ability to maintain good relationships with key retail customers. The loss of one or more of our key retail customers could have an adverse effect on our business, financial condition, results of operations, and cash flows.

6

***We rely on third-party co-packers to manufacture our products. If we are unable to maintain good relationships with our co-packers or their ability to manufacture our products becomes constrained or unavailable to us, our business could suffer.***

We do not directly manufacture our products, but instead outsource such manufacturing to third-party co-packers. We have created a network model within North America that encompasses the utilization of co-packers and warehousing across each geographical area, as well as alternative warehousing and co-packing capacity, in order to reduce our exposure within each geographical area. These third-party co-packers may not be able to fulfill our demand as it arises or fail to meet our product specifications, could begin to charge rates that make using their services cost inefficient or may simply not be able to or willing to provide their services to us on a timely basis or at all. There could also be food safety concerns or other regulatory compliance issues with our third-party co-packers, which could require them to (temporarily or permanently) cease manufacturing product and/or necessitate destruction of product that they have already manufactured. In the event of any disruption or delay in production of product by our co-packers, whether caused by a rift in our relationship or the inability of our co-packers to manufacture our products as required, we would need to secure the services of alternative co-packers. We may be unable to procure alternative packing facilities at commercially reasonable rates or within a reasonably short time period, and any such transition could be costly. In such case, our business, financial condition, results of operations and cash flows would be adversely affected.

***Our customers are material to our success. If we are unable to maintain good relationships with our existing customers, our business could suffer.***

Our customers, including distributors, grocery chains, convenience chains, drug stores, nutrition stores, mass merchants, club warehouses and other customers, may decide for any reason or no reason at all to discontinue carrying all or any of our products, which could cause our business to suffer. Such decisions are outside of our control, and may be made based upon any number of reasons, including cost, changing consumer tastes and preferences and the availability of competing products. Such a loss of customers would have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Increases in cost or shortages of raw materials or increases in costs of co-packing could harm our business.***

The principal raw materials used in our products are flavors and ingredient blends as well as aluminum cans, the prices of which are subject to fluctuation. We are uncertain whether the prices of any of the foregoing or any other raw materials or ingredients we utilize will rise in the future and whether we will be able to pass any of such increases on to our customers. We do not use hedging agreements or alternative instruments to manage the risks associated with securing sufficient ingredients or raw materials. In addition, some of these raw materials, such as our sleek 12 ounce can, are only available from a limited number of suppliers. As alternative sources of supply may not be available, any interruption in the supply of such raw materials could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

In the past, our industry has faced shortages of aluminum cans, a key raw material. Such industry-wide shortages of raw materials, including aluminum cans, could from time to time (and often unpredictably) be encountered, which could interfere with or delay production of certain of our products and negatively impact our financial performance.

***Our demand generation strategies through use of third-parties, including celebrities, social media influencers, and others may expose us to risk of negative publicity, litigation, and/or regulatory enforcement action, which could impact our future profitability.***

We rely on marketing by social media influencers and celebrity spokespersons that represent the Celsius brand to generate demand for our products. The promotion of our brand, products, and services by social media influencers and celebrities is subject to FTC regulations and guidance, including, for example, a requirement to disclose any compensatory arrangements between us and influencers in any reviews or public statements by such influencers about the Company or our products. These social media influencers and celebrities, with whom we maintain relationships, could engage in activities or behaviors or use their platforms to communicate directly with our customers in a manner that violates applicable requirements or reflects poorly on our brand and that behavior may be attributed to us or otherwise adversely affect us. In addition, influencers and celebrities who are associated with us may engage in behavior that is unrelated to us but that causes damage to our brand because of these associations or may make claims against us whether or not based in facts. In 2023 we received an adverse jury verdict in the amount of $82.6 million related to a lawsuit filed by a former influencer, which is currently on appeal. Any such activities or behaviors of the social media influencers or celebrities we engage, litigation with such third-parties, or our failure to adhere to regulatory requirements could have a material adverse effect on our business, financial condition, results of operations, and cash flows, and on our reputation.

***We have extensive commercial arrangements with Pepsi and, as a result, significant disagreements with Pepsi or a termination of these arrangements could materially adversely impact our financial position and results of operations.***

In 2023, sales to Pepsi constituted 59.4% of our total net revenue, and receivables from Pepsi represented 69.0% of our total receivables as of December 31, 2023. Pepsi is our primary distribution supplier for our products in the U.S. and the exclusive distributor of our products in Canada. As a result, we have reduced our distributor diversification and are dependent on Pepsi's domestic distribution platforms. Given the significant concentration of our supply chain with Pepsi, any significant disagreement or a termination of our arrangement could prevent us from distributing our products and have a material adverse effect on our financial results.

***Our failure to accurately estimate demand for our products could adversely affect our business and financial results.***

We may not correctly estimate demand for our existing products or new products. Our ability to estimate demand for our products relies on various assumptions that may ultimately prove to be incorrect, particularly with regard to new products, and our estimates may be less precise during periods of rapid growth, including in new markets. If we materially underestimate demand for our products or are unable to secure sufficient ingredients, flavors, aluminum cans and other raw materials or packaging materials for our beverage products or experience difficulties with our co-packing arrangements, including production shortages or quality issues, we might not be able to satisfy demand on a short-term basis. Moreover, industry-wide shortages of certain ingredients and packaging materials have occurred and could occur, from time to time in the future, resulting in production fluctuations or product shortages. We generally do not use hedging agreements or alternative instruments to manage this risk. Such shortages could interfere with or delay production of certain of our products and could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

If we do not accurately anticipate the future demand for a particular product or the time it will take to obtain new inventory, our inventory levels may be inadequate, and our results of operations may be negatively impacted. If we fail to meet our shipping schedules, we could damage our relationships with distributors or retailers, increase our distribution costs or cause sales opportunities to be delayed or lost. In order to be able to deliver our products on a timely basis, we need to maintain adequate inventory levels of the desired products. If the inventory of our products held by our distributors or retailers is too high, they will not place orders for additional products, which could unfavorably impact our future sales and have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Significant additional labeling or warning requirements or limitations on the marketing or sale of our products may inhibit sales of affected products.***

Various jurisdictions may adopt significant additional product labeling or warning requirements or limitations on the marketing or sale of our products as a result of the ingredients we use or allegations that our products cause adverse health effects. If these types of requirements become applicable to one or more of our products, they may inhibit sales of such products. For example, under one such law in California, known as Proposition 65, if the state has determined that a substance causes cancer, birth defects or other reproductive harm, a warning must be provided for any product sold in the state that exposes consumers to that substance, unless the exposure falls under an established safe harbor level or another exemption is applicable. If we were required to add Proposition 65 warnings on the labels of one or more of our products produced for sale in California, the resulting consumer reaction to the warnings and possible adverse publicity could negatively affect our sales both in California and in other markets. In addition, we are aware of ongoing efforts in the U.S. and in certain foreign countries to seek governmental review of the energy drink industry, including with respect to advertising claims, health claims, caffeine content, and marketing to individuals under the age of 18. Should we become the target of government review or experience limitations on or additional requirements with respect to the marketing or sale of our products, our business, financial condition, results of operations, and cash flows may be materially, adversely impacted.

***Our continued expansion outside of the U.S. exposes us to uncertain conditions and other risks in international markets.***

We have sales of products internationally in a variety of markets, and most recently began distribution through third-parties in Canada, the United Kingdom of Great Britain and Northern Ireland, the Channel Islands, the Isle of Man and the Republic of Ireland. As our growth strategy includes continuing the expansion in these and other international markets, if our current efforts are unsuccessful or if we are unable to continue to expand distribution of our products outside the U.S., our growth rate could be adversely affected. Although we do, and we intend to continue to, sell through established distributors in international markets, we have limited or no operating experience in many of such markets, and it may be costly to promote our brands in international markets. We face and will continue to face substantial risks associated with foreign distribution and sale of our products, including economic or political instability in various international markets; fluctuations in foreign currency exchange rates; restrictions on or costs relating to the repatriation of foreign profits to the U.S., including possible taxes or withholding obligations on any repatriations; and tariffs or trade restrictions. Also, distribution and sale of products outside of the U.S. are subject to risks relating to appropriate compliance with legal and regulatory requirements in local jurisdictions, potentially higher product damage rates if our products are shipped long distances, potentially higher incidence of fraud or corruption, credit risk of distributors and potentially adverse tax consequences. Our products have also been sold without our consent outside of our distribution networks which can expose us to regulatory scrutiny should our product be sold or consumed in markets without proper approvals. These risks could have a significant impact on our ability to distribute and sell our products on a competitive basis in international markets or result in the imposition of fines or lost revenue, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Numerous U.S. and international laws, including export and import controls, affect our ability to compete in international markets.***

U.S. export control laws and economic and trade sanctions prohibit the provision of certain products and services to U.S. embargoed or sanctioned countries, governments and persons. Even though we take precautions to prevent our products from being shipped or provided to embargoed countries and U.S. sanctions targets, they could be shipped, or provided by our distributors, to those countries and targets despite such precautions. The provision of goods in violation of U.S. export controls or sanctions could have negative consequences for our business, including government investigations, penalties and reputational harm. We must also comply with U.S. import laws.

8

U.S. laws such as the Foreign Corrupt Practices Act (the "FCPA") also impact our international activities. We are subject to the FCPA and other laws that prohibit improper payments and offers to foreign officials and political parties for the purpose of obtaining or retaining business. Selling products into international markets, including through distributors, creates the risk of unauthorized payments or offers, for which we may be held responsible. Violations of the FCPA or other applicable anti-corruption and anti-bribery laws may result in severe criminal or civil sanctions, or other liabilities, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

Changes in export and import regulations, economic sanctions and related laws, shifts in the enforcement or scope of existing regulations, changes in the countries, governments or persons targeted by such regulations and the imposition of tariffs may create delays in the introduction and sale of our products in international markets, result in decreased ability to export or sell our products to existing or potential customers with international operations or in some cases, prevent the export or import of our products to certain countries, governments or persons.

Actions taken with respect to tariffs or trade relations between the U.S. and other countries, the products subject to such actions, and actions taken by other countries in retaliation may also have an adverse impact on us. The failure to comply with applicable current or future U.S. import, export control, sanctions and anti-corruption laws, including U.S. Customs regulations, could expose us and our employees to substantial civil or criminal penalties, fines and in extreme cases, incarceration. In addition, if our distributors fail to obtain appropriate import, export or re-export licenses or authorizations, or otherwise act in accordance with applicable laws, we may be adversely affected through reputational harm and penalties, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Failure to successfully complete or manage strategic transactions can adversely affect our business.***

We regularly review and evaluate potential acquisitions, joint ventures, distribution agreements, divestitures, and other strategic transactions. The success of these transactions, is dependent upon, among other things, our ability to realize the full extent of the expected returns, benefits, cost savings or synergies as a result of a transaction, within the anticipated time frame, or at all; and receipt of necessary consents, clearances and approvals. Risks associated with strategic transactions include integrating manufacturing, distribution, sales, accounting, financial reporting and administrative support activities and information technology systems with our company or difficulties separating such personnel, activities and systems in connection with divestitures; operating through new business models or in new categories or territories; motivating, recruiting and retaining executives and key employees; conforming controls (including internal control over financial reporting and disclosure controls and procedures) and policies (including with respect to environmental compliance, health and safety compliance and compliance with anti-bribery laws); retaining existing customers and consumers and attracting new customers and consumers; managing tax costs or inefficiencies; maintaining good relations with divested or refranchised businesses in our supply or sales chain; inability to offset loss of revenue associated with divested brands or businesses; managing the impact of business decisions or other actions or omissions of our joint venture partners that may have different interests than we do; and other unanticipated problems or liabilities, such as contingent liabilities and litigation. Strategic transactions that are not successfully completed or managed effectively, or our failure to effectively manage the risks associated with such transactions, could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***We depend upon our trademarks and proprietary rights, and any failure to protect our intellectual property rights or any claims that we are infringing upon the rights of others may adversely affect our competitive position.***

Our success depends, in large part, on our ability to protect our current and future brands and products and to defend our intellectual property rights. We cannot be sure that trademarks will be issued with respect to any future trademark applications or that our competitors will not challenge, invalidate or circumvent any existing or future trademarks issued to, or licensed by us.

Our products are manufactured using our proprietary blends of ingredients. These blends are created by third-party suppliers to our specifications and then supplied to our co-packers. Although all of the third parties in our supply and manufacture chain execute confidentiality agreements, there can be no assurance that our trade secrets, including our proprietary ingredient blends will not become known to competitors.

We believe that our competitors, many of whom are more established, may be able to replicate or reverse engineer our processes, brands, flavors, or our products in a manner that could circumvent our protective safeguards. Therefore, we cannot give you any assurance that our confidential business information will remain proprietary. Any such loss of confidentiality could diminish or eliminate any competitive advantage provided by our proprietary information, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***We must continually maintain, protect or upgrade our information technology systems, including protecting us from internal and external cyber-security threats.***

Information technology enables us to operate efficiently, interface with customers, maintain financial accuracy and efficiency and accurately produce our financial statements. If we do not appropriately allocate and effectively manage the resources necessary to build and sustain the proper technology infrastructure, we could be subject to transaction errors, processing inefficiencies, the exposure of private data, the loss of customers, business disruptions, or the loss of or damage to our intellectual property or brand image through security breaches, including internal and external cyber-security threats. Cyber-security attacks by hackers, criminal groups or nation-state organizations are evolving and include, but are not limited to, malicious software (malware, ransomware and viruses), phishing and social engineering, cyber extortion, attempts to gain unauthorized access to networks, computer systems and data, malicious or negligent actions of employees (including misuse of information they are entitled to access) and other forms of electronic security breaches that could lead to disruptions in business systems, an inability to process customer orders or lost customer orders, unauthorized access, destruction, loss, alteration, falsification, unavailability or release of material confidential or otherwise protected information and corruption of data. Such cyberattacks could result in violations of data protection laws and regulations, damage to the reputation and credibility of the Company, loss of opportunities to acquire or divest of businesses, and loss of ability to commercialize products developed through research and development efforts, any of which could require us to spend significant financial or other resources to remedy, and, therefore, could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

We rely on relationships with third parties, including suppliers, distributors, co-packers, contractors, cloud data storage and other information technology service providers and other external business partners, for certain functions or for services in support of our operations. These third-party service providers, and partners, with whom we may share data including without limitation, for data hosting, back-office support, and other functions, are subject to similar risks as we are, relating to cyber-security, privacy violations, business interruption, and systems, as well as employee failures. While we have procedures in place for selecting and managing our relationships with third-party service providers and other business partners, we do not have control over their business operations or governance and compliance systems, practices and procedures, which increases our financial, legal, reputational and operational risk. These third parties may experience cyber-security incidents that may involve data we share with them or rely on them to provide to us, and the need to coordinate with such third-parties, including with respect to timely notification and access to personnel and information concerning an incident, may complicate our efforts to resolve any issues that arise.

In addition, if our data management systems do not effectively collect, store, process and report relevant data for the operation of our business (whether due to network or equipment malfunction or constraints, software deficiencies, cyber-security attack or human error), our ability to effectively plan, forecast and execute our business plan and comply with applicable laws and regulations will be impaired, perhaps materially. Any such impairment could have a material adverse effect on our business, financial condition, results of operations, and cash flows, and the timeliness with which we report our internal and external operating results. There are no assurances that our cyber-security insurance would be adequate in relation to any incurred losses. Moreover, as cyber-security attacks increase in frequency and magnitude, we may be unable to obtain cyber-security insurance in amounts and on terms we view as appropriate for our operations.

***If we fail to comply with data privacy and personal data protection laws, we could be subject to adverse publicity, government enforcement actions or private litigation, which may negatively impact our business and operating results.***

We receive, process, transmit and store information relating to certain identified or identifiable individuals ("personal data"), including current and former employees, in the ordinary course of business. As a result, we are subject to various U.S. federal and state and foreign laws and regulations relating to personal data. These laws are subject to change, and new personal data legislation may be enacted in other jurisdictions at any time. In the European Union, the General Data Protection Regulation (the "GDPR") became effective in May 2018 for all member states. The GDPR includes operational requirements for companies receiving or processing personal data of residents of the European Union different from those that were previously in place and also includes significant penalties for noncompliance. Other examples of certain requirements we face include those with respect to the Health Insurance Portability Act, the California Consumer Privacy Act (the "CCPA"), the California Privacy Rights Act, the Colorado Privacy Act, and the Virginia Consumer Data Protection Act. Any such legislation can impose onerous and costly requirements on companies. For example, the CCPA provides a private right of action and statutory damages for certain data breaches and imposes operational requirements on companies that process personal data of California residents, including making disclosures to consumers, employees and B2B contacts about data collection, processing and sharing practices and allowing consumers to opt out of certain data sharing with third-parties.

Changes introduced by the GDPR, the CCPA, and such other legislation, as well as other changes to existing personal data protection laws and the introduction of such laws in other jurisdictions, and changes to regulation, industry standards and contractual obligations, subject the Company to, among other things, additional costs and expenses and may require costly changes to our business practices and security systems, policies, procedures and practices. The interpretation and application of these laws and regulations are often uncertain and evolving; as a result, there can be no assurance that our data protection measures will be deemed adequate by a regulator or court. There can be no assurances that our security controls over personal data, training of personnel on data privacy and data security, vendor management processes, and the policies, procedures and practices we implement will prevent the improper processing or breaches of personal data. Data breaches or improper processing, or breaches of personal data in violation of the GDPR, the CCPA or of such other personal data protection or privacy laws and regulations in existence today or in the future, could harm our reputation, cause loss of consumer confidence, subject us to government enforcement actions (including fines), and mandatory corrective action, or result in private litigation against us, which may result in potential loss of revenue, increased costs, liability for monetary damages or fines or criminal prosecution, thereby materially adversely affecting our business, financial condition, results of operations, and cash flows.

### *If we fail to manage future growth effectively, our business could be materially adversely affected.*

We have experienced rapid growth and anticipate such growth may continue. During the year ended December 31, 2023, we grew to 765 employees, and expect to continue expanding our hiring and marketing efforts with no assurance that our business or revenue will continue to grow. This growth may place significant demands on management and our operational infrastructure. As we continue to grow, we must manage such growth effectively by successfully integrating, developing and motivating a large number of new employees, while maintaining the beneficial aspects of our company culture. If we do not manage the growth of our business and operations effectively, the quality of our products and efficiency of our operations could suffer and we may not be able to execute on our business plan, which could harm our brand, and have a material adverse effect on our business, financial condition, results of operations, and cash flows. Accordingly, we cannot guarantee that we will achieve our planned growth, or that we will continue to sustain such growth or performance.

### *Global or regional catastrophic events could impact our operations and affect our ability to grow our business.*

Because of our increasingly global presence, our business could be affected by unstable political conditions, civil unrest, protests and demonstrations, large-scale terrorist acts, especially those directed against the U.S. or other major industrialized countries where our products are distributed, the outbreak or escalation of armed hostilities, such as the ongoing conflicts in the Ukraine, and the Israel Gaza Strip conflict, major natural disasters and extreme weather conditions, such as hurricanes, wildfires, tornadoes, earthquakes or floods, or widespread outbreaks of infectious diseases (such as the COVID-19 pandemic). Such catastrophic events could impact our operations and our supply chain, including the production or distribution of our products. Materials or personnel may need to mobilize to other locations. Our headquarters and a large part of our operations are located in Florida, a state at greater risk of hurricanes. Some of the raw materials we use, including certain sizes of cans, are available from limited suppliers, and a regional catastrophic event impacting such suppliers could adversely impact our operations. In addition, such events could disrupt global or regional economic activity, which could affect consumer purchasing power and consumers' ability to purchase our products, thereby reducing demand for our products. If our operations are disrupted or we are unable to grow our business as a result of these factors, our growth rate could decline, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

### *Climate change and natural disasters may affect our business.*

There is concern that a gradual increase in global average temperatures due to increased carbon dioxide and other greenhouse gases in the atmosphere could cause significant changes in weather patterns around the globe and an increase in the frequency and severity of natural disasters. Changing weather patterns could result in decreased agricultural productivity in certain regions, or outbreaks of diseases or other health issues, which may limit availability or increase the cost of certain ingredients used in our products and could impact the food security of communities around the world. Increased frequency or duration of extreme weather conditions could also impair production capabilities, disrupt our supply chain or impact demand for our products.

Natural disasters and extreme weather conditions, such as hurricanes, wildfires, earthquakes or floods, and outbreaks of diseases (such as the COVID-19 pandemic) or other health issues may affect our operations and the operation of our supply chain, impact the operations of our distributors and unfavorably impact our consumers' ability to purchase our products. In addition, public expectations for reductions in greenhouse gas emissions could result in increased energy, transportation and raw material costs, and may require us to make additional investments in facilities and equipment. Changes in applicable laws, regulations, standards or practices related to greenhouse gas emissions, packaging and water scarcity, and reporting requirements with respect thereto, as well as initiatives by advocacy groups in favor of certain climate change-related laws, regulations, standards or practices, may result in increased compliance costs, capital expenditures and other financial obligations, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows. Sales of our products may also be influenced to some extent by weather conditions in the markets in which we operate. Our third-party co-packers use a number of key ingredients in the manufacture of our products that are derived from agricultural commodities. Increased demand for food products and decreased agricultural productivity in certain regions of the world as a result of changing weather patterns and other factors may limit the availability or increase the cost of such agricultural commodities and could impact the food security of communities around the world. Weather conditions, therefore, may influence consumer demand for certain of our products and otherwise impact our business and operations, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

11

***We may incur material losses as a result of product recalls, regulatory enforcement actions, and/or product liability.***

Potential contamination that could cause foodborne illness, the presence of undisclosed major food allergens, and/or other food safety concerns, whether or not caused by our actions, could lead to a voluntary product recall, regulatory enforcement action and/or private litigation. This could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

There are costs associated with undertaking a product recall, which may not be fully covered by our current and/or future insurance policies. If product is recalled and/or inventory of product is destroyed because of a food safety concern, it could also lead to loss of sales due to unavailability of product. Additionally, a recall could decrease future demand for product from existing customers and/or increase difficulty in attracting new customers. If the recall is a result of actions of a third-party co-packer, raw material supplier, or packaging material supplier, it could also result in damage to the relationship with that entity, which could potentially disrupt the supply of product(s) and/or increased costs associated with manufacturing the product(s).

There may also be regulatory action from federal, state, or local agencies if a product is deemed to be adulterated and/or misbranded due to contamination, undisclosed major food allergens, or other food safety issues. It could, for example, result in the issuance of a warning letter or another type of enforcement action from the FDA. There could also be state or federal civil and/or criminal penalties associated with selling an adulterated and/or misbranded food product, even if it was done so inadvertently.

We may also be liable to consumers if the consumption of any of our products causes injury, illness or death. The amount of the insurance we carry is limited, and that insurance is subject to certain exclusions and may or may not be adequate. Accordingly, consumer class action litigation or a significant product liability judgment could cause us to incur material losses.

A product recall, regulatory enforcement action and/or litigation could also cause long term reputational damage to the brand and/or Company, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows. Additionally, product tampering, either on a small or large scale, such as the introduction of foreign material, chemical contaminants or pathogenic organisms into product, could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***We rely on our management team and other key personnel.***

We depend on the skills, experience, relationships, and continued services of key personnel, including our experienced management team. In addition, our ability to achieve our operating goals also depends on our ability to recruit, train, and retain qualified individuals. We compete with other companies both within and outside of our industry for talented personnel, and we may lose key personnel or fail to attract and retain additional talented personnel. Any such loss or failure could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

In particular, our continued success will depend in part, on our ability to retain the talents and dedication of key employees. Furthermore, we may not be able to locate suitable replacements for any of our key employees who leave or be able to offer employment to potential replacements on reasonable terms, all of which could adversely affect our procurement and distribution processes, sales and marketing activities, and our financial processes, have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***If we fail to attract or maintain a highly skilled and diverse workforce, our business could be negatively affected.***

Our business requires that we attract, develop, and maintain a highly skilled and diverse workforce. Our employees are highly sought after by our competitors and other companies, and competition for existing and prospective personnel have increased. Our continued ability to compete effectively depends on our ability to attract, retain, develop, and motivate highly skilled personnel for all areas of our organization. Moreover, the broader labor market continues to be impacted by numerous factors, including, but not limited to, wage inflation, labor shortages, increased employee turnover, changes in availability, and a shift toward remote work, which, in turn, has created a shortage of qualified workers, thereby further increasing the competitive landscape of attracting and retaining qualified workers. Consequently, we may not be able to successful attract and maintain a highly skilled and diverse workforce that is necessary to support key capabilities such as e-commerce, social media and digital marketing and advertising, and digital analytics. Changes in immigration laws and policies could also make it more difficult for us to recruit or relocate highly skilled technical, professional, and management personnel to meet our business needs. In addition, the unexpected loss of experienced and highly skilled employees due to an increase in aggressive recruiting for best-in-class talent could deplete our institutional knowledge base and erode our competitiveness. Further, failure to attract, retain, and develop associates from underrepresented communities can damage our business results and our reputation. Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***The FDA could take issue with the manufacturer, composition/ingredients, packaging, marketing/labeling, storage, transportation, and/or distribution of our products.***

The FDA does not pre-approve finished beverage products or the labeling of such products, so it has not approved our product formulations nor has it reviewed or approved any claims we make related to our products. If the FDA or any other governmental authority were to take issue with the claims we make about our products or other aspects of our product labeling, such as components of our facts panel, or require that we change or cease making certain claims or otherwise alter our marketing strategy, we could experience a material adverse effect on our business, financial condition, results of operations, and cash flows. If the FDA or any other governmental authority were to take issue with any of the ingredients used in our products or any of the components of the packaging materials for our products this could also have a material adverse effect on our business, financial condition, results of operations, and cash flows.

Any type of federal, state, or local regulatory enforcement action related to the manufacturer, transportation, storage, and/or distribution of our products, whether taken against us or a third-party, such as a co-manufacturer, could also have a material adverse effect on our business, financial condition, results of operations, and cash flows. This could include, for example, enforcement action taken against one of our third-party co-packers for failing to maintain an appropriate FDA registration or comply with applicable current good manufacturing practice ("CGMP") requirements.

***The FTC regulates advertising and may review the truthfulness of and substantiation for any claim we make related to our products.***

Our advertising activities are subject to regulation by the FTC under the Federal Trade Commission Act. Any actions or investigations initiated against the Company by governmental authorities or private litigants could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

The shifting regulatory environment through the various jurisdictions in which our products are sold necessitates building and maintaining robust systems to achieve and maintain compliance in multiple jurisdictions and increases the possibility that we may violate one or more of the legal requirements. If our operations are found to be in violation of any applicable laws or regulations we may be subject to, without limitation, civil and criminal penalties, damages, fines, the curtailment or restructuring of our operations, injunctions, or product withdrawals, recalls or seizures, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***The ongoing Russia-Ukraine conflict and the recent escalation of the Israel-Hamas conflict may adversely impact our business operations and financial performance.***

U.S. and global markets are experiencing volatility and disruption following the geopolitical instability resulting from the ongoing Russia-Ukraine conflict and the recent escalation of the Israel-Hamas conflict. In response to the ongoing Russia-Ukraine conflict, the North Atlantic Treaty Organization ("NATO") deployed additional military forces to eastern Europe, and the U.S., the United Kingdom, the European Union and other countries have announced various sanctions and restrictive actions against Russia, Belarus and related individuals and entities, including the removal of certain financial institutions from the Society for Worldwide Interbank Financial Telecommunication (SWIFT) payment system. Certain countries, including the U.S., have also provided and may continue to provide military aid or other assistance to Ukraine and to Israel, increasing geopolitical tensions among a number of nations. The invasion of Ukraine by Russia and the escalation of the Israel-Hamas conflict and the resulting measures that have been taken, and could be taken in the future, by NATO, the U.S., the United Kingdom, the European Union, Israel and its neighboring states and other countries have created global security concerns that could have a lasting impact on regional and global economies. Although the length and impact of the ongoing conflicts are highly unpredictable, they could lead to market disruptions, including significant volatility in commodity prices, credit and capital markets, as well as supply chain interruptions and increased cyber-attacks against U.S. companies. Additionally, any resulting sanctions could adversely affect the global economy and financial markets and lead to instability and lack of liquidity in capital markets. These ongoing conflicts and the resulting geopolitical instability could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

**Risk Factors Relating to Our Industry**

***We are subject to significant competition by other companies in the functional beverage product industry.***

The functional beverage product industry is highly competitive. The principal areas of competition are pricing, packaging, distribution channel penetration, development of new products and flavors and marketing campaigns. Our products compete with a wide range of beverages produced by a relatively large number of manufacturers, many of which have substantially greater financial, marketing and distribution resources and name recognition than we do.

13

Important factors affecting our ability to compete successfully include the taste and flavor of our products, trade and consumer promotions, rapid and effective development of new, unique cutting-edge products, attractive and different packaging, branded product advertising and pricing. Our products compete with all liquid refreshments and with products of much larger and substantially better financed competitors, including the products of numerous nationally and internationally known producers, such as Monster Beverage Corporation, Red Bull GmbH, The Coca-Cola Company, Pepsi, Keurig Dr Pepper Inc., Nestlé S.A., BlueTriton Brands, Starbucks Corporation, and Congo Brands. We also compete with companies that are smaller or primarily local in operation. Our products also compete with private label brands such as those carried by supermarket chains, convenience store chains, drug store chains, mass merchants and club warehouses. New competitors continue to emerge, some of which target specific markets of ours as well as the health and wellness space. This may require additional marketing expenditures on our part to remain competitive.

The rapid growth in sales through e-commerce retailers, e-commerce websites, mobile commerce applications and subscription services, may result in a shift away from physical retail operations to digital channels and a reduction in impulse purchases. Further, the ability of consumers to compare prices on a real-time basis using digital technology puts additional pressure on us to maintain competitive prices. Sales in gas chains may also be affected by improvements in fuel efficiency and increased consumer preferences for electric or alternative fuel-powered vehicles, which may result in fewer trips by consumers to gas stations and a corresponding reduction in purchases by consumers in convenience gas retailers. We have been growing our e-commerce sales by using Amazon and leveraging our retail partners e-commerce platforms, rather than building our own internal platform. However, if we are unable to successfully adapt to the rapidly changing retail landscape, our share of sales, volume growth and overall financial results could be negatively affected.

Due to competition in the functional beverage product industry, we may encounter difficulties in maintaining our current revenues, market share or position in the functional beverage product industry, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Our inability to innovate successfully and to provide new cutting-edge products could adversely affect our business and financial results.***

Our ability to compete in the highly competitive functional beverage product industry and to achieve our business growth objectives depends, in part, on our ability to develop new flavors, products and packaging. The success of our innovation, in turn, depends on our ability to identify consumer trends and cater to consumer preferences. If we are not successful in our innovation activities, we could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Changes in consumer product and shopping preferences may reduce demand for some of our products.***

The functional beverage product category is subject to changing consumer preferences and shifts in consumer preferences may adversely affect us. There is increasing awareness of and concern for health, wellness and nutrition considerations, including concerns regarding caloric intake associated with sugar-sweetened drinks and the perceived undesirability of artificial ingredients. CELSIUS® has no aspartame or high fructose corn syrup and is very low in sodium. The main CELSIUS® line of products are sweetened with sucralose, a sugar-derived sweetener that is found in Splenda®, which makes these functional beverage products low-calorie. However, consumer preferences may shift away from the trend towards healthier options that we have observed, and as such, there can be no assurance that our current products and product lines will maintain their current levels of demand. There are also changes in demand for different packages, sizes and configurations. This may reduce demand for our functional beverage products, which could reduce our revenues and adversely affect our results of operations.

Consumers are seeking greater variety in their functional beverage products. Our future success will depend, in part, upon our continued ability to develop and introduce different and innovative functional beverage products that appeal to consumers. In order to retain and expand our market share, we must continue to develop and introduce different and innovative products and be competitive in the areas of efficacy, taste, quality and price, although there can be no assurance of our ability to do so. There is no assurance that consumers will continue to purchase our products in the future. Product lifecycles for some functional beverage brands, products or packages may be limited to a few years before consumers' preferences change. The functional beverage products that we currently market are in varying stages of their product lifecycles, and there can be no assurance that such products will become or remain profitable for us. We may be unable to achieve volume growth through product and packaging initiatives. We may also be unable to penetrate new markets. Additionally, as shopping patterns are being affected by the digital evolution, with consumers embracing shopping by way of mobile device applications, e-commerce retailers and e-commerce websites or platforms, we may be unable to address or anticipate changes in consumer shopping preferences or engage with our consumers on their preferred platforms. If our revenues decline, our business, financial condition, results of operations, and cash flows could be adversely affected.

***We derive virtually all of our revenues from functional beverage products, and competitive pressure in the functional beverage product category could adversely affect our business and operating results.***

Our focus is on the functional beverage product category, and our business is vulnerable to adverse changes impacting this category and business, which could adversely impact our business and the trading price of our common stock.

14

Virtually all of our sales are derived from our functional beverage products, including our CELSIUS® Originals and Vibe, CELSIUS® ESSENTIALS, CELSIUS® On-the-Go and CELSIUS® product lines. Any decrease in the sales of our functional beverage products could significantly adversely affect our future revenues and net income. Historically, we have experienced substantial competition from new entrants in the functional beverage category.

The increasing number of competitive products and limited amount of shelf space, including in coolers, in retail stores may adversely impact our ability to gain or maintain our share of sales in the marketplace. In addition, certain actions of our competitors, including unsubstantiated or misleading claims, false advertising claims and tortious interference in our business, as well as competitors selling misbranded products, could impact our sales. Competitive pressures in the functional beverage category as well as competition from the supplement category could impact our revenues, cause price erosion or lower market share, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***We compete in an industry that is brand-conscious, so brand name recognition and acceptance of our products are critical to our success and significant marketing and advertising could be needed to achieve and sustain brand recognition.***

Due to the highly competitive nature of the global functional beverage product sector, we expect and intend to continue to introduce new products and evolve existing products to better match consumer demand. The success of new and evolved products depends on a number of factors, including timely and successful development and consumer acceptance. Such endeavors may also involve significant risks and uncertainties, including distraction of management from current operations, greater than expected liabilities and expenses, inadequate return on capital, exposure to additional regulations and reliance on the performance of third-parties, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***If we are unable to successfully manage new product launches, our business and financial results could be adversely affected.***

Due to the highly competitive nature of the global functional beverage product sector, we expect and intend to continue to introduce new products and evolve existing products to better match consumer demand. The success of new and evolved products depends on a number of factors, including timely and successful development and consumer acceptance. Such endeavors may also involve significant risks and uncertainties, including distraction of management from current operations, greater than expected liabilities and expenses, inadequate return on capital, exposure to additional regulations and reliance on the performance of third-parties, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Our sales are affected by seasonality.***

As is typical in the non-alcoholic beverage category, our sales are seasonal. Our highest sales volumes generally occur in the second and third quarters, which correspond to the warmer months of the year in our major markets. Consumer demand for our products is also affected by weather conditions. Cool, wet spring or summer weather could result in decreased sales of our products and could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Changes in government regulation, or failure to comply with existing regulation concerning energy drinks, could adversely affect our business and financial performance.***

The production, marketing and sale of our functional beverage products are subject to the rules and regulations of various federal, state and local regulatory agencies. The marketing and sale of our products internationally is similarly subject to compliance with applicable laws, rules and regulations in those foreign countries where our products are sold. Legislation has been proposed and adopted at the U.S. federal, state and municipal level as well as in certain foreign jurisdictions to restrict the sale of energy drinks (including prohibiting the sale of energy drinks at certain establishments or pursuant to certain governmental programs), limit the content of caffeine and other ingredients in beverages, require certain product labeling disclosures and warnings, impose excise taxes, limit product size, or impose age restrictions for the sale of energy drinks. There is also a patchwork of state restrictions with respect to food packaging materials.

If a regulatory authority finds that a current or future product or production run is not in compliance with any of these regulations, we may be fined, or production may be stopped, thus adversely affecting our business, financial condition and results of operations. Similarly, any adverse publicity associated with any noncompliance may damage our reputation and our ability to successfully market our products. Furthermore, the rules and regulations are subject to change from time to time and can vary from state-to-state. While we closely monitor developments in this area, we have no way of anticipating whether changes in these rules and regulations will impact our business adversely. Additional or revised regulatory requirements, whether labeling, environmental, tax or otherwise, could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

Public health officials and health advocates remain focused on the public health consequences associated with obesity, especially as it affects children, and are seeking legislative change to reduce the consumption of sweetened beverages. There are also public health concerns regarding caffeine and other ingredients present in energy drinks. To the extent any such legislation is enacted in one or more jurisdictions where a significant amount of our products are sold, individually or in the aggregate, it could result in a reduction in demand for, or availability of, our products, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Product safety and quality concerns, or other negative publicity (whether or not warranted) could damage our brand image and corporate reputation and may cause our business to suffer.***

Our success depends in large part on our ability to maintain consumer confidence in the safety and quality of all of our products. We have rigorous product safety and quality standards, which we expect our operations as well as our suppliers to meet. However, despite our strong commitment to product safety and quality, we or our suppliers may not always meet these standards, particularly as we expand our product offerings through innovation or acquisitions into product categories that are beyond our traditional range of functional beverage products. If we or our suppliers fail to comply with applicable product safety and quality standards, or if our functional beverage products taken to the market are or become contaminated or otherwise adulterated by any means, we may be required to conduct costly product recalls and may become subject to product liability claims and negative publicity, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

Our success also depends on our ability to build and maintain the brand image for our existing products, new products and brand extensions and maintain our corporate reputation (see - *We compete in an industry that is brand-conscious, so brand name recognition and acceptance of our products are critical to our success and significant marketing and advertising could be needed to achieve and sustain brand recognition,* above). There can be no assurance that our advertising, marketing and promotional programs and our commitment to product safety and quality, human rights and environmental sustainability will have the desired impact on our products' brand image and on consumer preferences and demand. Claims regarding product safety, quality or ingredient content issues, our culture and our workforce, our environmental impact and the sustainability of our operations, or allegations of product contamination, even if false or unfounded, could tarnish the image of our brands and may cause consumers to choose other products. Consumer demand for our products could diminish significantly if we, our employees, distributors, suppliers or business partners fail to preserve the quality of our products, act or are perceived to act in an unethical, illegal, discriminatory, unequal or socially irresponsible manner, including with respect to the sourcing, content or sale of our products, service and treatment of our customers, or the use of customer data. Furthermore, our brand image or perceived product quality could be adversely affected by litigation, unfavorable reports in the media (internet or elsewhere), studies in general and regulatory or other governmental inquiries (in each case whether involving our products or those of our competitors) and proposed or new legislation affecting our industry. Negative postings or comments on social media or networking websites about the Company or any one of our brands, even if inaccurate or malicious, could generate adverse publicity that could damage the reputation of our brands or the Company. Business incidents, whether isolated or recurring and whether originating from us, our co-packers, distributors, suppliers or business partners, that erode consumer trust can significantly reduce brand value or potentially trigger boycotts of our products and can have a negative impact on consumer demand for our products as well as our reputation and financial results. The impact of such incidents may be exacerbated if they receive considerable publicity, including rapidly through social or digital media (including for malicious reasons) or result in litigation.

In addition, from time to time, there are public policy endeavors that are either directly related to our products and packaging or to our business. These public policy debates can occasionally be the subject of backlash from advocacy groups that have a differing point of view and could result in adverse media and consumer reaction, including product boycotts. Similarly, our sponsorship relationships could subject us to negative publicity as a result of actual or alleged misconduct by individuals or entities associated with organizations we sponsor or support. Likewise, campaigns by activists connecting us, or our supply chain, with human and workplace rights, environmental or animal rights issues could adversely impact our corporate image and reputation. Allegations, even if untrue, that we are not respecting the human rights found in the United Nations Universal Declaration of Human Rights; actual or perceived failure by our suppliers or other business partners to comply with applicable labor and workplace rights laws, including child labor laws, or their actual or perceived abuse or misuse of migrant workers; adverse publicity surrounding obesity and health concerns related to our products, our environmental impact and the sustainability of our operations, labor relations, our culture and our workforce or the like could negatively affect our Company's overall reputation and brand image, which in turn could have a negative impact on our products' acceptance by consumers, and a material adverse effect on our business, financial condition, results of operations, and cash flows.

***Failure by suppliers or third-party co-packers to comply with applicable laws and regulations, or with specifications and other requirements for our products, may adversely impact our business.***

We rely on our raw material suppliers and third-party co-packers for compliance with applicable legal and regulatory requirements. If our raw material suppliers or third-party co-packers fail to comply with applicable federal, state, and local requirements it could materially adversely impact our business. For example, failure of our third-party co-packers to comply with applicable CGMP requirements could necessitate a product recall, cause us to be subject to regulatory enforcement action, or lead to private litigation against us.

We also rely on our third-party co-packers to provide us with products that comply with our specifications and other applicable requirements. If they fail to do so, or if our raw material suppliers fail to supply us with material that complies with applicable specifications, it could lead to supply chain disruptions, damage to our reputation, or otherwise materially adversely impact our business. It could also result in the inability of the third-party co-packers to continue to manufacturer product for us or inability of the raw material suppliers to continue to supply product to us, which could result in disruption or increased cost of product. Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

16

*Litigation could expose us to significant liabilities and reduce demand for our products.*

We have been and are a party, from time to time, to various litigation and other legal proceedings, including, but not limited to, intellectual property, false advertising, product liability, and breach of contract claims. Lawsuits have been filed against us claiming that certain statements made in our advertisements or on the labels of our products were false or misleading or otherwise not in compliance with applicable state and/or federal regulatory requirements. Class action lawsuits have been filed against us, alleging that certain claims in our marketing promotional materials amount to false advertising. We do not believe any statements made by us in our promotional materials or set forth on our product labels are false or misleading or otherwise not in compliance with applicable state or federal legal and regulatory requirements, and we have been defending, and will continue to vigorously defend such lawsuits. At times, even if the Company believes that it is acting in compliance with the applicable laws and regulations, management may choose to settle claims in order to avoid lengthy litigation and associated expenses and/or disruptions to its business.

Any of the foregoing matters or other litigation, the threat thereof, or unfavorable media attention arising from pending or threatened litigation could consume significant financial and managerial resources and result in diminished operational efficiency of the Company, significant monetary awards against us, an injunction barring the sale of any of our products and injury to our reputation. Our failure to successfully defend or settle any litigation or legal proceedings could result in liabilities that, to the extent not covered by our insurance, could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*If we fail to remediate our existing material weaknesses or do not maintain an effective internal control environment as well as adequate control procedures over our financial reporting, investor confidence may be adversely affected thereby affecting the value of our stock price.*

We are required to maintain proper internal control over our financial reporting and adequate controls related to our disclosures. As defined in Rule 13a-15(f) under the Exchange Act, internal control over financial reporting is a process designed by, or under the supervision of, the principal executive and principal financial officers and effected by the Board, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. If we fail to maintain adequate controls, our business, the results of operations, financial condition or the value of our stock may be adversely impacted.

As described in Part II, Item 9A. *Controls and Procedures*, management identified material weaknesses in the Company's internal control over financial reporting ("ICFR") in 2021, 2022 and 2023. A material weakness is a deficiency, or a combination of deficiencies, in ICFR, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. We reported that a material weakness in ICFR continues to exist as of December 31, 2023, as a result of the ineffective design of certain controls.

The Company is in the process of remediating the material weakness, but there can be no assurances that those efforts will be successful. If the Company's remediation efforts are insufficient or if additional material weaknesses in ICFR are discovered or occur in the future, or if the Company fails to establish and maintain an effective control environment or ICFR, the Company's consolidated financial statements may contain material misstatements and it could be required to revise or restate its financial results, which could materially and adversely affect the Company's business, results of operations and financial condition, restrict its ability to access the capital markets, require it to expend significant resources to correct the material weakness, subject it to fines, penalties or judgments, harm its reputation or otherwise cause a decline in investor confidence, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*We currently face an investigation from the SEC, the timeline for which and the results of which are currently unknown.*

On January 8, 2021, we received a letter from the SEC Division of Enforcement seeking the production of documents in connection with a non-public fact-finding inquiry by the SEC to determine whether violations of the federal securities laws have occurred. We have subsequently received subpoenas for the production of documents in connection with this matter. The investigation and requests from the SEC do not represent that the SEC has concluded that the Company or anyone else has violated the federal securities laws. We have cooperated and will continue to cooperate with the SEC staff in its investigation and requests. At this time, however, we cannot predict the length, scope, or results of the investigation or the impact, if any, of the investigation on our results of operations.

We may also be subject to further or other examinations, investigations, proceedings and orders by the SEC or other regulators. Any such further or other actions could be expensive, damaging to our brand, and could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*Strikes or work stoppages or labor unrest can cause our business to suffer.*

Some employees of our third-party business partners that are involved in the manufacturing, production, or distribution of our products are covered by collective bargaining agreements, and other such employees may seek to be covered by collective bargaining agreements. Strikes or work stoppages or other business interruptions may occur if the third parties that are involved in the manufacturing, production and distribution of our products are unable to renew, or enter into new, collective bargaining agreements on satisfactory terms, which, in turn, can impair the manufacturing and distribution of our products, interrupt product supply, lead to a loss of sales, increase our costs, or otherwise affect our ability to fully implement future operational changes to enhance our efficiency or to adapt to changing business needs or strategy, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

**Risk Factors Related to Financial Risks**

*Fluctuations in our effective tax rate could adversely affect our financial condition and results of operations.*

We are subject to income and other taxes in both the U.S. and certain foreign jurisdictions. Therefore, we are subject to audits for multiple tax years in various jurisdictions at once.

Our 2020 through 2022 U.S. federal income tax returns are subject to examination by the IRS. Our state and local income tax returns are subject to examination for the 2019 through 2022 tax years.

At any given time, events may occur which change our expectation about how any such tax audits will be resolved and thus, there could be significant variability in our quarterly or annual tax rates, because these events may change our plans for uncertain tax positions.

Changes in U.S. tax laws as a result of any legislation proposed by U.S. Congress could adversely affect our provision for income taxes, resulting in an adverse impact on our financial condition or results of operations. In addition, changes in the manner in which U.S. multinational corporations are taxed on foreign earnings, including changes in how existing tax laws are interpreted or enforced, could adversely affect our financial condition or results of operations. For example, the Organization for Economic Cooperation and Development ("OECD") has recommended changes to numerous long-standing international tax principles through its base erosion and profit shifting ("BEPS") project. These changes, to the extent adopted, may increase tax uncertainty, result in higher compliance costs and adversely affect our provision for income taxes, results of operations or cash flow. In connection with the OECD's BEPS project, companies are required to disclose more information to tax authorities on operations around the world, which may lead to greater audit scrutiny of profits earned in various countries. Economic and political pressures to increase tax revenues in jurisdictions in which we operate, or the adoption of new or reformed tax legislation or regulation, may make resolving tax disputes more difficult and the final resolution of tax audits and any related litigation could differ from our historical provisions and accruals, could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*We may be required in the future to record a significant charge to earnings if our goodwill or intangible assets become impaired.*

Under U.S. Generally Accepted Accounting Principles ("U.S. GAAP"), we are required to review our goodwill and indefinite-lived intangible assets for impairment annually, and more frequently if events or changes in circumstances indicate the carrying value may not be recoverable. Factors potentially affecting our estimated fair values, used in comparison with carrying values, include but are not limited to, declining or slower than anticipated growth rates for certain of our existing products, a decline in stock price and market capitalization, reduced operating cash flows, changes in the business climate or competitive environment, and slower growth rates in our industry. An impairment charge, if required, would decrease the carrying value to that of our estimated fair value, on our consolidated balance sheet and impact earnings.

Finite-lived assets are reviewed for impairment whenever events or changes in circumstances suggest that their carrying value may not be fully recoverable and are subject to amortization over their useful lives.

We may be required in the future to record a significant charge to earnings during the period in which we determine that our intangible assets have been impaired. Any such charge would adversely impact our results of operations. As of December 31, 2023, our goodwill totaled approximately $14.2 million and net intangible assets totaled approximately $12.1 million.

*Fluctuations in foreign currency exchange rates may adversely affect our operating results.*

We are exposed to foreign currency exchange rate risk with respect to our sales, expenses, profits, assets and liabilities denominated in currencies other than the U.S. dollar and we expect that such risk exposure will increase as we continue to expand our international operations. As a result, our reported earnings may be affected by changes in foreign currency exchange rates. For the years ended December 31, 2023, 2022 and 2021, net foreign currency translation gain (loss) resulted in a gain of $1.2 million, a loss of $2.5 million and a gain of $0.8 million, respectively.

18

*Potential changes in accounting standards or practices or taxation may adversely affect our financial results.*

We cannot predict the impact that future changes in accounting standards or practices may have on our financial results. New accounting standards could be issued that change the way we record revenues, expenses, assets and liabilities. These changes in accounting standards could adversely affect our reported earnings. Increases in direct and indirect income tax rates could affect after-tax income. Equally, increases in indirect taxes (including environmental taxes pertaining to the disposal of beverage containers or indirect taxes on beverages generally or energy drinks in particular) could affect our products' affordability and reduce our sales.

*Uncertainty in the financial markets and other adverse changes in general economic or political conditions in any of the major countries in which we do business could adversely affect our industry, business and results of operations.*

Global economic uncertainties, including highly inflationary economies and foreign currency exchange rates, affect businesses such as ours in a number of ways, making it difficult to accurately forecast and plan our future business activities. There can be no assurance that economic improvements will occur, or that they would be sustainable, or that they would enhance conditions in markets relevant to us. In addition, we cannot predict the duration and severity of disruptions in any of our markets or the impact they may have on our customers or business, as our expansion outside of the U.S. has increased our exposure to any developments or crises in African, Asian, European and other international markets. Unfavorable economic conditions and financial uncertainties in our major international markets and unstable political conditions, including civil unrest and governmental changes, in certain of our other international markets could undermine global consumer confidence and reduce consumers' purchasing power, thereby reducing demand for our products, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*Our investments are subject to risks which may cause losses and affect the liquidity of these investments.*

On December 31, 2023, we had $756.0 million in cash and cash equivalents. Certain of these investments are subject to general credit, liquidity, market and interest rate risks. These risks associated with our investment portfolio may have a material adverse effect on our future results of operations, liquidity and financial condition.

**Risk Factors Related to our Common Stock**

*The market price and trading volume of our common stock has been, and may continue to be, volatile and could decline significantly.*

Our stock price is affected by a number of factors, including stockholder expectations, financial results, the introduction of new products by us and our competitors, general economic and market conditions such as inflation, estimates and projections by the investment community and public comments by other parties as well as many other factors including litigation, many of which are beyond our control. We do not provide guidance on our future performance, including, but not limited to, our revenues, margins, product mix, operating expenses or net income. We may be unable to achieve analysts' net revenue or earnings forecasts, which are based on their own projected revenues, sales volumes and sales mix of many product types or new products, certain of which are more profitable than others, as well as their own estimates of gross margin and operating expenses. There can be no assurance that we will achieve any such projected levels or mix of product sales, revenues, gross margins, operating profits or net income. As a result, our stock price is subject to significant volatility, and stockholders may not be able to sell our stock at attractive prices. In addition, periods of volatility in the market price of our stock could result in the initiation of securities class action litigation against us. During the fiscal year ended December 31, 2023, the high of our stock price was $68.42 and the low was $27.21, adjusted for the Forward Stock Split, that occurred within the year.

*Our Board has the authority, without stockholder approval, to issue preferred stock with terms that may not be beneficial to common stockholders and with the ability to affect adversely stockholder voting power and perpetuate control. We have outstanding shares of preferred stock with rights and preferences superior to those of our common stock.*

Our Articles of Incorporation allows our Board to issue shares of preferred stock without any vote or further action by our stockholders. Our Board has the authority to fix and determine the relative rights and preferences of preferred stock. As a result, our Board could authorize the issuance of a series of preferred stock that would grant to holders the preferred right to our assets upon liquidation, the right to receive dividend payments before dividends are distributed to the holders of common stock and the right to the redemption of the shares, together with a premium, prior to the redemption of our common stock.

19

On August 1, 2022, the Company filed a Series A Certificate with the Secretary of the State of Nevada (the "Series A Certificate"). The Series A Certificate authorizes 1,466,666 shares of Series A Preferred Stock, all of which were issued and sold to Pepsi, and were initially convertible at the rate of five shares of the Company's common stock, par value $0.001 per share, for each share of Series A Preferred Stock (now fifteen shares of the Company's common stock for each share of Series A Preferred Stock in connection with the Forward Stock Split). The Series A Preferred Stock ranks, with respect to distribution rights and rights on liquidation, winding-up and dissolution, (i) senior and in priority of payment to the Company's common stock, (ii) on parity with any class or series of capital stock of the Company expressly designated as ranking on parity with the Series A Preferred Stock, and (iii) junior to any class or series of capital stock of the Company expressly designated as ranking senior to the Series A Preferred Stock. Upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company (but excluding any change of control), each holder of Series A Preferred Stock will be entitled to receive an amount per share of Series A Preferred Stock equal to the Liquidation Preference, as defined in the Series A Certificate. Holders of shares of Series A Preferred Stock will be entitled to cumulative dividends, which will be payable quarterly in arrears either in cash, in-kind, or a combination thereof. Dividends will accrue on each share of Series A Preferred Stock at the rate of 5.00% per annum, subject to adjustment as set forth in the Series A Certificate. In addition to such quarterly regular dividends, such shares of Series A Preferred Stock are entitled to participate in dividends paid to holders of common stock.

***Certain of our affiliated stockholders can exert significant influence on the Company's corporate affairs.***

Certain of our affiliated stockholders own approximately 23% of our issued and outstanding common stock. Accordingly, they will be able to effectively influence the election of directors, as well as all other matters requiring stockholder approval. The interests of such stockholders may differ from the interests of other stockholders with respect to the issuance of shares, business transactions with or sales to other companies, selection of other directors and other business decisions.

***We do not expect to pay cash dividends on our common stock in the foreseeable future***.

We have never paid cash dividends on our common stock. We do not expect to pay cash dividends on our common stock at any time in the foreseeable future. The future payment of dividends on our common stock directly depends upon our future earnings, capital requirements, financial requirements and other factors that our Board will consider. Since we do not anticipate paying cash dividends on our common stock, return on your investment, if any, will depend solely on an increase, if any, in the market value of our common stock.

**Item 1B. Unresolved Staff Comments.**

Not applicable.

**Item 1C. Cybersecurity.**

*Cybersecurity Risk Management and Strategy*

The Company has established a cybersecurity risk management program, designed to identify, assess, mitigate, and manage cybersecurity risks, incidents and threats that could potentially impact our business operations. Our internal cybersecurity committee (the "Cybersecurity Committee"), which includes our Chief Financial Officer and key representatives from the Finance, Information Technology ("IT"), and Legal departments, direct our cybersecurity efforts. The Cybersecurity Committee is primarily responsible for monitoring our cybersecurity risk management program, establishing and updating materiality thresholds for reporting cybersecurity incidents and determining whether specific incidents meet established disclosure criteria. The Cybersecurity Committee's role is focused on evaluating incidents against these thresholds to ensure that significant cyber risks are appropriately managed, addressed and if required, disclosed in line with our overarching cybersecurity strategy and policies. The Company has also established a Cybersecurity Incident Assessment and Reporting Policy (the "Cyber Incident Policy").

Our Vice President of IT is tasked with continuous monitoring of our systems and networks for potential cybersecurity threats. The IT department monitors for incidents that meet our established materiality thresholds, which encompass items such as cost, potential impact on operations, and reputational risks, and escalates incidents within our organization for further assessment and responsive action by the Cybersecurity Committee.

The Cyber Incident Policy sets forth a process to report cybersecurity incidents that is intended to enable a rapid organizational response to mitigate risks and also to ensure compliance with our public reporting obligations. This process includes incident identification, reporting channels to report any cybersecurity incidents, reporting procedures with respect to information to be included in any incident report, provision for confidentiality of information reported, the initiation of a response process to any reported incident, communication of a reported incident to the Cybersecurity Committee and other stakeholders, and ongoing training and awareness of employees.

In addition to our internal reviews we may from time to time engage external cybersecurity firms to assist with investigations and external cybersecurity experts to evaluate our processes, including conducting penetration tests, to report on our cybersecurity infrastructure and processes to our senior management and to the Enterprise Risk and Audit Committee (the "Audit Committee") of our Board. Our Cyber Incident Policy also establishes procedures for engaging law enforcement should the need arise and defines certain parameters with respect to drafting initial incident reports, technical assessment reports, and financial impact reports for review by the Cybersecurity Committee, management, the Audit Committee, and the full Board, as appropriate.

Our Cybersecurity Committee also reviews cybersecurity incidents affecting our third party service providers as necessary. Upon being notified of an incident having occurred at a third party, our Vice President of IT or a designated point of contact will promptly contact the third party to understand the details and scope of the event. An initial report outlining the nature of the incident, affected systems, and preliminary impact assessment will be provided to the Cybersecurity Committee which will convene to review the matter. Regular communication is to be maintained with the third party with updates provided to the Cybersecurity Committee to enable appropriate steps to be taken and timely public reporting if needed.

*Cybersecurity Governance and Oversight*

The governance of our cybersecurity risks involves active and informed participation from our management team, our Audit Committee, and our Board. The Audit Committee, which receives regular updates from the Cybersecurity Committee, maintains oversight of our cybersecurity strategies and risks and will consider such updates as part of the Company's overall risk management program. This oversight includes briefings on the nature of the risks we face, the steps we are taking to mitigate these risks, and any significant cybersecurity incidents that have occurred. In addition, our Vice President of IT will provide reports and updates to the Audit Committee and to the full Board as the need arises. All Board members may attend the meetings of the Audit Committee during which cybersecurity is discussed and will be included in any tabletop exercises as they are planned.

We have not experienced a cybersecurity incident that had a material impact on our business strategy, results of operations, or financial condition. We continue to monitor potential cybersecurity threats and incorporate findings into our risk management strategies.

**Item 2. Properties.**

*Domestic Properties*

We lease our principal executive offices located at 2424 North Federal Highway, Boca Raton, Florida 33431. The spaces we lease within this building have varying terms and extensions with the longest extension running through June 2027. Our aggregate lease cost within this building is $44 thousand per month. As our operations continue to expand, we may acquire additional office space as necessary at our existing facilities or elsewhere. Additionally, we lease a warehouse in Boca Raton, Florida primarily for storing marketing apparel. The monthly cost is approximately $11 thousand and extends through the end of 2028.

We do not own any real property in the U.S., including office spaces, warehouses or other facilities.

*International Properties*

We also lease office spaces in Europe for an aggregate monthly cost of approximately $12 thousand. These leases have different terms and extend through 2027.

**Item 3. Legal Proceedings.**

We are subject to various claims and lawsuits in the ordinary course of business, which can include, among other matters, contractual disputes with our marketing and other partners, claims that the we infringed on the intellectual property of others, commercial general liability claims, automobile liability claims, labor law and employment claims, and potential class actions. We are also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings. In connection with such formal and informal inquiries, we receive numerous requests, subpoenas, and orders for documents, testimony, and information in connection with various aspects of our activities.

Additional information in response to this Item is included in Note 19. *Commitments and Contingencies* in the Notes to Consolidated Financial Statements and is incorporated by reference into Part I of this Report. Our consolidated financial statements and the accompanying Notes to Consolidated Financial Statements are filed as part of this Report under Item 15. *Exhibits and Financial Statement Schedules* and are set forth beginning on page F-1 immediately following the signature pages of this Report.

**Item 4. Mine Safety Disclosures.**

Not applicable.

21

**PART II**

**Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchase of Equity Securities.**

**Principal Market**

Our common stock is listed on the Nasdaq Capital Market under the symbol "CELH." As of February 21, 2024, there were 35 holders of record of our common stock. The holders of record as of such date do not include stockholders whose shares were held by banks, brokers and other financial institutions.

**Common Stock Split**

On November 1, 2023, the Board approved the Forward Stock Split. The split became effective on November 13, 2023 and our common stock began trading on a split-adjusted basis on November 15, 2023. Concurrently with the effectiveness of the split, the number of authorized shares of common stock increased from 100 million to 300 million, which is proportional to the ratio of the split. Neither the split nor the increase in authorized shares affected any stockholder's ownership percentage of our common stock, altered the par value of our common stock or modified any voting rights or other terms of the common stock. See Note 2. *Basis of Presentation and Summary of Significant Accounting Policies* in the notes to the consolidated financial statements contained in this Report for more information on the Forward Stock Split.

**Dividends**

*Pepsi*

On August 1, 2022, we issued 1,466,666 shares of our Series A Preferred Stock to Pepsi, which entitles Pepsi to cumulative dividends, payable quarterly in arrears either in cash, in-kind, or a combination thereof, at our election ("Regular Series A Dividends"). Regular Series A Dividends accrue on each share of Series A Preferred Stock at the rate of 5.00% per annum, subject to adjustment as set forth in the Series A Certificate. In addition to such quarterly Regular Series A Dividends, shares of Series A Preferred Stock also entitle the holder of such shares to participate in any dividends paid on the Company's common stock on an as-converted basis. During the year ended December 31, 2023, the Board declared and paid $27.5 million in Regular Series A Dividends, which equaled $18.72 per share of Series A Preferred Stock. There were no cumulative undeclared dividends on the Series A Preferred Stock at December 31, 2023.

With the exception of the Regular Series A Dividends, we have never declared or paid cash dividends. We do not expect to pay cash dividends on our common stock at any time in the foreseeable future. Any future payment of cash dividends depends upon our future earnings, capital requirements, financial requirements and other factors that the Board deems appropriate. Currently, the Company expects to use its net income to invest in the Company's business and operations.

**Recent Sales of Unregistered Securities**

There were no sales of unregistered equity securities during the three months ended December 31, 2023.

**Stock Performance Graph**

The information contained in this section shall not be deemed "soliciting material" or to be "filed" with the SEC or incorporated by reference in future filings with the SEC, or otherwise subject to the liabilities under Section 18 of the Exchange Act, except to the extent we specifically incorporate it by reference into such filing. The following information provides a five-year comparison of the cumulative total stockholder return on our common stock from December 31, 2018 through December 31, 2023 to the returns of: (i) the Standard & Poor's ("S&P") 500 Index; and (ii) a self-selected peer group. The graph is not, and is not intended to be indicative of future performance of our Common Stock.



\*    The graph assumes $100 was invested on December 31, 2018, including reinvestment of dividends. The Company's self-selected peer group is comprised of: Monster Beverage Corporation, The Coca-Cola Company, Pepsi, Keurig Dr Pepper Inc., and Starbucks Corporation. Cumulative total returns for the companies included in the peer group have been weighted on the basis of the total market capitalization for each company.

**Issuer Purchases of Equity Securities**

None.

**Item 6. Reserved.**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

This Management's Discussion and Analysis of Financial Condition and Results of Operations should be read in conjunction with our consolidated financial statements and the accompanying notes included elsewhere in this Report. This Report contains forward-looking statements within the meaning of the PSLRA Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Exchange Act, about our expectations, beliefs, plans and intentions regarding our product development efforts, business, financial condition, results of operations, strategies and prospects. Readers can identify forward-looking statements by the fact that these statements do not relate to historical or current matters. Rather, forward-looking statements relate to anticipated or expected events, activities, trends or results. Because forward-looking statements relate to matters that have not yet occurred, these statements are inherently subject to risks and uncertainties that could cause our actual results to differ materially from any future results expressed or implied through forward-looking statements. Many factors could cause our actual activities or results to differ materially from the activities and results anticipated in forward-looking statements. Please refer to Item 1A "Risk Factors" for a detailed discussion of these uncertainties and risks. Forward-looking statements reflect our views as of the date they are made. Except as required by law, we are not obligated to revise or publicly release any updates to these forward-looking statements. This includes not updating the statements to reflect events or circumstances occurring after they were made, or to address any differences between anticipated and actual results. We intend for all forward-looking statements to be subject to the safe harbor provisions of PSLRA.

The Management's Discussion and Analysis section aims to help the reader understand the Company's financial status and operational performance, guiding readers through our current business landscape and operational environment. Our analysis includes the results of operations and financial condition for the years ended December 31, 2023 and 2022 and year-over-year comparisons between 2023 and 2022. For a detailed discussion of our results of operations and financial condition for the year ended December 31, 2022 and year-over-year comparisons between 2022 and 2021, please refer to *Management's Discussion and Analysis of Financial Condition and Results of Operations* in Part II, Item 7 of our Annual Report on Form 10-K, as amended, for the year ended December 31, 2022.

**Our Business**

*Executive-Level Overview*

CELSIUS® is a fitness drink designed to enhance metabolism and burn body fat when paired with exercise, while also providing an energy boost. This product is available in two convenient forms: ready-to-drink and an on-the-go portable powder form. Additionally, we have introduced our Celsius Essentials line, featuring 16-ounce cans enriched with aminos. Our product range is widely available across the U.S. in various retail outlets, including grocery stores, natural product stores, convenience stores, fitness centers, mass retailers, vitamin specialty stores, and through online e-commerce platforms. Moreover, our products have also made their way into select markets in Europe, the Middle East and the Asia-Pacific region as we continue to expand our global presence.

We develop, process, market, sell, and distribute Celsius, Celsius Essentials and Celsius On-The-Go Powder to customers and consumers across the U.S. and in certain territories in Canada, Europe, the Middle East and Asia-Pacific. Our operational model strategically relies on co-packers for the manufacture and supply of our products, enabling us to leverage specialized expertise and scale production efficiently. This approach allows us to maintain flexibility in responding to market demands and to focus our resources on innovation, marketing, and expanding our distribution channels. We continually assess and work to optimize our supply chain to ensure quality, consistency and timely delivery to our customers.

On August 1, 2022, we entered into a long-term Distribution Agreement with Pepsi, making them our primary distributor in the U.S. and leveraging the right of first offer to facilitate our expansion into Canada. This agreement also helps to enable potential future international markets and new distribution channels with Pepsi. In connection with our relationship with Pepsi, we terminated certain previous distributor agreements and shifted certain distribution rights to Pepsi. Through our Transition Agreement with Pepsi, we received specific payments for transferring certain existing distribution rights to them.

*Company and Industry-Wide Factors*

*Energy Drink Market Trends* - The energy drink industry is experiencing significant growth, driven by increasing consumer demand for functional beverages that offer benefits beyond the larger carbonated soft drink market such as various health benefits, energy boosts, or other fitness-related benefits. This trend is supported by a shift towards healthier lifestyles and a growing preference for more natural ingredients and increased lower-calorie options.

*Consumer Behavior Changes* - There's a rising trend of consumers seeking products that align with personal wellness and fitness goals. Our product range caters to this demand, particularly among health-conscious consumers and fitness enthusiasts.

*Technological Advancements and Digital Trends* - The integration of technology in marketing and sales strategies is becoming increasingly important to our business. Leveraging digital marketing channels, e-commerce platforms, and data analytics are essential for reaching and understanding modern consumers. Adapting to these technological trends is vital for staying competitive and meeting evolving consumer expectations.

*Pepsi Partnership* - In August 2022, the Company issued approximately 1.5 million shares of non-voting Series A Preferred Stock to Pepsi for an aggregate purchase price of $550 million, and concurrently entered into the Distribution Agreement and Transition Agreement.

This partnership capitalizes on Pepsi's robust distribution channels to expand our reach into key market segments, including supermarkets, convenience stores, health clubs, and other retail outlets. The alliance enhances our market penetration and brand visibility, contributing to our long-term growth strategy. Additionally, this collaboration aligns with our mission to innovate and deliver high-quality products to a broader consumer base. Looking forward, we anticipate that this strategic alignment with Pepsi will not only continue to strengthen our distribution capabilities but also open up new opportunities for product development and market expansion. Our reliance on Pepsi's distribution expertise forms a cornerstone of our strategy to enhance accessibility and presence in diverse retail environments, further solidifying our position in the competitive energy drink market. In the U.S., we utilize Pepsi's distribution network to supply supermarkets, convenience stores, health clubs and other merchants where our products are sold to consumers. For more information refer to Item 1. *Business*, and Note 14. *Mezzanine Equity* to our consolidated financial statements contained elsewhere in this Report.

*Key Drivers of our Financial Success and Market Presence* - Much of our financial success is dependent on our ability to market and connect with a diverse consumer base, including wellness-focused consumers, fitness enthusiasts and consumers looking for more functionality in their beverage consumption. We believe that our strategic marketing initiatives, aimed at different demographic and lifestyle segments, contribute to revenue growth and market share expansion. We continuously adapt our marketing mix to align with changing consumer preferences, leveraging digital and social media channels for broader reach and engagement. Furthermore, our focus on product innovation is designed to meet the evolving demands of health-conscious consumers, while maintaining appeal to a general consumer base seeking quality and convenience, thereby enhancing our competitive position and financial performance. Our approach is to create a brand experience that is both inclusive and appealing to a wide range of consumers, fostering loyalty and driving sustainable growth. We believe that our multifaceted approach is crucial for driving enduring revenue growth and maintaining a strong market presence in the energy drink industry.

*Our Business Risks*

Our management has identified certain material opportunities, challenges and risks in the energy drink industry and the Company.

*Brand Reputation and Consumer Trust Risks* - Our success relies on maintaining a strong brand reputation and consumer trust. In the fast-paced consumer goods industry, public perception can shift rapidly due to various factors, including product quality issues, negative publicity, social media trends, and changing consumer preferences. A tarnished brand image, whether through real or perceived issues, can result in decreased customer loyalty, reduced sales, and ultimately, a negative impact on our financial performance.

To mitigate these risks, we are committed to maintaining high standards in product quality, engaging in responsible marketing practices, and actively managing public relations. We monitor consumer feedback continuously and respond swiftly to any concerns. Our management team is equipped to handle potential public relations challenges proactively to safeguard our brand image. However, despite these efforts, there is always a risk of unforeseen events that could harm our brand reputation.

*Reliance on Key Partnership with Pepsi*

Our business operations and financial health are significantly influenced by our strategic partnership with Pepsi, which plays a critical role not only in the distribution of our products but also in generating a substantial portion of our sales and accounts receivable. While this partnership has been instrumental in expanding our market reach and accelerating revenue growth, it also presents concentration risk. For more information, see Note 2. *Basis of Presentation and Summary of Significant Accounting Policies* to our consolidated financial statements.

The substantial portion of our sales attributed to Pepsi underscores our reliance on their distribution network. Any disruption in Pepsi's operations, shifts in their strategic focus, reduction in service levels or support for our products, or changes in the terms of our partnership could directly impact our sales performance and revenue streams. This dependency also extends to accounts receivable, where a significant portion of our receivables is tied to Pepsi. Delays or defaults in these receivables could adversely affect our cash flow and financial planning. Although there is concentration risk with Pepsi as our partner, Pepsi is a premier public company across both consumer goods as well as beverages and has a strong balance sheet, thereby insulating us from some of the potential exposures that would exist with a smaller, less established partner.

To address these risks, we are continuously engaged in strengthening our relationship with Pepsi, ensuring alignment in business strategies and operational goals. We actively monitor and manage our accounts receivable associated with Pepsi to maintain healthy cash flow. Additionally, we are exploring diversification strategies to reduce our reliance on a single partner. This includes seeking opportunities to expand our distribution channels and customer base, both domestically and internationally, to create a more balanced and resilient sales portfolio.

We recognize the critical importance of Pepsi to our current business model and are committed to an ongoing evaluation of this relationship. Our management team is focused on maintaining a balanced approach to our partnership, ensuring that it continues to support our growth objectives while actively managing the associated risks. We believe that by diversifying our market presence and continually assessing the partnership dynamics, we can sustainably grow our business and mitigate potential financial risks. In addition, we expect that continued growth and innovation, which increases our brand relevance within the energy drink category, will assist us in continuing to be an important component of the Pepsi energy drink portfolio.

*Market Competition Risks*

The energy drink industry is characterized by intense competition, involving a diverse array of competitors with varying market strategies and product offerings. This includes well-established companies with strong brand recognition, as well as emerging entities that may introduce innovative approaches or specialized products. The entry of new or strengthening of competitors, especially those introducing innovative products or employing aggressive pricing strategies, can significantly impact our market share and profitability. Additionally, continuing shifts in consumer preferences towards healthier alternatives or different beverage categories could intensify competition.

25

To address these challenges, we continuously innovate our product line, leveraging consumer insights through various channels, including customer feedback and social media trends, to ensure an understanding of our market and refine our marketing strategies. We also monitor the competitive landscape to anticipate and react to changes in competitor strategies, as the dynamic nature of our market means that we must constantly adapt to maintain our competitive edge. Changes in the competitive landscape could materially impact our results of operations and market position.

*Market Expansion Risks*

Our strategic growth plan includes expanding into new geographic markets and launching new product lines. These initiatives are key to increasing our market share and driving revenue growth. However, they also introduce inherent risks that could impact our business operations and financial health.

Successfully entering and thriving in new markets is contingent upon our understanding and adaptation to local consumer preferences, which may vary significantly from those in our current markets. A failure to accurately gauge these preferences could result in reduced product acceptance and lower sales in these regions.

Moreover, each new market presents unique regulatory challenges. Navigating varying regulatory landscapes and ensuring compliance is crucial. Non-compliance or changes in regulatory frameworks could lead to legal ramifications, increased operational costs, and potential delays in market entry.

Furthermore, as we venture into new territories, we encounter competition not only from well-established local brands but also from other global entities. This heightened competition can affect our market positioning, influence our pricing strategies, and ultimately impact our profitability in these new markets.

To mitigate these risks, we engage in market analysis to gain insights into local consumer trends and preferences. Collaborating closely with regulatory consultants, we aim to ensure full compliance with all regional legal and regulatory requirements. Additionally, we formulate and implement competitive strategies tailored to effectively contend with local and global competitors in these new markets.

*Global Minimum Tax*

Jurisdictions globally have implemented laws and policies from the Organization for Economic Co-operation and Development's (the "OECD") project to counteract base erosion and profit shifting. The OECD, representing the G20 and other nations, is advancing an initiative to redistribute taxing rights on multinational enterprises' profits to countries where their goods and services are sold.

The OECD's framework implements a global minimum corporate tax of 15% for companies with global revenues and profits above certain thresholds (referred to as "Pillar Two"), with certain aspects of Pillar Two effective January 1, 2024 and other aspects effective January 1, 2025. We do not expect to be subject to the Pillar Two rules until calendar year 2025 at the earliest. As of now, we do not expect Pillar Two to have a material impact on our effective tax rate or our consolidated results of operation, financial position, and cash flows.

**Results of Operations**

***Year ended December 31, 2023 compared to year ended December 31, 2022***

*Revenue*

For the year ended December 31, 2023, revenue was approximately $1,318.0 million, an increase of $664.4 million or 102% from $653.6 million for the year ended December 31, 2022. This growth was primarily the result of increased revenues from North America, where 2023 revenues were $1,263.3 million, an increase of $645.9 million or 105% from 2022. North America was driven by continued gains in distribution points and SKUs per location.

European revenues for 2023 were approximately $43.7 million, which increased by $12.7 million or 41% from 2022. Asia-Pacific revenues contributed an additional $4.8 million, an increase of $1.1 million or 30% from 2022. Other international markets, including Puerto Rico, generated approximately $6.2 million in revenue during 2023, an increase from $1.4 million in 2022.

The following table sets forth the amount of revenues by geographical location for the years ended December 31, 2023 and December 31, 2022:

| *(in thousands)* | Years Ended December 31, | |
| Revenue Source | 2023 | 2022 |
| --- | --- | --- |
| Total revenue | $ 1,318,014 | $ 653,604 |
| North America revenue | 1,263,341 | 617,457 |
| Europe revenue | 43,722 | 31,054 |
| Asia-Pacific revenue | 4,755 | 3,647 |
| Other revenue | 6,196 | 1,446 |

*Gross Profit*

For the year ended December 31, 2023, gross profit increased by $362.2 million or 134% to $633.1 million from $270.9 million for the year ended December 31, 2022. Gross profit margins increased to 48.0% for the year ended December 31, 2023 from 41.4% for the year ended December 31, 2022. Gross profit improvements were attributed to efficiencies in raw material sourcing, and product waste reduction.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses ("SG&A") for the year ended December 31, 2023 were $366.8 million, a decrease of $61.9 million or 14% from $428.7 million for the year ended December 31, 2022. The breakdown of changes within SG&A was comprised of a $181.0 million decrease primarily due to termination fees paid to distributors in 2022, offset by increases to depreciation and amortization, research and development, use and excise taxes, and other selling expenses. The remaining expenses included a $75.0 million increase in marketing investments, a $12.1 million increase in storage and distribution due to growing organic sales volume, a $13.4 million increase in employee costs reflecting our ongoing investments to support growth, and a $18.0 million, or approximately 45%, increase in administrative expenses to $57.9 million primarily due to higher audit, legal, consulting, insurance, and office rent costs. Stock-based compensation increased by $0.6 million to $21.2 million, driven by new awards to our expanding workforce, which is in line with our strategy to encourage employee ownership and promote exceptional performance, contributing to our continued business success based on key performance attributes.

*Other Income (Expense)*

Total net other income for the year ended December 31, 2023 was $25.4 million, which reflects an increase of $20.3 million versus $5.1 million for the year ended December 31, 2022. The increase is primarily attributable to interest income earned on cash held in our money market accounts.

*Net Income (Loss) Attributable to Common Stockholders*

Net income attributable to common stockholders for the year ended December 31, 2023 was $182.0 million, representing basic earnings per share of $0.79 based on a basic weighted average of 230.8 million shares outstanding. In comparison, for the year ended December 31, 2022 the Company had a net loss attributable to common stockholders of $(198.8) million, representing a basic loss per share of $(0.88) based on a weighted average of 226.9 million shares outstanding. Diluted earnings (loss) per share was $0.77 and $(0.88) for the years ended December 31, 2023 and December 31, 2022, respectively.

**Liquidity and Capital Resources**

*General*

As of December 31, 2023, we had cash and cash equivalents of approximately $756.0 million and working capital of $928.3 million.

27

Our primary sources of liquidity are cash flows from operations and our existing cash balances, which includes $542.0 million of net proceeds received from our issuance of Series A Preferred Stock to Pepsi in 2022. We believe that cash available from operations, including our cash resources, will be sufficient for our working capital needs, including purchase commitments for raw materials and inventory, increases in accounts receivable and other assets, and purchases of capital assets and equipment for the next twelve months and beyond. Our current cash resources available to fund cash outflows are sufficient for both our short and long-term cash needs.

Purchases of inventories, increases in accounts receivable and other assets, equipment purchases (including coolers), advances to certain of our co-packers and distributors, and payments of accounts payable and income taxes are expected to remain our principal recurring uses of cash and material cash requirements.

***Cash flows for the years ended December 31, 2023 and 2022***

*Cash flows provided by (used in) operating activities*

Cash flows provided by operating activities totaled $141.2 million for 2023, which compares to $108.2 million net cash provided by operating activities for the year ended December 31, 2022. The $33.0 million increase in operating cash generated can be attributed to significant operational growth and the timing of cash receipts, which were favorably influenced by increased sales associated with the Pepsi agreements. Additionally, our increased usage of various assets and liabilities aligned with our elevated operational figures. In contrast, operating cash flows in 2022 were largely impacted by deferred revenue, which increased $189.5 million from 2021, related to termination fees associated with the Pepsi agreements.

*Cash flows (used in) investing activities*

Cash flows used in investing activities totaled $14.2 million for 2023 compared to cash used in investing activities of $5.7 million for the year ended December 31, 2022. The change in cash used in investing activities was primarily due to increased purchases of property and equipment in the current year, with purchases of approximately $17.4 million versus $8.3 million for the years ended December 31, 2023 and December 31, 2022, respectively. Property and equipment purchases were partially offset by collections from our note receivable received from our China licensee of approximately $3.2 million and $2.6 million for the years ended December 31, 2023 and December 31, 2022, respectively.

*Cash flows (used in) provided by financing activities*

Cash flows used in financing activities totaled $25.2 million for 2023, representing a $559.3 million decrease from the $534.1 million cash provided by financing activities in 2022. The decrease is primarily due to net proceeds received of $542.0 million in 2022 from the issuance of Series A Preferred Stock related to Pepsi. In 2023, the Company used cash to pay dividends to the Series A Preferred Stock totaling $27.5 million versus $11.5 million in 2022.

**Off Balance Sheet Arrangements**

As of December 31, 2023 and 2022, we had no off balance sheet arrangements.

**Critical Accounting Policies and Estimates**

Our consolidated financial statements are prepared in accordance with U.S. GAAP. In connection with the preparation of our consolidated financial statements, we are required to make judgments and estimates that significantly affect the reported amounts of assets, liabilities, revenues and expenses and related disclosures. These estimates are based on historical experience, current trends and various other assumptions we believe to be reasonable under the circumstances. It is important to note that these critical accounting estimates are essential in fairly portraying our financial condition and results, and involve complex, subjective judgements. We continually review the underlying factors used in our estimates, including reviewing the significant accounting policies impacting the estimates, to ensure compliance with U.S. GAAP. However, due to the inherently uncertain nature of estimates, and the dependence on a number of underlying variables and a range of possible outcomes, actual results may be materially different. We have identified the accounting estimates below as critical to understanding and evaluating the financial results reported in our consolidated financial statements.

The following accounting policies and estimates should be read in conjunction with the descriptions of our significant accounting policies and recent accounting pronouncements, contained in Note 2. *Basis of Presentation and Summary of Significant Accounting Policies* to our consolidated financial statements set forth elsewhere in this Report.

28

*Revenue Recognition - Promotional (Billbacks) Allowance*

The Company's promotional allowance programs with its distributors or retailers are executed through separate agreements in the ordinary course of business. These agreements provide for one or more arrangements that are of varying durations. The Company's billbacks are calculated based on various programs with distributors and retail customers, and accruals are established for the Company's anticipated liabilities. These accruals are based on agreed upon terms as well as the Company's historical experience with similar programs. Differences between such estimated expenses and actual expenses for promotional and other allowance are recognized in earnings in the period such differences are determined.

The Company conducts regular reviews of promotional activities and related financial data, including final invoicing for previous periods. Such reviews are essential for ensuring the accuracy of accounting estimates related to accrued promotional allowances for our customers.

Promotional allowance (variable consideration) recorded as a reduction to revenue, primarily include consideration given to the Company's distributors or retail customers including, but not limited to the following:

- discounts from list prices to support price promotions to end-consumers by retailers;
- reimbursements given to the Company's distributors for agreed portions of their promotional spend with retailers, including slotting, shelf space allowances and other fees for both new and existing products;
- the Company's agreed share of fees given to distributors and/or directly to retailers for advertising, in-store marketing and promotional activities;
- the Company's agreed share of slotting, shelf space allowances and other fees given directly to retailers, club stores and/or wholesalers;
- incentives given to the Company's distributors and/or retailers for achieving or exceeding certain predetermined volume goals;
- discounted products;
- contractual fees given to the Company's distributors related to sales made directly by the Company to certain customers that fall within the distributors' sales territories; and
- contractual fees given to distributors for items sold below defined pricing targets.

For more information on our promotional allowance policies, including changes to the estimate, see Note 2. *Basis of Presentation and Summary of Significant Accounting Policies* and Note 4. *Revenue* to our consolidated financial statements.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk.**

*Commodity Pricing and Market Risks*

In the normal course of our business, our financial position and supply chain are routinely subject to a variety of risks, notably those related to commodity pricing. The production of our products and transportation are heavily reliant on commodities such as aluminum, sucralose, caffeine, vitamins, and energy sources. Customarily, we purchase the raw materials and these costs expose us to price volatility and fluctuations. Currently, ongoing global events, including conflicts and inflationary pressures, as well as adverse weather conditions and supply chain disruptions, can significantly influence these costs and their availability. To mitigate supply chain risks, we typically purchase raw materials from multiple sources and utilize multiple co-packers for manufacturing and third-party service providers for transportation. For a number of raw materials, we are able to establish pricing on an annual basis. In relation to manufacturing, we typically have multiple co-packers across each geographical area thereby allowing us to have redundancy if a manufacturer were to have operational challenges in a specific region or to utilize as our business grows. In addition, we typically hold sufficient inventory in order to offset short-term market disruptions, helping ensure continuous production and supply.

Our competitive environment limits our ability to offset rising costs through higher product pricing. Despite this, we believe that the risk from cost fluctuations is currently immaterial. To stabilize aluminum costs, we enter into agreements with 12-month durations, effectively reducing short-term volatility. Other raw material prices such as flavors and ingredients may experience fluctuations over varying periods, dependent on factors such as, market trends, contractual terms, and strategic decisions. We mitigate the risk of increasing costs by either renegotiating prices with current suppliers or seeking one of our alternative vendors offering favorable terms. Our reliance on price locking as a primary cost management strategy negates the need for hedging in our financial risk management approach.

*Interest Rate Risk*

Our financial assets subject to interest rate fluctuations were cash and cash equivalents of $756.0 million as of December 31, 2023. These balances are held in interest-bearing accounts, and changes in interest rates would directly affect our interest income.

29

Currently, we have no debt other than trade payables incurred in the ordinary course of business; therefore, we have no debt-related interest expense that could be impacted by fluctuating interest rates. This absence of debt underscores our stable financial position and reduces our exposure to interest rate risk, which primarily affects our interest income.

*Foreign Currency Exchange Risk*

We operate internationally, leading to exposure to foreign currency exchange risk. While the functional currency of our foreign subsidiaries is their local currency, their net assets are translated into U.S. dollars using current exchange rates. We periodically remeasure the assets and liabilities denominated in non-functional currencies and the gain or loss from these adjustments are included in the consolidated statements of operations and comprehensive income (loss). Translation gains and losses that arise from translating net assets from functional currency to U.S. dollars, and gains and losses on long-term intercompany balances, are recorded to other comprehensive income (loss), net of income tax. For a detailed discussion of our foreign currency gains, losses, and translation adjustments, including the impact on our financial results, please refer to Note 2. *Basis of Presentation and Summary of Significant Accounting Policies*, of our consolidated financial statements.

A substantial majority of our operations and investment activities are transacted in the U.S., limiting our exposure to foreign currency exchange risk. While at present, our foreign currency exchange risk is not considered material to our overall financial position, accounting for approximately 0.1% of our revenue in 2023, and approximately 0.4% of our 2022 revenue, we continuously monitor and assess our exposure to currency fluctuations and the potential impact to our financial position and results of operations.

**Item 8. Financial Statements and Supplementary Data.**

The information required by this Item 8 commences on page F-1, immediately following the signature page to this Report, and is incorporated by reference in this Item 8.

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.**

Not applicable.

**Item 9A. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

Disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) are designed to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms adopted by the SEC, including to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is accumulated and communicated to the Company's management, including our President and Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial and accounting officer), or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

Our President and Chief Executive Officer, as well as our Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2023. Based on that evaluation, our President and Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were not effective as of such date because of the material weakness in internal control over financial reporting described below.

Notwithstanding the foregoing conclusion, and notwithstanding the material weakness in our internal control over financial reporting described below, management believes that the consolidated financial statements and related financial information included in this Report fairly present in all material respects our financial condition, results of operations and cash flows as of the dates presented, and for the periods ended on such dates, in conformity with U.S. GAAP and the rules and regulations promulgated by the SEC.

*Management's Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Our internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and financial officers and effected by the Company's Board, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our President and Chief Executive Officer and our Chief Financial Officer conducted an evaluation of the effectiveness of internal control over financial reporting as of December 31, 2023 based on the criteria set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013) (the "COSO Framework").

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

*Prior Year Material Weaknesses*

As of December 31, 2022, we identified the following material weaknesses in internal controls:

- Management did not design effective information technology general controls (ITGCs) relating to appropriate segregation of duties over program change management for certain applications impacting the Company's business processes that are relevant to the Company's internal control over financial reporting; and

- Management did not design and implement components of the COSO Framework to address all relevant risks of material misstatement, including elements of the control environment, information and communication, control activities and monitoring activities components, relating to the identification, design, implementation, and monitoring of sufficient business process controls related to the Company's financial statement accounts to ascertain whether the components of internal control are present and functioning effectively.

Throughout 2023, we devoted substantial resources and effort to remediating the material weaknesses identified above.

As it relates to the material weakness related to our ITGCs in the prior year, we concluded that such material weakness was remediated during 2023. We updated our change management process to correct the segregation of duties issue, and we implemented changes to our change management process to ensure that the process is consistently applied and supported by standard operating procedures to govern the authorization, testing and approval of changes to the information technology systems that support the Company's internal control processes. Additionally, we implemented changes associated with the design, implementation, and monitoring of ITGCs in the area of program change management for systems supporting the Company's internal control processes to ensure that ITGCs are designed and operating effectively.

As it relates to the material weakness related to the design and implementation of components of the COSO Framework, during 2023, we undertook a rigorous process to enhance our control environment, including the expansion of formal accounting and IT policies and procedures and financial reporting controls. Additionally, we undertook a process during the first half of 2023 to design and implement effective review and approval controls, as well as implement appropriate timely review and oversight responsibilities within the accounting and financial reporting functions. As a result of our enhancement to our overall internal control over financial reporting environment and based on the results of our testing, we concluded that the material weakness related to the design and implementation of the components of the COSO Framework related to control environment, information and communication, and monitoring activities was remediated during 2023, with the exception of accounting for revenue recognition, promotional allowances, and inventories, for which the material weakness was not fully remediated.

*Current Year Material Weakness*

We concluded that a material weakness in internal control over financial reporting continues to exist as of December 31, 2023 with respect to the following processes as the result of the ineffective design and operation of business process level controls: (i) accounting for revenue recognition, (ii) accounting for promotional allowances, and (iii) accounting for inventories.

As a result of the material weakness described above, the Company's management concluded that, as of December 31, 2023, our internal control over financial reporting was ineffective.

31

*Attestation Report of the Registered Public Accounting Firm*

Ernst & Young LLP, our independent registered public accounting firm, which also audited our consolidated financial statements included in this Report, issued an adverse report on the effectiveness of our internal control over financial reporting as of December 31, 2023.

*Remediation Plan*

As of the date of this Report, management is reassessing the design of controls and modifying its processes to remediate the control deficiencies that led to the material weakness, including but not limited to placing increased emphasis on appropriately designing and implementing effective business process level controls. This material weakness cannot be considered remediated until the applicable controls are designed and operating effectively for a sufficient period of time, as supported by management's testing results.

*Changes in Internal Controls Over Financial Reporting*

Except for the remediation of certain aspects of the prior year material weaknesses in internal controls over financial reporting described above, there have been no other changes in our internal controls over financial reporting that occurred during the year ended December 31, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information.**

From time to time, certain of our executive officers and directors have, and we expect they will in the future, enter into, amend and terminate written trading arrangements pursuant to Rule 10b5-1 of the Exchange Act or otherwise. During the quarter ended December 31, 2023, none of the Company's directors or officers adopted or terminated any Rule 10b5-1 trading arrangement or non-Rule 10b5-1 trading arrangement, nor did the Company adopt or terminate a Rule 10b5-1 trading arrangement (as such terms are defined in Item 408 of Regulation S-K).

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.**

Not applicable.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance.**

Except to the extent included below, the information required by this item will be included in our Proxy Statement for our 2024 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2023 (the "2024 Proxy Statement") and is incorporated herein by reference.

**Code of Business Conduct and Ethics**

We have adopted a Code of Business Conduct and Ethics that applies to all our directors, officers (including our principal executive officer and principal financial officer) and employees. We will disclose information pertaining to any amendment to, or waiver from, the provisions of the Code of Business Conduct and Ethics that apply to the Company's principal executive officer, principal financial officer, principal accounting officer or persons performing similar functions and that relate to any element of the Code of Business Conduct and Ethics enumerated in the SEC rules and regulations by posting this information on the Company's website, https://www.celsiusholdingsinc.com/. The information on the Company's website or linked to or from the Company's website is not incorporated by reference into, and does not constitute a part of, this Report or any other documents the Company files with, or furnishes to, the SEC.

**Item 11. Executive Compensation.**

The information required by this item will be included in our 2024 Proxy Statement and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The information required by this item will be included in our 2024 Proxy Statement and is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions and Director Independence.**

The information required by this item will be included in our 2024 Proxy Statement and is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services.**

The information required by this item will be included in our 2024 Proxy Statement and is incorporated herein by reference.

**PART IV**

**Item 15. Exhibit and Financial Statement Schedules.**

(a)   The following documents are filed as part of this Report:

(1)   *Financial Statements.* The following consolidated financial statements and the report of our independent registered public accounting firm are filed as Item 8. *Financial Statements and Supplementary Data* of this Report:

Consolidated Balance Sheets as of December 31, 2023 and 2022

Consolidated Statements of Operations and Comprehensive Income (Loss) for the years ended December 31, 2023, 2022 and 2021

Consolidated Statements of Changes in Stockholders' Equity and Mezzanine Equity for the years ended December 31, 2023, 2022 and 2021

Consolidated Statements of Cash Flows for the years ended December 31, 2023, 2022 and 2021

Notes to Consolidated Financial Statements

Report of Independent Registered Public Accounting Firm (PCAOB ID: 42)

(2)   *Financial Statement Schedules.*

All financial statement schedules called for under Regulation S-X are omitted because the information is not required under the related instructions or the required information is shown in the financial statements or notes thereto, or included elsewhere in this Report.

(3)   *Exhibits.*

See Index to Exhibits.

**Index to Exhibits**

| Exhibit Number | Exhibit Description | Incorporated by Reference | | |
| --- | --- | --- | --- | --- |
| | | Form | Exhibit | Filing Date |
| 3.1* | Composite Articles of Incorporation of Celsius Holdings, Inc. | | | |
| 3.2 | Amended and Restated Bylaws, as amended | 10-Q | 3.2 | 8/9/2022 |
| 4.1* | Description of Capital Stock | | | |
| 10.1† | Amended 2006 Incentive Stock Plan | 10-12G | 10.3 | 7/22/2016 |
| 10.2† | 2015 Incentive Stock Plan | 10-12G | 10.4 | 7/22/2016 |
| 10.3†* | First Amendment to 2015 Incentive Stock Plan dated October 29, 2020 | | | |
| 10.4†* | Form of Restricted Stock Unit Award Grant Agreement | | | |
| 10.5†* | Form of Performance Stock Unit Award Grant Agreement | | | |
| 10.6†* | Employment Agreement between the Company and John Fieldly effective January 1, 2024 | | | |
| 10.7† | Employment Agreement between the Company and Jarrod Langhans effective January 1, 2024 | 8-K | 10.1 | 2/2/2024 |
| 10.8 | Securities Purchase Agreement, dated August 1, 2022, between PepsiCo, Inc. and Celsius Holdings, Inc. | 10-Q | 10.1 | 8/9/2022 |

34

| | | | | |
|---|---|---|---|---|
| 10.9 | Form of Lock-Up Agreement | 10-Q | 10.2 | 8/9/2022 |
| 10.10 | Registration Rights Agreement, dated August 1, 2022, between PepsiCo, Inc. and Celsius Holdings, Inc. | 10-Q | 10.3 | 8/9/2022 |
| 10.11 | Distribution Agreement, dated August 1, 2022, between PepsiCo, Inc. and Celsius Holdings, Inc. | 10-Q | 10.4 | 8/9/2022 |
| 10.12 | Channel Transition Agreement, dated August 1, 2022, between PepsiCo, Inc. and Celsius Holdings, Inc. | 10-Q | 10.5 | 8/9/2022 |
| 21.1* | Subsidiaries of Registrant | | | |
| 23.1* | Consent of Ernst & Young LLP | | | |
| 31.1* | Section 302 Certification by Chief Executive Officer | | | |
| 31.2* | Section 302 Certification by Chief Financial Officer | | | |
| 32.1** | Section 906 Certification by Chief Executive Officer | | | |
| 32.2** | Section 906 Certification by Chief Financial Officer | | | |
| 97.1†* | Celsius Holdings, Inc. Mandatory Recovery of Compensation Policy | | | |
| 101.INS | Inline XBRL Instance Document | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | |
| 104 | The cover page of this Annual Report on Form 10-K for the year ended December 31, 2023, formatted in Inline XBRL (included within the Exhibit 101 attachment) | | | |

_____

\*      Filed herewith.
\*\* Furnished herewith.
† Management contract or compensatory plan arrangement.

**Item 16. Form 10-K Summary.**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CELSIUS HOLDINGS, INC.**

Date: February 28, 2024                                    By:   /s/ John Fieldly
                                                                 John Fieldly,
                                                                 Chief Executive Officer
                                                                 (Principal Executive Officer)

Date: February 28, 2024                                    By:   /s/ Jarrod Langhans
                                                                 Jarrod Langhans,
                                                                 Chief Financial Officer
                                                                 (Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title(s) | Date |
|---|---|---|
| /s/ John Fieldly<br>John Fieldly | President, Chief Executive Officer and Director<br>(Principal executive officer) | February 28, 2024 |
| /s/ Jarrod Langhans<br>Jarrod Langhans | Chief Financial Officer<br>(Principal financial and accounting officer) | February 28, 2024 |
| /s/ Cheryl S. Miller<br>Cheryl S. Miller | Director | February 28, 2024 |
| /s/ Hal Kravitz<br>Hal Kravitz | Director | February 28, 2024 |
| /s/ Joyce Russell<br>Joyce Russell | Director | February 28, 2024 |
| /s/ Damon DeSantis<br>Damon DeSantis | Director | February 28, 2024 |
| /s/ Nicholas Castaldo<br>Nicholas Castaldo | Director | February 28, 2024 |
| /s/ Caroline Levy<br>Caroline Levy | Director | February 28, 2024 |
| /s/ Alexandre Ruberti<br>Alexandre Ruberti | Director | February 28, 2024 |
| /s/ James Lee<br>James Lee | Director | February 28, 2024 |

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm Ernst & Young LLP (PCAOB ID: 42) | F-2 |
| Consolidated Balance Sheets as of December 31, 2023 and 2022 | F-5 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) for the years ended December 31, 2023, 2022 and 2021 | F-6 |
| Consolidated Statements of Changes in Stockholders' Equity and Mezzanine Equity for the years ended December 31, 2023, 2022 and 2021 | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2023, 2022 and 2021 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

F-1

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Celsius Holdings, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Celsius Holdings, Inc.'s internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, because of the effect of the material weakness described below on the achievement of the objectives of the control criteria, Celsius Holdings, Inc. (the Company) has not maintained effective internal control over financial reporting as of December 31, 2023, based on the COSO criteria.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment. Management has identified a material weakness in the Company's internal control over financial reporting as the result of the ineffective design and operation of business process level controls within the following processes: (i) accounting for revenue recognition, (ii) accounting for promotional allowances, and (iii) accounting for inventories.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2023 and 2022, the related consolidated statements of operations and comprehensive income (loss), changes in stockholders' equity and mezzanine equity and cash flows for each of the three years in the period ended December 31, 2023, and the related notes. This material weakness was considered in determining the nature, timing and extent of audit tests applied in our audit of the 2023 consolidated financial statements, and this report does not affect our report dated February 28, 2024, which expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Boca Raton, Florida
February 28, 2024

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Celsius Holdings, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Celsius Holdings, Inc. (the Company) as of December 31, 2023 and 2022, the related consolidated statements of operations and comprehensive income (loss), changes in stockholders' equity and mezzanine equity and cash flows for each of the three years in the period ended December 31, 2023, and the related notes (collectively referred to as the "consolidated financial st atements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 28, 2024 expressed an adverse opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

F-3

***Accrued Promotional Allowances***

*Description of the Matter*

As more fully described in Notes 2, 4, and 13 of the consolidated financial statements, the Company's promotional allowance programs are calculated based on various programs and terms of its contractual arrangements with its distributors and retail customers, and accruals are established at the time of the initial product sale for the Company's anticipated liabilities. These accruals are based on agreed-upon terms with customers and in certain instances require management's judgment with respect to estimating consumer participation and/or distributor and retail customer performance levels to determine the accrual. The estimated promotional expenditures are recorded as a reduction to revenue in the period the underlying sale occurs to customers. Total promotional expenditures included as a reduction to revenue were $315.2 million for the year ended December 31, 2023, and accrued promotional allowances were $99.8 million at December 31, 2023.

We identified accrued promotional allowances as a critical audit matter because of the extent and subjective nature of management judgment required with respect to estimating consumer participation and/or distributor and retail customer performance levels and future promotional claims in determining the accrual for promotional allowances not yet invoiced by customers at year end.

*How We Addressed the Matter in Our Audit*

To test the accrued promotional allowances, our audit procedures included, among others, evaluating management's judgments regarding estimating the promotional allowances not yet invoiced by its customers as of December 31, 2023. We assessed the reasonableness of management's estimates of the accrued promotional allowances for a sample of customers by developing an expectation of the amount, primarily based on contractual terms in agreements with customers and the historical promotional expenditure amounts per case or as a percentage of sales, and we compared our expectation to management's recorded estimate. We performed inquiries of the Company's sales and marketing personnel to corroborate our understanding of new and existing promotional programs that may alter the relationship between gross billings and promotional allowances, as such programs are considered by management when estimating future promotional claims. In addition, we tested the accuracy and completeness of the underlying data used in management's estimation calculations. We also evaluated management's ability to estimate promotional allowances by comparing the actual invoices for promotional allowances subsequently paid to management's original estimates.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2021.

Boca Raton, Florida
February 28, 2024

F-4

**Celsius Holdings, Inc.**
**Consolidated Balance Sheets**
**(in thousands, except share and per share amounts)**

| | | December 31, 2023 | | December 31, 2022 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 755,981 | $ | 614,159 |
| Restricted cash | | - | | 38,768 |
| Accounts receivable-net | | 183,703 | | 63,311 |
| Note receivable-current-net | | 2,318 | | 2,979 |
| Inventories-net | | 229,275 | | 173,289 |
| Prepaid expenses and other current assets | | 19,503 | | 11,341 |
| Deferred other costs-current | | 14,124 | | 14,124 |
| Total current assets | $ | 1,204,904 | $ | 917,971 |
| | | | | |
| Note receivable-non-current | | - | | 3,574 |
| Property and equipment-net | | 24,868 | | 10,185 |
| Deferred tax assets | | 29,518 | | 501 |
| Right of use assets-operating leases | | 1,957 | | 972 |
| Right of use assets-finance leases | | 208 | | 208 |
| Other long-term assets | | 291 | | 263 |
| Deferred other costs-non-current | | 248,338 | | 262,462 |
| Intangibles-net | | 12,139 | | 12,254 |
| Goodwill | | 14,173 | | 13,679 |
| **Total Assets** | $ | **1,536,396** | $ | **1,222,069** |
| | | | | |
| **LIABILITIES, MEZZANINE EQUITY AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 42,840 | $ | 36,248 |
| Accrued expenses | | 62,120 | | 69,899 |
| Income taxes payable | | 50,424 | | 1,193 |
| Accrued distributor termination fees | | - | | 3,986 |
| Accrued promotional allowance | | 99,787 | | 35,977 |
| Lease liability obligation-operating leases | | 980 | | 661 |
| Lease liability obligation-finance leases | | 59 | | 70 |
| Deferred revenue-current | | 9,513 | | 9,675 |
| Other current liabilities | | 10,890 | | 3,586 |
| Total current liabilities | | 276,613 | | 161,295 |
| | | | | |
| Lease liability obligation-operating leases | | 955 | | 326 |
| Lease liability obligation-finance leases | | 193 | | 162 |
| Deferred tax liability | | 2,880 | | 15,919 |
| Deferred revenue-non-current | | 167,227 | | 179,788 |
| **Total Liabilities** | | **447,868** | | **357,490** |
| | | | | |
| Commitment and contingencies (Note 19) | | | | |
| | | | | |
| Mezzanine Equity: | | | | |
| Series A convertible preferred stock, $0.001 par value, 5% cumulative dividends; 1,466,666 shares issued and outstanding at December 31, 2023 and December 31, 2022, respectively, aggregate liquidation preference of $550,000 as of December 31, 2023 and December 31, 2022, respectively | | 824,488 | | 824,488 |
| Stockholders' Equity: | | | | |
| Common stock, $0.001 par value; 300,000,000 shares authorized, 231,787,482 and 229,146,788 shares issued and outstanding at December 31, 2023 and December 31, 2022, respectively[1] | | 77 | | 76 |
| Additional paid-in capital | | 276,717 | | 280,668 |
| Accumulated other comprehensive loss | | (701) | | (1,881) |
| Accumulated deficit | | (12,053) | | (238,772) |
| Total Stockholders' Equity | | 264,040 | | 40,091 |
| **Total Liabilities, Mezzanine Equity and Stockholders' Equity** | $ | **1,536,396** | $ | **1,222,069** |

[1] *Forward Stock Split - The accompanying consolidated financial statements and notes thereto have been retrospectively adjusted to reflect the three-for-one stock split. See Note 2. Basis of Presentation and Summary of Significant Accounting Policies for more information.*

*The accompanying notes are an integral part of these consolidated financial statements*

F-5

**Celsius Holdings, Inc.**
**Consolidated Statements of Operations and Comprehensive Income (Loss)**
**(in thousands, except per share amounts)**

| | | For the years ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | **2023** | | **2022** | | **2021** |
| Revenue | $ | 1,318,014 | $ | 653,604 | $ | 314,272 |
| Cost of revenue | | 684,875 | | 382,735 | | 186,103 |
| Gross profit | | **633,139** | | **270,869** | | **128,169** |
| Selling, general and administrative expenses | | 366,773 | | 428,670 | | 132,259 |
| | | | | | | |
| Income (loss) from operations | | **266,366** | | **(157,801)** | | **(4,090)** |
| | | | | | | |
| Other income (expense): | | | | | | |
| | | | | | | |
| Interest income (expense), net | | 26,501 | | 5,292 | | (8) |
| Interest income on note receivable | | 128 | | 237 | | 315 |
| Foreign exchange loss | | (1,246) | | (392) | | (276) |
| Total other income | | 25,383 | | 5,137 | | 31 |
| | | | | | | |
| Net income (loss) before income taxes | | 291,749 | | (152,664) | | (4,059) |
| | | | | | | |
| Income tax (expense) benefit | | (64,948) | | (34,618) | | 7,996 |
| | | | | | | |
| Net income (loss) | $ | **226,801** | $ | **(187,282)** | $ | **3,937** |
| | | | | | | |
| Dividends on Series A convertible preferred shares | | (27,462) | | (11,526) | | - |
| Income allocated to participating preferred shares | | (17,348) | | - | | - |
| Net income (loss) attributable to common stockholders | $ | **181,991** | $ | **(198,808)** | $ | **3,937** |
| | | | | | | |
| Other comprehensive income (loss): | | | | | | |
| Foreign currency translation gain (loss), net of income tax | | 1,180 | | (2,495) | | 817 |
| Comprehensive income (loss) | $ | **183,171** | $ | **(201,303)** | $ | **4,754** |
| | | | | | | |
| Earnings per share: | | | | | | |
| Basic | $ | 0.79 | $ | (0.88) | $ | 0.02 |
| Diluted | $ | 0.77 | $ | (0.88) | $ | 0.02 |
| Weighted average shares outstanding[1]: | | | | | | |
| Basic | | 230,784 | | 226,947 | | 221,343 |
| Diluted | | 236,964 | | 226,947 | | 233,067 |

[1] *Forward Stock Split - The accompanying consolidated financial statements and notes thereto have been retrospectively adjusted to reflect the three-for-one stock split. See Note 2. Basis of Presentation and Summary of Significant Accounting Policies for more information.*

*The accompanying notes are an integral part of these consolidated financial statements*

F-6

**Celsius Holdings, Inc.**
**Consolidated Statements of Changes in Stockholders' Equity and Mezzanine Equity**
**(in thousands)**

| | Stockholders' Equity | | | | | | Mezzanine Equity | |
| | Common Stock | | | Accumulated Other | | Total | | |
| | Shares[(1)] | Amount | Additional Paid-In Capital | Comprehensive Income (Loss) | Accumulated Deficit | Stockholders' Equity | Preferred Stock | Amount |
|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2020** | **216,789** $ | **72** | $ **159,884** | $ **(203)** | $ **(55,427)** | $ **104,326** | **-** | $ **-** |
| Issuance of common stock from private placement | 3,402 | 1 | 67,768 | - | - | 67,769 | - | - |
| Stock-based compensation | - | - | 36,475 | - | - | 36,475 | - | - |
| Stock option exercises, RSUs and PSUs converted | 4,536 | 2 | 3,719 | - | - | 3,721 | - | - |
| Foreign currency translation | - | - | - | 817 | - | 817 | - | - |
| Net income | - | - | - | - | 3,937 | 3,937 | - | - |
| **Balance at December 31, 2021** | **224,727** $ | **75** | $ **267,846** | $ **614** | $ **(51,490)** | $ **217,045** | **-** | $ **-** |
| Stock-based compensation | - | - | 20,665 | - | - | 20,665 | - | - |
| Stock option exercises, RSUs and PSUs converted | 4,420 | 1 | 3,683 | - | - | 3,684 | - | - |
| Issuance of Series A convertible preferred stock - net of issuance costs | - | - | - | - | - | - | 1,467 | 824,488 |
| Dividends paid to Series A convertible preferred stock | - | - | (11,526) | - | - | (11,526) | - | - |
| Foreign currency translation | - | - | - | (2,495) | - | (2,495) | - | - |
| Net income (loss) | - | - | - | - | (187,282) | (187,282) | - | - |
| **Balance at December 31, 2022** | **229,147** $ | **76** | $ **280,668** | $ **(1,881)** | $ **(238,772)** | $ **40,091** | **1,467** | $ **824,488** |
| Adoption of accounting standard | - | - | - | - | (82) | (82) | - | - |
| Stock-based compensation | - | - | 21,226 | - | - | 21,226 | - | - |
| Stock option exercises, RSUs and PSUs converted | 2,640 | 1 | 2,285 | - | - | 2,286 | - | - |
| Dividends paid to Series A convertible preferred stock | - | - | (27,462) | - | - | (27,462) | - | - |
| Foreign currency translation | - | - | - | 1,180 | - | 1,180 | - | - |
| Net income | - | - | - | - | 226,801 | 226,801 | - | - |
| **Balance at December 31, 2023** | **231,787** $ | **77** | $ **276,717** | $ **(701)** | $ **(12,053)** | $ **264,040** | **1,467** | $ **824,488** |

[(1)] *Forward Stock Split - The accompanying consolidated financial statements and notes thereto have been retrospectively adjusted to reflect the three-for-one stock split. See Note 2. Basis of Presentation and Summary of Significant Accounting Policies for more information.*

*The accompanying notes are an integral part of these consolidated financial statements*

**Celsius Holdings, Inc.**
**Consolidated Statements of Cash Flows**
**(in thousands)**

| | For The Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ 226,801 | $ (187,282) | $ 3,937 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 3,226 | 1,917 | 1,264 |
| Impairment of intangible assets | - | 2,379 | - |
| Allowance for credit losses | 2,128 | 2,352 | 1,494 |
| Amortization of deferred other costs | 14,124 | 5,885 | - |
| Inventory excess and obsolescence | 7,312 | 6,131 | 2,355 |
| Loss on disposal of property and equipment | 198 | - | - |
| Stock-based compensation expense | 21,226 | 20,665 | 36,475 |
| Deferred income taxes-net | (42,055) | 20,244 | (9,201) |
| Foreign exchange loss | 1,246 | 483 | 880 |
| Gain on lease cancellations | - | - | (28) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable-net | (121,558) | (26,369) | (25,249) |
| Inventories-net | (63,299) | 11,802 | (175,174) |
| Prepaid expenses and other current assets | (7,980) | 2,214 | 1,072 |
| Accounts payable | 5,249 | 428 | 23,966 |
| Accrued expenses | (8,025) | 34,644 | 26,484 |
| Income taxes payable | 48,102 | (164) | 1,357 |
| Accrued promotional allowance | 63,810 | 16,940 | 13,379 |
| Accrued distributor termination fees | (3,739) | 3,986 | - |
| Other current liabilities | 7,305 | 2,610 | 374 |
| Change in right of use and lease obligation-net | (102) | (183) | 29 |
| Deferred revenue | (12,723) | 189,463 | - |
| Other assets | (28) | 37 | - |
| Net cash provided by (used in) operating activities | **141,218** | **108,182** | **(96,586)** |
| | | | |
| **Cash flows from investing activities:** | | | |
| Collections from note receivable | 3,233 | 2,592 | 1,886 |
| Purchase of property and equipment | (17,433) | (8,264) | (3,150) |
| Net cash (used in) investing activities | **(14,200)** | **(5,672)** | **(1,264)** |
| | | | |
| **Cash flows from financing activities:** | | | |
| Principal payments on finance lease obligations | (44) | (63) | (94) |
| Proceeds from exercise of stock options | 2,285 | 3,683 | 3,720 |
| Proceeds from issuance of Series A preferred shares, net of issuance costs | - | 542,018 | - |
| Dividends paid on preferred shares | (27,462) | (11,526) | - |
| Net proceeds from sale of common stock | - | - | 67,769 |
| Net cash (used in) provided by financing activities | **(25,221)** | **534,112** | **71,395** |
| | | | |
| Effect on exchange rate changes on cash and cash equivalents | 1,257 | 50 | (538) |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | **103,054** | **636,672** | **(26,993)** |
| Cash, cash equivalents and restricted cash at beginning of the period | 652,927 | 16,255 | 43,248 |
| | | | |
| **Cash, cash equivalents and restricted cash at end of the period** | $ **755,981** | $ **652,927** | $ **16,255** |
| | | | |
| **Supplemental disclosures**: | | | |
| Cash paid during period for: | | | |
| Taxes | $ 56,748 | $ 14,335 | $ - |
| Interest | $ - | $ - | $ 7 |

*The accompanying notes are an integral part of these consolidated financial statements*

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

**1. ORGANIZATION AND DESCRIPTION OF BUSINESS**

*Business* - Celsius Holdings, Inc. (the "Company," "Celsius Holdings" or "Celsius") was incorporated under the laws of the State of Nevada on April 26, 2005.

Celsius is a fast-growing company in the functional energy drink category in the United States ("U.S.") and internationally. The Company engages in the development, processing, marketing, sale, and distribution of functional energy drinks to a broad range of consumers. Celsius provides differentiated products that offer clinically proven and innovative formulas meant to positively impact the lives of its consumers. The Company's brand has also proven to be attractive to a broad range of customers, including fitness enthusiasts.

The Company's flagship asset, CELSIUS®, is marketed as a fitness drink or supplement which, with exercise, is designed to accelerate metabolism and burn body fat while providing energy. This product line comes in two versions, a ready-to-drink form and an on-the-go powder form. The Company also offers a new CELSIUS® Essentials line, available in 16-ounce cans. Celsius products are currently offered in major retail channels across the U.S., including conventional grocery, natural, convenience, fitness, mass market, vitamin specialty and e-commerce. Additionally, the Company's products are currently offered in certain Canadian, European, Middle Eastern and Asia-Pacific markets.

*Agreements with PepsiCo Inc.*

On August 1, 2022, the Company entered into multiple agreements with PepsiCo Inc. ("Pepsi"), including a long-term agreement that resulted in Pepsi becoming the primary distribution supplier for Celsius products in the U.S. (the "Distribution Agreement"). Under this agreement, the Company granted Pepsi a right of first offer in the event the Company intends to manufacture, distribute or sell products in certain additional countries or channels during the term of the agreement. Additionally, under the terms of a channel transition agreement entered into (the "Transition Agreement"), the Company received payments from Pepsi in exchange for the transition of certain existing distribution rights to Pepsi. In connection with the Distribution Agreement and Transition Agreement, the Company terminated supply agreements with existing suppliers to transition certain territory rights to Pepsi.

In connection with entering into the foregoing agreements, the Company issued and sold to Pepsi approximately 1.5 million shares of the Company's Series A Preferred Stock ("Series A" or "Series A Preferred Stock") in exchange for cash proceeds of $550 million, excluding transaction costs. For additional information regarding the Company's agreements with Pepsi, see Note 4. *Revenue,* Note 13. *Related Party Transactions,* and Note 14. *Mezzanine Equity*.

**2. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation and Principles of Consolidation* - The accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP") and the rules and regulations of the Securities and Exchange Commission (the "SEC"). The consolidated financial statements of the Company include the accounts of the Company and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated in accordance with U.S. GAAP.

Certain prior period amounts have been reclassified to conform with the current period's presentation in the consolidated financial statements and notes thereto. Accounts payable, Accrued expenses, and Income taxes payable were reallocated from within Accounts payable and accrued expenses and are now reflected as standalone financial statement line items in the consolidated balance sheets and consolidated statements of cash flows, respectively. The Company is also now presenting Selling and marketing expenses and General and administrative expenses together as one combined financial statement line item titled Selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

*Common Stock Split* - On November 15, 2023 the Company effected a three-for-one stock split to shareholders of record on November 13, 2023 (the "Forward Stock Split"). For clarity and consistency in financial reporting, all shares, restricted stock units, performance stock units, stock options, and per-share amounts presented in the consolidated financial statements and related notes have been retrospectively adjusted to account for the effects of the stock split for all periods presented.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

*Significant Estimates* -  The preparation of consolidated financial statements and accompanying disclosures in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue and expenses and disclosure of contingent assets and liabilities at the date of the financial statements. Although these estimates are based on management's best knowledge of current events and actions that the Company may undertake in the future, actual results may differ from those estimates. Significant estimates include the allowance for current expected credit losses, allowance for inventory obsolescence and sales returns, the useful lives of property and equipment, impairment of goodwill and intangibles, deferred taxes and related valuation allowance, promotional allowance, and valuation of stock-based compensation.

*Segment Reporting* - Operating segments are defined as components of an enterprise that engage in business activities, maintain discrete financial information, and undergo regular review by the chief operating decision maker (the "CODM") who in this case, is the Chief Executive Officer. This review is performed to assess performance and allocate resources.

Despite the Company's presence in several geographical regions, it operates as a single entity. The Company's operations and strategies are centrally designed and executed due to the substantial similarities among the geographical components. The CODM evaluates operating results and allocates resources primarily on a consolidated basis due to the significant economic interdependencies between the Company's geographical operations. As a result, the Company is managed as a single operating segment and has a single reportable segment.

*Concentrations of Risk* - Substantially all of the Company's revenue is derived from the sale of Celsius® functional energy drinks and liquid supplements.

Revenue from customers accounting for more than 10% of total revenue for the years ended December 31, 2023, 2022 and 2021 were as follows:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Pepsi | 59.4 % | 22.2 % | - |
| Costco | 12.0 % | 16.7 % | 12.7 % |
| Amazon | 7.6 % | 8.8 % | 10.1 % |
| All others | 21.0 % | 52.3 % | 77.2 % |
| **Total** | **100.0 %** | **100.0 %** | **100.0 %** |

Accounts receivable from customers accounting for more than 10% of total accounts receivable at December 31, 2023 and 2022 were as follows:

|  | 2023 | 2022 |
|---|---|---|
| Pepsi | 69.0 % | 47.6 % |
| Amazon | 5.9 % | 11.8 % |
| All others | 25.1 % | 40.6 % |
| **Total** | **100.0 %** | **100.0 %** |

Financial instruments that potentially subject the Company to concentrations of credit risk primarily include cash and cash equivalents, accounts receivable and a note receivable. The Company ensures cash and cash equivalents are held with reputable financial institutions to mitigate this risk. At times, balances in the Company's cash accounts may exceed the Federal Deposit Insurance Corporation ("FDIC") limit. At December 31, 2023 and 2022, the Company had approximately $755.5 million and $652.4 million, respectively, in excess of the FDIC limit.

*Cash Equivalents* - The Company considers all highly liquid instruments with original maturities of three months or less, when purchased, to be cash equivalents. As of December 31, 2023 and 2022, the Company did not hold any instruments with original maturities exceeding three months.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

*Restricted Cash* - During 2022, the Company received upfront payments from Pepsi which were contractually restricted to satisfy termination payments due to former distributors. Any unused payments were repaid to Pepsi during the year ended December 31, 2023. These upfront payments received from Pepsi could not be used for the Company's general operating activities and were therefore classified as restricted cash based on the terms of the Transition Agreement. See Note 4. *Revenue* for more information. At December 31, 2023, the Company did not have any restricted cash. At December 31, 2022, the Company had $38.8 million of restricted cash.

*Accounts Receivable and Current Expected Credit Losses* - The Company is exposed to potential credit risks associated with its product sales and related accounts receivable, as it generally does not require collateral from its customers. The Company's expected loss allowance methodology for accounts receivable is determined using historical collection experience, current and future economic and market conditions, a review of the current status of customers' trade accounts receivables, and where available, a review of the financial condition and credit ratings of larger customers, including credit reports. Customers are pooled based on having specific risk factors in common, and the Company reassesses these customer pools on a periodic basis. The receivables allowance is based on aging of the accounts receivable balances and estimated credit loss percentages. The Company uses the probability of default and forward-looking information to assess credit risk and estimate expected credit losses for its note receivable related to Qifeng Food Technology (Beijing) Co. Ltd ("Qifeng"). See Note 7. *Note Receivable* for more information on Qifeng and the note receivable.

Allowances can be affected by changes in the industry, customer credit issues or customer bankruptcies when such events are reasonable and supportable. Historical information is used in addition to reasonable and supportable forecast periods, where applicable.

|  | Allowance for Expected Credit Losses |
| --- | ---: |
| Balance as of December 31, 2022 | $ 2,147 |
| Adoption of accounting standard | (82) |
| Current period change for expected credit losses | 1,072 |
| **Balance as of December 31, 2023** | **$ 3,137** |

*Inventories* - Inventories are valued at the lower of cost or net realizable value, with costs approximating those determined under the first-in, first-out method. As of December 31, 2023 and December 31, 2022, the inventory allowance for excess and obsolete products was approximately $4.2 million and $8.4 million, respectively. Changes in the allowance are included in cost of revenue.

*Property and Equipment* - Property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation of property and equipment is calculated using the straight-line method over the estimated useful life of the asset, generally ranging from three to seven years.

*Long-Lived Assets* - In accordance with ASC Topic 360, *Property, Plant, and Equipment* the Company reviews the carrying value of long-lived assets, which includes property and equipment-net, right-of-use assets, and definite-lived intangibles-net, for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss is recognized for a long-lived asset if its carrying amount is not recoverable and exceeds its fair value. The carrying amount is not recoverable when it exceeds the sum of the undiscounted cash flows expected to result from use of the asset over its remaining useful life and final disposition. The Company did not record any impairment charges related to long-lived assets for the year ended December 31, 2023.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

*Long-Lived Asset Geographic Data*

The following table sets forth long-lived asset information, which includes property and equipment-net, right-of-use assets, and definite-lived intangibles-net and excludes goodwill and indefinite-lived intangibles, where individual countries represent a significant portion of the total:

| | December 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| North America | $ | 24,316 | $ | 9,750 |
| Finland | | 12,153 | | 12,171 |
| Sweden | | 2,212 | | 1,251 |
| Other | | 29 | | 1 |
| Long-lived assets related to foreign operations | | 14,394 | | 13,423 |
| **Total long-lived assets-net** | $ | **38,710** | $ | **23,173** |

*Goodwill and Intangible Assets* - Indefinite-lived intangible assets and goodwill are not amortized but instead, are measured for impairment at least annually, on October 1st, or when events indicate that an impairment exists. In the qualitative assessment, the Company determines whether, given various qualitative factors, it is more likely than not that an impairment exists. Factors considered include macroeconomic conditions, industry conditions, cost factors regarding raw materials and operations, legal and regulatory environments, historical financial performance and significant changes in the brand. If the qualitative assessment indicates that it is more likely than not that an impairment exists, then a quantitative assessment is performed.

In the quantitative assessment for goodwill, the Company calculates the fair value of the respective reporting unit. The estimated fair values of indefinite lived intangible assets and goodwill are determined using discounted cash flows, which requires an analysis of various estimates including future cash flows, annual sales growth rates, and discount rates, based on market data available at the time. Changes in the factors used in the fair value estimates could have a significant impact on the fair values of the reporting unit and indefinite-lived intangible assets. At December 31, 2023 and December 31, 2022, there were no indicators of goodwill impairment. See Note 10. *Goodwill and Intangibles* for more information.

The addition of the Pepsi distribution network in 2022 shifted the Company's primary focus to the U.S. market, and as a result it was determined that impairment indicators for the Func Foods Brands indefinite intangible asset were present. The Company does not anticipate focusing on the expansion of Func Food branded products and the Company plans to focus on Celsius branded products. As a result of the strategic shift, which the Company considered a triggering event, the Company quantitatively tested the Func Foods brand name for impairment utilizing the relief from royalty method to determine its fair value. As a result of the quantitative assessment, the Company recorded an impairment charge of $2.4 million for the year ended December 31, 2022 which is presented within selling, general and administrative expenses. At December 31, 2023, there were no further indicators of intangible asset impairment.

*Revenue Recognition* - The Company recognizes revenue in accordance with ASC Topic 606 *Revenue from Contracts with Customers* ("ASC 606"). Revenue is recognized when performance obligations under the terms of a contract with the customer are satisfied. Product sales occur once control is transferred based on the commercial terms of the customer. Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring goods. For agreements with terms one year or less, the practical expedient under ASC 340-40-25-4 is applied to expense contract acquisition costs when incurred if the amortization period of the contract asset would have otherwise been recognized in one year or less. See Note 4. *Revenue* for more information.

*Deferred Revenue* - The Company receives payments from certain distributors in new territories as reimbursement for contract termination costs paid to the prior distributors in those territories. Amounts received pursuant to these new or amended distribution agreements entered into with certain distributors relating to the costs associated with terminating the Company's prior distributors, are accounted for as deferred revenue and recognized ratably over the anticipated life of the respective new or amended distribution agreements.

*Distributor Termination Fees* - For the year ended December 31, 2023, termination fees related to termination charges associated with certain prior distributors were immaterial. However, the Company incurred approximately $193.8 million in such expenses for the year ended December 31, 2022. These costs were included in selling, general and administrative expenses upon termination of the distributor agreements.

F-12

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

*Customer Advances* - From time to time the Company may require deposits from customers in advance of delivery of products and/or production runs. Such amounts are initially recorded as customer advances liability within deferred revenue. The Company recognizes such revenue as it is earned in accordance with revenue recognition policies. The Company had no customer advances as of December 31, 2023 or December 31, 2022.

*Advertising Costs* - Advertising costs are expensed as incurred and charged to selling, general and administrative expenses. The Company mainly uses targeted marketing initiatives, such as sporting events, print, radio, and television advertising, alongside direct sponsorships and endorsements. The Company incurred advertising expenses of approximately $160.0 million, $85.1 million and $36.7 million, for the years ended December 31, 2023, 2022, and 2021, respectively.

*Research and Development* - Research and development costs are charged to selling, general and administrative expenses as incurred and consist primarily of consulting fees, raw material usage and test production of beverages. The Company incurred expenses of approximately $1.7 million, $0.4 million and $1.0 million for the years ended December 31, 2023, 2022, and 2021, respectively.

*Foreign Currency Gain/Loss* - Foreign subsidiaries' functional currency is the local currency of operations. The net assets of foreign operations are translated into U.S. dollars using current exchange rates.

The foreign subsidiaries perform remeasurements of their assets and liabilities denominated in non-functional currencies on a periodic basis and the gain or loss from these adjustments related to the fluctuations in foreign exchange rates versus the U.S. dollar are included in the consolidated statements of operations and comprehensive income (loss) as foreign exchange gain (loss). For the years ended December 31, 2023, 2022 and 2021, the Company recognized net foreign exchange losses of approximately $1.2 million, $0.4 million, and $0.3 million, respectively.

Translation gains and losses that arise from the translation of net assets from functional currency to the reporting currency, as well as exchange gains and losses on intercompany balances of a long-term investment nature, are included in other comprehensive income (loss) as foreign currency translation gain (loss), net of income tax. The Company experienced a foreign currency translation net gain of approximately $1.2 million for the year ended December 31, 2023 and a net loss of $2.5 million for the year ended December 31, 2022. For the year ended December 31, 2021, there was a net gain of approximately $0.8 million. The Company's operations in different countries requires that it transacts in the following currencies:

China - Yuan,
Hong Kong - Hong Kong Dollar,
Norway - Krone,
Sweden - Krona,
Finland - Euro,
United Kingdom - Pound Sterling, and
Canada - Canadian Dollar

*Fair Value of Financial Instruments* - The carrying value of cash and cash equivalents, accounts receivable, accounts payable, other current liabilities, note receivable and accrued expenses approximate fair value due to their relative short-term maturity and market interest rates.

*Income Taxes* - The Company accounts for income taxes pursuant to the provisions of ASC Topic 740-10, *Accounting for Income Taxes.* This approach requires, among other things, an asset and liability approach to calculating deferred income taxes, and recognizing deferred tax assets and liabilities for expected future tax consequences stemming from temporary differences between asset and liability carrying amounts and their tax bases.

A valuation allowance is established to offset any net deferred tax assets for which management believes it is more-likely-than-not that the net deferred asset will not be realized.

The Company's 2020 through 2022 U.S. federal income tax returns are subject to examination by the IRS. The Company's state income tax returns are subject to examination for the 2019 through 2022 tax years.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

*Earnings per Share* - The Company computes earnings per share ("EPS") in accordance with ASC Topic 260 *Earnings per Share* ("ASC 260"), which requires that basic earnings per common share are computed by dividing income or loss available to common stockholders by the weighted average number of shares of basic common stock outstanding. It also requires that companies with different classes of stock (common stock and participating preferred stock) to calculate EPS using the two-class method. The two-class method is an allocation of earnings (distributed and undistributed) between the holders of common stock and a company's participating preferred stockholders. Under the two-class method, earnings for the reporting period are allocated between common stockholders and other security holders based on their respective participation rights in undistributed earnings. See Note 3. *Earnings per Share* for more information.

The Company also computes diluted EPS, which accounts for the potential impact of dilutive securities on EPS. Dilutive EPS includes the effect of all potential dilutive common shares that were outstanding during the period. Such dilutive securities include RSUs, options, and convertible preferred shares. For the computation of diluted EPS, the numerator remains unchanged from basic EPS, but the denominator is adjusted to also include the weighted average of any additional shares that would have been outstanding if dilutive potential common shares had been issued.

*Stock-Based Compensation* - The Company follows the provisions of ASC Topic 718 *Compensation - Stock Compensation* and related interpretations. As such, compensation cost is measured on the date of grant at the fair value of the share-based payments. Such compensation amounts, if any, are amortized over the respective vesting periods of the grants. See Note 18. *Stock-Based Compensation* for more information.

*Cost of Revenue* - Cost of Revenue consists of the costs of raw materials, which includes concentrates and or liquid bases, co-packing fees, repacking fees, freight charges, as well as certain internal transfer costs, warehouse expenses incurred prior to the manufacturing of the Company's finished products, inventory allowance for excess and obsolete products, and certain quality control costs. Raw materials account for the largest portion of the cost of revenue. Raw materials include cans, other containers, flavors, ingredients and packaging materials.

*Selling, General and Administrative Expenses* - Selling, general and administrative expenses include various operating expenses such as warehousing costs after manufacturing, expenses for advertising, samplings and in-store demonstrations, costs for merchandise displays, point-of-sale materials and premium items, sponsorship expenses, other marketing expenses and design expenses. Selling, general and administrative expenses also include costs such as payroll costs, travel costs, professional service fees (including legal fees), depreciation and other selling, general and administrative costs.

*Shipping and Handling Costs* - Shipping and handling costs for freight charges on goods shipped are included in cost of revenue. Freight expense on goods shipped for the years ended December 31, 2023, 2022 and 2021 were approximately $58.7 million, $26.8 million and $26.9 million, respectively.

**Recently Adopted Accounting Pronouncements**

The Company adopts all applicable, new accounting pronouncements as of the specified effective dates.

Effective January 1, 2023, the Company adopted ASU 2016-13 *Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("CECL"), using a modified retrospective approach. ASU 2016-13 replaces the incurred loss impairment model with an expected credit loss impairment model for financial instruments, including trade receivables. The guidance requires entities to consider forward-looking information to estimate expected credit losses, resulting in earlier recognition of losses for receivables that are current or not yet due. Upon adoption of the ASU on January 1, 2023, the cumulative effect was recorded directly to accumulated deficit. The amount recorded was not material to our financial position or results of operations.

**Recently Issued Accounting Pronouncements**

In November 2023, the Financial Accounting Standards Board (the "FASB") introduced ASU 2023-07 *Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures*, which enhances Segment Reporting (Topic 280) disclosures. This update mandates detailed disclosures on key segment expenses and other items, including segment profit or loss measures. It also requires that companies with a single reportable segment provide comprehensive Topic 280 disclosures. The effective date is for fiscal years beginning after December 15, 2023, and interim periods in fiscal years after December 15, 2024, with retrospective application to all periods presented. The Company is currently evaluating the impact of ASU 2023-07 on its financial statements and related disclosures.

F-14

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

In December 2023, the FASB issued ASU 2023-09 *Income Taxes (Topic 740): Improvements to Income Tax Disclosures*, introducing changes to income tax disclosures, primarily relating to effective tax rates and cash paid for taxes. This ASU requires companies to provide an annual rate reconciliation in both dollar figures and percentages, and changes the way annual income taxes paid are disclosed by all entities, necessitating a breakdown by federal, state, and foreign jurisdictions. The standard is effective for public business entities for fiscal years beginning after December 15, 2024. Prospective application is permitted. The Company is currently evaluating the impact of ASU 2023-09 on its financial statements and related disclosures.

**3. EARNINGS PER SHARE**

The Company's Series A Preferred Stock is classified as a participating security in accordance with ASC 260. Net income allocated to the holders of Series A Preferred Stock is based on the Series A stockholders' proportionate share of weighted average shares of common stock outstanding on an if-converted basis.

For purposes of determining diluted earnings per common share, basic earnings per common share was adjusted to include the effect of potential dilutive common shares outstanding. These potential dilutive shares include unvested restricted stock and performance-based stock units. The more dilutive of the two-class method or the treasury method is used for this adjustment. Additionally, Series A Preferred Stock is included using the if-converted method.

Under the two-class method, net income is reallocated to common stock, the Series A Preferred Stock, and all dilutive securities based on the contractual participating rights of the respective securities to share in the current earnings as if all of the earnings for the period had been distributed.

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | **2023** | **2022** | **2021** |
| **Numerator:** | | | |
| Net income (loss) | $ 226,801 | $ (187,282) | $ 3,937 |
| Convertible preferred stock dividends | (27,462) | (11,526) | - |
| Allocation of earnings to participating securities | (17,348) | - | - |
| **Net income (loss) attributable to common stockholders** | **$ 181,991** | **$ (198,808)** | **$ 3,937** |
|  | | | |
| **Effect of dilutive securities:** | | | |
| Allocation of earnings to participating securities | $ 17,348 | $ - | $ - |
| Reallocation of earnings to participating securities | (16,934) | - | - |
| **Numerator for Diluted EPS - Income (loss) available to common stockholders after assumed conversions** | **$ 182,405** | **$ (198,808)** | **$ 3,937** |
|  | | | |
| **Denominator:** | | | |
| Weighted average basic common shares outstanding | 230,784 | 226,947 | 221,343 |
| Dilutive effect of common shares | 6,180 | - | 11,724 |
| **Weighted average diluted common shares outstanding** | **236,964** | **226,947** | **233,067** |
|  | | | |
| **Earnings per share:** | | | |
| Basic | $ 0.79 | $ (0.88) | $ 0.02 |
| Diluted | $ 0.77 | $ (0.88) | $ 0.02 |

For the years ended December 31, 2023 and 2022, approximately 22.0 million and 30.6 million potentially dilutive securities were excluded from the computation of diluted earnings per share related to common stockholders, as their effect was antidilutive. No potentially dilutive securities were antidilutive or were excluded from the computation for the year ended December 31, 2021.

F-15

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

**4. REVENUE**

The Company recognizes revenue when performance obligations under the terms of a contract with the customer are satisfied. The primary performance obligation is the promise to sell finished products to customers, including distributors/co-packers, wholesalers, and retailers. Product sales occur once control or title is transferred based on the commercial terms of its agreements with such customers and traditionally do not allow for a right of return. Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring goods. Product sales are recorded net of variable consideration, such as provisions for returns, discounts and allowances. Such provisions are calculated using historical averages and adjusted for any expected changes due to current business conditions. Consideration given to customers for cooperative advertising is recognized as a reduction of revenue except to the extent that there is a distinct good or service, in which case the expense is classified as selling or marketing expense. The amount of consideration the Company receives and revenue the Company recognizes varies with changes in incentives the Company offers to its customers and their customers.

Information about the Company's revenues by geographical location for the years ended December 31, 2023, 2022 and 2021 was as follows:

| | For the years ended | | |
|---|---|---|---|
| | December 31, 2023 | December 31, 2022 | December 31, 2021 |
| North America | $ 1,263,341 | $ 617,457 | $ 273,005 |
| Europe | 43,722 | 31,054 | 38,097 |
| Asia-Pacific | 4,755 | 3,647 | 2,538 |
| Other | 6,196 | 1,446 | 632 |
| **Net sales** | $ **1,318,014** | $ **653,604** | $ **314,272** |

Primarily all of the Company's North American revenue was derived from the U.S., which is the Company's country of domicile.

Revenue from Sweden represented the largest foreign portion of total consolidated revenue accounting for approximately $29.3 million, $21.7 million, and $26.9 million for the years ended December 31, 2023, 2022, and 2021, respectively.

*Promotional (Billback) Allowances*

The Company's promotional allowance programs with its distributors or retailers are executed through separate agreements in the ordinary course of business. These agreements provide for one or more of the arrangements described above and are of varying durations. The Company's billbacks are calculated based on various programs with distributors and retail customers, and accruals are established for the Company's anticipated liabilities. These accruals are based on agreed upon terms as well as the Company's historical experience with similar programs and require management's judgment with respect to estimating consumer participation and/or distributor and retail customer performance levels. Differences between such estimated expenses and actual expenses for promotional and other allowance are recognized in the period such differences are determined.

Promotional allowance (variable consideration) recorded as a reduction to revenue, primarily include consideration given to the Company's distributors or retail customers including, but not limited to the following:
- discounts from list prices to support price promotions to end-consumers by retailers;
- reimbursements given to the Company's distributors for agreed portions of their promotional spend with retailers, including slotting, shelf space allowances and other fees for both new and existing products;
- the Company's agreed share of fees given to distributors and/or directly to retailers for advertising, in-store marketing and promotional activities;
- the Company's agreed share of slotting, shelf space allowances and other fees given directly to retailers, club stores and/or wholesalers;
- incentives given to the Company's distributors and/or retailers for achieving or exceeding certain predetermined volume goals;
- discounted products;
- contractual fees given to the Company's distributors related to sales made directly by the Company to certain customers that fall within the distributors' sales territories; and
- contractual fees given to distributors for items sold below defined pricing targets.

F-16

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

For the years ended December 31, 2023, 2022, and 2021, promotional allowances included as a reduction of revenue were $315.2 million, $158.5 million, and $64.2 million, respectively.

Accrued promotional allowances were $99.8 million and $36.0 million as of December 31, 2023 and 2022, respectively.

*Agreements with Pepsi*

The Company executed multiple agreements with Pepsi on August 1, 2022, including a Distribution Agreement relating to the sale and distribution of certain of the Company's beverage products in existing channels and distribution methods in the U.S., excluding certain existing customer accounts, sales channels, Puerto Rico and the U.S. Virgin Islands (collectively the "Territory"). Under the Distribution Agreement, the Company granted Pepsi the right to sell and distribute its existing beverage products in existing channels and distribution methods and future beverage products that are added from time to time as licensed products under the Distribution Agreement in defined territories. The Distribution Agreement represents a master service agreement and can be cancelled by either party without cause in the nineteenth year of the term (i.e., 2041), the twenty-ninth year of the term (i.e., 2051) and in each 10th year thereafter (i.e., 2061, 2071, etc.) by providing twelve months' written notice to the other party on August 1st of the year preceding the year of termination. Except for a termination by the Company "with cause" or a termination by Pepsi "without cause" (each as defined in the Distribution Agreement), the Company is required to pay Pepsi certain compensation upon a termination as specified in the Distribution Agreement.

The Company agreed to provide Pepsi a right of first offer in the event the Company intends to (i) manufacture, distribute or sell products in certain additional countries as specified in the Distribution Agreement or (ii) distribute or sell products in any future channels and distribution methods during the term of the Distribution Agreement. Pepsi agreed to meet and confer in good faith with the Company regarding the terms and conditions upon which Pepsi may be willing to sell or distribute the product, either directly or through local sub-distributors in certain other additional countries. The Distribution Agreement includes other customary provisions, including non-competition covenants in favor of the Company, representations and warranties, indemnification provisions, insurance provisions and confidentiality provisions. In the fourth quarter of 2023 under the terms of the Distribution Agreement, the Company and Pepsi agreed to extend distribution to the Canadian market. Following this agreement, the Company began order fulfillment, with Pepsi serving as the exclusive distributor. Distribution operations began in January of 2024.

On August 1, 2022, the Company and Pepsi also executed the Transition Agreement, providing for the Company's transition of certain existing distribution rights in the Territory to Pepsi. Under the terms of the Transition Agreement, Pepsi agreed to pay the Company up to $250 million in multiple tranches to facilitate the Company's transition of certain distribution rights to Pepsi. Amounts received from Pepsi were contractually restricted to only be used to pay termination fees due to other distributors; any excess cash received over amounts due to other distributors is to be refunded back to Pepsi, and all amounts were refunded to Pepsi as of December 31, 2023.

*Accounting for the agreements Executed with Pepsi*

The Company evaluated the securities purchase agreement, pursuant to which the Company issued and sold to Pepsi Series A Preferred Stock (the "Purchase Agreement"), the Transition Agreement, the Distribution Agreement, and other agreements executed with Pepsi on August 1, 2022, as one combined contract because the agreements were executed on the same day, with the same counterparty, in contemplation of one another, and contractual terms are defined and referenced across the agreements. These agreements are referred to collectively as the Pepsi Arrangement. Management concluded that the Pepsi Arrangement was partially in the scope of ASC 606 and partially in the scopes of ASC 505, *Equity* ("ASC 505") and ASC 480, *Distinguishing liabilities from equity* ("ASC 480"). The Company first applied the measurement and classification criteria in ASC 505 and ASC 480 with respect to the Company's issuance of approximately 1.5 million shares of Series A Preferred Stock, as the substance of the issuance of the Series A Preferred Stock was determined to be a financing transaction. See Note 14. *Mezzanine Equity* for more information.

After application of the measurement and classification principles in ASC 505, and ASC 480, the Company accounted for the residual revenue elements of the Pepsi Arrangement under ASC 606. The revenue elements of the Pepsi Arrangement consisted of (i) $227.8 million in payments received from Pepsi under the Transition Agreement and (ii) a $282.5 million implicit payment made to Pepsi by Celsius, representing the excess fair value over issuance proceeds received for the Series A Preferred Stock. See Note 13. *Related Party Transactions* for more information on the upfront payment and implicit payment related to the excess in fair value over issuance proceeds.

The $282.5 million excess fair value over issuance proceeds of the Series A Preferred Stock represented an implicit payment made to a customer. The Company concluded that this implicit payment met the definition of an asset and recorded such implicit payment as a deferred other cost in the Company's consolidated balance sheets, with a portion included as current. The Company will amortize the asset balance as a reduction of revenues (contra-revenues) ratably over a twenty-year period consistent with the term of the Distribution Agreement. The Company assesses the deferred other cost asset for impairment at each reporting period.

F-17

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

For product sales under the Distribution Agreement, the Company recognizes revenues when control of the underlying goods are transferred to Pepsi based on the contractual terms of noncancellable purchase orders issued by Pepsi. The Company's customary revenue recognition policy as described above is applied with respect to billbacks.

*License Agreement*

In January 2019, the Company entered into a license and repayment of an investment agreement with Qifeng. Under the agreement, Qifeng was granted the exclusive license rights to manufacture, market and commercialize Celsius branded products in China. The term of the agreement is 50 years, with annual royalty fees due from Qifeng after the end of each calendar year. The royalty fees are based on a percentage of Qifeng's sales of Celsius branded products; however, the fees are fixed for the first five years of the agreement, totaling approximately $6.9 million combined, and then are subject to annual guaranteed minimums over the remaining term of the agreement.

Under the agreement, the Company granted Qifeng exclusive license rights and provides ongoing support in product development, brand promotion and technical expertise. The ongoing support is integral to the exclusive license rights and, as such, both of these represent a combined, single performance obligation. The transaction price consists of the guaranteed minimums and the variable royalty fees, all of which are allocated to the single performance obligation.

The Company recognizes revenue from the agreement over time because Qifeng simultaneously receives and consumes the benefits from the services. The Company uses the passage of time to measure progress towards satisfying its performance obligation because of its ongoing efforts in providing the exclusive license rights including providing continuous access, updates and support, to product development, brand promotion and technical expertise. Total revenue recognized under the agreement was approximately $2.2 million, $2.0 million, and $1.6 million for the years ended December 31, 2023, 2022, and 2021, respectively, which is reflected in the revenues from Asia-Pacific.

## 5. INVENTORIES

Inventories-net consists of the following:

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Finished goods | $ 184,434 | $ 119,229 |
| Raw materials | 49,022 | 62,491 |
| Less: Inventory reserve | (4,181) | (8,431) |
| **Inventories-net** | **$ 229,275** | **$ 173,289** |

## 6. PREPAID EXPENSES AND OTHER CURRENT ASSETS

Prepaid expenses and other current assets totaled approximately $19.5 million and $11.3 million, at December 31, 2023 and 2022, respectively, consisting mainly of prepaid advances to co-packers related to inventory production, advertising, prepaid insurance, prepaid slotting fees, value added tax payments and deposits on purchases.

## 7. NOTE RECEIVABLE

Note receivable-net consists of the following:

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Note receivable-current | $ 3,471 | $ 2,979 |
| Current period change for expected credit losses[1] | (1,153) | - |
| Note receivable-non-current | - | 3,574 |
| **Total** | **$ 2,318** | **$ 6,553** |

[1] Upon adoption of CECL on January 1, 2023, the Company recorded a reserve for estimated expected credit losses associated with the note receivable.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

Effective January 1, 2019, the Company restructured its China distribution efforts by entering into two separate economic agreements as they relate to the commercialization of Celsius products (i.e., the Qifeng exclusive license rights and repayment of investment agreement with Qifeng). See Note 4. *Revenue* for information regarding the license agreement with Qifeng. Under a separate economic agreement, Qifeng agreed to repay the marketing investments made by Celsius into the China market through 2018, over a five-year period. The repayment, which was formalized via a note receivable from Qifeng (the "Note"), will need to be serviced even if the licensing agreement is cancelled or terminated. The Note is denominated in Chinese-Yuan.

The Note requires annual principal payments and interest due on March 31 of each year, with the final payment scheduled for 2024. The final payment date was extended to December 31, 2024. The Note is recorded at amortized cost. Interest income generated from the Note has been immaterial.

The Company assesses the Note for impairment at each reporting period. This evaluation considers the probability that the Company will be unable to collect the scheduled principal and interest payments, based on historical experience of Qifeng's ability to pay, the current economic environment, forward-looking information and other factors. As evidence of solvency for the Note, a stock certificate in Celsius Holdings Inc. which amounts to 60,000 shares owned by an affiliate under common control of Qifeng is being held at a brokerage account. A letter of guarantee was executed with several restrictions regarding their shares. In particular, it was agreed that the stock would not be sold or transferred without the prior written consent from Celsius. There are other restrictions and agreements, which include that a statement of account will be provided to Celsius on a quarterly basis to confirm and validate the existence of the remaining shares.

Under the Company's CECL allowance methodology adopted January 1, 2023, the probability of default is evaluated by considering historical collection experiences, as well as current and future economic and market conditions in quantifying the reserve recorded against the Note. During the year ended December 31, 2022, the Note was not deemed to be impaired under the incurred loss impairment model. Payment in full was received for the amounts due on March 31, 2023.

## 8. LEASES

The Company's leasing activities include operating leases of its corporate office space from a related party (See Note 13. *Related Party Transactions)* and other operating and finance leases of vehicles and office space for the Company's European operations.

At the inception of a contract, the Company determines whether it is or contains a lease based on specific criteria, including the use of a distinct identified asset, rights to economic benefits, and control over the asset's use. Consideration in the contract is allocated to lease and non-lease components based on relative stand-alone prices, with separate accounting for each. Leases are classified as either finance or operating leases per ASC Topic 842, with real estate comprising the majority of operating leases, and vehicles under finance leases.

At lease commencement, a lease liability is recorded at the present value of lease payments, using the implicit rate or the Company's incremental borrowing rate, alongside a corresponding right-of-use ("ROU") asset. This asset includes initial lease payments and excludes incentives, and may be adjusted for options to extend or terminate the lease. Operating lease expenses are recognized on a straight-line basis over the lease term, including any variable payments not part of the initial liability, and these expenses are included in selling, general, and administrative expenses. Finance lease expenses are split between ROU asset amortization, over the shorter of the asset's useful life or lease term, and interest expense calculated using the effective interest rate method.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

The future annual minimum lease payments required under the Company's leases as of December 31, 2023 were as follows:

| Future minimum lease payments | Operating Leases | | Finance Leases | | Total | |
|---|---|---|---|---|---|---|
| 2024 | $ | 1,075 | $ | 67 | $ | 1,142 |
| 2025 | | 422 | | 84 | | 506 |
| 2026 | | 344 | | 118 | | 462 |
| 2027 | | 148 | | - | | 148 |
| 2028 | | 140 | | - | | 140 |
| Total future minimum lease payments | | 2,129 | | 269 | | 2,398 |
| Less: Amount representing interest | | (194) | | (17) | | (211) |
| Present value of lease liabilities | | 1,935 | | 252 | | 2,187 |
| Less: current portion | | (980) | | (59) | | (1,039) |
| Long-term portion | $ | 955 | $ | 193 | $ | 1,148 |

## 9. PROPERTY AND EQUIPMENT

Property and equipment-net consisted of the following:

| | Estimated Useful Life in Years | December 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|---|
| Merchandising equipment - coolers | 3 - 7 | $ | 21,908 | $ | 9,885 |
| Office equipment | 3 - 7 | | 1,467 | | 1,124 |
| Vehicles | 5 | | 6,143 | | 1,257 |
| Less: accumulated depreciation | | | (4,650) | | (2,081) |
| **Total** | | $ | **24,868** | $ | **10,185** |

Depreciation expense amounted to approximately $2.6 million, $1.4 million and $0.6 million during years ended December 31, 2023, 2022, and 2021, respectively, and is reflected in selling, general and administrative expenses.

## 10. GOODWILL AND INTANGIBLES

As of December 31, 2023 and December 31, 2022, goodwill was approximately $14.2 million and $13.7 million, respectively.

F-20

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

The carrying amount and accumulated amortization of intangible assets as of December 31, 2023 and December 31, 2022, were as follows:

| | December 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| **Definite-lived intangible assets** | | | | |
| Customer relationships | $ | 13,902 | $ | 13,418 |
| Less: accumulated amortization | | (2,233) | | (1,677) |
| Effect of exchange rate changes | | 9 | | 67 |
| Definite-lived intangible assets, net | $ | 11,678 | $ | 11,808 |
| | | | | |
| **Indefinite-lived intangible assets** | | | | |
| Brands | $ | 446 | $ | 2,984 |
| Less: impairment | | - | | (2,576) |
| Effect of exchange rate changes | | 15 | | 38 |
| Indefinite-lived intangible assets, net | $ | 461 | $ | 446 |
| **Intangibles-net** | $ | 12,139 | $ | 12,254 |

Customer relationships are amortized over an estimated useful life of 25 years, while brands have an indefinite life. Amortization expense for the years ended December 31, 2023, 2022, and 2021 was approximately $0.5 million, $0.5 million, and $0.6 million, respectively and is reflected in selling, general and administrative expenses.

Other fluctuations in the amounts of intangible assets are due to currency translation adjustments.

The following was the future estimated amortization expense related to customer relationships as of December 31, 2023:

| Years ending December 31, | | |
|---|---|---|
| 2024 | $ | 556 |
| 2025 | | 556 |
| 2026 | | 556 |
| 2027 | | 556 |
| 2028 | | 556 |
| Thereafter | | 8,898 |
| **Total** | $ | 11,678 |

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

## 11. ACCOUNTS PAYABLE AND ACCRUED EXPENSES

As of December 31, 2023 and December 31, 2022, accounts payable was approximately $42.8 million and $36.2 million, respectively.

Accrued expenses consisted of the following:

|  | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Due to Pepsi[1] | $ - | $ 34,807 |
| Accrued freight | 2,267 | 8,532 |
| Accrued marketing | 18,252 | 2,238 |
| Accrued legal | 7,633 | 10,463 |
| Unbilled purchases | 11,851 | 8,672 |
| Other accrued expenses | 22,117 | 5,187 |
| **Total** | **$ 62,120** | **$ 69,899** |

[1] See Note 13. *Related Party Transactions* for more information related to Pepsi amounts fully refunded in 2023.

## 12. OTHER CURRENT LIABILITIES

Other current liabilities consisted of the following:

|  | December 31, 2023 | December 31, 2022 |
|---|---|---|
| VAT / GST payable | $ 823 | $ 198 |
| State Beverage Container Deposit | 10,067 | 3,388 |
| **Total** | **$ 10,890** | **$ 3,586** |

## 13. RELATED PARTY TRANSACTIONS

*Transactions with Pepsi*

As further described in Note 14. *Mezzanine Equity,* on August 1, 2022, the Company issued approximately 1.5 million shares of non-voting Series A Preferred Stock to Pepsi. The shares accounted for approximately 8.5% of the Company's outstanding common stock on the date of issuance, on an if-converted method. The Purchase Agreement grants Pepsi the right to designate a nominee for election to the Company's nine-member Board of Directors (the "Board"), provided Pepsi meets certain ownership requirements. In 2022, a Pepsi executive was designated by Pepsi and elected to the Company's Board.

Based on Pepsi's contractual representation rights for a seat on the Company's Board, the Company concluded that Pepsi is a related party. The following transactions were recognized in the Company's financial statements:

- Revenue to Pepsi amounted to $782.3 million and $142.3 million for the years ended December 31, 2023 and 2022, respectively, and are included in Revenue.

- Estimated accrued promotional allowance related to Pepsi was $51.8 million and $13.9 million as of December 31, 2023 and 2022, respectively, and is included in Accrued promotional allowance.

- Accounts receivable due from Pepsi on December 31, 2023 and 2022 were $130.4 million and $31.6 million, respectively, and are included in Accounts receivable-net.

- For the year ended December 31, 2023, the Company purchased company-branded coolers from Grayhawk Leasing LLC ("Grayhawk"), a wholly-owned subsidiary of Pepsi, totaling $10.5 million. In 2022, the Company incurred $1.6 million of spend with Grayhawk related to company-branded coolers.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

- Pepsi paid the Company $227.8 million in cash under the Transition Agreement in 2022. This amount was used for settling termination fees with former distributors; any excess cash was contractually restricted and due back to Pepsi, all of which was refunded to Pepsi as of December 31, 2023. The Company had deferred revenues (a contract liability) of $176.7 million as of December 31, 2023, of which $167.2 million was classified as Deferred revenue-non-current and $9.5 million was classified as Deferred revenue-current. This is net of $9.5 million of related revenue recognized in 2023. As of December 31, 2022, the Company had deferred revenues of $189.5 million, of which $179.8 million was classified as Deferred revenue-non-current and $9.7 million was classified as Deferred revenue-current. This is net of $4.2 million of related revenue recognized in 2022. The deferred revenues will continue to be recognized ratably over the twenty-year agreement term.

- Amounts due to Pepsi of $34.8 million as of December 31, 2022, representing refund liabilities owed to Pepsi under the Transition Agreement, were recorded to accrued expenses. As of December 31, 2023, payments due to Pepsi under the Transition Agreement had been fully refunded, and the Company did not have a refund liability.

- The Company issued Series A Preferred Stock with a fair value of $832.5 million for an issuance price of $550.0 million on August 1, 2022. The excess of the fair value over the issuance proceeds, amounting to $282.5 million, was recorded as deferred other costs in the accompanying consolidated balance sheets. See Note 14. *Mezzanine Equity* for more information. As of December 31, 2023 unamortized deferred other costs of $14.1 million and $248.3 million, were recorded in deferred other costs-current and deferred other costs-non-current, respectively in the consolidated balance sheets. As of December 31, 2022 unamortized deferred other costs of $14.1 million and $262.5 million were recorded as deferred other costs-current and deferred other costs-non-current, respectively in the consolidated balance sheets. Amortization of deferred other costs for the year ended December 31, 2023 and 2022, were $14.1 million and $5.9 million, respectively. This was recorded as an offset to revenue. Costs are amortized over 20 years, which is the life of the agreement.

See Note 1. *Organization and Description of Business,* Note 2. *Basis of Presentation and Summary of Significant Accounting Policies,* Note 4. *Revenue*, Note 11. *Accounts Payable and Accrued Expenses,* and Note 14*. Mezzanine Equity* for more information.

*Related Party Leases*

The Company's office space is leased from a company affiliated with CD Financial, LLC, which is owned by a few of the Company's principal stockholders. The leases extend until June 2027 with a combined monthly rent of $44 thousand.

## 14. MEZZANINE EQUITY

*Series A Convertible Preferred Stock*

As of December 31, 2023 and December 31, 2022, Company has designated and authorized 1,466,666 shares of Series A Preferred Stock with a par value of $0.001 per share and a stated value of $375.00 per share. The stated value per share may be increased from time-to-time in the event dividends on the Series A are paid-in-kind ("PIK dividends") pursuant to the Series A Certification of Designation (the "Series A Certificate"). On August 1, 2022, pursuant to the Purchase Agreement, the Company issued approximately 1.5 million shares of Series A, representing 100% of the authorized Series A shares, to Pepsi for stated cash consideration aggregating $550.0 million, excluding issuance costs. The Series A was issued concurrently with the execution of Distribution Agreement and the Transition Agreement. The Company determined that the aggregate fair value of the Series A on the issuance date was $832.5 million, or $567.61 per share. Accordingly, the Series A Preferred Stock was recorded at that amount, net of issuance costs of $8.0 million, in the Company's consolidated balance sheets and statement of changes in stockholders' equity and mezzanine equity.

*Mezzanine Classification*

The Series A Preferred Stock is redeemable in the event of a change in control as defined in the Series A Certificate. S99-3A(2) of the SEC's Accounting Series Release No. 268 ("ASR 268") requires preferred securities that are redeemable for cash or other assets to be classified outside of permanent equity if they are redeemable (i) at a fixed or determinable price on a fixed or determinable date, (ii) at the option of the holder, or (iii) upon the occurrence of an event that is not solely within the control of the issuer. Preferred securities that are mandatorily redeemable are required to be classified by the issuer as liabilities whereas under ASR 268 an issuer should classify a preferred security whose redemption is contingent on an event not entirely in control of the issuer as mezzanine equity. The Series A is not mandatorily redeemable, however, a change in control is not solely in control of the Company, accordingly, the Company determined that mezzanine treatment is appropriate for the Series A and has presented it as

F-23

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

such in the consolidated balance sheets and statement of changes in stockholders' equity and mezzanine equity, as of both December 31, 2023 and December 31, 2022.

Pursuant to the Purchase Agreement, Pepsi, together with its affiliates, has certain rights and is also subject to various restrictions with respect to the Company's outstanding common shares on an as-converted basis through purchases of the Company's Common Stock in the open market and the accumulation of PIK dividends. Additionally, pursuant to the Purchase Agreement, Pepsi has the right to designate one nominee for election to Company's Board, for so long as Pepsi (together with its affiliates) beneficially owns at least approximately 11.0 million shares of the Company's outstanding Common Stock on an as-converted basis. Notwithstanding that the Series A is not currently convertible into common stock, the Purchase Agreement provides that Pepsi is deemed to beneficially own the underlying shares of common stock for purposes of its rights under the Purchase Agreement. In August of 2022, the Company expanded the number of seats from eight to nine in connection with the election of a Pepsi representative to the Company's Board.

*Liquidation Preference*

The Series A ranks, with respect to distribution rights and rights on liquidation, winding-up and dissolution, (i) senior and in priority of payment to the Company's common stock, (ii) senior to any class or series of capital stock of the Company expressly designated as ranking junior to the Series A, (iii) on parity with any class or series of capital stock of the Company expressly designated as ranking on parity with the Series A, and (iv) junior to any class or series of capital stock of the Company expressly designated as ranking senior to the Series A. The aggregate liquidation preference of the Series A was $550.0 million as of both December 31, 2023 and 2022.

*Voting*

The Series A confers no voting rights, except as otherwise required by applicable law, and with respect to matters that adversely change the powers, preferences, privileges, rights or restrictions given to the Series A or provided for its benefit, or would result in securities that would be senior to or *pari passu* with the Series A. As described above, Pepsi has a contractual right to representation on the Company's Board, subject to certain shareholding thresholds.

*Stock Split*

As a result of the Forward Stock Split, the conversion ratio for Series A Preferred Stock, initially set at five-for-one, was adjusted to fifteen-to-one. The adjustment maintains the proportional interests of Series A Stockholders post-split. The revised conversion ratio, reflecting the impact of the three-for-one stock split, was made effective on the split's effective date.

*Dividends*

The Series A entitles the holder to cumulative dividends, which are payable quarterly in arrears either in cash, in-kind, or a combination thereof, at the Company's election ("Regular Dividends"). Regular Dividends accrue on each share of Series A at the rate of 5.00% per annum, subject to adjustment as set forth in the Series A Certificate. In addition to such quarterly Regular Dividends, shares of Series A also entitle the holder to participate in any dividends paid on the Company's common stock on an as-converted basis. The Company declared and paid $27.5 million and $11.5 million in Regular Dividends on the Series A, which amounted to $18.72 and $7.86 per share of Series A for the years ended December 31, 2023 and 2022, respectively. There were no cumulative undeclared dividends on the Series A at December 31, 2023. In addition, there were no dividends issued to common shareholders as of the years ended December 31, 2023 and 2022.

*Redemption*

Pursuant to certain conditions set forth in the Series A Certificate, Series A may be redeemed at a price per share of Series A equal to the sum of (i) the stated value of such share of Series A as of the applicable redemption date, plus (ii) without duplication, all accrued and unpaid dividends previously added to the stated value of such share of Series A, and all accrued and unpaid dividends per share of Series A through such redemption date (the "Redemption Price").

*Company's Optional Redemption*

At any time from and after the earlier of (i) August 1, 2029, if the ten-day volume weighted average price of the Company's common stock (the "Ten-Day VWAP") does not exceed the conversion price on the date immediately prior to the date the Company delivers a redemption notice to the holders, and (ii) the cancellation of the Distribution Agreement by the Company, the Company has the right to redeem all (and not less than all) of the then-outstanding shares of Series A, at the Redemption Price. In the event of

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

the Company's optional redemption, the Company shall affect such redemption by paying the entire Redemption Price on or before the date that is thirty days after the delivery of the Company's redemption notice and by redeeming all the shares of Series A on such date.

*Change in Control Redemption*

In the event of a change in control, as defined by the following scenarios, the Company (or its successor) shall redeem all (and not less than all) of the then-issued and outstanding shares of Series A: (i) a sale or transfer, directly or indirectly, of all or substantially all of the assets of the Company in any transaction or series of related transactions (other than sales in the ordinary course of business); (ii) any merger, consolidation or reorganization of the Company with or into any other entity or entities as a result of which the holders of the Company's outstanding capital stock (on a fully-diluted basis) immediately prior to the merger, consolidation or reorganization no longer represent at least a majority of the voting power of the surviving or resulting Company or other entity; or (iii) any sale or series of sales, directly or indirectly, beneficially or of record, of shares of the Company's capital stock by the holders thereof which results in any person or group of affiliated persons owning capital stock holding more than 50% of the Company's voting power.

Upon a change in control and redemption, each Series A holder will receive, an amount equal to the greater of (A) the Redemption Price in cash, and (B) the cash and/or other assets (including securities) such holder would have received if each share of Series A were converted into a number of shares of common stock equal to the then-applicable conversion ratio and participated in such transaction resulting in such change of control as of the close of business on the business day immediately prior to the effective date of such transaction.

If the Company or its successor shall not have sufficient funds legally available under the Nevada law governing distributions to stockholders to redeem all outstanding shares of Series A, then the Company shall (A) redeem, pro rata among the holders, a number of shares of Series A equal to the number of shares of Series A that can be redeemed with the maximum amount legally available for the redemption, and (B) redeem all remaining shares of Series A not redeemed because of the foregoing limitations at the applicable change of control redemption price as soon as practicable after the Company (or its successor) is able to make such redemption out of assets legally available for the purchase of such shares of Series A. The inability of the Company (or its successor) to make a redemption payment for any reason shall not relieve the Company (or its successor) from its obligation to affect any required redemption when, as and if permitted by applicable law.

*Holder Right to Request Redemption*

On each of August 1, 2029, August 1, 2032, and August 1, 2035, the majority holders of the Series A have the right, upon no less than six months prior written notice to the Company, to request that the Company redeem all (and not less than all) of the then-outstanding shares of Series A, at the Redemption Price.

In the event of a holder-optional redemption, the Redemption Price will be payable, and the Company shall redeem the shares in three equal installments. These installments would commence on August 1, 2029, August 1, 2032, or August 1, 2035, as applicable, and in each case on the fifteenth- and thirtieth-month anniversary thereafter. On each redemption date for a holder-optional redemption, the Company will redeem shares of Series A on a pro rata basis according to the number of shares owned by each holder. The number of outstanding shares will be determined by dividing (i) the total number of Series A shares outstanding immediately prior to such redemption date by (ii) the number of remaining redemption dates (including the redemption date to which such calculation applies).

If, on any redemption date, legal constraints under the Nevada law governing distributions to stockholders or the terms of any indebtedness of the Company to financial institutions prevents the Company from redeeming all shares of Series A, the Company will ratably redeem the maximum number of shares that it may legally redeem, and will redeem the remaining shares as soon as it may lawfully do so.

Should any shares of Series A scheduled for redemption on a redemption date remain unredeemed for any reason on such redemption date, the following will occur: from the redemption date to the fifteen-month anniversary of such redemption date, the dividend rate with respect to such unredeemed share will automatically increase to 8% per annum. From such fifteenth-month anniversary to the thirtieth-month anniversary of such redemption date, the dividend rate with respect to such unredeemed share will automatically increase to 10% per annum. After such thirtieth-month anniversary of such redemption date, the dividend rate with respect to any such unredeemed share will automatically increase to 12% per annum, in each case until such share is duly redeemed or converted.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

*Conversion*

The shares of Series A may be converted into shares of the Company's common stock pursuant to the Series A Certificate either at the option of the Company or subject to an automatic conversion as discussed below. The Series A was issued with a conversion price of $25 which is potentially subject to adjustment pursuant to the Series A Certificate. The conversion ratio is calculated as the quotient of (a) the sum of (x) the stated value of such share of Series A as of the applicable conversion date, plus (y) all accrued and unpaid dividends previously added to the stated value of such share of Series A, and without duplication, all accrued and unpaid dividends per share of Series A through the applicable conversion date; divided by (b) the conversion price as of the conversion date. As of December 31, 2023, the conversion ratio of the Series A into common was one to fifteen. At December 31, 2023, approximately 22.0 million shares of the Company's common stock were issuable upon conversion of the Series A Preferred Stock.

As of December 31, 2023, the Series A was not probable of becoming redeemable, as the most likely method of settlement is through conversion which is likely to occur before the holder's right to request redemption becomes exercisable.

*Company Optional Conversion*

At any time from and after August 1, 2029, provided the Ten-Day VWAP immediately prior to the date the Company delivers a conversion notice to the holders of Series A exceeds the Conversion Price, the Company may elect to convert all, but not less than all, of the outstanding shares of Series A into shares of the Company's common stock.

*Automatic Conversion*

The Series A will convert automatically into shares of the Company's common stock upon the occurrence of any of the following, each, an "Automatic Conversion Event":

- Any date from and after the valid termination of the Distribution Agreement by the Company or Pepsi, if the Ten-Day VWAP immediately preceding such date exceeds the Conversion Price of such share as of such date.

- Any date from and after August 1, 2028, on which (x) the Company's products meet a market share requirement during a specified period (as defined in the Distribution Agreement) and (y) the Ten-Day VWAP immediately prior to such date exceeds the conversion price of such share as of such date. In the case of an Automatic Conversion Event, each share of Series A then outstanding shall be converted into the number of shares of common stock equal to the conversion ratio of such share in effect as of the automatic conversion date. The occurrence of an Automatic Conversion Event will terminate any right of the holder to receive a redemption at their request even if such request has already been submitted, provided that the Series A shares have not already been redeemed.

*Other Accounting Matters*

The Company has adopted Accounting Standards Update 2020-06 ("ASU 2020-06"), effective January 1, 2022. The provisions of ASU 2020-06 prohibit the recognition of a beneficial conversion feature on preferred shares issued after the adoption of the ASU.

FASB ASC 815 generally requires an analysis of embedded terms and features that have characteristics of derivatives to be evaluated for bifurcation and separate accounting in instances where their economic risks and characteristics are not clearly and closely related to the risks of the host contract. The Company performed an evaluation and determined the Series A and the host instrument is more akin to equity. The Company identified certain embedded redemption and conversion features which it evaluated for bifurcation and determined no bifurcation of these embedded or conversion features was required.

## 15. STOCKHOLDERS' EQUITY

*Issuance of common stock pursuant to exercise of stock options and other awards*

During the year ended December 31, 2023, the Company issued an aggregate of 2.6 million shares of common stock and received approximately $2.3 million, under the 2015 Plan Stock Incentive Plan (the "2015 Plan").

During the year ended December 31, 2022, under the 2015 Plan and 2006 Incentive Stock Plan (the "2006 Plan" and, collectively with the 2015 Plan, the "Stock Incentive Plans"), the Company issued approximately 4.4 million shares of its common stock and received approximately $3.7 million.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

During the year ended December 31, 2021, under the Stock Incentive Plans, the Company issued an aggregate of approximately 4.5 million shares of its common stock and received approximately $3.7 million.

*June 2021 Public Offering*

In June 9, 2021, the Company, and certain selling stockholders, consummated a public offering of 19.6 million shares of common stock, at a price of $20.83 each, less underwriting discounts. This included a 30-day option for underwriters to purchase approximately 2.9 million additional shares, with approximately 2.6 million shares exercised on June 11, 2021. The offering, closed on June 14, 2021, resulting in the Company issuing and selling approximately 3.4 million shares of common stock and the selling stockholders selling 18.8 million shares of common stock, generating net proceeds of approximately $67.8 million for the Company and $375.4 million for selling stockholders. The Company used its proceeds from the offering for general corporate purposes.

## 16. FAIR VALUE MEASUREMENTS

ASC 820 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Additionally, ASC 820 requires the use of valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. These inputs are prioritized below:

Level 1: Observable inputs such as quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.

Level 3: Unobservable inputs for which there is little or no market data, which require the use of the reporting entity's own assumptions.

The Company engaged a third-party valuation firm to assist in determining the fair value of the approximately 1.5 million shares of Series A Preferred Stock issued on August 1, 2022. The Series A Preferred Stock is classified in mezzanine equity, see Note 14. *Mezzanine Equity* for more information. The valuation of the Series A Preferred Stock represents a non-recurring fair value measurement. The Company used a Monte Carlo simulation model to determine the fair value of the Series A Preferred Stock on August 1, 2022. The Monte Carlo simulation utilized multiple level 2 input variables to determine the value of the Series A Preferred Stock including a volatility rate of 45%, risk free interest rate of 2.69%, 5.0% dividend rate, the closing price of the Company's common stock on the issuance date of $98.87 (pre-split), a debt discount rate of 12.5% and a discount for lack of marketability attributed to the registration period of the underlying stock. The selected historical volatility was based on Celsius and a certain peer group. The risk-free interest rate was based on the U.S. STRIPS Rate with a corresponding term as of issuance date. The 5.0% dividend rate is consistent with the provisions of the Series A Preferred Stock and with the Company's past payments or such dividends made in cash. The debt discount rate was based on estimated credit analysis and corresponding market yields as of the issuance date. The Company applied a nominal discount for lack of marketability with respect to the assumed registration period of the underlying shares.

## 17. INCOME TAXES

The domestic and foreign components of the Company's income (loss) before provision for income taxes are as follows:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Domestic | $ 291,203 | $ (151,551) | $ (4,176) |
| Foreign | 546 | (1,113) | 117 |
| **Net income (loss) before income taxes** | **$ 291,749** | **$ (152,664)** | **$ (4,059)** |

The provision for income tax expense (benefit) consists of the following:

| Current: | 2023 | 2022 | 2021 |
|---|---|---|---|
| Domestic | $ 79,840 | $ 10,498 | $ - |
| State and local | 27,596 | 2,601 | 1,523 |
| Foreign | 192 | - | (38) |
| **Current federal, state and local, tax expense** | **$ 107,628** | **$ 13,099** | **$ 1,485** |

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

| Deferred: | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| Domestic | $ | (34,535) | $ | 18,558 | $ | (7,142) |
| State and local | | (8,261) | | 4,034 | | (1,878) |
| Foreign | | 116 | | (1,073) | | (461) |
| Deferred federal, state and local, tax expense | $ | (42,680) | $ | 21,519 | $ | (9,481) |
| | | | | | | |
| Income tax expense (benefit) | $ | 64,948 | $ | 34,618 | $ | (7,996) |

The reconciliation of the U.S. federal statutory rate to the effective rate on net income (loss) before taxes is as follows:

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| U.S. Statutory federal rate | 21.0 % | 21.0 % | 21.0 % |
| State taxes, net of federal benefit | 4.7 % | (3.9)% | (12.5)% |
| Tax effect of Pepsi valuation premium | - % | (38.9)% | - % |
| Stock based compensation | (3.4)% | (0.9)% | 50.5 % |
| Change in valuation allowance | (0.3)% | 0.4 % | 219.8 % |
| Change in deferred balances | 0.3 % | - % | (80.6)% |
| Other | (0.1)% | (0.4)% | (0.9)% |
| Effective tax rate | 22.2 % | (22.7)% | 197.3 % |

The Tax Cuts and Jobs Act introduced a provision to tax global intangible low-taxed income ("GILTI") of foreign subsidiaries and a measure to tax certain intercompany payments under the base erosion anti-abuse tax "BEAT" regime. For the years ended December 31, 2023 and 2022, the Company did not generate intercompany transactions that met the BEAT threshold but does have to include GILTI relating to the Company's foreign subsidiaries. The Company elected to account for GILTI as a current period cost.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts for income tax purposes.

Deferred tax assets and liabilities consisted of the following:

| | | December 31, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| Net operating loss carryforwards | $ | 3,441 | $ | 4,774 |
| Charitable contributions | | - | | 17 |
| Deferred revenue | | 45,907 | | - |
| Fixed assets | | (3,338) | | (1,158) |
| Pepsi valuation premium | | (68,250) | | (70,637) |
| Right of use liability | | 157 | | 154 |
| Right of use asset | | (275) | | (146) |
| Distributor termination fees | | 40,429 | | 46,859 |
| Stock-based compensation | | 4,892 | | 5,236 |
| Inventory allowance | | 9,221 | | 5,423 |
| Intangibles | | (2,495) | | (2,516) |
| Total deferred tax assets (liabilities) | | 29,689 | | (11,994) |
| Valuation allowance | | (2,496) | | (3,424) |
| Net deferred tax assets (liabilities) | $ | 27,193 | $ | (15,418) |

F-28

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

At December 31, 2023, the Company has approximately $1.9 million of Federal net operating loss carryforwards and $1.9 million of state net operating loss ("NOL") carryforwards, which will begin to expire in 2027. The Federal and State NOLs are subject to limitation under Section 382 due to a December 2008 ownership change of greater than 50% over a three-year testing period. The ownership change resulted in approximately $4.5 million of NOLs that will not be realized. The $4.5 million has been removed from the available NOL carryforward and US NOL deferred tax asset. The Company had foreign NOL carryforwards of approximately $16.7 million, some of which will begin to expire in 2024.

The Company considers the earnings of its foreign entities to be permanently reinvested outside the U.S. based on estimates that future cash generation will be sufficient to meet future domestic cash needs. Accordingly, deferred taxes have not been recorded for the undistributed earnings of the Company's foreign subsidiaries. All other outside basis differences not related to earnings were impractical to account for at this period of time and are currently considered as being permanent in duration.

As required by the authoritative guidance on accounting for income taxes, the Company evaluates the realizability of deferred tax assets on a jurisdictional basis at each reporting date. Accounting for income taxes requires that a valuation allowance be established when it is more likely than not that all or a portion of the deferred taxes will not be realized. In circumstances where there is sufficient negative evidence indicating that the deferred tax assets are not more likely than not realizable, the Company establishes a valuation allowance. Through the year ended December 31, 2020, the Company maintained a full valuation allowance on its worldwide net deferred tax assets. During the fourth quarter of 2021, the Company concluded that it is more likely than not that its U.S. deferred tax assets would be realized. This conclusion was based on the US profitability and NOL utilization in 2020 and 2021 as well as future forecasts of U.S. profitability. During the fourth quarter of 2022, the Company concluded that is more likely than not that is Celsius Europe deferred tax assets would be realized, based on Finland profitability and NOL utilization in 2021 and 2022. For the year ended December 31, 2021, the Company reported a release of its U.S. valuation allowance for deferred tax assets of approximately $6.0 million. For the year ended December 31, 2022, the Company reported a release of non-U.S. valuation of $0.5 million. The Company continues to maintain a valuation allowance on certain of its foreign net operating losses as it is not more likely than not that the losses in those specific jurisdictions will be realized.

A reconciliation of the beginning and ending amounts of unrecognized tax benefits is as follows:

|  | 2023 | 2022 |
|---|---|---|
| Gross unrecognized tax benefit, beginning of period | $ 702 | $ 1,080 |
| Additions based on tax positions related to the current year | 555 | - |
| Additions based on tax positions related to the prior years | - | - |
| Reductions due to lapse in statute of limitations and settlements | - | (378) |
| Gross unrecognized tax benefit, end of period | $ 1,257 | $ 702 |

The Company recognizes only those tax positions that meet the more-likely-than-not recognition threshold and establishes tax reserves for uncertain tax positions that do not meet this threshold. To the extent these unrecognized tax benefits are ultimately recognized, approximately $1.3 million will impact the Company's effective tax rate in future periods. Tax positions will potentially decrease by $0.2 million within the next twelve months. Interest and penalties associated with income tax matters are included in the provision for income taxes. As of December 31, 2023, the Company had uncertain tax positions of approximately $1.3 million, inclusive of $0.1 million of interest and penalties.

The Company files U.S., state, and foreign income tax returns in jurisdictions with various statutes of limitations. Below is a summary of the filing jurisdictions and open tax years:

|  | Open Years |
|---|---|
| U.S. Federal | 2020-2022 |
| U.S State and local | 2019-2022 |
| Non-U.S. | 2017-2022 |

F-29

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

**18. STOCK-BASED COMPENSATION**

On April 30, 2015, the Company adopted the 2015 Plan, with the objective of attracting and retaining highly competent personnel through opportunities to acquire the Company's common stock.

There are currently 17.7 million shares available for issuance under the 2015 Plan. The 2015 Plan expires in 2025 and the Company intends to seek stockholder approval of a new plan during the 2025 annual meeting of stockholders. For more information on the number of shares issued, refer to Note 15. *Stockholders' Equity.*

The 2006 Plan, which was adopted on January 18, 2007 and expired in 2017, similarly had the objective of attracting and retaining highly competent employees, directors, and independent consultants through opportunities to acquire the Company's common stock. No further awards can be granted under the 2006 Plan. As of December 31, 2023, there were no unvested awards under the 2006 plan and certain vested but unexercised awards remained outstanding.

For the years ended December 31, 2023, 2022 and 2021, the Company recognized stock-based compensation expense of approximately $21.2 million, $20.7 million and $36.5 million, respectively, which is included in selling, general and administrative expenses.

*Stock Options*

The Company used straight-line amortization of compensation expense over the two to three-year requisite service or vesting period of the grant. The maximum contractual term of the Company's stock options is 10 years.

The Company uses the Black-Scholes option pricing model to estimate the fair value of its stock option awards and warrant issuances and recognize forfeitures as they occur.

A summary of the status of the Company's outstanding stock options as of December 31, 2023 and changes during the period are as follows:

| | Shares (000's) | | Weighted Average Exercise Price | | Aggregate Intrinsic Value (000's) [1] | | Weighted Average Remaining Term (Yrs) |
|---|---|---|---|---|---|---|---|
| **Options** | | | | | | | |
| At December 31, 2022 | 6,798 | $ | 3.22 | $ | 213,914 | | 5.43 |
| Exercised | (1,818) | $ | 1.69 | $ | 81,380 | | |
| Forfeited and cancelled | (62) | | 1.65 | | | | |
| **At December 31, 2023** | **4,918** | $ | **3.81** | $ | **249,541** | | **4.45** |
| **Exercisable at December 31, 2023** | **4,620** | $ | **3.13** | $ | **237,432** | | **4.29** |

[1] The intrinsic value represents the amount by which the fair value of the Company's common stock exceeds the option exercise price as of December 31, 2023.

The total intrinsic value of the stock options exercised was $102.3 million and $84.4 million in the years ended December 31, 2022 and 2021, respectively. The total number of stock options exercised was 3.8 million and 4.4 million in the years ended December 31, 2022 and 2021, respectively.

There were no stock options granted during the years ended December 31, 2023 or 2022. The number of stock options granted during the year ended December 31, 2021 was 0.9 million with a weighted average fair value on grant date of $10.11.

As of December 31, 2023, unrecognized non-cash compensation expense related to stock options was immaterial.

*Restricted Stock Units*

Restricted stock units are awards that give the holder the right to receive one share of common stock for each restricted stock unit upon meeting service-based vesting conditions (typically annual vesting in three equal annual installments, with a requirement that the holder remains in the continuous employment of the Company). The Company determines the fair value of restricted stock-based awards based on the market price of the common stock on the date of grant. The holders of unvested units do not have the

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

same rights as stockholders including but not limited to any dividends which may be declared by the Company, and do not have the right to vote. The value of restricted stock units that vest over time is established by the market price on the date of its grant.

A summary of the Company's restricted stock unit activity for the year ended December 31, 2023 is presented in the following table:

| | Shares (000's) | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested at beginning of period | 1,617 | $ | 20.24 |
| Granted | 468 | | 36.41 |
| Vested | (670) | | 19.65 |
| Forfeited and cancelled | (197) | | 24.35 |
| **Unvested at end of period** | **1,218** | **$** | **26.13** |

The number of restricted stock units granted during the years ended December 31, 2022 and 2021 was approximately 0.7 million and 1.7 million, respectively. The weighted average grant date fair value of restricted stock units during the years ended December 31, 2022 and 2021 was $24.71 and $18.13, respectively.

The total fair value of shares vested during the years ended December 31, 2023, 2022, and 2021 was approximately $24.9 million, $11.6 million and $1.4 million, respectively. Unrecognized compensation expense related to outstanding restricted stock units to employees and directors as of December 31, 2023 was approximately $17.8 million and is expected to be expensed over the next 1.9 years.

*Performance-based Stock Awards*

In Q3 2022, the Human Resources and Compensation Committee of the Board approved the issuance of approximately 228.0 thousand shares of PSUs to certain employees which represented restricted stock units with performance-based vesting. The aggregate grant date fair value of $7.5 million included an immediate vesting of 20% of the shares as well as specific performance-based metrics to be met in year one and year two of the issuance. The performance criteria for the awards were met during the first year. The Company believes the future attainment of the performance-based metrics to be probable of being achieved. Accordingly, the Company will recognize expense for each tranche of the awards separately in line with ASC 718.

A summary of the Company's PSU activity for the year ended December 31, 2023 is presented in the following table:

| | Shares (000's) | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested at beginning of period | 228 | $ | 30.49 |
| Granted | - | | - |
| Vested | (92) | | 32.76 |
| Forfeited and cancelled | (13) | | 24.87 |
| **Unvested at end of period** | **123** | **$** | **29.43** |

Unrecognized compensation expense related to outstanding PSUs issued to employees and non-employee consultants as of December 31, 2023, was approximately $0.9 million and is expected to be expensed over the next 0.6 years.

The number of performance-based stock units granted during the years ended December 31, 2022 and 2021 was approximately 228 thousand and 45 thousand, respectively. The weighted average grant date fair value of restricted stock units during the years ended December 31, 2022 and 2021 was $32.76 and $21.55, respectively.

F-31

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

**19. COMMITMENTS AND CONTINGENCIES**

*Legal*

*SEC Inquiry*

On January 8, 2021, the Company received a letter from the SEC Division of Enforcement seeking the production of documents in connection with a non-public fact-finding inquiry by the SEC to determine whether violations of the federal securities laws have occurred. Subsequent to January 8, 2021, the Company received subpoenas for production of documents in connection with the matter. The investigation and requests from the SEC do not represent that the SEC has concluded that the Company or anyone else has violated the federal securities laws. The Company has cooperated and will continue to cooperate with the SEC staff in its investigation and requests. At this time, however, the Company cannot predict the length, scope, or results of the investigation or the impact, if any, of the investigation on the Company's results of operations.

*Securities Class Action*

On March 16, 2022, a putative securities class action lawsuit was commenced against the Company and certain officers in the U.S. District Court for the Southern District of Florida. On July 8, 2022, the lead plaintiffs filed an amended complaint alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"). The allegations pertain to purported false and misleading statements or omissions made between August 12, 2021, and March 1, 2022, which allegedly artificially inflated the Company's stock prices.

In response, the Company and the individual defendants filed a motion to dismiss on August 5, 2022, which was partially granted by the Court on March 22, 2023. On July 17, 2023, the parties notified the court that an agreement in principle had been reached to settle the action on a class-wide basis. The agreement in principle provided for a single cash payment of $7.9 million in exchange for the dismissal with prejudice of all claims asserted against the defendants. The $7.9 million was paid on September 7, 2023, and is included in selling, general and administrative expenses for the year ended December 31, 2023. During the final settlement hearing on January 31, 2024, the court approved the settlement and the case is now closed.

*Derivative Actions*

On January 11, 2023, certain of the Company's directors and present and former officers were named as defendants in a derivative action complaint filed in the U.S. District Court for the District of Nevada, (the "Lampert Derivative Action"). The Company was named as a nominal defendant. This class action asserts claims for (i) breach of fiduciary duty, (ii) unjust enrichment, and (iii) violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Subsequently, substantially similar derivative action complaints were filed, first on May 19, 2023, certain of the Company's directors and present and former officers were named as defendants in a derivative action filed in the U.S. District Court for the Southern District of Florida, (the "Hammond Derivative Action"). The Company was named a nominal defendant. This class action asserts claims for (i) breach of fiduciary duty, (ii) aiding and abetting breach of fiduciary duty, (iii) unjust enrichment, (iv) waste of corporate assets, and (v) violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Second on July 10, 2023, certain of the Company's directors and present and former officers were named as defendants in a derivative action filed in the District Court for the Eighth Judicial District in Clark County, Nevada, (the "Ingrao Derivative Action"). The Company was named as a nominal defendant. The Ingrao Derivative Action asserts claims for (i) breach of fiduciary duty, and (ii) unjust enrichment.

Third on July 12, 2023, certain of the Company's directors and present and former officers were named as defendants in a derivative action filed in the U.S. District Court for the Southern District of Florida (the "Hepworth Derivative Acton"). This class action asserts claims for (i) breach of fiduciary duty, (ii) aiding and abetting breach of fiduciary duty, (iii) unjust enrichment, (iv) waste of corporate assets, and (v) violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

The Ingrao Derivative Action remains stayed, following the Court's entry of an Order, on September 11, 2023, approving the parties' joint stipulation regarding stay of litigation. The Lampert Derivative Action remains stayed, following the Court's entry of an Order, on April 14, 2023, approving the parties' joint stipulation regarding stay of litigation. The stays in both cases will expire and the parties will update the court in both cases by March 4, 2024. The court overseeing the Hammond Derivative Action and Hepworth Derivative Action lifted its stay and the parties filed a litigation schedule on February 22, 2024.

The derivative actions allege facts that are substantially the same as those alleged in the securities class action.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2023**
**(Tabular dollars in thousands, except per share amounts)**

*Strong Arm Productions*

On May 4, 2021, Plaintiffs Strong Arm Productions USA, Inc., Tramar Dillard p/k/a Flo Rida, and D3M Licensing Group, LLC filed a lawsuit against the Company in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida. Plaintiffs asserted that the Company breached two endorsement and licensing agreements that were entered into between Plaintiffs and the Company in 2014 and 2016. Plaintiffs alleged the Company had reached certain revenue and sales benchmarks set forth in the 2014 agreement that entitled them to receive 750 thousand shares of the Company's stock. In addition, Plaintiffs claimed they were entitled to receive unspecified royalties under the 2016 agreement.

A jury trial commenced on this matter on January 10, 2023. On January 18, 2023, the jury rendered a verdict against the Company for $82.6 million in compensatory damages. On April 27, 2023, the court denied the Company's post-trial motions which sought (i) dismissal of the case notwithstanding the verdict based on the plain language of the contracts at issue; (ii) in the alternative, granting a new trial; or (iii) in the alternative, reducing the award of damages to $2.1 million, which reflects the Company's stock price on the date that the jury found the relevant revenue and sales benchmarks at issue were met. The judgment will accrue post-judgement interest at 5.52% per year as of February 13, 2023.
The Company believes that the jury verdict is not supported by the facts of the case or applicable law, is the result of significant trial error, and there are strong grounds for appeal. The Company filed a notice of appeal to the Fourth District Court of Appeal for the State of Florida on February 21, 2023, which is currently proceeding. The Company intends to vigorously challenge the judgment and filed its initial brief on October 6, 2023.

The Company believes that the likelihood that the full amount of the judgment will be affirmed is not probable. The Company currently estimates a range of possible outcomes between $2.1 million and $82.6 million plus interest, and has accrued a liability as of December 31, 2023, which is reflected in accrued expenses, in the consolidated balance sheets, at the low end of that range. The ultimate amount of the original judgement that the Company may be required to pay could be materially different than amount the Company has accrued. The Company cannot predict or estimate the duration or ultimate outcome of this matter.

In addition to the foregoing, from time to time, the Company may become party to litigation or other legal proceedings in the ordinary course of business.

***Commitments***

The Company has entered into distribution agreements that provide for the payment of liquidated damages in the event that the Company cancels the distribution agreements without cause. Cause has been defined in various ways. If management makes the decision to terminate an agreement without cause, an estimate of expected damages is accrued, and an expense is recorded within selling, general and administrative expenses during the period in which termination was initiated.

As of December 31, 2023 and December 31, 2022, the Company had purchase commitments to third parties of $55.3 million and $30.7 million. These purchase obligations are primarily related to third-party suppliers and have arisen through the normal course of business. The purchase commitments may have various terms, and none are individually significant.

The Company had long term contractual obligations totaling to approximately $34.4 million at December 31, 2023, which related primarily to sponsorships and other marketing activities.

**20. SUBSEQUENT EVENTS**

The Company evaluates subsequent events and transactions that occur after the balance sheet date up to the date the consolidated financial statements are issued. Except for the matters discussed in Note 19. *Commitments and Contingencies*, there were no other subsequent events that would have required adjustment or disclosure in the consolidated financial statements.

F-33

THIS COMPOSITE ARTICLES OF INCORPORATION OF CELSIUS HOLDINGS, INC. (THE "CORPORATION") REFLECTS THE PROVISIONS OF THE CORPORATION'S ARTICLES OF INCORPORATION AND ALL AMENDMENTS THERETO FILED WITH THE NEVADA SECRETARY OF STATE THEREAFTER ON OR PRIOR TO FEBRUARY 28, 2024, BUT IS NOT AN AMENDMENT AND/OR RESTATEMENT THEREOF.

COMPOSITE
ARTICLES
OF
INCORPORATION

I, the undersigned being the original incorporator herein named, for the purpose of forming a corporation under and pursuant to Chapter 78 of the Nevada Revised Statutes, the general corporation laws of the State of Nevada, to do business both within and without the State of Nevada, do make and file these Articles of Incorporation hereby declaring and certifying that the facts herein stated are true:

ARTICLE I
NAME

The name of the corporation is Celsius Holdings, Inc.

ARTICLE II
PRINCIPAL OFFICE

Section 2.01 Resident Agent. The name and address of its resident agent for service process is Resident Agents of Nevada, Inc. 711 S. Carson, Suite 4, Carson City, Nevada 89701.

Section 2.02 Other Offices. The corporation may also maintain offices for the transaction of any business at such other places within or without the State of Nevada as it may from time to time determine. Corporate business of every kind and nature may be conducted, and meetings of directors and stockholders held outside the State of Nevada with the same effect as if in the State of Nevada.

ARTICLE III
PURPOSE

The corporation is organized for the purpose of engaging in any lawful activity, within or without the State of Nevada.

ARTICLE IV
SHARES OF STOCK

Section 4.01 Number and Class. The amount of the total authorized capital stock of this corporation is:

a. 300,000,000 shares of common stock with a par value of $0.001 per share; and
b. 2,500,000 shares of preferred stock with a par value of $0.001 per share.

The Common Stock and Preferred Stock may be issued from time to without action by the stockholders. The Common Stock and Preferred Stock may be issued for such consideration as may be fixed from time to time by the Board of Directors.

The Board of Directors may issue such shares of Preferred Stock in one or more series, with such voting powers, designations, preferences and rights or qualifications, limitations or restrictions thereof as shall be stated in the resolution or resolutions adopted by them.

Section 4.02 No Preemptive Rights. Holders of the Common Stock of the corporation shall not have any preference, preemptive right, or right of subscription to acquire any shares of the corporation authorized, issued or sold, or to be authorized, issued or sold, or to any obligations or shares authorized or issued or to be authorized or issued, and convertible into shares of the corporation, nor to any right of subscription thereto, other than to the extent, if any, the Board of Directors in its discretion, may determine from time to time.

Section 4.03 Assessment of Shares. The Common Stock of the corporation, after the amount of the subscription price has been paid in money, property or services, as the directors of the corporation shall determine,

subscription price has been paid, in money, property or services, as the directors of the corporation shall determine, shall not be subject to assessment to pay the debts of the corporation, nor for any other purpose, and no stock issued as fully paid shall ever be assessable or assessed, and the Articles of Incorporation shall not be amended in this particular.

## ARTICLE V
## TERMS OF SERIES A PREFERRED STOCK

Section 5.01. Definitions. For the purposes hereof, the following terms shall have the following meanings:

"10-Day VWAP" per share of Common Stock, measured as of any date of determination, shall mean the arithmetic average of the VWAP per share of Common Stock for each of the ten consecutive Trading Days ending on, and including, the Trading Day immediately preceding such date of determination.

"Accrued Dividend Amount" shall have the meaning set forth in Section 5.03(c).

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such Person, as such terms are used in and construed under Rule 144 under the Securities Act; provided, however, the Corporation and its Subsidiaries shall not be deemed to be Affiliates of any Holder or any of its Affiliates.

"Articles of Incorporation" shall mean the Articles of Incorporation of the Corporation (as amended from time to time).

"Automatic Conversion" shall have the meaning set forth in Section 5.06(b)(i).

"Automatic Conversion Date" shall mean the date an Automatic Conversion Event occurs.

"Automatic Conversion Event" shall have the meaning set forth in Section 5.06(b)(iii).

"Board" shall mean the Board of Directors of the Corporation.

"Business Day" shall mean any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Cash and PIK Dividend" shall have the meaning set forth in Section 5.03(d).

"Cash and PIK Dividend Aggregate Cash Amount" shall mean, with respect to any Cash and PIK Dividend authorized and declared by the Board (or any duly authorized committee thereof), the aggregate amount of cash authorized and declared to be paid to the Holders in respect of all issued and outstanding shares of Series A Preferred Stock as of the Record Date for such Cash and PIK Dividend.

"Cash and PIK Dividend Cash Settlement Amount" shall mean, with respect to each share of Series A Preferred Stock, an amount equal to the quotient of (A) the Cash and PIK Dividend Aggregate Cash Amount, divided by (B) the aggregate number of shares of Series A Preferred Stock issued and outstanding as of the Record Date for the applicable Cash and PIK Dividend.

"Certificate" shall mean the Certificate of Designation for the "Series A Convertible Preferred Stock".

"Change of Control" shall mean: (i) a sale or transfer, directly or indirectly, of all or substantially all of the assets of the Corporation in any transaction or series of related transactions (other than sales in the ordinary course of business); (ii) any merger, consolidation or reorganization of the Corporation with or into any other entity or entities as a result of which the holders of the Corporation's outstanding capital stock (on a fully-diluted basis) immediately prior to the merger, consolidation or reorganization no longer represent at least a majority of the voting power of the surviving or resulting corporation or other entity; or (iii) any sale or series of sales, directly or indirectly, beneficially or of record, of shares of the Corporation's capital stock by the holders thereof which results in any Person or group of Affiliated Persons owning capital stock holding more than 50% of the voting power of the Corporation.

"Change of Control Notice" shall have the meaning set forth in Section 5.08(d)(ii).

"Change of Control Redemption" shall have the meaning set forth in Section 5.08(d)(i).

"Change of Control Redemption Date" shall have the meaning set forth in Section 5.08(d)(ii).

"Change of Control Redemption Price" shall have the meaning set forth in Section 5.08(d)(i).

"Close of Business" shall mean 5:00 p.m., New York City time, on any Business Day.

"Common Stock" shall mean the Corporation's common stock, par value $0.001 per share, and stock of any other class of securities into which such securities may hereafter be reclassified or changed into.

"Conversion Date" shall mean any Automatic Conversion Date or Mandatory Conversion Date, as

~~Conversion Date~~ shall mean any Automatic Conversion Date or Mandatory Conversion Date, as applicable.

"Conversion Notice" shall mean any Automatic Conversion Notice or Mandatory Conversion Notice, as applicable.

"Conversion Ratio" for each share of Series A Preferred Stock with respect to any conversion pursuant to Section 5.06, shall mean the quotient of (a) the sum of (x) the Stated Value of such share of Series A Preferred Stock as of the applicable Conversion Date, plus (y) without duplication of all accrued and unpaid Dividends previously added to the Stated Value of such share of Series A Preferred Stock, all accrued and unpaid Dividends per share of Series A Preferred Stock through the applicable Conversion Date; divided by (b) the Conversion Price as of the Conversion Date.

"Conversion Price" shall mean $75.00, as adjusted in accordance with the terms and conditions of Section 5.07.

"Convertible Securities" shall mean any evidences of indebtedness, shares or other securities, in each case directly or indirectly convertible into or exchangeable for Common Stock, but excluding Options.

"Corporation" shall mean Celsius Holdings, Inc., a corporation organized and existing under the laws of the State of Nevada.

"Corporation Optional Redemption" shall have the meaning set forth in Section 5.08(a).

"Corporation Optional Redemption Notice" shall have the meaning set forth in Section 5.08(a).

"Corporation Optional Redemption Right" shall have the meaning set forth in Section 5.08(a).

"Corporation Termination Event" shall mean the date upon which the Distribution Agreement is terminated as a result of a valid termination by the Corporation in accordance with the terms of the Distribution Agreement.

"Distribution Agreement" shall mean that certain Distribution Agreement, effective as of August 1, 2022, by and between the Corporation and the Investor.

"Dividend" shall have the meaning set forth in Section 5.03(a).

"Dividend Payment Date" shall have the meaning set forth in Section 5.03(b).

"Dividend Rate" means, for a Regular Dividend Period for a share of Series A Preferred Stock, 5.00% per annum of the Stated Value of such share as of the Record Date for such dividend, as may be adjusted pursuant to Section 5.08(c)(iv).

"Exchange Property" shall have the meaning set forth in Section 5.07(b).

"Holder" shall mean any holder of Series A Preferred Stock.

"Holder Optional Redemption" shall have the meaning set forth in Section 5.08(b).

"Holder Optional Redemption Notice" shall have the meaning set forth in Section 5.08(b).

"Holder Optional Redemption Right" shall have the meaning set forth in Section 5.08(b).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Investor" shall mean the initial purchaser of the Series A Preferred Stock.

"Investor Termination Event" shall mean the date upon which the Distribution Agreement is terminated as a result of a valid termination by Investor in accordance with the terms of the Distribution Agreement.

"Issuance Date" shall mean August 1, 2022.

"Junior Stock" shall have the meaning set forth in Section 5.05(a).

"Liquidation Event" shall have the meaning set forth in Section 5.05(b).

"Liquidation Preference" shall have the meaning set forth in Section 5.05(b).

"Majority Holders" shall have the meaning set forth in Section 5.04(b).

"Mandatory Conversion" shall have the meaning set forth in Section 5.06(a)(i).

"Mandatory Conversion Date" shall have the meaning set forth in Section 5.06(a)(ii).

"Mandatory Conversion Notice" shall have the meaning set forth in Section 5.06(a)(ii).

"NRS" shall mean the Nevada Revised Statutes.

"Option" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

"Parity Stock" shall have the meaning set forth in Section 5.05(a).

"Participating Dividend" shall have the meaning set forth in Section 5.03(a).

"Participating Dividend Payment Date" shall have the meaning set forth in Section 5.03(b).

"Person" shall mean any individual, partnership, corporation, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"PIK Dividend" shall have the meaning set forth in Section 5.03(c).

"Preferred Stock" shall mean the Corporation's Preferred Stock, par value $0.001 per share.

"Record Date" shall mean, with respect to any dividend, distribution or other transaction or event in which the holders of shares of Common Stock or shares of Series A Preferred Stock, as applicable, have the right to receive any cash, securities or other property or in which the shares of Common Stock or shares of Series A Preferred Stock (or other applicable security), as applicable, is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of shareholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board or a committee thereof, or by statute, contract, this Certificate of Designation or otherwise).

"Redemption Date" shall have the meaning set forth in Section 5.08(c)(i).

"Redemption Notice" shall have the meaning set forth in Section 5.08(c)(ii).

"Redemption Price" shall mean a price per share of Series A Preferred Stock equal to the sum of (i) the Stated Value of such share of Series A Preferred Stock as of the applicable Redemption Date, plus (ii) without duplication of all accrued and unpaid Dividends previously added to the Stated Value of such share of Series A Preferred Stock, all accrued and unpaid Dividends per share of Series A Preferred Stock through such Redemption Date.

"Regular Dividend" shall have the meaning set forth in Section 5.03(a).

"Regular Dividend Payment Date" shall have the meaning set forth in Section 5.03(b).

"Regular Dividend Period" shall have the meaning set forth in Section 5.03(b).

"Required Approval" shall have the meaning set forth in Section 5.06(c)(iv).

"Redemption Notice" shall have the meaning set forth in Section 5.08(c)(ii).

"Related Person" shall have the meaning given to such term in Item 404(a) of Regulation S-K as promulgated under the Securities Act ("Item 404").

"Related Person Transaction" means any transaction for which disclosure is required under the terms of Item 404 involving the Corporation and any Related Person.

"Reorganization Event" shall have the meaning set forth in Section 5.07(b)(iii).

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Securities Purchase Agreement" shall mean that certain Securities Purchase Agreement, effective as of August 1, 2022, by and between the Corporation and Investor.

"Senior Stock" shall have the meaning set forth in Section 5.05(a).

"Series A Preferred Stock" shall have the meaning set forth in Section 5.02(a).

"Series A Preferred Stock Register" shall have the meaning set forth in Section 5.02(b).

"Seventh Anniversary Date" shall mean August 1, 2029.

"Share Delivery Date" shall have the meaning set forth in Section 5.06(c)(i).

"Sixth Anniversary Date" shall mean August 1, 2028.

"Stated Value" shall mean $375.00 per share of Series A Preferred Stock, as shall be increased from time to time for any PIK Dividends.

"Subject Action" shall have the meaning set forth in Section 5.09(a).

"Subsidiary" shall mean, with respect to any Person, (a) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of the equity entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or shareholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (b) any partnership or limited liability company where (i) more than 50% of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability company are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person, whether in the form of membership, general, special or limited partnership or limited liability company interests or otherwise; and (ii) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"Tenth Anniversary Date" shall mean August 1, 2032.

"Thirteenth Anniversary Date" shall mean August 1, 2035.

"Trading Day" shall mean a day on which the Common Stock is traded for any period on the principal securities exchange or if the Common Stock is not traded on a principal securities exchange, on a day that the Common Stock is traded on another securities market on which the Common Stock is then being traded.

"Triggering Condition" shall have the meaning set forth in the Distribution Agreement.

"VWAP" per share of Common Stock on any Trading Day means the per share volume-weighted average price as displayed under the heading VWAP with Bloomberg Definition calculation method (or, if Bloomberg ceases to publish such price, any successor service reasonably chosen by the Corporation) in respect of the period from the open of trading on the relevant Trading Day until the close of trading on such Trading Day (or if such volume-weighted average price is unavailable, the market price of one share of Common Stock on such Trading Day determined, using a volume-weighted average method, by a nationally recognized independent investment banking firm selected by the Corporation in good faith).

Section 5.02. Designation, Amount and Par Value; Assignment.

(a) The series of the Corporation's preferred stock designated by this Certificate of Designation shall be designated as Series A Convertible Preferred Stock (the "Series A Preferred Stock") and the number of shares so designated shall be One Million Four Hundred Sixty-Six Thousand Six Hundred Sixty Six (1,466,666). Each share of Series A Preferred Stock shall have a par value of $0.001 per share. The Series A Preferred Stock may be issued in certificated form or in uncertificated book-entry form at the election of the Holder. To the extent that any shares of Series A Preferred Stock are issued in uncertificated book-entry form, references herein to "certificates" shall instead refer to the book-entry notation relating to such shares.

(b) The Corporation shall register shares of the Series A Preferred Stock, upon records to be maintained by the Corporation for that purpose (the "Series A Preferred Stock Register"), in the name of the Holders thereof from time to time. The Corporation may deem and treat the registered Holder of shares of Series A Preferred Stock as the absolute owner thereof for the purpose of any conversion thereof and for all other purposes. The Corporation shall

register the transfer of any shares of Series A Preferred Stock in the Series A Preferred Stock Register, upon surrender of the certificates, if any, evidencing such shares to be transferred, duly endorsed by the Holder thereof, to the Corporation at its address specified herein. Upon any such registration or transfer of certificated shares of Series A Preferred Stock, a new certificate evidencing the shares of Series A Preferred Stock so transferred shall be issued to the transferee and a new certificate evidencing the remaining portion of the shares not so transferred, if any, shall be issued to the transferring Holder, in each case, within three Business Days. The provisions of this Certificate of Designation are intended to be for the benefit of all Holders from time to time and shall be enforceable by any such Holder.

Section 5.03. Dividends.

(a) Each share of Series A Preferred Stock shall be entitled to receive, in the manner set forth in this Section 5.03, (i) cumulative dividends in an amount equal to the Dividend Rate (each such dividend on the Series A Preferred Stock, a "Regular Dividend" and, collectively, the "Regular Dividends"), and (ii) on an as-converted basis, current payments of any dividend or other distribution (other than a distribution upon a Liquidation Event), whether paid in cash, in-kind or in other property (including, for the avoidance of doubt, any securities other than any dividends on shares of Common Stock payable in shares of Common Stock), authorized and declared by the Board on the issued and outstanding shares of Common Stock in an amount determined by assuming that a number of shares of Common Stock equal to the Conversion Ratio in effect on the applicable Record Date for such dividend or distribution (other than a distribution upon a Liquidation Event) were issued to, and held by, the Holder of such share of Series A Preferred Stock on such Record Date (each such dividend on the Series A Preferred Stock pursuant to this clause (ii), a "Participating Dividend" and, collectively, the "Participating Dividends" and, together with the Regular Dividends, the "Dividends").

(b) Regular Dividends shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year (unless any such day is not a Business Day, in which event such Regular Dividends shall be payable on the next succeeding Business Day, without accrual of interest thereon to the actual payment date), commencing on September 30, 2022 (each such payment date, a "Regular Dividend Payment Date," and the period from, and including, the Issuance Date to, and including, the first Regular Dividend Payment Date and each such quarterly period thereafter from, but excluding, the immediately preceding Regular Dividend Payment Date to, and including, the next occurring Regular Dividend Payment Date, a "Regular Dividend Period"). The amount of Regular Dividends payable in respect of each share of Series A Preferred Stock for any period shall be computed on the basis of a 365-day year and actual days elapsed (i.e., the daily accrual rate shall be determined by dividing the Dividend Rate by 365). Regular Dividends shall be cumulative and shall begin to accrue on a daily basis from the Issuance Date whether or not declared and whether or not the Corporation has assets legally available to make payment thereof, at a rate equal to the applicable Dividend Rate, regardless of whether or not in any Regular Dividend Period there are funds of the Corporation legally available for the payment of such Regular Dividend. The Corporation may, in its sole discretion and notwithstanding anything to the contrary in this Certificate of Designation, settle such Regular Dividend in cash out of funds legally available therefor, in-kind pursuant to the terms and conditions of Section 5.03(c), or a combination of cash and in-kind settlement pursuant to the terms and conditions of Section 5.03(d), and the Corporation shall set aside sufficient funds for the portion of any Regular Dividend to be paid in whole or in part in cash before the Board or any other authorized Person may declare, set apart funds for or pay any dividend on the Junior Stock. Participating Dividends shall be payable as and when paid to the holders of shares of Common Stock (each such date, a "Participating Dividend Payment Date" and, together with a Regular Dividend Payment Date, a "Dividend Payment Date").

(c) With respect to each share of Series A Preferred Stock, any Regular Dividend or portion thereof in respect of such share of Series A Preferred Stock that has accrued during any applicable Regular Dividend Period but is not paid (in whole or in part) in cash on the applicable Regular Dividend Payment Date (the amount of any accrued and unpaid Regular Dividend with respect to any share of Series A Preferred Stock for any Regular Dividend Period, regardless of whether such Regular Dividend is paid in cash or kind, the "Accrued Dividend Amount" with respect to such share of Series A Preferred Stock for such Regular Dividend Period) shall, regardless of whether or not such Regular Dividend is authorized and declared by the Board, or whether the Corporation has assets legally available to make payment thereof, be added to the Stated Value of such share of Series A Preferred Stock immediately following the Close of Business on such Regular Dividend Payment Date. Any such addition of the Accrued Dividend Amount in respect of a share of Series A Preferred Stock to the Stated Value of such share of Series A Preferred Stock pursuant

to this Section 5.03(c) is referred to herein as a "PIK Dividend." The Accrued Dividend Amount in respect of any Regular Dividend Period that is not paid (in whole or in part) in cash shall, without duplication of any prior PIK Dividends (if any) only be added to the Stated Value of such share of Series A Preferred Stock once. Regular Dividends with respect to each share of Series A Preferred Stock shall continue, from and after the date of each PIK Dividend, if any, to accrue in an amount per annum equal to the Dividend Rate (as such amount per annum may be adjusted pursuant to the terms and conditions hereof) of the Stated Value of such share of Series A Preferred Stock as of the relevant Record Date.

(d) In the event that the Board has elected to effect the settlement of a Regular Dividend payment in part by payment of cash to each Holder of shares of Series A Preferred Stock and in part pursuant to a PIK Dividend (any such Regular Dividend, a "Cash and PIK Dividend"), the Corporation shall, on the applicable Regular Dividend Payment Date and in respect of each share of Series A Preferred Stock, (i) pay to the Holder thereof an amount of cash equal to the Cash and PIK Dividend Cash Settlement Amount in respect of such share of Series A Preferred Stock, and (ii) add to the Stated Value of such share of Series A Preferred Stock an amount equal to (A) the Accrued Dividend Amount with respect to such share of Series A Preferred Stock for the Regular Dividend Period ending on, and including, such Regular Dividend Payment Date, minus (B) the Cash and PIK Dividend Cash Settlement Amount in respect of such share of Series A Preferred Stock. If the Board declares a Cash and PIK Dividend, and any portion of the cash payment of such Cash and PIK Dividend per share of Series A Preferred Stock is not paid pursuant to the terms of this Section 5.03, then such portion shall be added to the Stated Value of such share of Series A Preferred Stock in accordance with the terms of this Section 5.03(d).

(e) In the event that the Board has authorized and declared the payment of a Participating Dividend, such Participating Dividend shall be paid in a manner consistent with the payments of dividends on the shares of Common Stock. The Corporation will not declare any dividend or distribution (other than a distribution upon a Liquidation Event) on the Common Stock unless, concurrently therewith, the Corporation declares a corresponding Participating Dividend in accordance with Section 5.03(a).

(f) Except as otherwise provided herein, if at any time the Corporation pays, in cash, less than the total amount of Dividends then accrued, but unpaid, with respect to the shares of Series A Preferred Stock, such cash payment shall be distributed pro rata among the Holders thereof based upon the Stated Value of all shares of Series A Preferred Stock held by each such Holder as of the Record Date for such payment. When Dividends are not paid in full upon the Series A Preferred Stock, all dividends on Series A Preferred Stock and any other class or series of Parity Stock shall be paid pro rata so that the amount of dividends on the shares of Series A Preferred Stock and each such other class or series of Parity Stock shall in all cases bear to each other the same ratio as accrued, but unpaid, Dividends (for the full amount of dividends that would be payable for the most recently completed Regular Dividend Period if dividends were declared in full on non-cumulative Parity Stock) on the Series A Preferred Stock and such other class or series of Parity Stock bear to each other.

(g) Within one Business Day of the Record Date for any Regular Dividend, the Corporation will send written notice to each Holder of shares of Series A Preferred Stock stating (i) whether such Regular Dividend will be paid in

cash or in kind pursuant to Section 5.03(c), or pursuant to a Cash and PIK Dividend pursuant to Section 5.03(d), and (ii) if such Regular Dividend will be paid, at least in part, in kind pursuant to Section 5.03(c) or pursuant to a Cash and PIK Dividend pursuant to Section 5.03(d), the Stated Value of each share of Series A Preferred Stock immediately before and immediately after the applicable increase.

Section 5.04. Voting Rights.

(a) Except as otherwise provided herein or as otherwise required by the NRS, the Series A Preferred Stock shall have no voting rights.

(b) As long as any shares of Series A Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote of the Holders of a majority of the then outstanding shares of the Series A Preferred Stock ("Majority Holders"):

(i) alter or change adversely the powers, preferences or rights given to the Series A Preferred Stock or alter or amend this Certificate of Designation, amend or repeal any provision of, or add any provision to,

the Articles of Incorporation or the bylaws of the Corporation, if such action would adversely alter or change the preferences, rights, privileges or powers of, or restrictions provided for the benefit of the Series A Preferred Stock, regardless of whether any of the foregoing actions shall be by means of amendment to or other alteration of the Articles of Incorporation (including, without limitation, by way of filing a certificate of amendment or certificate of correction or by way of filing a certificate of designation with respect to any class or series of the Corporation's capital stock, or any amendment or correction to such certificate of designation) or by merger, consolidation or otherwise;

(ii) increase or decrease (other than by conversion) the number of authorized shares of Series A Preferred Stock;

(iii) authorize, create, issue or reclassify securities (or securities that are convertible into or exercisable for such securities) that would be Parity Stock or Senior Stock; or

(iv) enter into any agreement with respect to any of the foregoing.

(c) As long as any share of Series A Preferred Stock remains issued and outstanding, any action required or permitted to be taken by the Holders of shares of Series A Preferred Stock may be effected without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Majority Holders and shall be delivered to the Corporation by delivery to its registered office in the State of Nevada, its principal place of business, or an officer or agent of the Corporation having custody of the books in which proceedings of meetings of holders of any other class or series of capital stock of the Corporation are recorded.

(d) During such time or times as any Holder of Series A Preferred Stock is entitled to nominate for election a director and such seat is filled (a "Preferred Director"), the Corporation shall not, without approval of the Board (which such approval must include the affirmative approval of such Preferred Director), enter into any Related Person Transaction other than on an arms' length basis (as determined in the reasonable discretion of the Board).

Section 5.05. Rank; Liquidation.

(a) The Series A Preferred Stock shall, with respect to dividend rights and rights upon a Liquidation Event, rank: (i) senior to all of the Common Stock; (ii) senior to any class or series of capital stock of the Corporation hereafter created specifically ranking by its terms junior to any Series A Preferred Stock (any such junior class, together with the Common Stock, "Junior Stock"); (iii) on parity with any class or series of capital stock of the Corporation hereafter created specifically ranking by its terms on parity with the Series A Preferred Stock (the "Parity Stock"); and (iv) junior to any class or series of capital stock of the Corporation hereafter created specifically ranking by its terms senior to any Series A Preferred Stock ("Senior Stock").

(b) Upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation (but excluding any Change of Control) (each, a "Liquidation Event"), after satisfaction of all liabilities and obligations to creditors of the Corporation, subject to the rights of any class or series of Senior Stock and before any distribution or payment shall be made to any holder of any Junior Stock, and subject to Section 5.05(d), each Holder shall be entitled to receive, out of the assets of the Corporation or proceeds thereof (whether capital or surplus) legally available therefor, an amount per share of Series A Preferred Stock equal to the greater of (i) the sum of (1) the Stated Value of such share of Series A Preferred Stock as of the applicable as of the date of the liquidating payment, plus (2) without duplication of all accrued and unpaid Dividends previously added to the Stated Value of such share of Series A Preferred Stock, all accrued and unpaid Dividends per share of Series A Preferred Stock through the date of the liquidating payment; and (ii) the amount that such Holder would have received had each share of Series A Preferred Stock held by such Holder, as of the commencement of such Liquidation Event, converted into a number of shares of Common Stock equal to the then-applicable Conversion Ratio (such greater amount, the "Liquidation Preference").

(c) No Holder shall (i) be entitled to any payment in respect of its shares of Series A Preferred Stock in the event of any Liquidation Event other than payment of the Liquidation Preference expressly provided for in Section 5.05(b), or (ii) have any further right or claim to any of the Corporation's remaining assets, including any right or claim to participate in the receipt of any payment on Junior Stock in connection therewith (except as provided in Section 5.05(b)(ii)).

(d) If, in connection with any liquidating distribution pursuant to Section 5.05(b), the assets of the Corporation or proceeds thereof are not sufficient to pay in full the applicable Liquidation Preference payable on the shares of Series A Preferred Stock and the corresponding liquidating distributions payable on the shares of Parity Stock, if any, then such assets, or the proceeds thereof, shall be paid pro rata in accordance with the full respective aggregate liquidating distributions that would be payable on all such shares if all amounts payable thereon were paid in full.

Section 5.06. Conversion.

(a) Conversion at the Option of the Corporation.

(i) At any time from and after the Seventh Anniversary Date, provided the 10-Day VWAP immediately prior to the date the Corporation delivers a Mandatory Conversion Notice to the Holders exceeds the Conversion Price, the Corporation may elect to convert (a "Mandatory Conversion") all, but not less than all, of the outstanding shares of Series A Preferred Stock into shares of Common Stock. In the case of a Mandatory Conversion, each share of Series A Preferred Stock then outstanding shall be converted into the number of shares of Common Stock equal to the Conversion Ratio of such share in effect as of the Mandatory Conversion Date.

(ii) If the Corporation elects to effect a Mandatory Conversion, the Corporation shall provide notice thereof to each Holder (such notice, a "Mandatory Conversion Notice") and the Holder Optional Redemption Right with respect to such shares shall terminate. The Mandatory Conversion Notice shall state: (A) the date selected by the Corporation for the Mandatory Conversion to become effective, which shall be at least 5 Business Days and not more than 15 Business Days after the date on which the Corporation provides the Mandatory Conversion Notice to each such Holder (the "Mandatory Conversion Date"); (B) the applicable Conversion Price and Conversion Ratio as in effect on the date of the Mandatory Conversion Notice; and (C) the number of shares of Common Stock to be issued (and the amount of cash to be paid in lieu of any fractional share) to such Holder upon conversion of the shares of Series A Preferred Stock held by such Holder, calculated in accordance with the Conversion Price and Conversion Ratio referred to in the immediately preceding clause (B).

(b) Automatic Conversion.

(i) Each share of Series A Preferred Stock shall automatically convert (an "Automatic Conversion") into shares of Common Stock upon the occurrence of an Automatic Conversion Event and the Holder Optional Redemption Right shall terminate. In the case of an Automatic Conversion, each share of Series A Preferred Stock then outstanding shall be converted into the number of shares of Common Stock equal to the Conversion Ratio of such share in effect as of the Automatic Conversion Date.

(ii) If an Automatic Conversion Event occurs, the Corporation shall promptly, and in any event within 10 Business Days of such Automatic Conversion Event, provide notice of such Automatic Conversion to each Holder (such notice, a "Automatic Conversion Notice"). The Automatic Conversion Notice shall state: (A) the Automatic Conversion Date; (B) a description in reasonable detail of the Automatic Conversion Event, with such supporting information as the Holder may reasonably request; (C) the applicable Conversion Price and Conversion Ratio as in effect on the Automatic Conversion Date; and (D) the number of shares of Common Stock to be issued (and the amount of cash to be paid in lieu of any fractional share) to such Holder upon conversion of the shares of Series A Preferred Stock held by such Holder, calculated in accordance with the Conversion Price and Conversion Ratio referred to in the immediately preceding clause (C).

(iii) Each of the following shall be an "Automatic Conversion Event" with respect to any share of Series A Preferred Stock:

A. Any date from and after the Sixth Anniversary Date on which (x) the Triggering Condition is satisfied in accordance with the Distribution Agreement and (y) the 10-Day VWAP immediately prior to such date exceeds the Conversion Price of such share as of such date; and

B. Any date from and after the occurrence of a Corporation Termination Event, if the 10-Day VWAP immediately preceding such date exceeds the Conversion Price of such share as of such date.

C. Any date from and after the occurrence of an Investor Termination Event, if the 10-Day VWAP immediately preceding such date exceeds the Conversion Price of such share as of such date.

(c) Mechanics of Conversion.

(i) Record Holder; Delivery. The Holder entitled to receive shares of Common Stock issuable upon conversion of Series A Preferred Stock shall be treated for all purposes as the record holder(s) of such Common Stock as of the Close of Business on the Conversion Date for such conversion. As promptly as practicable on or after the Conversion Date (and in no event later than three Trading Days thereafter) (the "Share Delivery Date"), the Corporation shall issue the number of whole shares of Common Stock issuable upon conversion (and deliver payment of cash in lieu of fractional shares in accordance with Section 5.06(c)(iii)). Such shares of Common Stock shall be issued, at the option of the applicable Holder, in certificated or uncertificated form. Any such certificate or certificates, if applicable, shall be delivered by the Corporation to the appropriate Holder(s) by mailing certificates evidencing the shares to such Holder(s) at their respective addresses as set forth in the applicable conversion notice. Any such uncertificated shares of Common Stock, if applicable, shall be registered in the name and delivered to the Depository Trust Company or other applicable account directed by the applicable Holder. If fewer than all of the certificated shares of Series A Preferred Stock held by any Holder are converted pursuant to

this Section 5.06, then a new certificate representing the unconverted certificated shares of Series A Preferred Stock shall be issued to such Holder representing such unconverted certificated shares. In all cases, the Holder shall retain all of its rights and remedies for the Corporation's failure to convert Series A Preferred Stock.

(ii) Reservation of Shares Issuable Upon Conversion. The Corporation covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock for the sole purpose of issuance upon conversion of the Series A Preferred Stock, free from preemptive rights or any other actual contingent purchase rights of Persons other than the Holders of the Series A Preferred Stock, not less than such aggregate number of shares of the Common Stock as shall be issuable (taking into account the adjustments of Section 5.07) upon the conversion of all outstanding shares of Series A Preferred Stock. The Corporation covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly authorized, validly issued, fully paid and nonassessable.

(iii) Fractional Shares. Notwithstanding anything herein to the contrary, the Corporation shall not issue any fractional share of Common Stock upon conversion, as applicable, of any share of Series A Preferred Stock. In lieu of fractional shares otherwise issuable, Holders of shares of Series A Preferred Stock will be entitled to receive an amount in cash equal to the product of (i) such fraction of a share of Common Stock, multiplied by (ii) the 10-Day VWAP, measured as of the applicable Conversion Date. The Corporation shall pay such cash to the applicable Holder on the applicable Share Delivery Date.

(iv) Regulatory Approvals. Notwithstanding anything herein to the contrary, if any Mandatory Conversion or Automatic Conversion would require any consent, waiver, authorization or order of, or any notice provided to or filing or registration made with, any Governmental Entity (as defined in the Purchase Agreement) or the shareholders of the Corporation (a "Required Approval"), including pursuant to the HSR Act, the Corporation and the Majority Holders shall use reasonable best efforts to obtain such Required Approval as promptly as practical, and such Automatic Conversion or Mandatory Conversion shall not be effected until such Required Approval is obtained. If the Corporation and the Majority Holders determine in good faith that such Required Approval is not reasonably likely to be obtained, the Corporation shall take all action necessary to effect such conversion into Common Stock that is non-voting (but otherwise having identical rights as the existing Common Stock). For avoidance of doubt, the Holders shall retain all rights in respect of their Series A Preferred Stock (including with respect to Dividends) until such Required Approval is obtained.

(d) Transfer Restriction. With respect to any Mandatory Conversion or Automatic Conversion of Series A Preferred Stock held by Investor, in addition to any transfer restrictions which may otherwise apply to such shares of Common Stock, Investor shall not transfer or otherwise dispose of the shares of Common Stock received by Investor in such Mandatory Conversion or Automatic Conversion for a period of 35 calendar days after the receipt of the Common Stock in the Mandatory Conversion or Automatic Conversion.

Section 5.07. Certain Adjustments.

(a) Stock Dividends and Stock Splits.

(i) If the Corporation at any time after the Issuance Date: (i) pays a stock dividend or otherwise makes a distribution or distributions payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Corporation upon conversion of this Series A Preferred Stock) with respect to the then-outstanding shares of Common Stock; (ii) subdivides outstanding shares of Common Stock into a larger number of shares; or (iii) combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares, then the Conversion Ratio shall be divided by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Corporation) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event (excluding any treasury shares of the Corporation). Any adjustment made pursuant to this Section 5.07(a) shall become effective immediately after the Record Date for the determination of shareholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision or combination. All calculations under this Section 5.07 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be.

(ii) Whenever the Conversion Ratio is adjusted pursuant to any provision of this Section 5.07, the Corporation shall promptly deliver to each Holder a notice setting forth the Conversion Ratio after such adjustment and setting forth a brief statement of the facts requiring such adjustment.

(b) Reorganization Events. In the event of:

(i) any reclassification, statutory exchange, merger, consolidation or other similar business combination of the Corporation with or into another Person, in each case, pursuant to which at least a majority of the Common Stock is changed or converted into, or exchanged for, cash, securities or other property of the Corporation or another Person;

(ii) any sale, transfer, lease or conveyance to another Person of all or a majority of the property and assets of the Corporation, in each case pursuant to which the Common Stock is converted into cash, securities or other property; or

(iii) any statutory exchange of securities of the Corporation with another Person (other than in connection with a merger or acquisition) or reclassification, recapitalization or reorganization of the Common Stock into other securities; (each of which is referred to as a "Reorganization Event");

then each share of Series A Preferred Stock outstanding immediately prior to such Reorganization Event will, subject to Section 5.08(d), remain outstanding but shall become convertible into, out of funds legally available therefor, the number, kind and amount of securities, cash and other property (the "Exchange Property") that the Holder of such share of Series A Preferred Stock would have received in such Reorganization Event had each of the shares of Series A Preferred Stock held by such Holder been converted into a number of shares of Common Stock equal to the Conversion Ratio in effect immediately prior the Reorganization Event. If the kind or amount of securities, cash and other property receivable upon such Reorganization Event is not the same for each share of Common Stock held immediately prior to such Reorganization Event by a Person, then for the purpose of this Section 5.07(b), the kind and amount of securities, cash and other property receivable upon conversion following such Reorganization Event will be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common

Stock. Notwithstanding anything herein to the contrary, in the event of a Reorganization Event that constitutes a Change of Control, the provisions of Section 5.08(d) shall control.

Section 5.08. Redemption.

(a) Corporation Optional Redemption. At any time from and after the earlier of (i) the Seventh Anniversary Date, if the 10-Day VWAP does not exceed the Conversion Price on the date immediately prior to the date the Corporation delivers a Corporation Optional Redemption Notice to the Holders, and (ii) the occurrence of a Corporation Termination Event, if the 10-Day VWAP does not exceed the Conversion Price on the date immediately prior to the date the Corporation delivers a Corporation Optional Redemption Notice to the Holders, the Corporation shall have the right (the "Corporation Optional Redemption Right" and, such redemption, a "Corporation Optional Redemption") upon written notice to the Holders (such written notice, the "Corporation Optional Redemption Notice") to redeem all (and not less than all) of the then-outstanding shares of Series A Preferred Stock, at the Redemption Price in the manner set forth in Section 5.08(c).

(b) Holder Optional Redemption. On each of the Seventh Anniversary Date, the Tenth Anniversary Date and the Thirteenth Anniversary Date, the Majority Holders shall have the right (the "Holder Optional Redemption Right" and, such redemption, a "Holder Optional Redemption"), upon no less than six months prior written notice to the Corporation (such written notice, the "Holder Optional Redemption Notice"), to require the Corporation to redeem all (and not less than all) of the then-outstanding shares of Series A Preferred Stock, at the Redemption Price in the manner set forth in Section 5.08(c).

(c) Mechanics of Optional Redemption.

(i) In the event of a Corporation Optional Redemption, the Corporation shall effect such redemption by paying the entire Redemption Price on or before the date that is 30 days after the delivery of the Corporation Optional Redemption Notice and by redeeming all of the shares of Series A Preferred Stock on such date. In the event of a Holder Optional Redemption, the Redemption Price shall be payable, and the shares of Series A Preferred Stock redeemed by the Corporation, in three equal installments, commencing on the Seventh Anniversary Date, the Tenth Anniversary Date or the Thirteenth Anniversary Date, as applicable, and in each case on the 15th and 30th month anniversary thereafter. The date any portion of the Redemption Price is paid pursuant hereto shall be referred to as a "Redemption Date". On each Redemption Date for a Holder Optional Redemption, the Corporation shall redeem, on a pro rata basis in accordance with the number of shares of Series A Preferred Stock owned by each Holder, that number of outstanding shares of Series A Preferred Stock determined by dividing (i) the total number of shares of Series A Preferred Stock outstanding immediately prior to such Redemption Date by (ii) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies). If, on any Redemption Date, Nevada law governing distributions to stockholders or the terms of any indebtedness of the Corporation to banks and other financial institutions engaged in the business of lending money prevent the Corporation from redeeming all share of Series A Preferred Stock to be redeemed, the Corporation shall ratably redeem the maximum number of shares that it may redeem consistent with such law, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

(ii) Upon receipt of a Holder Optional Redemption Notice or delivery of the Corporation Optional Redemption Notice, the Corporation shall send written notice (the "Redemption Notice") to each holder of record of Series A Preferred Stock not less than 15 days prior to each Redemption Date. Each Redemption Notice shall state:

(A) The number of shares of Series A Preferred Stock held by the Holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

(B) the Redemption Date and the Redemption Price;

(C) for shares in certificated form, that the Holder is to surrender to the Corporation, in the manner and at the place designated, such certificate or certificates representing the shares of Series A Preferred Stock to be redeemed; and

(D) the procedures that Holders must follow in order for their shares of Series A Preferred Stock to be redeemed.

On or before the applicable Redemption Date, the Corporation shall deliver to each Holder, by wire transfer of immediately available funds to an account or accounts specified in writing by such Holder, the Redemption Price for the shares being redeemed on such Redemption Date, subject to such Holder having complied with the procedures for surrender specified in the Redemption Notice. In the event that less than all of the shares

of Series A Preferred Stock represented by a certificate are redeemed, a new certificate or book entry representing the unredeemed shares of Series A Preferred Stock shall be promptly issued to such Holder.

(iii) If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Series A Preferred Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Series A Preferred Stock so called for redemption shall not have been surrendered, dividends with respect to such shares of Series A Preferred Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such certificate or certificates therefor.

(iv) If any shares of Series A Preferred Stock scheduled for redemption on a Redemption Date are not redeemed for any reason on such Redemption Date, (x) from such Redemption Date until the 15-month anniversary of such Redemption Date, the Dividend Rate with respect to such unredeemed share of Series A Preferred Stock shall automatically increase to 8%, (y) from such 15-month anniversary of such Redemption Date until the 30th-month anniversary of such Redemption Date, the Dividend Rate with respect to such unredeemed share of Series A Preferred Stock shall automatically increase to 10% and (z) from and after such 30th-month anniversary of such Redemption Date, the Dividend Rate with respect to any such unredeemed share of Series A Preferred Stock shall automatically increase to 12%, in each case until such share is duly redeemed.

(d) Change of Control Redemption.

(i) In the event of a transaction resulting in a Change of Control, the Corporation (or its successor) shall redeem (a "Change of Control Redemption") all (and not less than all) of the then-issued and outstanding shares of Series A Preferred Stock. Upon such redemption, the Corporation will pay or deliver, as applicable, to each Holder in respect of each share of Series A Preferred Stock held by such Holder, an amount equal to the greater of (A) cash in an amount equal to the Redemption Price and (B) the amount of cash and/or other assets (including securities) such Holder would have received had each share of Series A Preferred Stock held by such Holder as of the Close of Business on the Business Day immediately prior to the effective date of such transaction resulting in a Change of Control, converted into a number of shares of Common Stock equal to the then-applicable Conversion Ratio and participated in such transaction resulting in such Change of Control as a holder of shares of Common Stock (such greater amount, the "Change of Control Redemption Price"). No later than the consummation of any transaction resulting in a Change of Control, the Corporation (or its successor) shall deliver or cause to be delivered to each Holder the Change of Control Redemption Price with respect to such Holder's shares of Series A Preferred Stock.

(ii) On or prior to the 10th Business Day prior to the date on which the Corporation anticipates consummating a transaction which would result in a Change of Control (or, if later, promptly after the Corporation shall have discovered that a transaction resulting in a Change of Control has occurred), the Corporation shall send written notice (a "Change of Control Notice") to the Holders of record of shares of Series A Preferred Stock, which such Change of Control Notice shall include (A) the date on which the transaction that would result in a Change of Control is anticipated to be effected (or, to the extent applicable, the date on which a Schedule TO or other similar schedule, form or report disclosing the occurrence of a Change of Control was filed), (B) a description of the material terms and conditions of such transaction, (C) a statement that all shares of Series A Preferred Stock shall be redeemed by the Corporation (or its successor)

on a date specified in such Change of Control Notice (the "Change of Control Redemption Date"), which such date must be a Business Day of the Corporation's choosing that is no later than the date of the consummation of the transaction resulting in such Change of Control, (D) the Change of Control Redemption Price with respect to each share of Series A Preferred Stock, and (E) the procedures that Holders of shares of Series A Preferred Stock must follow in order for their shares of Series A Preferred Stock to be redeemed. The Holder of shares of Series A Preferred Stock subject to any Change of Control Redemption entitled to receive any securities or other assets payable upon such redemption shall be treated for all purposes as the record holder of such securities or assets as of the Close of Business on the Change of Control Redemption Date; provided, however, that such Holder may identify one or more other Persons to receive such securities or assets in connection with any such redemption in a written notice sent to the Corporation no later than three Business Days prior to the Change of Control Redemption Date.

(iii) If, in connection with a transaction resulting in a Change of Control, the Corporation or its successor shall not have sufficient funds legally available under the Nevada law governing distributions to stockholders to redeem all outstanding shares of Series A Preferred Stock, then the Corporation shall (A) redeem, pro rata among the Holders, a number of shares of Series A Preferred Stock equal to the number of shares of Series A Preferred Stock that can be redeemed with the maximum amount legally available for the redemption of such shares of Series A Preferred Stock under the Nevada law governing distributions to stockholders, and (B) redeem all remaining shares of Series A Preferred Stock not redeemed because of the foregoing limitations at the applicable Change of Control Redemption Price as soon as practicable after the Corporation (or its successor) is able to make such redemption out of assets legally available for the purchase of such share of Series A Preferred Stock. The inability of the Corporation (or its successor) to make a redemption payment for any reason shall not relieve the Corporation (or its successor) from its obligation to effect any required redemption when, as and if permitted by applicable law.

Section 5.09. Miscellaneous.

(a) Notwithstanding anything herein to the contrary, if at any time the payment of any PIK Dividend or a conversion of Series A Preferred Stock (a "Subject Action") would be prohibited until the Corporation has obtained the approval of the shareholders of the Corporation under the NRS, continued listing rules of Nasdaq or otherwise, the Corporation and the Holder shall not effect such Subject Action until such vote has been duly obtained; provided, however, that nothing herein will affect the compounding of any Dividend that the Corporation does not pay in cash (which compounding will apply even if the Corporation is otherwise prohibited from electing to make any PIK Dividend pursuant to this sentence). In such case, until such time as the requisite shareholder approval has been obtained for the Subject Action, the Corporation covenants that it shall use its reasonable best efforts to obtain such approval at any annual or special meeting of the shareholders entitled to vote on such for the purpose of voting on such Subject Action to be called as soon as reasonably practicable.

(b) Notices. Any and all notices or other communications or deliveries to be provided by the Holders hereunder including, without limitation, any Conversion Notice or Redemption Notice, shall be in writing and delivered personally, by email, or sent by a nationally recognized overnight courier service, addressed to the Corporation, 2424 N. Federal Highway, Suite 208, Boca Raton, Florida 33431, Attn: Chief Financial Officer and General Counsel, email address: jlanghans@celsius.com and msandifer@celsius.com, or such other address or email address as the Corporation may specify for such purposes by notice to the Holders delivered in accordance with this Section. Any and all notices or other communications or deliveries to be provided by the Corporation hereunder shall be in writing and delivered personally, by email, or sent by a nationally recognized overnight courier service addressed to each Holder at the address or email address of such Holder appearing on the books of the Corporation, or if no such address or email address appears on the books of the Corporation, at the principal place of business of such Holder. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via email, (ii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service, or (iii) upon actual receipt by the party to whom such notice is required to be given.

(c) Lost or Mutilated Series A Preferred Stock Certificate. If a Holder's Series A Preferred Stock certificate shall be mutilated, lost, stolen or destroyed, the Corporation shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated certificate, or in lieu of or in substitution for a lost, stolen or destroyed certificate, a new certificate for the shares of Series A Preferred Stock so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such certificate, and of the ownership thereof, reasonably satisfactory to the Corporation and, in each case, customary and reasonable indemnity, if requested. Applicants for a new certificate under such circumstances shall also comply with such other reasonable regulations and procedures and pay such other reasonable third-party costs as the Corporation may prescribe.

(d) Waiver. Any waiver by the Corporation or a Holder of a breach of any provision of this Certificate of Designation shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Certificate of Designation or a waiver by any other Holders. The failure of the Corporation or a Holder to insist upon strict adherence to any term of this Certificate of Designation on one or more occasions shall not be considered a waiver or deprive that party (or any other Holder) of the right thereafter to insist upon strict adherence to that term or any other term of this Certificate of Designation. Any waiver by the Corporation or a Holder must be in writing. Notwithstanding any provision in this Certificate of Designation to the contrary, any provision contained herein and any right of the Holders of Series A Preferred Stock granted hereunder may be waived as to all shares of Series A Preferred Stock (and the Holders thereof) upon the written consent of the Majority Holders, unless a higher percentage is required by the NRS, in which case the written consent of the Holders of not less than such higher percentage shall be required.

(e) Severability. If any provision of this Certificate of Designation is invalid, illegal or unenforceable, the balance of this Certificate of Designation shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law.

(f) Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

(g) Headings. The headings contained herein are for convenience only, do not constitute a part of this Certificate of Designation and shall not be deemed to limit or affect any of the provisions hereof.

(h) Status of Converted Series A Preferred Stock. If any shares of Series A Preferred Stock shall be converted or reacquired by the Corporation, such shares shall be automatically, and without need for further action by the Board, restored to the status of authorized and unissued shares of Preferred Stock, without designation or classification as to series, until such shares are once more designated or classified as part of a particular series by the Board pursuant to the provisions of the Articles of Incorporation.

ARTICLE VI
DIRECTORS

Section 6.01 <u>Governing Board</u>. The members of the Board of Directors of the corporation shall be styled directors.

Section 6.02 <u>Initial Board of Directors</u>. The Board of Directors shall consist of at least one (1) but no more than five (5) members. The name(s) and addresses of the initial members of the Board of Directors are as follows:

| <u>NAME</u> | <u>ADDRESS</u> |
|---|---|
| Kristian Kostovski | Analipseos 30, Apt #25<br>52236 Panorama, Thessaloniki, Greece |

These individuals shall serve as directors of the corporation until the first annual meeting of the stockholders or until their successors shall have been elected and qualified.

Section 6.03 <u>Change in the Number of Directors</u>. The number of directors may be increased or decreased by duly adopted amendment to the Bylaws of the corporation.

## ARTICLE VII
### INCORPORATORS

The name and address of the sole incorporator is Sandra L. Miller 711 St. Carson, Ste 4, Carson City, Nevada 89701.

## ARTICLE VIII
### PERIOD OF DURATION

This corporation is to have A PERPETUAL existence.

## ARTICLE IX
### DIRECTORS AND OFFICERS' LIABILITY

A director or officer of the corporation shall not be personally liable to this corporation or its stockholders for damages for breach of fiduciary duty as a director of officers, but this Article shall not eliminate or limit the liability of a director or officer for (i) acts or omissions which involve intentional misconduct, fraud or a knowing violation of law, or (ii) the unlawful payment of dividends. Any repeal or modification of this Article by the stockholders of the corporation shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director or officer of the corporation for acts and omissions prior to such repeal or modification.

## ARTICLE X
### INDEMNITY

Every person who was or is a party to, or is threatened to be made a party to, or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he, or a person of whom he is the legal representative, is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director of officer of another corporation, or as its representative in a partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless to the fullest extent legally permissible under the laws of the State of Nevada from time to time against all expenses, liability and loss (including attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) reasonably incurred or suffered by him in connection therewith. Such right of indemnification shall be a contract right which may be enforced in any manner desired by such person. The expenses of officers and directors incurred in defending a civil or criminal action, suit or proceeding must be paid by the corporation as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he is not entitled to be indemnified by the corporation. Such right of indemnification shall not be exclusive of any other right which such directors, officers or representatives may have or hereafter acquire, and, without limiting the generality of such statement, they shall be entitled to their respective rights of indemnification under any Bylaw, agreement, vote of stockholders, provision of law, or otherwise, as well as their rights under this Article.

Without limiting the application of the foregoing, the Board of Directors may adopt Bylaws from time to time with respect to indemnification, to provide at all times the fullest indemnification permitted by the laws of the State of Nevada, and may cause the corporation to purchase and maintain insurance on behalf of any person who is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, or as its representative in a partnership, joint venture, trust or other enterprises, against any liability asserted against such person and incurred in any such capacity or arising out of such status, whether or not the corporation would have the power to indemnify such person.

The indemnification provided in this Article shall continue as to a person who has ceased to be a director, officer, employee or agent, and shall inure to the benefit of the heirs, executors and administrators of such person.

## ARTICLE XI

### AMENDMENTS

Subject at all times to the express provisions of Section 4.03 hereof, which cannot be amended, this corporation reserves the right to amend, alter, change, or repeal any provision contained in these Articles of Incorporation or its Bylaws, in the manner now or hereafter prescribed by statute or by these Articles of Incorporation or said Bylaws, and all rights conferred upon the stockholders are granted subject to this reservation.

## ARTICLE XII

## POWERS OF DIRECTORS

In furtherance, and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized:

(1) Subject to the Bylaws, if any, adopted by the stockholders, to make, alter or repeal the Bylaws of the corporation;

(2) To authorize and cause to be executed mortgages and liens, with or without limit as to amount, upon the real and personal property of the corporation;

(3) To authorize the guaranty by the corporation of securities, evidences of indebtedness and obligations of other persons, corporations and business entities;

(4) To set apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose and to abolish any such reserve; and

(5) By resolution adopted by a majority of the whole Board of Directors, to designate one or more committees, each committee to consist of one or more of the directors of the corporation, which, to the extent provided in the resolution or in the Bylaws of the Board of Directors in the management of the business and affairs of the corporation, any may authorize the seal of the corporation to be affixed to all papers which may require it. Such committee or committees shall have such name or names as may be stated in the Bylaws of the corporation or as may be determined from time to time by resolution adopted by the Board of Directors.

All corporate powers of the corporation shall be exercised by the Board of Directors except as otherwise provided herein or by law.

### ARTICLE XIII
### CONTROL SHARE ACQUISITIONS

The corporation expressly opts-out of or elects not to be governed by the "Acquisition of Controlling Interest" provisions contained in NRS Sections 78.378 through 78.3793 inclusive all as permitted under NRS 78.378.1.

### ARTICLE XIV
### COMBINATIONS WITH INTERESTED STOCKHOLDERS

The corporation expressly opts-out of, and elects not to be governed by the "Combinations with Interested Stockholder" provisions contained in NRS Section 78.411 through 78.444, inclusive all as permitted under NRS Section 78.434.

**Description of Registrant's Securities Registered**
Pursuant to Section 12 of the Securities Exchange Act of 1934

General

As of the end of the period covered by the most recent Annual Report on Form 10-K of Celsius Holdings, Inc. (the "registrant"), the common stock, par value $0.001 per share, of the registrant ("Common Stock") was registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Unless the context otherwise requires, all references herein to "we," "our," "ours," "Company" and "us" refer to Celsius Holdings, Inc.

The following description of the Common Stock is a summary and does not purport to be complete. A copy of our composite articles of incorporation, as amended, which we refer to as our Charter, and our amended and restated bylaws, which we refer to as our Amended Bylaws, have been filed as Exhibits 3.1 and 3.2, respectively, to our Annual Report on Form 10-K for the fiscal year ended December 31, 2023. Our Common Stock and the rights of the holders of our Common Stock are subject to the applicable provisions of the Nevada Revised Statutes (the "NRS"), our Charter, and our Amended Bylaws. The description below of our Common Stock and provisions of our Charter and Amended Bylaws are summaries and are qualified by reference to the Charter and our Amended Bylaws, as applicable, and by the applicable provisions of the NRS. We encourage you to read that law and those documents carefully.

Common Stock

General

Our authorized capital stock consists of 302,500,000 shares of capital stock, of which: (i) 300,000,000 shares are designated as Common Stock, par value $0.001 per share; and (ii) 2,500,000 shares are designated as preferred stock, par value $0.001 per share.

Voting Rights

The holders of shares of Common Stock are entitled to one vote per share in connection with any matter submitted to a vote of stockholders.

Dividend Rights

Subject to any preferential dividend rights of holders of any then outstanding shares of our preferred stock and the NRS, the holders of shares of Common Stock are entitled to ratably receive such dividends, if any, as may be declared from time to time by our board of directors (the "Board of Directors") in its discretion out of funds legally available therefor.

Liquidation Rights

In the event of our voluntary or involuntary liquidation, dissolution, distribution of assets or winding-up of the Company, after payments to creditors and subject to any preferential liquidation, dissolution or winding up rights of holders of any then outstanding shares of our preferred stock, the holders of shares of Common Stock are entitled to share ratably in all of our remaining assets and funds available for distribution to holders of shares of Common Stock.

Other Matters

Holders of shares of the Common Stock do not have any preemptive, subscription, redemption or conversion rights, and there are no sinking fund provisions with respect to our Common Stock. All of the shares of the Common Stock currently issued and outstanding have been validly issued and are fully-paid and nonassessable.

No Cumulative Voting; Quorum

The Charter does not provide for cumulative voting of shares of the Common Stock. Because of this, the holders of a majority of the shares of Common Stock entitled to vote in any election of directors can elect all of the directors standing for election.

Holders of our Common Stock representing a majority of the voting power of our capital stock issued and outstanding and entitled to vote, represented in person or by proxy, are necessary to constitute a quorum at any meeting

outstanding and entitled to vote, represented in person or by proxy, are necessary to constitute a quorum at any meeting of our stockholders.

## Transfer Agent and Registrar

The transfer agent and registrar for our Common Stock is Direct Transfer LLC. The transfer agent's address is 1 Glenwood Avenue, STE 1001, Raleigh, NC 27603.

## Listing

Our Common Stock is listed on the Nasdaq Capital Market under the symbol "CELH."

## Provisions of Nevada Law, our Charter and our Amended Bylaws That May Make the Acquisition of Control of us More Difficult.

### Authorized but Unissued Shares

Our authorized but unissued shares of our Common Stock may be issued without stockholder approval except as required by law or by any stock exchange on which our Common Stock may be listed. These additional shares may be utilized for a variety of corporate purposes, including, without limitation, public offerings to raise additional capital, acquisitions and employee benefit plans. In addition, our Board of Directors may authorize, without stockholder approval, the issuance of preferred stock, in one or more series, with voting rights or other rights or preferences designated from time to time by our Board of Directors. The existence of authorized but unissued shares of Common Stock or preferred stock may enable the Board of Directors to render more difficult or discourage an attempt to obtain control of us by means of a merger, tender offer, proxy contest or otherwise.

### Special Meetings of Stockholders; Stockholder Action by Written Consent

Our Amended Bylaws provide that special meetings of our stockholders may be called for any purpose at any time by or at the direction of the Board of Directors or the Chairman of the Board of Directors (the "Chairman") at the request of holders of not less than a majority of the combined voting power of the Common Stock.

Pursuant to Section 78.320 of the NRS, unless our articles of incorporation or bylaws provide otherwise, any action required to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of our stock entitled to vote thereon were present and voted. Neither our Charter nor our Amended Bylaws prohibit action by written consent, and our Amended Bylaws expressly permit stockholder action by written consent.

### Advance Notice Requirements for Stockholder Proposals and Nominations of Directors

Our Amended Bylaws require stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at an annual or special meeting of stockholders, to provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be received by the Company secretary at our principal executive offices not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the anniversary date of the immediately preceding annual meeting of stockholders. Pursuant to Rule 14a-8 of the Exchange Act, proposals seeking inclusion in our annual proxy statement must comply with the notice periods contained therein. Our Amended Bylaws also specify certain

requirements as to the form and content of such stockholder's notice. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at an annual or special meeting of stockholders.

### Amendment of Articles of Incorporation or Bylaws

Our Charter and Amended Bylaws provide that our Board of Directors is expressly authorized to alter, amend, rescind or repeal, in whole or in part, our Amended Bylaws without a stockholder vote in any matter not inconsistent with Nevada law and our Charter. Under Nevada law, our stockholders may also adopt, amend or repeal our Amended Bylaws.

The NRS provides generally that the affirmative vote of a majority of the outstanding shares entitled to vote thereon, voting together as a single class, is required to amend a corporation's articles of incorporation unless the articles of incorporation requires a greater percentage.

### Business Combinations

The NRS generally prohibits a publicly traded Nevada corporation with at least 200 stockholders of record from engaging in various "combination" transactions with any interested stockholder for a period of up to four years after the date of the transaction in which the person became an interested stockholder, unless the combination or transaction was approved by the Board of Directors before such person became an interested stockholder or the combination is approved by the Board of Directors, if within two years after the date in which the person became an interested stockholder, and is approved at a meeting of the stockholders by the affirmative vote of stockholders representing at least 60% (for a combination within two years after becoming an interested stockholder) or a majority

representing at least 60% (for a combination within two years after becoming an interested stockholder) or a majority (for combinations between two and four years thereafter) of the outstanding voting power held by disinterested stockholders. Alternatively, a corporation may engage in a combination with an interested stockholder more than two years after such person becomes an interested stockholder if:

- the consideration to be paid to the holders of the corporation's stock, other than the interested stockholder, is at least equal to the highest of: (a) the highest price per share paid by the interested stockholder within the two years immediately preceding the date of the announcement of the combination or the transaction in which it became an interested stockholder, whichever is higher, plus interest compounded annually, (b) the market value per share of common stock on the date of announcement of the combination or the date the interested stockholder acquired the shares, whichever is higher, less certain dividends paid or (c) for holders of preferred stock, the highest liquidation value of the preferred stock, if it is higher; and

- the interested stockholder has not become the owner of any additional voting shares since the date of becoming an interested stockholder except by certain permitted transactions.

A "combination" is generally defined to include (i) mergers or consolidations with the "interested stockholder" or an affiliate or associate of the interested stockholder, (ii) any sale, lease exchange, mortgage, pledge, transfer or other disposition of assets of the corporation, in one transaction or a series of transactions, to or with the interested stockholder or an affiliate or associate of the interested stockholder: (a) having an aggregate market value equal to 5% or more of the aggregate market value of the assets of the corporation, (b) having an aggregate market value equal to 5% or more of the aggregate market value of all outstanding shares of the corporation or (c) representing more than 10% of the earning power or net income (determined on a consolidated basis) of the corporation, (iii) any issuance or transfer of securities to the interested stockholder or an affiliate or associate of the interested stockholder, in one transaction or a series of transactions, having an aggregate market value equal to 5% or more of the aggregate market value of all of the outstanding voting shares of the corporation (other than under the exercise of warrants or rights to purchase shares offered, or a dividend or distribution made pro rata to all stockholders of the corporation), (iv) adoption of a plan or proposal for liquidation or dissolution of the corporation with the interested stockholder or an affiliate or associate of the interested stockholder and (v) certain other transactions having the effect of increasing the proportionate share of voting securities beneficially owned by the interested stockholder or an affiliate or associate of the interested stockholder.

In general, an "interested stockholder" means any person who (i) beneficially owns, directly or indirectly, 10% or more of the voting power of the outstanding voting shares of a corporation, or (ii) is an affiliate or associate of the corporation that beneficially owned, within two years prior to the date in question, 10% or more of the voting power of the then-outstanding shares of the corporation.

We have opted out of the "business combination" provisions of Sections 78.411 to 78.444, inclusive, of the NRS in our Charter.

Control Share Acquisitions

The "control share" statute of the NRS applies to ""issuing corporations" that are Nevada corporations doing business, directly or through an affiliate, in Nevada, and having at least 200 stockholders of record, including at least 100 of whom have addresses in Nevada appearing on the stock ledger of the corporation. The control share statute prohibits an acquirer, under certain circumstances, from voting its "control shares" of an issuing corporation's stock after crossing certain ownership threshold percentages, unless the acquirer obtains approval of the issuing corporation's disinterested stockholders or unless the issuing corporation amends its articles of incorporation or bylaws within 10 days of the acquisition. The statute specifies three thresholds: one-fifth or more but less than one-third, one-third but less than a majority, and a majority or more, of the outstanding voting power of a corporation. Generally, once an acquirer crosses one of the foregoing thresholds, those shares acquired in an acquisition or offer to acquire in an acquisition and acquired within 90 days immediately preceding the date that the acquirer crosses one of the thresholds become "control shares," and such control shares are deprived of the right to vote until disinterested stockholders restore the right. In addition, the corporation, if provided in its articles of incorporation or bylaws in effect on the 10th day following the acquisition of a controlling interest, may cause the redemption of all of the control shares at the average price paid for such shares if the stockholders do not accord the control shares full voting rights. If control shares are accorded full voting rights and the acquiring person has acquired a majority or more of all voting power, all other stockholders who did not vote in favor of authorizing voting rights to the control shares are entitled to demand payment for the fair value of their shares in accordance with statutory procedures established for dissenters' rights.

Even if a Nevada corporation has not opted out of the control share statute prior to an acquisition of control shares, Nevada law provides that it may out of the control share statute by amending our articles of incorporation or bylaws within 10 days of the acquisition.

We have opted out of the "control share" provisions of Sections 78.378 to 78.3793, inclusive, of the NRS, in our Charter.

FIRST AMENDMENT
TO THE
CELSIUS HOLDINGS, INC.
2015 STOCK INCENTIVE PLAN

This First Amendment (this "Amendment") to the Celsius Holdings, Inc. 2015 Stock Incentive Plan (the "Plan") is adopted by the Board of Directors (the "Board") of Celsius Holdings, Inc. effective as of October 29, 2020 (the "Effective Date").

RECITALS

WHEREAS, the Company desires to amend the Plan in order to supplement the provisions related to the treatment of outstanding Awards in the event of a Corporate Transaction or Change in Control; and

WHEREAS, the Plan may be amended by the Board, in accordance with Section 13 of the Plan.

NOW, THEREFORE, the Plan is hereby amended as follows:

1.   Terms used but not defined herein have the meanings assigned to them in the Plan.

2.   Section 11 of the Plan is hereby deleted in its entirety and replaced with the following:

"11. Corporate Transactions and Changes in Control. Effective upon the consummation or occurrence of a Corporate Transaction or Change in Control, any unexcercised portion of outstanding Awards under the Plan shall become immediately vested and fully exercisable. Such Awards shall remain exercisable until the expiration or sooner termination of the Award."

3.   This Amendment shall be and, as of the Effective Date, is hereby incorporated into and forms a part of the Plan.

4.   Except as expressly provided herein, all terms and conditions of the Plan shall remain in full force and effect.

CELSIUS HOLDINGS, INC.
2015 STOCK INCENTIVE PLAN
RESTRICTED STOCK GRANT AGREEMENT

THIS RESTRICTED STOCK GRANT AGREEMENT (this "Agreement"), made and entered into as of [_____], 20[__] (the "Grant Date"), between CELSIUS HOLDINGS, INC., a Nevada corporation (the "Company") and [_____] (the "Grantee").

RECITALS

WHEREAS, the Company has adopted the Celsius Holdings, Inc. 2015 Stock Incentive Plan (the "Plan"); and

WHEREAS, the Grantee is an employee of the Company and the Compensation Committee of the Board of Directors of the Company has determined that it is in the best interests of the Company to issue to the Grantee a grant of Restricted Stock (the "Stock Grant"), under the terms and conditions of the Plan and this Agreement and the Grantee desires to accept the Stock Grant under the terms and conditions of the Plan and this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.      Recitals; Definition of Certain Terms. The foregoing recitals are true and correct and incorporated herein by reference. Capitalized terms used but not otherwise defined in this Agreement have the meanings given to such terms in the Plan.

2.      Issuance of Stock Grant. The Company hereby issues to the Grantee, a grant of shares of Restricted Stock Units (the "Shares") subject to, and in accordance with, the terms and conditions set forth in the Plan and this Agreement.  In the event of any conflict between the Plan and this Agreement, the relevant provisions of the Plan shall control.

3.      Grant Price. The price at which the Shares shall have been deemed to be issued shall be $0.001 per Share.  The Grantee acknowledges that the Stock Grant will be deemed to be taxable income to the Grantee, based on such price per Share at fair market value at time of exercise

4.      Vesting of Grant. The Units shall be "Unvested" as of the Grant Date. The Units shall become "Vested" in three equal annual installments on the first, second and third anniversaries of the Grant Date in accordance with the terms of this Agreement and the Plan, provided, however, that the Grantee remains in the Continuous Employment of the Company or any of its subsidiaries or affiliates, as defined and provided for in the Plan.

5.      Restrictions on Transfer of Units. Unvested Units may not be transferred at any time. Grantee hereby acknowledges and agrees that the Vested Units and underlying Shares shall be subject to the restrictions on transfer applicable to "Units" and "Shares" to comply with all provisions of the Plan. Unvested Units may be designated to be placed in a deferred compensation or retirement plan, pursuant to IRC Section 409A, established by the Company. Each and every transferee or assignee of Vested Units issued upon exercise thereof from the Grantee shall be bound by and subject to all the terms and conditions of the Plan and this Agreement on the same basis as the Grantee is bound. So long as this Agreement is in effect, the Company shall require, as a condition precedent to the transfer of any Vested Units by Grantee that the transferee agrees in writing to be bound by, and subject to, the terms and conditions of the Plan and this Agreement and to ensure that such transferees' transferees shall be likewise bound.

6.      Rights as Shareholder. Until the Units granted under this Agreement become Vested and are exercised in accordance with the terms hereof, the Grantee shall have no rights as a shareholder (including, without limitation, voting and dividend rights) with respect to any underlying Shares.

7.      Termination of Units. Unvested Units shall, without notice, terminate and will be cancelled and become null and void on the date on which Grantee's Continuous Service with the Company terminates. Except

as specifically provided in the Plan or as otherwise determined in writing by the Committee or the Board in their sole discretion or as part of Separation agreements for consideration provided to the employee. Any Vested Units, shall, without notice, terminate and become null and void, three months after the date on which Grantee's Continuous Service with the Company terminates.

8.    Employment of the Grantee. The Grantee acknowledges that the Grantee is employed subject to the terms of his or her employment agreement, if any, with the Company.  The Grantee agrees that this Agreement does not create an obligation of the Company or any other Person to employ the Grantee, nor does it give rise to any right or expectancy with respect thereto.  Any change of the Grantee's duties as an employee of the Company shall not result in a modification of the terms of this Agreement.  References in this Agreement to employment by the Company shall be deemed to include employment by any of its subsidiaries or affiliates.

9.    Modification of Agreement. This Agreement may be modified, amended, suspended or terminated, and any terms or conditions may be waived, but only by a written instrument executed by the parties hereto. No waiver by either party hereto of any breach by the other party hereto of any provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions at the time or at any prior or subsequent time.

10.    Severability. Should any provision of this Agreement be held by a court of competent jurisdiction to be unenforceable or invalid for any reason, the remaining provisions of this Agreement shall not be affected by such holding and shall continue in full force in accordance with their terms.

11.    Remedies.

(a)    The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have at law or in equity.

(b)    Without limitation of the foregoing, the parties hereto agree that irreparable harm would occur in the event that any of the agreements and provisions of this Agreement were not performed fully by the parties hereto in accordance with their specific terms or were otherwise breached, and that money damages are an inadequate remedy for breach of the Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in accordance with its term or is otherwise breached.  It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions to restrain, enjoin and prevent breaches of this Agreement, such remedy being in addition to and not in lieu of, any other rights and remedies to which the other parties are entitled to at law or in equity.

(c)    Except where a time period is otherwise specified, no delay on the part of any party in the exercise of any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any exercise or partial exercise of any such right, power, privilege or remedy preclude any further exercise thereof or the exercise of any right, power, privilege or remedy.

12.    Governing Law; Venue. This Agreement shall be governed by the laws of the State of Florida, without regard to its conflicts of law principles. In the event that any party brings suit against the other hereunder, such party shall bring such suit in, and each party consents to the jurisdiction of, any state or federal court located within Palm Beach County, State of Florida. Each party (a) consents that all service of process may be made by certified mail directed to it at its address stated herein; (b) waives any objection which it may have based on lack of personal jurisdiction or improper venue or forum non conveniens to any suit or proceeding instituted by the other party under this Agreement in any state or federal court located within Palm Beach County, Florida; (c) consents to the granting of such legal or equitable relief as is deemed appropriate by the court; and (d) agrees that the prevailing party in any such action shall be entitled to recover attorney's fees and costs from the non-prevailing party at both the trial and appellate levels. This provision is a material inducement for each party to enter into this Agreement.

13.    Successors in Interest. This Agreement shall inure to the benefit of and be binding upon any successor to the Company or of the Grantee, respectively. All obligations imposed upon the Grantee and all rights granted to the Company under this Agreement shall be final, binding and conclusive upon the Grantee's beneficiaries, heirs, executors, administrators and successors.

14.    Execution in Counterparts. This Agreement may be executed in one or more counterparts (including by facsimile, .PDF or other electronic transmission), each of which shall be deemed an original, but all of which taken together shall constitute only one instrument, and shall become effective and binding upon the parties as of the Grant Date at such time as all the signatories hereto have signed a counterpart of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Company and the Grantee have executed this Agreement as of the day and year first written above.

THE COMPANY:

CELSIUS HOLDINGS, INC.

By: _____

       Name:

       Title:

THE GRANTEE:

_____

Signature

_____

Print Name

_____

Address 1

_____

Address 2

_____

Address 3

_____

Telephone Number

_____

Email Address

_____

Social Security Number

FORM OF AWARD AGREEMENT

AWARD TERMS OF
PERFORMANCE SHARE UNITS GRANTED UNDER
THE CELSIUS HOLDINGS INC. 2015 STOCK INCENTIVE PLAN

| | |
|---|---|
| Introduction | You have been granted Performance Share Units under the Celsius Holdings, Inc. 2015 Stock Incentive Plan ("2015 Plan"), subject to the following Award Terms. This grant is also subject to the terms of the 2015 Plan, which are hereby incorporated by reference. However, to the extent that an Award Term conflicts with the 2015 Plan, the 2015 Plan shall govern. Unless otherwise defined herein, the terms defined in the 2015 Plan shall have the same defined meanings in these Award Terms, including any appendices to these Award Terms (hereinafter, collectively referred to as the "Agreement"). |
| Grant Award Acceptance | IF YOU DO NOT ACCEPT YOUR PERFORMANCE SHARE UNITS IN THE MANNER INSTRUCTED BY THE COMPANY, YOUR PERFORMANCE SHARE UNITS WILL BE SUBJECT TO CANCELLATION. |
| Date of Grant | [               ] ("Date of Grant") |
| Type of Awards | Performance Share Units ("PSUs") |
| Dividend Equivalents | Dividends payable on the total number of shares represented by your Performance Share Units (including whole and fractional Performance Share Units) will be allocated to your account in the form of Performance Share Units (whole and fractional) based upon the closing stock price as reported on the Nasdaq Stock Market, Inc. on the date of the dividend payment. Dividend equivalent units will be determined after the end of the Performance Period and credited to your account at that time based on the performance-adjusted number of Performance Share Units in your account. Dividend equivalent units will be calculated by taking the final performance-adjusted Performance Share Units and calculating the dividend equivalent units for the first dividend payment date for the Performance Period. The resulting number of dividend equivalent units from the first dividend payment date will be added to the final performance-adjusted number of Performance Share Units before calculating the |
| | dividend equivalent units for the second dividend payment date during the Performance Period. This process will be repeated for each subsequent dividend payment date during the Performance Period. |
| Restricted Period | You may not sell, gift, or otherwise transfer or dispose of any |

of the Performance Share Units during the "Restricted Period." The Restricted Period commences on the Date of Grant and lapses as set forth herein.

| | |
|---|---|
| Vesting Schedule | The Performance Share Units shall only vest if the performance goals set forth on Exhibit A hereto (the "Performance Goals") are satisfied as of the end of the performance period set forth in Exhibit A, running from [_____] – [_____] (the "Performance Period"), and you remain employed on the Determination Date. If any portion of the Performance Share Units are determined to be earned as of the Determination Date (as defined on Exhibit A), the Restricted Period shall lapse with respect to such Performance Share Units on the Determination Date, subject to your remaining employed on such date, and any portion of the Performance Share Units that are determined to not be so earned will be forfeited on the Determination Date. To the extent your employment terminates for any reason prior to the Determination Date (unless otherwise provided herein or in an agreement between you and the Company or the terms of the 2015 Plan) all the Performance Share Units will be forfeited. |
| Payment | Performance Share Units, if earned, shall be paid to you when the Restricted Period lapses in accordance with the schedule set forth under "Restricted Period." Performance Share Units are payable in one share of Stock for each whole unit and a cash payment for any fraction of a unit. The value of each fractional unit will be based on the closing price of Stock as reported on the Nasdaq Stock Market Inc. as of immediately prior to the effective date of payment. Payment shall be made no later than [_____]. |

2

| | |
|---|---|
| Code Section 409A | To the extent that an amount that is considered "nonqualified deferred compensation" subject to Code Section 409A ("deferred compensation") is payable on account of your termination of employment, no amounts shall be paid hereunder on account thereof unless such termination of employment constitutes a "separation from service," within the meaning of Code Section 409A. If you are a "specified employee," within the meaning of Code Section 409A, no amount that is deferred compensation shall be paid or delivered, on account of your separation from service, earlier than the date that is six months after such separation from service. Amounts otherwise payable during that six month period shall be paid on the date that is six months and one day after your separation from service. |
| | The Performance Share Units are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject you to the payment of additional taxes and interest under Code Section |

409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement, the 2015 Plan or both, without your consent, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This section does not create an obligation on the part of the Company to modify the terms of this Agreement or the 2015 Plan and does not guarantee that the Performance Share Units or the delivery of shares of Stock upon vesting/settlement of the Performance Share Units will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. In no event whatsoever shall the Company be liable to any party for any additional tax, interest or penalties that may be imposed on you by Code Section 409A or any damages for failing to comply with Code Section 409A.

| | |
|---|---|
| Recoupment Policy | This Award shall be subject to the Company's Policy regarding the mandatory recovery of Compensation (as it may |

3

| | |
|---|---|
| | be amended from time to time), the terms of which are incorporated herein by reference. |
| Repayment/Forfeiture | Any benefits you may receive hereunder shall be subject to repayment or forfeiture as may be required to comply with the requirements of the U.S. Securities and Exchange Commission or any applicable law, including the requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any securities exchange on which the Stock is traded, as may be in effect from time to time. |
| Corporate Transactions and Change in Control | Effective upon the consummation or occurrence of a Corporate Transaction or Change in Control, as defined in the 2015 Plan, any unvested Performance Share Units shall vest at target and shall otherwise remain subject to the terms of this Agreement unless, and notwithstanding Section 11 of the 2015 Plan, the Performance Share Units are Replaced with a replacement award. For purposes of clarification, in the event of a termination of employment by the Company without Cause or by you with Good Reason within three months prior to or within two years following a Corporate Transaction or Change in Control and prior to the Determination Date, any unvested Performance Share Units shall vest at target and shall otherwise remain subject to the terms of this Agreement. |
| Withholding | You acknowledge that the Company and/or your employer (the "Employer") (1) make no representations or undertakings regarding the treatment of any income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the 2015 Plan and legally applicable to you ("Tax-Related Items") in connection with |

any aspect of the Performance Share Units, including, but not limited to, the grant, vesting or settlement of the Performance Share Units, the subsequent sale of shares of Stock acquired pursuant to such settlement and the receipt of any dividends and/or any dividend equivalents; and (2) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Performance Share Units to reduce or eliminate your liability for Tax- Related Items or achieve any particular tax result.  Further, if you are subject to Tax-Related Items in more than one jurisdiction, the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

4

Prior to any relevant taxable or tax withholding event, as applicable, you agree to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items.  In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following: (i) withholding from your wages or other cash compensation paid to you by the Company and/or the Employer; or (ii) withholding from proceeds of the sale of shares of Stock acquired upon settlement of the Performance Share Units either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization without further consent); or (iii) withholding in shares of Stock to be issued upon settlement of the Performance Share Units, provided however that if you are a Section 16 officer of the Company under the Exchange Act, then the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

If the obligation for Tax-Related Items is satisfied by withholding in shares of Stock, for tax purposes, you are deemed to have been issued the full number of shares of Stock subject to the vested Performance Share Units, notwithstanding that a number of the shares of Stock are held back solely for the purpose of paying the Tax-Related Items.

Finally, you agree to pay to the Company or the Employer, any amount of Tax- Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the 2015 Plan that cannot be satisfied by the means previously described.  The Company may refuse to issue or deliver the shares or the proceeds of the sale of shares of Stock, if you fail to comply with your obligations in connection with the Tax-Related Items.

Notwithstanding anything in this section to the contrary, to avoid a prohibited acceleration under Code Section 409A, if shares of Stock subject to the Performance Share Units will be withheld (or sold on your behalf) to satisfy any Tax Related Items arising prior to the date of settlement of the Performance Share Units for any portion of the Performance Share Units that is considered nonqualified deferred compensation subject to Code Section 409A, then the number of shares withheld (or sold on your behalf) shall not exceed

5

the number of shares that equals the liability for Tax-Related Items.

| Severability | The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable |

shall nevertheless be binding and enforceable.

| | |
|---|---|
| Waiver | You acknowledge that a waiver by the Company of breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach by you or any other participant. |
| INTERNATIONAL AWARDS: Appendix | Notwithstanding any provisions in these Award Terms, the Performance Share Units shall be subject to the additional terms and conditions set forth in Appendix A to this Agreement and to any special terms and provisions as set forth in Appendix B for your country, if any.  Moreover, if you relocate to one of the countries included in Appendix B, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons.  Appendix A and B constitute part of these Award Terms. |
| Imposition of Other Requirements | The Company reserves the right to impose other requirements on your participation in this Agreement, on the Performance Share Units and on any shares of Stock acquired under the 2015 Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. |

6

**EXHIBIT A**

**PERFORMANCE GOALS**

The Performance Goals are based on the following performance measures and weightings:

| Measure | Weighting |
|---|---|
| | |
| | |
| | |

Each measure is defined as follows: [_____]

Committee Discretion: The HRCC has the discretion to consider and adjust for the impact of extraordinary events on the results of the above metrics.

Performance and Measurement Period

The "Performance Period" is [_____].

Performance Goals

The Performance Goals will be considered achieved according to the following:   [_____]

Determination Date

The "Determination Date" is the date no later than [_____] on which the Committee determines whether, and the extent to which, the Performance Goals have been achieved.

INTERNATIONAL AWARDS: APPENDIX A

ADDITIONAL TERMS AND CONDITIONS

This Appendix includes additional terms and conditions that govern the Performance Share Units.  These terms and conditions are in addition to, or, if so indicated, in place of, the terms and conditions set forth in the Award Terms. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Award Terms or the 2015 Plan.

| Data Privacy | You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this Agreement and any other Performance Share Unit grant materials by and among, as applicable, the Employer, the Company and its Subsidiaries or Affiliates for the exclusive purpose of implementing, administering and managing your participation in the 2015 Plan. |
|---|---|

You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address, email address and telephone number, date of birth, social insurance number, passport number or other identification number (e.g., resident registration number), salary, nationality, job title, any stock or directorships held in the Company, details of all Performance Share Units or any other entitlement to stock or equivalent benefits awarded, canceled, exercised, vested, unvested or outstanding in your favor, for the exclusive purpose of implementing, administering and managing the 2015 Plan *("Data")*.

You understand that Data will be transferred to any third parties assisting the Company with the implementation, administration and management of the 2015 Plan.  You understand that the recipients of the Data may be located in the United States or elsewhere, and that the *recipients' country (e.g., the United States) may have different data* privacy laws and protections than your country.  You understand that

you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the Company, its Subsidiaries and Affiliates, the Employer and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the 2015 Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing your participation in the 2015 Plan. You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the 2015 Plan. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consent herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consent herein on

a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service with the Employer will not be affected; the only consequence of refusing or withdrawing your consent is that the Company would not be able to grant you Performance Share Units or other awards or administer or maintain such awards (i.e., the award would be null and void). Therefore, you understand that refusing or withdrawing your consent may affect your ability to participate in the 2015 Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.

Finally, upon request of the Company or the Employer, you agree to provide an executed data privacy consent form (or any other agreements or consents that may be required by the Company and/or the Employer) that the Company and/or the Employer may deem necessary to obtain from you for the purpose of administering your participation in the Plan in compliance with the data privacy laws in your country, either now or in the future. You understand and agree that you will not be able to participate in the Plan if you fail to provide any such consent or agreement requested by the Company and/or the Employer.

Nature of Grant    By participating in the 2015 Plan, you acknowledge, understand and agree that:

(a) the 2015 Plan is established voluntarily by the Company, it is discretionary in nature and may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the 2015 Plan;

(b) the grant of the Performance Share Units is exceptional voluntary and occasional and does not create any contractual or other right to receive future grants, or benefits in lieu of Performance Share Units, even if Performance Share Units have been granted in the past;

(c) all decisions with respect to future grants of Performance Share Units, if any, will be at the sole discretion of the Company;

(d) you are voluntarily participating in the 2015 Plan;

(e) the Performance Share Units and the shares of Stock subject to the Performance Share Units, and the income and value of same are not intended to replace any pension rights or compensation;

(f) unless otherwise agreed with the Company in writing, the Performance Share Units and the shares of Stock subject to the Performance Share Units, and the income and value of same, are not

granted as consideration for, or in connection with, any service you may provide as a director of a Subsidiary or Affiliate;

(g) the Performance Share Units and the shares of Stock subject to the Performance Share Units and the income and value of same are not part of normal or expected compensation for any purpose including, without limitation, calculating any severance, resignation, termination,

redundancy, holiday pay, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar mandatory payments;

(h) the future value of the underlying shares of Stock is unknown, indeterminable and cannot be predicted with certainty;

(i) no claim or entitlement to compensation or damages shall arise from forfeiture of the Performance Share Units resulting from the termination of your employment or other service relationship (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any);

(j) for purposes of the Performance Share Units, your employment or other service relationship will be considered terminated as of the date you are no longer actively providing services to the Company, the Employer or any of the other Subsidiaries or Affiliates of the Company (regardless of the reason for such termination and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any), and unless otherwise expressly provided in this Agreement or determined by the Company, your right to vest in the Performance Share Units under this Agreement, if any, will terminate as of such date and will not be extended by any notice period (e.g., your period of service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any); the Committee shall have the exclusive discretion to determine when you are no longer actively providing services for purposes of the Performance Share Unit grant (including whether you may still be considered to be providing services while on an approved leave of absence);

(k) unless otherwise provided in the 2015 Plan or by the Company in its discretion, the Performance Share Units and the benefits evidenced by this Agreement do not create any entitlement to have the Performance Share Units or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the shares of the Company; and

(l) neither the Company, the Employer nor any Subsidiary or Affiliate shall be liable for any foreign exchange rate fluctuation between your local currency and the U.S. dollar that may affect the value of the Performance Share Units or of any amount due to you pursuant to the settlement of the Performance Share Units or the subsequent sale of any shares of Stock acquired upon settlement.

| No Advice Regarding Grant | The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding your participation in the 2015 Plan, or your acquisition or sale of the underlying shares of Stock.  You understand and agree that you should consult with your own personal tax, legal and financial advisors regarding your participation in the 2015 Plan before taking any action related to the 2015 Plan. |
| --- | --- |
| Venue | Any and all disputes relating to, concerning or arising from this Agreement, or relating to, concerning or arising from the relationship between the parties evidenced by the Performance Share Units or this Agreement, shall be brought and heard exclusively in courts situated in the State of New York in New York County.  Each of the parties hereby represents and agrees that such party is subject to the personal |

jurisdiction of said courts; hereby irrevocably consents to the jurisdiction of such courts in any legal or equitable proceedings related to, concerning or arising from such dispute, and waives, to the fullest extent permitted by law, any objection which such party may now or hereafter have that the laying of the venue of any legal or equitable proceedings related to, concerning or arising from such dispute which is brought in such courts is improper or that such proceedings have been brought in an inconvenient forum.

| | |
|---|---|
| Language | If you have received this Agreement or any other document related to this Agreement translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control. |
| Electronic Delivery and Acceptance | The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the 2015 Plan by electronic means.  You hereby consent to receive such documents by electronic delivery and agree to participate in the 2015 Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company. |
| Insider Trading/Market Abuse Laws | You may be subject to insider trading restrictions and/or market abuse laws based on the exchange on which the shares of Stock are listed and in applicable jurisdictions including the United States and your country or your broker's country, if different, which may affect your ability to accept, acquire, sell or otherwise dispose of shares of Stock, rights to shares of Stock (e.g., Performance Share Units) or rights linked to the value of shares of Stock under the 2015 Plan during such times as you are considered to have "inside information" regarding the Company (as defined by the laws in the applicable jurisdictions). Local insider trading laws and regulations may prohibit the cancellation or amendment of orders you placed before you possessed inside information. Furthermore, you could be prohibited from (a) disclosing the inside information to any third party and (b) "tipping" third parties or causing them otherwise to buy or sell securities (third parties include fellow employees).  Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under the Company's insider trading policy.  You acknowledge that it is your responsibility to comply with any applicable restrictions, and you should speak to your personal advisor on this matter. |
| Foreign Asset/ Account Reporting Requirements | Your country may have certain foreign asset and/or account reporting requirements which may affect your ability to acquire or hold shares of Stock under the 2015 Plan or cash received from participating in the 2015 Plan (including from any dividends received or sale proceeds arising from the sale of shares of Stock) in a brokerage or bank account outside your country.  You may be required to report such accounts, assets or transactions to the tax or other authorities in your country.  You also may be required to repatriate sale proceeds or other funds received as a result of your participation in the 2015 Plan to your country through a designated bank or broker and/or within a certain time after receipt. You acknowledge that it is your responsibility to comply with such regulations, and you should consult your personal legal advisor for any details. |

INTERNATIONAL AWARDS: APPENDIX B

COUNTRY-SPECIFIC TERMS AND CONDITIONS

This Appendix includes additional terms and conditions that govern the Performance Share Units granted to you under the 2015 Plan if you reside in one of the countries listed herein. These terms and conditions are in addition to, or if so indicated, in place of the terms and conditions set forth in the Award Terms or Appendix A.

You should be aware that local exchange control laws may apply to you as a result of your participation in the 2015 Plan. By accepting the Performance Share Units, you agree to comply with applicable exchange control laws associated with your participation in the 2015 Plan. If you have any questions regarding your responsibilities in this regard, you agree to seek advice from your personal legal advisor, at your own cost, and further agree that neither the Company nor any Subsidiary or Affiliate will be liable for any fines or penalties resulting from your failure to comply with applicable laws.

If you are a citizen or resident of a country other than the one in which you are currently working, transfer employment and/or residency after the Performance Share Units are granted or are considered a resident of another country for local law purposes, the terms and conditions contained herein may not be applicable to you, and the Company shall, in its discretion, determine to what extent the terms and conditions contained herein shall apply to you.

## BELGIUM

There are no country specific provisions.

## BRAZIL

Compliance with Law. By accepting the Performance Share Units, you acknowledge that you agree to comply with applicable Brazilian laws and pay any and all applicable taxes associated with the vesting of the Performance Share Units, the receipt of any dividends, and the sale of shares of Stock acquired under the 2015 Plan.

Labor Law Acknowledgement. This provision supplements the acknowledgments contained in the Nature of Grant section of Appendix A:

By accepting the Performance Share Units, you agree that (i) you are making an investment decision, (ii) the shares of Stock will be issued to you only if the vesting conditions are met and any necessary services are rendered by you over the vesting period, and (iii) the value of the underlying shares of Stock is not fixed and may increase or decrease in value over the vesting period without compensation to you.

## CHINA

The following applies only to Grantees who are exclusively citizens of the People's Republic of China ("China") and who reside in mainland China, as determined by the Company in its sole discretion.

Settlement of Performance Share Units and Sale of Shares. To facilitate compliance with exchange control requirements, you agree to the sale of any shares of Stock to be issued to you upon vesting and settlement of the Award. The sale will occur (i) immediately upon the vesting/settlement of the Performance Share Units, (ii) following your termination of employment from the Company or one of its Subsidiaries or Affiliates, or (iii) within any other time frame as the Company determines to be necessary to comply with local regulatory requirements. You further agree that the Company is authorized to instruct its designated broker

requirements. You further agree that the Company is authorized to instruct its designated broker to assist with the mandatory sale of such shares (on your behalf pursuant to this authorization) and you expressly authorizes the Company's designated broker to complete the sale of such shares. You acknowledge that the Company's designated broker is under no obligation to arrange for the sale of the shares at any particular price. Upon the sale of the shares of Stock, the Company agrees to pay you the cash proceeds from the sale, less any brokerage fees or commissions and subject to any obligation to satisfy Tax-Related Items. You agree that the payment of the cash proceeds will be subject to the repatriation requirements described below.

You further agree that any shares to be issued to you shall be deposited directly into an account with the Company's designated broker. The deposited shares shall not be transferable (either electronically or in certificate form) from the brokerage account. This limitation shall apply both to transfers to different accounts with the same broker and to transfers to other brokerage firms. The limitation shall apply to all shares of Stock issued to you under the 2015 Plan, whether or not you continue to be employed by the Company or one of its Subsidiaries or Affiliates. If you sell shares of Stock issued upon vesting/settlement of the Performance Share Units, the repatriation requirements described below shall apply.

Exchange Control Requirements. You understand and agree that, pursuant to local exchange control requirements, you will be required to immediately repatriate to China the cash proceeds from the sale of shares of Stock acquired from the Performance Share Units and any dividends. You further understand that, under local law, such repatriation of the cash proceeds may need to be effected through a special exchange control account established by the Company or a Subsidiary or Affiliate of the Company and you hereby consent and agree that the proceeds from the sale of shares of Stock acquired from the Performance Share Units, any dividends or dividend equivalents may be transferred to such special account prior to being delivered to you. The proceeds may be paid in U.S. dollars or local currency at the Company's discretion. If the proceeds are paid in U.S. dollars, you acknowledge that you may be required to set up a U.S. dollar bank account in China so that the proceeds may be delivered to this account. If the proceeds are converted to local currency, you acknowledge that the Company (including its Subsidiaries and Affiliates) is under no obligation to secure any currency conversion rate and may face delays in converting the proceeds to local currency due to exchange control restrictions in China. You agree to bear any currency fluctuation risk between the date the shares of Stock acquired from the Performance Share Units are sold and any dividends or dividend equivalents are paid and the time that (i) the Tax-Related Items are converted to local currency and remitted to the tax authorities and (ii) net proceeds are converted to local currency and distributed to you. You acknowledge that neither the Company nor any Subsidiary or Affiliate will be held liable for any delay in delivering the proceeds to you. You agree to sign any agreements, forms and/or consents that may be requested by the Company or the Company's designated broker to effect any of the remittances, transfers, conversions or other processes affecting the proceeds.

Finally, you agree to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

FRANCE

Consent to Receive Information in English. By accepting the Award, you confirm having read and understood the documents relating to this grant (the 2015 Plan and the Agreement) which were provided in the English language. You accept the terms of these documents accordingly.

*En acceptant l'attribution, vous confirmez ainsi avoir lu et compris les documents relatifs à cette* attribution (le 2015 Plan et ce Contrat) qui ont été communiqués en langue anglaise. Vous acceptez les termes en connaissance de cause.

Award Not French-qualified. The Performance Share Units granted under this Agreement are not intended to qualify for specific tax and social security treatment pursuant to Sections L. 225-197-1 to L. 225-197-6 of the French Commercial Code, as amended.

GERMANY

There are no country specific provisions.

INDIA

There are no country specific provisions.

ITALY

Data Privacy. This provision replaces the Data Privacy section of Appendix A:

You understand that the Employer, the Company and any Subsidiary or Affiliate may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance (to the extent permitted under Italian law) or other identification number, salary, nationality, job title, any shares of stock or directorships held in the Company or any Subsidiary or Affiliate, details of all Performance Share Units or other entitlement to shares of stock or equivalent benefits granted, awarded, canceled, exercised, vested, unvested or outstanding in your favor, for the exclusive purpose of implementing, managing and administering the 2015 Plan *("Data").*

You also understand that providing the Company with Data is necessary for the performance of the 2015 Plan and that your refusal to provide such Data would make it impossible for the Company to perform its contractual obligations and may affect your ability to participate in the 2015 Plan. The Controller of personal data processing is [CLIENT], with registered offices at [LOCATION]

You understand that Data will not be publicized, but it may be transferred to banks, other financial institutions, or brokers involved in the management and administration of the 2015 Plan. You understand that Data may also be transferred to the *Company's stock plan service* provider, [PROVIDER NAME], or such other administrator that may be engaged by the

Company in the future. You further understand that the Company and/or any Subsidiary or Affiliate will transfer Data among themselves as necessary for the purpose of implementing, administering and managing your participation in the 2015 Plan, and that the Company and/or any Subsidiary or Affiliate may each further transfer Data to third parties assisting the Company in the implementation, administration, and management of the 2015 Plan, including any requisite transfer of Data to a broker or other third party with whom you may elect to deposit any shares of Stock acquired at vesting of the Performance Share Units. Such recipients may receive, possess, use, retain, and transfer Data in electronic or other form, for the purposes of implementing, administering, and managing your participation in the 2015 Plan. You understand that these recipients may be located in or outside the European Economic Area, such as in the United States or elsewhere. Should the Company exercise its discretion in suspending all necessary legal obligations connected with the management and administration of the 2015 Plan, it will delete Data as soon as it has completed all the necessary legal obligations connected with the management and administration of the 2015 Plan.

You understand that Data-processing related to the purposes specified above shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data is collected and with confidentiality and security provisions, as set forth by applicable Italian data privacy laws and regulations, with specific reference to Legislative Decree no. 196/2003.

The processing activity, including communication, the transfer of Data abroad, including outside of the European Economic Area, as herein specified and pursuant to applicable Italian data privacy laws and regulations, does not require your consent thereto as the processing is necessary to performance of contractual obligations related to implementation, administration, and management of the 2015 Plan. You understand that, pursuant to Section 7 of the Legislative Decree no. 196/2003, you have the right to, including but not limited to, access, delete, update, correct, or terminate, for legitimate reason, the Data processing. Furthermore, you are aware that Data will not be used for direct marketing purposes. In addition, Data provided can be reviewed and questions or complaints can be addressed by contacting your local human resources representative.

2015 Plan Document Acknowledgment. In accepting the grant of the Performance Share

Units, you acknowledge that you have received a copy of the 2015 Plan and this Agreement and have reviewed the 2015 Plan and this Agreement in their entirety and fully understand and accept all provisions of the 2015 Plan and this Agreement.

You acknowledge that you have read and specifically and expressly approved the following sections of this Agreement: Termination of Employment; Withholding; Imposition of Other Requirements; Nature of Grant; Venue; Language; and the Data Privacy section included in this Appendix.

<u>JAPAN</u>

There are no country specific provisions.

MEXICO

No Entitlement or Claims for Compensation.  These provisions supplement the Nature of Grant section of Appendix A:

Modification.  By accepting the Performance Share Units, you understand and agree that any modification of the 2015 Plan or the Agreement or its termination shall not constitute a change or impairment of the terms and conditions of your employment.

Policy Statement.  The Award of Performance Share Units the Company is making under the 2015 Plan is unilateral and discretionary and, therefore, the Company reserves the absolute right to amend it and discontinue it at any time without any liability.

The Company, with registered offices at [LOCATION] is solely responsible for the administration of the 2015 Plan and participation in the 2015 Plan and the acquisition of shares does not, in any way, establish an employment relationship between you and the Company since you are participating in the 2015 Plan on a wholly commercial basis, and the sole employer is [CLIENT] nor does it establish any rights between you and the Employer.

2015 Plan Document Acknowledgement.  By accepting the Award of Performance Share Units, you acknowledge that you have received copies of the 2015 Plan, have reviewed the 2015 Plan and the Agreement in their entirety and fully understand and accept all provisions of the 2015 Plan and the Agreement.

In addition, by accepting the Agreement, you further acknowledge that you have read and specifically and expressly approve the terms and conditions in the Agreement, in which the following is clearly described and established: (i) participation in the 2015 Plan does not constitute an acquired right; (ii) the 2015 Plan and participation in the 2015 Plan is offered by the Company on a wholly discretionary basis; (iii) participation in the 2015 Plan is voluntary; and (iv) the Company and any Subsidiary or Affiliates are not responsible for any decrease in the value of the shares of Stock underlying the Performance Share Units.

Finally, you hereby declare that you do not reserve any action or right to bring any claim against the Company for any compensation or damages as a result of your participation in the 2015 Plan and therefore grant a full and broad release to the Employer, the Company and any Subsidiary or Affiliate with respect to any claim that may arise under the 2015 Plan.

Spanish Translation

Sin derecho a Compensación o a su reclamación.  Las presentes disposiciones complementan el apartado denoninado  Naturaleza del Otorgamiento de los Términos del Otorgamiento:

Modificación.  Al aceptar las Acciones Restringidas, usted entiende y acepta que, cualquier modificación del 2015 Plan o del Contrato o su terminación, no deberá considerarse como un cambio o menoscabo a las condiciones de su relación de trabajo.

Declaración de Políticas.  El Otorgamiento de Acciones Restringidas que la Empresa está llevando a cabo en términos del 2015 Plan, es unilateral y discrecional y, por lo tanto, la Empresa

se reserva el derecho de modificar e interrumpir el mismo en cualquier tiempo, sin responsabilidad alguna.

La Empresa, con domicilio en [LOCATION] es la única responsable de la administración del 2015 Plan y la participación en el 2015 Plan, y la adquisición de acciones no establece, de ninguna manera, una relación de trabajo entre usted y la Empresa, en virtud de que su participación en el 2015 Plan es únicamente de carácter comercial y su único patrón es [CLIENT]

y tampoco crea ningún derecho entre usted y su Patrón..

Reconocimiento del Documento del 2015 Plan.  Al aceptar el Otorgamiento de las Acciones Restringidas, usted reconoce heber recibido una copia del 2015 Plan, haber revisado el mismo , asi como los Términos del Otorgamiento en su totalidad, y comprender y aceptar en su totalidad todas las disposiciones contenidas en el 2015 Plan y en los Términos del Otorgamiento.

Adicionalmente, al acceptar los Términos del Otorgamiento, reconoce que ha leído y, específica y expresamente, acepta los términos y condiciones contenidos en los Términos del Otorgamiento, en los que claramente se describe y establece lo siguiente: (i) la participación en el 2015 Plan no constituye un derecho adquirido; (ii) el 2015 Plan y la participación en el 2015 Plan es ofrecida por la Empresa completamente de forma discrecional; (iii) la participación en el 2015 Plan es voluntaria; y (iv) la Empresa, así como sus Subsidiarias o Filiales no serán responsables por cualquier disminución en el valor de las acciones subyacentes a las Acciones Restringidas.

Finalmente, por el presente, usted declara que no se reserva acción legal alguna o derecho a ejercitar en contra de la Empresa por cualquier compensación o daños que se generen como resultado de su participación en el 2015 Plan en virtud de ello, usted otorga el finiquito más amplio que en Derecho proceda al Patrón, la Empresa y sus Subsidiarias y Filiales respecto a cualquier reclamación o demanda que pudiera generarse en relación con el 2015 Plan.

## NETHERLANDS

There are no country specific provisions.

## RUSSIA

U.S. Transaction.  You understand that acceptance of the grant of the Performance Share Units results in a contract between you and the Company completed in the United States and that the Agreement is governed by the laws of the State of New York, without regard to choice of law principles thereof.  Any Stock to be issued upon vesting of the Performance Share Units shall be delivered to you through a brokerage account in the U.S.  You may hold the Stock in your brokerage account in the U.S.; however, in no event will Stock issued to you under the 2015 Plan be delivered to you in Russia. You are not permitted to sell the Stock directly to other Russian legal entities or individuals.

Securities Law Information.  You acknowledge that the Agreement, the grant of the Performance Share Units, the 2015 Plan and all other materials you may receive regarding participation in the 2015 Plan do not constitute advertising or an offering of securities in Russia. Absent any requirement under local law, the issuance of securities pursuant to the 2015 Plan has

not and will not be registered in Russia and therefore, the securities described in any 2015 Plan-related documents may not be used for offering or public circulation in Russia.

## SINGAPORE

Securities Law Information.  The grant of the Performance Share Units is being made pursuant to the "Qualifying Person" exemption under section 273(1)(f) of the Securities and Futures Act (Chapter 289, 2006 Ed.) ("SFA") under which it is exempt from the prospectus and registration requirements and is not made with a view to the underlying shares being subsequently offered for sale to any other party.  The 2015 Plan has not been and will not be lodged or registered as a prospectus with the Monetary Authority of Singapore and is not regulated by any financial supervisory authority pursuant to any legislation in Singapore. Accordingly, statutory liability under the SFA in relation to the content of prospectuses would not apply.  You should note that the Performance Share Units are subject to section 257 of the SFA and you should not make (i) any subsequent sale of Stock in Singapore or (ii) any offer of such subsequent sale of Stock subject to the awards in Singapore, unless such sale or offer is made (a) after six months from the Date of Grant or (b) pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the SFA.

## SOUTH KOREA

There are no country specific provisions.

SPAIN

**Nature of Grant.** This provision supplements the Nature of Grant section of Appendix A:

By accepting the Performance Share Units, you consent to participation in the 2015 Plan and acknowledge that you have received a copy of the 2015 Plan.

You understand and agree that, as a condition of the grant of the Performance Share Units, except as provided for under the Termination of Employment section of the Award Terms, the termination of your employment for any reason (including for the reasons listed below) will automatically result in the loss of the Performance Share Units that may have been granted to you and that have not vested on the date of termination.

In particular, you understand and agree that any unvested Performance Share Units as of your termination date will be forfeited without entitlement to the underlying shares of Stock or to any amount as indemnification in the event of a termination by reason of, including, but not limited to: resignation, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be without cause (i.e., subject to a "despido improcedente"), individual or collective layoff on objective grounds, whether adjudged to be with cause or adjudged or recognized to be without cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, unilateral withdrawal by the Employer, and under Article 10.3 of Royal Decree 1382/1985.

Furthermore, you understand that the Company has unilaterally, gratuitously and in its sole discretion decided to grant the Performance Share Units under the 2015 Plan to individuals who may be employees of the Company or any Subsidiary or Affiliate. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not economically or otherwise bind the Company or its Subsidiaries or Affiliates over and above the specific terms set forth in this Agreement. Consequently, you understand that the Performance Share Units are granted on the assumption and condition that the Performance Share Units and the shares of Stock issued at vesting shall not become a part of any employment or service contract (either with the Company, the Employer or any Subsidiary or Affiliate) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever. In addition, you understand that the grant of the Performance Share Units would not be made to you but for the assumptions and conditions referred to above; thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant to you of the Performance Share Units shall be null and void.

**Securities Law Information.** The Performance Share Units and the shares of Stock described in this Agreement do not qualify under Spanish regulations as securities. No "offer of securities to the public," as defined under Spanish law, has taken place or will take place in the Spanish territory. The Agreement has not been nor will it be registered with the Comisión Nacional del Mercado de Valores, and does not constitute a public offering prospectus.

SWITZERLAND

**Securities Law Information.** The Performance Share Units are not intended to be publicly offered in or from Switzerland. Because the offer of the Performance Share Units is considered a private offering, it is not subject to registration in Switzerland. Neither this document nor any other materials relating to the Performance Share Units (i) constitutes a prospectus as such term is understood pursuant to article 652a of the Swiss Code of Obligations, and neither this document nor any other materials relating to the Performance Share Units (ii) may be publicly distributed or otherwise made publicly available in Switzerland, and (iii) have been or will be filed with, approved or supervised by any Swiss regulatory authority.

TAIWAN

There are no country specific provisions.

<u>UNITED KINGDOM</u>

**Responsibility for Taxes.**  This provision supplements the Withholding section of the Award Terms:

If payment or withholding of income tax is not made within 90 days of the end of the U.K. tax year in which the event giving rise to the liability for income tax occurs (the "Due Date") or such other period specified in Section 222(1)(c) of the U.K. Income Tax (Earnings and Pensions) Act 2003, the amount of any uncollected income tax will constitute a loan owed by you to the Employer, effective on the Due Date.  You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately

due and repayable, and the Company or the Employer may recover it at any time thereafter by any of the means referred to in the Withholding section. Notwithstanding the foregoing, if you are a director or executive officer of the Company (within the meaning of Section 13(k) of the Exchange Act), you will not be eligible for such a loan to cover the income tax liability. In the event that you are a director or executive officer and income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax may constitute a benefit to you on which additional income tax and national insurance contributions may be payable. You will be responsible for reporting and paying any income tax and national insurance contributions due on this additional benefit directly to HMRC under the self-assessment regime and for reimbursing the Company or the Employer for any employee national insurance contributions due on this additional benefit, which the Company or the Employer may recover at any time thereafter by any of the means referred to in the Withholding section.

## EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (the "**Agreement**"), made and entered into as of January 18, 2024 with the effective date as of January 1, 2024 (the "**Effective Date**"), by and between **CELSIUS HOLDINGS, INC.**, a Nevada corporation (the "**Company**") and **JOHN FIELDLY** ("**Executive**"). The Company and Executive are sometimes referred to herein individually, as a "**Party**" and collectively, as the "**Parties**."

## RECITAL

**WHEREAS**, the Company is actively engaged in the business of manufacturing and distributing functional supplements and other digestible products in various delivery systems;

**WHEREAS**, Executive currently serves as Chief Executive Officer of the Company pursuant to an employment agreement between Executive and the Company dated August 1, 2020, with an effective date of January 1, 2021 (the "**Prior Agreement**"); and,

**WHEREAS**, Company desires to continue to employ Executive and Executive desires to continue to be employed pursuant to the terms of this Agreement.

## AGREEMENT

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

Article 1.
Employment of Executive

The Company agrees to continue to employ Executive, and Executive accepts continued employment with the Company, on and subject to the terms and conditions set forth in this Agreement.

Article 2.
Duties of Executive

Section 2.1. *Position and Duties*. During the Term (as hereinafter defined), the Company agrees to employ Executive as its Chief Executive Officer ("**CEO**") and agrees Executive will serve as a member the Company's Board of Directors (the "**Board**"). Executive shall report solely to the Board; and perform those services customary to the office of a CEO and such other lawful duties that may be reasonably assigned to him from time to time by the Board that are consistent with Executive's position. As part of Executive's duties, he shall have the right to approve the hiring and to terminate the employment of any other employee of the Company, other than C-Suite executives, who may only be terminated with concurrence of the Board.

Section 2.2. *Time Devoted to Work*. Executive further agrees to use his best efforts to promote the interests of the Company and to devote substantially all of his business time and energies to the business and affairs of the Company. Notwithstanding the foregoing, Executive will be permitted to (a) with the prior written consent of the Board (which consent will not be unreasonably withheld or delayed) act or serve as a director, trustee, or committee member of any type of business, civic, or charitable organization (but not to exceed three (3) organizations); and (b) purchase or hold any ownership interest of any investment; *provided that* (i) such ownership

represents a passive investment and does not exceed a five (5%) equity ownership in such entity; and (ii) Executive is not a controlling person of, or a member of a group that controls, such entity; *provided further that*, the activities described in **clauses (a)** and **(b)** do not interfere with the performance of Executive's duties and responsibilities to the Company as provided hereunder.

Article 3.
Place of Employment

Section 3.1. *Place of Employment*. Executive shall be based at the Company's principal office at 2424 N. Federal Highway, Suite 208 Boca Raton, FL 33431.

Article 4.
Compensation of Executive

Section 4.1. *Base Salary*. For all services rendered by Executive under this Agreement, the Company agrees to pay Executive an annual base salary of $850,000 ("**Base Salary**"), effective on the Effective Date. Base Salary shall be payable to Executive in such installments, but not less frequently than monthly, as are consistent with the Company's practice for its other executives. Executive's Base Salary shall be reviewed for an increase at least once annually by the Board.

Section 4.2. *Performance Bonus*. Executive will be eligible to receive a performance bonus during each calendar year of employment with the Company during the Term, with target equal to 100% of Executive's then current Base Salary. (the "**Performance Bonus**"). The award of each year's Performance Bonus shall be based upon performance criteria to be determined by the Compensation Committee and approved by the Board after consultation with Executive and paid within ninety (90) days of calendar year-end for each subsequent calendar year, but subject, in any event, subject to the discretion of the Board and the terms of the applicable short-term bonus plan (the "**Performance Criteria**").

Section 4.3. *Equity Awards*.

(a)     Executive will be entitled to an annual equity award under the Company's 2015 Stock Incentive Plan (the "**Plan**") (or a successor plan) in an amount and on terms determined by the Board based upon the annual Performance Criteria adopted by the Board. For 2024, the grant date target value of the long-term incentive award will be $3,000,000.

(b)     The term of any options granted to Executive shall be not less than five (5) years from the date of grant. No changes may be made to any equity award or to the Plan (or successor plan) under which any equity award was granted to Executive, that adversely impacts Executive's interest without Executive's consent. For purposes of this provision, any modification to an incentive stock option ("**ISO**") that may cause it to cease to be an ISO shall be deemed to adversely impact Executive. All stock options may be exercised pursuant to a cashless exercise, to the extent permitted by the Plan (or successor plan) and as otherwise permitted by applicable law and regulations. All options or other equity awards granted under the Plan (or successor plan) shall be subject to the terms and conditions of the Plan (or successor plan), which shall control.

Section 4.4. *Representations of the Company Regarding Compensation Plans and Arrangements*. The Company represents to Executive that all plans and arrangements providing for performance-based compensation and equity compensation provided hereunder have been properly approved and authorized by the Board, and where applicable, shareholders of the Company. All equity plans comply with the requirements of federal and applicable state securities laws and the

**2** | P a g e

rules and regulations of Nasdaq, so that the awards granted to Executive hereunder are valid and not subject to rescission or forfeiture.

Section 4.5. *Reimbursement for Business Expenses*. The Company shall promptly pay or reimburse Executive for all reasonable business expenses incurred by Executive in performing Executive's duties and obligations under this Agreement. Executive agrees to properly account for his business expenses in accordance with the Company's policies as in effect, from time to time during the Term.

Article 5.
Vacations and Other Paid Absences

Section 5.1. *Vacation Days*. Executive shall be entitled to twenty (20) days paid vacation each calendar year during the Term. Vacation days shall accrue in accordance with the policy established by the Company for its executives from time to time and the extent not used, shall not be carried over to the next calendar year.

Section 5.2. *Holidays*. Executive shall be entitled to the same paid holidays as authorized by the Company for its other executives.

Section 5.3. *Sick Days and Personal Absence Days*. Executive shall be entitled to the same number of paid sick days and personal absence days authorized by the Company for its other executives.

executives.

## Article 6.
## Life and Disability Insurance

The Company may, in its sole discretion, maintain in effect during the Term, life and/or disability policies on the life of Executive in such amounts as the Company shall in its sole discretion decide to maintain during the Term. Any proceeds payable under such policies shall be paid to the beneficiary or beneficiaries designated in writing from time to time by Executive in the case of death or to Executive or his legal representatives in the case of Disability and such proceeds shall be applied to amounts due Executive or his heirs or legal representatives from the Company pursuant to **Section 8.2** or **Section 8.3**.

## Article 7.
## Benefit Plans

Section 7.1. *Executive Benefit Plans*. Executive shall be entitled to participate in and receive benefits from all of the Company's executive benefit plans that are maintained by the Company for its executives as of the Effective Date, including, but not limited to any retirement plan, profit-sharing plan, or other executive benefit plan that the Company establishes for the benefit of its executives after the Effective Date ("**Executive Benefit Plans**"). No amounts paid to Executive from an Executive Benefit Plan shall count as compensation due Executive as Base Salary or Performance Bonus provided for hereunder. Nothing in this Agreement shall prohibit the Company from modifying or terminating any of its Executive Benefit Plans in a manner that does not discriminate between Executive and other executives of the Company. The Company reserves the right to amend or cancel any Executive Benefit Plan at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

Section 7.2. *Broad-Based Employee Benefits Plans*. Executive shall be entitled to participate in all broad-based employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "**Employee Benefit Plans**"), on a basis which is no less favorable than is provided to other similarly situated executives of the Company,

3 | P a g e

to the extent consistent with the terms of the applicable Employee Benefit Plans and applicable law. The Company reserves the right to amend or cancel any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

## Article 8.
## Term and Termination

Section 8.1. *Term*. Executive's term of employment under this Agreement (the "**Term**") shall commence on the Effective Date and shall continue until the three-year anniversary of such date, *provided, however*, that the Term shall thereafter be automatically extended for unlimited additional one-year periods unless, at least ninety (90) days prior to the then-scheduled date of expiration of the Term, either (a) the Company gives notice to Executive that it is electing not to so extend the Term or (b) Executive gives notice to the Company that he is electing not to so extend the Term. Notwithstanding the foregoing, the Term may be earlier terminated in strict accordance with the provisions of this Article 8, in which event Executive's employment with the Company shall expire in accordance therewith.

Section 8.2. *Termination at Executive's Death*. Executive's employment with the Company shall terminate upon Executive's death. Subject to **Section 8.9**, if Executive's employment terminates because of Executive's death, the Company shall pay, within thirty (30) days of the Termination Date, a lump sum death benefit to the person or persons designated in a written notice filed with the Company by Executive or, if no person has been designated, to Executive's legal representatives or estate. The amount of the lump sum death benefit will equal the amount of Executive's then current annual Base Salary plus a *pro rata* amount of Performance Bonus, based upon the annual Performance Bonus paid Executive most recently prior to Executive's death, multiplied by a fraction, the numerator of which is the number of full months he was employed hereunder during the year of his termination and the denominator of which is 12. If Executive's employment terminates due to his death, the vesting and exercisability of any options or other equity incentives awarded under the Plan (or any successor plan), will accelerate on the Termination Date, so that the options or other equity incentives awarded will vest on a pro-rata basis, such that the number of options or other equity awards that would have vested on the vesting date following Executive's termination (the "**Next Vesting Date**") will be multiplied by a fraction, the numerator of which is the number of full months he was employed hereunder from the prior vesting date (or date of grant, if there was no such prior vesting date) (the "**Prior Vesting Date**") through the date of his termination and the denominator of which is the number of full months from the Prior Vesting Date through the Next Vesting Date.

Section 8.3. *Termination after Executive's Disability*. Except as may otherwise be required

or prohibited by state or federal law, if because of illness or injury Executive becomes unable to work full time for the Company for more than ninety (90) consecutive days or one hundred and eighty (180) days, whether or not consecutive in any twelve (12) month period during the Term ("**Disability**") the Company may, in its sole discretion, at any time after the Disability occurs and provided Executive has not returned to full time employment with the Company, the Company may terminate Executive's employment upon written notice to Executive. In such event, subject to **Section 8.9**, (a) Executive will receive within thirty (30) days of the Termination Date, a lump sum equal to Executive's Base Salary plus a *pro rata* amount of Performance Bonus, based upon the annual Performance Bonus paid Executive most recently prior to Executive's Disability, multiplied by a fraction, the numerator of which is the number of full months he was employed hereunder during the year of his termination and the denominator of which is 12; (b) for the twelve (12) month period following the Termination Date, Executive will be entitled to continue participation in any Executive Benefit Plan and/or Employee Benefit Plan which he was participating in at the date of termination, provided that the terms of such Executive Benefit Plan or Employee Benefit Plan and applicable law permit such continued participation; and (c) the vesting and exercisability of any options or other equity incentives awarded under the Plan (or any successor plan), will

4 | P a g e

accelerate on the Termination Date, so that the options or other equity incentives awarded will vest on a pro-rata basis, such that the number of options or other equity awards that would have vested on the Next Vesting Date will be multiplied by a fraction, the numerator of which is the number of full months he was employed hereunder from the Prior Vesting Date through the date of his termination and the denominator of which is the number of full months from the Prior Vesting Date through the Next Vesting Date.

Section 8.4. *Termination by the Company for Cause or by Executive Without Good Reason.* Executive's employment hereunder may be terminated by the Company for Cause (as hereinafter defined) or by Executive without Good Reason (as hereinafter defined). If Executive's employment is terminated by the Company for Cause or by Executive without Good Reason, Executive shall be entitled to receive the following ("**Accrued Amounts**"):

> (a)    any accrued but unpaid Base Salary and accrued but unused vacation which shall be paid in accordance with the Company's customary payroll procedures;

> (b)    any earned but unpaid Performance Bonus with respect to any completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date;

> (c)    reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; and

> (d)    such employee benefits, if any, to which Executive may be entitled under the Company's employee benefit plans as of the Termination Date; *provided that*, in no event shall Executive be entitled to any payments in the nature of severance or termination payments except as specifically provided herein.

In addition to the foregoing, all options or other equity incentive awards granted to Executive under the Plan (or any successor plan), to the extent unvested, shall terminate forthwith.

Section 8.5. *Without Cause or for Good Reason or upon Non-Renewal.* Executive's employment hereunder may be terminated by the Company without Cause, by Executive for Good Reason or upon non-renewal of the Term as provided in **Section 8.1**. In the event of such termination or upon non-renewal by the Company, Executive shall be entitled to receive the Accrued Amounts and subject to **Section 8.9** and Executive's compliance with **Articles 9** and **10** of the Agreement, Executive shall be entitled to the following:

> (a)    An amount equal to two (2) times the sum of (i) Executive's Base Salary in effect on the Termination Date plus (ii) Executive's target annual Performance Bonus for the calendar year in which the termination occurs, paid in equal installment payments in accordance with the Company's normal payroll practices for a period of twenty-four (24) months from the Termination Date, beginning on the first regular payroll date following the date that the Release described in **Section 8.9** becomes irrevocable;

> (b)    All option grants or equity awards to Executive under the Plan (or any successor plan), to the extent vested as of the Termination Date; and

> (c)    If Executive timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985

> ("**COBRA**"), the Company shall reimburse Executive for the difference between the monthly COBRA premium paid by Executive for himself and his dependents and the monthly premium amount paid by similarly situated active executives. Such reimbursement shall be paid to Executive on the day of the month immediately following the month in which Executive timely remits the premium payment. Executive shall be eligible to receive such reimbursement for the same period in which the payments of severance are payable to Executive.

In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement and any amounts payable pursuant to this **Section 8.5** shall not be reduced by compensation Executive earns on account of employment with another employer.

Section 8.6. *Notice of Termination*. Any termination of Executive's employment by the Company or Executive, must be communicated to the other Party by a written notice. The notice must specify the provision of this Agreement providing the basis for the termination.

Section 8.7. *Special Terms*. For purposes of this Agreement, the following terms have the following meanings:

(a)     the term "**Cause**" shall mean the occurrence of any of the following, in each case during the Term:

(i)     an action or omission of Executive which constitutes a material breach of, or failure or refusal (other than by reason of his disability) to perform his material duties under, this Agreement which is not cured within fifteen (15) days after receipt by Executive of written notice of same;

(ii)     Executive's fraud, embezzlement, or misappropriation of funds in connection with his services hereunder;

(iii)     Executive's conviction of any crime which involves dishonesty, moral turpitude or any felony;

(iv)     gross negligence of Executive in connection with the performance of Executive's material duties hereunder, which is not cured within fifteen (15) days after written receipt by Executive of written notice of same;

(v)     violation by Executive of **Article 9** or **Article 10** of this Agreement; or

(vi)     the entry by a court of competent jurisdiction of permanent injunctive or other declaratory relief prohibiting or determining that Executive's service as an officer, director or employee of the Company, as the case may be, violates a prior agreement between Executive and a prior employer of Executive.

Termination of Executive's employment shall not be deemed to be for Cause unless and until the Company delivers to Executive a copy of a resolution duly adopted by the affirmative vote of the Board after the expiration of applicable notice, hearing and cure provisions.

6 | P a g e

(b)     the term "**Change in Control**" shall mean the occurrence of one of the following events (excluding acquisitions of stock or assets by any beneficial owner of five percent (5%) or more of the Company's common stock as set forth in the Company's Annual Report on Form 10-K for the year ended December 31, 2017 or their respective affiliates):

(i)     one person (or more than one person acting as a group) acquires (or has acquired during the twelve-month period ending on the date of the most recent acquisition) ownership of the Company's stock possessing 50% or more of the total voting power of the stock of the Company;

(ii)     the sale of all or substantially all of the Company's assets; or

(iii)     individuals who, as of the date of this Agreement, constitute the Board (the "**Incumbent Board**") cease for any reason to constitute at least a majority of the Board within a twelve (12) month period, *provided that* any person becoming a director subsequent to the Effective Date whose nomination was approved by the affirmative vote of the Board, shall be considered as though such person were a member of the Incumbent Board.

(c)    the term "**Good Reason**" shall mean the occurrence of any of the following, in each case during the Term without Executive's written consent:

    (i)    a reduction in Executive's Base Salary;

    (ii)    a reduction in Executive's Performance Bonus opportunity;

    (iii)    any material breach by the Company of any material provision of this Agreement or any material provision of any other agreement between Executive and the Company;

    (iv)    the Company's failure to obtain an agreement from any successor to the Company to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no succession had taken place, except where such assumption occurs by operation of law;

    (v)    an adverse change in Executive's title, authority, duties, or responsibilities (other than temporarily while Executive is physically or mentally incapacitated or as required by applicable law); or

    (vi)    an adverse change in the reporting structure applicable to Executive.

Executive cannot terminate his employment for Good Reason hereunder unless he has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason and the Company has had at least fifteen (15) days from the date on which such notice is provided to cure such circumstances.

    (d)    The term "**Termination Date**" shall mean:

    (i)    If Executive's employment terminates because of Executive's death, then Executive's employment will be considered to have terminated on the date of Executive's death.

    (ii)    If Executive's employment is terminated by Executive, then Executive's employment will be considered to have terminated on the date that notice of termination is given.

    (iii)    If Executive's employment is terminated by the Company (whether after Disability, for Cause or without Cause), then Executive's employment will be considered to have terminated on the date specified by the notice of termination.

Notwithstanding anything contained herein, the Termination Date shall not occur until the date on which Executive incurs a "**separation from service**" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended or any successor statute (the "**Code**").

Section 8.8. *Change in Control Payments*. If within three months prior to or within two years following a Change in Control and prior to expiration of the Term, the Company terminates Executive's employment without Cause or due to non-renewal of the Term by the Company or Executive terminates his employment for Good Reason, then, in lieu of amounts which Executive is entitled to receive from the Company pursuant to this **Article 8**, Executive shall be entitled to receive the Accrued Amounts and, subject to **Section 8.9** and Executive's compliance with **Articles 9** and **10** of the Agreement, Executive shall be entitled to the following:

    (a)    An amount equal to two and a half (2.5) times the sum of (i) Executive's Base Salary in effect on the Termination Date plus (ii) Executive's target annual Performance Bonus for the calendar year in which the termination occurs, paid in a lump sum on the sixtieth (60th) day following the Termination Date;

    (b)    Full vesting and exercisability of all option grants or equity awards granted to Executive under the Plan (or any successor plan), *provided* that performance-based awards shall vest based on the target level of performance; and

    (c)    If Executive timely and properly elects health continuation coverage under COBRA, the Company shall reimburse Executive for the

difference between the monthly COBRA premium paid by Executive for himself and his dependents and the monthly premium amount paid by similarly situated active executives. Such reimbursement shall be paid to Executive on the day of the month immediately following the month in which Executive timely remits the premium payment. Executive shall be eligible to receive such reimbursement for thirty (30) months following the Termination Date.

Section 8.9 _Release_.   Executive's entitlement to the payments described in **Sections 8.2**, **8.3**, **8.5** and **8.8** (other than the Accrued Obligations) is expressly contingent upon Executive (or Executive's beneficiary or estate, as applicable) first providing the Company with a signed release of claims in favor of the Company (the "**Release**").  In order to be effective, such Release must be delivered by Executive to the Company no later than forty-five (45) days following the Termination Date and not revoked by Executive during the seven (7) day period following such delivery.

Section 8.10. *Section 280G*. If any of the payments or benefits received or to be received by Executive (including, without limitation, any payment or benefits received in connection with the termination of Executive's employment, whether following a Change in Control or otherwise, whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement, or otherwise) (all such payments collectively referred to herein as the "**280G Payments**") constitute "**parachute payments**" within the meaning of Section 280G of the Code and would, but for this **Section 8.10**, be subject to the excise tax imposed under Section 4999 of the Code (the "**Excise Tax**"), then prior to making the 280G Payments, a calculation shall be made comparing (a) the Net Benefit (as defined below) to Executive of the 280G Payments after payment of the Excise Tax; to (b) the Net Benefit to Executive if the 280G Payments are limited to the extent necessary to avoid being subject to the Excise Tax. Only if the amount calculated under (a) above is less than the amount under (b) above will the 280G Payments be reduced to the minimum extent necessary to ensure that no portion of the 280G Payments is subject to the Excise Tax. "**Net Benefit**" shall mean the present value of the 280G Payments net of all federal, state, local, foreign income, employment, and excise taxes. Any reduction made pursuant to this **Section 8.10** shall be made in a manner determined by the Company that is consistent with the requirements of Section 409A.

All calculations and determinations under this **Section 8.10** shall be made by an independent accounting firm or independent tax counsel appointed by the Company (the "**Tax Counsel**") whose determinations shall be conclusive and binding on the Company and Executive for all purposes. For purposes of making the calculations and determinations required by this **Section 8.10**, the Tax Counsel may rely on reasonable, good faith assumptions and approximations concerning the application of Section 280G and Section 4999 of the Code. The Company and Executive shall furnish the Tax Counsel with such information and documents as the Tax Counsel may reasonably request in order to make its determinations under this **Section 8.10**. The Company shall bear all costs the Tax Counsel may reasonably incur in connection

Article 9.
Confidential Information

Section 9.1. *Confidential Information Defined*. "**Confidential Information**" as used in this Employment Agreement shall mean any and all technical and non-technical information, regardless of format, belonging to, or in the possession of, the Company or its officers, directors, executives, affiliates, subsidiaries, clients, vendors, or executives, including without limitation, patent, trade secret, and proprietary information; techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, source codes, object codes, software programs, software source documents, and formulae related to the Company's business or any other current, future and/or proposed business, product or service contemplated by the Company; and includes, without limitation, all information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, vendor lists, business forecasts, sales and merchandising, and marketing plans or similar information.

Section 9.2. *Disclosures*. Executive agrees that he shall, at no time during or after termination of this Employment Agreement, directly or indirectly make use of, disseminate, or in any way disclose Confidential Information to any person, firm or business, except to the extent necessary for performance of this Employment Agreement or as otherwise required by law. Executive agrees that he shall disclose Confidential Information only to the Company's employees, consultants and advisors who need to know such information and who Executive believes have previously agreed to be bound by the terms and conditions of a substantially similar confidentiality provision and shall be liable for damages for the intentional disclosure of Confidential Information. Executive's obligations with respect to any portion of Confidential Information shall terminate only when: (a) such information is lawfully in the public domain; or (b) the communication was in response to a valid order or subpoena issued under the authority

of a court of competent jurisdiction, provided, however that Executive shall promptly notify the Company of his notice of any such order or subpoena and he agrees to cooperate reasonably with the Company in an attempt to limit or avoid such disclosure.

Section 9.3. This **Article 9** shall survive expiration or termination of this Agreement.

Article 10.
Noncompetition; Non-Solicitation

Section 10.1. *Noncompetition.* For a period of twenty-four (24) months from the Termination Date (the "**Restricted Period**"), Executive agrees not to directly or indirectly own, manage, control, operate or serve as a director, manager, officer, director, partner or employee of, have any direct or indirect financial interest in (other than an interest in a prior employer), or assist in any way; any person or entity that engages in the Business in any geographic region in which the Company conducts the Business. For purposes of this Agreement, the "**Business**" shall mean companies that are in the same category or industry, as defined by Spins, Nielson, or IRI, as the Company as of the Termination Date or in the same category or industry, as defined by Spins, Nielson, or IRI, of any other line of business that the Company has an intention, as evidenced by the Company's written business plans as of the Termination Date, to engage in following the Termination Date.

Section 10.2. *Non-Solicitation.* During the Restricted Period, Executive shall not, directly or indirectly, take any of the following actions, and, to the extent Executive owns, manages, operates, controls, is employed by or participates in the ownership, management, operation or control of, or is connected in any manner with, any business, Executive shall use his best efforts to ensure that such business does solicit employment or a similar relationship as an independent contractor or employ or retain as an independent contractor, any person who during the Restricted Period is or within one (1) year prior to the date of termination of Executive's employment with the Company was, an employee of or independent contractor to the Company or attempt to persuade any customer, prospective customer, vendor or supplier who during the Restricted Period is or within one (1) year prior to the date of termination of Executive's employment with the Company was, a customer, prospective customer, vendor or supplier of the Company, to cease doing business with the Company, or to reduce the amount of business it does with the Company.

Section 10.3. *Survival.* This **Article 10** shall survive any expiration or termination of this Agreement.

Article 11.
Intellectual Property

Section 11.1. Intellectual Property.

(a) All creations, inventions, ideas, designs, copyrightable materials, trademarks, and other technology and rights (and any related improvements or modifications), whether or not subject to patent or copyright protection (collectively, "**Creations**"), relating to any activities of the Company which are conceived by Executive or developed by Executive in the course of his employment with the Company, whether prior to or during the Term, whether conceived alone or with others and whether or not conceived or developed during regular business hours, shall be the sole property of the Company and, to the maximum extent permitted by applicable law, shall be deemed "**works made for hire**" as that term is used in the United States Copyright Act.

(b) To the extent, if any, that Executive retains any right, title or interest with respect to any Creations delivered to the Company or related to his employment with the Company, Executive hereby grants to the Company an irrevocable, paid-up, transferable, sub-licensable, worldwide right and license: (i) to modify all or any portion of such Creations, including, without limitation, the making of additions to or deletions from such Creations, regardless of the medium (now or hereafter known) into which such Creations may be modified and regardless of the effect of such modifications on the integrity of such Creations; and (ii) to identify Executive, or not to identify him, as one or more authors of or contributors to such Creations or any portion thereof, whether or not such Creations or any portion thereof have been modified. Executive further waives any "**moral**" rights, or other rights with respect to attribution of authorship or integrity of such Creations that he may have under any applicable law, whether under copyright, trademark, unfair competition, defamation, and right of privacy, contract, tort or other legal theory.

(c) Executive will promptly inform the Company of any Creations. Executive will also allow the Company under reasonable conditions to inspect any Creations he conceives or develops within one (1) year after the termination of his employment for any reason to determine if they are based on Confidential Information. Executive shall (whether during his employment or after the termination of his employment) execute such written instruments and do other such acts as may be reasonable and necessary to secure the Company's rights in

the Creations, including obtaining a patent, registering a copyright, or otherwise (and Executive hereby irrevocably appoints the Company and any of its officers as his attorney in fact to undertake such acts in his name). Executive's obligation to execute written instruments and otherwise assist the Company in securing its rights in the Creations will continue after the termination of his employment for any reason. The Company shall reimburse Executive for any out-of-pocket expenses (but not attorneys' fees) he incurs in connection with his compliance with this **Section 11.1**.

Section 11.2. *Survival*. This **Article 11** shall survive any expiration or termination of this Agreement.

Article 12.
Enforcement

Section 12.1. *Reasonableness of Restrictions*. **Articles 9**, **10** and **11** of this Agreement are intended to protect the Company's interest in its Confidential Information, goodwill and established employee and customer relationships. Executive agrees that such restrictions are reasonable and appropriate for this purpose.

Section 12.2. *Specific Enforcement*. Notwithstanding anything else provided in this Agreement, Executive agrees that it would be difficult to measure any damages caused to the Company which might result from any breach by Executive of **Article 9**, **10** and **11** of this Agreement. Accordingly, if Executive breaches any term of **Articles 9**, **10** and **11** of this Agreement the Company shall be entitled, in addition to all other remedies that it may have, to a temporary and preliminary injunction or other appropriate equitable relief to restrain any such breach without showing or providing any actual damage to the Company from any court having competent jurisdiction over Executive.

Article 13.
Miscellaneous

**11** | P a g e

Section 13.1. *Disputes/Arbitration*.

(a)   The Company and Executive waive their right to seek remedies in court, including any right to a jury trial. The Company and Executive agree that any dispute arising out of or relating to this Agreement, Executive's employment with the Company, or any termination of such employment, shall be resolved by binding arbitration before a single, neutral arbitrator in the county in which Executive worked at the time the dispute or claim arose, unless the Company and Executive mutually agree to a different location.  The arbitration shall be administered in accordance with the applicable JAMS Employment Arbitration Rules and Procedures ("JAMS Rules") to the extent they are not inconsistent with this Agreement.  The Company and Executive agree that nothing in this Agreement relieves either party from any obligation it may have to exhaust certain administrative remedies before arbitrating any claims or disputes under this Agreement.  Each claim subject to arbitration must be initiated within the applicable statute of limitations. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(b)   EXECUTIVE ACKNOWLEDGES THAT HE HAS RECEIVED AND READ OR HAS HAD THE OPPORTUNITY TO READ THIS AGREEMENT AND THAT IT INCLUDES AN AGREEMENT TO ARBITRATE. EXECUTIVE ALSO UNDERSTANDS AND AGREES THAT HE HAS BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE SIGNING THIS AGREEMENT, AND HAS HAD AN OPPORTUNITY TO DO SO.  EXECUTIVE AGREES THAT HE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS THAT BY SIGNING IT, HE IS WAIVING ALL RIGHTS TO A COURT TRIAL OR HEARING BEFORE A JUDGE AND/OR JURY OF ANY AND ALL DISPUTES AND CLAIMS SUBJECT TO ARBITRATION UNDER THIS AGREEMENT.

(c)   The prevailing Party shall be entitled to reasonable attorneys' fees and costs from the non-prevailing Party in connection with any action filed under this **Section 13.1**.

Section 13.2. *Integration*. This Employment Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements between the Parties concerning such subject matter, including the Prior Agreement.

Section 13.3. *Section 409A of the Code.*

Section 13.3. *Section 409A of the Code.*

     (a)    Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall either be exempt from the requirements of Section 409A of the Code ("**Section 409A**") or shall comply with the requirements of such provision. Notwithstanding any provision of this Agreement to the contrary, if Executive is a "specified employee" within the meaning of Section 409A, any payments or arrangements due upon a termination of Executive's employment under any arrangement that constitutes a "deferral of compensation" within the meaning of Section 409A and which do not otherwise qualify under the exemptions under Treas. Regs. Section 1.409A-1 (including without limitation, the short-term deferral exemption or the permitted payments under Treas. Regs. Section 1.409A-1(b)(9)(iii)(A)), shall be delayed and paid or provided on the earlier of (i) the date which is six months after Executive's "separation from service" (as such term is

12 | P a g e

defined in Section 409A and the regulations and other published guidance thereunder) for any reason other than death, and (ii) the date of Executive's death.

(b) After any Termination Date, Executive shall have no duties or responsibilities that are inconsistent with having a "separation from service" within the meaning of Section 409A as of the Termination Date and, notwithstanding anything in the Agreement to the contrary, distributions upon termination of employment may only be made upon a "separation from service" as determined under Section 409A and such date shall be the Termination Date for purposes of this Agreement. Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A. In no event may Executive, directly or indirectly, designate the calendar year of any payment to be made under this Agreement which constitutes a "deferral of compensation" within the meaning of Section 409A.

(c) Any amounts otherwise payable to Executive following a termination of employment that are not so paid by reason of this Section 13.2 shall be paid as soon as practicable following, and in any event within thirty (30) days following, the date that is six months after Executive's separation from service (or, if earlier, the date of Executive's death) together with interest on the delayed payment at the Company's cost of borrowing. All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A.

Section 13.4. *Binding Agreement*. This Agreement shall inure to the benefit of and be enforceable by Executive's personal representatives, executors, administrators, heirs, distributees, devisees and legatees. In the event of Executive's death after his termination of employment but prior to the completion by the Company of all payments due him under this Agreement, the Company shall continue such payments to Executive's beneficiary designated in writing to the Company prior to his death (or to his estate, if Executive fails to make such designation). The Company shall require any successor to the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

Section 13.5. *Enforceability*. If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Section 13.6. *Waiver*. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving Party. The failure of any Party to require the performance of any term or obligation of this Agreement, or the waiver by any Party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

Section 13.7. *Notices*. Notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and delivered in person or sent by a nationally recognized overnight courier service to Executive at the last address Executive has filed in writing with the Company or, in the case of the Company, at its main offices, attention of the Chief Financial Officer. Notices shall be effective on receipt.

Section 13.8. *Amendment*. This Agreement may be amended or modified only by a written instrument signed by Executive and by a duly authorized representative of the Company.

Section 13.9. *Governing Law*. This is a Florida contract and shall be construed under and be governed in all respects by the laws of Florida for contracts to be performed in that state and without giving effect to the conflict of laws principles of Florida or any other state.

Section 13.10. "**Affiliate**" *Defined*. As used in this Agreement, the term "**affiliate**" of a

Party shall mean any person who controls, is controlled by or who is under common control with a Party.

Section 13.11. *Counterparts*. This Agreement may be executed in any number of counterparts, including by facsimile, .PDF or other electronic transmission (which shall be deemed to be an original), each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute one and the same document.

14 | P a g e

**IN WITNESS WHEREOF**, the Parties have executed this Agreement effective as of the Effective Date.

**THE COMPANY:**

CELSIUS HOLDINGS, INC.

By: /s/Richard Mattessich
     Richard Mattessich

By: /s/Hal Kravitz
     Hal Kravitz

**EXECUTIVE:**

/s/ John Fieldly
John Fieldly



15 | P a g e

**Exhibit 21.1**

**Subsidiaries of Celsius Holdings, Inc.**
**(as of December 31, 2023)**

| Entity Name | Jurisdiction of Organization |
|---|---|
| Celsius, Inc. | Nevada |
| Celsius Canada EH, LLC | Nevada |
| Celsius Asia Holdings Ltd. | Hong Kong |
| Celsius China Holdings Ltd. | Hong Kong |
| Celsius (Beijing) Beverage Co. Ltd | China |
| Celsius European Holdings, B.V. | Netherlands |
| Celsius Europe OY | Finland |
| Celsius Finland OY | Finland |
| Celsius Live Fit International Designated Activity Company | Ireland |
| Celsius Sweden AB | Sweden |
| Celsius Holdings UK Ltd | United Kingdom |

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statements of Celsius Holdings, Inc. listed below of our reports dated February 28, 2024, with respect to the consolidated financial statements of Celsius Holdings, Inc., and the effectiveness of internal control over financial reporting of Celsius Holdings, Inc., included in this Annual Report (Form 10-K) for the year ended December 31, 2023:

- Registration Statement (Form S-3 No. 333-256930) of Celsius Holdings, Inc.;
- Registration Statement (Form S-3 No. 333-248875) of Celsius Holdings, Inc.;
- Registration Statement (Form S-8 No. 333-216029) pertaining to the Celsius Holdings, Inc. 2006 Stock Incentive Plan and 2015 Stock Incentive Plan;
- Registration Statement (Form S-8 No. 333-161356) pertaining to the Celsius Holdings, Inc. 2006 Stock Incentive Plan; and
- Registration Statement (Form S-8 No. 333-150334) pertaining to the Elite FX, Inc. Incentive Stock Plan.

/s/ Ernst & Young LLP

Boca Raton, Florida
February 28, 2024

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, John Fieldly, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2023 of Celsius Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and,

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: February 28, 2024

By: /s/ John Fieldly
      Name:    John Fieldly
                Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Jarrod Langhans, certify that:

1.  I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2023 of Celsius Holdings, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and,

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: February 28, 2024

By: /s/ Jarrod Langhans
_____
Name:    Jarrod Langhans
Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350 AS ADOPTED**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Celsius Holdings, Inc., a Nevada corporation (the "Company") on Form 10-K for the year ended December 31, 2023, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John Fieldly, the President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 28, 2024

CELSIUS HOLDINGS, INC.

By:  /s/ John Fieldly
      John Fieldly, President and Chief Executive Officer
      (Principal Executive Officer)

**Exhibit 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350 AS ADOPTED**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Celsius Holdings, Inc., a Nevada corporation (the "Company") on Form 10-K for the year ended December 31, 2023, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jarrod Langhans, the Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 28, 2024

CELSIUS HOLDINGS, INC.

By:   /s/ Jarrod Langhans
　　　Jarrod Langhans, Chief Financial Officer
　　　(Principal Financial and Accounting Officer)

Celsius Holdings, Inc.
Policy Regarding the Mandatory Recovery of Compensation
Effective November 1, 2023

1. **Applicability.** This Policy Regarding the Mandatory Recovery of Compensation (this "Policy") applies to any Incentive Compensation paid to the Executive Officers of Celsius Holdings, Inc. (the "Company"). The Policy is intended to comply with and be interpreted in accordance with the requirements of Listing Rule 5608 ("Listing Rule 5608") of The Nasdaq Stock Market LLC ("Nasdaq"). The provisions of Listing Rule 5608 shall prevail in the event of any conflict between the text of this Policy and such listing rule. Certain capitalized terms are defined in Section 4 hereof.

2. **Recovery.**

   (a) **Triggering Event.**

   Except as provided herein and subject to Section 2(b) below, in the event that the Company is required to prepare a Financial Restatement, the Company shall reasonably promptly recover the Recoverable Amount of any Incentive Compensation received by a current or former Executive Officer during the Look-Back Period. The Recoverable Amount shall be repaid to the Company within a reasonably prompt time after the current or former Executive Officer is notified in writing of the Recoverable Amount as set forth in Section 2(c) below. For the sake of clarity, the recovery rule in this Section 2(a) shall apply regardless of any misconduct or fault of the Company, any Executive Officer, the Company's Board of Directors (the "Board") or any committee thereof.

   (b) **Compensation Subject to Recovery.**

   Incentive Compensation subject to mandatory recovery under Section 2(a) includes any Incentive Compensation received by an Executive Officer:

   i) after beginning service as an Executive Officer;

   ii) who served as an Executive Officer at any time during the performance period for that Incentive Compensation;

   iii) while the Company has a class of securities listed on a national securities exchange or a national securities association; and

   iv) During the Look-Back Period.

   As used in this Section 2(b), Incentive Compensation is deemed "received" in the fiscal period that the Financial Reporting Measure specified in the applicable Incentive Compensation award is attained, even if the payment or grant of the Incentive Compensation occurs after the end of that period. For the elimination of doubt, an Executive Officer subject to this Policy may include a former Executive Officer who left the Company, retired or transitioned to a non-Executive Officer

   role (including after serving as an Executive Officer in an interim capacity) during the applicable Look-Bac Period.

   This Policy applies only to Incentive Compensation received on or after October 2, 2023.

   (c) Recoupment

(c) Recoupment.

The Human Resource and Compensation Committee of the Board (the "Compensation Committee") shall determine, at its sole discretion, the method for recouping Incentive Compensation, which may include, without limitation, (A) requiring reimbursement of Incentive Compensation previously paid; (B) seeking recovery of any gain realized on the vesting, exercise, settlement, sale, transfer, or other disposition of any equity-based awards; (C) deducting the amount to be recouped from any compensation otherwise owed by the Company to the Executive Officer; or (D) taking any other remedial and recovery action permitted by law, as determined by the Compensation Committee.

(d) Recoverable Amount.

i) The "Recoverable Amount" is equal to the amount of Incentive Compensation received in excess of the amount of Incentive Compensation that would have been received had it been determined based on the restated amounts in the Financial Restatement, without regard to any taxes paid by the Company or the Executive Officer.

ii) In the event the Incentive Compensation is based on a measurement that is not subject to mathematical recalculation, the Recoverable Amount shall be based on a reasonable estimate of the effect of the Financial Restatement, as determined by the Compensation Committee, which shall be set forth in writing. For example, in the case of Incentive Compensation based on stock price or total shareholder return, the Recoverable Amount shall be based on a reasonable estimate of the effect of the Financial Restatement on the stock price or total shareholder return. The Company shall maintain documentation of such reasonable estimate and provide such documentation to Nasdaq in accordance with applicable Nasdaq rules.

3. Exceptions to Applicability.

The Company must recover the Recoverable Amount of Incentive Compensation as stated above in Section 2(a), unless the Compensation Committee, or in the absence of such committee, a majority of the independent directors serving on the Board, makes a determination that recovery would be impracticable, and at least one of the following applies:

(a) The direct expense paid to a third party to assist in enforcing recovery would exceed the Recoverable Amount, and a reasonable attempt to recover the Recoverable Amount has already been made and documented;

2

(b) Recovery of the Recoverable Amount would violate home country law (provided such law was adopted prior to November 28, 2022 and that an opinion of counsel in such country is obtained stating that recoupment would result in such violation, and such opinion must be acceptable, and provided, to Nasdaq); or

(c) Recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company and its subsidiaries, to fail to meet the requirements of 26 U.S.C. 401(a)(13) or 26 U.S.C. 411(a) and regulations thereunder.

4. Miscellaneous.

(a) The Board or Compensation Committee may require that any incentive plan, employment agreement, equity award agreement, or similar agreement entered into on or after the date hereof shall, as a condition to the grant of any benefit thereunder, require an Executive Officer to agree to abide by the terms of this Policy, including the repayment of the Recoverable Amount of erroneously awarded Incentive Compensation; provided, that, this Policy shall apply to all Executive Officers irrespective of any such explicit agreement. Any right of recoupment under this Policy is in addition to, and not in lieu of, any other rights under applicable law, regulation or

rule or any similar policy in any employment agreement, equity plan, equity award agreement or similar arrangement and any other legal remedies available to the Company; provided, further, that this Policy shall not provide for recovery of Incentive Compensation that the Company has already recovered pursuant to Section 304 of the Sarbanes-Oxley Act or other recovery obligations.

(b) To the extent that an Executive Officer fails to repay the entirety of the appliable Recoverable Amount to the Company when due (as determined in accordance with this Policy), the Company shall take reasonable and appropriate actions to recover such outstanding Recoverable Amount from the applicable Executive Officer.

(c) The Company shall not indemnify any Executive Officer or other individual against the loss of any incorrectly awarded or otherwise recouped Incentive Compensation.

(d) The Company shall comply with applicable compensation recovery policy disclosure rules of the Securities and Exchange Commission (the "Commission").

(e) The Committee or the independent members of the Board may amend this Policy from time to time in its discretion and shall amend this Policy as it deems necessary, including as and when it determines that it is legally required by any federal securities laws, Commission rule or the rules of any national securities exchange or national securities association on which the Company's securities are then listed. The Board or the independent members of the Board may terminate this Policy at any time. Notwithstanding anything in this Section 4(d) to the contrary, no amendment or termination of this Policy shall be effective if such amendment or termination would (after taking into account any actions taken by the Company contemporaneously with such amendment or termination) cause the Company to violate any federal securities

3

laws, Commission rule, or the rules of any national securities exchange or national securities association on which the Company's securities are then listed.

5. Definitions.

(a) Executive Officer. "Executive Officer" means the Company's Chief Executive Officer, President, Chief Financial Officer, or principal accounting officer (or, if there is no such accounting officer, the Controller), any vice-president of the Company in charge of a principal business unit, division or function (such as sales, administration or finance), and any other officer or person who performs a policy-making function for the Company, whether such person is employed by the Company or a subsidiary thereof For the sake of clarity, "Executive Officer" includes at a minimum executive officers identified by the Board pursuant to Item 401(b) of Regulation S-K.

(b) Financial Reporting Measure. "Financial Reporting Measure" means any reporting measure that is determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measures that are derived wholly or in part from such measures. Stock price and total shareholder return are considered to be Financial Reporting Measures for purposes of this Policy. A financial reporting measure need not be presented within the financial statements or included in a filing with the Commission.

(c) Financial Restatement. A "Financial Restatement" means any accounting restatement due to the material noncompliance of the Company with any financial reporting requirement under applicable securities laws, including any required accounting restatement to correct an error in previously issued financial statements that (i) is material to the previously issued financial statements (commonly referred to as a "Big R" restatement), or (ii) is not material to previously issued financial statements, but would result in a material misstatement if the error were left uncorrected in the current period or the error correction were recognized in the current period (commonly referred to as a "little r" restatement). For purposes of this Policy, the date of a Financial Restatement will be deemed to be the earlier of (i) the date the Board, a committee of the Board, or officers authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to

concludes, or reasonably should have concluded, that the Company is required to prepare an accounting restatement, and (ii) the date a court, regulator, or other legally authorized body directs the Company to prepare an accounting restatement. Notwithstanding the foregoing, none of the following changes to the Company's financial statements represent error corrections and shall not be deemed a Financial Restatement: (a) retrospective application of a change in accounting principle; (b) retrospective revision to reportable segment information due to a change in the structure of the Company's internal organization; (c) retrospective reclassification due to a discontinued operation; (d) retrospective application of a change in reporting entity, such as from a reorganization of entities under common control; and (e) retrospective revision for stock splits, reverse stock splits, stock dividends or other changes in capital structure.

4

(d) Incentive Compensation. "Incentive Compensation" means any compensation that is granted, earned, or vests based wholly or in part upon the attainment of a Financial Reporting Measure, but does not include awards that are earned or vest based solely on the continued provision of services for a period of time.

(e) Look-Back Period. The "Look-Back Period" means the three completed fiscal years immediately preceding the date of a Financial Restatement and any transition period as set forth in Listing Rule 5608.

5