# EXHIBIT L

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-Q**
**QUARTERLY REPORT PURSUANT TO SECTIONS 13 OR 15 (d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**
**FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2022**
Commission file number: **001-34611**
**CELSIUS HOLDINGS, INC.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **20-2745790** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**2424 N Federal Highway, Suite 208, Boca Raton, Florida 33431**
(Address of Principal Executive Offices)
**(561) 276-2239**
(Registrant's telephone number, including area code)

_____
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (ss.232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Trading Symbol(s)** | **Name of Each Exchange on Which Registered** |
|---|---|---|
| Common Stock, $.001 par value | CELH | Nasdaq Capital Market |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The number of shares outstanding of the registrant's common stock, $0.001 par value, as of August 9, 2022 was 75,640,924 shares.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| PART I – FINANCIAL INFORMATION | | 1 |
| | | |
| Item 1. | Financial Statements. | 1 |
| | Consolidated Balance Sheets as of June 30, 2022 (unaudited) and December 31, 2021 | 1 |
| | Consolidated Statements of Operations and Comprehensive Income for the three and six months ended June 30, 2022 and 2021 (unaudited) | 2 |
| | Consolidated Statements of Changes in Stockholders' Equity for the three and six months ended June 30, 2022 (unaudited) | 3 |
| | Consolidated Statements of Changes in Stockholders' Equity for the three and six months ended June 30, 2021 (unaudited) | 4 |
| | Consolidated Statements of Cash Flows for the six months ended June 30, 2022 and 2021 (unaudited) | 5 |
| | Notes to Consolidated Financial Statements (unaudited) | 6 |
| | | |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 23 |
| Item 3. | Quantitative Disclosures About Market Risks. | 26 |
| Item 4. | Controls and Procedures. | 26 |
| PART II – OTHER INFORMATION | | 28 |
| Item 1. | Legal Proceedings. | 28 |
| Item 1A. | Risk Factors. | 28 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds. | 28 |
| Item 3. | Defaults Upon Senior Securities. | 28 |
| Item 4. | Mine Safety Disclosures. | 28 |
| Item 5. | Other Information. | 28 |
| Item 6. | Exhibits. | 30 |
| SIGNATURES | | 30 |

i

**PART I – FINANCIAL INFORMATION**

**Item 1. Financial Statements.**

**Celsius Holdings, Inc.**
**Consolidated Balance Sheets**
**(In thousands, except par value)**
**(Unaudited)**

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash | $ | 60,031 | $ | 16,255 |
| Accounts receivable-net (note 2) | | 66,195 | | 38,741 |
| Note receivable-current (note 6) | | 3,066 | | 2,588 |
| Inventories-net (note 4) | | 162,138 | | 191,222 |
| Prepaid expenses and other current assets (note 5) | | 12,298 | | 13,555 |
| Total current assets | | 303,728 | | 262,361 |
| Note receivable (note 6) | | 3,679 | | 7,117 |
| Property and equipment-net (note 8) | | 5,135 | | 3,180 |
| Deferred tax asset (note 14) | | 7,686 | | 9,019 |
| Right of use assets-operating leases (note 7) | | 954 | | 1,128 |
| Right of use assets-finance leases (note 7) | | 180 | | 86 |
| Other long-term assets | | 264 | | 300 |
| Intangibles (note 9) | | 14,689 | | 16,301 |
| Goodwill (note 9) | | 13,323 | | 14,527 |
| **Total Assets** | **$** | **349,638** | **$** | **314,019** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses (note 10) | $ | 102,416 | $ | 91,479 |
| Lease liability obligation-operating leases (note 7) | | 556 | | 512 |
| Lease liability obligation-finance leases (note 7) | | 101 | | 157 |
| Other current liabilities (note 11) | | 2,761 | | 976 |
| Total current liabilities | | 105,834 | | 93,124 |
| Long-term liabilities: | | | | |
| Lease liability obligation-operating leases (note 7) | | 420 | | 658 |
| Lease liability obligation-finance leases (note 7) | | 138 | | 45 |
| Deferred tax liability | | 2,886 | | 3,146 |
| Other long-term liabilities | | 487 | | — |
| **Total Liabilities** | | **109,765** | | **96,973** |
| Stockholders' Equity: | | | | |
| Common stock, $0.001 par value; 100,000 shares authorized, 75,622 and 74,909 shares issued and outstanding at June 30, 2022 and December 31, 2021, respectively (note 13) | | 76 | | 75 |
| Additional paid-in capital | | 277,623 | | 267,847 |
| Accumulated other comprehensive income (loss) | | (2,173 ) | | 614 |
| Accumulated deficit | | (35,653 ) | | (51,490 ) |
| Total Stockholders' Equity | | 239,873 | | 217,046 |
| **Total Liabilities and Stockholders' Equity** | **$** | **349,638** | **$** | **314,019** |

*The accompanying notes are an integral part of these unaudited consolidated financial statements*

1

**Celsius Holdings, Inc.**
**Consolidated Statements of Operations and Comprehensive Income**
**(In thousands, except per share amounts)**
**(Unaudited)**

| | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2022 | | 2021 |
| Revenue (note 3) | $ | 154,020 | $ | 65,073 | $ | 287,408 | $ | 115,108 |
| Cost of revenue (note 2) | | 94,701 | | 36,824 | | 174,195 | | 66,280 |
| Gross profit | | 59,319 | | 28,249 | | 113,213 | | 48,828 |
| | | | | | | | | |
| Selling and marketing expenses | | 32,475 | | 15,531 | | 64,072 | | 27,490 |
| General and administrative expenses | | 14,414 | | 12,300 | | 26,595 | | 20,106 |
| Total operating expenses | | 46,889 | | 27,831 | | 90,667 | | 47,596 |
| | | | | | | | | |
| **Income from operations** | $ | **12,430** | $ | **418** | $ | **22,546** | $ | **1,232** |
| | | | | | | | | |
| Other income/(expense) | | | | | | | | |
| | | | | | | | | |
| Interest income on note receivable (note 6) | | 55 | | 76 | | 133 | | 163 |
| Interest on other obligations | | (3) | | (1) | | (4) | | (3) |
| Other miscellaneous income | | — | | 109 | | — | | 97 |
| Foreign exchange gain/(loss) | | (514) | | 178 | | (676) | | (123) |
| Total other income (expense) | | (462) | | 362 | | (547) | | 134 |
| | | | | | | | | |
| **Net income before income taxes** | $ | **11,968** | $ | **780** | $ | **21,999** | $ | **1,366** |
| | | | | | | | | |
| Income tax expense (Note 14) | | 2,810 | | — | | 6,161 | | — |
| | | | | | | | | |
| **Net income** | $ | **9,158** | $ | **780** | $ | **15,838** | $ | **1,366** |
| | | | | | | | | |
| Other comprehensive income: | | | | | | | | |
| Foreign currency translation gain/(loss) | | (2,296) | | 277 | | (2,787) | | 84 |
| **Comprehensive Income** | $ | **6,862** | $ | **1,057** | $ | **13,051** | $ | **1,450** |
| | | | | | | | | |
| Income per share: | | | | | | | | |
| Basic | $ | 0.12 | $ | 0.01 | $ | 0.21 | $ | 0.02 |
| Diluted | $ | 0.12 | $ | 0.01 | $ | 0.20 | $ | 0.02 |
| Weighted average shares outstanding: | | | | | | | | |
| Basic | | 75,451 | | 73,159 | | 75,472 | | 73,655 |
| Diluted[1] | | 78,372 | | 77,238 | | 78,397 | | 77,658 |

[1]   *Refer to Earnings Per Share section for further details.*

*The accompanying notes are an integral part of these unaudited consolidated financial statements*

**Celsius Holdings, Inc.**
**Consolidated Statements of Changes in Stockholders' Equity**
**(In thousands)**
**(Unaudited)**

| | Common Stock | | Additional Paid-In | Accumulated Other Comprehensive Income | Accumulated | |
| --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Capital | (Loss) | Deficit | Total |
| **Balance at December 31, 2021** | **74,909** | **$ 75** | **$ 267,847** | **$ 614** | **$ (51,490)** | **$ 217,046** |
| Share-based payment expense | — | — | 4,310 | — | — | 4,310 |
| Issuance of common stock pursuant to stock incentive plan - cashless | 248 | — | — | — | — | — |
| Issuance of common stock pursuant to stock incentive plan - cash | 194 | — | 810 | — | — | 810 |
| Foreign currency fluctuations | — | — | — | (491) | — | (491) |
| Net income | — | — | — | — | 6,679 | 6,679 |
| **Balance at March 31, 2022** | **75,351** | **$ 75** | **$ 272,967** | **$ 123** | **$ (44,811)** | **$ 228,354** |
| Share-based payment expense | — | — | 4,207 | — | — | 4,207 |
| Issuance of common stock pursuant to stock incentive plan - cashless | 99 | — | — | — | — | — |
| Issuance of common stock pursuant to stock incentive plan - cash | 172 | 1 | 449 | — | — | 450 |
| Foreign currency fluctuations | — | — | — | (2,296) | — | (2,296) |
| Net income | — | — | — | — | 9,158 | 9,158 |
| **Balance at June 30, 2022** | **75,622** | **$ 76** | **$ 277,623** | **$ (2,173)** | **$ (35,653)** | **$ 239,873** |

*The accompanying notes are an integral part of these unaudited consolidated financial statements*

3

**Celsius Holdings, Inc.**
**Consolidated Statements of Changes in Stockholders' Equity**
**(In thousands)**
**(Unaudited)**

| | Common Stock | | Additional Paid-In | | Accumulated Other Comprehensive Income | | Accumulated | | Total | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | Capital | | (Loss) | | Deficit | | Total |
| **Balance at December 31, 2020** | **72,263** | **$** | **72** | **$** | **159,884** | **$** | **(202)** | **$** | **(55,427)** | **$** | **104,327** |
| Share-based payment expense | — | | — | | 3,575 | | — | | — | | 3,575 |
| Issuance of common stock pursuant to stock incentive plan - cashless | 88 | | — | | — | | — | | — | | — |
| Issuance of common stock pursuant to stock incentive plan - cash | 235 | | 1 | | 716 | | — | | — | | 717 |
| Foreign currency fluctuations | — | | — | | — | | (193) | | — | | (193) |
| Net income | — | | — | | — | | — | | 585 | | 585 |
| **Balance at March 31, 2021** | **72,586** | **$** | **73** | **$** | **164,175** | **$** | **(395)** | **$** | **(54,842)** | **$** | **109,011** |
| Share-based payment expense | — | | — | | 7,202 | | — | | — | | 7,202 |
| Issuance of common stock pursuant to stock incentive plan - cashless | 316 | | — | | — | | — | | — | | — |
| Issuance of common stock pursuant to stock incentive plan - cash | 435 | | — | | 1,799 | | — | | — | | 1,799 |
| Issuance of common stock from capital raise | 1,134 | | 1 | | 67,768 | | — | | — | | 67,769 |
| Foreign currency fluctuations | — | | — | | — | | 277 | | — | | 277 |
| Net income | — | | — | | — | | — | | 780 | | 780 |
| **Balance at June 30, 2021** | **74,471** | **$** | **74** | **$** | **240,944** | **$** | **(118)** | **$** | **(54,062)** | **$** | **186,838** |

*The accompanying notes are an integral part of these unaudited consolidated financial statements*

4

**Celsius Holdings, Inc.**
**Consolidated Statements of Cash Flows**
**(In thousands)**
**(Unaudited)**

| | | For the six months ended | | |
| --- | --- | --- | --- | --- |
| | | June 30, 2022 | | June 30, 2021 |
| **Cash flows from operating activities:** | | | | |
| Net income | $ | 15,838 | $ | 1,366 |
| Adjustments to reconcile net income to net cash /provided/(used in) by operating activities: | | | | |
| Depreciation | | 556 | | 178 |
| Amortization | | 275 | | 375 |
| Bad debt expense | | 466 | | 855 |
| Inventory excess and obsolescence | | 331 | | 1,260 |
| Stock-based compensation expense | | 8,517 | | 10,777 |
| Un-realized exchange loss | | 602 | | — |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable-net | | (27,920) | | (18,267) |
| Inventories-net | | 28,753 | | (46,683) |
| Prepaid expenses and other current assets | | 1,257 | | (8,118) |
| Accounts payable and accrued expenses | | 10,336 | | 27,579 |
| Deferred tax-net | | 1,072 | | — |
| Other current liabilities | | 1,820 | | 340 |
| Change in right of use assets and lease obligation-net | | (95) | | 8 |
| Other long-term liabilities | | 488 | | — |
| Net cash provided by/(used in) operating activities | | **42,296** | | **(30,330)** |
| **Cash flows from investing activities:** | | | | |
| Proceeds from note receivable | | 2,592 | | 1,876 |
| Purchase of property and equipment | | (2,456) | | (1,216) |
| Net cash provided by investing activities | | **136** | | **660** |
| **Cash flows from financing activities:** | | | | |
| Principal payments on finance lease obligations | | (37) | | (50) |
| Proceeds from capital raise | | — | | 67,769 |
| Proceeds from exercise of stock options | | 1,260 | | 2,515 |
| Net cash provided by financing activities | | **1,223** | | **70,234** |
| Effect on exchange rate changes on cash | | 121 | | (24) |
| **Net increase in cash** | | **43,776** | | **40,540** |
| Cash at beginning of the period | | 16,255 | | 43,248 |
| **Cash at end of the period** | $ | **60,031** | $ | **83,788** |
| **Supplemental cash flow disclosures:** | | | | |
| Cash paid during period for: | | | | |
| Taxes | $ | 2,100 | $ | — |
| Interest | $ | — | $ | — |

*The accompanying notes are an integral part of these unaudited consolidated financial statements*

5

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

1. **ORGANIZATION AND DESCRIPTION OF BUSINESS**

*Business* —Celsius Holdings, Inc. (the "Company" or "Celsius Holdings") was incorporated under the laws of the State of Nevada on April 26, 2005. On January 24, 2007, the Company entered into a merger agreement and plan of reorganization with Elite FX, Inc., a Florida corporation. Under the terms of the Merger Agreement, Elite FX, Inc. was merged into the Company's subsidiary, Celsius, Inc. and became a wholly-owned subsidiary of the Company on January 26, 2007. In addition, on March 28, 2007 the Company established Celsius Netshipments, Inc. a Florida corporation as a subsidiary of the Company. On February 7, 2018, the Company established Celsius Asia Holdings Limited, a Hong Kong corporation, as a wholly-owned subsidiary of the Company. On February 7, 2018 Celsius China Holdings Limited, a Hong Kong corporation, became a wholly-owned subsidiary of Celsius Asia Holdings Limited and on May 9, 2018, Celsius Asia Holdings Limited established Celsius (Beijing) Beverage Limited, a China corporation, as a wholly-owned subsidiary of Celsius Asia Holdings Limited.

On October 25, 2019, the Company acquired 100% of Func Food Group, Oyj ("Func Food"). The Acquisition was structured as a purchase of all of Func Food's equity shares and a restructuring of Func Food's pre-existing debt. Func Food was the Nordic distributor for the Company since 2015. Func Food is a marketer and distributor of nutritional supplements, health food products, and beverages.

The Company is engaged in the development, marketing, sale and distribution of "functional" calorie-burning functional energy drinks and liquid supplements under the Celsius® brand name.

2. **BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation and Principles of Consolidation* – The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("**US GAAP**") for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. Accordingly, the consolidated financial statements do not include all of the information and footnotes required by US GAAP for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included and such adjustments are of a normal recurring nature. These unaudited consolidated financial statements and the accompanying notes should be read in conjunction with the Form 10-K filed for December 31, 2021. The consolidated financial statements of the Company include the Company and its wholly owned subsidiaries. All inter-company balances and transactions have been eliminated.

*Consolidation Policy* — The accompanying consolidated financial statements include the accounts of Celsius Holdings, Inc. and its subsidiaries. All inter-company balances and transactions have been eliminated in consolidation.

*Significant Estimates* — The preparation of consolidated financial statements and accompanying disclosures in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue and expenses and disclosure of contingent assets and liabilities at the date of the financial statements. Although these estimates are based on management's best knowledge of current events and actions that the Company may undertake in the future, actual results may differ from those estimates. Significant estimates include the allowance for doubtful accounts, allowance for inventory obsolescence, promotional allowance, the useful lives of property and equipment, impairment of intangible assets & goodwill, valuation of stock-based compensation, and deferred tax asset valuation allowance.

*Segment Reporting* — Operating segments are defined as components of an enterprise that engage in business activities, have discrete financial information, and whose operating results are regularly reviewed by the chief operating decision maker ("CODM") to make decisions about allocating resources and to assess performance. Even though we have operations in several geographies, we operate as a single enterprise. Our operations and strategies are centrally designed and executed given that our geographical components are very similar. Our CODM, the CEO, reviews operating results primarily from a consolidated perspective, and makes decisions and allocates resources based on that review. The reason our CODM focuses on consolidated results in making decisions and allocating resources is because of the significant economic interdependencies between our geographical operations and the Company's U.S. entity.

*Concentrations of Risk* — Substantially all of the Company's revenue derives from the sale of Celsius® functional energy drinks and liquid supplements.

The Company uses single supplier relationships for its raw materials purchases and filling capacity, which potentially subjects the Company to a concentration of business risk. If a supplier had operational problems or ceased making product available to the Company, operations could be adversely affected.

Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash and cash equivalents and accounts receivable. The Company places its cash and cash equivalents with high-quality financial institutions. At times, balances in the Company's cash accounts may exceed the Federal Deposit Insurance Corporation limit. At June 30, 2022, the Company had approximately $60.0 million in excess of the Federal Deposit Insurance Corporation limit.

6

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

For the six months ended June 30, 2022, the Company had one customer which accounted for revenue concentrations more than 10 percent. Costco accounted for approximately 16.6% of our revenue for the six months ended June 30, 2022. For the six months ended June 30, 2021, the company had one customer which accounted for a revenue concentration more than 10%. Amazon accounted for 10.0% of revenue for the six months ended June 30, 2021. At June 30, 2022, Amazon represented the only customer with a 10 percent or greater concentration of accounts receivable representing 10.0% of the accounts receivable balance. At December 31, 2021, the company had two customers with a 10 percent or greater concentration of accounts receivable. Amazon and Publix accounted for approximately 22.7% and 10.3% of our accounts receivable balance, respectively, at December 31, 2021.

*Cash Equivalents* — The Company considers all highly liquid instruments with original maturities of three months or less when purchased to be cash equivalents. At June 30, 2022 and December 31, 2021, the Company did not have any investments with original maturities of three months or less.

*Accounts Receivable* — Accounts receivable are reported at net realizable value. The Company establishes an allowance for doubtful accounts based upon factors pertaining to the credit risk of specific customers, historical trends, and other information. Delinquent accounts are written-off when it is determined that the amounts are uncollectible. At June 30, 2022 and December 31, 2021, there was an allowance for doubtful accounts of approximately $1.2 million and $0.8 million, respectively.

*Inventories* — Inventories include only the purchase cost and are stated at the lower of cost and net realizable value. Cost is determined using the FIFO method. Inventories consist of raw materials and finished products. The Company establishes an inventory allowance to reduce the value of the inventory during the period in which such materials and products are no longer usable or marketable. Specifically, the Company reviews inventory utilization during the past twelve months and also customer orders for subsequent months. If there has been no utilization during the last 12 months and there are no orders in-place in future months which will require the use of an inventory item, then the inventory item will be included as part of the allowance during the period being evaluated. Inventory allowance pertains to excess and obsolete products and certain quality control costs. Management will then specifically evaluate whether these items may be utilized within a reasonable time frame (e.g., 3 to 6 months). At June 30, 2022 and December 31, 2021, there was an inventory allowance for excess and obsolete products of $2.9 million and $2.6 million, respectively. The changes in the allowance are included in cost of revenue.

*Property and Equipment* — Property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation of property and equipment is calculated using the straight-line method over the estimated useful life of the asset generally ranging from three to seven years.

*Impairment of Long-Lived Assets* — In accordance with ASC Topic 360, "Property, Plant, and Equipment" the Company reviews the carrying value of long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss is determined regarding a long-lived asset if its carrying amount is not recoverable and exceeds its fair value. The carrying amount is not recoverable when it exceeds the sum of the undiscounted cash flows expected to result from use of the asset over its remaining useful life and final disposition. The Company did not record any impairment charges during the six months ended June 30, 2022 and 2021.

*Long-lived Asset Geographic Data* — The following table sets forth long-lived asset information, which includes property and equipment and right-of-use assets and excludes goodwill and intangibles, where individual countries represent a significant portion of the total:

| | June 30, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| United States | $ | 4,633 | $ | 3,043 |
| Sweden | | 1,267 | | 1,050 |
| Finland | | 369 | | 301 |
| **Long-lived assets related to foreign operations** | | 1,636 | | 1,351 |
| **Total long-lived assets-net** | $ | 6,269 | $ | 4,394 |

*Goodwill* — The Company records goodwill when the consideration paid for an acquisition exceeds the fair value of net tangible and intangible assets acquired, including related tax effects. Goodwill is not amortized; instead, goodwill is tested for impairment on an annual basis as of October 1st, or more frequently if the Company believes indicators of impairment exist. The Company first assesses qualitative factors such as macro-economic conditions, industry and market conditions, cost factors as well as other relevant events, to determine whether it is more-likely-than-not that the fair value of a reporting unit is less than its carrying value. If the Company determines that the fair value is less than the carrying value, the Company will recognize an impairment charge based on the excess of a reporting unit's carrying value over its fair value. At June 30, 2022, there were no indicators of impairment.

*Intangible assets* — Intangible assets are comprised of customer relationships and brands acquired in a business combination. The Company amortizes intangible assets with a definitive life over their respective useful lives. Assets with indefinite lives are tested for impairment on an annual basis as of October 1st or more frequently if the Company believes indicators of impairment exist. If the Company determines that the fair value is less than the carrying value, the Company will recognize an impairment charge based on the excess carrying value over its fair value. At June 30, 2022, there were no indicators of impairment.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

*Revenue Recognition* — The Company recognizes revenue in accordance with ASC Topic 606 "Revenue from Contracts with Customers." The Company recognizes revenue when performance obligations under the terms of a contract with the customer are satisfied. Product sales occur once control or title is transferred based on the commercial terms. Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring goods. Product sales are recorded net of variable consideration, such as provisions for returns, discounts and allowances. Such provisions are calculated using historical averages and adjusted for any expected changes due to current business conditions. Consideration given to customers for cooperative advertising is recognized as a reduction of revenue except to the extent that there is a distinct good or service, in which case the expense is classified as selling or marketing expense. Provisions for customer volume rebates are based on achieving a certain level of purchases and other performance criteria that are established on a situation basis. These rebates are estimated based on the expected amount to be provided to the customers and are recognized as a reduction of revenue. The amount of consideration the Company receives and revenue the Company recognizes varies with changes in customer incentives the Company offers to its customers and their customers. Additionally, for any agreements which are 1 year or less, the practical expedient under ASC 340-40-25-4 is applied to expense contract acquisition costs when incurred if the amortization period of the contract asset would have otherwise been recognized in one year or less. Sales taxes and other similar taxes are excluded from revenue. Management believes that adequate provision has been made for cash discounts, returns and spoilage based on the Company's historical experience.

The Company receives payments from certain distributors in new territories as reimbursement for contract termination costs paid to the prior distributors in those territories. Amounts received pursuant to these new and/or amended distribution agreements entered into with certain distributors relating to the costs associated with terminating the Company's prior distributors, are accounted for as deferred revenue and recognized ratably over the anticipated life of the respective distribution agreements. Termination charges related to certain of the Company's prior distributors are included in operating expenses upon termination. The Company recognized termination expenses of $0.8 million and $0.8 million for the three and six month periods ended June 30, 2022. Termination expenses was immaterial for the three and six month periods ended June 30, 2021.

*Deferred Revenue* — Amounts received from certain distributors at inception of their distribution contracts are accounted for as deferred revenue. As of June 30, 2022, the Company had $0.6 million of deferred revenue, which is included in other current and long-term liabilities within the consolidated balance sheets. As of December 31, 2021, the Company did not have any deferred revenue related to contract liabilities. During the three and six months ended June 30, 2022, an immaterial amount of deferred revenue was recognized in net sales. There was no deferred revenue recognized in net sales during 2021.

*Customer Advances* — From time to time the Company requires deposits in advance of delivery of products and/or production runs. Such amounts are initially recorded as customer advances liability within other current liabilities. The Company recognizes such revenue as it is earned in accordance with revenue recognition policies. The Company had no customer advances as of June 30, 2022 or December 31, 2021, respectively.

*Advertising Costs* — Advertising costs are expensed as incurred. The Company uses mainly radio, local sampling events, sponsorships, endorsements, and digital advertising. The Company incurred marketing and advertising expenses of approximately $29.3 million and $12.6 million, during the six months ended June 30, 2022 and 2021, respectively.

*Research and Development* — Research and development costs are charged to general and administrative expenses as incurred and consist primarily of consulting fees, raw material usage and test productions of beverages. The Company incurred expenses of $0.2 million and $0.4 million during the six months ended June 30, 2022 and 2021, respectively.

*Foreign Currency Gain/Losses* — Foreign subsidiaries' functional currency is the local currency of operations and the net assets of foreign operations are translated into U.S. dollars using current exchange rates. The foreign subsidiaries perform re-measurements of their assets and liabilities denominated in non-functional currencies on a periodic basis and the gain or losses from these adjustments are included in the Statement of Operations as foreign exchange gains or losses. For three months ended June 30, 2022 exchange losses have amounted to approximately $0.5 million while during the three months ended June 30, 2021, we recognized foreign currency gains of approximately $0.2 million mainly related to fluctuations in exchange rates. For the six months ended June 30, 2022 exchange losses have amounted to approximately $0.7 million while during the six months ended June 30, 2021, we recognized foreign currency losses of approximately $0.1 million mainly related to fluctuations in exchange rates. Translation gain and losses that arise from the translation of net assets, as well as exchange gains and losses on intercompany balances of long-term investment nature, are included in Other Comprehensive Income. The Company incurred foreign currency translation net loss during the three months ended June 30, 2022 of approximately $2.3 million and a net gain of approximately $0.3 million during the three months ended June 30, 2021. The Company incurred foreign currency translation net loss during the six months ended June 30, 2022 of approximately $2.8 million and a net gain of approximately $0.1 million n during the six months ended June 30, 2021. Our operations in different countries required that we transact in the following currencies:

Chinese-Yuan
Norwegian-Krone
Swedish-Krona
Finland-Euro

*Fair Value of Financial Instruments* — The carrying value of cash, accounts receivable, accounts payable, other current liabilities and accrued expenses approximate fair value due to their relative short-term maturity and market interest rates.

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

*Fair Value Measurements* - ASC 820 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Additionally, ASC 820 requires the use of valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. These inputs are prioritized below:

Level 1:    Observable inputs such as quoted market prices in active markets for identical assets or liabilities.

Level 2:    Observable market-based inputs or unobservable inputs that are corroborated by market data.

Level 3:    Unobservable inputs for which there is little or no market data, which require the use of the reporting entity's own assumptions.

Other than those noted previously, the Company did not have any other assets or liabilities measured at fair value at June 30, 2022 and December 31, 2021.

*Income Taxes* — The Company accounts for income taxes pursuant to the provisions of ASC 740-10, "Accounting for Income Taxes," which requires, among other things, an asset and liability approach to calculating deferred income taxes. The asset and liability approach require the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the carrying amounts and the tax bases of assets and liabilities. A valuation allowance is provided to offset any net deferred tax assets for which management believes it is more likely than not that the net deferred asset will not be realized. The Company follows the provisions of the ASC 740-10 related to *Accounting for Uncertain Income Tax Positions.* When tax returns are filed, it is highly certain that some positions taken would be sustained upon examination by the taxing authorities, while others are subject to uncertainty about the merits of the position taken or the amount of the position that would be ultimately sustained. In accordance with the guidance of ASC 740-10, the benefit of a tax position is recognized in the financial statements in the period during which, based on all available evidence, management believes it is more likely than not that the position will be sustained upon examination, including the resolution of appeals or litigation processes, if any.

Tax positions taken are not offset or aggregated with other positions. Tax positions that meet the more-likely-than-not recognition threshold are measured as the largest amount of tax benefit that is more than 50 percent likely of being realized upon settlement with the applicable taxing authority. The portion of the benefits associated with tax positions taken that exceeds the amount measured as described above should be reflected as a liability for uncertain tax benefits in the accompanying balance sheet along with any associated interest and penalties that would be payable to the taxing authorities upon examination.

The Company has adopted ASC 740-10-25 Definition of Settlement, which provides guidance on how an entity should determine whether a tax position is effectively settled for the purpose of recognizing previously unrecognized tax benefits and provides that a tax position can be effectively settled upon the completion of an examination by a taxing authority without being legally extinguished. For tax positions considered effectively settled, an entity would recognize the full amount of tax benefit, even if the tax position is not considered more likely than not to be sustained based solely on the basis of its technical merits and the statute of limitations remains open.

The Company's tax returns for tax years in 2018 through 2020 remain subject to potential examination by the taxing authorities.

*Earnings per Share* — Basic earnings per share are calculated by dividing net income available to stockholders by the weighted-average number of common shares outstanding during each period. Diluted earnings per share are computed using the weighted average number of common and dilutive common share equivalents outstanding during the period. Refer to the below table for additional details (tabular dollars in thousands except per share amounts):

| | For the three months ended June 30, | | For the six months ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Net income | $ 9,158 | $ 780 | $ 15,838 | $ 1,366 |
| Income per share: | | | | |
| Basic | $ 0.12 | $ 0.01 | $ 0.21 | $ 0.02 |
| Diluted | $ 0.12 | $ 0.01 | $ 0.20 | $ 0.02 |
| Weighted average shares outstanding: | | | | |
| Basic | 75,451 | 73,159 | 75,472 | 73,655 |
| Effect of dilutive shared based awards | 2,921 | 4,079 | 2,925 | 4,003 |
| Diluted | 78,372 | 77,238 | 78,397 | 77,658 |

9

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

*Share-Based Payments* — The Company follows the provisions of ASC Topic 718 "Compensation — Stock Compensation" and related interpretations. As such, compensation cost is measured on the date of grant at the fair value of the share-based payments. Such compensation amounts, if any, are amortized over the respective vesting periods of the grants. On April 30, 2015, the Company adopted the 2015 Stock Incentive Plan. This plan is intended to provide incentives which will attract and retain highly competent persons at all levels as employees of the Company, as well as independent contractors providing consulting or advisory services to the Company, by providing them opportunities to acquire the Company's common stock. The 2015 Plan permits the grant of options and other share based awards for up to 5 million shares. In addition, there is a provision for an annual increase of 15% to the shares included under the plan, with the shares to be added on the first day of each calendar year, beginning on January 1, 2017 (note 15). As of June 30, 2022, total shares available are 4.4 million.

*Cost of Sales* — Cost of sales consists of the cost of concentrates and or liquid bases, the costs of raw materials utilized in the manufacture of products, co-packing fees, repacking fees, in-bound & out-bound freight charges, as well as certain internal transfer costs, warehouse expenses incurred prior to the manufacture of the Company's finished products, inventory allowance for excess and obsolete products, and certain quality control costs. Raw materials account for the largest portion of the cost of sales. Raw materials include cans, bottles, other containers, flavors, ingredients and packaging materials.

*Operating Expenses* — Operating expenses include selling expenses such as warehousing expenses after manufacture, as well as expenses for advertising, samplings and in-store demonstrations costs, costs for merchandise displays, point-of-sale materials and premium items, sponsorship expenses, other marketing expenses and design expenses. Operating expenses also include such costs as payroll costs, travel costs, professional service fees (including legal fees), depreciation and other general and administrative costs.

*Shipping and Handling Costs* — Shipping and handling costs for freight expense on goods shipped are included in cost of sales. Freight expense on goods shipped for three months ended June 30, 2022 and 2021 was approximately $8.5 million and $5.5 million, respectively. Freight expense on goods shipped for the six months ended June 30, 2022 and 2021 was approximately $11.4 million and $9.7 million, respectively.

**Recent Accounting Pronouncements**

The Company adopts all applicable, new accounting pronouncements as of the specified effective dates.

In September 2016, the FASB issued ASU No. 2016-13, Financial Instruments – Credit Losses (Topic 326) ("ASU 2016-13"), which requires the immediate recognition of management's estimates of current and expected credit losses. In November 2018, the FASB issued ASU 2018-19, which makes certain improvements to Topic 326. In April and May 2019, the FASB issued ASUs 2019-04 and 2019-05, respectively, which adds codification improvements and transition relief for Topic 326. In November 2019, the FASB issued ASU 2019-10, which delays the effective date of Topic 326 for Smaller Reporting Companies to interim and annual periods beginning after December 15, 2022, with early adoption permitted. We have elected the relief provided. In November 2019, the FASB issued ASU 2019-11, which makes improvements to certain areas of Topic 326. In February 2020, the FASB issued ASU 2020-02, which adds an SEC paragraph, pursuant to the issuance of SEC Staff Accounting Bulletin No. 119, to Topic 326. Topic 326 is effective for the Company for fiscal years and interim reporting periods within those years beginning after December 15, 2022. We have commenced an initial analysis of the adoption of this ASU on our results of operations, cash flows or financial position and we are not able to estimate the effect the adoption of the new standard will have on our financial statements.

*Liquidity* — These financial statements have been prepared assuming the Company will be able to continue as a going concern. At June 30, 2022, the Company had an accumulated deficit of approximately $35.7 million which includes a net income available to common stockholders of approximately $15.8 million for the six months ended June 30, 2022. During the six months ended June 30, 2022, the Company's net cash provided by operating activities totaled approximately $42.3 million. As of June 30, 2021, the Company had an accumulated deficit of $54.1 million which includes a net income available to common stockholders of $1.4 million for the six months ended June 30, 2021. During the six months ended June 30, 2021 the Company's net cash used in operating activities totaled approximately $30.3 million.

If our sales volumes do not meet our projections, expenses exceed our expectations, our plans change, we may be unable to generate enough cash flow from operations to cover our working capital requirements. In such case, we may be required to adjust our business plan, by reducing marketing, lower our working capital requirements and reduce other expenses or seek additional financing. Furthermore, our business and results of operations may be adversely affected by changes in the global macro-economic environment related to the pandemic and public health crises related to the COVID-19 outbreak.

*Correction of Immaterial Errors* — During the third quarter of 2021, the company performed immaterial corrections to the previously reported consolidated financial statements related to the Func Foods acquisition in 2019. Goodwill increased by $3.7 million and deferred tax liabilities increased by $3.5 million attributable to tax implications of acquired intangible assets that had not been recorded in the purchase accounting treatment acquisition. The impact on the consolidated statements of operations and comprehensive income resulted in a $0.2 million deferred tax benefit.

*Correction of previously issued financial statements* — Subsequent to filing the Company's Quarterly Reports on Form 10-Q for the periods ended June 30, 2021, and September 30, 2021, the Company determined that the calculation of expense of share based compensation related to grants of stock options and restricted stock units ("RSUs") issued to former employees and retired directors was materially understated during the three-and

10

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

six-month periods ended June 30, 2021 and three- and nine-month periods ended September 30, 2021 (the "Affected Periods"), based on the application of U.S. generally accepted accounting principles. During the Affected Periods, the stock options and RSUs were modified and the expense should have been calculated and recognized using the fair market value of the awards as of the date of modification and recognized over the remaining service period.

In accordance with Staff Accounting Bulletin ("SAB") No. 99, Materiality, and SAB No. 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, the Company evaluated the misstatements and based on an analysis of quantitative and qualitative factors determined that the impact of the misstatement to its interim reporting periods ending June 30, 2021, and September 30, 2021, was material. Accordingly, the Company has restated its interim consolidated financial statements for the three- and six-months ended June 30, 2021, and three- and nine- months ended September 30, 2021, respectively, and included that restated financial information within our annual report for the period ending December 31, 2021.

In connection with the filing of this Quarterly Report, the Company as revised the accompanying financial statements, and the related notes to revise those misstatements that impacted such periods.

The effects of the adjustments to the Company's previously reported unaudited 2021 quarterly consolidated statements of operations and comprehensive income (loss) on a standalone quarter basis are as follows:

| | Consolidated Statement of Operations and Comprehensive Income Three months ended June 30, 2021 (unaudited) | | | Consolidated Statement of Operations and Comprehensive Income Six months ended June 30, 2021 (unaudited) | | |
|---|---|---|---|---|---|---|
| | As Reported | Adjustment | As Restated | As Reported | Adjustment | As Restated |
| Revenue | $ 65,073 | $ — | $ 65,073 | $ 115,108 | $ — | $ 115,108 |
| Gross Profit | 28,249 | — | 28,249 | 48,828 | — | 48,828 |
| General and administrative expenses[1] | 9,120 | 3,180 | 12,300 | 16,926 | 3,180 | 20,106 |
| Total operating expense | 24,651 | 3,180 | 27,831 | 44,416 | 3,180 | 47,596 |
| **Income (loss) from operations** | **3,598** | **(3,180)** | **418** | **4,412** | **(3,180)** | **1,232** |
| Net income (loss) before income taxes | 3,960 | (3,180) | 780 | 4,546 | (3,180) | 1,366 |
| **Net income (loss)** | $ **3,960** | $ **(3,180)** | $ **780** | $ **4,546** | $ **(3,180)** | $ **1,366** |
| Net income (loss) per share | | | | | | |
| Basic | $ 0.05 | $ (0.04) | $ 0.01 | $ 0.06 | $ (0.04) | $ 0.02 |
| Diluted | $ 0.05 | $ (0.04) | $ 0.01 | $ 0.06 | $ (0.04) | $ 0.02 |

[1] In order to correct previously reported share-based compensation for three-months and six-months ended June 30, 2021, the Company is recognizing additional share-based compensation expense of $3.2 million, respectively.

The effects of the adjustments to the Company's previously reported unaudited 2021 quarterly consolidated balance sheet is as follows:

| | Consolidated Balance Sheet (unaudited) June 30, 2021 | | |
|---|---|---|---|
| | As Reported | Adjustment | As Restated |
| Current assets | $ 205,306 | $ — | $ — |
| Total assets | 241,548 | — | — |
| Current liabilities | $ 54,257 | $ — | $ — |
| Total liabilities | 54,709 | — | — |
| Additional paid-in capital | $ 237,764 | $ 3,180 | $ 240,944 |
| Accumulated deficit | (50,881) | (3,180) | (54,061) |
| **Total Stockholders' Equity** | $ **186,839** | $ **—** | $ **186,839** |

These corrections had no effect on the Company's previously reported net cash flows from operating activities, investing activities or financing activities for the three and six months ended June 30, 2021.

11

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

**3.    REVENUE**

The Company recognizes revenue in accordance with ASC Topic 606 "Revenue from Contracts with Customers." The Company recognizes revenue when performance obligations under the terms of a contract with the customer are satisfied. Product sales occur once control is transferred, based on the commercial terms. Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring goods. Product sales are recorded net of variable consideration, such as provisions for returns, discounts and allowances. Such provisions are calculated using historical averages and adjusted for any expected changes due to current business conditions. Consideration given to customers for cooperative advertising is recognized as a reduction of revenue except to the extent that there is a distinct good or service, in which case the expense is classified as selling or marketing expense. Provisions for customer volume rebates are based on achieving a certain level of purchases and other performance criteria that are established on a situation basis. These rebates are estimated based on the expected amount to be provided to the customers and are recognized as a reduction of revenue. The amount of consideration the Company receives and revenue the Company recognizes varies with changes in customer incentives the Company offers to its customers and their customers. Additionally, for any agreements which are 1 year or less, the practical expedient under ASC 340-40-25-4 is applied to expense contract acquisition costs when incurred if the amortization period of the contract asset would have otherwise been recognized in one year or less.

Information about the Company's net sales by geographical location for the three and six months ended June 30, 2022 and 2021 is as follows:

| | For the three months ended | | | | For the six months ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | June 30, 2022 | | June 30, 2021 | | June 30, 2022 | | June 30, 2021 | |
| North America | $ | 145,409 | $ | 53,601 | $ | 268,882 | $ | 92,604 |
| Europe | | 7,280 | | 10,792 | | 15,775 | | 21,160 |
| Asia | | 883 | | 619 | | 1,849 | | 1,155 |
| Other | | 448 | | 61 | | 902 | | 189 |
| Net sales | $ | 154,020 | $ | 65,073 | $ | 287,408 | $ | 115,108 |

All of the Company's North America revenue is derived from the United States, which is the Company's country of domicile. Total foreign revenues are approximately $8.6 million and $11.5 million for the three months ended June 30, 2022 and 2021, respectively. Total foreign revenues are approximately $18.5 million and $22.5 million for the six months ended June 30, 2022 and 2021, respectively. Sweden represented the largest foreign portion of total consolidated revenue of approximately $5.1 million and $7.9 million for the three months ended June 30, 2022 and 2021, respectively and $10.8 million and $14.6 million for the six months ended June 30, 2022 and 2021, respectively.

*License Agreement*

In January 2019, the Company entered into a license and repayment of investment agreement with Qifeng Food Technology (Beijing) Co., Ltd ("Qifeng"). Under the agreement, Qifeng was granted the exclusive license rights to manufacture, market and commercialize Celsius branded products in China. The term of the agreement is 50 years, with annual royalty fees due from Qifeng after the end of each calendar year. The royalty fees are based on a percentage of Qifeng's sales of Celsius branded products; however, the fees are fixed for the first five years of the agreement, totaling approximately $6.9 million, and then are subject to annual guaranteed minimums over the remaining term of the agreement.

Under the agreement, the Company grants Qifeng exclusive license rights and provides ongoing support in product development, brand promotion and technical expertise. The ongoing support is integral to the exclusive license rights and, as such, both of these represent a combined, single performance obligation. The transaction price consists of the guaranteed minimums and the variable royalty fees, all of which are allocated to the single performance obligation.

The Company recognizes revenue from the agreement over time because the customer simultaneously receives and consumes the benefits from the services. The Company uses the passage of time to measure progress towards satisfying its performance obligation because of its ongoing efforts in providing the exclusive license rights including providing continuous access, updates and support. Total revenue recognized under the agreement was approximately $0.5 million and $0.5 million for the three months ended June 30, 2022 and 2021, respectively and approximately $1.0 million and $0.8 million for the six months ended June 30, 2022 and 2021, respectively, which is reflected in the revenues from Asia.

**4.    INVENTORIES**

Inventories consist of the following at:

12

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| Finished goods | $ | 107,883 | $ | 123,594 |
| Raw Materials | | 57,159 | | 70,201 |
| Less: Inventory allowance for excess and obsolete products | | (2,904) | | (2,573) |
| **Inventories** | $ | **162,138** | $ | **191,222** |

**5.   PREPAID EXPENSES AND OTHER CURRENT ASSETS**

Prepaid expenses and other current assets total approximately $12.3 million and $13.6 million at June 30, 2022 and December 31, 2021, respectively, consist mainly of prepaid advances to co-packers related to inventory production, advertising, prepaid insurance, prepaid slotting fees, value added tax payments and deposits on purchases.

**6.   NOTE RECEIVABLE**

Note receivable consists of the following at:

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| Note receivable-current | $ | 3,066 | $ | 2,588 |
| Note receivable-non-current | | 3,679 | | 7,117 |
| **Total Note receivable** | $ | **6,745** | $ | **9,705** |

Effective January 1, 2019, we restructured our China distribution efforts by entering into two separate economic agreements as it relates to the commercialization of our Celsius products (i.e., license agreement) and a repayment of investment agreement with Qifeng. Under the license agreement, Qifeng was granted the exclusive license rights to manufacture, market and commercialize Celsius® brand products in China. Qifeng will pay a minimum royalty fee of approximately $6.9 million for the five years of the term of the agreement, transitioning to a volume-based royalty fee, thereafter. Under a separate economic agreement, Qifeng Food will repay the marketing investments made by Celsius into the China market through 2018, over the same five-year period. The repayment, which was formalized via a Note Receivable from Qifeng, will need to be serviced even if the licensing agreement is cancelled or terminated. The note receivable is denominated in Chinese-Yuan.

Scheduled principal payments plus accrued interest are due annually on March 31 of each year starting in 2020. The note receivable is recorded at amortized cost and accrues interest at a rate per annum equal to the weighted average of 5% of the outstanding principal up to $5 million and 2% of the outstanding principal above $5 million. On June 12, 2020, it was agreed to fix the interest rate at 3.21% which reflected the weighted average interest rate for the 5-year period of the Note. For the three months ended June 30, 2022 and 2021, interest income was approximately $0.1 million and $0.1 million, respectively. For the six months ended June 30, 2022 and 2021, interest income was approximately $0.1 million and $0.2 million, respectively.

The Company assesses the note receivable for impairment at each reporting period, by evaluating whether it is probable that the Company will be unable to collect all the contractual principal and interest payments as scheduled in the Note agreement, based on historical experience of Qifeng's ability to pay, the current economic environment and other factors. If the Note is determined to be impaired, the impairment is measured based on the present value of the expected future cash flows under the Note, discounted at the Note's effective interest rate. At June 30, 2022, the Note was not deemed to be impaired. Payment in-full was received by April 2022 pertaining to the amounts due on March 31, 2022.

As collateral for the Note, a stock certificate in Celsius Holdings, Inc., which amounts to 34,830 of shares owned by an affiliate under common control with Qifeng is being held at a brokerage account. These shares were originally issued on April 20, 2015 via a private transaction which involved Risejoy Services Limited an affiliate under the common control of Qifeng, our Chinese licensee. Furthermore, a letter of guarantee was executed with several restrictions regarding these shares. These shares serve only as collateral and is a component of management's consideration when evaluating impairment indicators.

**7.   LEASES**

The Company's leasing activities include an operating lease of its corporate office space from a related party (see note 12) and other operating and finance leases of vehicles and office space for the Company's European operations.

At the inception of a contract, the Company assesses whether the contract is, or contains, a lease. The Company's assessment is based on: (1) whether the contract involves the use of a distinct identified asset, (2) whether the Company obtains the right to substantially all the economic benefit from the use of the asset throughout the term, and (3) whether the Company has the right to direct the use of the asset. The Company allocates the consideration in the contract to each lease and non-lease component based on the component's relative stand-alone price to determine the lease payments. Lease and non-lease components are accounted for separately.

13

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

Leases are classified as either finance leases or operating leases based on criteria in ASC Topic 842, "Leases". The Company's operating leases are generally comprised of real estate and vehicles, and the Company's finance leases are generally comprised of vehicles.

At lease commencement, the Company records a lease liability equal to the present value of the remaining lease payments, discounted using the rate implicit in the lease or, if that rate cannot be readily determined, the Company's incremental borrowing rate. A corresponding right-of-use asset ("ROU asset") is recorded, measured based on the initial measurement of the lease liability. ROU assets also include any lease payments made and exclude lease incentives. Lease terms may include options to extend or terminate the lease when it is reasonably certain that the Company will exercise that option.

Lease expense for operating leases is recognized on a straight-line basis over the lease term and is included in general and administrative expenses. Included in lease expense are any variable lease payments incurred in the period that were not included in the initial lease liability. Lease expense for finance leases consists of the amortization of the ROU asset on a straight-line basis over the shorter of the useful life of the asset or the lease term, and interest expense is calculated using the effective interest rate method.

The future annual minimum lease payments required under the Company's operating and finance lease liabilities as of June 30, 2022 are as follows:

| Future minimum lease payments | Operating Leases | | Finance Leases | | Total | |
|---|---|---|---|---|---|---|
| 2022 | $ | 296 | $ | 79 | $ | 375 |
| 2023 | | 548 | | 68 | | 616 |
| 2024 | | 174 | | 21 | | 195 |
| 2025 | | 6 | | 78 | | 84 |
| 2026 | | — | | 5 | | 5 |
| Total future minimum lease payments | | 1,024 | | 251 | | 1,275 |
| Less: Amount representing interest | | (48) | | (12) | | (60) |
| Present value of lease liabilities | | 976 | | 239 | | 1,215 |
| Less: current portion | | (556) | | (101) | | (657) |
| Long-term portion | $ | 420 | $ | 138 | $ | 558 |

**8.   PROPERTY AND EQUIPMENT**

Property and equipment consist of the following at:

| | June 30, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| Merchandising equipment - coolers | $ | 4,944 | $ | 3,052 |
| Office Equipment | | 996 | | 891 |
| Vehicles | | 739 | | 304 |
| Less: accumulated depreciation | | (1,544) | | (1,067) |
| Total | $ | 5,135 | $ | 3,180 |

Depreciation expense amounted to approximately $0.4 million and $0.1 million for the three months ended June 30, 2022 and 2021, respectively. Depreciation expense amounted to approximately $0.6 million and $0.2 million for the six months ended June 30, 2022 and 2021, respectively.

**9.   GOODWILL AND INTANGIBLES**

At June 30, 2022 and December 31, 2021, goodwill consists of approximately $13.3 million and $14.5 million, respectively resulting from the excess of the consideration paid over the fair value of net tangible and intangible assets acquired from the Func Food Acquisition.

Intangible assets consist of acquired customer relationships and brands from the Func Food Acquisition. The gross carrying amount and accumulated amortization of intangible assets as of June 30, 2022 and December 31, 2021, respectively, were as follows:

14

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| *Definite-lived intangible assets* | | | | |
| Customer relationships | $ | 13,068 | $ | 14,248 |
| Less: accumulated amortization | | (1,307) | | (1,140) |
| Definite-lived intangible assets, net | $ | 11,761 | $ | 13,108 |
| *Indefinite-lived intangible assets* | | | | |
| Brands | $ | 2,928 | $ | 3,193 |
| **Total Intangibles** | **$** | **14,689** | **$** | **16,301** |

Customer relationships are amortized over an estimated useful life of 25 years and brands have an indefinite life. Amortization expense for the three months ended June 30, 2022 and 2021 was approximately $0.1 million and $0.2 million, respectively. Amortization expense for the six months ended June 30, 2022 and 2021 was approximately $0.3 million and $0.4 million, respectively. Amortization expense is reflected in general and administrative expenses. Other fluctuations in the amounts of goodwill and intangible assets are due to currency translation adjustments.

The following is the future estimated annualized amortization expense related to customer relationships:

| As of June 30, 2022: | | |
|---|---|---|
| 2022 | $ | 261 |
| 2023 | | 523 |
| 2024 | | 523 |
| 2025 | | 523 |
| 2026 | | 523 |
| Thereafter | | 9,408 |
| **Total** | **$** | **11,761** |

**10. ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

Accounts payable and accrued expenses consist of the following at:

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| Accounts payable | $ | 25,235 | $ | 35,821 |
| Promotional allowances | | 36,549 | | 19,037 |
| Freight | | 18,638 | | 15,872 |
| Accrued expenses | | 20,244 | | 15,311 |
| Unbilled purchases | | 1,750 | | 5,438 |
| **Total** | **$** | **102,416** | **$** | **91,479** |

**11. OTHER CURRENT AND LONG-TERM LIABILITIES**

Other current liabilities consist of the following at:

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **Short-term** | | | | |
| Deferred revenue, short-term | $ | 151 | $ | — |
| VAT payable | | 198 | | — |
| State Beverage Container Deposit | | 2,412 | | 976 |
| **Total short-term** | | 2,761 | | 976 |
| | | | | |
| **Long-term** | | | | |
| Deferred revenue, long-term | | 487 | | — |
| | | | | |
| **Total** | **$** | **3,248** | **$** | **976** |

**12. RELATED PARTY TRANSACTIONS**

15

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

The Company's office is rented from a company affiliated with CD Financial, LLC which is controlled by one of our major shareholders. The current lease expires on December 2024 with monthly base rent of approximately $35 thousand.

13. **STOCKHOLDERS' EQUITY**

*Issuance of common stock pursuant to exercise of stock options and other awards*

During the six months ended June 30, 2022, the Company issued an aggregate of 712,944 shares of its common stock pursuant to the exercise of grants under the Company's Stock Incentive Plans. The Company received aggregate proceeds of approximately $1.3 million for 365,730 options exercised for cash, with the balance of the options having been exercised on a "cashless" basis. During the six months ended June 30, 2021, the Company issued an aggregate of 1,073,757 shares of its common stock pursuant to the exercise of grants under the Company's Stock Incentive Plans. The Company received aggregate proceeds of approximately $2.5 million for 669,532 options exercised for cash, with the balance of the options having been exercised on a "cashless" basis.

*June 2021 Public Offering*

On June 9, 2021, the Company and certain selling stockholders (the "Selling Stockholders") entered into an underwriting agreement (the "Underwriting Agreement") with UBS Securities LLC and Jefferies LLC, as representatives (the "Representatives") of the several underwriters (the "Underwriters"), relating to the sale of 6,518,267 shares of common stock, par value $0.001 per share, of the Company at a public offering price of $62.50 per share less underwriting discounts and commissions in a registered public offering (the "Offering"). The Company and certain Selling Stockholders also granted the Underwriters an option, exercisable for 30 days, to purchase up to an additional 977,740 shares of its Common Stock. The Underwriters partially exercised their option to purchase 873,141 shares of the Company's Common Stock on June 11, 2021; 1,133,953 of which were sold by the Company and 739,188 of which were sold by certain of the Selling Stockholders. The Offering closed on June 14, 2021. The Company issued and sold 1,133,953 shares of Common Stock, and the Selling Stockholders sold 6,257,455 shares, in the aggregate, of Common Stock in the Offering. The Offering generated net proceeds for the Company of $67,769,386 and net proceeds for the Selling Stockholders of $375,447,300. The Company intends to use the proceeds for general corporate purposes. The Company did not receive any proceeds from the sale of shares by the Selling Stockholders.

The Underwriting Agreement contains customary representations and warranties of the parties, and indemnification and contribution provisions under which the Company and the Selling Stockholders have agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). Pursuant to the Underwriting Agreement, the Company has agreed, subject to certain exceptions, not to sell or transfer any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock for 90 days after June 9, 2021 without first obtaining the written consent of the Representatives.

14. **INCOME TAXES**

In general, the Company uses an estimated annual effective tax rate, which is based on expected annual income and statutory tax rates in the various jurisdictions in which the Company operates, to determine its quarterly provision for income taxes. Certain significant or unusual items are separately recognized in the quarter in which they occur and can be a source of variability on the effective tax rates from quarter to quarter. The Company's effective tax rate may change from period-to-period based on recurring and non-recurring factors including the geographical mix of earnings, enacted tax legislation and state and local income taxes.

The effective income tax rate for the six months ended June 30, 2022 was 28.0%. The effective income tax rate for the six months ended June 30, 2022 differed from the statutory federal income tax rate of 21% primarily due to the impact of disallowed stock based compensation expense, state income tax expense and the release of certain state income tax reserves.

The Company is subject to U.S. federal income tax as well as income tax in multiple state and foreign jurisdictions. The Company recognizes those tax positions that meet the more-likely-than-not recognition threshold and establishes tax reserves for uncertain tax positions that do not meet this threshold. Interest and penalties associates with income tax matters are included in the provision for income taxes in the consolidated statements of operations.

15. **STOCK-BASED COMPENSATION**

The Company adopted an Incentive Stock Plan on January 18, 2007. This plan is intended to provide incentives which will attract and retain highly competent persons at all levels as employees of the Company, as well as independent contractors providing consulting or advisory services to the

16

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

Company, by providing them opportunities to acquire the Company's common stock. While the plan terminated 10 years after the adoption date, issued awards have their own schedule of terminations. As such, the Company is no longer granting awards under this plan and there are no unvested awards as of June 30, 2022.

The Company adopted the 2015 Stock Incentive Plan on April 30, 2015. This plan is intended to provide incentives which will attract and retain highly competent persons at all levels as employees of the Company, as well as independent contractors providing consulting or advisory services to the Company, by providing them opportunities to acquire the Company's common stock or to receive monetary payments based on the value of such shares pursuant to Awards issued. The 2015 Plan permits the grant of options and shares for up to 5 million shares. In addition, there is a provision for an annual increase of 15% of the shares pertaining to the 2015 plan that are outstanding as of the last day of the prior year. As of June 30, 2022, approximately 4.4 million shares are available.

The Company determines the fair value of restricted stock-based awards based on the market price on the date of grant. The Company uses the Black-Scholes option-pricing model to estimate the fair value of its stock option awards and warrant issuances and recognizes forfeitures as they occur.

For the six months ended June 30, 2022 and 2021, the Company recognized an expense of approximately $8.5 million and $10.8 million, respectively, of non-cash compensation expense (included in General and Administrative expense in the accompanying Consolidated Statement of Operations).

*Stock Options*

Under the 2015 Stock Incentive Plan, the Company has issued options to purchase approximately 3.2 million shares at an average price of $7.98 with a fair value of $182.1 million. For the six months ended June 30, 2022 and 2021, the Company issued options to purchase 0 and 304,750 shares, respectively. Upon exercise, shares of new common stock are issued by the Company.

A summary of the status of the Company's outstanding stock options as of June 30, 2022 and changes during the periods ending on that date is as follows:

| | Shares (000's) | Exercise Price | Weighted Average Grant Date Fair Value | Aggregate Intrinsic Value (000's) | Weighted Average Remaining Term (Yrs) |
|---|---|---|---|---|---|
| **Options** | | | | | |
| At December 31, 2021 | 3,600 | $ 7.47 | | $ 241,515 | 6.37 |
| Granted | — | $ — | $ — | | |
| Exercised | (401) | $ 3.57 | $ 50.93 | $ 21,636 | |
| Forfeiture and cancelled | (19) | $ 6.43 | | | |
| At June 30, 2022 | 3,180 | $ 7.98 | | $ 182,105 | 6.07 |
| Exercisable at June 30, 2022 | 2,383 | $ 5.80 | | $ 141,688 | 5.58 |

The following table summarizes information about employee stock options outstanding at June 30, 2022:

| | Outstanding Options | | | Vested Options | | |
|---|---|---|---|---|---|---|
| Range of Exercise Price | Number Outstanding at June 30, 2022 (000's) | Weighted Averaged Remaining Life | Weighted Averaged Exercise Price | Number Exercisable at June 30, 2022 (000's) | Weighted Averaged Exercise Price | Weighted Averaged Remaining Life |
| $0.20 - $0.53 | 20 | 1.59 | $ 0.34 | 20 | $ 0.34 | 1.59 |
| $0.65 - $1.80 | 10 | 2.66 | $ 1.05 | 10 | $ 1.05 | 2.66 |
| $1.83 - $2.84 | 105 | 3.52 | $ 1.97 | 105 | $ 1.97 | 3.52 |
| $3.20 - $6.20 | 2,665 | 5.88 | $ 4.14 | 2,123 | $ 4.20 | 5.57 |
| $7.20-$60.00 | 380 | 8.44 | $ 37.16 | 125 | $ 37.30 | 8.44 |
| Outstanding options | 3,180 | 6.07 | $ 7.98 | 2,383 | $ 5.80 | 5.58 |

As of June 30, 2022, the Company had approximately $5.5 million of unrecognized pre-tax non-cash compensation expense related to options to purchase shares, which the Company expects to recognize, based on a weighted-average period of 1.4 years. The Company used straight-line amortization of compensation expense over the two to three-year requisite service or vesting period of the grant. The maximum contractual term of the Company's stock options is 10 years. The Company recognizes forfeitures as they occur. There are options to purchase approximately 2.4 million shares that have vested as of June 30, 2022.

*Restricted Stock Awards*

17

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

Restricted stock awards are awards of common stock that are subject to restrictions on transfer and to a risk of forfeiture if the holder leaves the Company before the restrictions lapse. The holders of a restricted stock award are generally entitled after the release to transact and obtain the same rights as rights of a shareholder of the Company, including the right to vote the shares. The holders of unvested restricted stock awards do not have the same rights as shareholders including but not limited to any dividends which may be declared by the Company, and do not have the right to vote. The value of restricted stock awards that vest over time is established by the market price on the date of its grant. A summary of the Company's restricted stock award activity for the six months ended June 30, 2022 and 2021 is presented in the following table:

| | For the six months ended | | | |
| | June 30, 2022 | | June 30, 2021 | |
| | Shares (000's) | Weighted Average Grant Date Fair Value | Shares (000's) | Weighted Average Grant Date Fair Value |
|---|---|---|---|---|
| Unvested at beginning of period | 0.2 | $ 14.72 | 66 | $ 14.78 |
| Transfers to restricted stock units | — | — | (46) | 34.02 |
| Granted | — | — | — | — |
| Vested | — | — | — | 22.30 |
| Forfeiture and cancelled | (0.2) | 14.72 | — | 34 |
| Unvested at end of period | — | $ — | 20 | $ 14.72 |

There were no shares vested during the six months ended June 30, 2022. There are no outstanding restricted stock awards as of June 30, 2022.

*Restricted Stock Units*

Restricted stock units are awards that give the holder the right to receive one share of common stock for each restricted stock unit upon meeting service-based vesting conditions (typically annual vesting in three equal annual installments, with a requirement that the holder remains in the continuous employment of the Company). The holders of unvested units do not have the same rights as stockholders including but not limited to any dividends which may be declared by the Company, and do not have the right to vote. The value of restricted stock units that vest over time is established by the market price on the date of its grant. A summary of the Company's restricted stock unit activity for the six months ended June 30, 2022 and 2021 is presented in the following table:

| | For the six months ended | | | |
| | June 30, 2022 | | June 30, 2021 | |
| | Shares (000's) | Weighted Average Grant Date Fair Value | Shares (000's) | Weighted Average Grant Date Fair Value |
|---|---|---|---|---|
| Unvested at beginning of period | 566 | $ 52.66 | — | $ — |
| Transfers from restricted stock awards | — | — | 46 | 34.02 |
| Granted | 202 | 73.33 | 510 | 51.03 |
| Vested | (145) | 51.08 | — | — |
| Forfeited and cancelled | (42) | 61.17 | (15) | 50.67 |
| Unvested at end of period | 581 | $ 59.62 | $ 541 | $ 49.59 |

The total fair value of shares vested during the six months ended June 30, 2022 was $7.4 million. Unrecognized compensation expense related to outstanding restricted stock units to employees and directors as of June 30, 2022 and 2021 was $25.8 million and $22.5 million, respectively, and is expected to be expensed over the next 2.2 years.

*Stock-based Awards Issued to Non-employee Consultants*

The Company issues stock-based awards to third-party consultants for providing marketing, sales, and general business development services related to Celsius products. The stock-based awards are in the form of restricted stock units with performance vesting conditions ("performance stock units" or "PSUs"). The holders of unvested PSUs do not have the same rights as stockholders including but not limited to any dividends which may be declared by the Company, and do not have the right to vote. The PSU performance vesting conditions are linked to the consultants obtaining specified incremental earnings for the Company in a given year over the performance vesting period, typically five years. The fair value of PSUs is based on the market price of the underlying stock on the grant date. The Company recognizes compensation cost for performance stock awards issued to non-employees in the same manner and periods as though cash had been paid for services received. A summary of the Company's PSU activity for the six months ended June 30, 2022 and 2021 is presented in the following table:

18

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

| | For the six months ended | | | | |
| | June 30, 2022 | | June 30, 2021 | | |
| | Shares (000's) | Weighted Average Grant Date Fair Value | | Shares (000's) | Weighted Average Grant Date Fair Value |
|---|---|---|---|---|---|
| Unvested at beginning of period | 15 | $ 64.65 | | — | $ — |
| Granted | — | — | | — | — |
| Vested | — | — | | — | — |
| Forfeited and cancelled | — | — | | — | — |
| **Unvested at end of period** | **15** | **$ 64.65** | **$ —** | **$** | **—** |

The total fair value of awards vested during the six months ended June 30, 2022 was $0.1 million. Unrecognized compensation expense related to outstanding PSUs issued to non-employee consultants as of June 30, 2022 was approximately $0.8 million and is expected to be expensed over the next 4.1 years.

*Modifications*

There were certain Board of Directors members and employees whose service was terminated during 2021. In connection with their terminations, the vesting conditions of the previously granted awards were modified to accelerate the vesting of specified un-vested awards pursuant to Board resolutions or severance agreements. Pursuant ASC 718, these were Type III modifications requiring re-valuation of un-vested awards to modification date fair value with recognition of compensation expense over the remaining service period. There have been no modifications in the three and six months ended June 30, 2022. Modifications during the three and six month period ended June 30, 2021 resulted in additional stock based compensation expense of $3.2 million for both periods.

16. **COMMITMENTS AND CONTINGENCIES**

In November of 2020, McGovern Capital, Inc. and Kevin McGovern (collectively "McGovern") filed a claim in arbitration related to its Representative Agreement with Celsius Holdings, Inc. as amended by the first amendment dated August 6, 2016. Pursuant to the Representative Agreement, McGovern is entitled to receive a fee of three percent (3%) of "Net Revenues" received by the Company from sales of the Company's products in the People's Republic of China for a period of four years from Initial Commercial Sale (which was September 1, 2017). "Net Revenues" are defined in the Representative Agreement as "the Company's revenues net of actual discounts applied, credits and returns." Effective January 1, 2019, the Company restructured its China operations from a distribution arrangement with Qifeng Food Technology (Beijing) Co. Ltd. ("Qifeng"), to a license and royalty arrangement and a loan, pursuant to which Qifeng will market and distribute the Company's products in China, and Celsius will receive an annual royalty payment. The Company intended to pay McGovern its percentage of the annual royalty payment, but McGovern had objected claiming that McGovern is entitled to be paid commissions on the entire royalty payment and the amount of the loan to Qifeng. During the quarter, a confidential settlement agreement was signed for an amount included in our Consolidated Statements of Operations and Comprehensive Income for the three and six months ended June 30, 2022 that is not material to the financial results of the Company .

In March of 2019, Daniel Prescod filed a putative class action lawsuit against the Company in the Superior Court for the State of California, County of Los Angeles, filed on March 19, 2019, (the "Prescod Litigation"). Daniel Prescod asserts that the Company's use of citric acid in its products while simultaneously claiming "no preservatives" violates California Consumer Legal Remedies Act, California Business and Professions Code Section 17200, et seq., and California Business and Professions Code Section 17500, et seq., because citric acid acts as a preservative. The Company does not use citric acid as a preservative in its products, but rather as a flavoring, and therefore it believes that its "no preservatives" claim is fair and not deceptive. A motion to certify the case as a class action was filed and on August 2, 2021, that motion was granted. However, the Company also has a motion for summary adjudication pending and that motion would be dispositive of plaintiff's claims if granted. No fact discovery has been conducted on the merits and this matter is still in its initial stages. The Company intends to contest the claims vigorously on the merits. Since merits discovery is still in its initial stages, we are unable to predict the outcome at this time.

On January 8, 2021, we received a letter from the SEC Division of Enforcement seeking the production of documents in connection with a non-public fact-finding inquiry by the SEC to determine whether violations of the federal securities laws have occurred. Subsequent to January 8, 2021, we received subpoenas for production of documents in connection with the matter. The investigation and requests from the SEC do not represent that the SEC has concluded that the Company or anyone else has violated the federal securities laws. We have cooperated and will continue to cooperate with the SEC staff in its investigation and requests. At this time, however, we cannot predict the length, scope, or results of the investigation or the impact, if any, of the investigation on our results of operations.

On March 16, 2022, Christian McCallion filed a putative class action lawsuit against the Company in the United States District Court for the Southern District of Florida. Plaintiff McCallion asserts that because of Celsius' delay in filing its Annual Report on Form 10-K for the year ended December 31, 2021, there was a decline in the market value of the Company's securities Plaintiff and as a result, Class members have suffered significant losses and damages. On June 6, 2022 Judge Middlebrooks appointed a lead class plaintiff and the Company filed its Motion to Dismiss

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

on August 5, 2022. As the Company has previously disclosed in its periodic reports filed with the SEC, prior to filing an application for an automatic fifteen (15) day extension of the original filing date, the Company experienced staffing limitations, unanticipated delays and identified material errors in previous filings. Celsius has not committed any federal securities violations or made false and/or misleading statements and/or material omissions as alleged in the complaint. The Company intends to contest the claims vigorously on the merits.

In addition to the foregoing, from time to time, we may become party to litigation or other legal proceedings that we consider to be a part of the ordinary course of our business.

The Company has entered into distribution agreements with liquidated damages in case the Company cancels the distribution agreements without Cause. Cause has been defined in various ways. If management makes the decision to terminate an agreement without cause, an estimate of expected damages is accrued and an expense is recorded within operating expenses during the period in which termination was initiated.

Additionally, our business and results of operations may be adversely affected by the pandemic and public health crises related to the COVID-19 outbreak which is affecting the macro-economic environment.

17. **SUBSEQUENT EVENTS**

*Securities Purchase Agreement*

On August 1, 2022, the Company entered into a securities purchase agreement (the "Purchase Agreement") with PepsiCo, Inc., a North Carolina corporation (the "Purchaser"), pursuant to which the Company agreed to sell to the Purchaser, in a private placement exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), and Rule 506 of Regulation D promulgated thereunder, 1,466,666 shares of a newly created series of the Company's preferred stock, par value $0.001 per share, designated as "Series A Convertible Preferred Stock" (the "Series A Preferred Stock"), for an aggregate purchase price of $550,000,000 and a price per share, on an as-converted to Common Stock (as hereinafter defined) basis, equal to $75.00.

Pursuant to the Purchase Agreement, the Purchaser, together with its affiliates, will have certain rights and be subject to various restrictions with respect to its equity ownership in the Company, including the right to increase its ownership to up to a specified percentage of the Company's outstanding shares, with restrictions on new purchases above a specified percentage for so long as the Purchaser owns any shares of Series A Preferred Stock or Common Stock (subject to certain exceptions). Additionally, the Company has agreed to permit the Purchaser to designate one nominee (the "Purchaser Designee") to the board of directors of the Company (the "Board") for so long as the Purchaser (together with its affiliates) beneficially owns at least 3,666,665 shares of the Company's outstanding Common Stock on an as-converted basis. Effective as of the closing of the transaction (the "Closing"), the size of the Board has been increased to nine members, with James Lee elected to the Board as the initial Purchaser Designee to serve for a term expiring at the 2023 annual meeting of the Company's stockholders.

Pursuant to the Purchase Agreement and in connection with the Closing, the Company adopted or entered into, as applicable: (i) the Certificate of Designation of Series A Convertible Preferred Stock, as filed with the Secretary of State of the State of Nevada, setting forth the rights, preferences, privileges and restrictions applicable to the Series A Preferred Stock (the "Series A Certificate"); (ii) a registration rights agreement between the Company and the Purchaser (the "Registration Rights Agreement"); (iii) a lock-up agreement between the Company and each of the Company's directors (other than Mr. Lee), chief executive officer and chief financial officer (the "Lock-Up Agreements"); (iv) a distribution agreement (the "Distribution Agreement") between the Company and the Purchaser; and (v) a channel transition agreement between the Company and the Purchaser (the "Channel Transition Agreement").

*Series A Preferred Stock*

The Series A Certificate authorizes 1,466,666 shares of Series A Preferred Stock, all of which were issued and sold to Purchaser under the Purchase Agreement and are convertible at the rate of five shares of the Company's common stock, par value $0.001 per share (the "Common Stock") for each share of Series A Preferred Stock based on the conversion conditions noted below. The Series A Preferred Stock ranks, with respect to distribution rights and rights on liquidation, winding-up and dissolution, (i) senior and in priority of payment to the Company's Common Stock, (ii) on parity with any class or series of capital stock of the Company expressly designated as ranking on parity with the Series A Preferred Stock, and (iii) junior to any class or series of capital stock of the Company expressly designated as ranking senior to the Series A Preferred Stock.

Upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company (but excluding any change of control), each holder of Series A Preferred Stock will be entitled to receive an amount per share of Series A Preferred Stock equal to the Liquidation Preference, as defined in the Series A Certificate. Holders of shares of Series A Preferred Stock will be entitled to cumulative dividends, which will be payable quarterly in arrears either in cash, in-kind, or a combination thereof. Dividends will accrue on each share of Series A Preferred Stock at the rate of 5.00% per annum, as set forth in the Series A Certificate. In addition to such quarterly regular dividends, such shares of Series A Preferred Stock are entitled to participate in dividends paid to holders of Common Stock.

The shares of Series A Preferred Stock are convertible into shares of Common Stock at the then-applicable conversion ratio automatically or at the option of the Company at certain times and subject to the terms and conditions set forth in the Series A Certificate. Each share of Series A

20

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

Preferred Stock shall automatically convert into shares of Common Stock at any date from and after the sixth anniversary date on which a) the triggering condition is satisfied in accordance with the distribution agreement and the 10-day volume weighted average price ("VWAP") immediately prior to such date exceeds the conversion price of such share as of such date and b) any date from and after the occurrence of a corporation termination event, if the 10-day VWAP immediately preceding such date exceeds the conversion price of such share as of such date and c) any date from and after the occurrence of an investor termination event, if the 10-day VWAP immediately preceding such date exceeds the conversion price of such share as of such date. Conversion at the option of the company can occur at any time from and after the seventh anniversary date, provided that the 10-day VWAP immediately prior to the date the company delivers a mandatory conversion notice to the holders of the preferred shares exceeds the conversion price, the company may elect to convert all, but not less than all, of the outstanding shares of Series A Preferred Stock into shares of Common Stock.  In the case of a Mandatory Conversion, each share of Series A Preferred Stock then outstanding shall be converted into the number of shares of Common Stock equal to the conversion ratio of such share in effect as of the mandatory conversion date.

In addition, the shares of Series A Preferred Stock are redeemable at the option of the Company or the holders of a majority of the outstanding shares of Series A Preferred Stock at certain times and subject to the terms and conditions set forth in the Series A Certificate. At any time from and after the earlier of a) the seventh anniversary date, if the 10-day VWAP does not exceed the conversion price on the date immediately prior to the date the company delivers a corporation optional redemption notice to the holders and b) the occurrence of a corporation termination event, if the 10-day VWAP does not exceed the conversion price on the date immediately prior to the date the company delivers a corporation optional redemption notice to the holders, the company shall have the right upon written notice to the holders to redeem all (and not less than all) of the then-outstanding shares of Series A Preferred Stock. On each of the seventh anniversary date, the tenth anniversary date and the thirteenth anniversary date, the majority holders shall have the right upon no less than six months prior written notice to the company, to require the company to redeem in cash all (an not less than all) of the then-outstanding shares of Series A Preferred Stock.

In the event of a transaction resulting in a change of control, the company (or its successor) shall redeem all (and not less than all) of the then-issued and outstanding shares of Series A Preferred Stock. Upon such redemption, the company will pay or deliver, as applicable, to each holder in respect of each share of Series A Preferred Stock held by such holder, an amount equal to the greater of a) cash in the amount equal to the redemption price and b) the amount of cash and/or other assets (including securities) such holder would have received had each share of Series A Preferred Stock held by such holder as of the close of business on the business day immediately prior to the effective date of such transaction resulting in a change of control, converted into a number of shares of common stock equal to the then-applicable conversion ratio and participated in such transaction resulting in a change of control as a holder of shares of common stock.

The conversion ratio for each share of Series A Preferred Stock shall mean the quotient of a) the sum of (x) the stated value of such share of Series A Preferred Stock as of the applicable conversion date, plus (y) without duplication of all accrued and unpaid dividends previously added to the stated value of such shares of Series A Preferred Stock, all accrued and unpaid dividends per share of Series A Preferred Stock through the applicable conversion date; divided by b) the conversion price as of the conversion date.  The conversion price shall mean $75.00, as adjusted in accordance with the terms and conditions of the agreement.

The Series A Preferred Stock confers no voting rights on holders, except as otherwise required by applicable law, and with respect to matters that adversely change the powers, preferences, privileges, rights or restrictions given to the Series A Preferred Stock or provided for its benefit, or would result in securities that would be senior to or pari passu with the Series A Preferred Stock.

*Registration Rights Agreement*
In connection with the Purchase Agreement, the Company entered into the Registration Rights Agreement with the Purchaser relating to the registered resale of the Common Stock issuable upon exercise of the Series A Preferred Stock (the "Registrable Securities") pursuant to a registration statement to be filed with the Securities and Exchange Commission. The Company agreed to use commercially reasonable efforts to file a registration statement on Form S-3 or such other form under the Securities Act then available to the Company with respect to the resale of the Registrable Securities, and to use commercially reasonable efforts to cause such registration statement to be declared effective under the Securities Act as soon as practicable thereafter. In certain circumstances, the holders party to the Registration Rights Agreement will have piggyback registration rights and rights to request an underwritten offering as described in the Registration Rights Agreement. The resale registration rights under the Purchase Agreement are only transferrable to affiliates of the Purchaser, subject to the terms and conditions set forth in the Registration Rights Agreement.

*Lock-Up Agreements*

21

**Celsius Holdings, Inc.**
**Notes to Consolidated Financial Statements (unaudited)**
**June 30, 2022**
**(Tabular dollars in thousands, except per share amounts)**

As a condition to the transaction, the Company's chief executive officer, chief financial officer, and all of the directors of the Company (other than Mr. Lee) entered into Lock-Up Agreements pursuant to which they agreed not to sell, pledge, hypothecate or otherwise transfer their shares for a period of 12 months commencing on the date of the Closing, subject to certain exceptions.

*Distribution Agreement*

Simultaneously with the execution and delivery of the Purchase Agreement, the Company entered into the Distribution Agreement with the Purchaser relating to the sale and distribution of certain of the Company's beverage products in existing channels and distribution methods in the United States, excluding Puerto Rico and the US Virgin Islands (the "Territory").

Under the Distribution Agreement, the Company has granted the Purchaser the right to sell and distribute its existing beverage products in existing channels and distribution methods and future beverage products that are added from time to time as licensed products under the Distribution Agreement (the "Products") in the Territory. The Distribution Agreement does not have a specified term. Instead, it may be terminated in accordance with the terms of the Distribution Agreement by either party "with cause" (including by the Purchaser if the Company undergoes a change of control involving a competitor), by the Company, if the Company undergoes a change of control, and by either party without cause in the nineteenth year of the term (i.e., 2041), the twenty-ninth year of the term (i.e., 2051) and each ten (10) year period thereafter (i.e., 2061, 2071, etc.) by providing twelve (12) months' written notice on August 1st of each such year to the other party. Except for a termination by the Company "with cause" and the Purchaser without cause, the Company is required to pay the Purchaser certain compensation upon a termination as specified in the Distribution Agreement.

The Company agreed to provide the Purchaser a right of first offer in the event the Company intends to (i) manufacture, distribute or sell Products in certain additional countries as specified in the Distribution Agreement or (ii) distribute or sell Products in any future channels and distribution methods during the term of the Agreement. Additionally, pursuant to the Distribution Agreement, the Company and the Purchaser agreed to use commercially reasonable efforts to negotiate and execute with the Purchaser a distribution agreement reasonably consistent with the Distribution Agreement for the sale and distribution of the Products in Canada, and the Purchaser agreed to meet and confer in good faith with the Company regarding the terms and conditions upon which the Purchaser may be willing to sell or distribute the Products, either directly or through a local sub-distributor in certain other additional countries. The Distribution Agreement includes other customary provisions, including non-competition covenants in favor of the Company, representations and warranties, indemnification provisions, insurance provisions and confidentiality provisions.

*Channel Transition Agreement*

In connection with the Distribution Agreement, the Company entered into the Channel Transition Agreement with the Purchaser relating to the Company's transition of certain existing distribution rights in the Territory to the Purchaser.

22

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

When used in this report, unless otherwise indicated, the terms "the Company," "Celsius," "we," "us" and "our" refer to Celsius Holdings, Inc. and its subsidiaries.

**Note Regarding Forward Looking Statements**

This report contains forward-looking statements that reflect our current views about future events. We use the words "anticipate," "assume," "believe," "estimate," "expect," "will," "intend," "may," "plan," "project," "should," "could," "seek," "designed," "potential," "forecast," "target," "objective," "goal," or the negatives of such terms or other similar expressions. These statements relate to future events or our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements.

**Business Overview**

Celsius Holdings is a fast-growing company in the functional energy drink and liquid supplement categories in the United States and internationally. We engage in the development, processing, marketing, sale, and distribution of functional drinks and liquid supplements to a broad range of consumers. We believe that we provide differentiated products that offer clinically proven and innovative formulas meant to change the lives of our consumers for the better. We also believe that our brand is attractive to a broad range of customers including fitness enthusiasts.

Our core offerings include pre- and post-workout functional energy drinks, as well as protein bars. Our flagship functional energy drink and liquid supplement brands are backed by science, being clinically proven to deliver health benefits by six self-funded studies published in various journals including the Journal of the International Society of Sports Nutrition, the Journal of the American College of Nutrition, and the Journal of Strength and Conditioning Research. These studies have concluded that a single serving of Celsius burns 100-140 calories (by increasing a consumer's resting metabolism an average of 12%, while providing sustained energy for up to three hours).

Our flagship asset, Celsius, is a fitness supplement drink which accelerates metabolism and burns calories and body fat while providing energy. This product line comes in two versions, a ready-to-drink supplement format and an on-the-go powder form. We also offer a Celsius Heat and a Branch Chain Amino Acids line, catered to both pre- and post-workout consumer needs. Our products are currently offered in major retail channels in the US including conventional grocery, natural, convenience, fitness, mass market, vitamin specialty and e-commerce.

An integral part of our value proposition is our focus on the functional energy drink and liquid supplement category, ensuring our products have clear and proven benefits. This is why we invest in research and development from the start and utilize our proprietary MetaPlus formulation in our portfolio, a blend of ginger root, guarana seed extract, chromium, vitamins, and green tea extract.

**Corporate Information**

We were incorporated in the State of Nevada in April 2005. Our principal executive offices are located at 2424 North Federal Highway, Suite 208, Boca Raton, Florida 33431, and our telephone number is (561) 276-2239. Our website is *www.celsiusholdingsinc.com*. Information contained on, or that can be accessed through, our website is not incorporated by reference into this Quarterly Report on Form 10-Q.

Celsius® and MetaPlus® are registered trademarks of the Company in the United States. This Quarterly Report on Form 10-Q also contains other registered and unregistered trademarks of the Company.

**Results of Operations**

*Three months ended June 30, 2022 compared to three months ended June 30, 2021*

*Revenue*

For the three months ended June 30, 2022, revenue was approximately $154.0 million, an increase of $88.9 million or 137% from $65.1 million for the three months ended June 30, 2021. Approximately 103% of this growth was as a result of increased revenues from North America, where second quarter 2022 revenues were $145.4 million, an increase of $91.8 million or 171% from the 2021 quarter. The balance of the revenues for the 2022 quarter were mainly attributable to European revenues of $7.3 million, which decreased by $3.5 million from the prior year quarter primarily due to foreign exchange rates and timing. Asian revenues (which include royalty revenues from our China licensee) contributed an additional approximately $0.9 million, an increase of 43% from approximately $0.6 million for the prior year quarter, which include increases in royalties payable under our licensing agreement. Other international markets generated approximately $0.4 million in revenues during the 2022 quarter, an increase of $0.4 million or 634% from $0.1 million for the prior year quarter.

The total increase in revenue was largely attributable to increases in sales volume, as opposed to increases in product pricing. The primary factors behind the increase in North American sales volume were related to continued strong triple-digit growth in traditional distribution channels, combined with an increase in and optimization of our products' presence in world class retailers (e.g., additional SKUs). Additionally, the continued expansion of our Direct Store Delivery ("DSD") network resulted in significant growth in distributor revenues when compared to the prior year quarter.

23

The following table sets forth the amount of revenues by category and changes therein for the three months ended June 30, 2022 and 2021 (dollars in thousands):

| Revenue Source | | Three months ended June 30, | | | | Change |
|---|---|---|---|---|---|---|
| | | **2022** | | **2021** | | |
| Total Revenue | $ | 154,020 | $ | 65,073 | | 136.7% |
| North American Revenue | $ | 145,409 | $ | 53,601 | | 171.3% |
| European Revenue | $ | 7,280 | $ | 10,792 | | (32.5% ) |
| Asian Revenue | $ | 883 | $ | 619 | | 42.6% |
| Other | $ | 448 | $ | 61 | | 634.4% |

*Gross profit*

For the three months ended June 30, 2022, gross profit increased by approximately $31.1 million or 110% to $59.3 million, from $28.2 million for the three months ended June 30, 2021. Gross profit margins reflected a decrease to 38.5% for the three months ended June 30, 2022 from 43.4% for the 2021 quarter. The increase in gross profit dollars is related to increases in volume, while the decrease in gross profit margins is mainly related to higher raw material costs (particularly aluminum cans), ocean freight costs, transportation costs and repackaging costs.

We estimate that the increase in gross profit dollars of approximately $31.1 million from the 2021 quarter to the 2022 quarter, included $40.7 million related to volume increases, as well as an unfavorable cost impact of approximately $7.5 million and unfavorable currency impact of $2.1 million.

*Sales and marketing expenses*

Sales and marketing expenses for the three months ended June 30, 2022 were approximately $32.5 million, an increase of approximately $16.9 million or 109% from approximately $15.5 million for the three months ended June 30, 2021. This increase was primarily attributable to higher marketing investment activities, which resulted in an increase of $8.4 million when compared to the prior year quarter. Additionally, employee costs increased by approximately $2.8 million from the year ago quarter as we continue to invest in this area in order to have the proper infrastructure to support our growth. Lastly, storage and distribution expenses as well as broker costs accounted for the remainder of the increase in this area in the amount of $5.8 million from the 2021 quarter to the 2022 quarter.

*General and administrative expenses*

General and administrative expenses for the three months ended June 30, 2022 were approximately $14.4 million, an increase of $2.1 million or 17%, from $12.3 million for the three months ended June 30, 2021. Employee costs for the three months ended June 30, 2022 reflect an increase of $1.0 million as investments in this area are also required to properly support our higher business volume and the commercial and operational areas of the business, as well as travel expenses are now being incurred. Administrative expenses amounted to $6.8 million or an increase of $4.1 million when compared to the prior year quarter. Depreciation and amortization increased by approximately $0.2 million when compared to the prior year quarter. These increases were offset by a $3.0 million decrease in stock-based compensation expense, which amounted to $4.2 million in the current quarter, when compared to the prior year quarter. Management deems it very important to motivate employees by providing them ownership in the business in order to promote over performance which translates into the continued success of our business based on key performance attributes. Lastly, all other administrative expenses which were mainly composed of research, development and quality control testing, decreased by approximately $0.2 million from to the second quarter of 2021.

*Other income/(expense)*

Total net other expense for the three months ended June 30, 2022 is mainly related to foreign currency exchange which is offset by interest and non-operating income.

*Net Income*

Net income for the three months ended June 30, 2022 was $9.2 million or $0.12 per share based on a weighted average of 75,451,165 shares outstanding and dilutive earnings per share of $0.12 based on a fully-dilutive weighted average of 78,371,705 shares outstanding, which includes the dilutive impact share-based awards of 2,920,540 shares. In comparison, for the three months ended June 30, 2021, the Company had net income of approximately $0.8 million or $0.01 per share, based on a weighted average of 73,158,836 shares outstanding and a dilutive earnings per share of $0.01 based on a fully-dilutive weighted average of 77,238,389 shares outstanding.

***Six months ended June 30, 2022 compared to six months ended June 30, 2021***

*Revenue*

24

For the six months ended June 30, 2022, revenue was approximately $287.4 million, an increase of $172.3 million or 150% from $115.1 million for the six months ended June 30, 2021. Approximately 102% of this growth was as a result of increased revenues from North America, where first six months of 2022 revenues were $268.9 million, an increase of $176.3 million or 190% from the 2021 first six months. The balance of the revenues for the six months ended June 30, 2022 were mainly attributable to European revenues of $15.8 million, which decreased by $5.4 million from the prior year six months primarily due to foreign exchange rates and timing. Asian revenues (which include royalty revenues from our China licensee) contributed an additional approximately $1.8 million, an increase of 60% from approximately $1.2 million for the prior year, which include increases in royalties payable under our licensing agreement. Other international markets generated approximately $0.9 million in revenues during the six months ended June 30, 2022, an increase of $0.7 million or 377.2% from $0.2 million for the prior year.

The total increase in revenue was largely attributable to increases in sales volume, as opposed to increases in product pricing. The primary factors behind the increase in North American sales volume were related to continued strong triple-digit growth in traditional distribution channels, combined with an increase in and optimization of our products' presence in world class retailers (e.g., additional SKUs). Additionally, the continued expansion of our Direct Store Delivery ("DSD") network resulted in significant growth in distributor revenues when compared to the prior year quarter.

The following table sets forth the amount of revenues by category and changes therein for the six months ended June 30, 2022 and 2021 (dollars in thousands):

| Revenue Source | | Six months ended June 30, | | Change |
| --- | --- | --- | --- | --- |
| | | 2022 | 2021 | |
| Total Revenue | $ | 287,408 | $  115,108 | 149.7% |
| North American Revenue | $ | 268,882 | $  92,604 | 190.4% |
| European Revenue | $ | 15,775 | $  21,160 | (25.4%) |
| Asian Revenue | $ | 1,849 | $  1,155 | 60.1% |
| Other | $ | 902 | $  189 | 377.2% |

*Gross profit*

For the six months ended June 30, 2022, gross profit increased by approximately $64.4 million or 132% to $113.2 million, from $48.8 million for the six months ended June 30, 2021. Gross profit margins reflected a decrease to 39.4% for the six months ended June 30, 2022 from 42.4% for the six months ended June 30, 2021. The increase in gross profit dollars is related to increases in volume, while the decrease in gross profit margins is mainly related to higher raw material costs (particularly aluminum cans), ocean freight costs, transportation costs and repackaging costs.

We estimate that the increase in gross profit dollars of approximately $64.4 million from the six months ended June 30, 2021, included $75.4 million related to volume increases, as well as an unfavorable cost impact of approximately $8.7 million and unfavorable currency impact of $2.3 million.

*Sales and marketing expenses*

Sales and marketing expenses for the six months ended June 30, 2022 were approximately $64.1 million, an increase of approximately $36.6 million or 133% from approximately $27.5 million for the six months ended June 30, 2021. This increase was primarily attributable to higher marketing investment activities, which resulted in an increase of $17.5 million when compared to the prior year. Additionally, employee costs increased by approximately $4.1 million from the prior year as we continue to invest in this area in order to have the proper infrastructure to support our growth. Lastly, storage and distribution expenses as well as broker costs accounted for the remainder of the increase in this area in the amount of $14.9 million from the six months ended June 30, 2021.

*General and administrative expenses*

General and administrative expenses for the six months ended June 30, 2022 were approximately $26.6 million, an increase of $6.5 million or 32%, from $20.1 million for the six months ended June 30, 2021. This increase was primarily attributable to employee costs for the six months ended June 30, 2022 which reflect an increase of $2.2 million, as investments in this area are also required to properly support our higher business volume and the commercial and operational areas of the business, as well as travel expenses are now being incurred. Administrative expenses amounted to $11.4 million, an increase of $6.6 million, when compared to the prior year quarter. Depreciation and amortization increased by approximately $0.3 million when compared to the prior year quarter. These increases were offset by a decrease in stock-based compensation expense which amounted to $8.5 million for the six months ended June 30, 2022, compared to $10.8 million in the prior year quarter. Management deems it very important to motivate employees by providing them ownership in the business in order to promote over performance which translates into the continued success of our business based on key performance attributes. Lastly, all other administrative expenses which were mainly composed of research, development and quality control testing, decreased by approximately $0.3 million from to the first six months of 2021.

*Other income/(expense)*

25

Total net other expense for the six months ended June 30, 2022 is mainly related to foreign currency exchange which is offset by interest and non-operating income.

***Net Income***

Net income for the six months ended June 30, 2022 was $15.8 million or $0.21 per share based on a weighted average of 75,472,158 shares outstanding and dilutive earnings per share of $0.20 based on a fully-dilutive weighted average of 78,396,950 shares outstanding, which includes the dilutive impact share-based awards of 2,924,792 shares. In comparison, for the six months ended June 30, 2021, the Company had net income of approximately $1.4 million or $0.02 per share, based on a weighted average of 73,655,125 shares outstanding and a dilutive earnings per share of $0.02 based on a fully-dilutive weighted average of 77,658,318 shares outstanding.

**Liquidity and Capital Resources**

As of June 30, 2022, and December 31, 2021, we had cash of approximately $60.0 million and $16.3 million, respectively, and working capital of approximately $197.9 million and $169.2 million, respectively.

In addition to cash flow from operations, our primary sources of working capital have been private placements and public offerings of our securities, including an underwritten public offering of 1,133,953 shares at an offering price of $62.50 per share completed on June 14, 2021 and a private placement of 1,437,909 shares at a price of $15.30 completed on August 25, 2020.

Our current operating plan for the next twelve (12) months reflects sufficient financial resources, notwithstanding the potential effects of the COVID-19 pandemic.

***Cash flows used in operating activities***

Cash flows provided by operating activities totaled approximately $42.3 million for the six months ended June 30, 2022, which compares to $30.3 million net cash used in operating activities for the six months ended June 30, 2021. The approximately $72.6 million increase in cash generation was driven by an increase in net income and improvements in working capital. Working capital improvements were driven primarily by the stabilization of our inventory as we have established optimal levels to service the demand of our product as well as timing of accounts payable, offset in part by increases of accounts receivable driven by the significant growth in our business.

***Cash flows used in investing activities***

Cash flows provided by investing activities totaled approximately $0.1 million for the six months ended June 30, 2022, which compares to cash provided by investing activities of $0.7 million for the six months ended June 30, 2021. The decrease in the cash used in investing activities when compared to the 2021 period was primarily due to an increase of capital expenditures to $2.5 million offset by payment on our note receivable, as we received payment on our note receivable of approximately $2.6 million in April 2022.

***Cash flows provided by financing activities***

Cash flows provided by financing activities totaled approximately $1.2 million for the six months ended June 30, 2022, which compares to cash provided by financing activities of $70.2 million for the six months ended June 30, 2021. Cash provided by financing activities is mainly related to the net proceeds of $1.3 million from stock exercises. Net proceeds were received from a public offering in June 2021 for approximately $67.8 million.

**Off Balance Sheet Arrangements**

As of June 30, 2022 and December 31, 2021, we had no off-balance sheet arrangements.

**Item 3. Quantitative Disclosures About Market Risks.**

In the normal course of business our financial position is routinely subject to a variety of risks. The principal market risks (i.e., the risk of loss arising from adverse changes in market rates and prices) to which we are exposed are fluctuations in commodity and other input prices affecting the costs of our raw materials (including, but not limited to, increases in the costs of the price of aluminum cans, sucralose and other sweeteners, as well as other raw materials contained within our products). We generally do not use hedging agreements or alternative instruments to manage the risks associated with securing sufficient ingredients or raw materials. We are also subject to market risks with respect to the cost of commodities and other inputs because our ability to recover increased costs through higher pricing is limited by the competitive environment in which we operate.

We do not use derivative financial instruments to protect ourselves from fluctuations in interest rates and generally do not hedge against fluctuations in commodity prices.

**Item 4. Controls and Procedures**

**Management's Report on Disclosure Controls and Procedures**

Our Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial and accounting officer), conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e)

26

under the Exchange Act, as of June 30, 2022, to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms adopted by the SEC, including to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

Our Chief Executive Officer and our Chief Financial Officer do not expect that our disclosure controls or internal controls will prevent all error and all fraud. Although our disclosure controls and procedures were designed to provide reasonable assurance of achieving their objectives and our Chief Executive Officer and our Chief Financial Officer have determined that our disclosure controls and procedures are effective at doing so, a control system, no matter how well conceived and operated, can provide only reasonable, not absolute assurance that the objectives of the system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented if there exists in an individual a desire to do so. There can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.

We identified material weaknesses as of December 31, 2021 in our internal controls over financial reporting, which were not fully remedied as of June 30, 2022. A material weakness is a deficiency or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected and corrected on a timely basis. As a result of these material weaknesses, we concluded that internal controls over the following areas were not effective as of December 31, 2021 and were not fully remedied as of June 30, 2022.

a) Management failed to design effective controls related to the application of U.S. GAAP guidance in their evaluation of modifications to share-based payment arrangements, resulting in the correction of errors in previously issued interim financial statements relating to the recognition of compensation expense;

b) For a substantial portion of the year, management did not design and maintain effective controls over information technology general controls (ITGCs) for information systems and applications that are relevant to the preparation of the consolidated financial statements. Specifically, management did not design and maintain: sufficient user access controls to ensure appropriate segregation of duties and adequately restrict user and privileged access to financial applications, programs and data to appropriate Company personnel; program change management controls to ensure that information technology (IT) program and data changes affecting financial information technology applications and underlying accounting records are authorized, tested, and implemented appropriately. As a result, business process controls (automated and it-dependent manual controls) that are dependent on the ineffective ITGCs, or that use data produced from systems impacted by the ineffective ITGCs were deemed ineffective at December 31 2021; and

c) Management did not have an adequate process in place to monitor and provide oversight over the completion of its testing and assessment of the design and operating effectiveness of internal control over financial reporting in a timely manner. As such, we determined that management failed to fully implement components of the COSO framework, including elements of the control environment, information and communication, control activities and monitoring activities components, relating to: (i) providing sufficient and timely management oversight and ownership over the internal control evaluation process; (ii) hiring and training sufficient personnel to timely support the Company's internal control objectives; (iii) performing timely monitoring and oversight to ascertain whether the components of internal control are present and functioning effectively.

To address the issues associated with our material weaknesses as described above, management is re-assessing the design of controls and modifying processes designed to improve our internal control over financial reporting and remediate the control deficiencies that led to the material weaknesses, including but not limited to, (a) enhancing monitoring and oversight controls in the application of U.S. GAAP guidance pertaining to modifications of share-based payments, (b) hiring additional accounting and IT personnel with appropriate technical skillsets, (c) improving consistency in change management supported by standard operating procedures to govern the authorization, testing and approval of changes to information technology systems supporting all of the Company's internal control processes, (d) enhancing design and implementation of our control environment, including the expansion of formal accounting and IT policies and procedures and financial reporting controls, and (e) implementing appropriate timely review and oversight responsibilities within the accounting and financial reporting functions. However, as of June 30, 2022, the identified material weaknesses were not fully remedied.

**Changes in Internal Controls Over Financial Reporting**

During the six months ended June 30, 2022, we have been implementing and will aggressively continue to implement changes that are both organizational and process-focused to improve the control environment. We anticipate the actions to be taken, and resulting process improvements, to generally strengthen our internal controls over financial reporting, information technology general controls as well as our controls around share-based payments, and over time, will address the material weaknesses noted as of December 31, 2021. These remedial measures were considered changes to our internal control environment which had a material effect on internal control over financial reporting. However, because certain of the remedial actions have only recently been undertaken and others will occur over the next several months, we have concluded that our controls and procedures in the areas listed above were not effective as of June 30, 2022. We will not be able to conclude that the material weaknesses have been eliminated until the completion of the December 31, 2022 annual report on form 10-K.

27

**PART II - OTHER INFORMATION**

**Item 1. Legal Proceedings.**

On March 16, 2022, Christian McCallion filed a putative class action lawsuit against the Company in the United States District Court for the Southern District of Florida. Plaintiff McCallion asserts that because of Celsius' delay in filing its Annual Report on Form 10-K for the year ended December 31, 2021, there was a decline in the market value of the Company's securities Plaintiff and as a result, Class members have suffered significant losses and damages. . On June 6, 2022, Judge Middlebrooks appointed a lead class plaintiff and the Company filed its Motion to Dismiss on August 5, 2022. As the Company has previously disclosed in its periodic reports filed with the SEC, prior to filing an application for an automatic fifteen (15) day extension of the original filing date, the Company experienced staffing limitations, unanticipated delays and identified material errors in previous filings. Celsius has not committed any federal securities violations or made false and/or misleading statements and/or material omissions as alleged in the complaint. The Company intends to contest the claims vigorously on the merits. In addition to other matters previously reported in our periodic reports filed under the Securities Exchange Act of 1934, as amended, from time to time, we may become party to litigation or other legal proceedings that we consider to be a part of the ordinary course of our business.

**Item 1.A. Risk Factors**

See "Item 1.A. Risk Factors." in our Annual Report on Form 10-K for the year ended December 31, 2021, as filed with the SEC.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

None.

**Item 3. Defaults Upon Senior Securities.**

None.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**Item 5. Other Information.**

On June 2, 2022, the Company's Board of Directors (the "Board") amended and restated the Company's bylaws to clarify and establish certain corporate procedures and make certain other enhancements and technical changes. The changes effected by the amendment and restatement of the Company's bylaws (as so amended and restated, the "Amended and Restated Bylaws") include, without limitation, the following:

- implementing a majority vote standard for the election of directors in uncontested director elections, with a plurality vote standard applying to contested director elections

- increasing the number of directors to nine;

- clarifying that director nominations and proposals of other business may only be made by a stockholder who is a stockholder of record;

- establishing procedures and disclosure requirements for stockholders to make director nomination and proposals of other business for consideration at meetings of stockholders, including among other things, establishing that a stockholder's advance notice of director nominations and proposals of other business must be received between 120 days and 90 days prior to the anniversary of the immediately preceding annual meeting;

- clarifying that meetings of stockholders may, in addition to or instead of a physical meeting, be held by means of remote communication (including virtually) as provided under the Nevada Revised Statutes;

- clarifying the power of the Board to postpone, reschedule or cancel any annual or special meeting of stockholders previously scheduled by the Board;

- clarifying the powers of (x) the Board and the chair of a stockholder meeting to establish rules for the conduct of any meeting of stockholders and (y) the chair of a stockholder meeting to regulate conduct at any such meeting;

- selecting the [Eighth Judicial District Court of Clark County of the State of Nevada][1] as the sole and exclusive forum for certain types of litigation;

- selecting the federal district courts of the United States as the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended;

- adopting gender-neutral language, including the adoption of the title Chair in place of Chairman; and

- making certain administrative, modernizing, clarifying and confirming changes.

28

The Amended and Restated Bylaws are effective June 2, 2022. The foregoing description of the Amended and Restated Bylaws is qualified in its entirety by the full text of the Amended and Restated Bylaws, a copy of which is filed as Exhibit 3.1 hereto and is incorporated by reference herein.

## STOCKHOLDER PROPOSALS AND NOMINATIONS

The Company's definitive proxy statement for the 2022annual meeting of stockholders of the Company, which was filed with the SEC on April 21, 2022, contained typographical errors in the section entitled "General Information About The Annual Meeting—When are stockholder proposals due for next year's annual meeting?" concerning the deadline, under Rule 14a-8 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), for stockholders to submit proposals to be considered for inclusion in the proxy materials for the Company's 2023 annual meeting. The corrected deadline for submitting Rule 14a-8 shareholder proposals is December 23, 2022, as set forth below.

In addition, the deadline for stockholder to submit director nominations and proposals of business (other than pursuant other than shareholder proposals in accordance with Rule 14a-8) for action at the 2023 Annual Meeting is also set forth below.

**Shareholder Proposals under Rule 14a-8**

Pursuant to the various rules promulgated by the U.S. Securities and Exchange Commission, stockholders interested in submitting a proposal to be considered for inclusion in our proxy materials and for presentation at the 2023 Annual Meeting may do so by following the procedures set forth in Rule 14a-8 under the Exchange Act. In general, to be eligible for inclusion in our proxy materials, Rule 14a-8 shareholder proposals must be received by the Company's Corporate Secretary at the Company's principal executive officers (located at Celsius Holdings, Inc., 2424 N Federal Highway, Suite 208, Boca Raton, Florida 33431) no later than December 23, 2022.

**Stockholder Nominations for Director Candidates and Proposals**

Any stockholder of record of the Company who desires to nominate one or more director candidates at the 2023 Annual Meeting or submit a proposal of business (other than shareholder proposals in accordance with Rule 14a-8) for action at the 2023 Annual Meeting, must deliver written notice of an intent to make such director nomination and/or make such proposal of business to the Company's Corporate Secretary at c/o Corporate Secretary, Celsius Holdings, Inc., 2424 N Federal Highway, Suite 208, Boca Raton, Florida 33431 no earlier than the close of business on February 2, 2023, and no later than the close of business on March 4, 2023. However, if the date of the 2023 Annual Meeting is more than 30 days before or more than 70 days after the anniversary of the date of the prior year's annual meeting, then such notice must be delivered to the Company's Secretary at c/o Corporate Secretary, Celsius Holdings, Inc., 2424 N Federal Highway, Suite 208, Boca Raton, Florida 33431 no later than the earlier of (x) the close of business of the 10th day following the day the public announcement of the date of the 2023 Annual Meeting is first made by the Company and (y) the close of business on the date which is 90 days prior to the date of the 2023 Annual Meeting. Any such notice must also comply with the timing, disclosure, procedural and other requirements as set forth in the Amended and Restated Bylaws.

In addition to satisfying the requirements under the Amended and Restated Bylaws described in the immediately preceding paragraph, to comply with the universal proxy rules under the Exchange Act, any stockholder who intends to solicit proxies in support of director nominees other than the Board's nominees must provide notice that sets forth the information required by Rule 14a-19 under the Exchange Act [no later than April 3, 2023. However, if the date of the 2023 Annual Meeting is more than 30 days before or after the anniversary of the date of the prior year's annual meeting, then such notice must be delivered by the later of (x) the 10th day following the day the public announcement of the date of the 2023 Annual Meeting is first made by the Company and (y) the date which is 60 days prior to the date of the 2023 Annual Meeting.

**Item 6. Exhibits.**

| Exhibit No. | Description of Exhibit |
|---|---|
| 3.1 | Articles of Incorporation of Celsius Holdings, Inc., as amended.* |
| 3.2 | Celsius Holdings, Inc. Bylaws, as amended.* |
| 10.1 | Securities Purchase Agreement, dated August 1, 2022, between PepsiCo, Inc. and Celsius Holdings, Inc.* |
| 10.2 | Form of Lock-Up Agreement.* |
| 10.3 | Registration Rights Agreement, dated August 1, 2022, between PepsiCo, Inc. and Celsius Holdings, Inc.* |
| 10.4 | Distribution Agreement, dated August 1, 2022, between PepsiCo, Inc. and Celsius Holdings, Inc.*# |
| 10.5 | Channel Transition Agreement, dated August 1, 2022, between PepsiCo, Inc. and Celsius Holdings, Inc. *# |
| 10.6 | Employment Agreement between Celsius and Jarrod Langhans, effective April 18, 2022 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on April 18, 2022). |
| 31.1 | Section 302 Certification of Chief Executive Officer* |
| 31.2 | Section 302 Certification of Chief Financial Officer* |
| 32.1 | Section 906 Certification of Chief Executive Officer** |
| 32.2 | Section 906 Certification of Chief Financial Officer** |
| 101.INS | Inline XBRL Instance Document |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |

\*     Filed herewith
\*\*    Furnished herewith
\#     Portions of this exhibit, marked by brackets and asterisks, have been omitted pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act of 1933, as amended, because they are both (i) not material and (ii) would likely cause competitive harm to the registrant if publicly disclosed. The registrant undertakes to promptly provide an unredacted copy of the exhibit on a supplemental basis, if requested by the Commission or its staff

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**CELSIUS HOLDINGS, INC.**

Dated: August 9, 2022                    By:   /s/ John Fieldly
                                               John Fieldly,
                                               Chief Executive Officer
                                               (Principal Executive Officer)

Dated: August 9, 2022                    By:   /s/ Jarrod Langhans
                                               Jarrod Langhans,
                                               Chief Financial Officer
                                               (Principal Financial and Accounting Officer)

30

**Exhibit 3.1**



DEAN HELLER
Secretary of State
206 North Carson Street
Carson City, Nevada 89701-4299
(775) 684 5708
Website: secretaryofstate.biz

## Articles of Incorporation
(PURSUANT TO NRS 78)

| Filed in the office of | Document Number |
|---|---|
| *~Da. Hell~* Dean Heller Secretary of State State of Nevada | 20050149075-53 |
| | Filing Date and Time |
| | 04/26/2005 11:27 AM |
| | Entity Number |
| | E0241042005-4 |

*Important. Read attached instructions before completing form.*   ABOVE SPACE IS FOR OFFICE USE ONLY

**1. Name of Corporation:**  VECTOR VENTURES CORP

**2. Resident Agent Name and Street Address:**
*(must be a Nevada address where process may be served)*

Resident Agents Of Nevada, Inc.
Name

711 S. Carson Street, Ste 4
Street Address

Carson City      NEVADA 89701
City                              Zip Code

Optional Mailing Address      City      State      Zip Code

**3. Shares:**
*(number of shares corporation authorized to issue)*

Number of shares with par value:  75,000,000      Par value: $ .001
Number of shares without par value:

**4. Names & Addresses, of Board of Directors/Trustees:**
*(attach additional page there is more than 3 directors/trustees)*

1. Kristian Kostovski of Analipscos
Name

30 Apt. #25, 52236 Panorama
Street Address

Thessaloniki      Greece
City                  State      Zip Code

2.
Name

Street Address      City      State      Zip Code

3.
Name

Street Address      City      State      Zip Code

**5. Purpose:**
*(optional see instructions)*

The purpose of this Corporation shall be:
Any legal purpose

**6. Names, Address and Signature of Incorporator.**
*(attach additional page there is more than 1 incorporator)*

Sandra L. Miller
Name

711 S. Carson Street, Ste 4
Address

*[signature]*
Signature

Carson City      NV      89701
City                  State      Zip Code

**7. Certificate of Acceptance of Appointment of Resident Agent:**

I hereby accept appointment as Resident Agent for the above named corporation.

*[signature]*
Authorized Signature of R. A. or On Behalf of R. A. Company

4/26/05
Date

*This form must be accompanied by appropriate fees. See attached fee schedule.*

*Nevada Secretary of State Form 78 AR:10 v.65 2003
Revised on 02/04/02*

**ARTICLES OF INCORPORATION**
of
**Vector Ventures Corp.**
A Nevada Corporation

I, the undersigned, being the original incorporator herein named, for the purpose of forming a corporation under and pursuant to Chapter 78 of the Nevada Revised Statutes, the general corporation laws of the State of Nevada, to do business both within and without the State of Nevada, do make and file these Articles of Incorporation hereby declaring and certifying that the facts herein stated are true:

**ARTICLE I**
**NAME**

The name of the corporation is **Vector Ventures Corp.**

**ARTICLE II**
**PRINCIPAL OFFICE**

Section 2.01 Resident Agent. The name and address of its resident agent for service process is Resident Agents of Nevada, Inc. 711 S. Carson, Suite 4, Carson City, Nevada 89701.

Section 2.02 Other Offices. The corporation may also maintain offices for the transaction of any business at such other places within or without the State of Nevada as it may from time to time determine. Corporate business of every kind and nature may be conducted, and meetings of directors and stockholders held outside the State of Nevada with the same effect as if in the State of Nevada.

**ARTICLE III**
**PURPOSE**

The corporation is organized for the purpose of engaging in any lawful activity, within or without the State of Nevada.

## ARTICLE IV
## SHARES OF STOCK

Section 4.01 Number and Class. The amount of the total authorized capital stock of this corporation is Seventy-Five Million (75,000,000) shares with a par value of $0.001 designated as Common Stock. The Common Stock may be issued from time to time without action by the stockholders. The Common Stock may be issued for such consideration as may be fixed from time to time by the Board of Directors.

The Board of Directors may issue such shares of Common Stock in one of more series, with such voting powers, designations, preferences and rights or qualifications, limitations or restrictions thereof as shall be stated in the resolution or resolutions adopted by them.

Section 4.02 No Preemptive Rights. Holders of the Common Stock of the corporation shall not have any preference, preemptive right, or right of subscription to acquire any shares of the corporation authorized, issued or sold, or to be authorized, issued or sold, or to any obligations or shares authorized or issued or to be authorized or issued, and convertible into shares of the corporation, nor to any right of subscription thereto, other than to the extent, if any, the Board of Directors in its discretion, may determine from time to time.

Section 4.03 Assessment of Shares. The Common Stock of the corporation, after the amount of the subscription price has been paid, in money, property or services, as the directors of the corporation shall determine, shall not be subject to assessment to pay the debts of the corporation, nor for any other purpose, and no stock issued as fully paid shall ever be assessable or assessed, and the Articles of Incorporation shall not be amended in this particular.

## ARTICLE V
## DIRECTORS

Section 5.01 Governing Board. The members of the Board of Directors of the corporation shall be styled directors.

Section 5.02 <u>Initial Board of Directors.</u>  The Board of Directors shall consist of at least one (1) but no more than five (5) members.  The name(s) and address(s) of the initial members of the Board of Directors are as follows:

**NAME** **ADDRESS**

Kristian Kostovski of Analipseos 30 Apt. #25, 52236 Panorama, Thessaloniki, Greece.

These individuals shall serve as directors of the corporation until the first annual meeting of the stockholders or until their successors shall have been elected and qualified.

Section 5.03 <u>Change in the Number of Directors.</u>  The number of directors may be increased or decreased by duly adopted amendment to the Bylaws of the corporation.

## ARTICLE VI
## INCORPORATORS

The name and address of the sole incorporator is Sandra L. Miller 711 S. Carson, Ste 4, Carson City, Nevada 89701

## ARTICLE VII
## PERIOD OF DURATION

This corporation is to have **A PERPETUAL** existence.

## ARTICLE VIII
## DIRECTORS AND OFFICERS' LIABILITY

A director or officer of the corporation shall not be personally liable to this corporation or its stockholders for damages for breach of fiduciary duty as a director or officer, but this Article shall not eliminate or limit the liability of a director or officer for (I) acts or omissions which involve intentional misconduct, fraud or a knowing violation of law, or (ii) the unlawful payment of dividends.  Any

repeal or modification of this Article by the stockholders of the corporation shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director or officer of the corporation for acts and omissions prior to such repeal or modification.

## ARTICLE IX
### INDEMNITY

Every person who was or is a party to, or is threatened to be made a party to, or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he, or a person of whom he is the legal representative, is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, or as its representative in a partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless to the fullest extent legally permissible under the laws of the State of Nevada from time to time against all expenses, liability and loss (including attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) reasonably incurred or suffered by him in connections therewith. Such right of indemnification shall be a contract right which may be enforced in any manner desired by such person. The expenses of officers and directors incurred in defending a civil or criminal action, suit or proceeding must be paid by the corporation as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he is not entitled to be indemnified by the corporation. Such right of indemnification shall not be exclusive of any other right which such directors, officers or representatives may have or hereafter acquire, and, without limiting the generality of such statement, they shall be entitled to their respective rights of indemnification under any Bylaw, agreement, vote of stockholders, provision of law, or otherwise, as well as their rights under this Article.

Without limiting the application of the foregoing, the Board of Directors may adopt Bylaws from time to time with respect to indemnification, to provide at all times the fullest indemnification permitted by the laws of the State of Nevada, and may cause the corporation to purchase and maintain insurance on behalf of any person who is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, or as its representative in a partnership, joint venture, trust or other enterprises, against any liability asserted against such person and incurred in any such capacity or arising out of such status, whether or not the corporation would have the power to indemnify such person.

The indemnification provided in this Article shall continue as to a person who has ceased to be a director, officer, employee or agent, and shall inure to the benefit of the heirs, executors and administrators of such person.

## ARTICLE X
## AMENDMENTS

Subject at all times to the express provisions of Section 4.03, hereof, which cannot be amended, this corporation reserves the right to amend, alter, change, or repeal any provision contained in these Articles of Incorporation or its Bylaws, in the manner now or hereafter prescribed by statute or by these Articles of Incorporation or said Bylaws, and all rights conferred upon the stockholders are granted subject to this reservation.

## ARTICLE XI
## POWERS OF DIRECTORS

In futherance, and not in limitation of the powers conferred by statue, the Board of Directors is expressly authorized:

(1)    Subject to the Bylaws, if any, adopted by the stockholders, to make, alter or repeal the Bylaws of the corporation;

Page 5 of 7

(2)    To authorize and cause to be executed mortgages and liens, with or without limit as to amount, upon the real and personal property of the corporation;

(3)    To authorize the guaranty by the corporation of securities, evidences of indebtedness and obligations of other persons, corporations and business entities;

(4)    To set apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose and to abolish any such reserve; and

(5)    By resolution adopted by a majority of the whole Board of Directors, to designate one or more committees, each committee to consist of one or more of the directors of the corporation, which, to the extent provided in the resolution or in the By-laws of the Board of Directors in the management of the business and affairs of the corporation, any may authorize the seal of the corporation to be affixed to all papers which may require it Such committee or committees shall have such name or names as may be stated in the Bylaws of the corporation or as may be determined from time to time by resolution adopted by the Board of Directors

All corporate powers of the corporation shall be exercised by the Board of Directors except as otherwise provided herein or by law.

**IN WITNESS WHEREOF**, I have hereunto set my hand this 26th day of April, 2005 hereby declaring and certifying that the facts stated herein above are true.

_____
Sandra L. Miller
Sole Incorporator

Page 6 of 7

**ACKNOWLEDGMENT**

STATE OF NEVADA     )

                        :    ss

CITY OF CARSON     )

On this 26th day of April, 2005 Sandra L. Miller personally appeared before for me, a Notary Public, and acknowledged to me that she executed the foregoing instrument for the purposes therein set forth.



DIANE E. KALINOWSKI
Notary Public, State of Nevada
Appointment No. 99-58966-5
My Appt. Expires Oct 24, 2007

NOTARY PUBLIC _Diane E. Kalinowski_

### CERTIFICATE OF ACCEPTANCE OF APPOINTMENT OF RESIDENT AGENT

IN THE MATTER OF: Vector Ventures Corp.

Resident Agents of Nevada, Inc., Resident Agent # 83364, with address at 711 S. Carson, Ste 4, Carson City, Nevada 89701, hereby accepts the appointment as Resident Agent of the above-entitled corporation in accordance with NRS 78.090.

Furthermore, that the mailing address for the above registered office is as set forth above

IN WITNESS WHEREOF, I hereunto set my hand this 26th of April 2005.

By _Sandra L. Miller_

Sandra L. Miller
Resident Agents of Nevada, Inc., Resident
Agent # 83364
Resident Agents

12/15/2006 19:00 FAX 909 999 9170    Venture Law Corporation    @...

## CERTIFICATE OF AMENDMENT TO ARTICLES OF VECTOR



**DEAN HELLER**
Secretary of State
202 North Carson Street, Suite 1
Carson City, Nevada 89701-4299
(775) 684-5708
Website: secretaryofstate.biz

| | |
|---|---|
| Filed in the office of | Document Number<br>**20060806473-36** |
| Dean Heller<br>Secretary of State<br>State of Nevada | Filing Date and Time<br>**12/15/2006 3:25 AM** |
| | Entity Number<br>**E0241042005-4** |

### Certificate of Amendment
(PURSUANT TO NRS 78.385 and 78.390)

*Important: Read attached instructions before completing form.*          ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Amendment to Articles of Incorporation For Nevada Profit Corporations
(Pursuant to NRS 78.385 and 78.390 - After Issuance of Stock)

1. Name of corporation:

Vector Ventures Corp.

  2. The articles have been amended as follows (provide article numbers, if available):

1. NAME OF CORPORATION: "Celsius Holdings, Inc."

3. SHARES: The number of shares the corporation is authorized to issue is an aggregate total of 400,000,000 shares with a par value of $0.001 per share divided into:

  a.        350,000,000 shares of Common Stock with a par value of $0.001 per share; and

  b.        50,000,000 shares of Preferred Stock with a par value of $0.001 per share.

And

**ARTICLE IV**
**SHARES OF STOCK**

Section 4.01 Number and Class. The amount of the total authorized capital stock of this corporation is:

  a.   350,000,000 shares of common stock with a par value of $0.001 per share; and
  b.   50,000,000 shares of preferred stock with a par value of $0.001 per share.

The Common Stock and Preferred Stock may be issued from time to time without action by the stockholders. The Common Stock and Preferred Stock may be issued for such consideration as may he fixed from time to time by the Board of Directors.

The Board of Directors may issue such shares of Preferred Stock in one of more series, with such voting powers, designations, preferences and rights or qualifications, limitations or restrictions thereof as shall be stated in the resolution or resolutions adopted by them.

11

12/18/2008 10:01 FAX 604 688 9175          Venture Law Corporation                    @005

**ARTICLE XII**
**CONTROL SHARE ACQUISITIONS**

The Corporation expressly opts-out of, or elects not to be governed by the "Acquisition of Controlling Interest" provisions contained in NRS Sections 78.378 through 78.3793 inclusive all as permitted under NRS Section 78.378.1.

**ARTICLE XIII**
**COMBINATIONS WITH INTERESTED STOCKHOLDERS**

The Corporation expressly opts-out of, and elects not to be governed by the "Combinations with Interested Stockholders" provisions contained in NRS Section 78.411 through 78.444, inclusive all as permitted under NRS Section 78.434.

Effective as of December 26, 2006 (the "**Effective Date**"), all outstanding shares of common stock of the Corporation automatically shall be subdivided at the rate of four-for-one (the "**Forward Split**") without the necessity of any further action on the part of the holders thereof or the Corporation, provided, however, that the Corporation shall, through its transfer agent, exchange certificates representing common stock outstanding immediately prior to the Effective Date of the Forward Split (the "**Existing Common**") into new certificates representing the appropriate number of shares of common stock resulting from the subdivision ("**New Common**").

From and after the Effective Date, the term "New Common" as used in this Third Article shall mean common stock as provided in the Certificate of Incorporation.

3. The vote by which the stockholders holding shares in the corporation entitling them to exercise at least a majority of the voting power, or such greater proportion of the voting power as may be required in the case of a vote by classes or series, or as may be required by the provisions of the * articles of incorporation have voted in favor of the amendment is:

66.32%

4. Effective date of filing (optional):          12 /26 /06

5. Officer Signature (required):          _____
Kristian Kostovski, President and C.E.O.

*If any proposed amendment would alter or change any preference or any relative or other right given to any class or series of outstanding shares, then the amendment must be approved by the vote, in addition to the affirmative vote otherwise required, of the holders of shares representing a majority of the voting power of each class or series affected by the amendment regardless of limitations or restrictions on the voting power thereof.

IMPORTANT: Failure to include any of the above information and submit the proper fees may cause this filing to be rejected.

This form must be accompanied by appropriate fees. See attached fee schedule.

Nevada Secretary of State AM 78.385
Amend 2003

Revised on: 11/03/03

12



**ROSS MILLER**
Secretary of State
204 North Carson Street, Ste 1
Carson City, Nevada 89701-4299
(775) 684 5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
| --- | --- |
| *[signature]*<br>Ross Miller<br>Secretary of State<br>State of Nevada | 20080555432-54 |
| | Filing Date and Time<br>08/20/2008 7:30 AM |
| | Entity Number<br>E0241042005-4 |

## Certificate of Designation
(PURSUANT TO NRS 78.1955)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Designation For
### Nevada Profit Corporations
(Pursuant to NRS 78.1955)

1. Name of corporation:

Celsius Holdings, Inc.

2. By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.

Celsius Holdings, Inc. Certificate of Designation of Series A Preferred Stock
Celsius Holdings, Inc., a Nevada corporation (the "Company"), acting pursuant to Chapter 78 of the Nevada Revised Statutes, the General Corporation Law of Nevada, does hereby submit the following Certificate of Designation of Series A Convertible Preferred Stock (this "Certificate").
FIRST: The name of the Company is Celsius Holdings, Inc.
SECOND: By unanimous consent of the Board of Directors of the Company (the "Board of Directors"), the following resolutions were duly adopted:
WHEREAS the Articles of Incorporation of the Company (as amended and restated, the "Articles of Incorporation") authorizes Preferred Stock consisting of 50,000 shares, par value $0.001 per share, issuable from time to time in one or more series;
TEXT CONTINUES ON ATTACHED DOCUMENT

3. Effective date of filing: (optional) [                    ]

(must not be later than 90 days after the certificate is filed)

4. Signature: (required)

X _____

Signature of Officer

**Filing Fee: $175.00**

IMPORTANT: Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State Stock Designation
Revised: 7-1-08

*Execution copy*

## CELSIUS HOLDINGS, INC.

### CERTIFICATE OF DESIGNATION
### OF
### SERIES A CONVERTIBLE PREFERRED STOCK

Celsius Holdings, Inc., a Nevada corporation (the "*Company*"), acting pursuant to Chapter 78 of the Nevada Revised Statutes, the General Corporation Law of Nevada, does hereby submit the following Certificate of Designation of Series A Convertible Preferred Stock (this "*Certificate*").

FIRST: The name of the Company is Celsius Holdings, Inc.

SECOND: By unanimous consent of the Board of Directors of the Company (the "*Board of Directors*"), the following resolutions were duly adopted:

WHEREAS the Articles of Incorporation of the Company (as amended and restated, the "*Articles of Incorporation*") authorizes Preferred Stock consisting of 50,000 shares, par value $0.001 per share, issuable from time to time in one or more series;

WHEREAS the Board of Directors is authorized, subject to limitations prescribed by law and by the provisions of Article 4.01 of the Company's Articles of Incorporation, as amended, to establish and fix the number of shares to be included in any series of Preferred Stock and the designation, rights, preferences, powers, restrictions and limitations of the shares of such series; and

WHEREAS it is the desire of the Board of Directors to establish and fix the number of shares to be included in a new series of Preferred Stock and the designation, rights, preferences and limitations of the shares of such new series.

NOW, THEREFORE, BE IT RESOLVED that pursuant to Article 4.01 of the Articles of Incorporation there is hereby established a new series of 3,000 shares of Series A Convertible Preferred Stock of the Company (the "*Series A Preferred Stock*") to have the designation, rights, preferences, powers, restrictions and limitations set forth in a supplement of Article 4.01 as follows:

Section 1. Designation and Number of Shares: Defined Terms.

(a)     Designation.   The series will be known as the "Series A Convertible Preferred Stock" and will be a Series A consisting of 3,000 shares of the authorized but unissued preferred stock of the Company.  The face amount of each share of Series A Preferred Stock shall be One Thousand Dollars ($1,000) (the "*Stated Value*")

(b)     Defined Terms.  When used herein, the terms below shall have the

- 1 -

respective meanings indicated:

"*Capital Stock*" means the capital stock of the Company, including, without limitation, the Series A Preferred Stock.

"*CDS*" means CDS Ventures of South Florida, LLC, a Florida limited liability company, and its successors and permitted assigns.

"*Change of Control*" means the existence, occurrence, public announcement or entering into an agreement contemplating of any of the following: (a) the sale, conveyance or disposition of all or substantially all of the assets of the Company to any Person, (b) the sale, conveyance or disposition of all or substantially all of the assets of any Company Subsidiary to a Person other than the Company or another Company Subsidiary; (c) the effectuation of a transaction or series of transactions in which more than fifty percent (50%) of the equity or voting power of the Company is disposed of; (d) the effectuation of a transaction or series of transactions in which any of the equity or voting power of any Company Subsidiary is disposed to a Person other than the Company or another Company Subsidiary; (e) the consolidation, merger or other business combination of the Company with or into any other entity, immediately following which the prior stockholders of the Company fail to own, directly or indirectly, at least fifty percent (50%) of the surviving entity; (f) the consolidation, merger or other business combination of any Company Subsidiary with or into any other entity other than the Company or another Company Subsidiary; (g) a transaction or series of transactions in which any Person or group (other than pursuant to an agreement between current affiliates of the Company) acquires more than fifty percent (50%) of the equity or voting power of the Company; (h) a transaction or series of transactions in which any Person or group (other than the Company or a Company Subsidiary) acquires any of the voting equity of a Company Subsidiary; and (i) the Continuing Directors do not at any time constitute at least a majority of the Board of Directors.

"*Continuing Director*" means, at any date, a member of the Board of Directors (i) who was a member of such board on the effective date of this Certificate or (ii) who was nominated or elected by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or whose election to the Board of Directors was recommended or endorsed by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or such lesser number comprising a majority of a nominating committee if authority for such nominations or elections has been delegated to a nominating committee whose authority and composition have been approved by at least a majority of the directors who were Continuing Directors at the time such committee was formed.

"*Conversion Price*" means (A) from the date on which this Certificate is effective in the State of Nevada until and including 200 days thereafter $0.08 (eight cents) (B) after 200 days after the date on which this Certificate is effective in the State of Nevada, the greater of (i) 90% of the Market Price on the conversion date and (ii) $0.08 (eight cents) as appropriately adjusted for stock splits, stock dividends and similar events.

-2-

"*Common Stock*" means the Company's common stock, par value $0.001 per share.

"*Company*" means Celsius Holdings, Inc., a Nevada corporation, and its successors and permitted assigns.

"*Default Interest Rate*" means the lower of eighteen (18%) and the maximum rate permitted by applicable law or by the applicable rules or regulations of any governmental agency or of any stock exchange or other self-regulatory organization having jurisdiction over the Company or the trading of its securities.

"*Delivery Default Amount*" means, with respect to a Delivery Default of (i) Dividend Shares, the aggregate Liquidation Preference of the Dividend Shares subject to such Delivery Default as of the date on which such Dividend Shares were required to be delivered; and (ii) Maturity Shares or Conversion Shares, the product of (x) the number of the Maturity Shares or Conversion Shares, as the case may be, subject to such Delivery Default *multiplied by* (y) the VWAP as of the date on which such Maturity Shares or Conversion Shares were required to be delivered.

"*Excluded Stock*" shall mean: (i) the Series A Preferred Stock; (ii) all Deliverable Shares; (iii) securities issued pursuant to the acquisition of another business entity or business segment of any such entity by the Company by merger, purchase of substantially all of the assets or other reorganization whereby the Company will own more than fifty percent (50%) of the voting power of such business entity or business segment of any such entity; (iv) securities issued to employees, consultants, officers, directors or other advisors of the Company pursuant to any stock option, stock purchase or stock bonus plan, agreement or arrangement approved by the Board of Directors; and (v) securities issued to leasing companies, landlords and other providers of goods and services to the Company and approved by the Board of Directors.

"*Holder*" means any Person that holds any Shares.

"*Liquidation Event*" means where (i) the Company or any Company Subsidiary shall make a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties, or the Company or any Company Subsidiary shall commence any action or proceeding or take advantage of or file under any federal or state insolvency statute, including, without limitation, the United States Bankruptcy Code, seeking to have an order for relief entered with respect to it or seeking adjudication as a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution, administration, a voluntary arrangement, or other relief with respect to it or its debts; or (ii) there shall be commenced against the Company or any Company Subsidiary any action or proceeding of the nature referred to in *clause (i)* above or seeking issuance of a warrant of attachment, execution, distraint, or similar process against all or any substantial part of its

-3-

property, which results in the entry of an order for relief which remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there is initiated the dissolution or other winding up of the Company or any material Company Subsidiary, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy proceedings; or (iv) there is initiated any assignment for the benefit of creditors or any marshalling of the material assets or material liabilities of the Company or any Company Subsidiary.

"**Market Price**" means the average of the ten daily VWAPs for the 10 Trading Days immediately preceding the applicable date of determination.

"**Securities Purchase Agreement**" means the Securities Purchase Agreement, dated as of August 8, 2008, by and between the Company and CDS Ventures of South Florida, LLC, as may be amended from time to time.

"**Series A Preferred Stock**" has the meaning specified in the recitals of this Certificate.

"**Shares**" means shares of Series A Preferred Stock.

"**Stated Value**" has the meaning specified in *Section 1(a)*.

"**VWAP**" on a Trading Day means the volume weighted average price of the Common Stock for such Trading Day on the Principal Market as reported by Bloomberg Financial Markets or, if Bloomberg Financial Markets is not then reporting such prices, by a comparable reporting service of national reputation selected by the Holders and reasonably satisfactory to the Company. If the VWAP cannot be calculated for the Common Stock on such Trading Day on any of the foregoing bases, then the Company shall submit such calculation to an independent investment banking firm of national reputation (reasonably acceptable to the Holders of not less than two-thirds of the Shares then outstanding), and shall cause such investment banking firm to perform such determination and notify the Company and the Holders of the results of determination no later than two (2) Business Days from the time such calculation was submitted to it by the Company. All such determinations shall be appropriately adjusted for any stock dividend, stock split, reverse stock split or other similar transaction during such period.

(c) Cross References. The terms below are defined in the sections of this Certificate indicated below:

| | |
|---|---|
| "**Board of Directors**" | Preamble |
| "**Certificate**" | Preamble |
| "**Articles of Incorporation**" | Recitals |
| "**Conversion**" | Section 8(a) |
| "**Conversion Date**" | Section 8(b) |
| "**Conversion Delivery Date**" | Section 8(c) |
| "**Conversion Notice**" | Section 8(b) |

- 4 -

| | |
|---|---|
| "Conversion Shares" | Section 8(a) |
| "Deliverable Shares" | Section 10 |
| "Delivery Default" | Section 10(b) |
| "Delivery Default Date" | Section 10(b) |
| "Delivery Default Payments" | Section 10(b) |
| "Dividend Payment Date" | Section 2(b) |
| "Dividend Share Delivery Date" | Section 2(c) |
| "Dividend Shares" | Section 2(c) |
| "Dividends" | Section 2(a) |
| "DTC" | Section 10(a) |
| "DWAC" | Section 10(a) |
| "Early Redemption" | Section 7(a) |
| "Early Redemption Date" | Section 7(a) |
| "Early Redemption Notice" | Section 7(a) |
| "Early Redemption Price" | Section 7(b) |
| "Issue Date" | Section 2(a) |
| "Junior Stock" | Section 2(b) |
| "Liquidation Preference" | Section 4(a) |
| "Mandatory Redemption" | Section 6(a) |
| "Mandatory Redemption Date" | Section 6(c) |
| "Mandatory Redemption Event" | Section 6(a) |
| "Mandatory Redemption Notice" | Section 6(c) |
| "Mandatory Redemption Price" | Section 6(b) |
| "Maturity Date" | Section 3(a) |
| "Maturity Shares" | Section 3(b) |
| "Maturity Share Delivery Date" | Section 3(b) |
| "Transfer Agent" | Section 10(a) |

(d)    Terms Defined in Securities Purchase Agreement. Any capitalized term used but not defined herein has the meaning specified in the Securities Purchase Agreement.

(e)    Usage. All definitions contained in this Certificate are equally applicable to the singular and plural forms of the terms defined. The words "hereof", "herein" and "hereunder" and words of similar import contained in this Certificate refer to this Certificate as a whole and not to any particular provision of this Certificate.

Section 2. Dividends.

(a)    Dividend Rate. Dividends (the "Dividends") shall accrue on the Stated Value of each Share at an annual rate equal to ten percent (10%), computed on the basis of a 360-day year (consisting of 12 months of 30 days each) and calculated using the actual number of days elapsed since and including the date on which such Share was issued (the "Issue Date") or the date on which Dividends were most recently paid, as the case may be.

- 5 -

(b) <u>Dividend Payment Date</u>. Each Holder shall be entitled to receive, in preference to the payment of dividends to any holders of the Company's common stock or any other class or series of preferred stock (collectively, the "*Junior Stock*"), the accrued and unpaid Dividends for each Share held by such Holder on the last Business Day of each fiscal year of the Company (each, a "*Dividend Payment Date*").

(c) <u>Payment of Dividend in Shares</u>. The Company shall pay all Dividends in kind with additional Shares. The number of Shares to be issuable to a Holder on a Dividend Payment Date shall be equal to the quotient of (x) the Dividends payable to such Holder on such Dividend Payment Date *divided by* (y) $1,000 (the "*Dividend Shares*"). On or before the fifth (5th) Business Day following a Dividend Payment Date (the "*Dividend Share Delivery Date*"), the Company must deliver to each Holder the Dividend Shares issuable to such Holder in accordance with the provisions of *Section 10*.

Section 3. <u>Maturity Date</u>.

(a) <u>Payment at Maturity</u>. All Shares shall mature on February 1, 2013 (the "*Maturity Date*"). On the Maturity Date, the Company shall pay to each Holder the aggregate Liquidation Preference for such Holder's Shares in accordance with this *Section 3*.

(b) <u>Payment in Shares of Common Stock</u>. The Company shall pay the amount due on the Maturity Date in kind with shares of Common Stock. The number of shares of Common Stock to be issuable to a Holder on the Maturity Date (the "*Maturity Shares*") shall be equal to the quotient of (x) the aggregate Liquidation Preference for such Holder's Shares on the Maturity Date *divided by* (y) the Conversion Price in effect as of the Maturity Date. On or before the third (3rd) Business Day following the Maturity Date (the "*Maturity Share Delivery Date*"), the Company must deliver to each Holder the Maturity Shares issuable to such Holder under this *Section 3* in accordance with the provisions of *Section 10*.

Section 4. <u>Liquidation Preference</u>.

(a) <u>Preference</u>. In the event of any liquidation, dissolution or winding up of the Company, either voluntarily or involuntarily, each Holder shall be entitled to receive prior and in preference to any distribution of any of the assets or surplus funds of the Company to the holders of any Junior Stock, an amount (the "*Liquidation Preference*") equal to (A) $1,000 per Share held by such Holder, *plus* (B) a further amount equal to any Dividends accrued but unpaid on such Shares. If, upon such liquidation, dissolution or winding up of the Company, the assets of the Company available for distribution to the stockholders of the Company are insufficient to provide for the payment of the full aforesaid preferential amount, such assets as are so available shall be distributed among the Holders in proportion to the relative aggregate Liquidation Preferences of the Shares held by such Holders. The Liquidation Preference set forth in this *Section 4(a)* shall be appropriately adjusted for any stock splits, stock combinations, stock dividends or similar recapitalizations.

- 6 -

(b) Noncash Distributions. If any of the assets of the Company are to be distributed other than in cash under this **Section 4,** then the Board of Directors shall promptly engage independent competent appraisers to determine the value of the assets to be distributed to the holders of Capital Stock. The Company shall, upon receipt of such appraiser's valuation, give prompt written notice to each holder of Capital Stock of the appraiser's valuation.

Section 5. Covenants and Agreements.

(a) Certain Affirmative Covenants of the Company. The Company shall, and shall cause each Company Subsidiary to:

(i) maintain its corporate existence in good standing;

(ii) comply with all Governmental Requirements applicable to the operation of its business, except for instances of noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii) comply with all agreements, documents and instruments binding on it or affecting its Properties or business, including, without limitation, all Material Contracts, except for instances of noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iv) provide each Holder with copies of all materials sent to its shareholders at the same time as such materials are delivered to such shareholders;

(v) timely file with the Commission all reports required to be filed pursuant to the Exchange Act and refrain from terminating its status as an issuer required by the Exchange Act to file reports thereunder even if the Exchange Act or the rules or regulations thereunder would permit such termination (and otherwise make and keep public information available, as those terms are understood and defined in Rule 144);

(vi) ensure that the Common Stock is at all times listed or quoted on the Nasdaq Bulletin Board, Nasdaq Global Market, the New York Stock Exchange, the American Stock Exchange, or such other exchange or quotation service (reasonably satisfactory to the Holders of not less than two-thirds of the Shares then outstanding;

(vii) maintain commercially reasonable insurance coverage (including D&O insurance) for each of the Company and Company Subsidiaries; and

(viii) obtain Stockholder Cap Approval in accordance with the terms of the Securities Purchase Agreement, if such is needed.

(b) Certain Negative Covenants of the Company. The Company shall

- 7 -

not, and shall cause each Company Subsidiary not to:

(i)   enter into any transaction or arrangement with any Affiliate, employee, officer, director or shareholder of the Company or Company Subsidiary, unless such transaction is effectuated on an arms' length basis and approved by the independent directors of the Company or such Company Subsidiary, as the case may be;

(ii)   incur (or permit to exist) any Debt (other than Permitted Debt);

(iii)   grant, establish or maintain any Lien on any of its Property other than Permitted Liens;

(iv)   make any Restricted Payments other than Restricted Payments made by a Company Subsidiary to the Company;

(v)   make any offers or sales of any security or solicit any offers to buy any security, which will be integrated with the sale of the Securities in a manner which would require the registration of any of the Securities under the Securities Act or require stockholder approval under the rules and regulations of the Principal Market;

(vi)   dispose of all or any part of its Property unless (i) such disposition is in the ordinary course of business and for fair market value, and (ii) such Property is not material to the Company's or any Company Subsidiary's business, operations or financial condition or performance; or

(vii)   consent to or implement any termination, amendment, modification, supplement or waiver of the certificate or articles of incorporation, articles of organization, bylaws, regulations or other constituent documents of the Company or any Company Subsidiary which could reasonably be expected to adversely affect the rights of any Holder under the Transaction Documents.

Section 6. Mandatory Redemption.

(a)   Mandatory Redemption Event. Each Holder shall have the right to require the Company to redeem all or any portion of the Shares held by such Holder (a "*Mandatory Redemption*") in cash upon the occurrence of any of the following events (each, a "*Mandatory Redemption Event*"):

(i)   any representation or warranty of the Company set forth in the Securities Purchase Agreement was not true and correct in all material respects as of the date when made;

(ii)   the Company fails at any time to comply with or perform in all material respects all of the agreements, obligations, covenants and conditions set forth in *Section 5* or any other provision of this Certificate that are required to be complied

- 8 -

with or performed by it, and such failure is not cured within five (5) Business Days from the date on which a Holder delivers written notice thereof to the Company; or

(iii)     a Change of Control.

(b)     Mandatory Redemption Price.  The amount payable upon a Mandatory Redemption (the "*Mandatory Redemption Price*") shall be equal to the greater of (i) the aggregate Liquidation Preference for the Shares being redeemed as of the Mandatory Redemption Date and (ii) the aggregate Liquidation Preference for such Shares *divided by* the Conversion Price *multiplied by* the Market Price in effect on the Mandatory Redemption Date.

(c)     Payment of Mandatory Redemption Price.  The Company shall pay in cash the Mandatory Redemption Price to the Holder exercising its right to redemption on or prior to the fifth (5th) Business Day following the date on which such Holder delivers written notice (the "*Mandatory Redemption Notice*") to the Company demanding the redemption of such Holder's Shares pursuant to this *Section 6* and specifying the number of Shares to be redeemed (such fifth (5th) Business Day being referred to herein as the "*Mandatory Redemption Date*").  If the Company fails to pay the Mandatory Redemption Price to a Holder on or before the Mandatory Redemption Date, such Holder shall be entitled to interest thereon, from and after the Mandatory Redemption Payment Date until the Mandatory Redemption Price has been paid in full, at an annual rate equal to the Default Interest Rate.

Section 7.  Early Redemption.

(a)     General.  The Company shall have the right at any time on or after July 1, 2010 to redeem all but not less than all of the outstanding Shares in cash (an "*Early Redemption*").  For the avoidance of doubt, the Company shall not have the right to redeem any Shares prior to July 1, 2010.  In order to effectuate an Early Redemption, the Company must deliver written notice thereof to each Holder (an "*Early Redemption Notice*"), and such notice shall specify the date on which such early redemption shall be effectuated (the "*Early Redemption Date*"), *provided* that the Early Redemption Date must be at least sixty (60) days following the date on which the Early Redemption Notice has been delivered to all of the Holders.  Notwithstanding the foregoing, if a Holder delivers a Mandatory Redemption Notice or Conversion Notice at any time prior to the Early Redemption Date, then the provisions of this Certificate applicable to such Mandatory Redemption or Conversion, as applicable, including the Company's obligation to pay the amounts or deliver shares of Common Stock in connection with such Mandatory Redemption or Conversion, as applicable, shall apply and control.

(b)     Early Redemption Price.  The amount payable upon an Early Redemption (the "*Early Redemption Price*") shall be equal to 104% of the aggregate Liquidation Preference for the Shares being redeemed.

(c)     Payment of Early Redemption Price.  The Company shall pay in cash the Early Redemption Price to each Holder on the Early Redemption Date.  If the Company

- 9 -

fails to pay the Early Redemption Price to a Holder on or before the Early Redemption Date, such Holder shall be entitled to interest thereon, from and after the Early Redemption Date until the Early Redemption Price has been paid in full, at an annual rate equal to the Default Interest Rate.

Section 8. Conversion. The Series A Preferred Stock shall be convertible into Common Stock as follows:

(a)     Right to Convert; Number of Conversion Shares. Each Holder shall have the right to convert, at any time and from time to time, all or any part of the Shares held by such Holder into such number of fully paid and non-assessable shares (the "*Conversion Shares*") of Common Stock as is determined in accordance with the terms hereof (a "*Conversion*"). The number of Conversion Shares to be delivered by the Company pursuant to a Conversion shall be determined by dividing (i) the aggregate Liquidation Preference of the Shares to be converted by (ii) the Conversion Price in effect on the applicable Conversion Date.

(b)     Conversion Notice. In order to convert Shares, a Holder shall send to the Company by facsimile transmission, at any time prior to 5:00 p.m., New York City time, on the date on which such Holder wishes to effect such Conversion (the "*Conversion Date*"), a notice of conversion (a "*Conversion Notice*") stating the number of Shares to be converted, the amount of Dividends accrued (but remaining unpaid) thereon, and a calculation of the number of shares of Common Stock issuable upon such Conversion. Such Holder shall thereafter send the certificate or certificates representing the Shares being converted to the Company. The Company shall issue a new certificate for Shares to such Holder in the event that less than all of the Shares represented by a certificate are converted; *provided, however*, that the failure of the Company to deliver such new certificate shall not affect the right of such Holder to submit a further Conversion Notice with respect to such Shares and, in any such case, such Holder shall be deemed to have submitted the original of such new certificate at the time that it submits such further Conversion Notice. Except as otherwise provided herein, upon delivery of a Conversion Notice by a Holder in accordance with the terms hereof, such Holder shall, as of the applicable Conversion Date, be deemed for all purposes to be the record owner of the Common Stock to which such Conversion Notice relates. In the case of a dispute between the Company and a Holder as to the calculation of the Conversion Price or the number of Conversion Shares issuable upon a Conversion (including without limitation the calculation of any adjustment to the Conversion Price pursuant to *Section 9*), the Company shall issue to such Holder the number of Conversion Shares that are not disputed within the time periods specified in *Section 10* and shall submit the disputed calculations to its independent accountant within two (2) Business Days of receipt of such Holder's Conversion Notice. The Company shall cause such accountant to calculate the Conversion Price as provided herein and to notify the Company and such Holder of the results in writing no later than five (5) Business Days following the Company's receipt of such Holder's Conversion Notice. Such accountant's calculation shall be deemed conclusive absent manifest error. The fees of any such accountant shall be borne by the party whose calculations were most at variance with those of such accountant.

- 10 -

(c)     Delivery of Conversion Shares.  Upon receipt of a fax copy of a Conversion Notice from a Holder, the Company shall, no later than the close of business on the fifth (5th) Business Day following the Conversion Date set forth in such Conversion Notice (the *"Conversion Delivery Date"*), issue and deliver or caused to be delivered to such Holder the number of Conversion Shares determined pursuant to *Section 8(a)*; *provided, however*, that any Conversion Shares that are the subject of the dispute procedure described in *Section 8(b)* shall be delivered no later than the close of business on the fifth (5th) Business Day following the determination made pursuant thereto.  The Company must deliver to each Holder the Conversion Shares issuable to such Holder under this *Section 8* in accordance with the provisions of *Section 10*.

Section 9.  Adjustment of Conversion Price.  The Conversion Price of the Series A Preferred Stock shall be subject to adjustment from time to time as follows:

(a)     Stock Splits and Stock Dividends.  If the number of shares of Common Stock outstanding at any time after the date hereof is increased by (i) a stock dividend payable in (x) shares of Common Stock (other than dividends payable pursuant to the Series A Preferred Stock), or (y) options to purchase or rights to subscribe for Common Stock or other securities of the Company convertible into or exchangeable for Common Stock, or (ii) a subdivision or split-up of shares of Common Stock, then, on the date such payment is made or such change is effective, the Conversion Price shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of the Series A Preferred Stock shall be increased in proportion to such increase of outstanding shares.

(b)     Reverse Stock Splits and Stock Combinations.  If the number of shares of Common Stock outstanding at any time after the date hereof is decreased by a combination of the outstanding shares of Common Stock, then, on the effective date of such combination, the Conversion Price shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of the Series A Preferred Stock shall be decreased in proportion to such decrease in outstanding shares.

(c)     Distributions.  In case the Company shall declare a cash dividend upon its Common Stock or shall distribute to holders of its Common Stock shares of its capital stock (other than Common Stock), stock or other securities of other Persons, evidences of indebtedness issued by the Company or other Persons, assets (excluding cash dividends) or options or rights (excluding options to purchase and rights to subscribe for Common Stock or other securities of the Company convertible into or exchangeable for Common Stock), then, in such case, each Holder shall, concurrently with the distribution to holders of Common Stock, receive a like distribution based upon the number of shares of Common Stock into which such Holder's Shares are then convertible at the Conversion Price in effect on the record date for such distribution.

(d)     Capital Reorganization.  In case, at any time after the date hereof, of any capital reorganization, or any reclassification of the stock of the Company (other

- 11 -

than a change in par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or the consolidation or merger of the Company with or into another Person (other than a consolidation or merger in which the Company is the continuing entity and which does not result in any change in the Common Stock), or of the sale or other disposition of all or substantially all of the properties and assets of the Company as an entirety to any other Person, the Shares shall, if such event is not deemed a liquidation for purposes of *Section 4*, after such reorganization, reclassification, consolidation, merger, sale or other disposition, be convertible into the kind and number of shares of stock or other securities or property of the Company or of the entity resulting from such consolidation or surviving such merger or to which such properties and assets shall have been sold or otherwise disposed to which such Holder would have been entitled if immediately prior to such reorganization, reclassification, consolidation, merger, sale or other disposition such Holder had converted its Shares into Common Stock.   The provisions of this *Section 9(e)* shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or other dispositions. The provisions of this *Section 9(e)* shall not affect the Holders right to effect a Mandatory Redemption if any of the transactions described in this *Section 9(e)* also constitute a Mandatory Redemption Event.

(e)     Minimal Adjustments. No adjustment in a Conversion Price need be made if such adjustment would result in a change in a Conversion Price of less than $0.01. Any adjustment of less than $0.01 which is not made shall be carried forward and shall be made at the time of and together with any subsequent adjustment which, on a cumulative basis, amounts to an adjustment of $0.01 or more in a Conversion Price. All calculations under this *Section 9* shall be made to the nearest cent or to the nearest one hundredth (1/100) of a share, as the case may be.

(f)     Certificate as to Adjustments.   Upon the occurrence of each adjustment or readjustment of a Conversion Price pursuant to this *Section 9*, the Company at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon written request at any time of any Holder, furnish or cause to be furnished to such Holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect for the Series A Preferred Stock held, and (iii) the number of shares of Common Stock and the amount if any, of other property which at the time would be received upon the conversion of the Series A Preferred Stock.

(g)     Notices of Record Date.   In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend) or other distribution, the Company shall mail to each Holder at least ten (10) Business Days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend or distribution.

- 12 -

Section 10. <u>Delivery of Shares</u>. The provisions of this **Section 10** shall apply to all deliveries of Dividend Shares, Maturity Shares and Conversion Shares (collectively, the "**Deliverable Shares**"):

(a)  <u>Method of Delivery</u>. The Company or its designated transfer agent (the "**Transfer Agent**") shall effect all deliveries of Deliverable Shares required to be delivered to a Holder by issuing and delivering such Deliverable Shares to the Depository Trust Company ("**DTC**") account on such Holder's behalf via the Deposit Withdrawal Agent Commission System ("**DWAC**"). Notwithstanding the foregoing, the delivery of (i) all Dividend Shares, (ii) any other Deliverable Shares to the extent such Deliverable Shares are restricted and may not be delivered in accordance with the preceding sentence, and (iii) any other Deliverable Shares to the extent such Holder requests in writing, shall be effected by delivering to such Holder or its nominee physical certificates representing such Deliverable Shares no later than the close of business on the date on which such Deliverable Shares are due. Deliverable Shares delivered to a Holder shall not contain any restrictive legend as long as the resale of such Deliverable Shares (x) has been or will be made (as certified in writing by such Holder to the Company) pursuant to an effective registration statement, (y) has been made pursuant to Rule 144 under the Securities Act, or (z) may be made pursuant to Rule 144(k) under the Securities Act or any successor rule or provision.

(b)  <u>Failure to Deliver</u>.

(i)  In the event that, for any reason, a Holder has not timely received the number of Deliverable Shares required to be delivered to such Holder, or the Deliverable Shares so delivered contain a restrictive legend in spite of such Holder complying with the requirements described in **clause (x)**, **(y)** or **(z)** of **Section 10(a)**, on or before the delivery date for such Deliverable Shares (a "**Delivery Default**", and the date on which such delivery was required to be made, the "**Delivery Default Date**"), the Company shall pay to such Holder payments ("**Delivery Default Payments**") in the amount of (A) (N/360) *multiplied by* (B) the applicable Delivery Default Amount *multiplied by* (C) the Default Interest Rate, where "N" equals the number of days elapsed between the date on which such Deliverable Shares were to be delivered (or date on which the restrictive legend was to be removed from such Deliverable Shares) and the date on which such Delivery Default has been cured. Amounts payable pursuant to the preceding sentence shall be paid to the Holder in immediately available funds on or before the second (2nd) Business Day following written notice from such Holder to the Company specifying the amount owed to it by the Company.

(ii)  In addition to any other remedies provided herein, each Holder shall have the right to pursue actual damages for the Company's failure to issue and deliver Deliverable Shares on the applicable delivery date, including, without limitation, damages relating to any purchase of shares of Common Stock by or on behalf of such Holder in order to make delivery on a sale lawfully effected in anticipation of receiving Deliverable Shares, such damages to be in an amount equal to (A) the aggregate amount paid by such Holder for the shares of Common Stock so purchased *minus* (B) the aggregate amount received by such Holder upon the sale of such Deliverable Shares (or in the case of

- 13 -

Dividend Shares, the aggregate amount received by such Holder upon the conversion of such Dividend Shares and subsequent sale of the Conversion Shares), and such Holder shall have the right to pursue all other remedies available to it at law or in equity (including, without limitation, a decree of specific performance and/or injunctive relief).

(c)     Fractional Shares. No fractional Deliverable Shares shall be issued upon conversion of the Series A Preferred Stock. In lieu of any fractional share to which a Holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by (i) $1,000 in the case of a fractional Dividend Share, and (ii) the Market Price determined as of the required delivery date in the case of a fractional share of Common Stock.

Section 11. Reservation of Deliverable Shares. The Company shall at all times reserve and keep available out of its authorized but unissued shares of Series A Preferred Stock and shares of Common Stock solely for the purpose of effecting the delivery of the Deliverable Shares as shall from time to time be sufficient to effect all of the delivery requirements under this Certificate, and if at any time the number of authorized but unissued shares of Series A Preferred Stock or shares of Common Stock shall not be sufficient to effect any of the delivery requirements under this Certificate, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Series A Preferred Stock or shares of Common Stock, as the case may be, to such number of shares as shall be sufficient for such purpose.

Section 12. Voting Rights; Protective Provisions; Waivers.

(a)     Voting Rights. Each Share shall have the same voting rights as the shares of Common Stock into which it may be converted determined in accordance with the Conversion Price then in effect. The Company shall provide each Holder with prior notification of each meeting of stockholders (and copies of proxy statements and other information sent to such stockholders) in the same manner as notification sent to holders of Common Stock.

(b)     Protective Provisions. So long any Shares are outstanding, the Company shall not, without first obtaining the approval of the Holders of not less than two-thirds of the Shares then outstanding:

(i)     alter, change, modify or amend (x) the terms of the Series A Preferred Stock in any way or (y) the terms of any other capital stock of the Company so as to affect adversely the Series A Preferred Stock;

(ii)     create or issue any new class or series of capital stock, or increase the authorized number of any existing class or series of capital stock, in either such case having a preference over or ranking *pari passu* with the Series A Preferred Stock as to redemption or distribution of assets upon a Liquidation Event or any other liquidation, dissolution or winding up of the Company;

- 14 -

(iii)   increase the authorized number of shares of Series A Preferred Stock;

(iv)   re-issue any Shares which have been converted or redeemed in accordance with the terms hereof; or

(v)   issue any Shares except pursuant to the terms of this Certificate.

In the event that (x) the Holders of not less than two-thirds of the Shares then outstanding agree to allow the Company to alter or change the rights, preferences or privileges of the Series A Preferred Stock pursuant to the terms hereof, no such change shall be effective to the extent that, by its terms, it applies to less than all of the Shares then outstanding.

(c)   Waivers. Any waiver or consent under this Certificate shall be in writing and be binding only upon the specific Person giving such waiver or consent and limited to the specific instance and purpose for which such waiver or consent was given.

Section 13. Notices. Any notice required by the provisions of this Certificate to be given to a Holder shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to such Holder of record at such Holder's latest address appearing on the books of the Company or at such other address provided by such Holder to the Company in writing.

[Remainder of Page Intentionally Left Blank]

- 15 -

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed by its President and attested to by its Secretary this 8 th day of August, 2008.

CELSIUS HOLDINGS, INC.

By: _____
Name: Stephen C. Haley
Title: Chief Executive Officer

ATTEST:

_____
Name: Jan A Norelid
Title: Secretary

Dec. 15. 2008 12:06PM                                              No. 6608   P. 1/4



**ROSS MILLER**
Secretary of State
204 North Carson Street, Ste 1
Carson City, Nevada 89701-4299
(775) 684 5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *signature* | 20080817335-37 |
| Ross Miller | Filing Date and Time |
| Secretary of State | 12/15/2008 12:36 PM |
| State of Nevada | Entity Number |
| | E0241042005-4 |

## Amendment to
## Certificate of Designation
## After Issuance of Class or Series
(PURSUANT TO NRS 78.1955)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Amendment to Certificate of Designation
### For Nevada Profit Corporations
(Pursuant to NRS 78.1955 - After Issuance of Class or Series)

1. Name of corporation:

Celsius Holdings, Inc

2. Stockholder approval pursuant to statute has been obtained.

3. The class or series of stock being amended:

Series A Preferred Stock

4. By a resolution adopted by the board of directors, the certificate of designation is being amended as follows or the new class or series is:

The Certificate of Designation authorizing is 3,000 shares of Series A Convertible Preferred Stock of the Company (the "Series A Preferred Stock") is hereby amended as follows:

"Conversion Price" means (A) until and including December 31, 2010 $0.08 (eight cents) and (B) after December 31, 2010 the greater of (i) 90% of the Market Price on the conversion date and (ii) $0.08 (eight cents) as appropriately adjusted for stock splits, stock dividends and similar events.

5. Effective date of filing: (optional) [ _____ ]
(must not be later than 90 days after the certificate is filed)

6. Signature: (required)

X *signature*

Signature of Officer

**Filing Fee: $175.00**

IMPORTANT: Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

This form must be accompanied by appropriate fees.                    Nevada Secretary of State NRS Amend Designation - After
                                                                       Revised: 7-1-06

**CELSIUS HOLDINGS, INC.**

**CERTIFICATE OF AMENDMENT**
**TO**
**CERTIFICATE OF DESIGNATION**
**OF**
**SERIES A CONVERTIBLE PREFERRED STOCK**

Celsius Holdings, Inc., a Nevada corporation (the *"Company"*), acting pursuant to Chapter 78 of the Nevada Revised Statutes, the General Corporation Law of Nevada, does hereby submit the following Certificate of Amendment to the Certificate of Designation of Series A Convertible Preferred Stock filed on August 20, 2008 (the *"Certificate of Designation"*).

FIRST: The name of the Company is Celsius Holdings, Inc.

SECOND: By unanimous consent of the Board of Directors of the Company (the *"Board of Directors"*), the following resolutions were duly adopted:

WHEREAS it is the desire of the Board of Directors to amend the certificate of designation issued August 8, 2008;

NOW, THEREFORE, BE IT RESOLVED that the Certificate of Designation authorizing is 3,000 shares of Series A Convertible Preferred Stock of the Company (the *"Series A Preferred Stock"*) is hereby amended as follows:

*"Conversion Price"* means (A) until and including December 31, 2010 $0.08 (eight cents) and (B) after December 31, 2010 the greater of (i) 90% of the Market Price on the conversion date and (ii) $0.08 (eight cents) as appropriately adjusted for stock splits, stock dividends and similar events.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed by its President and attested to by its Secretary this 12th day of December, 2008.

CELSIUS HOLDINGS, INC.

By: _____
Name: Stephen C. Haley
Title: Chief Executive Officer

ATTEST:

_____
Name: Jan A Norelid
Title: Secretary



**ROSS MILLER**
Secretary of State
204 North Carson Street, Ste 1
Carson City, Nevada 89701-4299
(775) 684 5708
Website: www.nvsos.gov

## Certificate of Designation
(PURSUANT TO NRS 78.1955)

| Filed in the office of | Document Number |
| --- | --- |
| *Ross Miller* | 20080838321-15 |
| Ross Miller | Filing Date and Time |
| Secretary of State | 12/22/2008 7:51 AM |
| State of Nevada | Entity Number |
| | E0241042005-4 |

USE BLACK INK ONLY - DO NOT HIGHLIGHT    ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Designation For Nevada Profit Corporations
(Pursuant to NRS 78.1955)

1. Name of corporation:

Celsius Holdings, Inc.

2. By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.

Celsius Holdings, Inc. Certificate of Designation of Series B Convertible Preferred Stock
Celsius Holdings, Inc., a Nevada corporation (the "Company"), acting pursuant to Chapter 78 of the Nevada Revised Statutes, the General Corporation Law of Nevada, does hereby submit the following Certificate of Designation of Series B Convertible Preferred Stock (this "Certificate").
FIRST: The name of the Company is Celsius Holdings, Inc.
SECOND: By unanimous consent of the Board of Directors of the Company (the "Board of Directors"), the following resolutions were duly adopted:
WHEREAS the Board of Directors is authorized, subject to limitations prescribed by law and by the provisions of Article 4.01 of the Company's Articles of Incorporation, as amended, to establish and fix the

TEXT CONTINUES ON ATTACHED DOCUMENT

3. Effective date of filing: (optional) [_____]

(must not be later than 90 days after the certificate is filed)

4. Signature: (required)

X _____
Signature of Officer

**Filing Fee: $175.00**

IMPORTANT: Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*   Nevada Secretary of State Stock Designation
Revised: 7-1-08

*Execution Copy*

## CELSIUS HOLDINGS, INC.

### CERTIFICATE OF DESIGNATION
### OF
### SERIES B CONVERTIBLE PREFERRED STOCK

Celsius Holdings, Inc., a Nevada corporation (the "*Company*"), acting pursuant to Chapter 78 of the Nevada Revised Statutes, the General Corporation Law of Nevada, does hereby submit the following Certificate of Designation of Series B Convertible Preferred Stock (this "*Certificate*").

FIRST: The name of the Company is Celsius Holdings, Inc.

SECOND: By unanimous consent of the Board of Directors of the Company (the "*Board of Directors*"), the following resolutions were duly adopted:

WHEREAS the Articles of Incorporation of the Company (as amended and restated, the "*Articles of Incorporation*") authorizes Preferred Stock consisting of 50,000 shares, par value $0.001 per share, issuable from time to time in one or more series;

WHEREAS the Board of Directors is authorized, subject to limitations prescribed by law and by the provisions of Article 4.01 of the Company's Articles of Incorporation, as amended, to establish and fix the number of shares to be included in any series of Preferred Stock and the designation, rights, preferences, powers, restrictions and limitations of the shares of such series; and

WHEREAS it is the desire of the Board of Directors to establish and fix the number of shares to be included in a new series of Preferred Stock and the designation, rights, preferences and limitations of the shares of such new series.

NOW, THEREFORE, BE IT RESOLVED that pursuant to Article 4.01 of the Articles of Incorporation there is hereby established a new series of 4,000 shares of Series B Convertible Preferred Stock of the Company (the "*Series B Preferred Stock*") to have the designation, rights, preferences, powers, restrictions and limitations set forth in a supplement of Article 4.01 as follows:

Section 1. Designation and Number of Shares; Defined Terms.

    (a)   Designation. The series will be known as the "Series B Convertible Preferred Stock" and will be a Series B consisting of 4,000 shares of the authorized but unissued preferred stock of the Company. The face amount of each share of Series B Preferred Stock shall be One Thousand Dollars ($1,000) (the "*Stated Value*")

    (b)   Defined Terms. When used herein, the terms below shall have the

- 1 -

respective meanings indicated:

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the Series B Preferred Stock.

"**CDS**" means CDS Ventures of South Florida, LLC, a Florida limited liability company, and its successors and permitted assigns.

"**Change of Control**" means the existence, occurrence, public announcement or entering into an agreement contemplating of any of the following: (a) the sale, conveyance or disposition of all or substantially all of the assets of the Company to any Person, (b) the sale, conveyance or disposition of all or substantially all of the assets of any Company Subsidiary to a Person other than the Company or another Company Subsidiary; (c) the effectuation of a transaction or series of transactions in which more than fifty percent (50%) of the equity or voting power of the Company is disposed of; (d) the effectuation of a transaction or series of transactions in which any of the equity or voting power of any Company Subsidiary is disposed to a Person other than the Company or another Company Subsidiary; (e) the consolidation, merger or other business combination of the Company with or into any other entity, immediately following which the prior stockholders of the Company fail to own, directly or indirectly, at least fifty percent (50%) of the surviving entity; (f) the consolidation, merger or other business combination of any Company Subsidiary with or into any other entity other than the Company or another Company Subsidiary; (g) a transaction or series of transactions in which any Person or group (other than pursuant to an agreement between current affiliates of the Company) acquires more than fifty percent (50%) of the equity or voting power of the Company; (h) a transaction or series of transactions in which any Person or group (other than the Company or a Company Subsidiary) acquires any of the voting equity of a Company Subsidiary; and (i) the Continuing Directors do not at any time constitute at least a majority of the Board of Directors.

"**Continuing Director**" means, at any date, a member of the Board of Directors (i) who was a member of such board on the effective date of this Certificate or (ii) who was nominated or elected by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or whose election to the Board of Directors was recommended or endorsed by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or such lesser number comprising a majority of a nominating committee if authority for such nominations or elections has been delegated to a nominating committee whose authority and composition have been approved by at least a majority of the directors who were Continuing Directors at the time such committee was formed.

"**Conversion Price**" means (A) from the date on which this Certificate is effective in the State of Nevada until and including December 31, 2010, $0.05 (five cents) and (B) after December 31, 2010, the greater of (i) 90% of the Market Price on the conversion date and (ii) $0.05 (five cents) as appropriately adjusted for stock splits, stock dividends and similar events.

- 2 -

"*Common Stock*" means the Company's common stock, par value $0.001 per share.

"*Company*" means Celsius Holdings, Inc., a Nevada corporation, and its successors and permitted assigns.

"*Default Interest Rate*" means the lower of eighteen (18%) and the maximum rate permitted by applicable law or by the applicable rules or regulations of any governmental agency or of any stock exchange or other self-regulatory organization having jurisdiction over the Company or the trading of its securities.

"*Delivery Default Amount*" means, with respect to a Delivery Default of (i) Dividend Shares, the aggregate Liquidation Preference of the Dividend Shares subject to such Delivery Default as of the date on which such Dividend Shares were required to be delivered; and (ii) Maturity Shares or Conversion Shares, the product of (x) the number of the Maturity Shares or Conversion Shares, as the case may be, subject to such Delivery Default *multiplied by* (y) the VWAP as of the date on which such Maturity Shares or Conversion Shares were required to be delivered.

"*Excluded Stock*" shall mean: (i) the Series B Preferred Stock; (ii) all Deliverable Shares; (iii) securities issued pursuant to the acquisition of another business entity or business segment of any such entity by the Company by merger, purchase of substantially all of the assets or other reorganization whereby the Company will own more than fifty percent (50%) of the voting power of such business entity or business segment of any such entity; (iv) securities issued to employees, consultants, officers, directors or other advisors of the Company pursuant to any stock option, stock purchase or stock bonus plan, agreement or arrangement approved by the Board of Directors; and (v) securities issued to leasing companies, landlords and other providers of goods and services to the Company and approved by the Board of Directors.

"*Holder*" means any Person that holds any Shares.

"*Liquidation Event*" means where (i) the Company or any Company Subsidiary shall make a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties, or the Company or any Company Subsidiary shall commence any action or proceeding or take advantage of or file under any federal or state insolvency statute, including, without limitation, the United States Bankruptcy Code, seeking to have an order for relief entered with respect to it or seeking adjudication as a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution, administration, a voluntary arrangement, or other relief with respect to it or its debts; or (ii) there shall be commenced against the Company or any Company Subsidiary any action or proceeding of the nature referred to in *clause (i)* above or seeking issuance of a warrant of attachment, execution, distraint, or similar process against all or any substantial part of its

- 3 -

property, which results in the entry of an order for relief which remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there is initiated the dissolution or other winding up of the Company or any material Company Subsidiary, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy proceedings; or (iv) there is initiated any assignment for the benefit of creditors or any marshalling of the material assets or material liabilities of the Company or any Company Subsidiary.

"**Market Price**" means the average of the ten daily VWAPs for the 10 Trading Days immediately preceding the applicable date of determination.

"**Securities Purchase Agreement**" means the Securities Purchase Agreement, dated as of December __, 2008, by and between the Company and CDS Ventures of South Florida, LLC, as may be amended from time to time.

"**Series B Preferred Stock**" has the meaning specified in the recitals of this Certificate.

"**Shares**" means shares of Series B Preferred Stock.

"**Stated Value**" has the meaning specified in *Section 1(a)*.

"**VWAP**" on a Trading Day means the volume weighted average price of the Common Stock for such Trading Day on the Principal Market as reported by Bloomberg Financial Markets or, if Bloomberg Financial Markets is not then reporting such prices, by a comparable reporting service of national reputation selected by the Holders and reasonably satisfactory to the Company. If the VWAP cannot be calculated for the Common Stock on such Trading Day on any of the foregoing bases, then the Company shall submit such calculation to an independent investment banking firm of national reputation (reasonably acceptable to the Holders of not less than two-thirds of the Shares then outstanding), and shall cause such investment banking firm to perform such determination and notify the Company and the Holders of the results of determination no later than two (2) Business Days from the time such calculation was submitted to it by the Company. All such determinations shall be appropriately adjusted for any stock dividend, stock split, reverse stock split or other similar transaction during such period.

(c)     Cross References. The terms below are defined in the sections of this Certificate indicated below:

| | |
|---|---|
| "**Board of Directors**" | *Preamble* |
| "**Certificate**" | *Preamble* |
| "**Articles of Incorporation**" | *Recitals* |
| "**Conversion**" | *Section 8(a)* |
| "**Conversion Date**" | *Section 8(b)* |
| "**Conversion Delivery Date**" | *Section 8(c)* |
| "**Conversion Notice**" | *Section 8(b)* |

- 4 -

| | |
|---|---|
| "Conversion Shares" | Section 8(a) |
| "Deliverable Shares" | Section 10 |
| "Delivery Default" | Section 10(b) |
| "Delivery Default Date" | Section 10(b) |
| "Delivery Default Payments" | Section 10(b) |
| "Dividend Payment Date" | Section 2(b) |
| "Dividend Share Delivery Date" | Section 2(c) |
| "Dividend Shares" | Section 2(c) |
| "Dividends" | Section 2(a) |
| "DTC" | Section 10(a) |
| "DWAC" | Section 10(a) |
| "Early Redemption" | Section 7(a) |
| "Early Redemption Date" | Section 7(a) |
| "Early Redemption Notice" | Section 7(a) |
| "Early Redemption Price" | Section 7(b) |
| "Issue Date" | Section 2(a) |
| "Junior Stock" | Section 2(b) |
| "Liquidation Preference" | Section 4(a) |
| "Mandatory Redemption" | Section 6(a) |
| "Mandatory Redemption Date" | Section 6(c) |
| "Mandatory Redemption Event" | Section 6(a) |
| "Mandatory Redemption Notice" | Section 6(c) |
| "Mandatory Redemption Price" | Section 6(b) |
| "Maturity Date" | Section 3(a) |
| "Maturity Shares" | Section 3(b) |
| "Maturity Share Delivery Date" | Section 3(b) |
| "Transfer Agent" | Section 10(a) |

(d)    Terms Defined in Securities Purchase Agreement. Any capitalized term used but not defined herein has the meaning specified in the Securities Purchase Agreement.

(e)    Usage. All definitions contained in this Certificate are equally applicable to the singular and plural forms of the terms defined. The words "hereof", "herein" and "hereunder" and words of similar import contained in this Certificate refer to this Certificate as a whole and not to any particular provision of this Certificate.

Section 2. Dividends.

(a)    Dividend Rate. Dividends (the "Dividends") shall accrue on the Stated Value of each Share at an annual rate equal to ten percent (10%), computed on the basis of a 360-day year (consisting of 12 months of 30 days each) and calculated using the actual number of days elapsed since and including the date on which such Share was issued (the "Issue Date") or the date on which Dividends were most recently paid, as the case may be.

(b)     Dividend Payment Date. Each Holder shall be entitled to receive, in preference to the payment of dividends to any holders of the Company's common stock or any other class or series of preferred stock other than Series A Convertible Preferred Stock (collectively, the "*Junior Stock*"), the accrued and unpaid Dividends for each Share held by such Holder on the last Business Day of each fiscal year of the Company (each, a "*Dividend Payment Date*").

(c)     Payment of Dividend in Shares. The Company shall pay all Dividends in kind with additional Shares.  The number of Shares to be issuable to a Holder on a Dividend Payment Date shall be equal to the quotient of (x) the Dividends payable to such Holder on such Dividend Payment Date *divided by* (y) $1,000 (the "*Dividend Shares*").  On or before the fifth (5th) Business Day following a Dividend Payment Date (the "*Dividend Share Delivery Date*"), the Company must deliver to each Holder the Dividend Shares issuable to such Holder in accordance with the provisions of *Section 10*.

Section 3. Maturity Date.

(a)     Payment at Maturity. All Shares shall mature on December 31, 2013 (the "*Maturity Date*"). On the Maturity Date, the Company shall pay to each Holder the aggregate Liquidation Preference for such Holder's Shares in accordance with this *Section 3*.

(b)     Payment in Shares of Common Stock. The Company shall pay the amount due on the Maturity Date in kind with shares of Common Stock.  The number of shares of Common Stock to be issuable to a Holder on the Maturity Date (the "*Maturity Shares*") shall be equal to the quotient of (x) the aggregate Liquidation Preference for such Holder's Shares on the Maturity Date *divided by* (y) the Conversion Price in effect as of the Maturity Date.  On or before the third (3rd) Business Day following the Maturity Date (the "*Maturity Share Delivery Date*"), the Company must deliver to each Holder the Maturity Shares issuable to such Holder under this *Section 3* in accordance with the provisions of *Section 10*.

Section 4. Liquidation Preference.

(a)     Preference. In the event of any liquidation, dissolution or winding up of the Company, either voluntarily or involuntarily, each Holder shall be entitled to receive prior and in preference to any distribution of any of the assets or surplus funds of the Company to the holders of any Junior Stock, an amount (the "*Liquidation Preference*") equal to (A) $1,000 per Share held by such Holder, *plus* (B) a further amount equal to any Dividends accrued but unpaid on such Shares.  If, upon such liquidation, dissolution or winding up of the Company, the assets of the Company available for distribution to the stockholders of the Company are insufficient to provide for the payment of the full aforesaid preferential amount, such assets as are so available shall be distributed among the Holders in proportion to the relative aggregate Liquidation Preferences of the Shares held by such Holders. The Liquidation Preference set forth in this *Section 4(a)* shall be appropriately adjusted for any stock splits, stock combinations,

- 6 -

stock dividends or similar recapitalizations.

(b)     Noncash Distributions.  If any of the assets of the Company are to be distributed other than in cash under this *Section 4*, then the Board of Directors shall promptly engage independent competent appraisers to determine the value of the assets to be distributed to the holders of Capital Stock.  The Company shall, upon receipt of such appraiser's valuation, give prompt written notice to each holder of Capital Stock of the appraiser's valuation.

Section 5.  Covenants and Agreements.

(a)     Certain Affirmative Covenants of the Company.  The Company shall, and shall cause each Company Subsidiary to:

(i)     maintain its corporate existence in good standing;

(ii)     comply with all Governmental Requirements applicable to the operation of its business, except for instances of noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii)     comply with all agreements, documents and instruments binding on it or affecting its Properties or business, including, without limitation, all Material Contracts, except for instances of noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iv)     provide each Holder with copies of all materials sent to its shareholders at the same time as such materials are delivered to such shareholders;

(v)     timely file with the Commission all reports required to be filed pursuant to the Exchange Act and refrain from terminating its status as an issuer required by the Exchange Act to file reports thereunder even if the Exchange Act or the rules or regulations thereunder would permit such termination (and otherwise make and keep public information available, as those terms are understood and defined in Rule 144);

(vi)     ensure that the Common Stock is at all times listed or quoted on the Nasdaq Bulletin Board, Nasdaq Global Market, the New York Stock Exchange, the American Stock Exchange, or such other exchange or quotation service (reasonably satisfactory to the Holders of not less than two-thirds of the Shares then outstanding;

(vii)     maintain commercially reasonable insurance coverage (including D&O insurance) for each of the Company and Company Subsidiaries; and

(viii)     obtain Stockholder Cap Approval in accordance with the terms of the Securities Purchase Agreement, if such is needed.

-7-

(b)    Certain Negative Covenants of the Company.   The Company shall not, and shall cause each Company Subsidiary not to:

(i)    enter into any transaction or arrangement with any Affiliate, employee, officer, director or shareholder of the Company or Company Subsidiary, unless such transaction is effectuated on an arms' length basis and approved by the independent directors of the Company or such Company Subsidiary, as the case may be;

(ii)    incur (or permit to exist) any Debt (other than Permitted Debt);

(iii)    grant, establish or maintain any Lien on any of its Property other than Permitted Liens;

(iv)    make any Restricted Payments other than Restricted Payments made by a Company Subsidiary to the Company;

(v)    make any offers or sales of any security or solicit any offers to buy any security, which will be integrated with the sale of the Securities in a manner which would require the registration of any of the Securities under the Securities Act or require stockholder approval under the rules and regulations of the Principal Market;

(vi)    dispose of all or any part of its Property unless (i) such disposition is in the ordinary course of business and for fair market value, and (ii) such Property is not material to the Company's or any Company Subsidiary's business, operations or financial condition or performance; or

(vii)    consent to or implement any termination, amendment, modification, supplement or waiver of the certificate or articles of incorporation, articles of organization, bylaws, regulations or other constituent documents of the Company or any Company Subsidiary which could reasonably be expected to adversely affect the rights of any Holder under the Transaction Documents.

Section 6.  Mandatory Redemption.

(a)    Mandatory Redemption Event.   Each Holder shall have the right to require the Company to redeem all or any portion of the Shares held by such Holder (a "*Mandatory Redemption*") in cash upon the occurrence of any of the following events (each, a "*Mandatory Redemption Event*"):

(i)    any representation or warranty of the Company set forth in the Securities Purchase Agreement was not true and correct in all material respects as of the date when made;

(ii)    the Company fails at any time to comply with or perform in all material respects all of the agreements, obligations, covenants and conditions set forth

- 8 -

in *Section 5* or any other provision of this Certificate that are required to be complied with or performed by it, and such failure is not cured within five (5) Business Days from the date on which a Holder delivers written notice thereof to the Company; or

        (iii)    a Change of Control.

        (b)    Mandatory Redemption Price.  The amount payable upon a Mandatory Redemption (the "*Mandatory Redemption Price*") shall be equal to the greater of (i) the aggregate Liquidation Preference for the Shares being redeemed as of the Mandatory Redemption Date and (ii) the aggregate Liquidation Preference for such Shares *divided by* the Conversion Price *multiplied by* the Market Price in effect on the Mandatory Redemption Date.

        (c)    Payment of Mandatory Redemption Price.  The Company shall pay in cash the Mandatory Redemption Price to the Holder exercising its right to redemption on or prior to the fifth (5th) Business Day following the date on which such Holder delivers written notice (the "*Mandatory Redemption Notice*") to the Company demanding the redemption of such Holder's Shares pursuant to this *Section 6* and specifying the number of Shares to be redeemed (such fifth (5th) Business Day being referred to herein as the "*Mandatory Redemption Date*").  If the Company fails to pay the Mandatory Redemption Price to a Holder on or before the Mandatory Redemption Date, such Holder shall be entitled to interest thereon, from and after the Mandatory Redemption Payment Date until the Mandatory Redemption Price has been paid in full, at an annual rate equal to the Default Interest Rate.

Section 7.  Early Redemption.

        (a)    General.  The Company shall have the right at any time on or after December 31, 2010 to redeem all but not less than all of the outstanding Shares in cash (an "*Early Redemption*").  For the avoidance of doubt, the Company shall not have the right to redeem any Shares prior to January 1, 2011.  In order to effectuate an Early Redemption, the Company must deliver written notice thereof to each Holder (an "*Early Redemption Notice*"), and such notice shall specify the date on which such early redemption shall be effectuated (the "*Early Redemption Date*"), *provided* that the Early Redemption Date must be at least sixty (60) days following the date on which the Early Redemption Notice has been delivered to all of the Holders.  Notwithstanding the foregoing, if a Holder delivers a Mandatory Redemption Notice or Conversion Notice at any time prior to the Early Redemption Date, then the provisions of this Certificate applicable to such Mandatory Redemption or Conversion, as applicable, including the Company's obligation to pay the amounts or deliver shares of Common Stock in connection with such Mandatory Redemption or Conversion, as applicable, shall apply and control.

        (b)    Early Redemption Price.  The amount payable upon an Early Redemption (the "*Early Redemption Price*") shall be equal to 104% of the aggregate Liquidation Preference for the Shares being redeemed.

- 9 -

(c)     Payment of Early Redemption Price. The Company shall pay in cash the Early Redemption Price to each Holder on the Early Redemption Date. If the Company fails to pay the Early Redemption Price to a Holder on or before the Early Redemption Date, such Holder shall be entitled to interest thereon, from and after the Early Redemption Date until the Early Redemption Price has been paid in full, at an annual rate equal to the Default Interest Rate.

Section 8.   Conversion.   The Series B Preferred Stock shall be convertible into Common Stock as follows:

(a)     Right to Convert; Number of Conversion Shares. Each Holder shall have the right to convert, at any time and from time to time, all or any part of the Shares held by such Holder into such number of fully paid and non-assessable shares (the "*Conversion Shares*") of Common Stock as is determined in accordance with the terms hereof (a "*Conversion*"). The number of Conversion Shares to be delivered by the Company pursuant to a Conversion shall be determined by dividing (i) the aggregate Liquidation Preference of the Shares to be converted by (ii) the Conversion Price in effect on the applicable Conversion Date.

(b)     Conversion Notice. In order to convert Shares, a Holder shall send to the Company by facsimile transmission, at any time prior to 5:00 p.m., New York City time, on the date on which such Holder wishes to effect such Conversion (the "*Conversion Date*"), a notice of conversion (a "*Conversion Notice*") stating the number of Shares to be converted, the amount of Dividends accrued (but remaining unpaid) thereon, and a calculation of the number of shares of Common Stock issuable upon such Conversion. Such Holder shall thereafter send the certificate or certificates representing the Shares being converted to the Company. The Company shall issue a new certificate for Shares to such Holder in the event that less than all of the Shares represented by a certificate are converted; *provided, however,* that the failure of the Company to deliver such new certificate shall not affect the right of such Holder to submit a further Conversion Notice with respect to such Shares and, in any such case, such Holder shall be deemed to have submitted the original of such new certificate at the time that it submits such further Conversion Notice. Except as otherwise provided herein, upon delivery of a Conversion Notice by a Holder in accordance with the terms hereof, such Holder shall, as of the applicable Conversion Date, be deemed for all purposes to be the record owner of the Common Stock to which such Conversion Notice relates. In the case of a dispute between the Company and a Holder as to the calculation of the Conversion Price or the number of Conversion Shares issuable upon a Conversion (including without limitation the calculation of any adjustment to the Conversion Price pursuant to *Section 9*), the Company shall issue to such Holder the number of Conversion Shares that are not disputed within the time periods specified in *Section 10* and shall submit the disputed calculations to its independent accountant within two (2) Business Days of receipt of such Holder's Conversion Notice. The Company shall cause such accountant to calculate the Conversion Price as provided herein and to notify the Company and such Holder of the results in writing no later than five (5) Business Days following the Company's receipt of such Holder's Conversion Notice. Such accountant's calculation shall be deemed conclusive absent manifest error. The fees of any such

- 10 -

accountant shall be borne by the party whose calculations were most at variance with those of such accountant.

(c)     Delivery of Conversion Shares.  Upon receipt of a fax copy of a Conversion Notice from a Holder, the Company shall, no later than the close of business on the fifth (5th) Business Day following the Conversion Date set forth in such Conversion Notice (the "*Conversion Delivery Date*"), issue and deliver or caused to be delivered to such Holder the number of Conversion Shares determined pursuant to *Section 8(a)*; *provided, however*, that any Conversion Shares that are the subject of the dispute procedure described in *Section 8(b)* shall be delivered no later than the close of business on the fifth (5th) Business Day following the determination made pursuant thereto.  The Company must deliver to each Holder the Conversion Shares issuable to such Holder under this *Section 8* in accordance with the provisions of *Section 10*.

Section 9.  Adjustment of Conversion Price.  The Conversion Price of the Series B Preferred Stock shall be subject to adjustment from time to time as follows:

(a)     Stock Splits and Stock Dividends.  If the number of shares of Common Stock outstanding at any time after the date hereof is increased by (i) a stock dividend payable in (x) shares of Common Stock (other than dividends payable pursuant to the Series B Preferred Stock), or (y) options to purchase or rights to subscribe for Common Stock or other securities of the Company convertible into or exchangeable for Common Stock, or (ii) a subdivision or split-up of shares of Common Stock, then, on the date such payment is made or such change is effective, the Conversion Price shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of the Series B Preferred Stock shall be increased in proportion to such increase of outstanding shares.

(b)     Reverse Stock Splits and Stock Combinations.  If the number of shares of Common Stock outstanding at any time after the date hereof is decreased by a combination of the outstanding shares of Common Stock, then, on the effective date of such combination, the Conversion Price shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of the Series B Preferred Stock shall be decreased in proportion to such decrease in outstanding shares.

(c)     Distributions.  In case the Company shall declare a cash dividend upon its Common Stock or shall distribute to holders of its Common Stock shares of its capital stock (other than Common Stock), stock or other securities of other Persons, evidences of indebtedness issued by the Company or other Persons, assets (excluding cash dividends) or options or rights (excluding options to purchase and rights to subscribe for Common Stock or other securities of the Company convertible into or exchangeable for Common Stock), then, in such case, each Holder shall, concurrently with the distribution to holders of Common Stock, receive a like distribution based upon the number of shares of Common Stock into which such Holder's Shares are then convertible at the Conversion Price in effect on the record date for such distribution.

- 11 -

(d)    Capital Reorganization. In case, at any time after the date hereof, of any capital reorganization, or any reclassification of the stock of the Company (other than a change in par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or the consolidation or merger of the Company with or into another Person (other than a consolidation or merger in which the Company is the continuing entity and which does not result in any change in the Common Stock), or of the sale or other disposition of all or substantially all of the properties and assets of the Company as an entirety to any other Person, the Shares shall, if such event is not deemed a liquidation for purposes of *Section 4*, after such reorganization, reclassification, consolidation, merger, sale or other disposition, be convertible into the kind and number of shares of stock or other securities or property of the Company or of the entity resulting from such consolidation or surviving such merger or to which such properties and assets shall have been sold or otherwise disposed to which such Holder would have been entitled if immediately prior to such reorganization, reclassification, consolidation, merger, sale or other disposition such Holder had converted its Shares into Common Stock.   The provisions of this *Section 9(e)* shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or other dispositions. The provisions of this *Section 9(e)* shall not affect the Holders right to effect a Mandatory Redemption if any of the transactions described in this *Section 9(e)* also constitute a Mandatory Redemption Event.

(e)    Minimal Adjustments. No adjustment in a Conversion Price need be made if such adjustment would result in a change in a Conversion Price of less than $0.01. Any adjustment of less than $0.01 which is not made shall be carried forward and shall be made at the time of and together with any subsequent adjustment which, on a cumulative basis, amounts to an adjustment of $0.01 or more in a Conversion Price. All calculations under this *Section 9* shall be made to the nearest cent or to the nearest one hundredth (1/100) of a share, as the case may be.

(f)    Certificate as to Adjustments.   Upon the occurrence of each adjustment or readjustment of a Conversion Price pursuant to this *Section 9*, the Company at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon written request at any time of any Holder, furnish or cause to be furnished to such Holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect for the Series B Preferred Stock held, and (iii) the number of shares of Common Stock and the amount if any, of other property which at the time would be received upon the conversion of the Series B Preferred Stock.

(g)    Notices of Record Date.  In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend) or other distribution, the Company shall mail to each Holder at least ten (10) Business Days prior to the date specified therein, a notice specifying the date on

- 12 -

which any such record is to be taken for the purpose of such dividend or distribution.

Section 10. Delivery of Shares. The provisions of this **Section 10** shall apply to all deliveries of Dividend Shares, Maturity Shares and Conversion Shares (collectively, the "**Deliverable Shares**"):

(a)    Method of Delivery. The Company or its designated transfer agent (the "**Transfer Agent**") shall effect all deliveries of Deliverable Shares required to be delivered to a Holder by issuing and delivering such Deliverable Shares to the Depository Trust Company ("**DTC**") account on such Holder's behalf via the Deposit Withdrawal Agent Commission System ("**DWAC**"). Notwithstanding the foregoing, the delivery of (i) all Dividend Shares, (ii) any other Deliverable Shares to the extent such Deliverable Shares are restricted and may not be delivered in accordance with the preceding sentence, and (iii) any other Deliverable Shares to the extent such Holder requests in writing, shall be effected by delivering to such Holder or its nominee physical certificates representing such Deliverable Shares no later than the close of business on the date on which such Deliverable Shares are due. Deliverable Shares delivered to a Holder shall not contain any restrictive legend as long as the resale of such Deliverable Shares (x) has been or will be made (as certified in writing by such Holder to the Company) pursuant to an effective registration statement, (y) has been made pursuant to Rule 144 under the Securities Act, or (z) may be made pursuant to Rule 144(k) under the Securities Act or any successor rule or provision.

(b)    Failure to Deliver.

(i)    In the event that, for any reason, a Holder has not timely received the number of Deliverable Shares required to be delivered to such Holder, or the Deliverable Shares so delivered contain a restrictive legend in spite of such Holder complying with the requirements described in *clause (x), (y)* or *(z)* of *Section 10(a)*, on or before the delivery date for such Deliverable Shares (a "**Delivery Default**", and the date on which such delivery was required to be made, the "**Delivery Default Date**"), the Company shall pay to such Holder payments ("**Delivery Default Payments**") in the amount of (A) (N/360) *multiplied by* (B) the applicable Delivery Default Amount *multiplied by* (C) the Default Interest Rate, where "N" equals the number of days elapsed between the date on which such Deliverable Shares were to be delivered (or date on which the restrictive legend was to be removed from such Deliverable Shares) and the date on which such Delivery Default has been cured. Amounts payable pursuant to the preceding sentence shall be paid to the Holder in immediately available funds on or before the second (2nd) Business Day following written notice from such Holder to the Company specifying the amount owed to it by the Company.

(ii)    In addition to any other remedies provided herein, each Holder shall have the right to pursue actual damages for the Company's failure to issue and deliver Deliverable Shares on the applicable delivery date, including, without limitation, damages relating to any purchase of shares of Common Stock by or on behalf of such Holder in order to make delivery on a sale lawfully effected in anticipation of receiving Deliverable Shares, such damages to be in an amount equal to (A) the aggregate amount

- 13 -

paid by such Holder for the shares of Common Stock so purchased *minus* (B) the aggregate amount received by such Holder upon the sale of such Deliverable Shares (or in the case of Dividend Shares, the aggregate amount received by such Holder upon the conversion of such Dividend Shares and subsequent sale of the Conversion Shares), and such Holder shall have the right to pursue all other remedies available to it at law or in equity (including, without limitation, a decree of specific performance and/or injunctive relief).

(c)     Fractional Shares. No fractional Deliverable Shares shall be issued upon conversion of the Series B Preferred Stock. In lieu of any fractional share to which a Holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by (i) $1,000 in the case of a fractional Dividend Share, and (ii) the Market Price determined as of the required delivery date in the case of a fractional share of Common Stock.

Section 11. Reservation of Deliverable Shares. The Company shall at all times reserve and keep available out of its authorized but unissued shares of Series B Preferred Stock and shares of Common Stock solely for the purpose of effecting the delivery of the Deliverable Shares as shall from time to time be sufficient to effect all of the delivery requirements under this Certificate, and if at any time the number of authorized but unissued shares of Series B Preferred Stock or shares of Common Stock shall not be sufficient to effect any of the delivery requirements under this Certificate, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Series B Preferred Stock or shares of Common Stock, as the case may be, to such number of shares as shall be sufficient for such purpose.

Section 12. Voting Rights; Protective Provisions; Waivers.

(a)     Voting Rights. Each Share shall have the same voting rights as the shares of Common Stock into which it may be converted determined in accordance with the Conversion Price then in effect. The Company shall provide each Holder with prior notification of each meeting of stockholders (and copies of proxy statements and other information sent to such stockholders) in the same manner as notification sent to holders of Common Stock.

(b)     Protective Provisions. So long any Shares are outstanding, the Company shall not, without first obtaining the approval of the Holders of not less than two-thirds of the Shares then outstanding:

(i)     alter, change, modify or amend (x) the terms of the Series B Preferred Stock in any way or (y) the terms of any other capital stock of the Company so as to affect adversely the Series B Preferred Stock;

(ii)    create or issue any new class or series of capital stock, or increase the authorized number of any existing class or series of capital stock, in either such case having a preference over or ranking *pari passu* with the Series B Preferred Stock as to

- 14 -

redemption or distribution of assets upon a Liquidation Event or any other liquidation, dissolution or winding up of the Company;

        (iii)   increase the authorized number of shares of Series B Preferred Stock;

        (iv)   re-issue any Shares which have been converted or redeemed in accordance with the terms hereof; or

        (v)   issue any Shares except pursuant to the terms of this Certificate.

In the event that (x) the Holders of not less than two-thirds of the Shares then outstanding agree to allow the Company to alter or change the rights, preferences or privileges of the Series B Preferred Stock pursuant to the terms hereof, no such change shall be effective to the extent that, by its terms, it applies to less than all of the Shares then outstanding.

        (c)   Waivers. Any waiver or consent under this Certificate shall be in writing and be binding only upon the specific Person giving such waiver or consent and limited to the specific instance and purpose for which such waiver or consent was given.

        Section 13. Notices. Any notice required by the provisions of this Certificate to be given to a Holder shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to such Holder of record at such Holder's latest address appearing on the books of the Company or at such other address provided by such Holder to the Company in writing.

[Remainder of Page Intentionally Left Blank]

- 15 -

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed by its President and attested to by its Secretary this __th day of December, 2008.

CELSIUS HOLDINGS, INC.

By: _____
Name: Stephen C. Haley
Title: Chief Executive Officer

ATTEST:

_____
Name: Jan A Norelid
Title: Secretary



**ROSS MILLER**
Secretary of State
204 North Carson Street, Suite 1
Carson City, Nevada 89701-4520
(775) 684 5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *[signature]* Ross Miller Secretary of State State of Nevada | 20090625049-17 |
| | Filing Date and Time |
| | 08/17/2009 7:04 AM |
| | Entity Number |
| | E0241042005-4 |

## Certificate of Amendment
### (PURSUANT TO NRS 78.385 AND 78.390)

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Amendment to Articles of Incorporation
### For Nevada Profit Corporations
#### (Pursuant to NRS 78.385 and 78.390 - After Issuance of Stock)

1. Name of corporation:

CELSIUS HOLDINGS, INC.

2. The articles have been amended as follows: (provide article numbers, if available)

CERTIFICATE OF AMENDMENT TO THE CERTIFICATE OF INCORPORATION OF CELSIUS HOLDINGS, INC (a Nevada Corporation)
Pursuant to with provisions of the Nevada Revised Statutes, Chapter78, the undersigned, being the Chairman and Chief Executive Officer of Celsius Holdings, Inc., a corporation organized and existing under the laws of the State of Nevada (the "Corporation"), does hereby certify that the following resolutions were adopted by the Corporation's Board of Directors and its stockholders as hereinafter described:
RESOLVED: Certificate of Incorporation of this Corporation is hereby amended as follows:
3. SHARES: The number of shares the corporation is authorized to issue is an aggregate total of 1,050,000,000 shares with a par value of $0.001 per share divided into:  [continued on attached sheet]

3. The vote by which the stockholders holding shares in the corporation entitling them to exercise a least a majority of the voting power, or such greater proportion of the voting power as may be required in the case of a vote by classes or series, or as may be required by the provisions of the articles of incorporation* have voted in favor of the amendment is:     94.9 percent

4. Effective date of filing: (optional) _____
(must not be later than 90 days after the certificate is filed)

5. Signature: (required)

X _____
Signature of Officer

*If any proposed amendment would alter or change any preference or any relative or other right given to any class or series of outstanding shares, then the amendment must be approved by the vote, in addition to the affirmative vote otherwise required, of the holders of shares representing a majority of the voting power of each class or series affected by the amendment regardless to limitations or restrictions on the voting power thereof.

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State Amend Profit-After
Revised: 3-6-09

**CERTIFICATE OF AMENDMENT**
**TO THE CERTIFICATE OF INCORPORATION**
**OF**
**CELSIUS HOLDINGS, INC.**
(A Nevada Corporation)

Pursuant to with provisions of the *Nevada Revised Statutes, Chapter 78*, the undersigned, being the Chairman and Chief Executive Officer of Celsius Holdings, Inc., a corporation organized and existing under the laws of the State of Nevada (the "Corporation"), does hereby certify that the following resolutions were adopted by the Corporation's Board of Directors and its stockholders as hereinafter described:

RESOLVED: Certificate of Incorporation of this Corporation is hereby amended as follows:

3. **SHARES**: The number of shares the corporation is authorized to issue is an aggregate total of 1,050,000,000 shares with a par value of $0.001 per share divided into:

    a.   1,000,000,000 shares of Common Stock with a par value of $0.001 per share; and

    b.   50,000,000 shares of Preferred Stock with a par value of $0.001 per share.

And

**ARTICLE IV**
**SHARES OF STOCK**

Section 4.01 Number and Class. The amount of the total authorized capital stock of this corporation is:

    a.   1,000,000,000 shares of common stock with a par value of $0.001 per share; and
    b.   50,000,000 shares of preferred stock with a par value of $0.001 per share.

The Common Stock and Preferred Stock may be issued from time to time without action by the stockholders. The Common Stock and Preferred Stock may be issued for such consideration as may be fixed from time to time by the Board of Directors.

The Board of Directors may issue such shares of Preferred Stock in one of more series, with such voting powers, designations, preferences and rights or qualifications, limitations or restrictions thereof as shall be stated in the resolution or resolutions adopted by them.

The foregoing resolutions and this Certificate of Amendment were adopted by the Board of Directors of the Corporation pursuant to a written consent of the directors of the Corporation dated May 18, 2009 in accordance with provisions of the *Nevada Revised Statutes, Chapter 78*, and by the holders 94.9% of the votes cast at the annual meeting of stockholders held on July 16, 2009 in accordance with provisions of the *Nevada Revised Statutes, Chapter 78.*

IN WITNESS WHEREOF, the undersigned, being the Chief Executive Officer of this Corporation, has executed this Certificate of Amendment to the Corporation's Certificate of Incorporation as of August 10, 2009.

CELSIUS HOLDINGS, INC.

By: _____

Stephen C. Haley, Chief Executive Officer

Dec. 21. 2009  3:43PM                                            No. 1086   P.  1



**ROSS MILLER**
Secretary of State
204 North Carson Street, Suite 1
Carson City, Nevada 89701-4520
(775) 684 5708
Website: www.nvsos.gov

| | Filed in the office of | Document Number |
|---|---|---|
| **Certificate of Change Pursuant to NRS 78.209** | *[signature]*<br>Ross Miller<br>Secretary of State<br>State of Nevada | 20090874825-85 |
| | | Filing Date and Time<br>12/21/2009 1:00 PM |
| | | Entity Number<br>E0241042005-4 |

USE BLACK INK ONLY - DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

## Certificate of Change filed Pursuant to NRS 78.209
### For Nevada Profit Corporations

1. Name of corporation:

CELSIUS HOLDINGS, INC.

2. The board of directors have adopted a resolution pursuant to NRS 78.209 and have obtained any required approval of the stockholders.

3. The current number of authorized shares and the par value, if any, of each class or series, if any, of shares before the change:

1,000,000,000 authorized shares of common stock, par value $0.001
50,000,000 authorized shares of preferred stock, par value $0.001

4. The number of authorized shares and the par value, if any, of each class or series, if any, of shares after the change:

50,000,000 authorized shares of common stock, par value $0.001, 2,500,000 authorized shares of preferred stock; to be outstanding after the reverse stock split described below.

5. The number of shares of each affected class or series, if any, to be issued after the change in exchange for each issued share of the same class or series:

7,675,779 shares in exchange for 153,515,570 outstanding shares of common stock; 354.6 shares in exchange for 7,092 outstanding shares of preferred stock in a 20 for 1 reverse stock split.

6. The provisions, if any, for the issuance of fractional shares, or for the payment of money or the issuance of scrip to stockholders otherwise entitled to a fraction of a share and the percentage of outstanding shares affected thereby:

Fractional share of common stock will be rounded up to a whole share, not possible to estimate % affected.
Fractional shares of preferred stock will be issued, 100% of outstanding preferred shares are affected.

7. Effective date of filing: (optional) [                at the close of business December 23, 2009          ]
                                        (must not be later than 90 days after the certificate is filed)

8. Signature: (required)

X  *[signature]*                                    | Chief Executive Officer |
Signature of Officer                                              Title

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*                Nevada Secretary of State Stock Split
                                                                    Revised: 3-6-09



**ROSS MILLER**
Secretary of State
204 North Carson Street, Suite 1
Carson City, Nevada 89701-4520
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
| --- | --- |
| *signature* Ross Miller Secretary of State State of Nevada | 20130788849-20 |
| | Filing Date and Time |
| | 11/27/2013 8:38 AM |
| | Entity Number |
| | E0241042005-4 |

## Certificate of Reinstatement

(PURSUANT TO NRS CHAPTERS 78, 78A, 80, 81, 82, 84, 86, 87, 88 AND 89)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Reinstatement
(For Entities Governed by NRS Chapters 78,
78A, 80, 81, 82, 84, 86, 87, 88 and 89)

1. Name of Entity:

CELSIUS HOLDINGS, INC.

2. Entity Number:  E0241042005-4

3. Signature:

I declare under penalty of perjury that the reinstatement has been authorized by a court of competent jurisdiction or by the duly elected board of directors of the entity or if the entity has no board of directors, its equivalent of such board.

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X _____          11/6/2013
Signature of Officer or other Authorized Signature          Date

This form must be accompanied by appropriate fees.

Nevada Secretary of State Certificate of Reinstatement
Revised: 9-27-13



**ROSS MILLER**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov



*180303*

## Registered Agent Acceptance
(PURSUANT TO NRS 77.310)

| Filed in the office of | Document Number |
| --- | --- |
| *[signature]*<br>Ross Miller<br>Secretary of State<br>State of Nevada | 20130788848-19 |
| | Filing Date and Time<br>11/27/2013 8:38 AM |
| | Entity Number<br>E0241042005-4 |

This form may be submitted by: a Commercial Registered Agent, Noncommercial Registered Agent or Represented Entity. For more information please visit http://www.nvsos.gov/index.aspx?page=141

USE BLACK INK ONLY - DO NOT HIGHLIGHT          ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Acceptance of Appointment by Registered Agent

In the matter of  CELSIUS HOLDINGS, INC.

Name of Represented Business Entity

I,  RESIDENT AGENTS OF NEVADA, INC.                                    am a:

Name of Appointed Registered Agent   OR   Represented Entity Serving as Own Agent*

(complete only one)

a) **X**  commercial registered agent listed with the Nevada Secretary of State,

b) ☐  noncommercial registered agent with the following address for service of process:

| Street Address | City | Nevada | Zip Code |
| --- | --- | --- | --- |

| Mailing Address (if different from street address) | City | Nevada | Zip Code |
| --- | --- | --- | --- |

c) ☐  represented entity accepting own service of process at the following address:

Title of Office or Position of Person in Represented Entity

| Street Address | City | Nevada | Zip Code |
| --- | --- | --- | --- |

| Mailing Address (if different from street address) | City | Nevada | Zip Code |
| --- | --- | --- | --- |

and hereby state that on   11/6/2013   I accepted the appointment as registered agent for the above named business entity.   Date

**X** *Rebecca Bar[signature]*                    11/6/2013

Authorized Signature of R.A. or On Behalf of R.A. Company          Date

*If changing Registered Agent when reinstating, officer's signature required.

**X**

Signature of Officer                              Date

Nevada Secretary of State Form RA Acceptance
Revised: 5-7-13

**(PROFIT) INITIAL/ANNUAL LIST OF OFFICERS, DIRECTORS AND STATE BUSINESS LICENSE APPLICATION OF:**

ENTITY NUMBER

E0241042005-4

CELSIUS HOLDINGS, INC.
NAME OF CORPORATION

FOR THE FILING PERIOD OF   4/30/2011   TO   4/30/2014

USE BLACK INK ONLY - DO NOT HIGHLIGHT

**\*\*YOU MAY FILE THIS FORM ONLINE AT www.nvsilverflume.gov\*\***

☐ Return one file stamped copy. (If filing not accompanied by order instructions, file stamped copy will be sent to registered agent.)

*IMPORTANT: Read instructions before completing and returning this form.*

1. Print or type names and addresses, either residence or business, for all officers and directors. A President, Secretary, Treasurer, or equivalent of and all Directors must be named. There must be at least one director. An Officer must sign the form. *FORM WILL BE RETURNED IF UNSIGNED.*

2. If there are additional officers, attach a list of them to this form.

3. Return the completed form with the filing fee. Annual list fee is based upon the current total authorized stock as explained in the Annual List Fee Schedule For Profit Corporations. A $75.00 penalty must be added for failure to file this form by the deadline. An annual list received more than 90 days before its due date shall be deemed an amended list for the previous year.

4. State business license fee is $200.00. Effective 2/1/2013, $100.00 must be added for failure to file form by deadline.

5. Make your check payable to the Secretary of State.

6. *Ordering Copies:* If requested above, one file stamped copy will be returned at no additional charge. To receive a certified copy, enclose an additional $30.00 per certification. A copy fee of $2.06 per page is required for each additional copy generated when ordering 2 or more file stamped or certified copies. Appropriate instructions must accompany your order.

7. Return the completed form to: Secretary of State, 202 North Carson Street, Carson City, Nevada 89701-4201, (775) 684-5708.

8. Form must be in the possession of the Secretary of State on or before the last day of the month in which it is due. (Postmark date is not accepted as receipt date.) Forms received after due date will be returned for additional fees and penalties. Failure to include annual list and business license fees will result in rejection of filing.

| Filed in the office of | Document Number |
|---|---|
| *Ross Miller* | 20130788847-08 |
| Ross Miller | Filing Date and Time |
| Secretary of State | 11/27/2013 8:38 AM |
| State of Nevada | Entity Number |
| | E0241042005-4 |

Page 2
Additional Officers
ABOVE SPACE IS FOR OFFICE USE ONLY

**CHECK ONLY IF APPLICABLE AND ENTER EXEMPTION CODE IN BOX BELOW**

☐ Pursuant to NRS Chapter 76, this entity is exempt from the business license fee. Exemption code: ☐
NOTE: If claiming an exemption, a notarized Declaration of Eligibility form must be attached. Failure to attach the Declaration of Eligibility form will result in rejection, which could result in late fees.

☐ This corporation is a publicly traded corporation. The Central Index Key number is:
☐ This publicly traded corporation is not required to have a Central Index Key number.

NRS 76.020 Exemption Codes

001 - Governmental Entity
005 - Motion Picture Company
006 - NRS 680B.020 Insurance Co.

| NAME | TITLE(S) | | |
|---|---|---|---|
| ~~STEPHEN C HALEY~~ Gerry David | PRESIDENT (OR EQUIVALENT OF) | | |
| ADDRESS | CITY | STATE | ZIP CODE |
| 711 S CARSON ST STE 4 | CARSON CITY | NV | 89701 |

| NAME | TITLE(S) | | |
|---|---|---|---|
| ~~GEARY W COTTON~~ Kathleen Dwyer | SECRETARY (OR EQUIVALENT OF) | | |
| ADDRESS | CITY | STATE | ZIP CODE |
| 711 S CARSON ST STE 4 | CARSON CITY | NV | 89701 |

| NAME | TITLE(S) | | |
|---|---|---|---|
| ~~GEARY W COTTON~~ John Fieldly | TREASURER (OR EQUIVALENT OF) | | |
| ADDRESS | CITY | STATE | ZIP CODE |
| 711 S CARSON ST STE 4 | CARSON CITY | NV | 89701 |

| NAME | TITLE(S) | | |
|---|---|---|---|
| ~~GEARY COTTON~~ ~~Kathleen H. Hammac~~ | DIRECTOR | | |
| ADDRESS | CITY | STATE | ZIP CODE |
| 711 S CARSON ST STE 4 | CARSON CITY | NV | 89701 |

None of the officers or directors identified in the list of officers has been identified with the fraudulent intent of concealing the identity of any person or persons exercising the power or authority of an officer or director in furtherance of any unlawful conduct.

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X _____   Title TREASURER   Date 11-27-13

**Signature of Officer or
Other Authorized Signature**

Nevada Secretary of State List Profit
Revised 7-31-13

# CELSIUS HOLDINGS, INC.

ADDITIONAL OFFICERS/DIRECTORS

~~JAMES CAST~~ *Nickolas Castaldo*
711 S CARSON ST STE 4
CARSON CITY, NV 89701

THOMAS E LYNCH
711 S CARSON ST STE 4
CARSON CITY, NV 89701

WILLIAM MILMOE
711 S CARSON ST STE 4
CARSON CITY, NV 89701

~~CHRISTIAN A NAST~~ *Kathleen N. Dwyer*
711 S CARSON ST STE 4
CARSON CITY, NV 89701

~~RICHARD J SWANSON~~ *Kevin Harrington*
711 S CARSON ST STE 4
CARSON CITY, NV 89701

*Page 2*

From: 15612762268      Page: 4/22      Received by: NV Secretary of State      Date: 1/15/2014 7:08:27 AM

From: 15612762268      Page: 1/18      Received by: NV Secretary of State      Date: 9/18/2013 2:04:38 PM

*LS0101*

**ROSS MILLER**
Secretary of State
204 North Carson Street, Suite 1
Carson City, Nevada 89701-4520
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *Ross Miller signature* | 20140034010-45 |
| Ross Miller | Filing Date and Time |
| Secretary of State | 01/15/2014 8:04 AM |
| State of Nevada | Entity Number |
| | E0241042005-4 |

## Certificate of Designation
### (PURSUANT TO NRS 78.1955)

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Designation For Nevada Profit Corporations (Pursuant to NRS 78.1955)

1. Name of corporation:

Celsius Holdings, Inc.

2. By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.

CELSIUS HOLDINGS, INC. CERTIFICATE OF DESIGNATION OF SERIES C CONVERTIBLE PREFERRED STOCK
Celsius Holdings, Inc., a Nevada corporation (the "Company"), acting pursuant to Chapter 78 of the Nevada Revised Statutes, the General Corporation Law of Nevada, does hereby submit the following Certificate of Designation of Series C Convertible Preferred Stock (this "Certificate").
FIRST: The name of the Company is Celsius Holdings, Inc.
SECOND: By unanimous consent of the Board of Directors of the Company (the "Board of Directors"), the following resolutions were duly adopted:

TEXT CONTINUES ON ATTACHED DOCUMENT

3. Effective date of filing: (optional)

(must not be later than 90 days after the certificate is filed)

4. Signature: (required)

X _____ CFO
Signature of Officer

**Filing Fee: $175.00**

IMPORTANT: Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

This form must be accompanied by appropriate fees.

Nevada Secretary of State Stock Designation
Revised: 3-6-09

From: 15612762268    Page: 5/22    Received by: NV Secretary of State    Date: 1/15/2014 7:08:28 AM

From: 15612762268    Page: 3/18    Received by: NV Secretary of State    Date: 9/18/2013 2:04.39 PM

## CELSIUS HOLDINGS, INC.

### CERTIFICATE OF DESIGNATION
### OF
### SERIES C CONVERTIBLE PREFERRED STOCK

Celsius Holdings, Inc., a Nevada corporation (the "*Company*"), acting pursuant to Chapter 78 of the Nevada Revised Statutes, the General Corporation Law of Nevada, does hereby submit the following Certificate of Designation of Series C Convertible Preferred Stock (this "*Certificate*").

FIRST: The name of the Company is Celsius Holdings, Inc.

SECOND: By unanimous consent of the Board of Directors of the Company (the "*Board of Directors*"), the following resolutions were duly adopted:

WHEREAS the Articles of Incorporation of the Company (as amended and restated, the "*Articles of Incorporation*") authorizes Preferred Stock consisting of 50,000 shares, par value $0.001 per share, issuable from time to time in one or more series;

WHEREAS the Board of Directors is authorized, subject to limitations prescribed by law and by the provisions of Article 4.01 of the Company's Articles of Incorporation, as amended, to establish and fix the number of shares to be included in any series of Preferred Stock and the designation, rights, preferences, powers, restrictions and limitations of the shares of such series; and

WHEREAS it is the desire of the Board of Directors to establish and fix the number of shares to be included in a new series of Preferred Stock and the designation, rights, preferences and limitations of the shares of such new series.

NOW, THEREFORE, BE IT RESOLVED that pursuant to Article 4.01 of the Articles of Incorporation there is hereby established a new series of 2,200 shares of Series C Convertible Preferred Stock of the Company (the "*Series C Preferred Stock*") to have the designation, rights, preferences, powers, restrictions and limitations set forth in a supplement of Article 4.01 as follows:

Section 1. Designation and Number of Shares; Defined Terms.

(a)    Designation.    The series will be known as the "Series C Convertible Preferred Stock" and will be a Series C consisting of 2,200 shares of the authorized but unissued preferred stock of the Company. The face amount of each share of Series C Preferred Stock shall be One Thousand Dollars ($1,000) (the "*Stated Value*")

(b)    Defined Terms. When used herein, the terms below shall have the

-1-

From: 15612762268      Page: 6/22      Received by: NV Secretary of State      Date: 1/15/2014 7:08:28 AM

From: 15612762268      Page: 4/18      Received by: NV Secretary of State      Date: 9/18/2013 2:04:39 PM

respective meanings indicated:

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the Series C Preferred Stock.

"**CDS**" means CDS Ventures of South Florida, LLC, a Florida limited liability company, and its successors and permitted assigns.

"**Change of Control**" means the existence, occurrence, public announcement or entering into an agreement contemplating of any of the following: (a) the sale, conveyance or disposition of all or substantially all of the assets of the Company to any Person, (b) the sale, conveyance or disposition of all or substantially all of the assets of any Company Subsidiary to a Person other than the Company or another Company Subsidiary; (c) the effectuation of a transaction or series of transactions in which more than fifty percent (50%) of the equity or voting power of the Company is disposed of; (d) the effectuation of a transaction or series of transactions in which any of the equity or voting power of any Company Subsidiary is disposed to a Person other than the Company or another Company Subsidiary; (e) the consolidation, merger or other business combination of the Company with or into any other entity, immediately following which the prior stockholders of the Company fail to own, directly or indirectly, at least fifty percent (50%) of the surviving entity; (f) the consolidation, merger or other business combination of any Company Subsidiary with or into any other entity other than the Company or another Company Subsidiary; (g) a transaction or series of transactions in which any Person or group (other than pursuant to an agreement between current affiliates of the Company) acquires more than fifty percent (50%) of the equity or voting power of the Company; (h) a transaction or series of transactions in which any Person or group (other than the Company or a Company Subsidiary) acquires any of the voting equity of a Company Subsidiary; and (i) the Continuing Directors do not at any time constitute at least a majority of the Board of Directors.

"**Continuing Director**" means, at any date, a member of the Board of Directors (i) who was a member of such board on the effective date of this Certificate or (ii) who was nominated or elected by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or whose election to the Board of Directors was recommended or endorsed by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or such lesser number comprising a majority of a nominating committee if authority for such nominations or elections has been delegated to a nominating committee whose authority and composition have been approved by at least a majority of the directors who were Continuing Directors at the time such committee was formed.

"**Conversion Price**" means the Market Price on the Closing Date as defined in the Certificate as appropriately adjusted for stock splits, stock dividends and similar events.

"**Common Stock**" means the Company's common stock, par value $0.001

- 2 -

From: 15612762268     Page: 7/22     Received by: NV Secretary of State     Date: 1/15/2014 7:08:28 AM

From: 15612762268     Page: 5/18     Received by: NV Secretary of State     Date: 9/18/2013 2:04:40 PM

per share.

"*Company*" means Celsius Holdings, Inc., a Nevada corporation, and its successors and permitted assigns.

"*Default Interest Rate*" means the lower of eighteen (18%) and the maximum rate permitted by applicable law or by the applicable rules or regulations of any governmental agency or of any stock exchange or other self-regulatory organization having jurisdiction over the Company or the trading of its securities.

"*Delivery Default Amount*" means, with respect to a Delivery Default of (i) Dividend Shares, the aggregate Liquidation Preference of the Dividend Shares subject to such Delivery Default as of the date on which such Dividend Shares were required to be delivered; and (ii) Maturity Shares or Conversion Shares, the product of (x) the number of the Maturity Shares or Conversion Shares, as the case may be, subject to such Delivery Default *multiplied by* (y) the VWAP as of the date on which such Maturity Shares or Conversion Shares were required to be delivered.

"*Excluded Stock*" shall mean:  (i) the Series C Preferred Stock; (ii) all Deliverable Shares; (iii) securities issued pursuant to the acquisition of another business entity or business segment of any such entity by the Company by merger, purchase of substantially all of the assets or other reorganization whereby the Company will own more than fifty percent (50%) of the voting power of such business entity or business segment of any such entity; (iv) securities issued to employees, consultants, officers, directors or other advisors of the Company pursuant to any stock option, stock purchase or stock bonus plan, agreement or arrangement approved by the Board of Directors; and (v) securities issued to leasing companies, landlords and other providers of goods and services to the Company and approved by the Board of Directors.

"*Holder*" means any Person that holds any Shares.

"*Liquidation Event*" means where (i) the Company or any Company Subsidiary shall make a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties, or the Company or any Company Subsidiary shall commence any action or proceeding or take advantage of or file under any federal or state insolvency statute, including, without limitation, the United States Bankruptcy Code, seeking to have an order for relief entered with respect to it or seeking adjudication as a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution, administration, a voluntary arrangement, or other relief with respect to it or its debts; or (ii) there shall be commenced against the Company or any Company Subsidiary any action or proceeding of the nature referred to in *clause (i)* above or seeking issuance of a warrant of attachment, execution, distraint, or similar process against all or any substantial part of its property, which results in the entry of an order for relief which remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there is initiated the

-3-

From: 15612762268      Page: 8/22      Received by: NV Secretary of State      Date: 1/15/2014 7:08:29 AM

From: 15612762268      Page: 6/18      Received by: NV Secretary of State      Date: 9/18/2013 2:04:40 PM

dissolution or other winding up of the Company or any material Company Subsidiary, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy proceedings; or (iv) there is initiated any assignment for the benefit of creditors or any marshalling of the material assets or material liabilities of the Company or any Company Subsidiary.

"*Market Price*" means the weighted average of the ten daily VWAPs for the 10 Trading Days immediately preceding the Closing Date.

"*Securities Purchase Agreement*" means the Securities Purchase Agreement, dated as of August 26, 2013, by and between the Company and CDS Ventures of South Florida, LLC, as may be amended from time to time.

"*Series C Preferred Stock*" has the meaning specified in the recitals of this Certificate.

"*Shares*" means shares of Series C Preferred Stock.

"*Stated Value*" has the meaning specified in *Section 1(a)*.

"*VWAP*" on a Trading Day means the volume weighted average price of the Common Stock for such Trading Day on the Principal Market as reported by Nasdaq.com or, if Nasdaq.com is not then reporting such prices, by a comparable reporting service of national reputation selected by the Holders and reasonably satisfactory to the Company. If the VWAP cannot be calculated for the Common Stock on such Trading Day on any of the foregoing bases, then the Company shall submit such calculation to an independent investment banking firm of national reputation (reasonably acceptable to the Holders of not less than two-thirds of the Shares then outstanding), and shall cause such investment banking firm to perform such determination and notify the Company and the Holders of the results of determination no later than two (2) Business Days from the time such calculation was submitted to it by the Company. All such determinations shall be appropriately adjusted for any stock dividend, stock split, reverse stock split or other similar transaction during such period.

(c)     Cross References. The terms below are defined in the sections of this Certificate indicated below:

| | |
|---|---|
| "*Board of Directors*" | *Preamble* |
| "*Certificate*" | *Preamble* |
| "*Articles of Incorporation*" | *Recitals* |
| "*Conversion*" | *Section 8(a)* |
| "*Conversion Date*" | *Section 8(b)* |
| "*Conversion Delivery Date*" | *Section 8(c)* |
| "*Conversion Notice*" | *Section 8(b)* |
| "*Conversion Shares*" | *Section 8(a)* |
| "*Deliverable Shares*" | *Section 10* |

- 4 -

From: 15612762268        Page: 9/22        Received by: NV Secretary of State        Date: 1/15/2014 7:08:29 AM

From: 15612762268        Page: 7/18        Received by: NV Secretary of State        Date: 9/18/2013 2:04:40 PM

| | |
|---|---|
| "Delivery Default" | Section 10(b) |
| "Delivery Default Date" | Section 10(b) |
| "Delivery Default Payments" | Section 10(b) |
| "Dividend Payment Date" | Section 2(b) |
| "Dividend Share Delivery Date" | Section 2(c) |
| "Dividend Shares" | Section 2(c) |
| "Dividends" | Section 2(a) |
| "DTC" | Section 10(a) |
| "DWAC" | Section 10(a) |
| "Early Redemption" | Section 7(a) |
| "Early Redemption Date" | Section 7(a) |
| "Early Redemption Notice" | Section 7(a) |
| "Early Redemption Price" | Section 7(b) |
| "Issue Date" | Section 2(a) |
| "Junior Stock" | Section 2(b) |
| "Liquidation Preference" | Section 4(a) |
| "Mandatory Redemption" | Section 6(a) |
| "Mandatory Redemption Date" | Section 6(c) |
| "Mandatory Redemption Event" | Section 6(a) |
| "Mandatory Redemption Notice" | Section 6(c) |
| "Mandatory Redemption Price" | Section 6(b) |
| "Maturity Date" | Section 3(a) |
| "Maturity Shares" | Section 3(b) |
| "Maturity Share Delivery Date" | Section 3(b) |
| "Transfer Agent" | Section 10(a) |

(d)     Terms Defined in Securities Purchase Agreement.  Any capitalized term used but not defined herein has the meaning specified in the Securities Purchase Agreement.

(e)     Usage.  All definitions contained in this Certificate are equally applicable to the singular and plural forms of the terms defined.  The words "hereof", "herein" and "hereunder" and words of similar import contained in this Certificate refer to this Certificate as a whole and not to any particular provision of this Certificate.

Section 2.  Dividends.

(a)     Dividend Rate.  Dividends (the "*Dividends*") shall accrue on the Stated Value of each Share at an annual rate equal to six percent (6%), computed on the basis of a 360-day year (consisting of 12 months of 30 days each) and calculated using the actual number of days elapsed since and including the date on which such Share was issued (the "*Issue Date*") or the date on which Dividends were most recently paid, as the case may be.

(b)     Dividend Payment Date.  Each Holder shall be entitled to receive, in preference to the payment of dividends to any holders of the Company's common

- 5 -

From: 15612782268          Page: 10/22          Received by: NV Secretary of State          Date: 1/15/2014 7:08:29 AM

From: 15612782268          Page: 8/18          Received by: NV Secretary of State          Date: 9/18/2013 2:04:41 PM

stock or any other class or series of preferred stock (collectively, the "*Junior Stock*"), the accrued and unpaid Dividends for each Share held by such Holder on the last Business Day of each fiscal year of the Company (each, a "*Dividend Payment Date*").

(c)     Payment of Dividend in Shares.  The Company shall pay all Dividends in kind with additional Shares.  The number of Shares to be issuable to a Holder on a Dividend Payment Date shall be equal to the quotient of (x) the Dividends payable to such Holder on such Dividend Payment Date *divided by* (y) $1,000 (the "*Dividend Shares*").  On or before the fifth (5th) Business Day following a Dividend Payment Date (the "*Dividend Share Delivery Date*"), the Company must deliver to each Holder the Dividend Shares issuable to such Holder in accordance with the provisions of *Section 10*.

Section 3.  Maturity Date.

(a)     Payment at Maturity.  All Shares shall mature on December 31, 2018 (the "*Maturity Date*").  On the Maturity Date, the Company shall pay to each Holder the aggregate Liquidation Preference for such Holder's Shares in accordance with this *Section 3*.

(b)     Payment in Shares of Common Stock.  The Company shall pay the amount due on the Maturity Date in kind with shares of Common Stock.  The number of shares of Common Stock to be issuable to a Holder on the Maturity Date (the "*Maturity Shares*") shall be equal to the quotient of (x) the aggregate Liquidation Preference for such Holder's Shares on the Maturity Date *divided by* (y) the Conversion Price in effect as of the Maturity Date.  On or before the third (3rd) Business Day following the Maturity Date (the "*Maturity Share Delivery Date*"), the Company must deliver to each Holder the Maturity Shares issuable to such Holder under this *Section 3* in accordance with the provisions of *Section 10*.

Section 4.  Liquidation Preference.

(a)     Preference.  In the event of any liquidation, dissolution or winding up of the Company, either voluntarily or involuntarily, each Holder shall be entitled to receive prior and in preference to any distribution of any of the assets or surplus funds of the Company to the holders of any Junior Stock, an amount (the "*Liquidation Preference*") equal to (A) $1,000 per Share held by such Holder, *plus* (B) a further amount equal to any Dividends accrued but unpaid on such Shares.  If, upon such liquidation, dissolution or winding up of the Company, the assets of the Company available for distribution to the stockholders of the Company are insufficient to provide for the payment of the full aforesaid preferential amount, such assets as are so available shall be distributed among the Holders in proportion to the relative aggregate Liquidation Preferences of the Shares held by such Holders.  The Liquidation Preference set forth in this *Section 4(a)* shall be appropriately adjusted for any stock splits, stock combinations, stock dividends or similar recapitalizations.

(b)     Noncash Distributions.  If any of the assets of the Company are to

- 6 -

From: 15612762268          Page: 11/22          Received by: NV Secretary of State          Date: 1/15/2014 7:08:30 AM

From: 15012762268          Page: 9/15          Received by: NV Secretary of State          Date: 9/18/2013 2:04:41 PM

be distributed other than in cash under this *Section 4*, then the Board of Directors shall promptly engage independent competent appraisers to determine the value of the assets to be distributed to the holders of Capital Stock. The Company shall, upon receipt of such appraiser's valuation, give prompt written notice to each holder of Capital Stock of the appraiser's valuation.

Section 5. Covenants and Agreements.

(a)   Certain Affirmative Covenants of the Company.   The Company shall, and shall cause each Company Subsidiary to:

(i)   maintain its corporate existence in good standing;

(ii)   comply with all Governmental Requirements applicable to the operation of its business, except for instances of noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii)   comply with all agreements, documents and instruments binding on it or affecting its Properties or business, including, without limitation, all Material Contracts, except for instances of noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iv)   provide each Holder with copies of all materials sent to its shareholders at the same time as such materials are delivered to such shareholders;

(v)   maintain commercially reasonable insurance coverage (including D&O insurance) for each of the Company and Company Subsidiaries; and

(vi)   obtain Stockholder Cap Approval in accordance with the terms of the Securities Purchase Agreement, if such is needed.

(b)   Certain Negative Covenants of the Company.   The Company shall not, and shall cause each Company Subsidiary not to:

(i)   enter into any transaction or arrangement with any Affiliate, employee, officer, director or shareholder of the Company or Company Subsidiary, unless such transaction is effectuated on an arms' length basis and approved by the independent directors of the Company or such Company Subsidiary, as the case may be;

(ii)   incur (or permit to exist) any Debt (other than Permitted Debt);

(iii)   grant, establish or maintain any Lien on any of its Property other than Permitted Liens;

(iv)   make any Restricted Payments other than Restricted

- 7 -

From: 15612762268     Page: 12/22     Received by: NV Secretary of State     Date: 1/15/2014 7:08:30 AM

From: 15612762268     Page: 10/18     Received by: NV Secretary of State     Date: 9/18/2013 2:04:41 PM

Payments made by a Company Subsidiary to the Company;

(v)     make any offers or sales of any security or solicit any offers to buy any security, which will be integrated with the sale of the Securities in a manner which would require the registration of any of the Securities under the Securities Act or require stockholder approval under the rules and regulations of the Principal Market;

(vi)     dispose of all or any part of its Property unless (i) such disposition is in the ordinary course of business and for fair market value, and (ii) such Property is not material to the Company's or any Company Subsidiary's business, operations or financial condition or performance; or

(vii)     consent to or implement any termination, amendment, modification, supplement or waiver of the certificate or articles of incorporation, articles of organization, bylaws, regulations or other constituent documents of the Company or any Company Subsidiary which could reasonably be expected to adversely affect the rights of any Holder under the Transaction Documents.

Section 6. Mandatory Redemption.

(a)     Mandatory Redemption Event. Each Holder shall have the right to require the Company to redeem all or any portion of the Shares held by such Holder (a "*Mandatory Redemption*") in cash upon the occurrence of any of the following events (each, a "*Mandatory Redemption Event*"):

(i)     any representation or warranty of the Company set forth in the Securities Purchase Agreement was not true and correct in all material respects as of the date when made;

(ii)     the Company fails at any time to comply with or perform in all material respects all of the agreements, obligations, covenants and conditions set forth in *Section 5* or any other provision of this Certificate that are required to be complied with or performed by it, and such failure is not cured within five (5) Business Days from the date on which a Holder delivers written notice thereof to the Company; or

(iii)     a Change of Control.

(b)     Mandatory Redemption Price. The amount payable upon a Mandatory Redemption (the "*Mandatory Redemption Price*") shall be equal to the greater of (i) the aggregate Liquidation Preference for the Shares being redeemed as of the Mandatory Redemption Date and (ii) the aggregate Liquidation Preference for such Shares *divided by* the Conversion Price *multiplied by* the Market Price in effect on the Mandatory Redemption Date.

(c)     Payment of Mandatory Redemption Price. The Company shall pay in cash the Mandatory Redemption Price to the Holder exercising its right to redemption on

- 8 -

From: 15612782268     Page: 13/22     Received by: NV Secretary of State     Date: 1/15/2014 7:08:30 AM

From: 15612782268     Page: 11/18     Received by: NV Secretary of State     Date: 9/18/2013 2:04:42 PM

or prior to the fifth (5th) Business Day following the date on which such Holder delivers written notice (the "*Mandatory Redemption Notice*") to the Company demanding the redemption of such Holder's Shares pursuant to this *Section 6* and specifying the number of Shares to be redeemed (such fifth (5th) Business Day being referred to herein as the "*Mandatory Redemption Date*"). If the Company fails to pay the Mandatory Redemption Price to a Holder on or before the Mandatory Redemption Date, such Holder shall be entitled to interest thereon, from and after the Mandatory Redemption Payment Date until the Mandatory Redemption Price has been paid in full, at an annual rate equal to the Default Interest Rate.

Section 7. Early Redemption.

(a)     General. The Company shall have the right at any time on or after December 31, 2014 to redeem all but not less than all of the outstanding Shares in cash (an "*Early Redemption*"). For the avoidance of doubt, the Company shall not have the right to redeem any Shares prior to January 1, 2015. In order to effectuate an Early Redemption, the Company must deliver written notice thereof to each Holder (an "*Early Redemption Notice*"), and such notice shall specify the date on which such early redemption shall be effectuated (the "*Early Redemption Date*"), *provided* that the Early Redemption Date must be at least sixty (60) days following the date on which the Early Redemption Notice has been delivered to all of the Holders. Notwithstanding the foregoing, if a Holder delivers a Mandatory Redemption Notice or Conversion Notice at any time prior to the Early Redemption Date, then the provisions of this Certificate applicable to such Mandatory Redemption or Conversion, as applicable, including the Company's obligation to pay the amounts or deliver shares of Common Stock in connection with such Mandatory Redemption or Conversion, as applicable, shall apply and control.

(b)     Early Redemption Price. The amount payable upon an Early Redemption (the "*Early Redemption Price*") shall be equal to 104% of the aggregate Liquidation Preference for the Shares being redeemed.

(c)     Payment of Early Redemption Price. The Company shall pay in cash the Early Redemption Price to each Holder on the Early Redemption Date. If the Company fails to pay the Early Redemption Price to a Holder on or before the Early Redemption Date, such Holder shall be entitled to interest thereon, from and after the Early Redemption Date until the Early Redemption Price has been paid in full, at an annual rate equal to the Default Interest Rate.

Section 8. Conversion. The Series C Preferred Stock shall be convertible into Common Stock as follows:

(a)     Right to Convert; Number of Conversion Shares. Each Holder shall have the right to convert, at any time and from time to time, all or any part of the Shares held by such Holder into such number of fully paid and non-assessable shares (the "*Conversion Shares*") of Common Stock as is determined in accordance with the terms hereof (a "*Conversion*"). The number of Conversion Shares to be delivered by the

- 9 -

From: 15612782268      Page: 14/22      Received by: NV Secretary of State      Date: 1/15/2014 7:08:31 AM

From: 15612782268      Page: 12/18      Received by: NV Secretary of State      Date: 9/18/2013 2:04:42 PM

Company pursuant to a Conversion shall be determined by dividing (i) the aggregate Liquidation Preference of the Shares to be converted by (ii) the Conversion Price in effect on the applicable Conversion Date.

(b)    Conversion Notice. In order to convert Shares, a Holder shall send to the Company by facsimile transmission, at any time prior to 5:00 p.m., New York City time, on the date on which such Holder wishes to effect such Conversion (the "*Conversion Date*"), a notice of conversion (a "*Conversion Notice*") stating the number of Shares to be converted, the amount of Dividends accrued (but remaining unpaid) thereon, and a calculation of the number of shares of Common Stock issuable upon such Conversion. Such Holder shall thereafter send the certificate or certificates representing the Shares being converted to the Company. The Company shall issue a new certificate for Shares to such Holder in the event that less than all of the Shares represented by a certificate are converted; *provided, however*, that the failure of the Company to deliver such new certificate shall not affect the right of such Holder to submit a further Conversion Notice with respect to such Shares and, in any such case, such Holder shall be deemed to have submitted the original of such new certificate at the time that it submits such further Conversion Notice. Except as otherwise provided herein, upon delivery of a Conversion Notice by a Holder in accordance with the terms hereof, such Holder shall, as of the applicable Conversion Date, be deemed for all purposes to be the record owner of the Common Stock to which such Conversion Notice relates. In the case of a dispute between the Company and a Holder as to the calculation of the Conversion Price or the number of Conversion Shares issuable upon a Conversion (including without limitation the calculation of any adjustment to the Conversion Price pursuant to *Section 9*), the Company shall issue to such Holder the number of Conversion Shares that are not disputed within the time periods specified in *Section 10* and shall submit the disputed calculations to its independent accountant within two (2) Business Days of receipt of such Holder's Conversion Notice. The Company shall cause such accountant to calculate the Conversion Price as provided herein and to notify the Company and such Holder of the results in writing no later than five (5) Business Days following the Company's receipt of such Holder's Conversion Notice. Such accountant's calculation shall be deemed conclusive absent manifest error. The fees of any such accountant shall be borne by the party whose calculations were most at variance with those of such accountant.

(c)    Delivery of Conversion Shares. Upon receipt of a fax copy of a Conversion Notice from a Holder, the Company shall, no later than the close of business on the fifth (5th) Business Day following the Conversion Date set forth in such Conversion Notice (the "*Conversion Delivery Date*"), issue and deliver or caused to be delivered to such Holder the number of Conversion Shares determined pursuant to *Section 8(a)*; *provided, however*, that any Conversion Shares that are the subject of the dispute procedure described in *Section 8(b)* shall be delivered no later than the close of business on the fifth (5th) Business Day following the determination made pursuant thereto. The Company must deliver to each Holder the Conversion Shares issuable to such Holder under this *Section 8* in accordance with the provisions of *Section 10*.

Section 9.  Adjustment of Conversion Price. The Conversion Price of the Series

- 10 -

From: 15612762268        Page: 15/22      Received by: NV Secretary of State        Date: 1/15/2014 7:08:31 AM

From: 15612762268        Page: 13/18      Received by: NV Secretary of State        Date: 9/18/2013 2:04:43 PM

C Preferred Stock shall be subject to adjustment from time to time as follows:

(a)    Stock Splits and Stock Dividends.  If the number of shares of Common Stock outstanding at any time after the date hereof is increased by (i) a stock dividend payable in (x) shares of Common Stock (other than dividends payable pursuant to the Series C Preferred Stock), or (y) options to purchase or rights to subscribe for Common Stock or other securities of the Company convertible into or exchangeable for Common Stock, or (ii) a subdivision or split-up of shares of Common Stock, then, on the date such payment is made or such change is effective, the Conversion Price shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of the Series C Preferred Stock shall be increased in proportion to such increase of outstanding shares.

(b)    Reverse Stock Splits and Stock Combinations.  If the number of shares of Common Stock outstanding at any time after the date hereof is decreased by a combination of the outstanding shares of Common Stock, then, on the effective date of such combination, the Conversion Price shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of the Series C Preferred Stock shall be decreased in proportion to such decrease in outstanding shares.

(c)    Distributions.  In case the Company shall declare a cash dividend upon its Common Stock or shall distribute to holders of its Common Stock shares of its capital stock (other than Common Stock), stock or other securities of other Persons, evidences of indebtedness issued by the Company or other Persons, assets (excluding cash dividends) or options or rights (excluding options to purchase and rights to subscribe for Common Stock or other securities of the Company convertible into or exchangeable for Common Stock), then, in such case, each Holder shall, concurrently with the distribution to holders of Common Stock, receive a like distribution based upon the number of shares of Common Stock into which such Holder's Shares are then convertible at the Conversion Price in effect on the record date for such distribution.

(d)    Capital Reorganization.  In case, at any time after the date hereof, of any capital reorganization, or any reclassification of the stock of the Company (other than a change in par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or the consolidation or merger of the Company with or into another Person (other than a consolidation or merger in which the Company is the continuing entity and which does not result in any change in the Common Stock), or of the sale or other disposition of all or substantially all of the properties and assets of the Company as an entirety to any other Person, the Shares shall, if such event is not deemed a liquidation for purposes of *Section 4*, after such reorganization, reclassification, consolidation, merger, sale or other disposition, be convertible into the kind and number of shares of stock or other securities or property of the Company or of the entity resulting from such consolidation or surviving such merger or to which such properties and assets shall have been sold or otherwise disposed to which such Holder would have been entitled if immediately prior to such reorganization, reclassification, consolidation, merger, sale or other disposition such Holder had converted its Shares into Common

- 11 -

From: 15612762268    Page: 16/22    Received by: NV Secretary of State    Date: 1/15/2014 7:08:32 AM

From: 15012762268    Page: 14/18    Received by: NV Secretary of State    Date: 9/18/2013 2:04:43 PM

Stock. The provisions of this *Section 9(e)* shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or other dispositions. The provisions of this *Section 9(e)* shall not affect the Holders right to effect a Mandatory Redemption if any of the transactions described in this *Section 9(e)* also constitute a Mandatory Redemption Event.

(e) Minimal Adjustments. No adjustment in a Conversion Price need be made if such adjustment would result in a change in a Conversion Price of less than $0.01. Any adjustment of less than $0.01 which is not made shall be carried forward and shall be made at the time of and together with any subsequent adjustment which, on a cumulative basis, amounts to an adjustment of $0.01 or more in a Conversion Price. All calculations under this *Section 9* shall be made to the nearest cent or to the nearest one hundredth (1/100) of a share, as the case may be.

(f) Certificate as to Adjustments. Upon the occurrence of each adjustment or readjustment of a Conversion Price pursuant to this *Section 9*, the Company at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon written request at any time of any Holder, furnish or cause to be furnished to such Holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect for the Series C Preferred Stock held, and (iii) the number of shares of Common Stock and the amount if any, of other property which at the time would be received upon the conversion of the Series C Preferred Stock.

(g) Notices of Record Date. In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend) or other distribution, the Company shall mail to each Holder at least ten (10) Business Days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend or distribution.

Section 10. Delivery of Shares. The provisions of this *Section 10* shall apply to all deliveries of Dividend Shares, Maturity Shares and Conversion Shares (collectively, the *"Deliverable Shares"*):

(a) Method of Delivery. The Company or its designated transfer agent (the *"Transfer Agent"*) shall effect all deliveries of Deliverable Shares required to be delivered to a Holder by issuing and delivering such Deliverable Shares to the Depository Trust Company (*"DTC"*) account on such Holder's behalf via the Deposit Withdrawal Agent Commission System (*"DWAC"*). Notwithstanding the foregoing, the delivery of (i) all Dividend Shares, (ii) any other Deliverable Shares to the extent such Deliverable Shares are restricted and may not be delivered in accordance with the preceding sentence, and (iii) any other Deliverable Shares to the extent such Holder requests in writing, shall be effected by delivering to such Holder or its nominee physical certificates representing such

- 12 -

From: 15612782268        Page: 17/22        Received by: NV Secretary of State        Date: 1/15/2014 7:08:32 AM

From: 15612782268        Page: 15/18        Received by: NV Secretary of State        Date: 9/18/2013 2:04:43 PM

Deliverable Shares no later than the close of business on the date on which such Deliverable Shares are due. Deliverable Shares delivered to a Holder shall not contain any restrictive legend as long as the resale of such Deliverable Shares (x) has been or will be made (as certified in writing by such Holder to the Company) pursuant to an effective registration statement, (y) has been made pursuant to Rule 144 under the Securities Act, or (z) may be made pursuant to Rule 144(k) under the Securities Act or any successor rule or provision.

(b)   Failure to Deliver.

(i)   In the event that, for any reason, a Holder has not timely received the number of Deliverable Shares required to be delivered to such Holder, or the Deliverable Shares so delivered contain a restrictive legend in spite of such Holder complying with the requirements described in *clause (x), (y)* or *(z)* of *Section 10(a)*, on or before the delivery date for such Deliverable Shares (a "*Delivery Default*", and the date on which such delivery was required to be made, the "*Delivery Default Date*"), the Company shall pay to such Holder payments ("*Delivery Default Payments*") in the amount of (A) (N/360) *multiplied by* (B) the applicable Delivery Default Amount *multiplied by* (C) the Default Interest Rate, where "N" equals the number of days elapsed between the date on which such Deliverable Shares were to be delivered (or date on which the restrictive legend was to be removed from such Deliverable Shares) and the date on which such Delivery Default has been cured. Amounts payable pursuant to the preceding sentence shall be paid to the Holder in immediately available funds on or before the second (2nd) Business Day following written notice from such Holder to the Company specifying the amount owed to it by the Company.

(ii)   In addition to any other remedies provided herein, each Holder shall have the right to pursue actual damages for the Company's failure to issue and deliver Deliverable Shares on the applicable delivery date, including, without limitation, damages relating to any purchase of shares of Common Stock by or on behalf of such Holder in order to make delivery on a sale lawfully effected in anticipation of receiving Deliverable Shares, such damages to be in an amount equal to (A) the aggregate amount paid by such Holder for the shares of Common Stock so purchased *minus* (B) the aggregate amount received by such Holder upon the sale of such Deliverable Shares (or in the case of Dividend Shares, the aggregate amount received by such Holder upon the conversion of such Dividend Shares and subsequent sale of the Conversion Shares), and such Holder shall have the right to pursue all other remedies available to it at law or in equity (including, without limitation, a decree of specific performance and/or injunctive relief).

(c)   Fractional Shares. No fractional Deliverable Shares shall be issued upon conversion of the Series C Preferred Stock. In lieu of any fractional share to which a Holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by (i) $1,000 in the case of a fractional Dividend Share, and (ii) the Market Price determined as of the required delivery date in the case of a fractional share of Common Stock.

Section 11.   Reservation of Deliverable Shares. The Company shall at all times

- 13 -

From: 15612762268          Page: 18/22          Received by: NV Secretary of State          Date: 1/15/2014 7:08:32 AM

From: 15612762268          Page: 16/18          Received by: NV Secretary of State          Date: 9/18/2013 2:04:44 PM

reserve and keep available out of its authorized but unissued shares of Series C Preferred Stock and shares of Common Stock solely for the purpose of effecting the delivery of the Deliverable Shares as shall from time to time be sufficient to effect all of the delivery requirements under this Certificate, and if at any time the number of authorized but unissued shares of Series C Preferred Stock or shares of Common Stock shall not be sufficient to effect any of the delivery requirements under this Certificate, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Series C Preferred Stock or shares of Common Stock, as the case may be, to such number of shares as shall be sufficient for such purpose.

Section 12.  Voting Rights; Protective Provisions; Waivers.

(a)  Voting Rights. Each Share shall have the same voting rights as the shares of Common Stock into which it may be converted determined in accordance with the Conversion Price then in effect. The Company shall provide each Holder with prior notification of each meeting of stockholders (and copies of proxy statements and other information sent to such stockholders) in the same manner as notification sent to holders of Common Stock.

(b)  Protective Provisions. So long any Shares are outstanding, the Company shall not, without first obtaining the approval of the Holders of not less than two-thirds of the Shares then outstanding:

(i)  alter, change, modify or amend (x) the terms of the Series C Preferred Stock in any way or (y) the terms of any other capital stock of the Company so as to affect adversely the Series C Preferred Stock;

(ii)  create or issue any new class or series of capital stock, or increase the authorized number of any existing class or series of capital stock, in either such case having a preference over or ranking *pari passu* with the Series C Preferred Stock as to redemption or distribution of assets upon a Liquidation Event or any other liquidation, dissolution or winding up of the Company;

(iii)  increase the authorized number of shares of Series C Preferred Stock;

(iv)  re-issue any Shares which have been converted or redeemed in accordance with the terms hereof; or

(v)  issue any Shares except pursuant to the terms of this Certificate.

In the event that (x) the Holders of not less than two-thirds of the Shares then outstanding agree to allow the Company to alter or change the rights, preferences or privileges of the Series C Preferred Stock pursuant to the terms hereof, no such change shall be effective to

- 14 -

From: 15612782268     Page: 19/22     Received by: NV Secretary of State     Date: 1/15/2014 7:08:33 AM

From: 15612782268     Page: 17/18     Received by: NV Secretary of State     Date: 9/16/2013 2:04:44 PM

the extent that, by its terms, it applies to less than all of the Shares then outstanding.

(c)     Waivers. Any waiver or consent under this Certificate shall be in writing and be binding only upon the specific Person giving such waiver or consent and limited to the specific instance and purpose for which such waiver or consent was given.

Section 13. Notices. Any notice required by the provisions of this Certificate to be given to a Holder shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to such Holder of record at such Holder's latest address appearing on the books of the Company or at such other address provided by such Holder to the Company in writing.

[Remainder of Page Intentionally Left Blank]

- 15 -

From: 15612762268        Page: 20/22        Received by: NV Secretary of State        Date: 1/15/2014 7:08:33 AM

From: 15612762268        Page: 18/18        Received by: NV Secretary of State        Date: 9/18/2013 2:04:44 PM

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed by its President and attested to by its Secretary this 26th day of August, 2013.

CELSIUS HOLDINGS, INC.

By: _____
Name: Gerry David
Title: Chief Executive Officer

ATTEST:

Name: _____
Title: Secretary to the Board of Directors



*150103*



BARBARA K. CEGAVSKE
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *Barbara K. Cegavske* | 20150172651-30 |
| Barbara K. Cegavske Secretary of State State of Nevada | Filing Date and Time 04/16/2015 9:35 AM |
| | Entity Number E0241042005-4 |

## Certificate of Designation
(PURSUANT TO NRS 78.1955)

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Designation For
### Nevada Profit Corporations
### (Pursuant to NRS 78.1955)

1. Name of corporation:

CELSIUS HOLDINGS, INC.

2. By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.

See attached Certificate of Designation of Series D Convertible Preferred Stock.

3. Effective date of filing: (optional) _____

(must not be later than 90 days after the certificate is filed)

4. Signature: (required)

X _____

Signature of Officer    *John Fieldly* CFO

**Filing Fee: $175.00**

IMPORTANT: Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State Stock Designation
Revised: 1-5-15

**CELSIUS HOLDINGS, INC.**

**CERTIFICATE OF DESIGNATION**
**OF**
**SERIES D CONVERTIBLE PREFERRED STOCK**

Celsius Holdings, Inc., a Nevada corporation (the *"Company"*), acting pursuant to Chapter 78 of the Nevada Revised Statutes, the General Corporation Law of Nevada, does hereby submit the following Certificate of Designation of newly created Series D Convertible Preferred Stock (this *"Certificate"*).

FIRST: The name of the Company is Celsius Holdings, Inc.

SECOND: By unanimous consent of the Board of Directors of the Company (the *"Board of Directors"*), the following resolutions were duly adopted:

WHEREAS the Articles of Incorporation of the Company (as amended and restated, the *"Articles of Incorporation"*) authorizes Preferred Stock consisting of 2,500,000 shares, par value $0.001 per share, issuable from time to time in one or more series;

WHEREAS the Board of Directors is authorized, subject to limitations prescribed by law and by the provisions of Article 4.01 of the Company's Articles of Incorporation, as amended, to establish and fix the number of shares to be included in any series of Preferred Stock and the designation, rights, preferences, powers, restrictions and limitations of the shares of such series; and

WHEREAS it is the desire of the Board of Directors to establish and fix the number of shares to be included in a new series of Preferred Stock and the designation, rights, preferences and limitations of the shares of such new series.

NOW, THEREFORE, BE IT RESOLVED that pursuant to Article 4.01 of the Articles of Incorporation there is hereby established a new series of 4,000 shares of Series D Convertible Preferred Stock of the Company (the *"Series D Preferred Stock"*) to have the designation, rights, preferences, powers, restrictions and limitations set forth in a supplement of Article 4.01 as follows:

Section 1. Designation and Number of Shares; Defined Terms.

(a) Designation. The series will be known as the "Series D Convertible Preferred Stock" and will be a Series D consisting of 4,000 shares of the authorized but unissued preferred stock of the Company. The face amount of each share of Series D Preferred Stock shall be One Thousand Dollars ($1,000) (the *"Stated Value"*).

(b) Defined Terms. When used herein, the terms below shall have the respective meanings indicated:

"*A&R Note*" means that certain Amended and Restated Promissory Note, dated as of April 16, 2015, in the principal amount of $4,500,000 issued by the Company to CD Financial.

"*Amendment*" means that certain Amendment to Loan and Security Agreement, dated as of April 16, 2015, between the Company and CD Financial.

"*Capital Stock*" means the capital stock of the Company, including, without limitation, the Series D Preferred Stock.

"*CD Financial*" means CD Financial, LLC, a Florida limited liability company, and its successors and permitted assigns.

"*Change of Control*" means the existence, occurrence, public announcement or entering into an agreement contemplating of any of the following: (a) the sale, conveyance or disposition of all or substantially all of the assets of the Company to any Person, (b) the sale, conveyance or disposition of all or substantially all of the assets of any subsidiary of the Company (each a "*Company Subsidiary*") to a Person other than the Company or another Company Subsidiary; (c) the effectuation of a transaction or series of transactions in which more than fifty percent (50%) of the equity or voting power of the Company is disposed of; (d) the consolidation, merger or other business combination of the Company with or into any other entity, immediately following which the prior stockholders of the Company fail to own, directly or indirectly, at least fifty percent (50%) of the surviving entity; (e) a transaction or series of transactions in which any Person or group (other than pursuant to an agreement between current affiliates of the Company) acquires more than fifty percent (50%) of the equity or voting power of the Company;; and (f) the Continuing Directors do not at any time constitute at least a majority of the Board of Directors.

"*Continuing Director*" means, at any date, a member of the Board of Directors (i) who was a member of such board on the effective date of this Certificate or (ii) who was nominated or elected by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or whose election to the Board of Directors was recommended or endorsed by at least a majority of the directors who were Continuing Directors at the time of such nomination or election or such lesser number comprising a majority of a nominating committee if authority for such nominations or elections has been delegated to a nominating committee whose authority and composition have been approved by at least a majority of the directors who were Continuing Directors at the time such committee was formed.

"*Conversion Price*" means $0.86 per share, as appropriately adjusted for stock splits, stock dividends and similar events.

"*Common Stock*" means the Company's common stock, par value $0.001 per share.

"*Company*" means Celsius Holdings, Inc., a Nevada corporation, and its successors and permitted assigns.

"*Default Interest Rate*" means the lower of eighteen (18%) and the maximum rate permitted by applicable law or by the applicable rules or regulations of any governmental agency or of any stock exchange or other self-regulatory organization having jurisdiction over the Company or the trading of its securities.

"*Delivery Default Amount*" means, with respect to a Delivery Default of (i) Dividends, the amount of such Dividends subject to such Delivery Default as of the date on which such Dividends were required to be delivered; and (ii) Maturity Shares, Mandatory Redemption Shares or Conversion Shares, the product of (x) the number of the Maturity Shares, Mandatory Redemption Shares or Conversion Shares, as the case may be, subject to such Delivery Default *multiplied by* (y) the VWAP as of the date on which such Maturity Shares or Conversion Shares were required to be delivered.

"*Holder*" means any Person that holds any Shares.

"*Liquidation Event*" means where (i) the Company or any Company Subsidiary shall make a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties, or the Company or any Company Subsidiary shall commence any action or proceeding or take advantage of or file under any federal or state insolvency statute, including, without limitation, the United States Bankruptcy Code, seeking to have an order for relief entered with respect to it or seeking adjudication as a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution, administration, a voluntary arrangement, or other relief with respect to it or its debts; or (ii) there shall be commenced against the Company or any Company Subsidiary any action or proceeding of the nature referred to in *clause (i)* above or seeking issuance of a warrant of attachment, execution, distraint, or similar process against all or any substantial part of its property, which results in the entry of an order for relief which remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there is initiated the dissolution or other winding up of the Company or any material Company Subsidiary, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy proceedings; or (iv) there is initiated any assignment for the benefit of creditors or any marshalling of the material assets or material liabilities of the Company or any Company Subsidiary.

"*Market Price*" means the weighted average of the ten daily VWAPs for the 10 Trading Days immediately preceding the applicable date of determination.

"*Material Adverse Effect*" means any circumstances, state of facts or matters which might reasonably be expected to have a material adverse effect in respect of the Company's or the Company Subsidiary's business, operations, properties, assets, condition (financial or otherwise), results, plans, strategies or prospects, as the case may be.

"*Person*" means an individual, a corporation, partnership, limited liability company, association, trust, or other legal entity or organization.

"*Series D Preferred Stock*" has the meaning specified in the recitals of this Certificate.

"*Shares*" means shares of Series D Preferred Stock.

"*Stated Value*" has the meaning specified in *Section 1(a)*.

"*VWAP*" on a Trading Day means the volume weighted average price of the Common Stock for such Trading Day on the Principal Market as reported by Nasdaq.com or, if Nasdaq.com is not then reporting such prices, by a comparable reporting service of national reputation selected by the Holders and reasonably satisfactory to the Company. If the VWAP cannot be calculated for the Common Stock on such Trading Day on any of the foregoing bases, then the Company shall submit such calculation to an independent investment banking firm of national reputation (reasonably acceptable to the Holders of not less than two-thirds of the Shares then outstanding), and shall cause such investment banking firm to perform such determination and notify the Company and the Holders of the results of such determination no later than two (2) Business Days from the time such calculation was submitted to it by the Company. All such determinations shall be appropriately adjusted for any stock dividend, stock split, reverse stock split or other similar transaction during such period.

(c) Cross References. The terms below are defined in the sections of this Certificate indicated below:

| | |
|---|---|
| "*Board of Directors:* | *Preamble* |
| "*Certificate*" | *Preamble* |
| "*Articles of Incorporation*" | *Recitals* |
| "*Conversion*" | *Section 8(a)* |
| "*Conversion Date*" | *Section 8(b)* |
| "*Conversion Delivery Date*" | *Section 8(c)* |
| "*Conversion Notice*" | *Section 8(b)* |
| "*Conversion Shares*" | *Section 8(a)* |
| "*Deliverable Shares*" | *Section 10(b)* |
| "*Delivery Default*" | *Section 10(b)* |
| "*Delivery Default Date*" | *Section 10(b)* |
| "*Delivery Default Payments*" | *Section 10(b)* |
| "*Dividend Payment Date*" | *Section 2(b)* |
| "*Dividends*" | *Section 2(a)* |
| "*DTC*" | *Section 10(a)* |
| "*DWAC*" | *Section 10(a)* |
| "*Early Redemption*" | *Section 7(a)* |
| "*Early Redemption Date*" | *Section 7(a)* |

| | |
|---|---|
| "Early Redemption Notice" | Section 7(a) |
| "Early Redemption Price" | Section 7(b) |
| "Issue Date" | Section (a) |
| "Junior Stock" | Section (b) |
| "Liquidation Preference" | Section 4(a) |
| "Mandatory Redemption" | Section 6(a) |
| "Mandatory Redemption Date" | Section 6(c) |
| "Mandatory Redemption Event" | Section 6(a) |
| "Mandatory Redemption Notice" | Section 6(c) |
| "Mandatory Redemption Price" | Section 6(b) |
| "Maturity Date" | Section 3(a) |
| "Maturity Shares" | Section 3(b) |
| "Maturity Share Delivery Date" | Section 3(b) |
| "Transfer Agent" | Section 10(a) |

(e)    Usage. All definitions contained in this Certificate are equally applicable to the singular and plural forms of the terms defined. The words "hereof", "herein" and "hereunder" and words of similar import contained in this Certificate refer to this Certificate as a whole and not to any particular provision of this Certificate.

Section 2. Dividends.

(a)    Dividend Rate. Dividends (the "Dividends") shall accrue on the Stated Value of each Share at an annual rate equal to five percent (5%), computed on the basis of a 360-day year (consisting of 12 months of 30 days each) and calculated using the actual number of days elapsed since and including the date on which such Share was issued (the "Issue Date") or the date on which Dividends were most recently paid, as the case may be.

(b)    Dividend Payment Date. The Holder shall be entitled to receive Dividends in preference to the payment of dividends to any holders of the Company's common stock or any other class or series of preferred stock (collectively, the "Junior Stock"), the accrued and unpaid Dividends for each Share held by such Holder on the last Business Day of each fiscal quarter of the Company (each, a "Dividend Payment Date").

(c)    Payment of Dividend in Cash. The Company shall pay all Dividends in cash or other immediately available funds. On or before the fifth (5th) Business Day following a Dividend Payment Date, the Company must deliver to each Holder the Dividend payable to such Holder in cash or other immediately available funds.

Section 3. Maturity Date.

(a)    Payment at Maturity. All Shares shall mature on the earlier to occur of (i) the maturity date of the A&R Note and (ii) such date that the A&R Note is repaid in full (the "Maturity Date"). On the Maturity Date, the Company shall pay to the Holder the aggregate Liquidation Preference for such Holder's Shares in

accordance with this *Section 3.*

(b)     Payment in Shares of Common Stock. The Company shall pay the amount due on the Maturity Date in kind with shares of Common Stock. The number of shares of Common Stock to be issuable to a Holder on the Maturity Date (the *"Maturity Shares"*) shall be equal to the quotient of (x) the aggregate Liquidation Preference for such Holder's Shares on the Maturity Date *divided by* (y) the Conversion Price in effect as of the Maturity Date. On or before the third (3rd) Business Day following the Maturity Date (the *"Maturity Share Delivery Date"*), the Company must deliver to each Holder the Maturity Shares issuable to the Holder under this Section 3 in accordance with the provisions of Section 10, as applicable.

Section 4. Liquidation Preference.

(a)     Preference. In the event of any liquidation, dissolution or winding up of the Company, either voluntarily or involuntarily, each Holder shall be entitled to receive pari passu with the holders of the Company's Series C Preferred Stock and prior and in preference to any distribution of any of the assets or surplus funds of the Company to the holders of any Junior Stock, an amount (the *"Liquidation Preference"*) equal to (A) $1,000 per Share held by such Holder, *plus* (B) a further amount equal to any Dividends accrued but unpaid on such Shares.  If, upon such liquidation, dissolution or winding up of the Company, the assets of the Company available for distribution to the stockholders of the Company are insufficient to provide for the payment of the full aforesaid preferential amount, such assets as are so available shall be distributed to the Holders in proportion to the relative aggregate Liquidation Preferences of the Shares held by such Holders. The Liquidation Preference set forth in this *Section 4(a)* shall be appropriately adjusted for any stock splits, stock combinations, stock dividends or similar recapitalizations. Such Liquidation Preference shall be paid in lieu of any conversion into and distribution on any shares of Common Stock issuable upon conversion of the Series D Preferred Stock, unless the Holder elects to convert such Holder's shares of Series D Preferred Stock into Common Stock.

(b)     Noncash Distributions. If any of the assets of the Company are to be distributed other than in cash under this *Section 4*, then the Board of Directors shall promptly engage independent competent appraisers to determine the value of the assets to be distributed to the holders of Capital Stock. The Company shall, upon receipt of such appraiser's valuation, give prompt written notice to each holder of Capital Stock of the appraiser's valuation.

Section 5. Covenants and Agreements.

(a)     Certain Affirmative Covenants of the Company. The Company shall, and shall cause each Company Subsidiary to:

(i)     maintain its corporate existence in good standing;

(ii)     comply with all governmental requirements applicable to the operation of its business, except for instances of

noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii)   comply with all agreements, documents and instruments binding on it or affecting its properties and assets or business, including, without limitation, all material contracts to which the Company is a party, except for instances of noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iv)   provide each Holder with copies of all materials sent to its shareholders at the same time as such materials are delivered to such shareholders; and

(v)   maintain commercially reasonable insurance coverage (including D&O insurance) for each of the Company and Company Subsidiaries.

(b)   Certain Negative Covenants of the Company. The Company shall not, and shall cause each Company Subsidiary not to:

(i)   enter into any transaction or arrangement with any affiliate, employee, officer, director or shareholder of the Company or Company Subsidiary, unless such transaction is effectuated on an arms' length basis and approved by the directors of the Company or such Company Subsidiary, as the case may be;

(ii)   dispose of all or any part of its Property unless (i) such disposition is in the ordinary course of business and for fair market value, and (ii) such Property is not material to the Company's or any Company Subsidiary's business, operations or financial condition or performance; or

(iii)   consent to or implement any termination, amendment, modification, supplement or waiver of the certificate or articles of incorporation, articles of organization, bylaws, regulations or other constituent documents of the Company or any Company Subsidiary which could reasonably be expected to adversely affect the rights of any Holder hereunder.

Section 6. Mandatory Redemption.

(a)   Mandatory Redemption Event. Each Holder shall have the right, at its election, to require the Company to redeem all or any portion of the Shares held by such Holder (a "*Mandatory Redemption*") in exchange for cash or Common Stock upon the occurrence of any of the following events (each, a "*Mandatory Redemption Event*"):

(i)   any representation or warranty of the Company set forth in the Amendment was not true and correct in all material respects as of the date

when made;

      (ii)    the Company fails at any time to comply with or perform in all material respects all of the agreements, obligations, covenants and conditions set forth in Section 5 or any other provision of this Certificate that are required to be complied with or performed by it, and such failure is not cured within five (5) Business Days from the date on which a Holder delivers written notice thereof to the Company; or

      (iii)    a Change of Control.

    (b)    Mandatory Redemption Price. The cash amount payable upon a Mandatory Redemption Event (the *"Mandatory Redemption Price"*) shall be equal to the greater of (i) the aggregate Liquidation Preference for the Shares being redeemed as of the Mandatory Redemption Date and (ii) the aggregate Liquidation Preference for such Shares *divided by* the Conversion Price *multiplied by* the Market Price in effect on the Mandatory Redemption Date. The number of shares of Common Stock issuable upon a Mandatory Redemption Event shall be equal to the quotient of (x) the Mandatory Redemption Price *divided by* (y) the Conversion Price (the *"Mandatory Redemption Shares"*).

    (c)    Payment of Mandatory Redemption Price and Delivery of Mandatory Redemption Shares. The Company shall pay in cash the Mandatory Redemption Price or deliver the Mandatory Redemption Shares to the Holder exercising its right to redemption on or prior to the fifth (5th) Business Day following the date on which such Holder delivers written notice (the *"Mandatory Redemption Notice"*) to the Company demanding the redemption of such Holder's Shares pursuant to this *Section 6* and specifying the number of Shares to be redeemed (such fifth (5th) Business Day being referred to herein as the *"Mandatory Redemption Date"*). If the Company fails to pay the Mandatory Redemption Price or deliver the Mandatory Redemption Shares in accordance with the provisions of *Section 10* to a Holder on or before the Mandatory Redemption Date, such Holder shall be entitled to interest thereon, from and after the Mandatory Redemption Payment Date until the Mandatory Redemption Price has been paid in full, at an annual rate equal to the Default Interest Rate.

Section 7. Early Redemption.

    (a)    General. The Company shall have the right at any time on or after December 31, 2016 to redeem all but not less than all of the outstanding Shares in exchange for cash or shares of Common Stock (an *"Early Redemption"*). For the avoidance of doubt, the Company shall not have the right to redeem any Shares prior to January 1, 2017. In order to effectuate an Early Redemption, the Company must deliver written notice thereof to each Holder (an *"Early Redemption Notice"*), and such notice shall specify the date on which such early redemption shall be effectuated (the *"Early Redemption Date"*), *provided* that the Early Redemption Date must be at least sixty (60) days following the date on which the Early Redemption Notice has been delivered to all of the Holders. Notwithstanding the foregoing, if a Holder delivers a Mandatory Redemption Notice or Conversion Notice at any time prior to the Early Redemption Date,

then the provisions of this Certificate applicable to such Mandatory Redemption or Conversion, as applicable, including the Company's obligation to pay the amounts or deliver shares of Common Stock in connection with such Mandatory Redemption or Conversion, as applicable, shall apply and control.

(b) Early Redemption Price. The amount payable upon an Early Redemption (the "*Early Redemption Price*") shall be equal to 104% of the aggregate Liquidation Preference for the Shares being redeemed.

(c) Payment of Early Redemption Price. The Company shall pay in cash the Early Redemption Price to each Holder on the Early Redemption Date. If the Company fails to pay the Early Redemption Price on or before the Early Redemption Date, such Holder shall be entitled to interest thereon, from and after the Early Redemption Date until the Early Redemption Price has been paid in full, at an annual rate equal to the Default Interest Rate.

Section 8. Conversion. The Series D Preferred Stock shall be convertible into Common Stock as follows:

(a) Right to Convert; Number of Conversion Shares. Each Holder shall have the right to convert, at any time and from time to time, all or any part of the Shares held by such Holder into such number of fully paid and non-assessable shares (the "*Conversion Shares*") of Common Stock as is determined in accordance with the terms hereof (a "*Conversion*"). The number of Conversion Shares to be delivered by the Company pursuant to a Conversion shall be determined by dividing (i) the aggregate Liquidation Preference of the Shares to be converted by (ii) the Conversion Price in effect on the applicable Conversion Date.

(b) Conversion Notice. In order to convert Shares, a Holder shall send to the Company by facsimile transmission, at any time prior to 5:00p.m., New York City time, on the date on which such Holder wishes to effect such Conversion (the "*Conversion Date*"), a notice of conversion (a "*Conversion Notice*") stating the number of Shares to be converted, the amount of Dividends accrued (but remaining unpaid) thereon, and a calculation of the number of shares of Common Stock issuable upon such Conversion. Such Holder shall thereafter send the certificate or certificates representing the Shares being converted to the Company. The Company shall issue a new certificate for Shares to such Holder in the event that less than all of the Shares represented by a certificate are converted; provided, however, that the failure of the Company to deliver such new certificate shall not affect the right of such Holder to submit a further Conversion Notice with respect to such Shares and, in any such case, such Holder shall be deemed to have submitted the original of such new certificate at the time that it submits such further Conversion Notice. Except as otherwise provided herein, upon delivery of a Conversion Notice by a Holder in accordance with the terms hereof, such Holder shall, as of the applicable Conversion Date, be deemed for all purposes to be the record owner of the Common Stock to which such Conversion Notice relates. In the case of a dispute between the Company and a Holder as to the calculation of the Conversion Price or the number of Conversion Shares issuable upon a Conversion (including without limitation the calculation of any adjustment to the Conversion Price pursuant to *Section 9)*, the

Company shall issue to such Holder the number of Conversion Shares that are not disputed within the time periods specified in *Section 10* and shall submit the disputed calculations to its independent accountant within two (2) Business Days of receipt of such Holder's Conversion Notice. The Company shall cause such accountant to calculate the Conversion Price as provided herein and to notify the Company and such Holder of the results in writing no later than five (5) Business Days following the Company's receipt of such Holder's Conversion Notice. Such accountant's calculation shall be deemed conclusive absent manifest error. The fees of any such accountant shall be borne by the party whose calculations were most at variance with those of such accountant.

(c)     Delivery of Conversion Shares.  Upon receipt of a fax copy of a Conversion Notice from a Holder, the Company shall, no later than the close of business on the fifth (5th) Business Day following the Conversion Date set forth in such Conversion Notice (the *"Conversion Delivery Date"),* issue and deliver or caused to be delivered to such Holder the number of Conversion Shares determined pursuant to *Section 8(a); provided, however,* that any Conversion Shares that are the subject of the dispute procedure described in *Section 8(b)* shall be delivered no later than the close of business on the fifth (5th) Business Day following the determination made pursuant thereto. The Company must deliver to each Holder the Conversion Shares issuable to such Holder under this *Section 8* in accordance with the provisions of *Section 10.*

Section 9.     Adjustment of Conversion Price.  The Conversion Price of the Series D Preferred Stock shall be subject to adjustment from time to time as follows:

(a)     Stock Splits and Stock Dividends.  If the number of shares of Common Stock outstanding at any time after the date hereof is increased by (i) a stock dividend payable in (x) shares of Common Stock (other than dividends payable pursuant to the Series D Preferred Stock), or (y) options to purchase or rights to subscribe for Common Stock or other securities of the Company convertible into or exchangeable for Common Stock, or (ii) a subdivision or split-up of shares of Common Stock, then, on the date such payment is made or such change is effective, the Conversion Price shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of the Series D Preferred Stock shall be increased in proportion to such increase of outstanding shares.

(b)     Reverse Stock Splits and Stock Combinations.  If the number of shares of Common Stock outstanding at any time after the date hereof is decreased by a combination of the outstanding shares of Common Stock, then, on the effective date of such combination, the Conversion Price shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of the Series D Preferred Stock shall be decreased in proportion to such decrease in outstanding shares.

(c)     Distributions.  In case the Company shall declare a cash dividend upon its Common Stock or shall distribute to holders of its Common Stock shares of its capital stock (other than Common Stock), stock or other securities of other Persons, evidences of indebtedness issued by the Company or other Persons, assets (excluding cash dividends) or options or rights (excluding options to purchase and rights to subscribe for Common Stock or other securities of the Company convertible into or

exchangeable for Common Stock), then, in such case, each Holder shall, concurrently with the distribution to holders of Common Stock, receive a like distribution based upon the number of shares of Common Stock into which such Holder's Shares are then convertible at the Conversion Price in effect on the record date for such distribution.

(d)   Capital Reorganization. In case, at any time after the date hereof, of any capital reorganization, or any reclassification of the stock of the Company (other than a change in par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or the consolidation or merger of the Company with or into another Person (other than a consolidation or merger in which the Company is the continuing entity and which does not result in any change in the Common Stock), or of the sale or other disposition of all or substantially all of the properties and assets of the Company as an entirety to any other Person, the Shares shall, if such event is not deemed a liquidation for purposes of *Section 4*, after such reorganization, reclassification, consolidation, merger, sale or other disposition, be convertible into the kind and number of shares of stock or other securities or property of the Company or of the entity resulting from such consolidation or surviving such merger or to which such properties and assets shall have been sold or otherwise disposed to which such Holder would have been entitled if immediately prior to such reorganization, reclassification, consolidation, merger, sale or other disposition such Holder had converted its Shares into Common Stock.   The provisions of this *Section 9(d)* shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or other dispositions. The provisions of this *Section 9(d)* shall not affect the Holders right to effect a Mandatory Redemption if any of the transactions described in this *Section 9(d)* also constitute a Mandatory Redemption Event.

(e)   Minimal Adjustments. No adjustment in a Conversion Price need be made if such adjustment would result in a change in a Conversion Price of less than $0.01. Any adjustment of less than $0.01 which is not made shall be carried forward and shall be made at the time of and together with any subsequent adjustment which, on a cumulative basis, amounts to an adjustment of $0.01 or more in a Conversion Price. All calculations under this *Section 9* shall be made to the nearest cent or to the nearest one hundredth (1/100) of a share, as the case may be.

(f)   Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of a Conversion Price pursuant to this *Section 9*, the Company at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon written request at any time of any Holder, furnish or cause to be furnished to such Holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect for the Series D Preferred Stock held, and (iii) the number of shares of Common Stock and the amount if any, of other property which at the time would be received upon the conversion of the Series D Preferred Stock.

(g)   Notices of Record Date.  In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining

the holders thereof who are entitled to receive any dividend (other than a cash dividend) or other distribution, the Company shall mail to each Holder at least ten (10) Business Days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend or distribution.

Section 10.   Delivery of Shares.  The provisions of this *Section 10* shall apply to all deliveries of Maturity Shares, Mandatory Redemption Shares and Conversion Shares (collectively, the *"Deliverable Shares"*):

(a)   Method of Delivery.   The Company or its designated transfer agent (the *"Transfer Agent"*) shall effect all deliveries of Deliverable Shares required to be delivered to a Holder by issuing and delivering such Deliverable Shares to the Depository Trust Company (*"DTC"*) account on such Holder's behalf via the Deposit Withdrawal Agent Commission System (*"DWAC"*). Notwithstanding the foregoing, the delivery of any Deliverable Shares to the extent such Deliverable Shares are restricted and may not be delivered in accordance with the preceding sentence, and (iii) any other Deliverable Shares to the extent such Holder requests in writing, shall be effected by delivering to such Holder or its nominee physical certificates representing such Deliverable Shares no later than the close of business on the date on which such Deliverable Shares are due. Deliverable Shares delivered to a Holder shall not contain any restrictive legend as long as the resale of such Deliverable Shares (x) has been or will be made (as certified in writing by such Holder to the Company) pursuant to an effective registration statement, (y) has been made pursuant to Rule 144 under the Securities Act, or (z) may be made pursuant to Rule 144(k) under the Securities Act or any successor rule or provision.

(b)   Failure to Deliver.

(i)   In the event that, for any reason, a Holder has not timely received the number of Deliverable Shares required to be delivered to such Holder, or the Deliverable Shares so delivered contain a restrictive legend in spite of such Holder complying with the requirements described in *clause (x), (y) or (z)* of *Section 10(a)*, on or before the delivery date for such Deliverable Shares (a *"Delivery Default"*, and the date on which such delivery was required to be made, the *"Delivery Default Date"*), the Company shall pay to such Holder payments (*"Delivery Default Payments"*) in the amount of (A) (N/360) *multiplied by* (B) the applicable Delivery Default Amount *multiplied by* (C) the Default Interest Rate, where "N" equals the number of days elapsed between the date on which such Deliverable Shares were to be delivered (or date on which the restrictive legend was to be removed from such Deliverable Shares) and the date on which such Delivery Default has been cured. Amounts payable pursuant to the preceding sentence shall be paid to the Holder in immediately available funds on or before the second (2nd) Business Day following written notice from such Holder to the Company specifying the amount owed to it by the Company.

(ii)   In addition to any other remedies provided herein, each Holder shall have the right to pursue actual damages for the Company's

failure to issue and deliver Deliverable Shares on the applicable delivery date, including, without limitation, damages relating to any purchase of shares of Common Stock by or on behalf of such Holder in order to make delivery on a sale lawfully effected in anticipation of receiving Deliverable Shares, such damages to be in an amount equal to (A) the aggregate amount paid by such Holder for the shares of Common Stock so purchased *minus* (B) the aggregate amount received by such Holder upon the sale of such Deliverable Shares, and such Holder shall have the right to pursue all other remedies available to it at law or in equity (including, without limitation, a decree of specific performance and/or injunctive relief).

(c)  Fractional Shares. No fractional Deliverable Shares shall be issued upon conversion of the Series D Preferred Stock. In lieu of any fractional share to which a Holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by the Market Price determined as of the required delivery date in the case of a fractional share of Common Stock.

Section 11.  Reservation of Deliverable Shares. The Company shall at all times reserve and keep available out of its authorized but unissued shares of Series D Preferred Stock and shares of Common Stock solely for the purpose of effecting the delivery of the Deliverable Shares as shall from time to time be sufficient to effect all of the delivery requirements under this Certificate, and if at any time the number of authorized but unissued shares of Series D Preferred Stock or shares of Common Stock shall not be sufficient to effect any of the delivery requirements under this Certificate, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Series D Preferred Stock or shares of Common Stock, as the case may be, to such number of shares as shall be sufficient for such purpose.

Section 12.  Voting Rights; Protective Provisions; Waivers.

(a)  Voting Rights. Each Share shall have the same voting rights as the shares of Common Stock into which it may be converted determined in accordance with the Conversion Price then in effect. The Company shall provide each Holder with prior notification of each meeting of stockholders (and copies of proxy statements and other information sent to such stockholders) in the same manner as notification sent to holders of Common Stock.

(b)  Protective Provisions. So long as any Shares are outstanding, the Company shall not, without first obtaining the approval of the Holders of not less than two-thirds of the Shares then outstanding:

(i)  alter, change, modify or amend (x) the terms of the Series D Preferred Stock in any way or (y) the terms of any other capital stock of the Company so as to affect adversely the Series D Preferred Stock;

(iii)  create or issue any new class or series of capital stock,

or increase the authorized number of any existing class or series of capital stock, in either such case having a preference over or ranking *pari passu* with the Series D Preferred Stock as to redemption or distribution of assets upon a Liquidation Event or any other liquidation, dissolution or winding up of the Company;

(iv)   increase the authorized number of shares of Series D Preferred Stock;

(v)   re-issue any Shares which have been converted or redeemed in accordance with the terms hereof, or

(vi)   issue any Shares except pursuant to the terms of this Certificate.

In the event that (x) the Holders of not less than two-thirds of the Shares then outstanding agree to allow the Company to alter or change the rights, preferences or privileges of the Series D Preferred Stock pursuant to the terms hereof, no such change shall be effective to the extent that, by its terms, it applies to less than all of the Shares then outstanding.

(c)   Waivers. Any waiver or consent under this Certificate shall be in writing and be binding only upon the specific Person giving such waiver or consent and limited to the specific instance and purpose for which such waiver or consent was given.

Section 13.   Notices. Any notice required by the provisions of this Certificate to be given to a Holder shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to such Holder of record at such Holder's latest address appearing on the books of the Company or at such other address provided by such Holder to the Company in writing.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the Company has caused this Certificate to be executed by its President and attested to by its Secretary this 16th day of April, 2015.

CELSIUS HOLDINGS, INC.

By: _Gerry David_ Chief Executive Officer

ATTEST:

Name: _John Fieldly_
Title: Secretary to the Board of Directors



**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *Barbara K. Cegavske* | 20150172650-29 |
| Barbara K. Cegavske | Filing Date and Time |
| Secretary of State | 04/16/2015 9:35 AM |
| State of Nevada | Entity Number |
| | E0241042005-4 |

## Certificate of Amendment
(PURSUANT TO NRS 78.385 AND 78.390)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Amendment to Articles of Incorporation
### For Nevada Profit Corporations
**(Pursuant to NRS 78.385 and 78.390 - After Issuance of Stock)**

1. Name of corporation:

CELSIUS HOLDINGS, INC.

2. The articles have been amended as follows: (provide article numbers, if available)

To amend Article IV to increase the number of authorized shares of common stock issuable by the corporation from 50,000,000 to 75,000,000, par value $0.001 per share.

3. The vote by which the stockholders holding shares in the corporation entitling them to exercise at least a majority of the voting power, or such greater proportion of the voting power as may be required in the case of a vote by classes or series, or as may be required by the provisions of the articles of incorporation* have voted in favor of the amendment is:

4. Effective date and time of filing: (optional)    Date: 4/16/15    Time: 11:00 Am
(must not be later than 90 days after the certificate is filed)

5. Signature: (required)

X _____ CFO
Signature of Officer    John Fieldy cfu

*If any proposed amendment would alter or change any preference or any relative or other right given to any class or series of outstanding shares, then the amendment must be approved by the vote, in addition to the affirmative vote otherwise required, of the holders of shares representing a majority of the voting power of each class or series affected by the amendment regardless to limitations or restrictions on the voting power thereof.

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

This form must be accompanied by appropriate fees.                    Nevada Secretary of State Amend Profit-After
                                                                        Revised: 1-5-15



BARBARA K. CEGAVSKE
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *Barbara K. Cegavske* Barbara K. Cegavske Secretary of State State of Nevada | 20150172649-97 |
| | Filing Date and Time 04/16/2015 9:35 AM |
| | Entity Number E0241042005-4 |

## Amendment to
## Certificate of Designation
## After Issuance of Class or Series
(PURSUANT TO NRS 78.1955)

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Amendment to Certificate of Designation
### For Nevada Profit Corporations
(Pursuant to NRS 78.1955 - After Issuance of Class or Series)

1. Name of corporation:

CELSIUS HOLDINGS, INC.

2. Stockholder approval pursuant to statute has been obtained.

3. The class or series of stock being amended:

Series C Convertible Preferred Stock

4. By a resolution adopted by the board of directors, the certificate of designation is being amended as follows or the new class or series is:

To amend Section 1(a) to increase the number of authorized shares of Series C Convertible Preferred Stock issuable by the Company from 2,200 to 3,000.

5. Effective date of filing: (optional)

(must not be later than 90 days after the certificate is filed)

6. Signature: (required)

X _____
Signature of Officer    *John Fieldly CFO*

Filing Fee: $175.00

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State NRS Amend Designation - After
Revised: 1-5-15

EX-3.1 2 ea121965ex3-1_celsiushold.htm CERTIFICATE OF AMENDMENT TO ARTICLES OF INCORPORATION

Exhibit 3.1

| Filed in the Office of | Business Number E0241042005-4 |
|---|---|
|  Secretary of State State Of Nevada | Filing Number 20200643025 |
| | Filed On 05/05/2020 10:30:08 AM |
| | Number of Pages 4 |



BARBARA K. CEGAVSKE
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

## Profit Corporation:
## Certificate of Amendment (PURSUANT TO NRS 78.380 & 78.385/78.390)
## Certificate to Accompany Restated Articles or Amended and Restated Articles (PURSUANT TO NRS 78.403)
## Officer's Statement (PURSUANT TO NRS 80.030)

TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT

| | |
|---|---|
| **1. Entity Information:** | Name of entity as on file with the Nevada Secretary of State:<br><br>Celsius Holdings, Inc.<br><br>Entity or Nevada Business Identification Number (NVID):  NV20051151800 |
| **2. Restated or Amended and Restated Articles:**<br>(Select one)<br><br>(If amending and restating only, complete section 1,2 3, 5 and 6) | Certificate to Accompany Restated Articles or Amended and Restated Articles<br>   Restated Articles - No amendments; articles are restated only and are signed by an officer of the corporation who has been authorized to execute the certificate by resolution of the board of directors adopted on:<br>   The certificate correctly sets forth the text of the articles or certificate as amended to the date of the certificate.<br>   Amended and Restated Articles<br>* Restated or Amended and Restated Articles must be included with this filing type. |
| **3. Type of Amendment Filing Being Completed:**<br>(Select only one box)<br><br>(If amending, complete section 1, 3, 5 and 6.) | Certificate of Amendment to Articles of Incorporation  (Pursuant to NRS 78.380 - Before Issuance of Stock)<br>   The undersigned declare that they constitute at least two-thirds of the following:<br>      (Check only one box)      incorporators      board of directors<br>   The undersigned affirmatively declare that to the date of this certificate, no stock of the corporation has been issued<br><br>x  Certificate of Amendment to Articles of Incorporation (Pursuant to NRS 78.385 and 78.390 - After Issuance of Stock)<br>   The vote by which the stockholders holding shares in the corporation entitling them to exercise at least a majority of the voting power, or such greater proportion of the voting power as may be required in the case of a vote by classes or series, or as may be required by the provisions of the articles of incorporation* have voted in favor of the amendment is:   55.6%<br><br>Officer's Statement (foreign qualified entities only) -<br>   Name in home state, if using a modified name in Nevada:<br><br>   Jurisdiction of formation:<br><br>   Changes to takes the following effect:<br>      The entity name has been amended.            Dissolution<br>      The purpose of the entity has been amended.      Merger<br>      The authorized shares have been amended.      Conversion<br>      Other (specify changes)<br><br>* Officer's Statement must be submitted with either a certified copy of or a certificate evidencing the filing of any document, amendatory or otherwise, relating to the original articles in the place of the corporations creation. |

This form must be accompanied by appropriate fees.

Page 1 of 2
Revised: 1/1/2019



BARBARA K. CEGAVSKE
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

## Profit Corporation:
### Certificate of Amendment (PURSUANT TO NRS 78.380 & 78.385/78.390)
### Certificate to Accompany Restated Articles or Amended and Restated Articles (PURSUANT TO NRS 78.403)
### Officer's Statement (PURSUANT TO NRS 80.030)

| | |
|---|---|
| **4. Effective Date and Time:** (Optional) | Date:     Time:<br>(must not be later than 90 days after the certificate is filed) |
| **5. Information Being Changed:** (Domestic corporations only) | Changes to takes the following effect:<br><br>   The entity name has been amended.<br><br>   The registered agent has been changed. (attach Certificate of Acceptance from new registered agent)<br><br>   The purpose of the entity has been amended.<br><br>  x The authorized shares have been amended.<br><br>   The directors, managers or general partners have been amended.<br><br>   IRS tax language has been added.<br><br>   Articles have been added.<br><br>   Articles have been deleted.<br><br>   Other.<br><br>   The articles have been amended as follows: (provide article numbers, if available)<br><br>(see amendment to Article IV below)<br><br>(attach additional page(s) if necessary) |
| **6. Signature:** (Required) | X _____      Chief Executive Officer<br>Signature of Officer or Authorized Signer     Title<br><br>X _____<br>Signature of Officer or Authorized Signer     Title<br>*If any proposed amendment would alter or change any preference or any relative or other right given to any class or series of outstanding shares, then the amendment must be approved by the vote, in addition to the affirmative vote otherwise required, of the holders of shares representing a majority of the voting power of each class or series affected by the amendment regardless to limitations or restrictions on the voting power thereof. |

**Please include any required or optional information in space below:**
(attach additional page(s) if necessary)

Article IV is hereby amended to increase the number of authorized shares of common stock to 100,000,000, par value $0.001 per share.

This form must be accompanied by appropriate fees

Page 2 of 2
Revised 11/2019

EX-3.1 2 d176668dex31.htm EX-3.1

Exhibit 3.1

**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the Office of | Business Number E0241042005-4 |
| Barbara K Cegavske | Filing Number 20211507792 |
| Secretary of State State Of Nevada | Filed On 6/4/2021 10:22:00 AM |
| | Number of Pages 1 |

## Certificate, Amendment or Withdrawal of Designation

NRS 78.1955, 78.1955(6)

☐ Certificate of Designation
☐ Certificate of Amendment to Designation - Before Issuance of Class or Series
☐ Certificate of Amendment to Designation - After Issuance of Class or Series
☒ Certificate of Withdrawal of Certificate of Designation

TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT

| | |
|---|---|
| **1. Entity information:** | Name of entity: <br> Celsius Holdings, Inc. <br><br> Entity or Nevada Business Identification Number (NVID):  NV20051151800 |
| **2. Effective date and time:** | For Certificate of Designation or Amendment to Designation Only (Optional):  Date:        Time: <br> (must not be later than 90 days after the certificate is filed) |
| **3. Class or series of stock:** (Certificate of Designation only) | The class or series of stock being designated within this filing: |
| **4. Information for amendment of class or series of stock:** | The original class or series of stock being amended within this filing: |
| **5. Amendment of class or series of stock:** | ☐ Certificate of Amendment to Designation- Before Issuance of Class or Series <br> As of the date of this certificate no shares of the class or series of stock have been issued. <br><br> ☐ Certificate of Amendment to Designation- After Issuance of Class or Series <br> The amendment has been approved by the vote of stockholders holding shares in the corporation entitling them to exercise a majority of the voting power, or such greater proportion of the voting power as may be required by the articles of incorporation or the certificate of designation. |
| **6. Resolution:** Certificate of Designation and Amendment to Designation only) | By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes OR amends the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.* |
| **7. Withdrawal:** | Designation being Withdrawn:  Series A Convertible Preferred Stock   Date of Designation:  08/20/2008 <br><br> No shares of the class or series of stock being withdrawn are outstanding. <br><br> The resolution of the board of directors authorizing the withdrawal of the certificate of designation establishing the class or series of stock: * <br><br> RESOLVED, that the Board of Directors hereby approves the withdrawal of each Certificate of Designation and the cancellation of the authorization of each of the previously designated series of Preferred Stock; |
| **8. Signature:** (Required) | X _____   Date:   06/04/2021 <br>     Signature of Officer |

* Attach additional page(s) if necessary
This form must be accompanied by appropriate fees.

Page 1 of 1
Revised: 1/1/2019

EX-3.2 3 d176668dex32.htm EX-3.2

Exhibit 3.2

| | Filed in the Office of | Business Number E0241042005-4 |
|---|---|---|
| Barbara K. Cegavske | Filing Number 20211507725 |
| Secretary of State State Of Nevada | Filed On 6/4/2021 10:22:00 AM |
| | Number of Pages 1 |

**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

## Certificate, Amendment or Withdrawal of Designation

### NRS 78.1955, 78.1955(6)

☐ Certificate of Designation
☐ Certificate of Amendment to Designation - Before Issuance of Class or Series
☐ Certificate of Amendment to Designation - After Issuance of Class or Series
☒ Certificate of Withdrawal of Certificate of Designation

TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT

| 1. Entity information: | Name of entity: |
|---|---|
| | Celsius Holdings, Inc. |
| | Entity or Nevada Business Identification Number (NVID):  NV20051151800 |

| 2. Effective date and time: | For Certificate of Designation or Amendment to Designation Only (Optional): | Date: | Time: |
|---|---|---|---|
| | | (must not be later than 90 days after the certificate is filed) | |

| 3. Class or series of stock: (Certificate of Designation only) | The class or series of stock being designated within this filing: |
|---|---|

| 4. Information for amendment of class or series of stock: | The original class or series of stock being amended within this filing: |
|---|---|

| 5. Amendment of class or series of stock: | ☐ Certificate of Amendment to Designation- Before Issuance of Class or Series<br>   As of the date of this certificate no shares of the class or series of stock have been issued. |
|---|---|
| | ☐ Certificate of Amendment to Designation- After Issuance of Class or Series<br>   The amendment has been approved by the vote of stockholders holding shares in the corporation entitling them to exercise a majority of the voting power, or such greater proportion of the voting power as may be required by the articles of incorporation or the certificate of designation. |

| 6. Resolution: Certificate of Designation and Amendment to Designation only) | By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes OR amends the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.* |
|---|---|

| 7. Withdrawal: | Designation being Withdrawn: Series B Convertible Preferred Stock  Date of Designation: 12/22/2008 |
|---|---|
| | No shares of the class or series of stock being withdrawn are outstanding. |
| | The resolution of the board of directors authorizing the withdrawal of the certificate of designation establishing the class or series of stock: * |
| | RESOLVED, that the Board of Directors hereby approves the withdrawal of each Certificate of Designation and the cancellation of the authorization of each of the previously designated series of Preferred Stock; |

| 8. Signature: (Required) | X _____  Date: 06/04/2021 |
|---|---|
| | Signature of Officer |

* Attach additional page(s) if necessary
This form must be accompanied by appropriate fees.

Page 1 of 1
Revised: 1/1/2019

EX-3.3 4 d176668dex33.htm EX-3.3

Exhibit 3.3

| | Filed in the Office of | Business Number E0241042005-4 |
|---|---|---|
| **BARBARA K. CEGAVSKE** Secretary of State 202 North Carson Street Carson City, Nevada 89701-4201 (775) 684-5708 Website: www.nvsos.gov | *Barbara K Cegavske* Secretary of State State Of Nevada | Filing Number 20211507732 Filed On 6/4/2021 10:22:00 AM Number of Pages 1 |

## Certificate, Amendment or Withdrawal of Designation

### NRS 78.1955, 78.1955(6)

☐ Certificate of Designation
☐ Certificate of Amendment to Designation - Before Issuance of Class or Series
☐ Certificate of Amendment to Designation - After Issuance of Class or Series
☒ Certificate of Withdrawal of Certificate of Designation

TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT

| **1. Entity information:** | Name of entity: Celsius Holdings, Inc. |
|---|---|
| | Entity or Nevada Business Identification Number (NVID):  NV20051151800 |
| **2. Effective date and time:** | For Certificate of Designation or Amendment to Designation Only (Optional):   Date: _____   Time: _____ (must not be later than 90 days after the certificate is filed) |
| **3. Class or series of stock:** (Certificate of Designation only) | The class or series of stock being designated within this filing: |
| **4. Information for amendment of class or series of stock:** | The original class or series of stock being amended within this filing: |
| **5. Amendment of class or series of stock:** | ☐ Certificate of Amendment to Designation- Before Issuance of Class or Series  As of the date of this certificate no shares of the class or series of stock have been issued. |
| | ☐ Certificate of Amendment to Designation- After Issuance of Class or Series  The amendment has been approved by the vote of stockholders holding shares in the corporation entitling them to exercise a majority of the voting power, or such greater proportion of the voting power as may be required by the articles of incorporation or the certificate of designation. |
| **6. Resolution:** Certificate of Designation and Amendment to Designation only) | By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes OR amends the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.* |
| **7. Withdrawal:** | Designation being Withdrawn:  Series C Convertible Preferred Stock    Date of Designation:  01/15/2014 |
| | No shares of the class or series of stock being withdrawn are outstanding. |
| | The resolution of the board of directors authorizing the withdrawal of the certificate of designation establishing the class or series of stock: * |
| | RESOLVED, that the Board of Directors hereby approves the withdrawal of each Certificate of Designation and the cancellation of the authorization of each of the previously designated series of Preferred Stock; |
| **8. Signature:** (Required) | X _____   Date:  06/04/2021 Signature of Officer |

* Attach additional page(s) if necessary
This form must be accompanied by appropriate fees.

Page 1 of 1
Revised: 1/1/2019

EX-3.4 5 d176668dex34.htm EX-3.4

Exhibit 3.4

BARBARA K. CEGAVSKE
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the Office of | Business Number E0241042005-4 |
| | Filing Number 20211507743 |
| Secretary of State State Of Nevada | Filed On 6/4/2021 10:22:00 AM |
| | Number of Pages 1 |

## Certificate, Amendment or Withdrawal of Designation

### NRS 78.1955, 78.1955(6)

☐ Certificate of Designation
☐ Certificate of Amendment to Designation - Before Issuance of Class or Series
☐ Certificate of Amendment to Designation - After Issuance of Class or Series
☒ Certificate of Withdrawal of Certificate of Designation

TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT

| | |
|---|---|
| **1. Entity information:** | Name of entity:<br>Celsius Holdings, Inc.<br>Entity or Nevada Business Identification Number (NVID): NV20051151800 |
| **2. Effective date and time:** | For Certificate of Designation or Amendment to Designation Only (Optional): Date: _____ Time: _____<br>(must not be later than 90 days after the certificate is filed) |
| **3. Class or series of stock:** (Certificate of Designation only) | The class or series of stock being designated within this filing: |
| **4. Information for amendment of class or series of stock:** | The original class or series of stock being amended within this filing: |
| **5. Amendment of class or series of stock:** | ☐ Certificate of Amendment to Designation- Before Issuance of Class or Series<br>As of the date of this certificate no shares of the class or series of stock have been issued.<br>☐ Certificate of Amendment to Designation- After Issuance of Class or Series<br>The amendment has been approved by the vote of stockholders holding shares in the corporation entitling them to exercise a majority of the voting power, or such greater proportion of the voting power as may be required by the articles of incorporation or the certificate of designation. |
| **6. Resolution:** Certificate of Designation and Amendment to Designation only) | By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes OR amends the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.* |
| **7. Withdrawal:** | Designation being Withdrawn: Series D Convertible Preferred Stock   Date of Designation: 04/16/2015<br>No shares of the class or series of stock being withdrawn are outstanding.<br>The resolution of the board of directors authorizing the withdrawal of the certificate of designation establishing the class or series of stock: *<br>RESOLVED, that the Board of Directors hereby approves the withdrawal of each Certificate of Designation and the cancellation of the authorization of each of the previously designated series of Preferred Stock; |
| **8. Signature:** (Required) | X _____   Date: 06/04/2021<br>Signature of Officer |

* Attach additional page(s) if necessary
This form must be accompanied by appropriate fees.

Page 1 of 1
Revised: 1/1/2019

| | | Filed in the Office of | Business Number E0241042005-4 |
| --- | --- | --- | --- |
| | | *Barbara K. Cegavske* | Filing Number 20222520354 |
| | | Secretary of State State Of Nevada | Filed On 8/1/2022 8:00:00 AM |
| | | | Number of Pages 20 |



**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

# Certificate, Amendment or Withdrawal of Designation

### NRS 78.1955, 78.1955(6)

× Certificate of Designation

Certificate of Amendment to Designation - Before Issuance of Class or Series

Certificate of Amendment to Designation - After Issuance of Class or Series

Certificate of Withdrawal of Certificate of Designation

TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT

| | |
| --- | --- |
| **1. Entity information:** | Name of entity: <br><br> CELSIUS HOLDINGS, INC. <br><br> Entity or Nevada Business Identification Number (NVID):   E0241042005-4 |
| **2. Effective date and time:** | For Certificate of Designation or Amendment to Designation Only (Optional):   Date:        Time: <br> (must not be later than 90 days after the certificate is filed) |
| **3. Class or series of stock:** (Certificate of Designation only) | The class or series of stock being designated within this filing: <br><br> Series A Convertible Preferred Stock |
| **4. Information for amendment of class or series of stock:** | The original class or series of stock being amended within this filing: |
| **5. Amendment of class or series of stock:** | Certificate of Amendment to Designation- Before Issuance of Class or Series <br>   As of the date of this certificate no shares of the class or series of stock have been issued. <br><br> Certificate of Amendment to Designation- After Issuance of Class or Series <br>   The amendment has been approved by the vote of stockholders holding shares in the corporation entitling them to exercise a majority of the voting power, or such greater proportion of the voting power as may be required by the articles of incorporation or the certificate of designation. |
| **6. Resolution:** Certificate of Designation and Amendment to Designation only) | By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes OR amends the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.* <br><br> NOW THEREFORE, BE IT RESOLVED, that pursuant to the authority expressly vested in the Board... [see attached full text of designation] |
| **7. Withdrawal:** | Designation being Withdrawn:        Date of Designation: <br><br> No shares of the class or series of stock being withdrawn are outstanding. <br><br> The resolution of the board of directors authorizing the withdrawal of the certificate of designation establishing the class or series of stock: * |
| **8. Signature:** (Required) | X _____        Date:   August 1, 2022 <br>      Signature of Officer |

* Attach additional page(s) if necessary

This form must be accompanied by appropriate fees.

Page 1 of 1
Revised 1/1/2019

**CELSIUS HOLDINGS, INC.**

**CERTIFICATE OF DESIGNATION**

**OF**

**SERIES A CONVERTIBLE PREFERRED STOCK**

**WHEREAS**, in accordance with the applicable provisions of the Nevada Revised Statutes ("**NRS**") and pursuant to the authority under the Articles of Incorporation of the Corporation (as amended from time to time, the "**Articles of Incorporation**"), the Board of Directors (the "**Board**") of Celsius Holdings, Inc., a corporation duly organized and existing under the laws of the State of Nevada (the "**Corporation**") is authorized to issue from time to time shares of the Corporation's Preferred Stock, par value $0.001 per share (the "**Preferred Stock**"), in one or more series; and

**WHEREAS**, the Board has adopted a resolution establishing a series of Preferred Stock designated as the "Series A Convertible Preferred Stock" and approving the terms thereof as set forth in this Certificate of Designation for such Preferred Stock (this "**Certificate**").

**NOW THEREFORE, BE IT RESOLVED**, that pursuant to the authority expressly vested in the Board and in accordance with the provisions of the Articles of Incorporation and the NRS, the designation and amount of the Series A Convertible Preferred Stock, and the voting powers, designations, preferences, limitations, restrictions, and relative rights of the shares of Series A Convertible Preferred Stock, as well as the qualifications, limitations or restrictions thereof (in addition to any provisions set forth in the Articles of Incorporation that are applicable to the Preferred Stock of all classes and series) are as set forth in this Certificate.

**SERIES A CONVERTIBLE PREFERRED STOCK**

**Section 1. Definitions.** For the purposes hereof, the following terms shall have the following meanings:

"**10-Day VWAP**" per share of Common Stock, measured as of any date of determination, shall mean the arithmetic average of the VWAP per share of Common Stock for each of the ten consecutive Trading Days ending on, and including, the Trading Day immediately preceding such date of determination.

"**Accrued Dividend Amount**" shall have the meaning set forth in Section 3(c).

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such Person, as such terms are used in and construed under Rule 144 under the Securities Act; provided, however, the Corporation and its Subsidiaries shall not be deemed to be Affiliates of any Holder or any of its Affiliates.

"**Articles of Incorporation**" shall have the meaning set forth in the first WHEREAS clause.

"**Automatic Conversion**" shall have the meaning set forth in Section 6(b)(i).

"**Automatic Conversion Date**" shall mean the date an Automatic Conversion Event occurs.

"**Automatic Conversion Event**" shall have the meaning set forth in Section 6(b)(iii).

"**Automatic Conversion Notice**" shall have the meaning set forth in Section 6(b)(ii).

"**Board**" shall have the meaning set forth in the first WHEREAS clause.

"**Business Day**" shall mean any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"**Cash and PIK Dividend**" shall have the meaning set forth in Section 3(d).

"**Cash and PIK Dividend Aggregate Cash Amount**" shall mean, with respect to any Cash and PIK Dividend authorized and declared by the Board (or any duly authorized committee thereof), the aggregate amount of cash authorized and declared to be paid to the Holders in respect of all issued and outstanding shares of Series A Preferred Stock as of the Record Date for such Cash and PIK Dividend.

"**Cash and PIK Dividend Cash Settlement Amount**" shall mean, with respect to each share of Series A Preferred Stock, an amount equal to the quotient of (A) the Cash and PIK Dividend Aggregate Cash Amount, divided by (B) the aggregate number of shares of Series A Preferred Stock issued and outstanding as of the Record Date for the applicable Cash and PIK Dividend.

"**Certificate**" shall have the meaning set forth in the second WHEREAS clause.

"**Change of Control**" shall mean: (i) a sale or transfer, directly or indirectly, of all or substantially all of the assets of the Corporation in any transaction or series of related transactions (other than sales in the ordinary course of business); (ii) any merger, consolidation or reorganization of the Corporation with or into any other entity or entities as a result of which the holders of the Corporation's outstanding capital stock (on a fully-diluted basis) immediately prior to the merger, consolidation or reorganization no longer represent at least a majority of the voting power of the surviving or resulting corporation or other entity; or (iii) any sale or series of sales, directly or indirectly, beneficially or of record, of shares of the Corporation's capital stock by the holders thereof which results in any Person or group of Affiliated Persons owning capital stock holding more than 50% of the voting power of the Corporation.

"**Change of Control Notice**" shall have the meaning set forth in Section 8(d)(ii).

"**Change of Control Redemption**" shall have the meaning set forth in Section 8(d)(i).

"**Change of Control Redemption Date**" shall have the meaning set forth in Section 8(d)(ii).

"**Change of Control Redemption Price**" shall have the meaning set forth in Section 8(d)(i).

"**Close of Business**" shall mean 5:00 p.m., New York City time, on any Business Day.

"**Common Stock**" shall mean the Corporation's common stock, par value $0.001 per share, and stock of any other class of securities into which such securities may hereafter be reclassified or changed into.

"**Conversion Date**" shall mean any Automatic Conversion Date or Mandatory Conversion Date, as applicable.

"**Conversion Notice**" shall mean any Automatic Conversion Notice or Mandatory Conversion

2

Notice, as applicable.

"**Conversion Ratio**" for each share of Series A Preferred Stock with respect to any conversion pursuant to Section 6, shall mean the quotient of (a) the sum of (x) the Stated Value of such share of Series A Preferred Stock as of the applicable Conversion Date, plus (y) without duplication of all accrued and unpaid Dividends previously added to the Stated Value of such share of Series A Preferred Stock, all accrued and unpaid Dividends per share of Series A Preferred Stock through the applicable Conversion Date; *divided by* (b) the Conversion Price as of the Conversion Date.

"**Conversion Price**" shall mean $75.00, as adjusted in accordance with the terms and conditions of Section 7.

"**Convertible Securities**" shall mean any evidences of indebtedness, shares or other securities, in each case directly or indirectly convertible into or exchangeable for Common Stock, but excluding Options.

"**Corporation**" shall mean Celsius Holdings, Inc., a corporation organized and existing under the laws of the State of Nevada.

"**Corporation Optional Redemption**" shall have the meaning set forth in Section 8(a).

"**Corporation Optional Redemption Notice**" shall have the meaning set forth in Section 8(a).

"**Corporation Optional Redemption Right**" shall have the meaning set forth in Section 8(a).

"**Corporation Termination Event**" shall mean the date upon which the Distribution Agreement is terminated as a result of a valid termination by the Corporation in accordance with the terms of the Distribution Agreement.

"**Distribution Agreement**" shall mean that certain Distribution Agreement, effective as of August 1, 2022, by and between the Corporation and the Investor.

"**Dividend**" shall have the meaning set forth in Section 3(a).

"**Dividend Payment Date**" shall have the meaning set forth in Section 3(b).

"**Dividend Rate**" means, for a Regular Dividend Period for a share of Series A Preferred Stock, 5.00% per annum of the Stated Value of such share as of the Record Date for such dividend, as may be adjusted pursuant to Section 8(c)(iv).

"**Exchange Property**" shall have the meaning set forth in Section 7(b).

"**Holder**" shall mean any holder of Series A Preferred Stock.

"**Holder Optional Redemption**" shall have the meaning set forth in Section 8(b).

"**Holder Optional Redemption Notice**" shall have the meaning set forth in Section 8(b).

"**Holder Optional Redemption Right**" shall have the meaning set forth in Section 8(b).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

3

"**Investor**" shall mean the initial purchaser of the Series A Preferred Stock.

"**Investor Termination Event**" shall mean the date upon which the Distribution Agreement is terminated as a result of a valid termination by Investor in accordance with the terms of the Distribution Agreement.

"**Issuance Date**" shall mean August 1, 2022.

"**Junior Stock**" shall have the meaning set forth in Section 5(a).

"**Liquidation Event**" shall have the meaning set forth in Section 5(b).

"**Liquidation Preference**" shall have the meaning set forth in Section 5(b).

"**Majority Holders**" shall have the meaning set forth in Section 4(b).

"**Mandatory Conversion**" shall have the meaning set forth in Section 6(a)(i).

"**Mandatory Conversion Date**" shall have the meaning set forth in Section 6(a)(ii).

"**Mandatory Conversion Notice**" shall have the meaning set forth in Section 6(a)(ii).

"**NRS**" has the meaning set forth in the first WHEREAS clause hereof.

"**Option**" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

"**Parity Stock**" shall have the meaning set forth in Section 5(a).

"**Participating Dividend**" shall have the meaning set forth in Section 3(a).

"**Participating Dividend Payment Date**" shall have the meaning set forth in Section 3(b).

"**Person**" shall mean any individual, partnership, corporation, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"**PIK Dividend**" shall have the meaning set forth in Section 3(c).

"**Preferred Stock**" shall have the meaning set forth in the first WHEREAS clause.

"**Record Date**" shall mean, with respect to any dividend, distribution or other transaction or event in which the holders of shares of Common Stock or shares of Series A Preferred Stock, as applicable, have the right to receive any cash, securities or other property or in which the shares of Common Stock or shares of Series A Preferred Stock (or other applicable security), as applicable, is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of shareholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board or a committee thereof, or by statute, contract, this Certificate of Designation or otherwise).

"**Redemption Date**" shall have the meaning set forth in Section 8(c)(i).

"**Redemption Notice**" shall have the meaning set forth in Section 8(c)(ii).

4

"**Redemption Price**" shall mean a price per share of Series A Preferred Stock equal to the sum of (i) the Stated Value of such share of Series A Preferred Stock as of the applicable Redemption Date, plus (ii) without duplication of all accrued and unpaid Dividends previously added to the Stated Value of such share of Series A Preferred Stock, all accrued and unpaid Dividends per share of Series A Preferred Stock through such Redemption Date.

"**Regular Dividend**" shall have the meaning set forth in Section 3(a).

"**Regular Dividend Payment Date**" shall have the meaning set forth in Section 3(b).

"**Regular Dividend Period**" shall have the meaning set forth in Section 3(b).

"**Required Approval**" shall have the meaning set forth in Section 6(c)(iv).

"**Redemption Notice**" shall have the meaning set forth in Section 8(c)(ii).

"**Related Person**" shall have the meaning given to such term in Item 404(a) of Regulation S-K as promulgated under the Securities Act ("**Item 404**").

"**Related Person Transaction**" means any transaction for which disclosure is required under the terms of Item 404 involving the Corporation and any Related Person.

"**Reorganization Event**" shall have the meaning set forth in Section 7(b)(iii).

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securities Purchase Agreement**" shall mean that certain Securities Purchase Agreement, effective as of August 1, 2022, by and between the Corporation and Investor.

"**Senior Stock**" shall have the meaning set forth in Section 5(a).

"**Series A Preferred Stock**" shall have the meaning set forth in Section 2(a).

"**Series A Preferred Stock Register**" shall have the meaning set forth in Section 2(b).

"**Seventh Anniversary Date**" shall mean August 1, 2029.

"**Share Delivery Date**" shall have the meaning set forth in Section 6(c)(i).

"**Sixth Anniversary Date**" shall mean August 1, 2028.

"**Stated Value**" shall mean $375.00 per share of Series A Preferred Stock, as shall be increased from time to time for any PIK Dividends.

"**Subject Action**" shall have the meaning set forth in Section 9(a).

"**Subsidiary**" shall mean, with respect to any Person, (a) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of the equity entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or shareholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other

5

business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (b) any partnership or limited liability company where (i) more than 50% of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability company are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person, whether in the form of membership, general, special or limited partnership or limited liability company interests or otherwise; and (ii) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"**Tenth Anniversary Date**" shall mean August 1, 2032.

"**Thirteenth Anniversary Date**" shall mean August 1, 2035.

"**Trading Day**" shall mean a day on which the Common Stock is traded for any period on the principal securities exchange or if the Common Stock is not traded on a principal securities exchange, on a day that the Common Stock is traded on another securities market on which the Common Stock is then being traded.

"**Triggering Condition**" shall have the meaning set forth in the Distribution Agreement.

"**VWAP**" per share of Common Stock on any Trading Day means the per share volume-weighted average price as displayed under the heading VWAP with Bloomberg Definition calculation method (or, if Bloomberg ceases to publish such price, any successor service reasonably chosen by the Corporation) in respect of the period from the open of trading on the relevant Trading Day until the close of trading on such Trading Day (or if such volume-weighted average price is unavailable, the market price of one share of Common Stock on such Trading Day determined, using a volume-weighted average method, by a nationally recognized independent investment banking firm selected by the Corporation in good faith).

### Section 2. Designation, Amount and Par Value; Assignment

(a)     The series of the Corporation's preferred stock designated by this Certificate of Designation shall be designated as Series A Convertible Preferred Stock (the "**Series A Preferred Stock**") and the number of shares so designated shall be One Million Four Hundred Sixty-Six Thousand Six Hundred Sixty Six (1,466,666). Each share of Series A Preferred Stock shall have a par value of $0.001 per share. The Series A Preferred Stock may be issued in certificated form or in uncertificated book-entry form at the election of the Holder. To the extent that any shares of Series A Preferred Stock are issued in uncertificated book-entry form, references herein to "certificates" shall instead refer to the book-entry notation relating to such shares.

(b)     The Corporation shall register shares of the Series A Preferred Stock, upon records to be maintained by the Corporation for that purpose (the "**Series A Preferred Stock Register**"), in the name of the Holders thereof from time to time. The Corporation may deem and treat the registered Holder of shares of Series A Preferred Stock as the absolute owner thereof for the purpose of any conversion thereof and for all other purposes. The Corporation shall register the transfer of any shares of Series A Preferred Stock in the Series A Preferred Stock Register, upon surrender of the certificates, if any, evidencing such shares to be transferred, duly endorsed by the Holder thereof, to the Corporation at its address specified herein. Upon any such registration or transfer of certificated shares of Series A Preferred Stock, a new certificate evidencing the shares of Series A Preferred Stock so transferred shall be issued to the transferee and a new certificate evidencing the remaining portion of the shares not so transferred, if any, shall be issued to the transferring Holder, in each case, within three Business Days. The provisions of this Certificate of Designation are intended to be for the benefit of all Holders from time to time and shall be

6

enforceable by any such Holder.

**Section 3. Dividends**

(a)      Each share of Series A Preferred Stock shall be entitled to receive, in the manner set forth in this Section 3, (i) cumulative dividends in an amount equal to the Dividend Rate (each such dividend on the Series A Preferred Stock, a "**Regular Dividend**" and, collectively, the "**Regular Dividends**"), and (ii) on an as-converted basis, current payments of any dividend or other distribution (other than a distribution upon a Liquidation Event), whether paid in cash, in-kind or in other property (including, for the avoidance of doubt, any securities other than any dividends on shares of Common Stock payable in shares of Common Stock), authorized and declared by the Board on the issued and outstanding shares of Common Stock in an amount determined by assuming that a number of shares of Common Stock equal to the Conversion Ratio in effect on the applicable Record Date for such dividend or distribution (other than a distribution upon a Liquidation Event) were issued to, and held by, the Holder of such share of Series A Preferred Stock on such Record Date (each such dividend on the Series A Preferred Stock pursuant to this clause (ii), a "**Participating Dividend**" and, collectively, the "**Participating Dividends**" and, together with the Regular Dividends, the "**Dividends**").

(b)      Regular Dividends shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year (unless any such day is not a Business Day, in which event such Regular Dividends shall be payable on the next succeeding Business Day, without accrual of interest thereon to the actual payment date), commencing on September 30, 2022 (each such payment date, a "**Regular Dividend Payment Date**," and the period from, and including, the Issuance Date to, and including, the first Regular Dividend Payment Date and each such quarterly period thereafter from, but excluding, the immediately preceding Regular Dividend Payment Date to, and including, the next occurring Regular Dividend Payment Date, a "**Regular Dividend Period**"). The amount of Regular Dividends payable in respect of each share of Series A Preferred Stock for any period shall be computed on the basis of a 365-day year and actual days elapsed (i.e., the daily accrual rate shall be determined by dividing the Dividend Rate by 365). Regular Dividends shall be cumulative and shall begin to accrue on a daily basis from the Issuance Date whether or not declared and whether or not the Corporation has assets legally available to make payment thereof, at a rate equal to the applicable Dividend Rate, regardless of whether or not in any Regular Dividend Period there are funds of the Corporation legally available for the payment of such Regular Dividend. The Corporation may, in its sole discretion and notwithstanding anything to the contrary in this Certificate of Designation, settle such Regular Dividend in cash out of funds legally available therefor, in-kind pursuant to the terms and conditions of Section 3(c), or a combination of cash and in-kind settlement pursuant to the terms and conditions of Section 3(d), and the Corporation shall set aside sufficient funds for the portion of any Regular Dividend to be paid in whole or in part in cash before the Board or any other authorized Person may declare, set apart funds for or pay any dividend on the Junior Stock. Participating Dividends shall be payable as and when paid to the holders of shares of Common Stock (each such date, a "**Participating Dividend Payment Date**" and, together with a Regular Dividend Payment Date, a "**Dividend Payment Date**").

(c)      With respect to each share of Series A Preferred Stock, any Regular Dividend or portion thereof in respect of such share of Series A Preferred Stock that has accrued during any applicable Regular Dividend Period but is not paid (in whole or in part) in cash on the applicable Regular Dividend Payment Date (the amount of any accrued and unpaid Regular Dividend with respect to any share of Series A Preferred Stock for any Regular Dividend Period, regardless of whether such Regular Dividend is paid in cash or kind, the "**Accrued Dividend Amount**" with respect to such share of Series A Preferred Stock for such Regular Dividend Period) shall, regardless of whether or not such Regular Dividend is authorized and declared by the Board, or whether the Corporation has assets legally available to make payment thereof, be added to the Stated Value of such share of Series A Preferred Stock immediately

7

following the Close of Business on such Regular Dividend Payment Date. Any such addition of the Accrued Dividend Amount in respect of a share of Series A Preferred Stock to the Stated Value of such share of Series A Preferred Stock pursuant to this Section 3(c) is referred to herein as a "**PIK Dividend**." The Accrued Dividend Amount in respect of any Regular Dividend Period that is not paid (in whole or in part) in cash shall, without duplication of any prior PIK Dividends (if any) only be added to the Stated Value of such share of Series A Preferred Stock once. Regular Dividends with respect to each share of Series A Preferred Stock shall continue, from and after the date of each PIK Dividend, if any, to accrue in an amount per annum equal to the Dividend Rate (as such amount per annum may be adjusted pursuant to the terms and conditions hereof) of the Stated Value of such share of Series A Preferred Stock as of the relevant Record Date.

(d)      In the event that the Board has elected to effect the settlement of a Regular Dividend payment in part by payment of cash to each Holder of shares of Series A Preferred Stock and in part pursuant to a PIK Dividend (any such Regular Dividend, a "**Cash and PIK Dividend**"), the Corporation shall, on the applicable Regular Dividend Payment Date and in respect of each share of Series A Preferred Stock, (i) pay to the Holder thereof an amount of cash equal to the Cash and PIK Dividend Cash Settlement Amount in respect of such share of Series A Preferred Stock, and (ii) add to the Stated Value of such share of Series A Preferred Stock an amount equal to (A) the Accrued Dividend Amount with respect to such share of Series A Preferred Stock for the Regular Dividend Period ending on, and including, such Regular Dividend Payment Date, minus (B) the Cash and PIK Dividend Cash Settlement Amount in respect of such share of Series A Preferred Stock. If the Board declares a Cash and PIK Dividend, and any portion of the cash payment of such Cash and PIK Dividend per share of Series A Preferred Stock is not paid pursuant to the terms of this Section 3, then such portion shall be added to the Stated Value of such share of Series A Preferred Stock in accordance with the terms of this Section 3(d).

(e)      In the event that the Board has authorized and declared the payment of a Participating Dividend, such Participating Dividend shall be paid in a manner consistent with the payments of dividends on the shares of Common Stock. The Corporation will not declare any dividend or distribution (other than a distribution upon a Liquidation Event) on the Common Stock unless, concurrently therewith, the Corporation declares a corresponding Participating Dividend in accordance with Section 3(a).

(f)      Except as otherwise provided herein, if at any time the Corporation pays, in cash, less than the total amount of Dividends then accrued, but unpaid, with respect to the shares of Series A Preferred Stock, such cash payment shall be distributed pro rata among the Holders thereof based upon the Stated Value of all shares of Series A Preferred Stock held by each such Holder as of the Record Date for such payment. When Dividends are not paid in full upon the Series A Preferred Stock, all dividends on Series A Preferred Stock and any other class or series of Parity Stock shall be paid pro rata so that the amount of dividends on the shares of Series A Preferred Stock and each such other class or series of Parity Stock shall in all cases bear to each other the same ratio as accrued, but unpaid, Dividends (for the full amount of dividends that would be payable for the most recently completed Regular Dividend Period if dividends were declared in full on non-cumulative Parity Stock) on the Series A Preferred Stock and such other class or series of Parity Stock bear to each other.

(g)      Within one Business Day of the Record Date for any Regular Dividend, the Corporation will send written notice to each Holder of shares of Series A Preferred Stock stating (i) whether such Regular Dividend will be paid in cash or in kind pursuant to Section 3(c), or pursuant to a Cash and PIK Dividend pursuant to Section 3(d), and (ii) if such Regular Dividend will be paid, at least in part, in kind pursuant to Section 3(c) or pursuant to a Cash and PIK Dividend pursuant to Section 3(d), the Stated Value of each share of Series A Preferred Stock immediately before and immediately after the applicable increase.

8

**Section 4. Voting Rights**

(a)    Except as otherwise provided herein or as otherwise required by the NRS, the Series A Preferred Stock shall have no voting rights.

(b)    As long as any shares of Series A Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote of the Holders of a majority of the then outstanding shares of the Series A Preferred Stock ("**Majority Holders**"):

(i)    alter or change adversely the powers, preferences or rights given to the Series A Preferred Stock or alter or amend this Certificate of Designation, amend or repeal any provision of, or add any provision to, the Articles of Incorporation or the bylaws of the Corporation, if such action would adversely alter or change the preferences, rights, privileges or powers of, or restrictions provided for the benefit of the Series A Preferred Stock, regardless of whether any of the foregoing actions shall be by means of amendment to or other alteration of the Articles of Incorporation (including, without limitation, by way of filing a certificate of amendment or certificate of correction or by way of filing a certificate of designation with respect to any class or series of the Corporation's capital stock, or any amendment or correction to such certificate of designation) or by merger, consolidation or otherwise;

(ii)    increase or decrease (other than by conversion) the number of authorized shares of Series A Preferred Stock;

(iii)    authorize, create, issue or reclassify securities (or securities that are convertible into or exercisable for such securities) that would be Parity Stock or Senior Stock; or

(iv)    enter into any agreement with respect to any of the foregoing.

(c)    As long as any share of Series A Preferred Stock remains issued and outstanding, any action required or permitted to be taken by the Holders of shares of Series A Preferred Stock may be effected without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Majority Holders and shall be delivered to the Corporation by delivery to its registered office in the State of Nevada, its principal place of business, or an officer or agent of the Corporation having custody of the books in which proceedings of meetings of holders of any other class or series of capital stock of the Corporation are recorded.

(d)    During such time or times as any Holder of Series A Preferred Stock is entitled to nominate for election a director and such seat is filled (a "**Preferred Director**"), the Corporation shall not, without approval of the Board (which such approval must include the affirmative approval of such Preferred Director), enter into any Related Person Transaction other than on an arms' length basis (as determined in the reasonable discretion of the Board).

**Section 5. Rank; Liquidation**

(a)    The Series A Preferred Stock shall, with respect to dividend rights and rights upon a Liquidation Event, rank: (i) senior to all of the Common Stock; (ii) senior to any class or series of capital stock of the Corporation hereafter created specifically ranking by its terms junior to any Series A Preferred Stock (any such junior class, together with the Common Stock, "**Junior Stock**"); (iii) on parity with any class or series of capital stock of the Corporation hereafter created specifically ranking by its terms on parity with the Series A Preferred Stock (the "**Parity Stock**"); and (iv) junior to any class or series of capital stock of the Corporation hereafter created specifically ranking by its terms senior to any

9

Series A Preferred Stock ("**Senior Stock**").

(b)     Upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation (but excluding any Change of Control) (each, a "**Liquidation Event**"), after satisfaction of all liabilities and obligations to creditors of the Corporation, subject to the rights of any class or series of Senior Stock and before any distribution or payment shall be made to any holder of any Junior Stock, and subject to Section 5(d), each Holder shall be entitled to receive, out of the assets of the Corporation or proceeds thereof (whether capital or surplus) legally available therefor, an amount per share of Series A Preferred Stock equal to the greater of (i) the sum of (1) the Stated Value of such share of Series A Preferred Stock as of the applicable as of the date of the liquidating payment, plus (2) without duplication of all accrued and unpaid Dividends previously added to the Stated Value of such share of Series A Preferred Stock, all accrued and unpaid Dividends per share of Series A Preferred Stock through the date of the liquidating payment; and (ii) the amount that such Holder would have received had each share of Series A Preferred Stock held by such Holder, as of the commencement of such Liquidation Event, converted into a number of shares of Common Stock equal to the then-applicable Conversion Ratio (such greater amount, the "**Liquidation Preference**").

(c)     No Holder shall (i) be entitled to any payment in respect of its shares of Series A Preferred Stock in the event of any Liquidation Event other than payment of the Liquidation Preference expressly provided for in Section 5(b), or (ii) have any further right or claim to any of the Corporation's remaining assets, including any right or claim to participate in the receipt of any payment on Junior Stock in connection therewith (except as provided in Section 5(b)(ii)).

(d)     If, in connection with any liquidating distribution pursuant to Section 5(b), the assets of the Corporation or proceeds thereof are not sufficient to pay in full the applicable Liquidation Preference payable on the shares of Series A Preferred Stock and the corresponding liquidating distributions payable on the shares of Parity Stock, if any, then such assets, or the proceeds thereof, shall be paid pro rata in accordance with the full respective aggregate liquidating distributions that would be payable on all such shares if all amounts payable thereon were paid in full.

**Section 6. Conversion**

(a)     Conversion at the Option of the Corporation.

(i)     At any time from and after the Seventh Anniversary Date, provided the 10-Day VWAP immediately prior to the date the Corporation delivers a Mandatory Conversion Notice to the Holders exceeds the Conversion Price, the Corporation may elect to convert (a "**Mandatory Conversion**") all, but not less than all, of the outstanding shares of Series A Preferred Stock into shares of Common Stock. In the case of a Mandatory Conversion, each share of Series A Preferred Stock then outstanding shall be converted into the number of shares of Common Stock equal to the Conversion Ratio of such share in effect as of the Mandatory Conversion Date.

(ii)     If the Corporation elects to effect a Mandatory Conversion, the Corporation shall provide notice thereof to each Holder (such notice, a "**Mandatory Conversion Notice**") and the Holder Optional Redemption Right with respect to such shares shall terminate. The Mandatory Conversion Notice shall state: (A) the date selected by the Corporation for the Mandatory Conversion to become effective, which shall be at least 5 Business Days and not more than 15 Business Days after the date on which the Corporation provides the Mandatory Conversion Notice to each such Holder (the "**Mandatory Conversion Date**"); (B) the applicable Conversion Price and Conversion Ratio as in effect on the date of the Mandatory Conversion Notice; and (C) the number of shares of Common Stock to be issued (and the amount of cash to be paid in lieu of any

10

fractional share) to such Holder upon conversion of the shares of Series A Preferred Stock held by such Holder, calculated in accordance with the Conversion Price and Conversion Ratio referred to in the immediately preceding clause (B).

(b)      Automatic Conversion.

(i)      Each share of Series A Preferred Stock shall automatically convert (an "**Automatic Conversion**") into shares of Common Stock upon the occurrence of an Automatic Conversion Event and the Holder Optional Redemption Right shall terminate.  In the case of an Automatic Conversion, each share of Series A Preferred Stock then outstanding shall be converted into the number of shares of Common Stock equal to the Conversion Ratio of such share in effect as of the Automatic Conversion Date.

(ii)      If an Automatic Conversion Event occurs, the Corporation shall promptly, and in any event within 10 Business Days of such Automatic Conversion Event, provide notice of such Automatic Conversion to each Holder (such notice, a "**Automatic Conversion Notice**").  The Automatic Conversion Notice shall state: (A) the Automatic Conversion Date; (B) a description in reasonable detail of the Automatic Conversion Event, with such supporting information as the Holder may reasonably request; (C) the applicable Conversion Price and Conversion Ratio as in effect on the Automatic Conversion Date; and (D) the number of shares of Common Stock to be issued (and the amount of cash to be paid in lieu of any fractional share) to such Holder upon conversion of the shares of Series A Preferred Stock held by such Holder, calculated in accordance with the Conversion Price and Conversion Ratio referred to in the immediately preceding clause (C).

(iii)      Each of the following shall be an "**Automatic Conversion Event**" with respect to any share of Series A Preferred Stock:

A.  Any date from and after the Sixth Anniversary Date on which (x) the Triggering Condition is satisfied in accordance with the Distribution Agreement and (y) the 10-Day VWAP immediately prior to such date exceeds the Conversion Price of such share as of such date; and

B.  Any date from and after the occurrence of a Corporation Termination Event, if the 10-Day VWAP immediately preceding such date exceeds the Conversion Price of such share as of such date.

C.  Any date from and after the occurrence of an Investor Termination Event, if the 10-Day VWAP immediately preceding such date exceeds the Conversion Price of such share as of such date.

(c)      Mechanics of Conversion.

(i)      Record Holder; Delivery. The Holder entitled to receive shares of Common Stock issuable upon conversion of Series A Preferred Stock shall be treated for all purposes as the record holder(s) of such Common Stock as of the Close of Business on the Conversion Date for such conversion.  As promptly as practicable on or after the Conversion Date (and in no event later than three Trading Days thereafter) (the "**Share Delivery Date**"), the Corporation shall issue the number of whole shares of Common Stock issuable upon conversion (and deliver payment of cash in lieu of fractional shares in accordance with Section 6(c)(iii)).  Such shares of Common Stock shall be issued, at the option of the applicable Holder, in certificated or uncertificated form.  Any such certificate or certificates, if applicable,

11

shall be delivered by the Corporation to the appropriate Holder(s) by mailing certificates evidencing the shares to such Holder(s) at their respective addresses as set forth in the applicable conversion notice. Any such uncertificated shares of Common Stock, if applicable, shall be registered in the name and delivered to the Depository Trust Company or other applicable account directed by the applicable Holder. If fewer than all of the certificated shares of Series A Preferred Stock held by any Holder are converted pursuant to this Section 6, then a new certificate representing the unconverted certificated shares of Series A Preferred Stock shall be issued to such Holder representing such unconverted certificated shares. In all cases, the Holder shall retain all of its rights and remedies for the Corporation's failure to convert Series A Preferred Stock.

(ii)    Reservation of Shares Issuable Upon Conversion. The Corporation covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock for the sole purpose of issuance upon conversion of the Series A Preferred Stock, free from preemptive rights or any other actual contingent purchase rights of Persons other than the Holders of the Series A Preferred Stock, not less than such aggregate number of shares of the Common Stock as shall be issuable (taking into account the adjustments of Section 7) upon the conversion of all outstanding shares of Series A Preferred Stock. The Corporation covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly authorized, validly issued, fully paid and nonassessable.

(iii)    Fractional Shares. Notwithstanding anything herein to the contrary, the Corporation shall not issue any fractional share of Common Stock upon conversion, as applicable, of any share of Series A Preferred Stock. In lieu of fractional shares otherwise issuable, Holders of shares of Series A Preferred Stock will be entitled to receive an amount in cash equal to the product of (i) such fraction of a share of Common Stock, *multiplied by* (ii) the 10-Day VWAP, measured as of the applicable Conversion Date. The Corporation shall pay such cash to the applicable Holder on the applicable Share Delivery Date.

(iv)    Regulatory Approvals. Notwithstanding anything herein to the contrary, if any Mandatory Conversion or Automatic Conversion would require any consent, waiver, authorization or order of, or any notice provided to or filing or registration made with, any Governmental Entity (as defined in the Purchase Agreement) or the shareholders of the Corporation (a "**Required Approval**"), including pursuant to the HSR Act, the Corporation and the Majority Holders shall use reasonable best efforts to obtain such Required Approval as promptly as practical, and such Automatic Conversion or Mandatory Conversion shall not be effected until such Required Approval is obtained. If the Corporation and the Majority Holders determine in good faith that such Required Approval is not reasonably likely to be obtained, the Corporation shall take all action necessary to effect such conversion into Common Stock that is non-voting (but otherwise having identical rights as the existing Common Stock). For avoidance of doubt, the Holders shall retain all rights in respect of their Series A Preferred Stock (including with respect to Dividends) until such Required Approval is obtained.

(d)    Transfer Restriction. With respect to any Mandatory Conversion or Automatic Conversion of Series A Preferred Stock held by Investor, in addition to any transfer restrictions which may otherwise apply to such shares of Common Stock, Investor shall not transfer or otherwise dispose of the shares of Common Stock received by Investor in such Mandatory Conversion or Automatic Conversion for a period of 35 calendar days after the receipt of the Common Stock in the Mandatory Conversion or Automatic Conversion.

**Section 7. Certain Adjustments**

(a)    Stock Dividends and Stock Splits.

12

(i)     If the Corporation at any time after the Issuance Date: (i) pays a stock dividend or otherwise makes a distribution or distributions payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Corporation upon conversion of this Series A Preferred Stock) with respect to the then-outstanding shares of Common Stock; (ii) subdivides outstanding shares of Common Stock into a larger number of shares; or (iii) combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares, then the Conversion Ratio shall be divided by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Corporation) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event (excluding any treasury shares of the Corporation). Any adjustment made pursuant to this Section 7(a) shall become effective immediately after the Record Date for the determination of shareholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision or combination. All calculations under this Section 7 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be.

(ii)    Whenever the Conversion Ratio is adjusted pursuant to any provision of this Section 7, the Corporation shall promptly deliver to each Holder a notice setting forth the Conversion Ratio after such adjustment and setting forth a brief statement of the facts requiring such adjustment.

(b)     Reorganization Events. In the event of:

(i)     any reclassification, statutory exchange, merger, consolidation or other similar business combination of the Corporation with or into another Person, in each case, pursuant to which at least a majority of the Common Stock is changed or converted into, or exchanged for, cash, securities or other property of the Corporation or another Person;

(ii)    any sale, transfer, lease or conveyance to another Person of all or a majority of the property and assets of the Corporation, in each case pursuant to which the Common Stock is converted into cash, securities or other property; or

(iii)   any statutory exchange of securities of the Corporation with another Person (other than in connection with a merger or acquisition) or reclassification, recapitalization or reorganization of the Common Stock into other securities; (each of which is referred to as a "**Reorganization Event**");

then each share of Series A Preferred Stock outstanding immediately prior to such Reorganization Event will, subject to Section 8(d), remain outstanding but shall become convertible into, out of funds legally available therefor, the number, kind and amount of securities, cash and other property (the "**Exchange Property**") that the Holder of such share of Series A Preferred Stock would have received in such Reorganization Event had each of the shares of Series A Preferred Stock held by such Holder been converted into a number of shares of Common Stock equal to the Conversion Ratio in effect immediately prior the Reorganization Event. If the kind or amount of securities, cash and other property receivable upon such Reorganization Event is not the same for each share of Common Stock held immediately prior to such Reorganization Event by a Person, then for the purpose of this Section 7(b), the kind and amount of securities, cash and other property receivable upon conversion following such Reorganization Event will be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock. Notwithstanding anything herein to the contrary, in the event of a Reorganization Event that constitutes a Change of Control, the provisions of Section 8(d) shall control.

13

**Section 8. Redemption**

(a)      Corporation Optional Redemption. At any time from and after the earlier of (i) the Seventh Anniversary Date, if the 10-Day VWAP does not exceed the Conversion Price on the date immediately prior to the date the Corporation delivers a Corporation Optional Redemption Notice to the Holders, and (ii) the occurrence of a Corporation Termination Event, if the 10-Day VWAP does not exceed the Conversion Price on the date immediately prior to the date the Corporation delivers a Corporation Optional Redemption Notice to the Holders, the Corporation shall have the right (the "**Corporation Optional Redemption Right**" and, such redemption, a "**Corporation Optional Redemption**") upon written notice to the Holders (such written notice, the "**Corporation Optional Redemption Notice**") to redeem all (and not less than all) of the then-outstanding shares of Series A Preferred Stock, at the Redemption Price in the manner set forth in Section 8(c).

(b)      Holder Optional Redemption. On each of the Seventh Anniversary Date, the Tenth Anniversary Date and the Thirteenth Anniversary Date, the Majority Holders shall have the right (the "**Holder Optional Redemption Right**" and, such redemption, a "**Holder Optional Redemption**"), upon no less than six months prior written notice to the Corporation (such written notice, the "**Holder Optional Redemption Notice**"), to require the Corporation to redeem all (and not less than all) of the then-outstanding shares of Series A Preferred Stock, at the Redemption Price in the manner set forth in Section 8(c).

(c)      Mechanics of Optional Redemption.

(i)      In the event of a Corporation Optional Redemption, the Corporation shall effect such redemption by paying the entire Redemption Price on or before the date that is 30 days after the delivery of the Corporation Optional Redemption Notice and by redeeming all of the shares of Series A Preferred Stock on such date.  In the event of a Holder Optional Redemption, the Redemption Price shall be payable, and the shares of Series A Preferred Stock redeemed by the Corporation, in three equal installments, commencing on the Seventh Anniversary Date, the Tenth Anniversary Date or the Thirteenth Anniversary Date, as applicable, and in each case on the 15th and 30th month anniversary thereafter.  The date any portion of the Redemption Price is paid pursuant hereto shall be referred to as a "**Redemption Date**".  On each Redemption Date for a Holder Optional Redemption, the Corporation shall redeem, on a pro rata basis in accordance with the number of shares of Series A Preferred Stock owned by each Holder, that number of outstanding shares of Series A Preferred Stock determined by dividing (i) the total number of shares of Series A Preferred Stock outstanding immediately prior to such Redemption Date by (ii) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies).  If, on any Redemption Date, Nevada law governing distributions to stockholders or the terms of any indebtedness of the Corporation to banks and other financial institutions engaged in the business of lending money prevent the Corporation from redeeming all share of Series A Preferred Stock to be redeemed, the Corporation shall ratably redeem the maximum number of shares that it may redeem consistent with such law, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

(ii)      Upon receipt of a Holder Optional Redemption Notice or delivery of the Corporation Optional Redemption Notice, the Corporation shall send written notice (the "**Redemption Notice**") to each holder of record of Series A Preferred Stock not less than 15 days prior to each Redemption Date.  Each Redemption Notice shall state:

(A)   The number of shares of Series A Preferred Stock held by the Holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

14

(B)   the Redemption Date and the Redemption Price;

(C)   for shares in certificated form, that the Holder is to surrender to the Corporation, in the manner and at the place designated, such certificate or certificates representing the shares of Series A Preferred Stock to be redeemed; and

(D)   the procedures that Holders must follow in order for their shares of Series A Preferred Stock to be redeemed.

On or before the applicable Redemption Date, the Corporation shall deliver to each Holder, by wire transfer of immediately available funds to an account or accounts specified in writing by such Holder, the Redemption Price for the shares being redeemed on such Redemption Date, subject to such Holder having complied with the procedures for surrender specified in the Redemption Notice.  In the event that less than all of the shares of Series A Preferred Stock represented by a certificate are redeemed, a new certificate or book entry representing the unredeemed shares of Series A Preferred Stock shall be promptly issued to such Holder.

(iii)   If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Series A Preferred Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Series A Preferred Stock so called for redemption shall not have been surrendered, dividends with respect to such shares of Series A Preferred Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such certificate or certificates therefor.

(iv)   If any shares of Series A Preferred Stock scheduled for redemption on a Redemption Date are not redeemed for any reason on such Redemption Date, (x) from such Redemption Date until the 15-month anniversary of such Redemption Date, the Dividend Rate with respect to such unredeemed share of Series A Preferred Stock shall automatically increase to 8%, (y) from such 15-month anniversary of such Redemption Date until the 30th-month anniversary of such Redemption Date, the Dividend Rate with respect to such unredeemed share of Series A Preferred Stock shall automatically increase to 10% and (z) from and after such 30th-month anniversary of such Redemption Date, the Dividend Rate with respect to any such unredeemed share of Series A Preferred Stock shall automatically increase to 12%, in each case until such share is duly redeemed.

(d)   Change of Control Redemption.

(i)   In the event of a transaction resulting in a Change of Control, the Corporation (or its successor) shall redeem (a "**Change of Control Redemption**") all (and not less than all) of the then-issued and outstanding shares of Series A Preferred Stock. Upon such redemption, the Corporation will pay or deliver, as applicable, to each Holder in respect of each share of Series A Preferred Stock held by such Holder, an amount equal to the greater of (A) cash in an amount equal to the Redemption Price and (B) the amount of cash and/or other assets (including securities) such Holder would have received had each share of Series A Preferred Stock held by such Holder as of the Close of Business on the Business Day immediately prior to the effective date of such transaction resulting in a Change of Control, converted into a number of shares of Common Stock equal to the then-applicable Conversion Ratio and participated in such transaction resulting in such Change of Control as a holder of shares of Common Stock (such greater amount, the "**Change of Control Redemption Price**").  No later than the consummation of any

15

transaction resulting in a Change of Control, the Corporation (or its successor) shall deliver or cause to be delivered to each Holder the Change of Control Redemption Price with respect to such Holder's shares of Series A Preferred Stock.

(ii) On or prior to the 10th Business Day prior to the date on which the Corporation anticipates consummating a transaction which would result in a Change of Control (or, if later, promptly after the Corporation shall have discovered that a transaction resulting in a Change of Control has occurred), the Corporation shall send written notice (a "**Change of Control Notice**") to the Holders of record of shares of Series A Preferred Stock, which such Change of Control Notice shall include (A) the date on which the transaction that would result in a Change of Control is anticipated to be effected (or, to the extent applicable, the date on which a Schedule TO or other similar schedule, form or report disclosing the occurrence of a Change of Control was filed), (B) a description of the material terms and conditions of such transaction, (C) a statement that all shares of Series A Preferred Stock shall be redeemed by the Corporation (or its successor) on a date specified in such Change of Control Notice (the "**Change of Control Redemption Date**"), which such date must be a Business Day of the Corporation's choosing that is no later than the date of the consummation of the transaction resulting in such Change of Control, (D) the Change of Control Redemption Price with respect to each share of Series A Preferred Stock, and (E) the procedures that Holders of shares of Series A Preferred Stock must follow in order for their shares of Series A Preferred Stock to be redeemed. The Holder of shares of Series A Preferred Stock subject to any Change of Control Redemption entitled to receive any securities or other assets payable upon such redemption shall be treated for all purposes as the record holder of such securities or assets as of the Close of Business on the Change of Control Redemption Date; provided, however, that such Holder may identify one or more other Persons to receive such securities or assets in connection with any such redemption in a written notice sent to the Corporation no later than three Business Days prior to the Change of Control Redemption Date.

(iii) If, in connection with a transaction resulting in a Change of Control, the Corporation or its successor shall not have sufficient funds legally available under the Nevada law governing distributions to stockholders to redeem all outstanding shares of Series A Preferred Stock, then the Corporation shall (A) redeem, pro rata among the Holders, a number of shares of Series A Preferred Stock equal to the number of shares of Series A Preferred Stock that can be redeemed with the maximum amount legally available for the redemption of such shares of Series A Preferred Stock under the Nevada law governing distributions to stockholders, and (B) redeem all remaining shares of Series A Preferred Stock not redeemed because of the foregoing limitations at the applicable Change of Control Redemption Price as soon as practicable after the Corporation (or its successor) is able to make such redemption out of assets legally available for the purchase of such share of Series A Preferred Stock. The inability of the Corporation (or its successor) to make a redemption payment for any reason shall not relieve the Corporation (or its successor) from its obligation to effect any required redemption when, as and if permitted by applicable law.

### Section 9. Miscellaneous

(a) Notwithstanding anything herein to the contrary, if at any time the payment of any PIK Dividend or a conversion of Series A Preferred Stock (a "**Subject Action**") would be prohibited until the Corporation has obtained the approval of the shareholders of the Corporation under the NRS, continued listing rules of Nasdaq or otherwise, the Corporation and the Holder shall not effect such Subject Action until such vote has been duly obtained; provided, however, that nothing herein will affect the compounding of any Dividend that the Corporation does not pay in cash (which compounding will apply even if the Corporation is otherwise prohibited from electing to make any PIK Dividend pursuant to this

16

sentence). In such case, until such time as the requisite shareholder approval has been obtained for the Subject Action, the Corporation covenants that it shall use its reasonable best efforts to obtain such approval at any annual or special meeting of the shareholders entitled to vote on such for the purpose of voting on such Subject Action to be called as soon as reasonably practicable.

(b)    Notices. Any and all notices or other communications or deliveries to be provided by the Holders hereunder including, without limitation, any Conversion Notice or Redemption Notice, shall be in writing and delivered personally, by email, or sent by a nationally recognized overnight courier service, addressed to the Corporation, 2424 N. Federal Highway, Suite 208, Boca Raton, Florida 33431, Attn: Chief Financial Officer and General Counsel, email address: jlanghans@celsius.com and msandifer@celsius.com, or such other address or email address as the Corporation may specify for such purposes by notice to the Holders delivered in accordance with this Section. Any and all notices or other communications or deliveries to be provided by the Corporation hereunder shall be in writing and delivered personally, by email, or sent by a nationally recognized overnight courier service addressed to each Holder at the address or email address of such Holder appearing on the books of the Corporation, or if no such address or email address appears on the books of the Corporation, at the principal place of business of such Holder. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via email, (ii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service, or (iii) upon actual receipt by the party to whom such notice is required to be given.

(c)    Lost or Mutilated Series A Preferred Stock Certificate. If a Holder's Series A Preferred Stock certificate shall be mutilated, lost, stolen or destroyed, the Corporation shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated certificate, or in lieu of or in substitution for a lost, stolen or destroyed certificate, a new certificate for the shares of Series A Preferred Stock so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such certificate, and of the ownership thereof, reasonably satisfactory to the Corporation and, in each case, customary and reasonable indemnity, if requested. Applicants for a new certificate under such circumstances shall also comply with such other reasonable regulations and procedures and pay such other reasonable third-party costs as the Corporation may prescribe.

(d)    Waiver. Any waiver by the Corporation or a Holder of a breach of any provision of this Certificate of Designation shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Certificate of Designation or a waiver by any other Holders. The failure of the Corporation or a Holder to insist upon strict adherence to any term of this Certificate of Designation on one or more occasions shall not be considered a waiver or deprive that party (or any other Holder) of the right thereafter to insist upon strict adherence to that term or any other term of this Certificate of Designation. Any waiver by the Corporation or a Holder must be in writing. Notwithstanding any provision in this Certificate of Designation to the contrary, any provision contained herein and any right of the Holders of Series A Preferred Stock granted hereunder may be waived as to all shares of Series A Preferred Stock (and the Holders thereof) upon the written consent of the Majority Holders, unless a higher percentage is required by the NRS, in which case the written consent of the Holders of not less than such higher percentage shall be required.

(e)    Severability. If any provision of this Certificate of Designation is invalid, illegal or unenforceable, the balance of this Certificate of Designation shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law.

(f)     Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

(g)     Headings. The headings contained herein are for convenience only, do not constitute a part of this Certificate of Designation and shall not be deemed to limit or affect any of the provisions hereof.

(h)     Status of Converted Series A Preferred Stock. If any shares of Series A Preferred Stock shall be converted or reacquired by the Corporation, such shares shall be automatically, and without need for further action by the Board, restored to the status of authorized and unissued shares of Preferred Stock, without designation or classification as to series, until such shares are once more designated or classified as part of a particular series by the Board pursuant to the provisions of the Articles of Incorporation.

\* \* \* \*

18

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Designation this 1st day of August, 2022.

CELSIUS HOLDINGS, INC.

By:
Name: John Fieldly
Title: President and Chief Executive Officer

SIGNATURE PAGE TO CERTIFICATE OF DESIGNATION OF SERIES A PREFERRED STOCK

**Exhibit 3.2**

**AMENDED AND RESTATED BYLAWS**
**OF**
**CELSIUS HOLDINGS, INC. (A NEVADA**
**CORPORATION)**
**INDEX**

PAGE NUMBER

**ARTICLE ONE OFFICES**

| | |
|---|---|
| Section 1. Principal Office | |
| Section 2. Other Offices | 1 |
| | 1 |

**ARTICLE TWO MEETINGS OF STOCKHOLDERS**

| | |
|---|---|
| Section 1. Place | 1 |
| Section 2. Time of Annual Meeting | 1 |
| Section 3. Call of Special Meetings | 1 |
| Section 4. Conduct of Meetings | 1 |
| Section 5. Notice and Waiver of Notice | 2 |
| Section 6. Advance Notice of Business and Nominations for Annual and Special Meetings | 3 |
| Section 7. Quorum | 10 |
| Section 8. Voting Rights Per Share | 10 |
| Section 9. Voting of Shares | 10 |
| Section 10. Proxies | 11 |
| Section 11. Stockholder List | 11 |
| Section 12. Action Without Meeting | 11 |
| Section 13. Fixing Record Date | 12 |
| Section 14. Inspectors and Judges | 12 |
| | 12 |

**ARTICLE THREE DIRECTORS**

| | |
|---|---|
| Section 1. Powers | 12 |
| Section 2. Number; Term; Qualification | 12 |
| Section 3. Election | 13 |
| Section 4. Resignation; Vacancies; Removal | 13 |
| Section 5. Place of Meetings. | 13 |
| Section 6. Annual Meetings | 13 |
| Section 7. Regular Meetings | 13 |
| Section 8. Special Meetings and Notice | 13 |
| Section 9. Quorum and Required Vote | 14 |
| Section 10. Action Without Meeting | 14 |
| Section 11. Conference Telephone or Similar Communications Equipment Meetings | 14 |
| Section 12. Committees | 14 |
| Section 13. Compensation of Directors | 15 |
| | 15 |

**ARTICLE FOUR OFFICERS**

| | |
|---|---|
| Section 1. Positions | 15 |
| Section 2. Election of Specified Officers by Board | 15 |
| Section 3. Election or Appointment of Other Officers | 15 |
| Section 4. Compensation | 15 |
| Section 5. Term; Resignation; Removal; Vacancies | 15 |
| Section 6. Chair of the Board | 16 |
| Section 7. Chief Executive Officer | 16 |
| Section 8. President | 16 |
| Section 9. Vice Presidents | 16 |

|  |  |
|---|---|
| Section 10. Secretary | 16 |
| Section 11. Chief Financial Officer | 16 |
| Section 12. Treasurer | 16 |
| Section 13. Other Officers; Employees and Agents | 17 |
|  | 17 |

**ARTICLE FIVE CERTIFICATES FOR SHARES**

|  |  |
|---|---|
| Section 1. Issue of Certificates | 17 |
| Section 2. Legends for Preferences and Restrictions on Transfer | 17 |
| Section 3. Facsimile Signatures | 17 |
| Section 4. Lost Certificates | 18 |
| Section 5. Transfer of Shares | 18 |
| Section 6. Registered Stockholders | 18 |
|  | 18 |

**ARTICLE SIX GENERAL PROVISIONS**

|  |  |
|---|---|
| Section 1. Dividends | 18 |
| Section 2. Reserves | 18 |
| Section 3. Checks | 18 |
| Section 4. Fiscal Year | 18 |
| Section 5. Seal | 18 |
| Section 6. Gender | 18 |
|  | 18 |

**ARTICLE SEVEN AMENDMENT OF BYLAWS**

|  |  |
|---|---|
|  | 19 |

**ARTICLE EIGHT EXCLUSIVE FORUM**

|  |  |
|---|---|
| Section 1. Internal Actions. | 19 |
| Section 2. Securities Act Claims | 19 |

**AMENDED AND RESTATED BYLAWS**
**OF**
**CELSIUS HOLDINGS, INC.**
**ARTICLE ONE <u>OFFICES</u>**

**Section 1. <u>Principal Office</u>**. The principal office of Celsius Holdings, Inc., a Nevada corporation (the "Corporation"), shall be located at such place determined by the Board of Directors of the Corporation (the "Board of Directors") in accordance with applicable law.

**Section 2. <u>Other Offices</u>**. The Corporation may also have offices at such other places, either within or without the State of Nevada, as the Board of Directors may from time to time determine or as the business of the Corporation may require.

**ARTICLE TWO <u>MEETINGS OF STOCKHOLDERS</u>**

**Section 1. <u>Place</u>**. All annual meetings of stockholders shall be held at such place, within or without the State of Nevada, as may be designated by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof. Special meetings of stockholders may be held at such place, within or without the State of Nevada, and at such time as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof. The Board of Directors may, in its sole discretion, determine that a meeting of stockholders shall, in addition to or instead of a physical meeting, be held by means of remote communication (including virtually) as provided under Title 7, Chapter 78 of Nevada Revised Statutes (as amended from time to time, the "NRS").

**Section 2. <u>Time of Annual Meeting</u>**. Annual meetings of stockholders shall be held on such date and at such time fixed, from time to time, by the Board of Directors, provided, that there shall be an annual meeting held every calendar year at which the stockholders shall elect a board of directors and transact such other business as may properly be brought before the meeting. The Board of Directors may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board of Directors.

**Section 3. <u>Call of Special Meetings</u>**. Special meetings of the stockholders may be called for any purpose or purposes at any time by the Chair of the Board or the President or by the Board of Directors and shall be called by the secretary of the Corporation (the "Secretary") upon the written request of stockholders holding of record at least 50% of the outstanding shares of stock of the Corporation entitled to vote at such meeting. Such written request shall state the purpose or purposes for which such meeting is to be called. Only such business shall be conducted at a special meeting as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. A special meeting of stockholders called by the Board of Directors, the Chair of the Board or the President other than one required to be called by reason of a written request of stockholders, may be postponed, rescheduled or cancelled by the Board of Directors at any time before the scheduled commencement of the meeting.

**Section 4. <u>Conduct of Meetings</u>**. The Board of Directors may adopt by resolution such rules, regulations and procedures for the conduct of any meeting of stockholders of the Corporation as it shall deem appropriate, including such guidelines and procedures as it may deem appropriate regarding the participation by means of remote communication of stockholders and proxyholders not physically present at a meeting. The Chair of the Board (or in the Chair of the Board's absence, the President, or in the President's absence, such other designee of the Board of Directors) shall preside at the annual and special

meetings of stockholders and shall be given full discretion in establishing the rules and procedures to be followed in conducting the meetings, except as otherwise provided by law or in these Amended and Restated Bylaws (as amended from time to time, the "Bylaws"). Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chair of the meeting, may include the following: (a) the establishment of an agenda or order of business for the meeting; (b) rules and procedures for maintaining order at the meeting and the safety of those present, including regulation of the manner of voting and the conduct of discussion; (c) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chair of the meeting shall determine; (d) restrictions on entry to the meeting after the time fixed for the commencement thereof; (e) limitations on the time allotted to questions or comments by participants; and (f) restrictions on the use of cell phones, audio or video recording devices and similar devices at the meeting. The chair of the meeting, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall, if the facts warrant, determine and declare to the meeting that a nomination or matter or business was not properly brought before the meeting and if such chair should so determine, such chair shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board of Directors or the chair of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure. The chair of the meeting shall announce at the meeting when the polls for each matter to be voted upon at the meeting will be opened and closed. After the polls close, no ballots, proxies or votes or any revocations or changes thereto may be accepted. The chair of the meeting shall have the power, right and authority to convene, recess or adjourn any meeting of stockholders, whether or not a quorum is present.

**Section 5. <u>Notice and Waiver of Notice</u>**. Except as otherwise provided by law, written or printed notice stating the place, date and time of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 nor more than 60 days before the date of the meeting, either personally or by first-class mail or other legally sufficient means, by or at the direction of the Chair of the Board, President, or the persons calling the meeting, to each stockholder of record entitled to vote at such meeting.

    **(a)**     **<u>Form of Notice</u>**. If the notice is mailed at least 30 days before the date of the meeting, it may be done by a class of United States mail other than first class. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the stockholder at the address appearing on the stock transfer books of the Corporation, with postage thereon prepaid. If given by courier, such notice shall be deemed given at the earlier of when the notice is received or left at such stockholder's address. Subject to the limitations of Section 5(c) of this ARTICLE TWO, if given by electronic transmission, such notice shall be deemed to be delivered: (i) if given by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice by facsimile; (ii) if by electronic mail, when directed to such stockholder's electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice; and (iv) if by any other form of electronic transmission consented to by the stockholder, when directed to the stockholder. An affidavit of the Secretary or an assistant secretary of the Corporation, the transfer agent of the Corporation or any other agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. If a meeting is adjourned to another time and/or place, and if an announcement of the adjourned time and/or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting unless the Board of Directors, after adjournment, fixes a new record date for the adjourned meeting.

2

**(b)**      <u>**Waiver of Notice**</u>. Whenever any notice is required to be given to any stockholder, a waiver thereof in writing signed by the person or persons entitled to such notice, whether signed before, during or after the time of the meeting stated therein, and delivered to the Corporation for inclusion in the minutes or filing with the corporate records, shall constitute an effective waiver of such notice. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice. Attendance of a person at a meeting shall constitute a waiver of (a) lack of or defective notice of such meeting, unless the person objects at the beginning to the holding of the meeting or the transacting of any business at the meeting, or (b) lack of or defective notice of a particular matter at a meeting that is not within the purpose or purposes described in the meeting notice, unless the person objects to considering such matter when it is presented.

**(c)**      <u>**Notice by Electronic Transmission**</u>. Without limiting the manner by which notice otherwise may be given effectively to stockholders of the Corporation pursuant to the NRS, the articles of incorporation of the Corporation (as amended from time to time, the "Articles of Incorporation") or these Bylaws, any notice to stockholders of the Corporation given by the Corporation under any provision of the NRS, the Articles of Incorporation or these Bylaws shall be effective if given by electronic mail complying with the NRS or other form of electronic transmission provided that receipt of notice by electronic mail or such other form of electronic transmission has been consented to by the stockholder of the Corporation to whom the notice is given. Any such consent is revocable by the stockholder by notice to the Corporation. Notice may not be given by electronic transmission from and after the time: (i) the stockholder is unable to receive by electronic transmission two consecutive notices given by the Corporation; and (ii) such inability becomes known to the Secretary or an assistant secretary of the Corporation or to the transfer agent or other person responsible for the giving of notice; provided, however, that the inadvertent failure to discover such inability shall not invalidate any meeting or other action. For purposes of these Bylaws, the term "electronic transmission" has the meaning ascribed to it in NRS 75.050.

**Section 6.** <u>**Advance Notice of Business and Nominations for Annual and Special Meetings**</u>

**(a)**      <u>**Annual Meeting of Stockholders**</u>. Nominations of persons for election to the Board of Directors and the proposal of other business to be considered by the stockholders may be made at an annual meeting of the stockholders only as (A) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors or any duly authorized committee thereof,

(B) brought by or at the direction of the Board of Directors or any duly authorized committee thereof, or

(C) otherwise properly brought by any stockholder of the Corporation who (1) was a stockholder of record

(I) at the time of giving of notice provided for in Section 6(a)(ii) of this ARTICLE TWO, (II) on the record date for determination of stockholders of the Corporation entitled to vote at the meeting, and (III) at the time of the annual meeting, (2) is entitled to vote at the meeting and (3) complies with the notice procedures set forth in Section 6(a)(ii) of this ARTICLE TWO. For the avoidance of doubt, the foregoing clause (C) of this Section 6(a) shall be the exclusive means for a stockholder to nominate for election or reelection to the Board of Directors any director or propose such business (other than business included in the Corporation's proxy materials pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) before an annual meeting of stockholders.

   (i)      In addition to any other applicable requirements, for any business or nominations to be properly brought before an annual meeting by a stockholder of record, the stockholder of record giving the notice (the "Noticing Stockholder") must have given timely notice thereof in proper form and in writing to the Secretary and any such proposed business must be a proper matter for stockholder action. To be timely, a Noticing

3

Stockholder's notice for such business must be delivered to the Secretary at the principal executive offices of the Corporation not earlier than the Close of Business on the 120th day prior to the first anniversary of the date of the preceding year's annual meeting of stockholders nor later than the Close of Business on the 90th day prior to the first anniversary of the date of the preceding year's annual meeting of stockholders; provided that if the date of the annual meeting is more than 30 days before or more than 70 days after such anniversary date, or if no annual meeting was held in the preceding year, such Noticing Stockholder's notice to be timely must be so delivered no later than the earlier of

(A) the Close of Business of the 10th day following the day the Public Announcement of the date of the annual meeting is first made by the Corporation and (B) the Close of Business on the date which is 90 days prior to the date of the annual meeting. In no event shall any adjournment, recess, rescheduling or postponement of an annual meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above. For the avoidance of doubt, a stockholder shall not be entitled to make additional or substitute nominations following the expiration of the time periods set forth in these Bylaws. Notwithstanding anything in the second sentence of this Section 6(a)(i) to the contrary, in the event that the number of directors to be elected to the Board of Directors is increased and there is no Public Announcement by the Corporation naming all of the nominees for director proposed by the Board of Directors or specifying the size of the increased Board of Directors at least 10 days before the last day a Noticing Stockholder may deliver a notice of nominations in accordance with such sentence, a Noticing Stockholder's notice required by this Bylaw shall be considered timely, but only with respect to proposed nominees for any new positions created by such increase, if it shall be delivered to the Secretary not later than the Close of Business on the 10th day following the day on which such Public Announcement is first made by the Corporation.

(ii)      To be in proper form, a Noticing Stockholder's notice to the Secretary (whether given pursuant to Section 6(a) or Section 6(b) of this ARTICLE TWO) must:

(A)      if the notice relates to any business other than the nomination of a director or directors that the stockholder proposes to bring before the meeting, set forth (1)(a) a brief description of the business desired to be brought before the annual meeting and (b) the text, if any, of the proposal or business (including the text of any resolutions or actions proposed for consideration and if such business includes a proposal to amend these Bylaws, the specific language of the proposed amendment), (2) the reasons for conducting such business at the meeting and any material interest in such business of each Holder and any Stockholder Associated Person (as such terms are defined below), and (3) a description of all agreements, arrangements and understandings between each Holder and any Stockholder Associated Person and any other person or persons (including their names) in connection with the proposal of such business by such stockholder;

(B)      set forth, as to the Noticing Stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (collectively with the Noticing Stockholder, the "Holders" and each a "Holder"):

(1) the name and address, as they appear on the Corporation's books, of each Holder and the name and address of any Stockholder Associated Person, (2)(a) the class or series and number of shares of stock of the Corporation which are directly or indirectly held of record or beneficially owned by each Holder and any Stockholder Associated Person (provided that, for the purposes of this

4

Section 6(a)(ii), any such person shall in all events be deemed to beneficially own any shares of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future), (b) any short position, profits interest, option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the Corporation or with a value derived, in whole or in part, from the value of any class or series of shares of the Corporation, whether or not such instrument or right shall be subject to settlement in the underlying class or series of capital stock of the Corporation or otherwise (a "Derivative Instrument") directly or indirectly held or beneficially held by each Holder and any Stockholder Associated Person, and any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the value of any security of the Corporation, (c) a description of any proxy, contract, arrangement, understanding or relationship pursuant to which each Holder and any Stockholder Associated Person has a right to vote or has granted a right to vote any security of the Corporation, (d) any Short Interest held by each Holder and any Stockholder Associated Person presently or within the last 12 months in any security of the Corporation (for purposes of these Bylaws, a person shall be deemed to have a "Short Interest" in a security if such person, directly or indirectly, though any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security), (e) any agreement, arrangement or understanding (including any contract to purchase or sell, acquisition or grant of any option, right or warrant to purchase or sell, swap or other instrument) between and among each Holder and/or any Stockholder Associated Person, on the one hand, and any person acting in concert with any such person, on the other hand, with the intent to, or the effect of which may be to, transfer to or from any such person, in whole or in part, any of the economic consequences of ownership of any security of the Corporation or to increase or decrease the voting power of any such person with respect to any security of the Corporation, (f) any direct or indirect legal, economic or financial interest (including Short Interest) of each Holder and any Stockholder Associated Person in the outcome of any (I) vote to be taken at any annual or special meeting of stockholders of the Corporation or (II) any meeting of stockholders of any other entity with respect to any matter that is related, directly or indirectly, to any nomination or business proposed by any Holder under this Bylaw, (g) any rights to dividends on any security of the Corporation owned beneficially by each Holder and any Stockholder Associated Person that are separated or separable from the underlying security of the Corporation, (h) any proportionate interest in any security of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership or limited liability company or similar entity in which any Holder or any Stockholder Associated Person is a general partner or, directly or indirectly, beneficially owns any interest in a general partner or is the manager or managing member or, directly or indirectly, beneficially owns any interest in the manager or managing member of a limited liability company or similar entity, (i) any performance-related fees (other than an asset-based fee) that each Holder and any Stockholder Associated Person is entitled to based on any increase or decrease in the value of securities of the Corporation or Derivative Instruments, if any, as of the date of such notice, (j) any direct or indirect legal, economic or financial interest (including Short Interest) in any principal competitor of the Corporation held by each Holder and any Stockholder Associated

Person, and (k) any material pending or threatened action, suit or proceeding (whether civil, criminal, investigative, administrative or otherwise) in which any Holder or any Stockholder Associated Person is, or is reasonably expected to be made, a party or material participant involving the Corporation or any of its officers, directors or employees, or any Affiliate of the Corporation, or any officer, director or employee of such Affiliate (sub-clauses (a) through (k) of this Section 6(a)(ii)(B)(2) shall be referred to as the "Stockholder Information"), (3) a representation by the Noticing Stockholder that such stockholder is a holder of record of stock of the Corporation entitled to vote at such meeting, will continue to be a stockholder of record of the Corporation entitled to vote at such meeting through the date of such meeting and intends to appear in person or by proxy at the meeting to propose such business or nomination, (4) a representation by the Noticing Stockholder as to whether any Holder and/or any Stockholder Associated Person intends or is part of a group which intends (a) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or elect any nominee and/or (b) otherwise to solicit proxies or votes from stockholders in support of such proposal or nomination or nominations, (5) a certification by the Noticing Stockholder that each Holder and any Stockholder Associated Person has complied with all applicable federal, state and other legal requirements in connection with its acquisition of shares or other securities of the Corporation and such person's acts or omissions as a stockholder of the Corporation, (6) the names and addresses of other stockholders (including beneficial owners) known by any of the Holder or Stockholder Associated Person to support such proposal or nomination or nominations, and to the extent known the class and number of all shares of the Corporation's capital stock owned beneficially or of record by such other stockholder(s) or other beneficial owner(s), and (7) a representation by the Noticing Stockholder as to the accuracy of the information set forth in the notice;

(C)      set forth, as to each person, if any, whom the Noticing Stockholder proposes to nominate for election or reelection to the Board of Directors (1) the name, age, business address and residence address of such person, (2) the principal occupation or employment of such person (at present and for the past five years),

(3) the Stockholder Information for such person and any member of the immediate family of such person, or any Affiliate or Associate (as such terms are defined below) of such person, or any person acting in concert therewith, (4) all information relating to such person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder (including such person's written consent to being named in proxy statements as a proposed nominee of the Noticing Stockholder and to serving as a director if elected), (5) a complete and accurate description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings (whether written or oral) during the past three years, and any other material relationships, between or among the Holders and/or any Stockholder Associated Person, on the one hand, and such person and any member of the immediate family of such person, and such person's respective Affiliates and Associates, or others acting in concert therewith, on the other hand, including, without limitation, all biographical and related party transaction and other information that would be required to be disclosed pursuant to the federal and state

6

securities laws, including Rule 404 promulgated under Regulation S-K under the Securities Act of 1933, as amended (the "Securities Act") (or any successor provision), if any Holder and/or any Stockholder Associated Person were the "registrant" for purposes of such rule and such person were a director or executive officer of such registrant; and (6) a completed and signed questionnaire, representation and agreement and any and all other information required by Section 6(d) of this ARTICLE TWO.

(iii)     A Noticing Stockholder shall further update and supplement its notice of any nomination or other business proposed to be brought before a meeting, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 6(a) shall be true and correct (A) as of the record date for the meeting and (B) as of the date that is 10 Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof. Such update and supplement shall be delivered to the Secretary not later than three Business Days after the later of the record date or the date a Public Announcement of the notice of the Record Date is first made (in the case of the update and supplement required to be made as of the record date for the meeting) and not later than seven Business Days prior to the date of the meeting, if practicable (or, if not practicable, on the first practicable date prior to the meeting), or any adjournment, recess, rescheduling or postponement thereof (in the case of the update and supplement required to be made as of 10 Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof). In addition, if the Noticing Stockholder has delivered to the Corporation a notice relating to the nomination of directors, the Noticing Stockholder shall deliver to the Corporation no later than seven Business Days prior to the date of the annual meeting or any adjournment, recess, rescheduling or postponement thereof, if practicable (or, if not practicable, on the first practicable date prior to the date of the annual meeting or such adjournment, recess, rescheduling or postponement thereof) reasonable evidence that it has complied with the requirements of Rule 14a-19 of the Exchange Act.

(iv)     The Corporation may also, as a condition to any such nomination or business being deemed properly brought before an annual meeting, require any Holder or any proposed nominee to deliver to the Secretary, within five Business Days of any such request, such other information as may be reasonably requested by the Corporation, including, without limitation, such other information as may be reasonably required by the Board of Directors, in its sole discretion, to determine (1) the eligibility of such proposed nominee to serve as a director of the Corporation, (2) whether such proposed nominee qualifies as an "independent director" or "audit committee financial expert" under applicable law, securities exchange rule or regulation, or any publicly disclosed corporate governance guideline or committee charter of the Corporation and (3) that the Board of Directors determines, in its sole discretion, could be material to a reasonable stockholder's understanding of the independence, or lack thereof, of such proposed nominee.

**(b)     Special Meetings of Stockholder**. In the event that a special meeting of stockholders is called for the purpose of electing one or more directors to the Board of Directors, nominations of persons for election to the Board of Directors may be made at such special meeting (i) by a stockholder who submitted a request for a special meeting in the manner provided for Section 3 of this ARTICLE TWO, (ii) by or at the direction of the Board of Directors or any duly authorized committee thereof or (iii) by any stockholder other than any stockholder who submitted a request for a special meeting in accordance with Section 3 of this ARTICLE TWO that included the election of directors in the request who (A) is a stockholder of record (1) at the time of giving of notice provided for in this Section 6, (2) on

7

the record date for the determination of stockholders of the Corporation entitled to vote at the meeting, and (3) at the time of the special meeting, (B) is entitled to vote at the meeting and (C) complies with the notice procedures provided for in Section 6(a) of this ARTICLE TWO, including delivering the stockholder's notice required by Section 6(a) of this ARTICLE TWO with respect to any nomination to the Secretary not earlier than the Close of Business on the 120th day prior to such special meeting, nor later than the Close of Business on the later of the 90th day prior to such special meeting or the 10th day following the date on which Public Announcement is first made by the Corporation of the special meeting and of the nominees, if any, proposed by the Board of Directors to be elected at such meeting. In no event shall the Public Announcement of an adjournment, recess, rescheduling or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

        (c)    **General**.

        (i)    As applicable to nominees or business being proposed by one or more stockholders, only such persons who are nominated in accordance with the procedures set forth in this Section 6 shall be eligible to be elected at an annual or special meeting of stockholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 6. Except as otherwise provided by law, the chairperson of the meeting shall have the power and duty (a) to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this Section 6 (including whether the Holder, if any, on whose behalf the nomination or proposal is made, solicited (or is part of a group which solicited) or did not so solicit, as the case may be, proxies in support of such Noticing Stockholder's nominee or proposal in compliance with such Holder's representation as required by Section 6(a)(ii)(B)(4) of ARTICLE TWO) and (b) if any proposed nomination or business was not made or proposed in compliance with this Section 6, to declare that such nomination shall be disregarded or that such proposed business shall not be transacted. The number of nominees a Noticing Stockholder may propose to nominate for election at a meeting of stockholders (or in the case of a Noticing Stockholder giving the notice on behalf of a beneficial owner, the number of nominees a Noticing Stockholder may propose to nominate for election at the meeting on behalf of such beneficial owner) shall not exceed the number of directors to be elected at such meeting.

        (ii)    Notwithstanding the foregoing provisions of this Section 6, unless otherwise required by law, if the Noticing Stockholder (or a Qualified Representative thereof) does not appear at the annual or special meeting of stockholders of the Corporation to present a nomination or propose business, such nomination shall be disregarded and such business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation.

        (iii)    For purposes of this Section 6, delivery of any notice or materials by a stockholder as required under this Section 6 shall be made by both (1) hand delivery, overnight courier service, or by certified or registered mail, return receipt requested, in each case to the Secretary at the principal executive offices of the Corporation and (2) electronic mail to the Secretary.

        (iv)    Definitions. For purposes of these Bylaws, the term:

8

(A)  "Affiliate" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act and the rules and regulations promulgated thereunder;

(B)  "Associate" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act and the rules and regulations promulgated thereunder;

(C)  "Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in Boca Raton, Florida or New York, New York are authorized or obligated by law or executive order to close;

(D)  "Close of Business" shall mean 5:00 p.m. local time at the principal executive offices of the Corporation, and if an applicable deadline falls on the Close of Business on a day that is not a Business Day, then the applicable deadline shall be deemed to be the Close of Business on the immediately preceding Business Day;

(E)  "Public Announcement" means any method (or combination of methods) of disclosure that is reasonably designed to provide broad, non- exclusionary distribution of the information to the public or the furnishing or filing of any document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act and the rules and regulations promulgated thereunder;

(F)  "Qualified Representative" of any stockholder means a duly authorized officer, manager or partner of such stockholder or authorized by a writing executed by such stockholder (or a reliable reproduction or electronic transmission of the writing) delivered to the Corporation prior to the presentation of any matters at any meeting of stockholders stating that such person is authorized to act for such stockholder as proxy at such meeting of stockholders; and

(G)  "Stockholder Associated Person" of any Holder means (1) any person acting in concert with such Holder, (2) any person controlling, controlled by or under common control with such Holder or any of their respective Affiliates and Associates, or person acting in concert therewith and (3) any member of the immediate family of such Holder or an Affiliate or Associate of such Holder.

(v)  Notwithstanding the foregoing provisions of this Section 6, a stockholder must also comply with all applicable requirements of the Exchange Act and the rules and regulations promulgated thereunder with respect to the matters set forth in this Section 6; provided that any references in these Bylaws to the Exchange Act or the rules and regulations promulgated thereunder are not intended to and shall not limit the requirements applicable to nominations or proposals as to any other business to be considered pursuant to Section 6(a) or Section 6(b) of this ARTICLE TWO. Nothing in this Section 6 shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act or any other applicable federal or state securities law with respect to that stockholder's request to include proposals in the Corporation's proxy statement.

9

**(d)** **Submission of Questionnaire, Representation and Agreement**. In addition to the other requirements of this Section 6, each person who a Noticing Stockholder proposes to nominate for election or re-election as a director of the Corporation must deliver in writing (in accordance with the time periods prescribed for delivery of notice under this Section 6) to the Secretary at the principal executive offices of the Corporation (A) a written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the Secretary upon written request of any stockholder of record identified by name within five Business Days of such written request) and (B) a written representation and agreement (in the form provided by the Secretary upon written request of any stockholder of record identified by name within five Business Days of such written request) that such person (1) is not and will not become a party to (x) any agreement, arrangement or understanding (whether written or oral) with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question (a "Voting Commitment") that has not been disclosed to the Corporation or (y) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the Corporation, with such person's fiduciary duties under applicable law, (2) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed to the Corporation, (3) in such person's individual capacity and on behalf of any person or entity on whose behalf the nomination is being made, would be in compliance, if elected as a director of the Corporation, and will comply with all applicable rules of the exchanges upon which the securities of the Corporation are listed and all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Corporation, and (4) in such person's individual capacity and on behalf of any Holder on whose behalf the nomination is being made, intends to serve a full term if elected as a director of the Corporation.

**Section 7. <u>Quorum</u>**. Shares entitled to vote as a separate voting group may take action on a matter at a meeting only if a quorum of those shares exists with respect to that matter. Except as otherwise provided in the Articles of Incorporation or applicable law, shares representing a majority of the votes pertaining to outstanding shares which are entitled to be cast on the matter by the voting group constitute a quorum of that voting group for action on that matter. If less than a quorum of shares are represented at a meeting, the holders of a majority of the shares so represented may adjourn the meeting from time to time. After a quorum has been established at any stockholders' meeting, the subsequent withdrawal of stockholders, so as to reduce the number of shares entitled to vote at the meeting below the number required for a quorum, shall not affect the validity of any action taken at the meeting or any adjournment thereof. Once a share is represented for any purpose at a meeting, it is deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or must be set for that adjourned meeting.

**Section 8. <u>Voting Rights Per Share</u>**. Every stockholder of record who is entitled to vote shall at every meeting of the stockholders be entitled to one vote for each share of stock held on the record date, except to the extent that the voting rights of the shares of any class are limited or denied by or pursuant to the Articles of Incorporation or the NRS.

**Section 9. <u>Voting of Shares</u>**. A stockholder may vote at any meeting of stockholders of the Corporation, either in person or by proxy. Shares standing in the name of another corporation, domestic or foreign, may be voted by the officer, agent or proxy designated by the bylaws of such corporate stockholder or, in the absence of any applicable bylaw, by such person or persons as the board of directors of the corporate stockholder may designate. In the absence of any such designation, or, in case of conflicting designation by the corporate stockholder, the chair of the board, the president, any vice president, the secretary and the treasurer of the corporate stockholder, in that order, shall be presumed to be fully

**10**

authorized to vote such shares. Shares held by an administrator, executor, guardian, personal representative, or conservator may be voted by such person, either in person or by proxy, without a transfer of such shares into such person's name. Shares standing in the name of a trustee may be voted by such person, either in person or by proxy, but no trustee shall be entitled to vote shares held by such person without a transfer of such shares into such person's name or the name of such person's nominee. Shares held by or under the control of a receiver, a trustee in bankruptcy proceedings, or an assignee for the benefit of creditors may be voted by such person without the transfer thereof into such person's name. If shares stand of record in the names of two or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety or otherwise, or if two or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary of the Corporation is given notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, then acts with respect to voting shall have the following effect: (a) if only one votes, in person or by proxy, such person's act binds all; (b) if more than one vote, in person or by proxy, the act of the majority so voting binds all; (c) if more than one vote, in person or by proxy, but the vote is evenly split on any particular matter, each faction is entitled to vote the share or shares in question proportionally; or (d) if the instrument or order so filed shows that any such tenancy is held in unequal interest, a majority or a vote evenly split for purposes hereof shall be a majority or a vote evenly split in interest. The principles of this paragraph shall apply, insofar as possible, to execution of proxies, waivers, consents, or objections and for the purpose of ascertaining the presence of a quorum.

**Section 10. Proxies**. Any stockholder of the Corporation, other person entitled to vote on behalf of a stockholder pursuant to law, or attorney-in-fact for such persons may vote the stockholder's shares in person or by proxy. Any stockholder of the Corporation may appoint a proxy to vote or otherwise act for such person by signing an appointment form, either personally or by such person's attorney-in-fact. An executed telegram or cablegram appearing to have been transmitted by such person, or a photographic, photostatic, or equivalent reproduction of an appointment form, shall be deemed a sufficient appointment form. An appointment of a proxy shall be valid for up to 6 months from its creation, unless a longer period is expressly provided in the appointment form in compliance with applicable law. The death or incapacity of the stockholder appointing a proxy does not affect the right of the Corporation to accept the proxy's authority unless notice of the death or incapacity is received by the Secretary or other officer or agent authorized to tabulate votes before the proxy authority under the appointment is exercised. An appointment of a proxy is revocable by the stockholder unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest.

**Section 11. Stockholder List**. After fixing a record date for a meeting of stockholders, the Corporation shall prepare an alphabetical list of the names of all its stockholders who are entitled to notice of the meeting, arranged by voting group with the address of, and the number and class and series, if any, of shares held by each. The stockholders' list must be available for inspection by any stockholder for a period of 10 days prior to the meeting or such shorter time as exists between the record date and the meeting and continuing through the meeting at the Corporation's principal office, at a place identified in the meeting notice in the city where the meeting will be held, or at the office of the Corporation's transfer agent or registrar. Any stockholder of the Corporation or such person's agent or attorney is entitled on written demand to inspect the stockholders' list (subject to the requirements of law), during regular business hours and at such person's expense, during the period it is available for inspection. The Corporation shall make the stockholders' list available at the meeting of stockholders, and any stockholder or agent or attorney of such stockholder is entitled to inspect the list at any time during the meeting or any adjournment. The stockholders' list is prima facie evidence of the identity of stockholders entitled to examine the stockholders' list or to vote at a meeting of stockholders.

**Section 12. Action Without Meeting**. Any action required or permitted by law to be taken at a meeting of stockholders may be taken without a meeting or notice if a consent, or consents, in writing,

11

setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all voting groups and shares entitled to vote thereon were present and voted with respect to the subject matter thereof.

**Section 13. <u>Fixing Record Date</u>**. For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment, recess, rescheduling or postponement thereof, or entitled to receive payment of any dividend, or in order to make a determination of stockholders for any other proper purposes, the Board of Directors may fix in advance a date as the record date for any such determination of stockholders, such date in any case to be not more than 60 days, and, in case of a meeting of stockholders, not less than 10 days, before the meeting or action requiring such determination of stockholders. If no record date is fixed for the determination of stockholders entitled to notice of or to vote at a meeting of stockholders or the determination of stockholders entitled to receive payment of a dividend, the Close of Business on the next day preceding the day on which the first notice of the meeting is mailed or the date on which the resolutions of the Board of Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of stockholders. When a determination of stockholders entitled to vote at any meeting of stockholders has been made as provided in this Section, such determination shall apply to any adjournment thereof, except where the Board of Directors fixes a new record date for the adjourned meeting.

**Section 14. <u>Inspectors and Judges</u>**. The Board of Directors in advance of any meeting may, but need not, appoint one or more inspectors of election or judges of the vote, as the case may be, to act at the meeting or any adjournment thereof. If any inspector or inspectors, or judge or judges, are not appointed, the person presiding at the meeting may, but need not, appoint one or more inspectors or judges. In case any person who may be appointed as an inspector or judge fails to appear or act, the vacancy may be filled by the Board of Directors in advance of the meeting, or at the meeting by the person presiding thereat. The inspectors or judges, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots and consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate votes, ballots and consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all stockholders. On request of the person presiding at the meeting, the inspector or inspectors or judge or judges, if any, shall make a report in writing of any challenge, question or matter determined by them, and execute a certificate of any fact found by them.

## ARTICLE THREE <u>DIRECTORS</u>

**Section 1. <u>Powers</u>**. The business and affairs of the Corporation shall be managed by the Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Articles of Incorporation or by these Bylaws directed or required to be exercised and done by the stockholders.

**Section 2. <u>Number; Term; Qualification</u>**. The number of directors of the Corporation shall be nine. Directors shall be elected in the manner and hold office for a one-year term which shall terminate at the conclusion of the next annual meeting of the stockholders at which their successors shall be elected and qualified or until such director's earlier resignation, removal from office, death or incapacity. Notwithstanding any stated term, all directors shall continue in office until the election and qualification of their respective successors in office or the expiration of the term of the directorship held by the director. Directors must be natural persons who are 18 years of age or older but need not be residents of the State of Nevada, stockholders of the Corporation or citizens of the United States.

12

**Section 3. <u>Election</u>**. The manner by which directors will be elected at an annual meeting or other meeting of stockholders will be as follows, depending on whether the election is "contested" or "uncontested" (as such terms are defined below). No director need be a stockholder. In an uncontested election, directors shall be elected by a majority of the votes cast by holders of shares of the Corporation's capital stock entitled to vote in the election of directors at any meeting of stockholders at which a quorum is present. In a contested election, directors shall be elected by a plurality of the votes cast by holders of shares of the Corporation's capital stock entitled to vote in the election of directors at any meeting of stockholders at which a quorum is present. Any director that does not receive an affirmative vote of the majority of the votes cast by holders of shares of the Corporation's capital stock entitled to vote in the election of directors shall submit such person's resignation to the Board of Directors. The Board of Directors is not legally obligated to accept such resignation and can take any factors and other information into consideration that it deems appropriate or relevant. An election of directors will be "contested" if, in connection with any annual meeting or other meeting of stockholders (i) the Secretary shall have received one or more notices that a stockholder has nominated or proposes to nominate a person or persons for election as a director, which notice(s) purports to be in compliance with the advance notice requirements set forth in Section 6 of ARTICLE TWO of these Bylaws, irrespective of whether the Board of Directors at any time determines that any such notice is not in compliance with such requirements, and (ii) as of the date that is 14 days in advance of the date that the Corporation files its definitive proxy statement (regardless of whether or not thereafter amended, revised or supplemented) with the Securities and Exchange Commission each such notice has not been formally and irrevocably withdrawn by the applicable stockholder. Any election of directors that is not contested shall be "uncontested."

**Section 4. <u>Resignation; Vacancies; Removal</u>**. Any director may resign at any time by giving written notice to the Board of Directors or the Chair of the Board. Such resignation shall take effect at the date of receipt of such notice or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. In the event the notice of resignation specifies a later effective date, the Board of Directors may fill the pending vacancy (subject to the provisions of the Articles of Incorporation) before the effective date if they provide that the successor does not take office until the effective date. Any director may be removed, with or without cause, at any time, by action of the holders of record of two-thirds of the voting power of the issued and outstanding stock of the Corporation. Any newly created directorships and vacancies occurring in the Board of Directors by reason of death, resignation, retirement, disqualification or removal, with or without cause, may be filled by the action of the holders of record of the majority of the issued and outstanding voting stock of the Corporation or by action of the Board of Directors. The director so chosen, whether filling an existing vacancy or elected to a new directorship, shall hold office until the next meeting of stockholders at which the election of directors is in the regular order of business, and until such director's successor has been elected and qualifies, or until such director sooner dies, resigns or is removed.

**Section 5. <u>Place of Meetings</u>**. Meetings of the Board of Directors, regular or special, may be held either within or without the State of Nevada.

**Section 6. <u>Annual Meetings</u>**. Unless scheduled for another time by the Board of Directors, the first meeting of each newly elected Board of Directors shall be held, without call or notice, immediately following each annual meeting of stockholders.

**Section 7. <u>Regular Meetings</u>**. Regular meetings of the Board of Directors may also be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

**Section 8. <u>Special Meetings and Notice</u>**. Special meetings of the Board of Directors may be called by the President or Chair of the Board and shall be called by the Secretary on the request of a majority

13

of the directors. At least 48 hours' prior written notice of the date, time and place of special meetings of the Board of Directors shall be given to each director. Except as required by law, neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting. Notices to directors shall be in writing and delivered to the directors at their addresses appearing on the books of the Corporation by personal delivery, mail or other legally sufficient means. Subject to the provisions of the preceding sentence, notice to directors may also be given by telegram, teletype or other form of electronic communication. Notice by mail shall be deemed to be given at the time when the same shall be received. Whenever any notice is required to be given to any director, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before, during or after the meeting, shall constitute an effective waiver of such notice. Attendance of a director at a meeting shall constitute a waiver of notice of such meeting and a waiver of any and all objections to the place of the meeting, the time of the meeting and the manner in which it has been called or convened, except when a director states, at the beginning of the meeting or promptly upon arrival at the meeting, any objection to the transaction of business because the meeting is not lawfully called or convened.

**Section 9. Quorum and Required Vote**. A majority of the prescribed number of directors determined as provided in the Articles of Incorporation or these Bylaws shall constitute a quorum for the transaction of business and the act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless a greater number is required by the Articles of Incorporation. Whenever, for any reason, a vacancy occurs in the Board of Directors, a quorum shall consist of a majority of the remaining directors until the vacancy has been filled. If a quorum shall not be present at any meeting of the Board of Directors, a majority of the directors present thereat may adjourn the meeting to another time and place, without notice other than announcement at the time of adjournment. At such adjourned meeting at which a quorum shall be present, any business may be transacted that might have been transacted at the meeting as originally notified and called.

**Section 10. Action Without Meeting**. Any action required or permitted to be taken at a meeting of the Board of Directors or committee thereof may be taken without a meeting if a consent in writing, setting forth the action taken, is signed by all of the members of the Board of Directors or the committee, as the case may be, and such consent shall have the same force and effect as a unanimous vote at a meeting. Action taken under this Section 10 is effective when the last director signs the consent, unless the consent specifies a different effective date. A consent signed under this Section 10 shall have the effect of a meeting vote and may be described as such in any document.

**Section 11. Conference Telephone or Similar Communications Equipment Meetings**. Directors and committee members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground the meeting is not lawfully called or convened.

**Section 12. Committees**. The Board of Directors, by resolution adopted by a majority of the whole Board of Directors, may designate from among its members an executive committee and one or more other committees, each of which, to the extent provided in such resolution, shall have and may exercise all of the authority of the Board of Directors in the business and affairs of the Corporation except where the action of the full Board of Directors is required by applicable law. Each committee must have two or more members who serve at the pleasure of the Board of Directors. The Board of Directors, by resolution adopted in accordance with this ARTICLE THREE, may designate one or more directors as alternate members of any committee, who may act in the place and stead of any absent member or members at any meeting of such committee. Vacancies in the membership of a committee may be filled only by the Board of Directors at a regular or special meeting of the Board of Directors. The executive committee shall keep regular

14

minutes of its proceedings and report the same to the Board of Directors when required. The designation of any such committee and the delegation thereto of authority shall not operate to relieve the Board of Directors, or any member thereof, of any responsibility imposed upon it or such member by law.

**Section 13. Compensation of Directors**. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefore. Similarly, members of special or standing committees may be allowed compensation for attendance at committee meetings or a stated salary as a committee member and payment of expenses for attending committee meetings. Directors may receive such other compensation as may be approved by the Board of Directors.

## ARTICLE FOUR OFFICERS

**Section 1. Positions**. The officers of the Corporation may consist of a Chair of the Board, a Chief Executive Officer, a President, one or more Vice Presidents (any one or more of whom may be given the additional designation of rank of Executive Vice President or Senior Vice President), a Secretary, a Chief Financial Officer and a Treasurer. Any two or more offices may be held by the same person. Officers other than the Chair of the Board need not be members of the Board of Directors. The Chair of the Board must be a member of the Board of Directors.

**Section 2. Election of Specified Officers by Board**. The Board of Directors at its first meeting after each annual meeting of stockholders shall elect a Chair of the Board, a Chief Executive Officer, a President, one or more Vice Presidents (including any Senior or Executive Vice Presidents), a Secretary, a Chief Financial Officer and a Treasurer.

**Section 3. Election or Appointment of Other Officers**. Such other officers and assistant officers and agents as may be deemed necessary may be elected or appointed by the Board of Directors, or, unless otherwise specified herein, appointed by the Chair of the Board. The Board of Directors shall be advised of appointments by the Chair of the Board at or before the next scheduled Board of Directors meeting.

**Section 4. Compensation**. The salaries, bonuses and other compensation of the Chair of the Board and all officers of the Corporation to be elected by the Board of Directors pursuant to Section 2 of this ARTICLE FOUR shall be fixed from time to time by the Board of Directors or pursuant to its direction. The salaries of all other elected or appointed officers of the Corporation shall be fixed from time to time by the Chair of the Board or pursuant to the Chair of the Board's direction.

**Section 5. Term; Resignation; Removal; Vacancies**. The officers of the Corporation shall hold office until their successors are chosen and qualified. Any officer or agent may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise shall be filled by the Board of Directors, or, in the case of an officer appointed by the Chair of the Board, by the Chair of the Board or the Board of Directors. Any officer of the Corporation may resign from such officer's respective office or position by delivering notice to the Corporation, and such resignation shall be effective upon receipt of such notice or at any later time specified therein, and the acceptance of such notice shall not be necessary to make it effective. If a resignation is made effective at a later date and the Corporation accepts the future effective date, the Board of Directors may fill the pending vacancy before the effective date if the Board of Directors provides that the successor does not take office until such effective date.

15

**Section 6.** __Chair of the Board__. The Chair of the Board shall preside at all meetings of the stockholders and the Board of Directors. The Chair of the Board shall also serve as the chair of any executive committee.

**Section 7.** __Chief Executive Officer__. Subject to the control of the Board of Directors, the Chief Executive Officer, in conjunction with the President, shall have general and active management of the business of the Corporation, shall see that all orders and resolutions of the Board of Directors are carried into effect and shall have such powers and perform such duties as may be prescribed by the Board of Directors. In the absence of the Chair of the Board or in the event the Board of Directors shall not have designated a Chair of the Board, the Chief Executive Officer shall preside at meetings of the stockholders and the Board of Directors. The Chief Executive Officer shall also serve as the vice-chair of any executive committee.

**Section 8.** __President__. Subject to the control of the Board of Directors, the President, in conjunction with the Chief Executive Officer, shall have general and active management of the business of the Corporation and shall have such powers and perform such duties as may be prescribed by the Board of Directors. In the absence of the Chair of the Board and the Chief Executive Officer or in the event the Board of Directors shall not have designated a Chair of the Board and a Chief Executive Officer shall not have been elected, the President shall preside at meetings of the stockholders and the Board of Directors. The President shall also serve as the vice-chair of any executive committee.

**Section 9.** __Vice Presidents__. The Vice Presidents, in the order of their seniority, unless otherwise determined by the Board of Directors, shall, in the absence or disability of the President and the Chief Executive Officer, perform the duties and exercise the powers of the President. They shall perform such other duties and have such other powers as the Board of Directors, the Chair of the Board or the Chief Executive Officer shall prescribe or as the President may from time to time delegate. Executive Vice Presidents shall be senior to Senior Vice Presidents, and Senior Vice Presidents shall be senior to all other Vice Presidents.

**Section 10.** __Secretary__. The Secretary shall attend all meetings of the stockholders and all meetings of the Board of Directors and record all the proceedings of the meetings of the stockholders and of the Board of Directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors and shall keep in safe custody the seal of the Corporation and, when authorized by the Board of Directors, affix the same to any instrument requiring it. The Secretary shall perform such other duties as may be prescribed by the Board of Directors, the Chair of the Board, the Chief Executive Officer or the President.

**Section 11.** __Chief Financial Officer__. The Chief Financial Officer shall be responsible for maintaining the financial integrity of the Corporation, shall prepare the financial plans for the Corporation and shall monitor the financial performance of the Corporation and its subsidiaries, as well as performing such other duties as may be prescribed by the Board of Directors, the Chair of the Board, the Chief Executive Officer or the President.

**Section 12.** __Treasurer__. The Treasurer shall have the custody of corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Chair of the Board and the Board of Directors at its regular meetings or when the Board of Directors so requires an account of all of such person's transactions as Treasurer and

16

of the financial condition of the Corporation. The Treasurer shall perform such other duties as may be prescribed by the Board of Directors, the Chair of the Board, the Chief Executive Officer or the President.

**Section 13. <u>Other Officers; Employees and Agents</u>**. Each and every other officer, employee and agent of the Corporation shall possess, and may exercise, such power and authority, and shall perform such duties, as may from time to time be assigned to such person by the Board of Directors, the officer so appointing such person or such officer or officers who may from time to time be designated by the Board of Directors to exercise such supervisory authority.

**ARTICLE FIVE <u>CERTIFICATES FOR SHARES</u>**

**Section 1. <u>Issue of Certificates</u>**. The shares of the Corporation shall be represented by certificates, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board of Directors, every holder of stock represented by certificates (and upon request every holder of uncertificated shares) shall be entitled to have a certificate signed by or in the name of the Corporation by the Chair of the Board or a Vice Chair of the Board, or the Chief Executive Officer, President or Vice President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, representing the number of shares registered in certificate form.

**Section 2. <u>Legends for Preferences and Restrictions on Transfer</u>**. The designations, relative rights, preferences and limitations applicable to each class of shares and the variations in rights, preferences and limitations determined for each series within a class (and the authority of the Board of Directors to determine variations for future series) shall be summarized on the front or back of each certificate. Alternatively, each certificate may state conspicuously on its front or back that the Corporation will furnish the stockholder a full statement of this information on request and without charge. Every certificate representing shares that are restricted as to the sale, disposition, or transfer of such shares shall also indicate that such shares are restricted as to transfer, and there shall be set forth or fairly summarized upon the certificate, or the certificate shall indicate that the Corporation will furnish to any stockholder upon request and without charge, a full statement of such restrictions. If the Corporation issues any shares that are not registered under the Securities Act, or not registered or qualified under the applicable state securities laws, the transfer of any such shares shall be restricted substantially in accordance with the following legend:

> "THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY APPLICABLE STATE LAW. THEY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR PLEDGED WITHOUT (1) REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND ANY APPLICABLE STATE LAW, OR (2) AT HOLDER'S EXPENSE, AN OPINION (SATISFACTORY TO THE CORPORATION) OF COUNSEL (SATISFACTORY TO THE CORPORATION) THAT REGISTRATION IS NOT REQUIRED."

**Section 3. <u>Facsimile Signatures</u>**. Any and all signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon such certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if the person were such officer, transfer agent or registrar at the date of issue.

**17**

**Section 4. <u>Lost Certificates</u>**. The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost or destroyed. When authorizing such issue of a new certificate or certificates, the Corporation may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or such owner's legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost or destroyed.

**Section 5. <u>Transfer of Shares</u>**. Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

**Section 6. <u>Registered Stockholders</u>**. The Corporation shall be entitled to recognize the exclusive rights of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Nevada.

**ARTICLE SIX <u>GENERAL PROVISIONS</u>**

**Section 1. <u>Dividends</u>**. The Board of Directors may from time to time declare, and the Corporation may pay, dividends on its outstanding shares in cash, property, stock (including its own shares) or otherwise pursuant to law and subject to the provisions of the Articles of Incorporation.

**Section 2. <u>Reserves</u>**. The Board of Directors may by resolution create a reserve or reserves out of earned surplus for any proper purpose or purposes, and may abolish any such reserve in the same manner.

**Section 3. <u>Checks</u>**. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

**Section 4. <u>Fiscal Year</u>**. The fiscal year of the Corporation shall end on December 31 of each year, unless otherwise fixed by resolution of the Board of Directors.

**Section 5. <u>Seal</u>**. The Board of Directors may adopt a seal by resolution of the Board of Directors. The corporate seal shall have inscribed thereon the name and state of incorporation of the Corporation. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

**Section 6. <u>Gender</u>**. All words used in these Bylaws in the masculine gender shall extend to and shall include the feminine and neuter genders.

**ARTICLE SEVEN <u>AMENDMENT OF BYLAWS</u>**

Except as otherwise set forth herein, these Bylaws may be altered, amended or repealed or new

**18**

Bylaws may be adopted at any meeting of the Board of Directors at which a quorum is present, by the

**19**

affirmative vote of a majority of the directors present at such meeting, or pursuant to an appropriate written consent adopted by the Board of Directors.

## ARTICLE EIGHT EXCLUSIVE FORUM

**Section 1. Internal Actions**. Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation by a person other than the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of the NRS or the Articles of Incorporation or these Bylaws, or (d) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation governed by the internal affairs doctrine, shall be the Eighth Judicial District Court of Clark County of the State of Nevada (the "Court") (or if the Court does not have jurisdiction, the federal district court for the District of Nevada). Any person who, or entity that, purchases or otherwise acquires an interest in stock of the Corporation will be deemed (i) to have notice of, and agree to comply with, the provisions of this Section 1, and (ii) to consent to the personal jurisdiction of the Court (or if the Court does not have jurisdiction, the federal district court for the District of Nevada) in any proceeding brought to enjoin any action by that person or entity that is inconsistent with the exclusive jurisdiction provided for in this Section 1.

**Section 2. Securities Act Claims**. Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States shall be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act against the Corporation or any director or officer or other employee of the Corporation.

**20**

**CORPORATE SECRETARY'S CERTIFICATE OF ADOPTION OF THE AMENDED AND RESTATED BYLAWS OF CELSIUS HOLDINGS, INC.**

I hereby certify:

That the foregoing Amended and Restated Bylaws, constitute the Bylaws of said corporation as duly adopted by the Board of Directors of the Corporation on August 5, 2022.

IN WITNESS WHEREOF, I have hereunder subscribed my name this 5th day of August, 2022.

Marcus Sandifer, Corporate Secretary

**Exhibit 10.1**
*Execution Version*

**SECURITIES PURCHASE AGREEMENT**

This SECURITIES PURCHASE AGREEMENT (this "*Agreement*") is made and entered into effective as of August 1, 2022, by and between Celsius Holdings, Inc., a Nevada corporation (the "*Company*"), and PepsiCo, Inc., a North Carolina corporation (the "*Purchaser*"). Certain terms used and not otherwise defined in the text of this Agreement are defined in Section 8 hereof.

**RECITALS**

WHEREAS, the Company desires to sell to the Purchaser, and the Purchaser desires to purchase from the Company, 1,466,666 shares of preferred stock, $0.001 par value per share (the "*Preferred Stock*") designated as "Series A Convertible Preferred Stock" (the "*Series A Preferred Stock*"), having the rights, preferences and privileges set forth in the Certificate of Designation attached hereto as Exhibit A (the "*Certificate*"), subject to the terms and conditions set forth in this Agreement; and

WHEREAS, in connection herewith, the Company and the Purchaser, are entering into a distribution agreement in the form mutually agreed by the Company and the Purchaser (the "*Distribution Agreement*").

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties and covenants herein contained, the parties hereto hereby agree as follows:

Section 1. Sale and Purchase of the Shares. Upon the terms and subject to the conditions herein contained, the Company agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Company, at the Closing, a total of 1,466,666 shares of a Series A Preferred Stock, at a price per share of $375.00, for an aggregate purchase price of $550,000,000 (the "*Purchase Price*"). The shares of Series A Preferred Stock sold hereunder at the Closing shall be referred to as the "*Shares*."

Section 2. Closing.

2.1 The closing of the purchase and sale of the Shares (the "*Closing*") shall take place on August 1, 2022 via electronic exchange of required documents at the time of receipt of certified evidence from the Secretary of State of the State of Nevada of the filing of the Certificate (the "*Effective Date*"). The date the Closing actually occurs shall be referred to herein as the "*Closing Date*".

2.2 At or prior to the Closing, the Company shall deliver or, as applicable, cause to be delivered, to the Purchaser:

(a) the Shares, free and clear of all Liens (except restrictions imposed by any applicable federal and state securities Laws and the transfer restrictions set forth herein or in any Transaction Document);

(b) evidence that the Certificate has been filed with the Secretary of State of Nevada and is in full force and effect as of the Closing;

(c) a registration rights agreement, in the form attached hereto as Exhibit B (the "*Registration Rights Agreement*"), duly executed by the Company;

(d) lock-up agreements, each in the form attached hereto as Exhibit C, duly executed by each of the Persons listed on Section 2.2(d) of the Disclosure Schedules;

(e) a properly executed IRS Form W-9; and

(f) the Distribution Agreement, duly executed by the Company.

2.3 At or prior to the Closing, the Purchaser shall deliver to the Company (a) the Purchase Price, by wire transfer in immediately available U.S. federal funds, to the account designated by the Company in writing, (b) the Registration Rights Agreement, duly executed by the Purchaser, (c) a properly executed IRS Form W-9; and (d) the Distribution Agreement, duly executed by Purchaser.

Section 3. Representations and Warranties of the Purchaser. The Purchaser represents and warrants to the Company as of the Effective Date that:

3.1 Organization and Good Standing; Corporate Power and Authority; Validity. The Purchaser is a duly organized and validly existing North Carolina corporation, has all requisite corporate power and authority to own its properties and conduct its business as presently conducted, and is duly qualified to do business and is in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified, except where failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the legality, validity or enforceability of any Transaction Documents. The Purchaser has all requisite corporate power and authority and has taken all necessary corporate action required for the due authorization, execution, delivery and performance by the Purchaser of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which it is a party will be duly executed and delivered by the Purchaser, and each such agreement constitutes or will constitute a legal, valid and binding obligation of the Purchaser enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other Laws of general application affecting enforcement of creditors' rights generally, and as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2

3.2 No Conflicts. The execution, delivery and performance by the Purchaser or its relevant Affiliate of the Transaction Documents and the consummation by each such party of the transactions contemplated hereby and thereby to which it is a party do not and will not (a) conflict with or violate any provision of the Purchaser's Organizational Documents, (b) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Purchaser pursuant to, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any material agreement, indenture or other instrument to which the Purchaser or its relevant Affiliate or any of their respective Subsidiaries is a party or by which any property or asset of such party is bound or affected, or (c) conflict with or result in a violation of any Law or other restriction of any Governmental Entity to which the Purchaser or its relevant Affiliate or any of their respective Subsidiaries is subject (including federal and state securities laws and regulations), or by which any property or asset of the Purchaser or its relevant Affiliate or any of their respective Subsidiaries is bound or affected, except in the case of each of clauses (a), (b) and (c), such as could not have or reasonably be expected to result in a material adverse effect on the legality, validity or enforceability of any Transaction Document.

3.3 Filings, Consents and Approvals. Assuming the accuracy of the representations set forth in Section 4.3, the Purchaser is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any Governmental Entity in connection with the execution, delivery and performance by the Purchaser of the Transaction Documents to which it is a party and the consummation of the transactions contemplated thereunder, other than such filings and registrations as are required to be made under applicable federal and state securities Laws.

3.4 <u>Brokers</u>. Except for Centerview Partners LLC, the fees and expenses of which shall be the obligation of the Purchaser, there is no broker, investment banker, financial advisor, finder or other Person which has been retained by or is authorized to act on behalf of the Purchaser who might be entitled to any fee or commission for which the Company will be liable in connection with the execution of this Agreement and the consummation of the transactions contemplated hereby.

3.5 <u>Investment Representations and Warranties</u>. The Purchaser understands and agrees that the offering and sale of the Shares has not been registered under the Securities Act or any applicable state securities Laws and is being made in reliance upon federal and state exemptions for transactions not involving a public offering which depend upon, among other things, the *bona fide* nature of the investment intent and the accuracy of the Purchaser's representations, warranties, agreements, acknowledgements and understandings as expressed herein.

3.6 <u>Acquisition for Own Account; No Control Intent</u>. The Purchaser is acquiring the Shares for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act or any applicable state securities Laws. The Purchaser is not party to any agreement providing for or contemplating the distribution of any of the Shares.

3.7 <u>Ability to Protect Its Own Interests and Bear Economic Risks</u>. The Purchaser, by reason of the business and financial experience of its management, has the capacity to protect its own interests in connection with the transactions contemplated by this Agreement and is capable of evaluating the merits and risks of the investment in the Shares. The Purchaser is able to bear the economic risk of an investment in the Shares and is able to sustain a loss of all of its investment in the Shares without economic hardship, if such a loss should occur.

3

3.8 <u>Accredited Investor; No Bad Actor</u>. The Purchaser is an "accredited investor" as that term is defined in Rule 501(a) under the Securities Act. The Purchaser has not taken any of the actions set forth in, and is not subject to, the disqualification provisions of Rule 506(d)(1) of the Securities Act.

3.9 <u>No Governmental Review</u>. The Purchaser understands that no United States federal or state agency or any Governmental Entity has passed on or made any recommendation or endorsement of the Shares or the fairness or suitability of the investment in the Shares nor have such authorities passed upon or endorsed the merits of the offering of the Shares.

3.10 <u>Access to Information</u>. The Purchaser has been provided with certain Company documents, records, and other information, and has been given an opportunity to ask questions of, and receive answers from, the Company's officers, employees, agents, accountants, and representatives concerning the Company's business, operations, financial condition, assets, liabilities, and other matters relevant to its investment in the Shares. The Purchaser understands that an investment in the Shares bears significant risk and represents that it has reviewed the SEC Reports, which serve to qualify certain of the Company representations set forth below.

3.11 <u>Restricted Shares</u>.

(a) The Purchaser understands that the Shares, as well as the common stock, par value $0.001 ("***Common Stock***") issuable upon conversion of the Shares, will be characterized as "restricted securities" under the federal securities Laws inasmuch as they are being acquired from the Company pursuant to the exemption from registration provided by Regulation D of the Securities Act and that under such Laws and applicable regulations such Shares may be resold without registration under the Securities Act only in certain limited circumstances.

(b) The Purchaser acknowledges that the Shares must be held indefinitely unless subsequently registered under the Securities Act and under applicable state securities Laws or an exemption from such registration is available. The Purchaser understands that the Company is under no obligation to register the Shares, except as provided in this Agreement or the Registration Rights Agreement.

(c) The Purchaser is aware of the provisions of Rule 144 under the Securities Act, which permit limited resale of securities purchased in a private placement.

3.12 Sufficient Funds. The Purchaser has sufficient funds presently available to deliver the Purchase Price in full and to consummate the transactions contemplated by this Agreement and the other Transaction Documents in accordance with the terms hereof and thereof.

4

3.13 No Public Market. The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

3.14 Tax Advisors. The Purchaser has had the opportunity to review with the Purchaser's own tax advisors the federal, state and local tax consequences of this investment, where applicable, and the transactions contemplated by this Agreement. The Purchaser is relying solely on the Purchaser's own determination as to tax consequences or the advice of such tax advisors and not on any statements or representations of the Company or any of its agents and understands that the Purchaser (and not the Company) shall be responsible for the Purchaser's own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

3.15 Limitation. Except as expressly set forth in Section 4 or in any other Transaction Document, the Purchaser acknowledges and agrees that none of the Company, its Subsidiaries, nor any other Person, has made any representation or warranty, express or implied, at law or in equity, by statute or otherwise, and any other representations or warranties are hereby expressly disclaimed by the Company, including, without limitation, any implied representation or warranty as to condition, merchantability, suitability or fitness for a particular purpose. Notwithstanding anything to the contrary, nothing in this Agreement shall limit the right of the Purchaser and its Affiliates to rely on the representations, warranties, covenants and agreements expressly set forth in this Agreement or in any other Transaction Document, nor will anything in this Agreement operate to limit any claim by the Purchaser or any of its Affiliates for actual and intentional fraud.

Section 4. Representations and Warranties by the Company. Except as set forth (x) in SEC Reports filed with or furnished to the Commission after January 1, 2020 and at least one Business Day prior to the date of this Agreement, excluding any disclosure set forth in any risk factor section, any disclosure in any section relating to forward-looking statements and any other disclosure included in any such form, report, schedule, statement or other document to the extent such disclosure is predictive or forward-looking in nature or constitutes a "forward looking statement" within the meaning of the Securities Act or the Exchange Act, or (y) in a correspondingly identified schedule separately provided by the Company to the Purchaser on the Effective Date (the "*Disclosure Schedules*"), it being understood that the disclosure of any fact or item in any section of the Disclosure Schedules will, should the existence of such fact or item be relevant to any other section, be deemed to be disclosed with respect to that other section to the extent that its relevance is reasonably apparent on its face, the Company represents and warrants to the Purchaser as of the Effective Date that:

4.1 Organization and Good Standing.

(a) The Company is a duly organized and validly existing Nevada corporation, has all requisite corporate power and authority to own its properties and conduct its business as presently conducted, is duly qualified to do business and is in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified, except where failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have Material Adverse Effect. Except as disclosed on Section 4.1(a) of the Disclosure Schedules, true and accurate copies of the articles of incorporation (as amended from time to time prior to the Effective Date, the "*Articles*") and bylaws (as amended from time to time prior to the Effective Date, the "*Bylaws*" and, together with the Articles, the "*Organizational Documents*"), are publicly available in the SEC Reports.

5

(b) Each of the Company's Subsidiaries is duly organized and validly existing under the Laws of its jurisdiction of organization, has all requisite corporate or other applicable entity power and authority to own its properties and conduct its business as presently conducted, is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified, except where failure to be so qualified or in good standing (where such concept is recognized under applicable Law) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.2 Corporate Power and Authority; Valid Issuance of Shares.

(a) The Company has all requisite corporate power and has taken all necessary corporate action required for the due authorization, execution, delivery and performance by the Company of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby. The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby, have been duly authorized by the Company's board of directors (the "**Board**") or a duly authorized committee thereof and no further consent or authorization of the Company, its Board or its stockholders is required. This Agreement has been duly executed and delivered by the Company, and the other Transaction Documents to herein to which it is a party will be duly executed and delivered by the Company, and each such agreement constitutes or will constitute a legal, valid and binding obligation of the Company enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other Laws of general application affecting enforcement of creditors' rights generally, and as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. Nevada Revised Statutes ("**NRS**") 78.378 to 78.3793, inclusive, and NRS 78.411 to 78.444, inclusive, are inapplicable to the Purchaser and its Affiliates, this Agreement and the transactions contemplated hereby.

(b) The Shares and the Common Stock issuable upon conversion of the Shares (the "**Conversion Shares**") have been duly and validly authorized and, when issued and paid for pursuant to this Agreement, the Shares and Conversion Shares (collectively, the "**Securities**") will be validly issued, fully paid and non-assessable, and shall be free and clear of all Liens (other than restrictions on transfer under the Transaction Documents or arising under applicable federal and state securities Laws), and will not be subject to preemptive rights or other similar rights of stockholders of the Company, and will effectively vest in the Purchaser good title to all such Securities, free and clear of all Liens (other than restrictions on transfer under the Transaction Documents or arising under applicable federal and state securities Laws). The respective rights, preferences, privileges, and restrictions of the Series A Preferred Stock and the Common Stock are as stated in the Articles or, in respect of the Series A Preferred Stock, in the Certificate. As of the Closing, the shares of Common Stock to be issued upon any conversion or redemption of the Shares shall have been duly reserved for such issuance.

6

(c) Assuming the accuracy of the Purchaser's representations in Section 3, the offer and sale of the Shares is exempt from the registration and prospectus delivery requirements of the Securities Act and the rules and regulations thereunder. Without limiting the foregoing, neither the Company nor, to the knowledge of the Company, any other person authorized by the Company to act on its behalf, has engaged in a general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) of investors with respect to offers or sales of the Shares and neither the Company nor, to the knowledge of the Company, any person acting on its behalf, has made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause the offering or issuance of the Shares under this Agreement to be integrated with prior offerings by the Company for purposes of the Securities Act that would result in Regulation D under the Securities Act or any other applicable exemption from registration under the Securities Act not being available, nor will the Company take any action or steps that would cause the offering or issuance of the Shares under this Agreement to be integrated with other offerings.

4.3 <u>Consents</u>. Neither the execution, delivery or performance of this Agreement by the Company, nor the consummation by it of the obligations and transactions contemplated hereby (including, without limitation, the issuance, the reservation for issuance and the delivery of the Shares and the provision to the Purchaser of the rights contemplated by the Transaction Documents) requires any consent of, authorization by, exemption from, filing with or notice to any Governmental Entity or any other Person, other than filings required under applicable U.S. federal and state securities Laws.

4.4 <u>No Conflicts</u>. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby (including, without limitation, the issuance, the reservation for issuance and the delivery of the Securities and the provision to the Purchaser of the rights contemplated by the Transaction Documents) will not (a) result in a violation of the Organizational Documents or require the approval of the Company's stockholders, (b) violate, conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any Material Contract to which the Company is a party, (c) result in any material respect in a violation of any Law, rule, regulation, order, judgment or decree (including, without limitation, U.S. federal and state securities Laws and regulations and regulations of any self- regulatory organizations to which the Company or its securities are subject) applicable to the Company or by which any material property or asset of the Company is bound or affected, (d) result in a violation of or require stockholder approval under any rule or regulation of Nasdaq, or (e) result in the creation of any encumbrance upon any of the Company's assets, except in the case of clauses (b) or (e), for matters that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7

4.5 <u>Capitalization</u>.

(a) The authorized capital stock of the Company consists of 100,000,000 shares of Common Stock and 2,500,000 shares of Preferred Stock. There are (i) 75,633,954 shares of Common Stock issued and outstanding; (ii) zero shares of Preferred Stock issued and outstanding; (iii) 3,178,942 shares of Common Stock reserved for issuance upon the exercise of stock options outstanding ("***Options***"); (iv) 595,843 shares of Common Stock issuable (and such number are reserved for issuance) upon vesting of restricted stock units for the issuance of Common Stock (the "***RSUs***") outstanding; and (v) zero shares of Common Stock held by the Company in its treasury. All of the issued and outstanding shares of Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights.

(b) No bonds, debentures, notes or other indebtedness having the right to vote (or convertible into or exchangeable for, securities having the right to vote) on any matters on which the stockholders of the Company may vote ("***Voting Debt***") are issued and outstanding. Except (i) pursuant to any cashless exercise provisions of any Options or pursuant to the surrender of shares to the Company or the withholding of shares by the Company to cover tax withholding obligations under Options or RSUs, and (ii) as set forth in <u>Section 4.5(a)</u> of the Disclosure Schedules, there are no outstanding equity securities of the Company, the Company does not have and is not bound by any outstanding options, preemptive rights, rights of first offer, warrants, phantom rights, calls, or other similar rights or written commitments or agreements calling for the purchase, redemption or issuance of, or securities or rights convertible into, or exchangeable for, any shares of Common Stock or any other equity securities of the Company or Voting Debt or any securities representing the right to purchase or otherwise receive any equity securities of the Company (including any stockholder rights plan or agreement) (collectively, "***Company Securities***"), or any obligations of the Company or any of its Subsidiaries to make any payments based on the price or value of any Company Securities. Neither the Company nor any of its Subsidiaries is a party to any stockholders' agreement, voting trust agreement or other similar agreement or understanding relating to any Company Securities or any other agreement relating to the disposition, voting or dividends with respect to any Company Securities. Except as contemplated by the Registration Rights Agreement, the Company has not granted or agreed to grant, and is not under any obligation to provide, any right to register under the Securities Act any

of the Company Securities. The Company is not party to a stockholder rights agreement, "poison pill" or similar anti-takeover agreement or plan.

4.6 <u>Material Contracts</u>. Each Material Contract is the legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except to the extent that enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other Laws of general application affecting enforcement of creditors' rights generally, and as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. The Company is in compliance with all material terms of the Material Contracts to which it is party, and there has not occurred any breach, violation or default or any event that, with the lapse of time, the giving of notice or the election of any Person, or any combination thereof, would constitute a breach, violation or default by the Company under any such Material Contract or, to the knowledge of the Company, by any other Person to any such contract except where such breach, violation or default would not have a Material Adverse Effect. The Company has not been notified in writing that any counterparty to any Material Contract intends, outside of the ordinary course, to cancel, terminate, not renew or exercise an option under any Material Contract, whether in connection with the transactions contemplated hereby or otherwise.

8

4.7 <u>Exchange Act; Nasdaq</u>.

(a) The Common Stock is registered pursuant to Section 12(b) of the Exchange Act, and the Company has taken no action intended to, or which, to the knowledge of the Company, is reasonably likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act, nor has the Company received as of the date of this Agreement any written notification that the Commission is contemplating terminating such registration.

(b) The Common Stock is listed on Nasdaq. To the Company's knowledge, there are no proceedings to revoke or suspend such listing or the listing of the Shares. The Company is in compliance in all material respects with the requirements of Nasdaq for continued listing of the Common Stock thereon and any other Nasdaq listing and maintenance requirements, and the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby (including the issuance of the Shares) will not result in any noncompliance by the Company with any such requirements.

4.8 <u>SEC Reports; Financial Statements</u>.

(a) The Company has, since January 1, 2019, filed with or furnished to the Commission, on a timely basis (giving effect to extensions under Rule 12b-25), all required reports, proxy statements, schedules, forms, and other documents required to be filed or furnished by the Company with the Commission pursuant to the Securities Act or the Exchange Act since January 1, 2019 (the foregoing, together with all exhibits thereto, collectively, the "**SEC Reports**"). Each of the SEC Reports, as of its respective filing date, complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the rules and regulations of the Commission thereunder applicable to such SEC Reports, and, except to the extent that information contained in any SEC Reports has been revised, amended or superseded by a later filed SEC Report filed and publicly available prior to any date as to which this representation speaks, none of the SEC Reports as of such respective dates of filing or furnishing (or, if revised, amended or superseded by a later filed SEC Report, as of the date of the filing or furnishing of such revision or amendment) contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

9

(b) The Company (i) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) that are reasonably designed to ensure that material information relating to the Company and its Subsidiaries is made known to the individuals responsible for the preparation of the Company's filings with the Commission, and (ii) has disclosed, based on its most recent evaluation prior to the date of this Agreement, to the Company's outside auditors and the audit committee of the Board (A) any significant deficiency or material weakness in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that is reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

(c) There is no transaction, arrangement or other relationship between the Company or any of its Subsidiaries and an unconsolidated or other off-balance sheet entity that is required to be disclosed by the Company in its SEC Reports and is not so disclosed.

(d) The financial statements of the Company and its Subsidiaries included in the SEC Reports (i) complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the Commission with respect thereto, in each case as of the date such SEC Report was filed (or, if any such SEC Report was revised, amended or superseded by a later filed SEC Report, as of the date of the filing or furnishing of such revision or amendment), and (ii) have been prepared in all material respects in accordance with generally accepted accounting principles in the United States ("*U.S. GAAP*") applied on a consistent basis during the periods involved (except as may be indicated in such financial statements or the notes thereto) and fairly present in all material respects the consolidated financial position of the Company and its Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows of the Company and its Subsidiaries for the periods then ended (subject, in the case of unaudited quarterly statements, to the absence of footnote disclosures and normal year-end audit adjustments).

(e) Except for (i) those liabilities that are reflected or reserved for in the consolidated financial statements of the Company included in its Annual Report on Form 10-K for the fiscal year ended December 31, 2021, (ii) liabilities incurred since December 31, 2021 in the ordinary course of business consistent with past practice, and (iii) liabilities that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Company and its Subsidiaries do not have any liability or obligation of any nature whatsoever (whether accrued, absolute, contingent or otherwise).

10

4.9 <u>Absence of Litigation</u>. There is no claim, action, suit, arbitration, investigation or other proceeding pending against, or to the knowledge of the Company, threatened, in writing, against or affecting, the Company or any of its Subsidiaries or any of their respective properties or, to the knowledge of the Company, any of their respective officers or directors before any Governmental Entity, in each case other than legal proceedings that are not reasonably expected to result in a Material Adverse Effect. Neither the Company, any of its Subsidiaries, or any director or officer thereof, is or has been the subject of any action involving a claim of a material violation of or liability under applicable federal or state securities Laws or a claim of breach of fiduciary duty relating to the Company or any of its Subsidiaries. Except as set forth on Section 4.9 of the Disclosure Schedules, there has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission of the Company, any of its Subsidiaries or any current or former director or officer of the Company or any of its Subsidiaries. The Company has not received any stop order or other order suspending the effectiveness of any registration statement filed by the Company under the Exchange Act or the Securities Act and, to the Company's knowledge, the Commission has not issued any such order.

4.10 <u>Compliance with Law</u>. The Company and each of its Subsidiaries are and, since January 1, 2019 have been, in compliance with all Laws, in each case, that are applicable to the Company or any of its Subsidiaries, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Company and each of its Subsidiaries hold all licenses, franchises, permits, certificates, approvals and

authorizations from Governmental Entities necessary for the lawful conduct of their respective businesses, except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.11 <u>Absence of Changes</u>. Since January 1, 2022, (a) except for the execution and performance of this Agreement and the Transaction Documents and the discussions, negotiations and transactions related thereto and any transaction of the type contemplated by this Agreement, the Transaction Documents or other extraordinary transaction, the business of the Company and its Subsidiaries has been carried on and conducted in all material respects in the ordinary course of business, consistent with past practice, and (b) there has not been any Material Adverse Effect or any event or occurrence that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.12 <u>Title</u>. Each of the Company and its Subsidiaries has (i) good and marketable title to its property that is owned real property, (ii) to the knowledge of the Company, valid leases to its property that is leased real property, and (iii) good and valid title to all of its other property, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.13 <u>Taxes</u>.

(a) Each of the Company and its Subsidiaries has filed all material Tax Returns required to have been filed, such Tax Returns were accurate in all material respects, and all Taxes due and payable (taking into account any extensions properly obtained) by the Company and its Subsidiaries (whether or not shown on any Tax Return) have been timely paid, except for those which are being contested in good faith and by appropriate proceedings and in respect of which adequate reserves with respect thereto are maintained in accordance with U.S. GAAP.

11

(b) Each of the Company and its Subsidiaries has duly and timely withheld all Taxes required to be withheld, and such withheld Taxes have been either duly and timely paid to the proper taxing authority or properly set aside in accounts for such purpose.

(c) No examination, audit, claim, suit, action, proceeding, or investigation of any Tax Return relating to any Taxes of the Company or any of its Subsidiaries or with respect to any Taxes due from or with respect to the Company or any of its Subsidiaries is currently in progress, pending, or threatened in writing.

(d) During the two year period ending on the date of this Agreement, the Company was not a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the United States Internal Revenue Code of 1986 (the "**Code**")) in a transaction intended to qualify for tax-free treatment under Section 355 of the Code.

(e) Neither the Company nor any of its Subsidiaries has engaged in, or has any liability or obligation with respect to, any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4.

(f) Neither the Company nor any of its Subsidiaries (i) has been a member of an affiliated, consolidated, combined or unitary group, other than one comprised only of the Company and/or one or more of its Subsidiaries, (ii) is party to any agreement relating to the apportionment, sharing, assignment or allocation of Taxes (other than (x) an agreement solely between or among the Company and/or one or more of its Subsidiaries or (y) Tax indemnification provisions in ordinary course commercial agreements that are not primarily related to Taxes), (iii) has entered into a closing agreement pursuant to Section 7121 of the Code, or any similar provision of state, local or non-U.S. law, which would be binding on the Company or its applicable Subsidiary after the Closing Date or (iv) has any liability for the Taxes of any Person (other

than the Company or any of its Subsidiaries) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. law) or as a transferee or successor.

(g) The Company is not and has not been during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code, a "United States real property holding Corporation" within the meaning of Section 897(c)(2) of the Code.

12

4.14 <u>Employee Matters</u>.

(a) Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) each Plan complies with, and has been operated and administered in compliance with, its terms and all applicable Laws (including ERISA and the Code), (ii) the Company and each of its Subsidiaries have each filed all reports, returns, notices, and other documentation required by ERISA, the Code or other applicable Law to be filed by such Person with any Governmental Entity with respect to each Plan, (iii) with respect to any Plan, no action, Lien, lawsuit, claim or complaint (other than routine claims for benefits, appeals of such claims and domestic relations order proceedings) is pending or, to the knowledge of the Company, threatened, and (iv) to the knowledge of the Company, no event has occurred with respect to a Plan which would reasonably be expected to result in a liability of the Company or any of its Subsidiaries to any Governmental Entity or adversely affect the qualified status for any such Plan. None of the Company, any of its Subsidiaries, or any other entity which, together with the Company or any of its Subsidiaries, would be treated as a single employer under Section 4001 of ERISA or Section 414 of the Code, has at any time during the last six years maintained, sponsored or contributed to any employee benefit plan that is subject to Title IV of ERISA, including any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(b) Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or other contract or agreement with any labor organization or other representative of any of the employees of the Company or any of its Subsidiaries, nor is any such contract or agreement presently being negotiated; (ii) to the knowledge of the Company, no campaign is being conducted to solicit cards from any of the employees of the Company or any of its Subsidiaries to authorize representation by any labor organization, and no such campaign has been conducted within the past three years; (iii) no labor strike, slowdown, work stoppage, dispute, lockout or other labor controversy is in effect or, to the knowledge of the Company, threatened in writing, and neither the Company nor any of its Subsidiaries has experienced any such labor controversy since January 1, 2019; (iv) no unfair labor practice charge or complaint is pending or, to the knowledge of the Company, threatened in writing with respect to any employment practice of the Company or any of its Subsidiaries; (v) no action, complaint, charge, inquiry, proceeding or investigation by or on behalf of any current or former employee, labor organization or other representative of the employees of the Company or any of its Subsidiaries (including persons employed jointly by such entities with any other staffing or other similar entity) is pending or, to the knowledge of the Company, threatened in writing; (vi) the Company and each of its Subsidiaries are in compliance with all applicable Laws, agreements, contracts, policies, plans and programs relating to employment, employment practices, compensation, benefits, hours, terms and conditions of employment, health and safety, employment discrimination, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues, payment of social security and other similar Taxes, termination of employment (including any obligation pursuant to the Worker Adjustment and Retraining Notification Act of 1988, as amended), the classification of employees as exempt or non-exempt from overtime pay requirements, the provision of meal and rest breaks and pay for all working time, and the proper classification of individuals as non- employee contractors or consultants; and (vii) the Company and each of its Subsidiaries are in compliance with all applicable Laws relating to child labor, forced labor and involuntary servitude.

13

4.15 <u>Product Matters; Compliance with Laws</u>.

(a) Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) the Company and each of its Subsidiaries is, and at all times has been, in compliance in all material respects with all applicable Laws (including the FDC Act, the Public Health Security and Bioterrorism Preparedness and Response Act, and similar Laws, relating to the manufacture, storage, transportation, import, export, sale, handling, distribution, packaging, packing, labeling, and advertising of the Company's or any of its Subsidiaries' products (the "***Products***")), and the Company and each of its Subsidiaries has paid, filed or otherwise complied with all applicable fees, renewals, registrations, licenses, reports, and other similar obligations; (ii) all of the Products meet, and at all times have met, all standards for quality and workmanship prescribed by industry standards, contractual agreements or product labels and labeling; (iii) neither the Company nor any of its Subsidiaries has received any deficiency notice, allegation of non-compliance, seizures, injunctions, warning letters, notices of violation or import alerts indicating or alleging that the Company's or its Subsidiaries' processes or Products do not comply with any applicable Laws, including those relating to the registration or certification of the Products or Product labeling; and (iv) the Products have received all applicable governmental approvals required for their sale and use.

(b) Without in any way limiting the generality of the foregoing, except as would not, individually or in the aggregate, have a Material Adverse Effect, for the past three years:

(i) neither the Company nor any of its Subsidiaries has sold or distributed any Products which are or were "adulterated," "misbranded," or otherwise violative within the meaning of the FDC Act or any comparable state Law, or are articles that may not be introduced into interstate commerce under the provisions of Sections 404 or 505 of the FDC Act;

(ii) all of the operations of the Company and its Subsidiaries are and have been in compliance, in all material respects, with all applicable Laws, guidelines, and policies issued or implemented by the U.S. Food and Drug Administration (the "***U.S. FDA***"), the U.S. Department of Agriculture (the "***USDA***"), and/or any other applicable Governmental Entity, including those related to facility registration, recordkeeping, prior notice of imported food, the reportable food registry, current good manufacturing practices, allergens, and food safety;

14

(iii) the Company and each of its Subsidiaries has not (x) received any written notice from the U.S. FDA or from comparable state governmental or regulatory body of any material violation of the FDC Act or of comparable state Laws, rules or regulations regarding any Products or any of its Subsidiaries; (y) been subject to any, nor is there any pending, material adverse inspection, finding of deficiency, finding of non- compliance, regulatory or warning letter, investigation, suspension of or refusal to renew a food facility registration, or other compliance or enforcement action, from or by the U.S. FDA, USDA, and/or any other Governmental Entity with respect to the Products, or any facility used in the manufacture, handling, storage, or distribution of the Products; or (z) undertaken any recall of Products that may have been adulterated, misbranded or otherwise made in violation of the FDC Act or the rules and regulations thereunder or comparable state Laws, rules or regulations, except for recalls that have been reported to the U.S. FDA and have been completed in accordance with U.S. FDA's requirements;

(iv) there has not been, nor is there any currently pending or, to the knowledge of the Company, threatened, recall or post-sale warning in respect of any Product, except for recalls that have been reported to the U.S. FDA and have been completed in accordance with the U.S. FDA's requirements, and neither the Company nor any of its Subsidiaries has received written notice of any material action or proceeding involving any Product designed, manufactured, distributed or sold by or on behalf of the Company or any of its Subsidiaries resulting from an alleged defect in

design or manufacture, any alleged hazard or impurity, or any alleged failure to warn, or from any alleged breach of implied warranties or representations, or any alleged noncompliance with any Laws, other than immaterial notices or claims that have been settled or resolved prior to the date of this Agreement;

(v) all labels for all Products manufactured, sold, or distributed by the Company or any of its Subsidiaries are, and at all times have been, correct in all material respects, and comply in all material respects, with all requirements of all applicable Laws including those governing "organic," "nutrient content," "structure-function," and "health" claims;

(vi) all promotional and advertising materials used or produced by the Company or any of its Subsidiaries are, and have been, in material compliance with all applicable Laws (including those of the U.S. FDA, United States Federal Trade Commission, and/or any other applicable Governmental Entity); and

(vii) neither the Company, any of its Subsidiaries nor any Person acting on their behalf has made an untrue statement of a material fact or fraudulent statement to any Governmental Entity, failed to disclose a material fact required by applicable Law to any Governmental Entity, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, would reasonably be expected to constitute a material violation of any applicable Laws.

15

4.16 FCPA; Illegal Payments.

(a) Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2019, none of the Company, any of its Subsidiaries or any officer or director or, to the knowledge of the Company, employee, agent, representative or consultant, acting on behalf of the Company or any of its Subsidiaries (and only in their capacities as such) has, in connection with the business of the Company: (i) unlawfully offered, paid, promised to pay, or authorized the payment of, directly or indirectly, anything of value, including money, loans, gifts, travel, or entertainment, to any Government Official with the purpose of (A) influencing any act or decision of such Government Official in his official capacity; (B) inducing such Government Official to perform or omit to perform any activity in violation of his legal duties; (C) securing any improper advantage; or (D) inducing such Government Official to influence or affect any act or decision of such Governmental Authority, except, with respect to the foregoing clauses (A) - (D), as permitted under the U.S. Foreign Corrupt Practices Act or other applicable Law; (ii) made any illegal contribution to any political party or candidate; (iii) made, offered or promised to pay any unlawful bribe, payoff, influence payment, kickback, unlawful rebate, or other similar unlawful payment of any nature, directly or indirectly, in connection with the business of the Company, to any person, including any supplier or customer; (iv) knowingly established or maintained any unrecorded fund or asset or made any false entry on any book or record of the Company or any of its Subsidiaries for any purpose; or (v) otherwise violated the U.S. Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010, as amended, or any other applicable anti-corruption or anti-bribery Law.

(b) For purposes of this Section: "*Government Official*" means any officer or employee of a Governmental Authority or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such Governmental Authority or department, agency, or instrumentality, or for or on behalf of any such public international organization, or any political party, party official, or candidate thereof, excluding officials of the governments of the United States, the several states thereof, any local subdivision of any of them or any agency, department or unit of any of the foregoing; and "*Governmental Authority*" means any foreign government, any political subdivision thereof, or any corporation or other entity owned or controlled by any government or any sovereign wealth fund, excluding the governments of the United States, the several states thereof, any local subdivision of any of them or any agency, department or unit of any of the foregoing.

4.17 <u>Brokers</u>. Except for UBS Securities LLC and Stifel, Nicolaus & Company, Inc., the fees and expenses of which shall be the obligation of the Company, there is no investment banker, broker, finder, financial advisor, placement agent or other Person that has been retained by or is authorized to act on behalf of the Company who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.18 <u>Environmental Matters</u>. Except as would not, individually or in the aggregate, have a Material Adverse Effect, the Company and each of its Subsidiaries: (i) is in compliance with any and all applicable foreign, federal, state and local Laws and regulations relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("***Environmental Laws***"), (ii) has received and is in compliance with all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct its business and (iii) has not received written notice of any actual or potential liability under any Environmental Law. Neither the Company nor any of its Subsidiaries, has been named as a "potentially responsible party" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

16

4.19 <u>Intellectual Property Matters</u>. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Company or one of its Subsidiaries owns all (A) Intellectual Property registrations and applications owned or purported to be owned by the Company or one of its Subsidiaries and all such registrations and applications are filed in their respective names, the registrations of which are subsisting and unexpired, and to the knowledge of the Company, valid and enforceable, and (B) other Intellectual Property used in the conduct of the businesses of the Company or any of its Subsidiaries that is not used pursuant to a license or in the public domain; (ii) to the knowledge of the Company, the conduct of the businesses of the Company and its Subsidiaries does not infringe the Intellectual Property of any third party, and no person is infringing any Intellectual Property owned by the Company or its Subsidiaries; (iii) the Company and its Subsidiaries take reasonable actions to protect the trade secrets and confidential information owned by the Company or its Subsidiaries and the security and operation of their software, websites and systems (and the data therein), and, to the knowledge of the Company, there has been no instance of unauthorized use or disclosure, security breach, malfunction or outage of the same; and (iv) since January 1, 2019, there has been no judicial or administrative order, decree or judgment to which the Company or any of its Subsidiaries is a party or by which they are bound that restricts any right to any proprietary Intellectual Property owned by the Company or used in the conduct of the businesses of the Company or its Subsidiaries.

4.20 <u>Suppliers and Customers</u>. Since January 1, 2021, to the knowledge of the Company, none of any of the top 10 suppliers, top 10 distributors, top 10 customers, or top 10 vendors has terminated or canceled, or threatened, in writing, to terminate or cancel, the business relationship between the Company and such top 10 supplier, top 10 distributor, top 10 customer, or top 10 vendor.

4.21 <u>Limitation</u>. Except as expressly set forth in <u>Section 3</u> or in any other Transaction Document, the Company acknowledges and agrees that neither the Purchaser nor any other Person, has made any representation or warranty, express or implied, at Law or in equity, by statute or otherwise, and any other representations or warranties are hereby expressly disclaimed by the Purchaser. Notwithstanding anything to the contrary, nothing in this Agreement shall limit the right of the Company and its Affiliates to rely on the representations, warranties, covenants and agreements expressly set forth in this Agreement or in any other Transaction Document, nor will anything in this Agreement operate to limit any claim by the Company or any of its Affiliates for actual and intentional fraud.

17

4.22 <u>No Other Representations and Warranties</u>. The representations and warranties set forth in this Section 4 are the only representations and warranties made by the Company with respect to the Shares or any other matter relating to the transactions contemplated by this Agreement. Except as specifically set forth in this Agreement, (a) the Company makes no warranty, express or implied, as to any matter relating to the Shares or any other matter relating to the transactions contemplated by this Agreement, including as to (i) the operation of the business of the Company and its Subsidiaries after the Closing in any manner or (ii) the probable success or profitability of the business of the Company and its Subsidiaries after the Closing, and (b) neither the Company or any of its Affiliates,

nor any of their respective stockholders, directors, officers, employees or agents will have or be subject to any liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution or delivery to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Company or any of its Affiliates, including any summary business descriptions, financial forecasts, projections or models, or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement. Notwithstanding anything to the contrary, nothing in this Agreement shall limit the right of the Purchaser and its Affiliates to rely on the representations, warranties, covenants and agreements expressly set forth in this Agreement, nor will anything in this Agreement operate to limit any claim by the Purchaser or any of its Affiliates for actual and intentional fraud in the making of the representations, warranties, covenants and agreements expressly set forth in this Agreement.

Section 5. Covenants.

5.1 Authorized Common Stock. At any time that any Shares are issued and outstanding, the Company shall from time to time take all lawful action within its control to cause the authorized capital stock of the Company to include a sufficient number of authorized but unissued shares of Common Stock to satisfy the conversion requirements of all shares of Series A Preferred Stock then issued and outstanding. All shares of Common Stock delivered upon conversion of the Series A Preferred Stock shall be newly issued shares or shares held in treasury by the Company, shall have been duly authorized and validly issued and shall be fully paid and nonassessable, and free and clear of any Liens (other than Liens incurred by the Purchaser, restrictions arising under applicable securities Laws, and the transfer restrictions expressly set forth in this Agreement or any Transaction Document).

5.2 Expenses. Each of the Company and the Purchaser shall be liable for, and will pay, its own expenses incurred in connection with the negotiation, preparation, execution and delivery of this Agreement, including, without limitation, attorneys' and consultants' fees and expenses.

18

5.3 Election of Directors.

(a) For so long as the Purchaser (together with its Affiliates) beneficially owns at least 3,666,665 shares of the Company's outstanding Common Stock (determined on as-converted basis, and as appropriately adjusted for any applicable stock split or other recapitalization or reclassification) (the "*Beneficial Ownership Requirement*"), the Purchaser shall have the right to designate one designee (the "*Purchaser Designee*") to be nominated by the Company for election to the Board, and the Board shall include the Purchaser Designee in the slate of nominees to be elected or appointed to the Board at the next (and each applicable subsequent) annual or special meeting of stockholders, subject to such designee's satisfaction of all applicable requirements regarding service as a director of the Company under applicable Law and Nasdaq rules (or the rules of the principal market on which the Common Stock is then listed) regarding service as a director and such other criteria and qualifications for service as a director applicable to all directors of the Company as in effect on the date thereof. The Purchaser and the Company agree that such individual must be (i) qualified to serve as a member of the Board under all applicable and bona fide corporate governance policies and guidelines of the Company and the Board, and all applicable legal, regulatory and stock exchange requirements, and (ii) to the extent feasible, but subject to any commercial or competitive considerations and applicable Law, an individual determined by the Purchaser (in its sole and reasonable discretion) to be in a leadership position of the Purchaser or one of its Affiliates; provided, however, that, if the Purchaser designates an individual to serve as a director that is not an employee of the Purchaser or its Affiliates, such person shall be reasonably acceptable to the Company. In no event shall any such Purchaser Designee's relationship with the Purchaser or its Affiliates (or any other actual or potential lack of independence resulting therefrom) be considered to disqualify such Purchaser Designee from being a member of the Board pursuant to this Section 5.3(a). In the event of the death, disability, resignation or removal of any Purchaser Designee as a member of the Board, the Purchaser shall be entitled designate a Purchaser Designee to replace such Purchaser Designee and, subject to this Section 5.3(a), the Company's

Organizational Documents, and any applicable provisions of the NRS, the Company shall cause such Purchaser Designee to fill such resulting vacancy. If at any time the Beneficial Ownership Requirement is not satisfied, then at the written request of the Board, the Purchaser Designee, as specified by the Purchaser, shall immediately resign, and the Purchaser shall cause such Purchaser Designee to immediately to resign, from the Board effective as of the first date on which the Beneficial Ownership Requirement ceases to be satisfied. In the event that such Purchaser Designee fails to immediately resign and the Purchaser fails to cause such Purchaser Designee to immediately resign, then within 10 days of such requirement not being satisfied, the Board may remove such Purchaser Designee.

(b) Effective as of the Closing, the size of the Board has been increased to nine members, and James Lee has been elected to the Board as the initial Purchaser Designee to serve for a term expiring at the 2023 annual meeting of the Company's stockholders.

(c) So long as the Beneficial Ownership Requirement is satisfied, the Company shall not decrease the size of the Board if such decrease would require the resignation of the Purchaser Designee without the consent of the Purchaser (which may be withheld in its sole discretion).

(d) The Company shall indemnify the Purchaser Designee and provide the Purchaser Designee with director and officer insurance to the same extent as it indemnifies and provides such insurance to other members of the Board, pursuant to the Organizational Documents, the NRS or otherwise.

19

5.4 <u>Information Rights</u>. Following the Closing, for so long as the Beneficial Ownership Requirement is satisfied, the Company agrees to provide the Purchaser with the following:

(a) within 60 days after the end of each fiscal year of the Company, (A) an audited, consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal year, (B) an audited, consolidated income statement of the Company and its Subsidiaries for such fiscal year and (C) an audited, consolidated statement of cash flows of the Company and its Subsidiaries for such fiscal year; <u>provided</u> that this requirement shall be deemed to have been satisfied if the Company files its annual report on Form 10-K for the applicable fiscal year with the Commission on or prior to the date such report is due under the Exchange Act and applicable Commission regulations (including any extensions granted pursuant to Rule 12b-25);

(b) within 45 days after the end of each of the first three quarters of each fiscal year of the Company, (A) an unaudited, consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal quarter, (B) an unaudited, consolidated income statement of the Company and its Subsidiaries for such fiscal quarter and (C) an unaudited, consolidated statement of cash flows of the Company and its Subsidiaries for such fiscal quarter; <u>provided</u> that this requirement shall be deemed to have been satisfied if the Company files its quarterly report on Form 10-Q for the applicable fiscal quarter with the Commission on or prior to the date such report is due under the Exchange Act and applicable Commission regulations (including any extensions granted pursuant to Rule 12b-25); and

(c) reasonable access, to the extent reasonably requested by the Purchaser to certain of the Company's and its Subsidiaries' books and records, and to discuss its and their affairs, finances and accounts with its and their officers, all upon reasonable notice and at a reasonable time; <u>provided</u> that any investigation pursuant to this <u>Section 5.4</u> shall be conducted in a manner as not to interfere unreasonably with the conduct of the business of the Company and its Subsidiaries and without requiring the Company to incur any cost not reimbursed by the Purchaser;

<u>provided</u> that the Company shall not be obligated to provide such access or materials if the Company determines, in its reasonable judgment, that doing so would reasonably be expected to (i) result in the disclosure of trade secrets or competitively sensitive information, (ii) violate applicable Law, an applicable order or a contract or obligation of

confidentiality owing to a third party, or (iii) jeopardize the protection of an attorney-client privilege, attorney work product protection or other legal privilege.

5.5 <u>Cooperation</u>. In the event the issuance of the Shares hereunder or the transactions contemplated hereby are subject to regulatory review by a Governmental Entity, the Company and the Purchaser shall reasonably cooperate as necessary with respect to such review.

20

5.6 <u>Use of Proceeds</u>. The Company will use the proceeds from the sale of the Shares for general corporate purposes, capital expenditures for the production and distribution of the Company's products (including, but not limited to, coolers, vending, and fleet expansion), sales and marketing, and general and administrative expenses, excluding, for the avoidance of doubt, stock buybacks or dividends (provided that (i) so long as the Company does not circumvent any obligations herein, the Company shall not be required to maintain the proceeds from the sale of the Shares in a segregated account or similarly track its use, and (ii) dividends or redemption payments made to the Purchaser pursuant to the terms of the Certificate may be made with any of the Company's available funds). Notwithstanding the foregoing, subject to the terms of the Company's Organizational Documents (including the Certificate) and applicable Law, the Company shall be permitted to engage in stock buybacks or issue dividends from operating cash, purchases and sales of assets, and additional equity or debt issuances.

5.7 <u>Confidentiality</u>.

(a) Each party acknowledges and agrees that, as of the Closing Date, the Confidentiality Agreement will terminate and all obligations under the Confidentiality Agreement will cease, and the treatment of Confidential Information will be governed by the terms of this Agreement and the Distribution Agreement. The foregoing will not be deemed to relieve any party from any liability or obligation under the Confidentiality Agreement arising out of any breach or violation of the Confidentiality Agreement occurring prior to the Effective Date.

(b) From and after the Effective Date, the Recipient agrees, and agrees to cause its Affiliates, to hold all Confidential Information in confidence and to use the Confidential Information for the purpose of performing its obligations under this Agreement and the Transaction Documents and not to use the Confidential Information for any other purpose (other than, with respect to Purchaser, to monitor its investment in the Company). The Recipient agrees, and agrees to cause its Affiliates, not to disclose the Confidential Information to any Person other than (i) its Affiliates, (ii) its representatives who need to know such information or (iii) as required by applicable Law or an order by a Governmental Entity or any requirements of stock market or exchange or other regulatory body having competent jurisdiction; provided, that, except where not permitted by Law, the Recipient will give the Disclosing Party reasonable advance notice of such required disclosure, and will reasonably cooperate, at the Disclosing Party's expense, with the Disclosing Party, in order to allow the Disclosing Party an opportunity to oppose, or limit the disclosure of the Confidential Information or otherwise secure confidential treatment of the Confidential Information required to be disclosed; provided further, that, if disclosure is ultimately required, the Recipient will furnish only that portion of the Confidential Information which, based upon advice of legal counsel, the Recipient is required to disclose in compliance with any such requirement. The Recipient will ensure that the Recipient's Affiliates and representatives are informed of the confidentiality provisions of this Agreement and that each such Person comply with this Agreement. The Recipient will be responsible to the Disclosing Party for any breach of this Agreement by its Affiliates or representatives.

21

5.8 <u>Public Disclosure</u>. The Company shall, on or before 8:00 a.m., New York time, on the Effective Date of this Agreement, issue a press release in the form attached hereto as Exhibit D (subject to any changes mutually agreed by the Company and Purchaser). The Company shall, promptly following the Effective Date (but in any event within the time period required by the rules and regulations of the Commission), file a Current Report on Form 8-K,

disclosing the material terms of the transactions contemplated hereby; provided that the Company shall provide the Purchaser an opportunity to review such Form 8-K and shall consider the Purchaser's comments in good faith prior to the filing thereof. Thereafter, each party shall reasonably consult with the other party prior to issuing any press releases or otherwise making public disclosure or other public announcements, including in its filings with the Commission, with respect to the transactions contemplated by this Agreement and the other Transaction Documents that are inconsistent with, or add new non-public information with respect to, public disclosure previously made pursuant to this Agreement, unless required by applicable Law or securities listing standards (upon advice of counsel to the disclosing party), in which case to the extent practicable and permitted by applicable Law, each party will provide the other party with a reasonable opportunity to review such press release or other announcement or disclosure prior to issuance, distribution or publication.

5.9 Standstill Restrictions.

(a) From the Closing until the seventh anniversary of the Effective Date, the Purchaser covenants and agrees that, without the prior written consent of the Company or its Board, the Purchaser will not, and will not cause or permit any of its Subsidiaries or controlled Affiliates to, directly or indirectly:

(i) except as permitted by Section 5.11, acquire, offer to acquire, or agree to acquire, directly or indirectly, by purchase or otherwise, any voting securities (it being understood that for purposes of this Agreement, "voting securities" shall include any derivative instrument related to or referencing shares of the Company's common stock, whether settled through cash or physical delivery ("**Derivative Securities**")) or direct or indirect rights to acquire any voting securities of the Company or any subsidiary thereof, or of any successor to or person in control of the Company, or any assets of the Company or any subsidiary or division thereof or of any such successor or controlling person;

(ii) except as set forth in Section 5.3, make, or in any way participate in, directly or indirectly, any (x) "solicitation" of "proxies" (as each of those terms is defined in Commission Rule 14a-1) to vote, or seek to advise or influence any person or entity with respect to the voting of (including, without limitation, through written consent), any voting securities of the Company or (y) tender offer or solicitation of tender of the Company's voting securities;

(iii) make any public announcement or proposal with respect to any extraordinary transaction involving the Company or its securities (including, without limitation, voting securities) or assets;

(iv) form, join or in any way participate in a "group" (as defined for purposes of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) in connection with any of the foregoing;

22

(v) except as set forth in Section 5.3, take any public action to remove any director from the Board or change the size or composition of the Board, or amend the Company's Organizational Documents;

(vi) except as set forth in Section 5.3, otherwise take public action, alone or in concert with any other Person, to seek or propose to control the management, Board or policies or affairs of the Company or any of its Subsidiaries; or

(vii) knowingly advise, assist, encourage or direct any other Person to do any of the foregoing.

(b) Notwithstanding Section 5.9(a), if (i) the Company enters into a binding definitive agreement with any third party providing for a Change of Control, (ii) any Person or group (other than the

Purchaser or any of its Affiliates) acquires beneficial ownership of more than 35% of the outstanding Common Stock or assets of the Company, (iii) any Bona Fide Acquiror makes a public or non-public offer or proposal to the Company which would result in such Bona Fide Acquiror acquiring beneficial ownership of more than 35% of the outstanding Common Stock or assets of the Company, or publicly announces a proposal to effect or an intention to engage in a transaction involving a Change of Control of the Company (any such public offer, proposal or announced intention, a "***Third Party Proposal***"), or (iv) any Bona Fide Acquiror publicly announces a tender or exchange offer for more than 35% of the outstanding Common Stock of the Company and files a tender offer statement under Section 14(d)(1) or 13(e)(1) of the Exchange Act, then the provisions of Section 5.9(a) will terminate; provided, however, that if the Person, group or Bona Fide Acquiror is solely the Person set forth on Section 5.9 of the Disclosure Schedules, the foregoing references to 35% shall be deemed to be 50%. If the Company engages an investment bank to explore or engage in a process that could lead to a Change of Control of the Company, the Company will, within 30 days of such engagement, provide the Purchaser with notice of such action; provided that, if the Company does not involve the Purchaser as a participant in such process (including providing Purchaser with all non-public information provided to other participants in such process), the Purchaser will not be subject to the restrictions set forth in Section 5.9(a) in connection with that particular sale process. Except as set forth in this Section 5.9(b) or as otherwise provided in applicable Law, neither the Company nor any of its advisors, agents or representatives will have any legal, fiduciary or other duty to the Purchaser with respect to the manner in which the sale process is conducted. Furthermore, nothing in this Agreement shall be construed to prohibit the Purchaser or its Affiliates (whether during the process described in the foregoing sentence or otherwise) from submitting to the Board or the Chief Executive Officer of the Company one or more confidential proposals or offers for a potential transaction (including a Change of Control transaction) with or relating to the Company. Notwithstanding anything to the contrary, nothing in this Section 5.9 will limit the ability of (i) the Purchaser to (x) exercise its rights pursuant to Section 5.3 or 5.11, (y) have its Shares converted or redeemed in accordance with the Certificate, or (z) vote any Common Stock beneficially owned by the Purchaser or (ii) any Purchaser Designee to vote or otherwise exercise his or her legal duties or otherwise act in his or her capacity as a member of the Board.

23

5.10 Preemptive Rights.

(a) From the Closing for so long as the Beneficial Ownership Requirement is satisfied and subject to Section 5.11, if the Company proposes to issue any Common Stock or Equity-Based Securities of any kind ("***New Securities***"), other than in an Excluded Issuance, then the Company shall:

(i) give written notice to the Purchaser (no less than 20 Business Days prior to the closing of such issuance) of the Company's bona fide intention to offer such New Securities, setting forth in reasonable detail (A) the designation and all of the terms and provisions of the New Securities proposed to be issued (the "***Proposed Securities***"), including, to the extent applicable, the voting powers, preferences and relative participating, optional or other special rights, and the qualification, limitations or restrictions thereof; (B) the price and other terms of the proposed sale of such securities; and (C) the amount of such securities proposed to be issued; provided that following the delivery of such notice, the Company shall deliver to the Purchaser any such information the Purchaser may reasonably request in order to evaluate the proposed issuance; and

(ii) offer to issue and sell to the Purchaser, on such terms as the Proposed Securities are issued and upon full payment by the Purchaser, a portion of the Proposed Securities equal to a percentage determined by dividing (A) the number of shares of Common Stock the Purchaser beneficially owns (on an as converted basis, assuming full conversion and/or exercise of all Equity-Based Securities then outstanding, whether vested, unvested or then convertible or exercisable) by (B) the total number of shares of Common Stock then outstanding (on an as-converted basis, assuming full conversion and/or exercise of all Equity- Based Securities then outstanding, whether vested, unvested or then convertible or exercisable) (such percentage, the Purchaser's "***Participation Portion***").

(b) The Purchaser will have the option, exercisable by written notice to the Company, to accept the Company's offer and commit to purchase any or all of Participation Portion of the Proposed Securities offered to be sold by the Company to the Purchaser, which notice must be given within 10 Business Days after receipt of such notice from the Company. The closing of the exercise of such preemptive right shall take place simultaneously with the closing of the sale of the Proposed Securities giving rise to such preemptive right. Upon the expiration of the offering period described above, the Company will be free to sell such Proposed Securities that the Purchaser has not elected to purchase during the 90 days following such expiration on terms and conditions no more favorable to the purchasers thereof than those offered to the Purchaser in the notice delivered in accordance with Section 5.10(a). Any Proposed Securities offered or sold by the Company after such 90-day period must be reoffered to issue or sell to the Purchaser pursuant to this Section 5.10.

24

(c) The election by the Purchaser not to exercise its preemptive rights under this Section 5.10 in any one instance shall not affect their right as to any subsequent proposed issuance.

(d) In the case of an issuance subject to this Section 5.10 for consideration in whole or in part other than cash, including securities acquired in exchange therefor (other than securities by their terms so exchangeable), the consideration other than cash shall be deemed to be the Fair Market Value thereof.

(e) Notwithstanding any provision hereof to the contrary, in lieu of complying with the provisions of this Section 5.10, the Company may elect to give notice to the Purchaser within 30 days after the issuance of New Securities. The Purchaser shall have 20 days from the date notice is given to elect to purchase up to the number of New Securities that would, if purchased by the Purchaser, maintain the Purchaser's percentage-ownership position, calculated as set forth in Section 5.10(a)(ii) before giving effect to the issuance of such New Securities.

5.11 Future Acquisitions. From the Closing for so long as the Purchaser owns any Shares, the Purchaser agrees that, without the prior approval of the Board, the Purchaser will not acquire or agree to acquire beneficial ownership of Common Stock and the Equity-Based Securities (including on an as converted basis), if such acquisition would result in the Purchaser beneficially owning more than 15% of the outstanding Common Stock and the Equity-Based Securities (on an as converted basis, assuming full conversion and/or exercise of all Equity-Based Securities then outstanding, whether vested, unvested or then convertible or exercisable). For the avoidance of doubt, it shall not be deemed a breach of this Section 5.11 if the Purchaser acquires beneficial ownership of more than 15% of the Common Stock (on an as converted basis, assuming full conversion and/or exercise of all Equity-Based Securities then outstanding, whether vested, unvested or then convertible or exercisable) as a result of the PIK Dividend (as defined in the Certificate) or as a result of any Company stock buyback program or other reduction in the Company's outstanding capital stock (e.g., stock split or reorganization), and nothing in Section 5.11 will limit the Purchaser's ability (i) to vote (subject to the Certificate), transfer (subject to Section 6 below), convert (subject to the Certificate) or otherwise exercise rights of its Common Stock or Series A Preferred Stock, (ii) to exercise its rights pursuant to Section 5.3 or pursuant to the Distribution Agreement or any other Transaction Document or (iii) to acquire beneficial ownership of Common Stock or Equity-Based Securities so long as such acquisition would not result in the Purchaser beneficially owning more than 15% of the Common Stock (on an as converted basis, assuming full conversion and/or exercise of all Equity-Based Securities then outstanding, whether vested, unvested or then convertible or exercisable). The Company and the Purchaser acknowledge and agree that, until the Company obtains the required stockholder approval under NASDAQ Marketplace Rule 5635 (the "*Approval*"), (a) the total number of shares of Common Stock resulting from the conversion of the Series A Preferred Stock cannot exceed 19.99% of the total number of shares of Common Stock outstanding immediately prior to the issuance of the Series A Preferred Stock pursuant to this Agreement (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction), and (b) the holder of the Series A Preferred Stock cannot be entitled to more than 19.99% of the total voting power of the Company's equity securities outstanding immediately prior to the issuance of the Series A Preferred Stock pursuant to this Agreement (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction). The Company covenants and agrees to use its reasonable best efforts to obtain

the Approval as soon as reasonably practicable, and immediately after the Approval is obtained, the limitations under this Section 5.11 shall no longer apply. For avoidance of doubt, the foregoing shall not effect the accrual of any PIK Dividend in accordance with the Certificate. The Purchaser acknowledges that in connection with the Approval, none of the Series A Preferred Stock may vote on such matter.

25

5.12 Intended Tax Treatment. Each of the Purchaser and the Company agrees, for U.S. federal and other applicable income tax purposes, to treat (i) the Shares as constituting common stock within the meaning of Section 305 of the Code and the Treasury regulations thereunder, (ii) the aggregate issue price of the Shares as being an amount equal to the Purchase Price, and (iii) each Dividend (as defined in the Certificate) that is paid in kind as a tax-free distribution of stock of the Company with respect to its stock within the meaning of Section 305(a) of the Code (clauses (i), (ii), and (iii), collectively, the "***Intended Tax Treatment***"). The Purchaser and the Company agree to file all Tax Returns and take other actions in a manner consistent with, and not to take any action in a manner that is inconsistent with, the Intended Tax Treatment unless otherwise required by a "determination" within the meaning of Section 1313 of the Code.

5.13 Termination. Except as specifically otherwise provided herein, the provisions of this Agreement (other than Section 5.7 (*Confidentiality*), Section 9.8 (*Governing Law; Jurisdiction*), and Section 9.9 (*Waiver of Jury Trial*)) shall terminate upon the earliest to occur of the following: (a) a Change of Control; or (b) all of the Shares (including any shares of Common Stock on an as-converted basis) having been sold, redeemed in full or otherwise disposed of, by the Purchaser and its Affiliates in accordance with the provisions of this Agreement and the Certificate. The covenants set forth in Sections 5.3 (*Election of Directors)*, 5.4 (*Information Rights*) and 5.10 (*Preemptive Rights*) shall terminate and be of no further force and effect upon a Corporation Termination Event (as defined in the Certificate) if such termination is a termination for Cause (as defined in the Distribution Agreement).

Section 6. Transfer Restrictions; Restrictive Legend.

6.1 Transfer Restrictions. The Purchaser understands that it may not, directly or indirectly, sell, assign, pledge, hypothecate or otherwise transfer (or enter into an obligation regarding the future sale, assignment, pledge or transfer of) (a "***Transfer***") any of the Shares (other than to an Affiliate of the Purchaser) prior to (a) any such Shares being converted into Common Stock or (b) six months following the delivery of a Redemption Notice (as defined in the Certificate). Notwithstanding the foregoing, (x) any transaction involving the Purchaser or its Affiliates (including any Transfer of the Purchaser's or its Affiliates' equity, including any change of control of the Purchaser) that is not a direct transfer of Shares shall under no circumstances constitute a Transfer and (y) the foregoing shall not restrict the Purchaser from Transferring any Shares six months following delivery of a Redemption Notice or any shares of Common Stock at any time. The Purchaser covenants and agree not to enter any transaction involving the Purchaser or its Affiliates to avoid or circumvent the Transfer restrictions in this Agreement. Any Transfer or purported Transfer that is made or effected with the intent to circumvent the restrictions on Transfer set forth in this Section 6.1 shall be void. The Purchaser and its Affiliates shall use commercially reasonable efforts to effectuate any Transfer or series of related Transfers in a manner that would not result in a material adverse effect on the publicly traded price of the Common Stock, including not effecting any block trades at a price that is a greater than 20% discount to the market price of the Common Stock on the date prior to the closing of such block trade. In addition, the Purchaser understands the Company may, as a condition to the Transfer of any of the Securities, require that the request for Transfer be accompanied by an opinion of counsel reasonably satisfactory to the Purchaser, to the effect that the proposed transfer does not result in a violation of the Securities Act, unless such transfer is covered by an effective registration statement or by Rule 144 or Rule 144A under the Securities Act. It is understood that the certificates evidencing the Shares may bear substantially the following legend:

26

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES ARE SUBJECT TO THE TERMS AND CONDITIONS OF, AND RESTRICTIONS ON TRANSFER SET FORTH IN, A

SECURITIES PURCHASE AGREEMENT, DATED AS OF AUGUST 1, 2022, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY, AND SUCH SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A OF SUCH ACT."

6.2 <u>Unlegended Certificates</u>. Upon request of the Purchaser (or any transferee of the Purchaser), upon receipt by the Company of an opinion of counsel reasonably satisfactory to the Company to the effect that such legend is no longer required under the Securities Act and applicable state Laws, the Company shall promptly cause the legend to be removed from, or no longer applied to, any certificate for, or record representing, any Share to be transferred in accordance with <u>Section 6.1</u>.

<u>Section 7</u>. <u>Registration, Transfer and Substitution of Certificates for Shares</u>.

7.1 <u>Stock Register; Ownership of Shares</u>. The Company will keep at its principal office, or will cause its transfer agent to keep, a register in which the Company will provide for the registration of transfers of the Shares. The Company may treat the Person in whose name any of the Shares are registered on such register as the owner thereof and the Company shall not be affected by any notice to the contrary. All references in this Agreement to a "holder" of any Shares shall mean the Person in whose name such Shares are at the time registered on such register.

7.2 <u>Replacement of Certificates</u>. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any certificate representing any of the Shares, and, in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement and surety bond reasonably satisfactory to the Company or, in the case of any such mutilation, upon surrender of such certificate for cancellation at the office of the Company maintained pursuant to <u>Section 7.2</u> hereof, the Company at its expense will execute and deliver, in lieu thereof, a new certificate representing such Shares, of like tenor.

27

<u>Section 8</u>. <u>Definitions</u>. Unless the context otherwise requires, the terms defined in this <u>Section 8</u> shall have the meanings specified for all purposes of this Agreement. All accounting terms used in this Agreement, whether or not defined in this <u>Section 8</u>, shall be construed in accordance with U.S. GAAP.

"***Affiliate***" shall have the meaning ascribed to such term in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

Any Person shall be deemed to "***beneficially own***", to have "***beneficial ownership***" of, or to be "***beneficially owning***" any securities that such Person is deemed to "beneficially own" within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act; <u>provided</u> that any Person shall be deemed to beneficially own any securities that such Person has the right to acquire, whether or not such right is exercisable immediately (including assuming conversion of all Series A Preferred Stock, if any, owned by such Person to Common Stock).

"***Bona Fide Acquiror***" means a Person or group making a Third Party Proposal that is reasonably capable of consummating such Third Party Proposal, taking into account all legal, financial, regulatory and other aspects of such Third Party Proposal, including the identity of the Person or group making such Third Party Proposal.

"***Business Day***" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by Law to remain closed.

"***Change of Control***" means: (i) a sale or transfer, directly or indirectly, of all or substantially all of the assets of the Company in any transaction or series of related transactions (other than sales in the ordinary course of business); (ii) any merger, consolidation or reorganization of the Company with or into any other entity or entities as a result of

which the holders of the Company's outstanding capital stock (on a fully-diluted basis) immediately prior to the merger, consolidation or reorganization no longer represent at least a majority of the voting power of the surviving or resulting corporation or other entity; or (iii) any sale or series of sales, directly or indirectly, beneficially or of record, of shares of the Company's capital stock by the holders thereof which results in any Person or group of Affiliated Persons owning capital stock holding more than 50% of the voting power of the Company.

"***Commission***" means the United States Securities and Exchange Commission.

"***Confidential Information***" means all confidential or proprietary information and data of the Disclosing Party or its Affiliates, disclosed or otherwise made available to the Recipient or its representatives in connection with this Agreement or the transactions contemplated hereby, whether disclosed before or after the date of this Agreement and whether disclosed electronically, orally or in writing or through other methods made available to the Recipient or its representatives. Notwithstanding the foregoing, for purposes of this Agreement, Confidential Information will not include any information which (a) at the time of disclosure is in the public domain or thereafter enters the public domain without any breach of this Agreement by the Recipient or any of its representatives, (b) is known by the Recipient before the time of disclosure, other than as a result of a prior disclosure on a confidential basis by the Disclosing Party or its Affiliates or the Disclosing Party's representatives, (c) is obtained from a third party who, to the Disclosing Party's knowledge, does not thereby breach an obligation of confidence to the Disclosing Party regarding such information, or (d) is developed by or for the Recipient or its representatives through their independent efforts without use of Confidential Information.

28

"***Confidentiality Agreement***" means Mutual Confidentiality and Non-Use Agreement, effective June 24, 2022, between the Company and PepsiCo Beverages North America, a division of the Purchaser.

"***Disclosing Party***" means the party disclosing or making available Confidential Information (either directly or indirectly through such party's representatives) to the Recipient or the Recipient's representatives.

"***Equity-Based Security***" means any class or series of shares (including a new class of common shares of the Company other than Common Stock), any Preferred Stock or other preference shares, or any other equity-like or hybrid securities (including debt securities with equity components), including options, warrants, convertibles, exchangeable or exercisable securities.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Excluded Issuance***" shall mean the issuance of any New Securities (i) pursuant to an employment contract, equity compensation plan, employee stock option plan, management incentive plan, restricted stock plan, stock purchase plan or stock, ownership plan or similar benefit plan, program or agreement as approved by the Board, (ii) in connection with any "business combination" (as defined in the rules and regulations promulgated by the Commission) or otherwise in connection with bona fide acquisitions of securities or substantially all of the assets of another Person, business unit, division or business, (iii) pursuant to the conversion, exercise or exchange of Series A Preferred Stock issued to the Purchaser, (iv) the issuance of New Securities in a share split, stock dividend, recapitalization or similar transactions (except to the extent that new capital is raised in connection therewith), (v) upon the exercise or conversion of any Equity-Based Security, (vi) New Securities issued as "kickers" to banks or other financial institutions pursuant to transactions the primary purpose of which is a debt financing transaction approved by the Board, (vii) New Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board, and (viii) New Securities issued in connection with a joint venture, collaboration, license, marketing or other strategic partnership approved by the Board.

"***Fair Market Value***" means, with respect to any security or other property, the fair market value of such security or other property as reasonably determined in good faith by a majority of the Board, or an authorized committee thereof, after consultation with an Independent Financial Advisor.

"***FDC Act***" means the United States Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.), as amended to date together with any rules or regulations promulgated thereunder.

29

"***Governmental Entity***" means any national, federal, state, municipal, local, territorial, foreign or other government or any department, commission, board, bureau, agency, regulatory authority, self-regulatory organization or instrumentality thereof, or any court, judicial, administrative or arbitral body or public or private tribunal.

"***Independent Financial Advisor***" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing; provided, however, that such firm or consultant is (i) not an Affiliate of the Company and (ii) so long as the Purchaser meets the Beneficial Ownership Requirement, is reasonably acceptable to the Purchaser.

"***Intellectual Property***" means all worldwide intellectual property rights, whether or not registered, including patents, utility models, trademarks, service marks, trade names, corporate names, and trade dress (and all goodwill relating thereto), domain names, copyrights and copyrighted works, inventions, know-how, trade secrets, methods, processes, formulae, technical or proprietary information and technology and all registrations, applications, renewals, re- examinations, re-issues, divisions, continuations, continuations-in part and foreign counterparts thereof.

"***knowledge***" means, with respect to the Company, the actual knowledge of the executive officers of the Company listed on Section 8 of the Disclosure Schedules after reasonable inquiry.

"***Laws***" means all statutes, rules, codes, regulations, ordinances, orders, decrees, judgments, injunctions, writs, awards and decrees of, or issued by, any Governmental Entity.

"***Liens***" means any mortgage, pledge, security interest, encumbrance, lien, charge or other restriction of any kind, whether based on common law, statute or contract.

"***Material Adverse Effect***" means any material adverse effect on the condition (financial or otherwise), prospects, properties, assets, liabilities, business or operations of the Company and its Subsidiaries, taken as a whole.

"***Material Contract***" means any (i) contract of the Company or any of its Subsidiaries the termination of which would reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole, each as set forth on Section 8 of the Disclosure Schedules, or (ii) any contract that has been filed or was required to have been filed as an exhibit to the SEC Reports pursuant to Items 601(b)(1), 601(b)(2), 601(b)(4), 601(b)(9) or 601(b)(10) of Regulation S-K promulgated by the Commission.

"***Nasdaq***" means The Nasdaq Capital Market.

"***Person***" means any individual, partnership, corporation, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

30

"***Plan***" means (i) any employee pension benefit plan (as defined in Section 3(2)(A) of ERISA) maintained for employees of the Company or of any member of a "controlled group," as such term is defined in Section 414 of the Code, of which the Company or any of its Subsidiaries is a part, or any such employee pension benefit plan to which the Company or any of its Subsidiaries is required to contribute on behalf of its employees, and any other employee benefit plan (as defined in Section 3(3) of ERISA), whether or not subject to ERISA; or (ii) any compensation or other benefit plan, policy, program, agreement or arrangement, including any employment, change in control, bonus, equity-based compensation, retention or other similar agreement, that the Company or any of its Subsidiaries, maintains, sponsors, is a party to, or as to which the Company or any of its Subsidiaries otherwise has

any material obligation or material liability in respect of its employees; in each case, excluding any compensation or benefit arrangement maintained by a Governmental Entity.

"***Recipient***" means the party receiving or otherwise having access to the Confidential Information (either directly or indirectly through such party's representatives) from the Disclosing Party or the Disclosing Party's representatives.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Subsidiary***" means, when used with respect to any Person, means any corporation, limited liability company, partnership, association, trust or other entity of which (i) securities or other ownership interests representing 50% or greater of the ordinary voting power (or, in the case of a partnership, 50% or greater of the general partnership interests) or (ii) sufficient voting rights to elect at least a majority of the board of directors or other governing body are, as of such date, owned by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"***Tax Return***" shall mean any return, declaration, report, statement or other document filed or required to be filed in respect of Taxes (including any attachments thereto), including any information return, claim for refund, amended return and declaration of estimated Tax.

"***Taxes***" shall mean all United States federal, state, local or foreign taxes, charges, fees, levies or other assessments, including, without limitation, income, gross receipts, excise, real and personal property, profits, estimated, severance, occupation, production, capital gains, capital stock, goods and services, environmental, employment, withholding, stamp, value added, alternative or add-on minimum, sales, transfer, use, license, payroll and franchise taxes or any other tax of any kind whatsoever, and such term shall include any interest, penalties, fines, or additions to tax attributable to such taxes, charges, fees, levies or other assessments.

"***Transaction Documents***" means this Agreement and all exhibits (other than Exhibit D) and schedules thereto and hereto and any other documents or agreements executed in connection with the transactions contemplated hereunder.

Section 9. Miscellaneous.

9.1 Survival. All representations and warranties contained in this Agreement will survive the Closing until the 18-month anniversary of the Effective Date and shall thereafter have no further force and effect; provided, however, that the representations and warranties set forth in Sections 4.1 (*Organization and Good Standing*), 4.2 (*Corporate Power and Authority; Valid Issuance of Shares*), 4.5(a) (*Capitalization*) and 4.17 (*Brokers*) shall survive until the third anniversary of the Effective Date and shall thereafter have no further force and effect. All covenants and agreements of the Company and the Purchaser contained in this Agreement that by their terms contemplate performance in whole or in part after the Closing shall survive until performed in accordance with their terms.

31

9.2 Waivers and Amendments. This Agreement may be amended, modified and supplemented only by a written instrument authorized and executed by the Company and the Purchaser; provided that any of the terms or provisions of this Agreement may be waived in writing at any time by the party that is entitled to the benefits of such waived terms or provisions.

9.3 Construction. Any reference in this Agreement to a "Section," "Exhibit" or "Schedule" refers to the corresponding Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise. The headings of Sections are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement. The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance. Where this Agreement states that a party "shall," "will" or "must" perform in some manner or otherwise act

or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement. Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time. Any reference to a contract or other document as of a given date means the contract or other document as amended, supplemented and modified from time to time through such date. Any words (including capitalized terms defined herein) in the singular will be held to include the plural and vice versa and words (including capitalized terms defined herein) of one gender will be held to include the other gender as the context requires. The terms "hereof," "herein" and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement. All references to any period of days will be deemed to be to the relevant number of calendar days unless otherwise specified. All references herein to "$" or dollars will refer to United States dollars, unless otherwise specified. All accounting terms not otherwise defined herein have the meanings given to them in accordance with U.S. GAAP. Reference herein to any document or other information being "delivered", "made available", "distributed" or "provided" to the Purchaser shall mean that such document or information was included in the virtual data room of the Company hosted by Intralinks.com, or otherwise delivered to the Purchaser or its representatives (including via e- mail), prior to execution of this Agreement.

9.4 <u>Notices</u>. All notices, requests, consents, and other communications under this Agreement shall be in writing and shall be deemed delivered: (a) when delivered, if delivered personally, (b) four Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid, (c) one Business Day after being sent via a reputable nationwide overnight courier service guaranteeing next Business Day delivery, or (d) when receipt is acknowledged, in the case of email, in each case to the intended recipient as set forth below, with respect to the Company, and to the addresses set forth on the signature pages hereto, with respect to the Purchaser.

If to the Company:

Celsius Holdings, Inc.
2424 N. Federal Highway, Suite 208
Boca Raton, FL 33431
Attn: Chief Financial Officer; General Counsel
Email:

32

with copies to:

Holland & Knight LLP
515 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL 33301
Attention: Alvin Johnson; Tammy Knight
E-mail: Alvin.Johnson@hklaw.com; Tammy.Knight@hklaw.com

If to the Purchaser:

PepsiCo, Inc.
700 Anderson Hill Road
Purchase, NY 10577
Attention: Daniel Fink; David Flavell
E-mail:

with copies to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: Barbara Becker; Saee Muzumdar
Email: BBecker@gibsondunn.com; SMuzumdar@gibsondunn.com

or at such other address as the Company or the Purchaser may specify by written notice to the other parties hereto in accordance with this <u>Section 9.4</u>.

9.5 <u>Cumulative Remedies</u>. None of the rights, powers or remedies conferred upon the Purchaser on the one hand or the Company on the other hand shall be mutually exclusive, and each such right, power or remedy shall be cumulative and in addition to every other right, power or remedy, whether conferred by this Agreement or now or hereafter available at Law, in equity, by statute or otherwise.

9.6 <u>Successors and Assigns</u>. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective parties hereto, the successors and permitted assigns of the Purchaser and the successors of the Company, whether so expressed or not. None of the parties hereto may assign its rights or obligations hereof without the prior written consent of the other party, except that the Purchaser may assign its rights to purchase the Shares hereunder to any of its Affiliates; provided, however, that (a) the Company is promptly furnished with written notice of the name and address of each such transferee (provided that failure to provide such notice shall not impact the validity of such assignment); and (b) each such Affiliate agrees to be bound by and subject to the terms and conditions of this Agreement and makes the same representations and warranties set forth in <u>Section 3</u> hereof. This Agreement shall not inure to the benefit of or be enforceable by any other Person.

33

9.7 <u>Headings</u>. The headings of the Sections and paragraphs of this Agreement have been inserted for convenience of reference only and do not constitute a part of this Agreement.

9.8 <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to its conflict of law principles. Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby may be brought in any federal or state court located in the County of New Castle in the State of Delaware, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

9.9 <u>WAIVER OF JURY TRIAL</u>. IN ANY ACTION, SUIT OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, EACH PARTY KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

9.10 <u>Counterparts; Effectiveness</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, with the same effect as if all parties had signed the same document. All such counterparts (including counterparts delivered by facsimile, DocuSign.com or other electronic format) shall be deemed an original, shall be construed together and shall constitute one and the same instrument. This Agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

9.11 <u>Entire Agreement</u>. This Agreement, the Disclosure Schedules and the Exhibits contains the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and, except as set forth below, this Agreement supersedes and replaces all other prior agreements, written or oral, among the parties hereto with respect to the subject matter hereof and thereof.

9.12 <u>Severability</u>. If any provision of this Agreement shall be found by any court of competent jurisdiction to be invalid or unenforceable, the parties hereby waive such provision to the extent that it is found to be invalid or unenforceable. Such provision shall, to the maximum extent allowable by Law, be modified by such court so that it becomes enforceable, and, as modified, shall be enforced as any other provision hereof, all the other provisions hereof continuing in full force and effect.

\* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed as of the Effective Date.

THE COMPANY:

CELSIUS HOLDINGS, INC.

By:      /s/ John Fieldly
Name:   John Fieldly
Title:    President and Chief Executive Officer

[Signature Page to Securities Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed as of the Effective Date.

PURCHASER:

PEPSICO, INC.

By:      /s/ Kirk Tanner
Name:   Kirk Tanner
Title:    Chief Executive Officer, PepsiCo Beverages North America

[Signature Page to Securities Purchase Agreement]

**EXHIBIT A**
**CERTIFICATE OF DESIGNATION**
**OF**
**SERIES A PREFERRED STOCK**
[ATTACHED]

A-1

**EXHIBIT B**
**FORM OF REGISTRATION RIGHTS AGREEMENT**
[ATTACHED]

B-1

**EXHIBIT C**
**FORM OF LOCK-UP AGREEMENT**
[ATTACHED]

C-1

**EXHIBIT D**
**PRESS RELEASE**
[ATTACHED]

D-1

**Exhibit 10.2**

**Celsius Holdings, Inc.**
**Form of Lock-Up Agreement**
August 1, 2022

PepsiCo, Inc.
700 Anderson Hill Road
Purchase, NY 10577

Re:   Celsius Holdings, Inc. - Lock-Up Agreement

Ladies and Gentlemen:

The undersigned understands that PepsiCo, Inc., a North Carolina corporation (the "Purchaser"), proposes to enter into a Securities Purchase Agreement (the "Purchase Agreement") with Celsius Holdings, Inc., a Nevada corporation (the "Company"), providing for the purchase of 1,466,666 shares of preferred stock, $0.001 par value per share, designated as "Series A Convertible Preferred Stock" (the "Series A Preferred Stock"). Capitalized terms not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

In consideration of the agreement by the Purchaser to purchase the Shares, and of other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the undersigned agrees that, subject to the provisions contained herein, during the period beginning from the date of this Lock-Up Agreement and continuing to and including the date that is 12 months after the Closing (subject to the conditions herein) (the "Lock-Up Period"), the undersigned shall not, without the prior written consent of Purchaser, (i) offer, sell, contract to sell, pledge, grant any option to purchase, lend or otherwise dispose of any shares of the Common Stock of the Company, par value $0.001 per share (the "Common Stock"), or any options or warrants to purchase any shares of Common Stock, or any securities convertible into, exchangeable for or that represent the right to receive shares of the Common Stock (such options, warrants or other securities, collectively, "Derivative Instruments"), including without limitation any such shares or Derivative Instruments now owned or hereafter acquired by the undersigned, (ii) engage in any hedging or other transaction or arrangement (including, without limitation, any short sale or the purchase or sale of, or entry into, any put or call option, or combination thereof, forward, swap or any other derivative transaction or instrument, however described or defined) that is designed to or that reasonably could be expected to lead to or result in a sale, loan, pledge or other disposition (whether by the undersigned or someone other than the undersigned), or transfer of any of the economic consequences of ownership, in whole or in part, directly or indirectly, of any shares of Common Stock or Derivative Instruments, whether any such transaction or arrangement (or instrument provided for thereunder) would be settled by delivery of Common Stock or other securities, in cash or otherwise (any such sale, loan, pledge or other disposition, or transfer of economic consequences, a "Transfer") or (iii) otherwise publicly announce any intention to engage in or cause any action or activity described in clause (i) above or transaction or arrangement described in clause (ii) above. Except the Rule 10b5-1 plan of the undersigned in effect as of the date of this Lock-Up Agreement, the undersigned represents and warrants that the undersigned is not currently a party to any agreement or arrangement that provides for, is designed to or which reasonably could be expected to lead to or result in any Transfer during the Lock-Up Period.

Notwithstanding the foregoing, the undersigned may transfer the undersigned's shares of Common Stock of the Company (i) as a *bona fide* gift or gifts or charitable contribution, or for bona fide estate planning purposes, (ii) to any trust or family limited partnership for the direct or indirect benefit of the undersigned or the immediate family of the undersigned, or to any other entity in which the undersigned owns, and will continue to own for the Lock-up Period, more than 50% of the voting securities, (iii) by will, other testamentary document or intestate succession to the legal representative, heir, beneficiary or a member of the immediate family (as defined below) of the undersigned

upon the death of the undersigned, (iv) by operation of law, including pursuant to a qualified domestic order or a negotiated divorce settlement, or (v) pursuant to Rule 10b5-1 plans of the undersigned in effect as of the date of this Lock-Up Agreement; <u>provided</u> that in the case of any transfer pursuant to clauses (i) through (iv), each donee, trustee or transferee thereof agrees to be bound in writing by the restrictions set forth herein and such transfer shall not involve a disposition for value.

Further, notwithstanding the foregoing, the restrictions in this Lock-Up Agreement shall not apply to:

(a) the establishment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of the undersigned's shares of Common Stock, provided that no direct or indirect offers, pledges, sales, contracts to sell, sales of any option or contract to purchase, purchases of any option or contract to sell, grants of any option, right or warrant to purchase, loans, or other transfers or disposals of any of the undersigned's shares of Common Stock may be effected pursuant to such plan during the Lock-Up Period;

(b) the transfer or surrender of the undersigned's shares of Common Stock to the Company upon a vesting event of restricted stock awards or other securities convertible into shares of Common Stock or upon the exercise of options or warrants to purchase shares of Common Stock in accordance with their terms pursuant to an employee benefit plan, option or warrant, in each case on a "cashless" or "net exercise" basis or to cover tax withholding obligations of the undersigned in connection with such vesting or exercise; provided that any such shares of Common Stock issued upon such vesting or exercise shall be subject to the restrictions set forth herein; and

(c) the pledge, hypothecation, grant and any related transfer of such shares in connection with any note purchase agreement or similar agreement secured by a pledge of the undersigned's shares of Common Stock.

Further, this Lock-Up Agreement shall not restrict any sale, disposal or transfer of the undersigned's shares of Common Stock to a *bona fide* third party pursuant to a tender offer for securities of the Company or any merger, consolidation or other business combination made to all holders of the Company's capital stock involving a Change of Control (as defined below) of the Company occurring after the Closing, that, in each case, has been approved by the board of directors of the Company; provided that all of the undersigned's shares of Common Stock subject to this Lock-Up Agreement that are not so transferred, sold, tendered or otherwise disposed of remain subject to this Lock-Up Agreement; and provided, further, that it shall be a condition of transfer, sale, tender or other disposition that if such tender offer or other transaction is not completed, any of the undersigned's shares of Common Stock subject to this Lock-Up Agreement shall remain subject to the restrictions set forth herein. For the purposes of this paragraph, "Change of Control" means the consummation of any *bona fide* third party tender offer, merger, consolidation or other similar transaction, the result of which is that any "person" (as defined in Section 13(d)(3) of the Exchange Act), or group of persons, other than the Company or its subsidiaries, becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 of the Exchange Act) of more than 50% of the total voting power of the voting share capital of the Company.

For purposes of this Lock-Up Agreement, "immediate family" shall mean any relationship by blood, marriage or adoption, not more remote than first cousin. The undersigned now has, and, except as contemplated by clause (i) – (v) above, for the duration of this Lock-Up Agreement will have, good and marketable title to the undersigned's shares of Common Stock of the Company, free and clear of all liens, encumbrances, and claims whatsoever. The undersigned also agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of the undersigned's shares of Common Stock of the Company except in compliance with the foregoing restrictions.

2

The undersigned acknowledges and agrees that the Purchaser has not made any recommendation or provided any investment or other advice to the undersigned with respect to this Lock-Up Agreement or the subject matter hereof, and the undersigned has consulted its own legal, accounting, financial, regulatory, tax and other advisors with respect to this Lock-Up Agreement and the subject matter hereof to the extent the undersigned has deemed appropriate.

The undersigned understands that the Purchaser is relying upon this Lock-Up Agreement in proceeding toward consummation of the purchase of the Series A Preferred Stock. The undersigned further understands that this Lock-Up Agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors, and assigns.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. Electronic signatures complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law will be deemed original signatures for purposes of this Lock-Up Agreement. Transmission by telecopy, electronic mail or other transmission method of an executed counterpart of this Lock-Up Agreement will constitute due and sufficient delivery of such counterpart.

[*Signature page follows.*]

3

Very truly yours,

_____

Exact Name of Shareholder

_____

Authorized Signature

_____

Title

*Signature Page to Lock-Up Agreement*

4

**Exhibit 10.3**
*Execution Version*

## REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (this "***Agreement***") is made as of August 1, 2022, by and between Celsius Holdings, Inc., a Nevada corporation and (the "***Company***"), and PepsiCo, Inc., a North Carolina corporation (the "***Original Holder***").

### RECITALS

WHEREAS, the Company and the Original Holder are parties to the Securities Purchase Agreement, effective as of August 1, 2022 (as amended from time to time, the "***Purchase Agreement***"), pursuant to which the Company is selling to the Original Holder, and the Original Holder is purchasing from the Company, an aggregate of 1,466,666 shares of the Series A Preferred Stock of the Company (the "***Series A Preferred Stock***"), which is convertible into shares of Common Stock (as defined below); and

WHEREAS, as a condition to the obligations of the Company and the Original Holder under the Purchase Agreement, the Company and the Original Holder are entering into this Agreement for the purpose of granting certain registration and other rights to the Holders.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1 Certain Definitions. As used in this Agreement, capitalized terms not otherwise defined herein shall have the meanings ascribed to them below:

"***Affiliate***" means, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person.

"***Business Day***" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in The City of New York.

"***Common Stock***" means the common stock, par value $0.001 per share, of the Company, and any equity securities issued or issuable in exchange for or with respect to the Common Stock by way of a stock dividend, stock split or combination of shares or in connection with a reclassification, recapitalization, merger, consolidation or other reorganization or otherwise.

"***Common Stock Equivalent***" means all options, warrants and other securities convertible into, or exchangeable or exercisable for (at any time or upon the occurrence of any event or contingency and without regard to any vesting or other conditions to which such securities may be subject), Common Stock.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*FINRA*" means the Financial Industry Regulatory Authority, Inc.

"*Holder*" or "*Holders*" means (i) the Original Holder, (ii) any Affiliate of the Original Holder who shall acquire and hold Registrable Securities in accordance with the terms of this Agreement and (iii) solely with respect to a Demand Registration (as defined below), any transferee of such Registrable Securities that is granted the right to a Demand Registration hereunder; provided, that such transferee is an Affiliate of the Original Holder.

"*Issuer Free Writing Prospectus*" means an issuer free writing prospectus, as defined in Rule 433 under the Securities Act, relating to an offer of Registrable Securities.

"*Majority Participating Holders*" means Participating Holders holding more than 50% of the Registrable Securities proposed to be included in any offering of Registrable Securities by such Participating Holders pursuant to Section 2.1 or Section 2.2.

"*Participating Holder*" means a Holder who shall have properly submitted a written request for inclusion of such Holder's Registrable Securities in a registration pursuant to Section 2.1 or Section 2.2 hereof.

"*Person*" means any individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity or any governmental or regulatory body or other agency or authority or political subdivision thereof, including any successor, by merger or otherwise, of any of the foregoing.

"*Registrable Securities*" means shares of Common Stock issuable upon conversion of the Series A Preferred Stock; provided, however, that such shares will cease to be Registrable Securities (a) when a registration statement with respect to the sale of such securities shall have been declared effective under the Securities Act and such securities shall have been sold or transferred in accordance with such registration statement, (b) when such shares shall have been sold to the public by the Original Holder (or an Affiliate of the Original Holder) pursuant to Rule 144 (or any successor provision) or (c) such securities have ceased to be outstanding

"*Registration Expenses*" means all fees and expenses incurred in connection with the Company's performance of or compliance with the provisions of Article II, including, without limitation: (i) all registration, listing, qualification and filing fees (including FINRA filing fees); (ii) fees and expenses of compliance with state securities or "blue sky" laws (including counsel fees in connection with the preparation of a blue sky and legal investment survey and FINRA filings); (iii) printing and copying expenses; (iv) messenger and delivery expenses; (v) expenses incurred in connection with any road show; (vi) fees and disbursements of counsel for the Company; (vii) with respect to each registration, the reasonable fees and disbursements of one counsel for the Participating Holder(s) selected by the Majority Participating Holders, in the case of a registration pursuant to Section 2.2, not to exceed $25,000; (viii) fees and disbursements of independent public accountants, including the expenses of any audit or "comfort" letter, and fees and expenses of other persons, including special experts, retained by the Company; (ix) underwriter fees, excluding discounts and commissions, and any other expenses which are customarily borne by the issuer or seller of securities in a public equity offering; and (x) all internal expenses of the Company (including all salaries and expenses of officers and employees performing legal or accounting duties).

2

"*SEC*" means the Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

**ARTICLE II**
**REGISTRATION RIGHTS**

Section 2.1 Demand Registrations; Resale Registration.

(a) (i) Subject to Section 2.1(c), at any time or from time to time, one or more Holders shall have the right to require the Company to file a registration statement under the Securities Act covering Registrable Securities with an aggregate value of $100,000,000 or greater (based on the market price of the Common Stock as of the date of the Demand Registration Request (as defined below)), by delivering a written request therefor to the Company specifying the number of Registrable Securities to be included in such registration by such Holders and the intended method of distribution thereof. All such requests by any Holder pursuant to this Section 2.1(a)(i) are referred to as "***Demand Registration Requests***," the registrations so requested are referred to as "***Demand Registrations***" and the Holders making such demand for registration are referred to as the "***Initiating Holders***." A Demand Registration requested pursuant to this Section 2.1(a)(i) may include an underwritten offering effected pursuant to an already effective registration statement. As promptly as practicable, but no later than ten days after receipt of a Demand Registration Request, the Company shall give written notice (a "***Demand Exercise Notice***") of such Demand Registration Request to all Holders of record of Registrable Securities.

(ii) The Company, subject to Section 2.3 and Section 2.7, shall include in a Demand Registration (A) the Registrable Securities of the Initiating Holders and (B) the Registrable Securities of any other Holder that shall have made a written request to the Company within the time limits specified below for inclusion in such registration. Any such request from the other Holders must be delivered to the Company within 15 days after the receipt of the Demand Exercise Notice and must specify the maximum number of Registrable Securities intended to be disposed of by such other Holder.

(iii) The Company, as expeditiously as possible but subject to Section 2.1(c), shall use its commercially reasonable efforts to effect such Demand Registration.

(b) Registrations under this Section 2.1 shall be on such appropriate registration form of the SEC for the disposition of such Registrable Securities in accordance with the intended method of disposition thereof, which form shall be selected by the Company and shall be reasonably acceptable to the Majority Participating Holders.

(c) The Demand Registration rights granted in Section 2.1(a) to the Holders are subject to the following limitations:

3

(i) the Company shall not be required to cause a registration pursuant to Section 2.1(a) to be filed within 90 days or to be declared effective within a period of 180 days after the effective date of any other registration statement of the Company filed pursuant to the Securities Act;

(ii) if in any registration of Registrable Securities would require disclosure of information not otherwise then required by law to be publicly disclosed and, in the good faith judgment of the board of directors of the Company, such disclosure is reasonably likely to adversely affect any material financing, acquisition, corporate reorganization or merger or other material transaction or event involving the Company or otherwise have a material adverse effect on the Company (a "***Valid Business Reason***"), the Company may postpone or withdraw a filing of a registration statement relating to a Demand Registration Request until such Valid Business Reason no longer exists, but in no event shall the Company avail itself of such right for more than 180 days, in the aggregate, in any period of 365 consecutive days; and the Company shall give notice to the Participating Holder(s) of its determination to postpone or withdraw a registration statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof;

(iii) the Company shall not be obligated to effect more than four Demand Registrations under Section 2.1(a) pursuant to this Agreement; and

(iv) the Company will not be obligated to file a registration statement pursuant to a Demand Registration at any time when a Registration Statement with respect to a shelf registration covering all Registrable Securities held by the Holder remains effective; provided, that, this Section 2.1(c)(iv) shall not

otherwise affect the Company's obligation to effect an underwritten shelf take-down of any of Registrable Securities registered on such shelf pursuant to a demand.

If the Company shall give any notice of postponement or withdrawal of any registration statement pursuant to clause (ii) above, the Company shall not register the resale of any equity security of the Company during the period of postponement or withdrawal. Each Holder agrees that, upon receipt of any notice from the Company that the Company has determined to withdraw any registration statement pursuant to clause (ii) above, such Holder will discontinue its disposition of Registrable Securities pursuant to such registration statement. If the Company shall have withdrawn or prematurely terminated a registration statement filed under Section 2.1(a)(i), the Company shall not be considered to have effected an effective registration for the purposes of this Agreement until the Company shall have filed a new registration statement covering the Registrable Securities covered by the withdrawn registration statement and such registration statement shall have been declared effective and shall not have been withdrawn. If the Company shall give any notice of withdrawal or postponement of a registration statement pursuant to clause (ii) above, at such time as the Valid Business Reason that caused such withdrawal or postponement no longer exists (but in no event more than 180 days after the date of the postponement or withdrawal), the Company shall use its reasonable best efforts to effect the registration under the Securities Act of the Registrable Securities covered by the withdrawn or postponed registration statement in accordance with this Section 2.1.

4

(d) The Company, subject to Section 2.3 and Section 2.7, may elect to include in any registration statement and offering made pursuant to Section 2.1(a)(i), (i) authorized but unissued shares of Common Stock or shares of Common Stock held by the Company as treasury shares and/or (ii) any other shares of Common Stock that are requested to be included in such registration pursuant to the exercise of piggyback rights granted by the Company that are not inconsistent with the rights granted in, or otherwise conflict with the terms of, this Agreement ("***Additional Piggyback Rights***"); provided, however, that such inclusion shall be permitted only to the extent that it is pursuant to and subject to the terms of the underwriting agreement or arrangements, if any, entered into by the Participating Holders.

(e) A Holder may withdraw its Registrable Securities from a Demand Registration at any time. If all such Holders do so, the Company shall cease all efforts to secure registration and such registration nonetheless shall be deemed a Demand Registration for purposes of this Section 2.1 unless (i) the withdrawal is made following withdrawal or postponement of such registration by the Company pursuant to a Valid Business Reason as contemplated by Section 2.1(c)(ii), (ii) the withdrawal is based on the reasonable determination of the Initiating Holders that there has been, since the date of the Demand Registration Request, a material adverse change in the business or prospects of the Company or (iii) the Initiating Holders have paid or reimbursed the Company for all of the reasonable out-of-pocket fees and expenses incurred by the Company in connection with the withdrawn registration.

(f) A Demand Registration shall not be deemed to have been effected and shall not count as such (i) unless a registration statement with respect thereto has become effective and has remained effective for a period of at least 180 days or such shorter period during which all Registrable Securities covered by such registration statement have been sold or withdrawn, or, if such registration statement relates to an underwritten offering, such longer period as, in the opinion of counsel for the underwriter(s), is required by law for delivery of a prospectus in connection with the sale of Registrable Securities by an underwriter or dealer, (ii) if, after the registration statement with respect thereto has become effective, it becomes subject to any stop order, injunction or other order or requirement of the SEC or other governmental agency or court for any reason, (iii) if it is withdrawn by the Company pursuant to a Valid Business Reason as contemplated by Section 2.1(c) or (iv) if the conditions to closing specified in the purchase agreement or underwriting agreement entered into in connection with such Demand Registration are not satisfied, other than solely by reason of some act or omission of the Participating Holders or other third party to such agreement that is out of the Company's control.

(g) In connection with any Demand Registration, the Company may designate the lead managing underwriter in connection with such registration and each other managing underwriter for such registration, provided, that, in each case, each such underwriter is reasonably satisfactory to the Majority Participating Holders.

(h) The Company shall use its commercially reasonable efforts to file a registration statement on Form S-3 or such other form under the Securities Act then available to the Company with respect to the resale of the Registrable Securities upon the date on which the shares of Series A Preferred Stock have been converted to Common Stock (but after the Original Holder has had an opportunity to review and comment on such registration statement). The Company shall use commercially reasonable efforts to cause such Form S-3 (or equivalent) to be declared effective under the Securities Act as soon as practicable thereafter, and shall use its commercially reasonable efforts to maintain the effectiveness of the registration statement for the resale of the Registrable Securities for so long as the Holders hold any of the Registrable Securities.

5

Section 2.2 <u>Piggyback Registrations</u>.

(a) If, at any time, the Company proposes or is required to register any of its equity securities under the Securities Act pursuant to a firm-commitment underwritten public offering (other than pursuant to (i) a registration on Form S-4 or Form S-8 or any successor or similar form which is then in effect, (ii) an offering of debt that is convertible into equity securities of the Company, or (iii) a Demand Registration under Section <u>2.1</u>) on a registration statement on Form S-1 or Form S-3 or an equivalent general registration form then in effect, whether or not for its own account, the Company shall give prompt written notice of its intention to do so to each Holder of record of Registrable Securities. Upon the written request of any such Holder, made within 15 days following the receipt of any such written notice (which request shall specify the maximum number of Registrable Securities intended to be disposed of by such Holder and the intended method of distribution thereof), the Company, subject to <u>Section 2.2(b)</u>, Section <u>2.3</u> and <u>Section 2.7</u>, shall use commercially reasonable efforts to cause all such Registrable Securities to be included in the registration statement with the securities that the Company at the time proposes to register to permit the sale or other disposition by such Holders in accordance with the intended method of distribution thereof of the Registrable Securities to be so registered. No registration of Registrable Securities effected under this <u>Section 2.2(a)</u> shall relieve the Company of its obligations to effect Demand Registrations under <u>Section 2.1</u>.

(b) If, at any time after giving written notice of its intention to register any equity securities and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register or to delay registration of such equity securities, the Company will give written notice of such determination to each Holder of record of Registrable Securities and (i) in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Securities in connection with such abandoned registration, without prejudice, or (ii) in the case of a determination to delay such registration of its equity securities pursuant to Section <u>2.1(c)(ii)</u>, shall be permitted to delay the registration of such Registrable Securities for the same period as the delay in registering such other equity securities.

(c) Any Holder shall have the right to withdraw its request for inclusion of its Registrable Securities in any registration statement pursuant to this Section <u>2.2</u> by giving written notice to the Company of its request to withdraw. Such request must be made in writing prior to the earlier of the execution of the underwriting agreement or the execution of the custody agreement with respect to such registration. Such withdrawal shall be irrevocable and, after making such withdrawal, a Holder shall no longer have any right to include Registrable Securities in the registration as to which such withdrawal was made.

(d) Notwithstanding anything in this <u>Section 2.2</u> to the contrary, no Holder shall have any right to include any Registrable Securities in any offering by the Company of Common Stock executed pursuant to any "at the market" program that the Company may have in effect from time to time on or after the date of this Agreement.

6

Section 2.3 <u>Priority in Registrations</u>.

(a) If any requested registration made pursuant to Section 2.1 involves an underwritten offering and the lead managing underwriter of such offering (the "*Manager*") shall advise the Company that, in its view, the number of securities requested to be included in such registration by the Participating Holders or any other persons, including those shares of Common Stock requested by the Company to be included in such registration, exceeds the largest number (the "*Section 2.3(a) Sale Number*") that can be sold in an orderly manner in such offering within a price range acceptable to the Majority Participating Holders, the Company shall use commercially reasonable efforts to include in such registration:

(i) first, all Registrable Securities requested to be included in such registration by the Holders thereof; provided, however, that, if the number of such Registrable Securities exceeds the Section 2.3(a) Sale Number, the number of such Registrable Securities (not to exceed the Section 2.3(a) Sale Number) to be included in such registration shall be allocated on a pro rata basis among all Holders requesting that Registrable Securities be included in such registration, based on the number of Registrable Securities then owned by each such Holder requesting inclusion in relation to the number of Registrable Securities owned by all Holders requesting inclusion;

(ii) second, to the extent that the number of securities to be included pursuant to clause (i) of this Section 2.3(a) is less than the Section 2.3(a) Sale Number, the remaining shares to be included in such registration shall be allocated on a pro rata basis among all Holders requesting that securities be included in such registration pursuant to the exercise of Additional Piggyback Rights ("*Piggyback Shares*"), based on the aggregate number of Piggyback Shares then owned by each Holder requesting inclusion in relation to the aggregate number of Piggyback Shares owned by all Holders requesting inclusion, up to the Section 2.3(a) Sale Number; and

(iii) third, to the extent that the number of securities to be included pursuant to clauses (i) and (ii) of this Section 2.3(a) is less than the Section 2.3(a) Sale Number, any securities that the Company proposes to register, up to the Section 2.3(a) Sale Number.

If, as a result of the proration provisions of this Section 2.3(a), any Holder shall not be entitled to include all Registrable Securities in a registration that such Holder has requested be included, such Holder may elect to withdraw its request to include Registrable Securities in such registration or may reduce the number requested to be included; provided, however, that (A) such request must be made in writing prior to the earlier of the execution of the underwriting agreement or the execution of the custody agreement with respect to such registration and (B) such withdrawal shall be irrevocable and, after making such withdrawal, such Holder shall no longer have any right to include Registrable Securities in the registration as to which such withdrawal was made.

7

(b) If any registration pursuant to Section 2.2 involves an underwritten offering that was proposed by the Company and the Manager shall advise the Company that, in its view, the number of securities requested to be included in such registration exceeds the number (the "*Section 2.3(b) Sale Number*") that can be sold in an orderly manner in such registration within a price range acceptable to the Company, the Company shall include in such registration:

(i) first, all Common Stock that the Company proposes to register for its own account; and

(ii) second, to the extent that the number of securities to be included pursuant to clause (i) of this Section 2.3(b) is less than the Section 2.3(b) Sale Number, the remaining shares to be included in such registration shall be allocated on a pro rata basis among all holders requesting that Registrable Securities or Piggyback Shares be included in such registration pursuant to the exercise of piggyback rights pursuant to Section 2.2 of this Agreement or Additional Piggyback Rights, based on the aggregate number of Registrable Securities and Piggyback Shares then owned by each holder requesting inclusion in relation to the aggregate number of Registrable Securities and Piggyback Shares owned by all holders requesting inclusion, up to the Section 2.3(b) Sale Number.

(c) If any registration pursuant to Section 2.2 involves an underwritten offering that was proposed by holders of securities of the Company that have the right to require such registration pursuant to an agreement entered into by the Company in accordance with Section 3.3 ("***Additional Demand Rights***") and the Manager shall advise the Company that, in its view, the number of securities requested to be included in such registration exceeds the number (the "***Section 2.3(c) Sale Number***") that can be sold in an orderly manner in such registration within a price range acceptable to the Company, the Company shall include in such registration:

(i) first, all securities requested to be included in such registration by the holders of Additional Demand Rights ("***Additional Registrable Securities***"); provided, however, that, if the number of such Additional Registrable Securities exceeds the Section 2.3(c) Sale Number, the number of such Additional Registrable Securities (not to exceed the Section 2.3(c) Sale Number) to be included in such registration shall be allocated on a pro rata basis among all holders of Additional Registrable Securities requesting that Additional Registrable Securities be included in such registration, based on the number of Additional Registrable Securities then owned by each such holder requesting inclusion in relation to the number of Additional Registrable Securities owned by all of such holders requesting inclusion;

(ii) second, to the extent that the number of securities to be included pursuant to clause (i) of this Section 2.3(c) is less than the Section 2.3(c) Sale Number, any Common Stock that the Company proposes to register for its own account, up to the Section 2.3(c) Sale Number; and

8

(iii) third, to the extent that the number of securities to be included pursuant to clauses (i) and (ii) of this Section 2.3(c) is less than the Section 2.3(c) Sale Number, the remaining shares to be included in such registration shall be allocated on a pro rata basis among all holders requesting that Registrable Securities or Piggyback Shares be included in such registration pursuant to the exercise of piggyback rights pursuant to Section 2.2 or Additional Piggyback Rights, based on the aggregate number of Registrable Securities and Piggyback Shares then owned by each holder requesting inclusion in relation to the aggregate number of Registrable Securities and Piggyback Shares owned by all holders requesting inclusion, up to the Section 2.3(c) Sale Number.

Section 2.4 Registration Procedures. Whenever the Company is required by the provisions of this Agreement to use its commercially reasonable efforts to effect or cause the registration of any Registrable Securities under the Securities Act as provided in this Agreement, the Company, as expeditiously as possible:

(a) shall prepare and file with the SEC the requisite registration statement, which shall comply as to form in all material respects with the requirements of the applicable form and shall include all financial statements required by the SEC to be filed therewith, and use commercially reasonable efforts to cause such registration statement to become and remain effective as follows: (i) in the case of a registration on Form S-1 or any successor form thereto, for a period of at least 90 calendar days (or, in the case of an underwritten offering, such period as the underwriters will reasonably require) following the date on which such registration statement is declared effective (or such shorter period which will terminate when all of the Registrable Securities covered by such registration statement have been sold pursuant thereto) or (ii) in the case of a registration on Form S-3 or any successor form thereto, until the earlier to occur of (A) the third anniversary of the effectiveness of such registration statement and (B) such time as all Registrable Securities covered by such registration statement have been sold pursuant thereto (provided, however, that before filing a registration statement or prospectus or any amendments or supplements thereto, or comparable statements under securities or blue sky laws of any jurisdiction, or any Issuer Free Writing Prospectus related thereto, the Company will furnish to one counsel for the Participating Holders (selected by the Majority Participating Holders) and to the lead managing underwriter, if any, copies of all such documents proposed to be filed (including all exhibits thereto), which documents will be subject to the reasonable review and reasonable comment of such counsel, and the Company shall not file any registration statement or amendment thereto, any prospectus or supplement thereto or any Issuer Free Writing Prospectus related thereto to which the Majority Participating Holders or the underwriters, if any, shall reasonably object; provided, further, however, that the Company shall not have any obligation to modify any information if the Company expects that so doing would cause the registration statement or amendment thereto, any prospectus or supplement thereto or any Issuer Free Writing Prospectus related thereto, to contain an untrue statement

of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading);

(b) shall prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for such period as set forth in **(a)**, and to comply with the provisions of the Securities Act with respect to the sale or other disposition of all Registrable Securities covered by such registration statement in accordance with the intended methods of disposition by the Participating Holder(s) thereof set forth in such registration statement;

9

(c) shall furnish, without charge, to each Participating Holder and each underwriter, if any, of the securities covered by such registration statement such number of copies of such registration statement, each amendment thereto, the prospectus included in such registration statement, each preliminary prospectus and each Issuer Free Writing Prospectus utilized in connection therewith, all in conformity with the requirements of the Securities Act, and such other documents as such Participating Holder and underwriter reasonably may request in order to facilitate the public sale or other disposition of the Registrable Securities owned by such Participating Holder, and shall consent to the use in accordance with all applicable law of each such registration statement, each amendment thereto, each such prospectus, preliminary prospectus or Issuer Free Writing Prospectus by each such Participating Holder and the underwriters, if any, in connection with the offering and sale of the Registrable Securities covered by such registration statement or prospectus;

(d) shall use commercially reasonable efforts to register or qualify the Registrable Securities covered by such registration statement under such other securities or "blue sky" laws of such jurisdictions as any Participating Holder or any managing underwriter, if any, reasonably shall request, and do any and all other acts and things that may be reasonably necessary or advisable to enable such Participating Holder or underwriter, if any, to consummate the disposition of the Registrable Securities in such jurisdictions, except that in no event shall the Company be required (i) to qualify to do business as a foreign corporation in any jurisdiction where, but for the requirements of this Section 2.4(d), it would not be required to be so qualified, (ii) to subject itself to taxation in any such jurisdiction, if it is not otherwise so subject or (iii) to consent to general service of process in any such jurisdiction;

(e) shall promptly notify each Participating Holder and each managing underwriter, if any:

(i) when the registration statement, any pre-effective amendment, the prospectus or any prospectus supplement related thereto, any post-effective amendment to the registration statement or any Issuer Free Writing Prospectus has been filed and, with respect to the registration statement or any post-effective amendment, when the same has become effective;

(ii) of any request by the SEC or state securities authority for amendments or supplements to the registration statement or the prospectus related thereto or for additional information;

(iii) of the issuance by the SEC of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings for that purpose;

(iv) of the receipt by the Company of any notification with respect to the suspension of the qualification of any Registrable Securities for sale under the securities or blue sky laws of any jurisdiction or the initiation of any proceeding for such purpose;

10

(v) of the existence of any fact of which the Company becomes aware which results in the registration statement, the prospectus related thereto, any document incorporated therein by reference, any Issuer Free Writing Prospectus or the information conveyed to any purchaser at the time of sale to such

purchaser containing an untrue statement of a material fact or omitting to state a material fact required to be stated therein or necessary to make any statement therein not misleading; and

(vi) if at any time the representations and warranties contemplated by any underwriting agreement, securities sale agreement or other similar agreement relating to the offering shall cease to be true and correct in all material respects; and, if the notification relates to an event described in clause (v), the Company, subject to the provisions of Section 2.1(c), promptly shall prepare and file with the SEC, and furnish to each seller and each underwriter, if any, a reasonable number of copies of, a prospectus supplemented or amended so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(f) shall comply with all applicable rules and regulations of the SEC, and make generally available to its security holders, as soon as reasonably practicable after the effective date of the registration statement (and in any event within 90 days after the end of the 12-month period described hereafter), an earnings statement, which need not be audited, covering a period of at least 12 consecutive months beginning with the first day of the Company's first calendar quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(g) shall use reasonable efforts to cause all Registrable Securities covered by such registration statement to be authorized to be listed on a national securities exchange if shares of the particular class of Registrable Securities are at that time, or will be immediately following the offering, listed on such exchange;

(h) shall provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities covered by such registration statement not later than the effective date of such registration statement;

(i) shall enter into such customary agreements (including, if applicable, an underwriting agreement) and take such other actions as the Majority Participating Holders shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (it being understood that the Holders of the Registrable Securities that are to be distributed by any underwriters shall be parties to any such underwriting agreement and may, at their option, require that the Company make to, and for the benefit of, such Holders the representations, warranties and covenants of the Company which are being made to and for the benefit of such underwriters);

11

(j) to the extent required by an underwriting agreement, if any, shall use commercially reasonable efforts to obtain an opinion from the Company's counsel and a "comfort" letter from the Company's independent public accountants in customary form and covering such matters as are customarily covered by such opinions and "comfort" letters delivered to underwriters in underwritten public offerings, which opinion and letter shall be reasonably satisfactory to the underwriter, if any;

(k) shall use commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of the registration statement;

(l) shall provide a CUSIP number for all Registrable Securities, not later than the effective date of the registration statement;

(m) shall make reasonably available its employees and personnel for participation in "road shows" and other marketing efforts and otherwise provide reasonable assistance to the underwriters, taking into account the needs of the Company's businesses and the requirements of the marketing process, in the marketing of Registrable Securities in any underwritten offering;

(n) shall promptly prior to the filing of any document that is to be incorporated by reference into the registration statement or the prospectus, and prior to the filing of any Issuer Free Writing Prospectus, provide copies

of such document to each managing underwriter, if any, and make the Company's representatives reasonably available for discussion of such document and make such changes in such document concerning the Participating Holders prior to the filing thereof as underwriters may reasonably request; provided, however, that the Company shall not have any obligation to modify any information if the Company expects that so doing would cause the registration statement or amendment thereto, any prospectus or supplement thereto or any Issuer Free Writing Prospectus related thereto, to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(o) shall cooperate with the Participating Holders and the managing underwriter, if any, to facilitate the timely preparation and delivery of certificates not bearing any restrictive legends representing the Registrable Securities to be sold, and cause such Registrable Securities to be issued in such denominations and registered in such names in accordance with the underwriting agreement prior to any sale of Registrable Securities to the underwriters or, if not an underwritten offering, in accordance with the instructions of the Participating Holders at least three Business Days prior to any sale of Registrable Securities and instruct any transfer agent and registrar of Registrable Securities to release any stop transfer orders in respect thereof; provided, however, that the Company may satisfy its obligations hereunder without issuing physical stock certificates through the use of The Depository Trust Company's Direct Registration System;

12

(p) shall take all such other reasonable actions as are necessary or advisable in order to expedite or facilitate the disposition of such Registrable Securities;

(q) shall not take any direct or indirect action prohibited by Regulation M under the Exchange Act; provided, however, that to the extent that any prohibition thereunder is applicable to the Company, the Company will take such action as is necessary to make any such prohibition inapplicable;

(r) shall cooperate with each Participating Holder and each underwriter or agent participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA; and

(s) shall take all reasonable action to ensure that any Issuer Free Writing Prospectus utilized in connection with any registration covered by Section 2.1 or Section 2.2 complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related prospectus, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

The Company may require as a condition precedent to the Company's obligations under this Section 2.4 that each Participating Holder as to which any registration is being effected furnish the Company such information in writing regarding such Participating Holder and the distribution of its Registrable Securities as the Company from time to time reasonably may request; provided, that such information is necessary for the Company to consummate such registration and shall be used only in connection with such registration. Each Participating Holder agrees that upon receipt of any notice from the Company under Section 2.4(e)(v), such Participating Holder will discontinue its disposition of Registrable Securities pursuant to the registration statement covering such Registrable Securities until such Participating Holder's receipt of the copies of the supplemented or amended prospectus. In the event the Company shall give any such notice, the applicable period set forth in Section 2.4(b) shall be extended by the number of days during such period from and including the date of the giving of such notice to and including the date when each Participating Holder shall have received the copies of the supplemented or amended prospectus. If any such registration statement or comparable statement under "blue sky" laws refers to any Holder by name or otherwise as the Holder of any securities of the Company, such Holder shall have the right to require (i) the insertion therein of language, in form and substance reasonably satisfactory to such Holder and the Company, to the effect that the holding by such Holder of such securities is not to be construed as a recommendation by such Holder of the investment quality of the Company's securities covered thereby and that such holding does not imply that such Holder will assist in meeting any future financial requirements of the Company or (ii) in the event that such reference to such Holder by

name or otherwise is not in the judgment of the Company, as advised by counsel, required by the Securities Act or any similar federal statute or any state "blue sky" or securities law then in force, the deletion of the reference to such Holder.

13

Section 2.5 <u>Automatic Shelf Registration Statements</u>. To the extent the Company is a well-known seasoned issuer as defined in Rule 405 under the Securities Act (a "**WKSI**") at the time (i) the Company files a registration statement pursuant to Section 2.1(h) or (ii) any Demand Registration Request is submitted to the Company, and, in the case of Demand Registration Request, such Demand Registration Request requests that the Company file an automatic shelf registration statement as defined in Rule 405 under the Securities Act (an "***automatic shelf registration statement***") on Form S-3, the Company shall file an automatic shelf registration statement that covers those Registrable Securities that are requested to be registered. The Company shall use commercially reasonable efforts to remain a WKSI and not become an ineligible issuer (as defined in Rule 405 under the Securities Act) during the period during which such automatic shelf registration statement is required to remain effective. If the Company does not pay the filing fee covering the Registrable Securities at the time the automatic shelf registration statement is filed, the Company shall pay such fee at such time or times as the Registrable Securities are to be sold. If the automatic shelf registration statement has been outstanding for at least three years, at the end of the third year the Company shall refile a new automatic shelf registration statement covering the Registrable Securities. If at any time when the Company is required to re-evaluate its WKSI status, the Company determines that it is not a WKSI, the Company shall use reasonable best efforts to refile the shelf registration statement on Form S-3 and, if such form is not available, Form S-1, and keep such registration statement effective during the period during which such registration statement is required to be kept effective. Notwithstanding anything contained herein to the contrary, the Company shall be entitled to exclude from the automatic shelf registration statement such Registrable Securities as the Company and its securities counsel reasonably determine (in consultation with the Majority Participating Holders and their securities counsel) is reasonably necessary for the offering to qualify as a secondary (rather than a primary) offering pursuant to Rule 415 under the Securities Act in response to comments from the staff of the SEC. To the extent any Registrable Securities are so excluded, the Company agrees to register such excluded shares in accordance with Section 2.1 promptly when eligible to do so under applicable federal securities laws, rules, regulations and policies, as the Company and its securities counsel reasonably determine (in consultation with the Majority Participating Holders and their securities counsel). If the Company files any shelf registration statement for the benefit of the holders of any of its securities other than the Holders, the Company shall include in such registration statement such disclosures as may be required by Rule 430B under the Securities Act, referring to the unnamed selling security holders in a generic manner, in order to ensure that the Holders may be added to such shelf registration statement at a later time through the filing of a prospectus supplement rather than a post-effective amendment.

Section 2.6 <u>Registration Expenses</u>.

(a) The Company shall pay all Registration Expenses (i) with respect to any Demand Registration whether or not it becomes effective or remains effective for the period contemplated by <u>Section 2.4(b)</u> and (ii) with respect to any registration effected under <u>Section 2.2</u>.

(b) Notwithstanding the foregoing, (i) the provisions of this Section 2.6 shall be deemed amended to the extent necessary to cause these expense provisions to comply with "blue sky" laws of each state in which the offering is made, (ii) in connection with any registration hereunder, each Participating Holder shall pay all underwriting discounts and commissions pro rata in accordance with the number of Registrable Securities sold in the offering by such Participating Holder and transfer taxes, if any, attributable to the sale of such Participating Holder's Registrable Securities, (iii) in connection with each registration pursuant to Section 2.2, the Participating Holder(s) shall pay all fees and disbursements of counsel for any holder of Registrable Securities other than with respect to the reasonable fees and disbursements of one counsel for the Participating Holder(s) selected by the Majority Participating Holders that are required to be paid by the Company, and (iv) the Company shall, in the case of all registrations under this Article II, be responsible for all its internal expenses.

14

Section 2.7 <u>Underwritten Offerings</u>.

(a) If requested by the underwriters for any underwritten offering by the Holders pursuant to a Demand Registration, the Company shall enter into a customary underwriting agreement with the underwriters. Such underwriting agreement shall be satisfactory in form and substance to the Majority Participating Holders and the Company and shall contain such representations and warranties by, and such other agreements on the part of, the Company and such other terms as are generally prevailing in agreements of that type; <u>provided</u>, <u>however</u>, that the Company shall not be required to make any representations or warranties with respect to written information specifically provided by a Participating Holder for inclusion in the registration statement.

(b) In the case of a registration pursuant to Section <u>2.2</u>, if the Company shall have determined to enter into an underwriting agreement in connection therewith, any Registrable Securities to be included in such registration shall be subject to such underwriting agreement.

(c) In the case of any Demand Registration pursuant to an underwritten offering, or, in the case of a registration under Section <u>2.2</u>, if the Company has determined to enter into an underwriting agreement in connection therewith, all securities to be included in such registration shall be subject to an underwriting agreement and no Person may participate in such registration unless such Person agrees to sell such Person's securities on the basis provided therein and, subject to the provisions of this <u>Section 2.7</u>, completes and executes all reasonable questionnaires, and other documents, including custody agreements and powers of attorney, that must be executed in connection therewith, and provides such other information to the Company or the underwriter as may be necessary to register such Person's securities.

Section 2.8 <u>Holdback Agreements</u>.

(a) Each Participating Holder agrees, to the extent requested in writing by a managing underwriter, if any, of any Demand Registration, not to sell, transfer, pledge, contract to sell, grant any option to purchase, or otherwise dispose of, indirectly or directly, including any sale pursuant to Rule 144 under the Securities Act, any Common Stock, or any other equity security of the Company or any security convertible into or exchangeable or exercisable for any equity security of the Company other than as part of such underwritten public offering during the time period reasonably requested by the managing underwriter, not to exceed 90 days.

15

(b) The Company agrees, to the extent requested in writing by a managing underwriter, if any, that, if it shall previously have received a request for registration pursuant to <u>Section 2.1</u> or 2.2, and if such previous registration shall not have been withdrawn or abandoned, it shall not sell, transfer, pledge, contract to sell, grant any option to purchase, or otherwise dispose of any Common Stock, or any other equity security of the Company or any security convertible into or exchangeable or exercisable for any equity security of the Company (other than as part of such underwritten public offering, a registration on Form S-4 or Form S-8 or any successor or similar form which is then in effect or upon the conversion, exchange or exercise of any then outstanding Common Stock Equivalent), until a period of 90 days shall have elapsed from the effective date of such previous registration; and the Company shall so provide in any registration rights agreements hereafter entered into with respect to any of its securities.

Section 2.9 <u>No Required Sale</u>. Nothing in this Agreement shall be deemed to create an independent obligation on the part of any Holder to sell any Registrable Securities pursuant to any effective registration statement.

Section 2.10 <u>Indemnification</u>.

(a) In the event of any registration of any securities of the Company under the Securities Act pursuant to this Article II, the Company will, and hereby agrees to, indemnify and hold harmless, to the fullest extent permitted by law, each Holder, its directors, officers, fiduciaries, employees, agents, Affiliates, consultants, representatives, general and limited partners, stockholders, successors, assigns (and the directors, officers, employees and stockholders thereof), and each other Person, if any, who controls such Holder within the meaning of the Securities

Act, from and against any and all losses, claims, damages or liabilities, joint or several, actions or proceedings (whether commenced or threatened) and expenses (including reasonable fees of counsel and any amounts paid in any settlement effected with the Company's consent, which consent shall not be unreasonably withheld or delayed) to which each such indemnified party may become subject under the Securities Act or otherwise in respect thereof (collectively, "**_Losses_**"), insofar as such Losses arise out of or are based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact necessary to be stated or necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, in any registration statement under which such securities were registered under the Securities Act, or amendment thereof or supplement thereto, or in any preliminary, final or summary prospectus or any amendment or supplement thereto, together with the documents incorporated by reference therein, or any Issuer Free Writing Prospectus utilized in connection therewith, and the Company will reimburse any such indemnified party for any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such Loss as such expenses are incurred; provided, however, that the Company shall not be liable to any such indemnified party in any such case to the extent such Loss arises out of or is based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission of a material fact made in such registration statement or amendment thereof or supplement thereto or in any such prospectus or any preliminary, final or summary prospectus or Issuer Free Writing Prospectus in reliance upon and in conformity with written information furnished to the Company by or on behalf of any indemnified party specifically for use therein. Such indemnity and reimbursement of expenses shall remain in full force and effect regardless of any investigation made by or on behalf of such indemnified party and shall survive the transfer of such securities by such Holder.

16

(b) Each Holder whose Registrable Securities are included in the securities as to which any registration under Section 2.1 or 2.2 is being effected shall, severally and not jointly, indemnify and hold harmless (in the same manner and to the same extent as set forth in paragraph (a) of this Section 2.10), to the fullest extent permitted by law, the Company, its officers and directors, each Person controlling the Company within the meaning of the Securities Act and all other prospective sellers and their respective directors, officers, fiduciaries, employees, agents, Affiliates, consultants, representatives, general and limited partners, stockholders, successors, assigns and respective controlling Persons from and against any Loss with respect to any untrue statement or alleged untrue statement of any material fact in, or omission or alleged omission of any material fact from, such registration statement, any preliminary, final or summary prospectus contained therein, or any amendment or supplement thereto, or any Issuer Free Writing Prospectus utilized in connection therewith, if such statement or alleged statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company or its representatives by or on behalf of such Holder specifically for use therein and reimburse such indemnified party for any legal or other expenses reasonably incurred in connection with investigating or defending any such Loss as such expenses are incurred; provided, however, that the aggregate amount that any such Holder shall be required to pay pursuant to this Section 2.10 shall in no case be greater than the amount of the net proceeds received by such Holder upon the sale of the Registrable Securities pursuant to the registration statement giving rise to such claim. Such indemnity and reimbursement of expenses shall remain in full force and effect regardless of any investigation made by or on behalf of such indemnified party and shall survive the transfer of such securities by such Holder.

(c) Any Person entitled to indemnification under this Agreement promptly shall notify the indemnifying party in writing of the commencement of any action or proceeding with respect to which a claim for indemnification may be made pursuant to this Section 2.10, but the failure of any such Person to provide such notice shall not relieve the indemnifying party of its obligations under the preceding paragraphs of this Section 2.10, except to the extent the indemnifying party is materially prejudiced thereby, and shall not relieve the indemnifying party from any liability that it may have to any such Person otherwise than under this Article II. In case any action or proceeding is brought against an indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, unless in the reasonable opinion of outside counsel to the indemnified party a conflict of interest between such indemnified and indemnifying parties may exist in respect of such claim, to assume the defense thereof jointly with any other indemnifying party similarly notified, to the extent that it chooses, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party that it so chooses, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof

other than reasonable costs of investigation; provided, however, that (i) if the indemnifying party fails to take reasonable steps necessary to defend diligently the action or proceeding within 20 days after receiving notice from such indemnified party, (ii) if such indemnified party who is a defendant in any action or proceeding that is also brought against the indemnifying party reasonably shall have concluded that there may be one or more legal defenses available to such indemnified party that are not available to the indemnifying party or (iii) if representation of both parties by the same counsel is otherwise inappropriate under applicable standards of professional conduct, then, in any such case, the indemnified party shall have the right to assume or continue its own defense as set forth above (but with no more than one firm of counsel for all indemnified parties in each jurisdiction, except to the extent any indemnified party or parties reasonably shall have concluded that there may be legal defenses available to such party or parties that are not available to the other indemnified parties or to the extent representation of all indemnified parties by the same counsel is otherwise inappropriate under applicable standards of professional conduct) and the indemnifying party shall be liable for any expenses therefor. Without the written consent of the indemnified party, which consent shall not be unreasonably withheld, no indemnifying party shall effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder, whether or not the indemnified party is an actual or potential party to such action or claim, unless such settlement, compromise or judgment (A) includes an unconditional release of the indemnified party from all liability arising out of such action or claim and (B) does not include a statement as to or an admission of fault, culpability or a failure to act, by or on behalf of any indemnified party.

17

(d) If for any reason the foregoing indemnity is unavailable or is insufficient to hold harmless an indemnified party under Section 2.10(a), (b) or (c), then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of any Loss in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and the indemnified party, on the other hand, with respect to such offering of securities. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. If, however, the allocation provided in the second preceding sentence is not permitted by applicable law, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative faults but also the relative benefits of the indemnifying party and the indemnified party as well as any other relevant equitable considerations. The parties hereto agree that it would not be just and equitable if contributions pursuant to this Section 2.10(d) were to be determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the preceding sentences of this Section 2.10(d). The amount paid or payable in respect of any Loss shall be deemed to include any legal or other third party expenses reasonably incurred by such indemnified party in connection with investigating or defending any such Loss. No Person guilty of fraudulent misrepresentation within the meaning of Section 11(f) of the Securities Act shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. Notwithstanding anything in this Section 2.10(d) to the contrary, no indemnifying party other than the Company shall be required pursuant to this Section 2.10(d) to contribute any amount in excess of the net proceeds received by such indemnifying party from the sale of Registrable Securities in the offering to which the Losses of the indemnified parties relate, less the amount of any indemnification payment made by such indemnifying party pursuant to Section 2.10(b) and Section 2.10(c).

(e) The indemnity and contribution agreements contained herein shall be in addition to any other rights to indemnification or contribution which any indemnified party may have pursuant to law or contract and shall remain operative and in full force and effect regardless of any investigation made or omitted by or on behalf of any indemnified party and shall survive the transfer of the Registrable Securities by any such party.

(f) The indemnification and contribution required by this Section 2.10 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or expense, loss, damage or liability is incurred.

18

**ARTICLE III**
**GENERAL**

Section 3.1 <u>Rule 144</u>. The Company covenants that (a) so long as it remains subject to the reporting provisions of the Exchange Act, it will timely file the reports required to be filed by it under the Securities Act or the Exchange Act or, if it is not required to file such reports, upon the request of any Holder it shall make publicly available other information so long as necessary to permit sales of such Registrable Securities in compliance with Rule 144 under the Securities Act and (b) it will take such further action as any Holder reasonably may request, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 under the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC. Upon the reasonable request of any Holder in connection with the sale by such Holder of Registrable Securities without registration, the Company will deliver to such Holder a written statement as to whether it has complied with such requirements.

Section 3.2 <u>Nominees for Beneficial Owners</u>. If Registrable Securities are held by a nominee for the beneficial owner thereof, the beneficial owner thereof may, at its option, be treated as the Holder of such Registrable Securities for purposes of any request or other action by any Holder or Holders pursuant to this Agreement or any determination of any number or percentage of shares constituting Registrable Securities held by any Holder or Holders contemplated by this Agreement; provided, that the Company shall have received assurances reasonably satisfactory to it of such beneficial ownership.

Section 3.3 <u>No Inconsistent Agreements</u>. The rights granted to the Holders hereunder do not in any way conflict with and are not inconsistent with any other agreements to which the Company is a party or by which it is bound. Without the prior written consent of Holders of a majority of the then outstanding Registrable Securities, which consent shall not be unreasonably withheld, the Company will not enter into any agreement with respect to its securities that is inconsistent with the rights granted in this Agreement or otherwise conflicts with the provisions hereof or provides terms and conditions that are more favorable to, or less restrictive on, the other party thereto than the terms and conditions contained in this Agreement are to the Holders, other than any lock-up agreement with the underwriters in connection with any registered offering effected hereunder, pursuant to which the Company shall agree not to register for sale, and the Company shall agree not to sell or otherwise dispose of, Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock, for a specified period following the registered offering. If the Company enters into any other registration rights agreement with respect to any of its securities that contains terms that are more favorable to, or less restrictive on, the other party thereto than the terms and conditions contained in this Agreement are to the Holders, the terms and conditions of this Agreement shall immediately be deemed to have been amended without further action by the Company or any of the Holders so that the Holders shall each be entitled to the benefit of any such more favorable or less restrictive terms or conditions.

19

**ARTICLE IV**
**MISCELLANEOUS**

Section 4.1 <u>Amendment and Waiver</u>.

(a) Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by the Company and a majority in interest of the Holders or, in the case of a waiver, by the party or parties against whom the waiver is to be effective, in an instrument specifically designated as an amendment or waiver hereto; <u>provided</u>, <u>however</u>, that waiver by the Holders shall require the consent of a majority in interest of the Holders.

(b) No failure or delay of any party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise

thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies which they would otherwise have hereunder. The failure of the Company to cause the Registration Statement to become effective and to remain effective as provided herein shall not convey to the Holder(s) any rights to the recovery of monetary and or liquidated damages.

Section 4.2 <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile, e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

    (i)      if to any Holder other than the Original Holder, to its last known address appearing on the books of the Company maintained for such purpose, and if to the Original Holder, to:

PepsiCo, Inc.
700 Anderson Hill Road
Purchase, NY 10577
Attention: Daniel Fink; David Flavell
E-mail:

20

With a copy to:
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: Barbara Becker; Saee Muzumdar
Email: BBecker@gibsondunn.com; SMuzumdar@gibsondunn.com

    (ii)      if to the Company, to:
Celsius Holdings, Inc.
2424 N Federal Highway, Suite 208
Boca Raton, FL 33431
Attention: Chief Financial Officer and General Counsel
Email:

With a copy to:
Holland & Knight LLP
515 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL 33301
Attention: Tammy Knight
Email: Tammy.Knight@hklaw.com

or such other address as the Company or the Original Holder shall have specified to the other party in writing in accordance with this <u>Section 4.2</u>.

Section 4.3 <u>Interpretation</u>. When a reference is made in this Agreement to a Section or Article, such reference shall be to a Section or Article of this Agreement unless otherwise indicated. The headings contained in this Agreement are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances

require. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified. Each of the parties hereto acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

Section 4.4 Entire Agreement. This Agreement constitutes the entire agreement, and supersedes all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the parties with respect to the subject matter hereof and thereof.

21

Section 4.5 No Third-Party Beneficiaries. Except as provided in Section 2.10, nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

Section 4.6 Governing Law. This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

Section 4.7 Submission to Jurisdiction. Each of the parties irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement brought by any other party or its successors or assigns shall be brought and determined in any Delaware State or federal court, and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the parties agrees not to commence any action, suit or proceeding relating thereto except in the courts described above in Delaware, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in Delaware as described herein. Each of the parties further agrees that notice as provided herein shall constitute sufficient service of process and the parties further waive any argument that such service is insufficient. Each of the parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 4.8 Assignment; Successors. The rights under this Agreement may be assigned in whole or in part (but only with all related obligations) by a Holder to a transferee of Registrable Securities that is an Affiliate of Holder; provided, however, that (x) the Company is promptly furnished with written notice of the name and address of such transferee and the Registrable Securities with respect to which such rights are being transferred; and (y) such transferee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and conditions of this Agreement. This Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns. If any Person shall acquire Registrable Securities from any Holder in accordance with the terms and conditions hereunder, whether by operation of law or otherwise, such Person shall promptly notify the Company and such Registrable Securities acquired from such Holder shall be held subject to all of the terms of this Agreement, and by taking and holding such Registrable Securities such Person shall be entitled to receive the benefits of and be conclusively deemed to have agreed to be bound by and to perform all of the terms and provisions of this Agreement. Any such successor or assign shall agree in writing to acquire and hold the Registrable Securities

acquired from such Holder subject to all of the terms hereof. Any attempted assignment or transfer in violation of this Agreement shall be null and void ab initio.

22

Section 4.9 <u>Enforcement</u>. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the parties shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any Delaware State or federal court, this being in addition to any other remedy to which such party is entitled at law or in equity. Each of the parties hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

Section 4.10 <u>Severability</u>. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 4.11 <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 4.12 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

Section 4.13 <u>Facsimile or .pdf Signature</u>. This Agreement may be executed by facsimile or .pdf signature and a facsimile or .pdf signature shall constitute an original for all purposes.

Section 4.14 <u>Time of Essence</u>. Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

Section 4.15 <u>Term</u>. Except as specifically otherwise provided herein, the provisions of this Agreement shall terminate upon the earliest to occur of the following: (i) no Registrable Securities remain outstanding; (ii) all of the Registrable Securities have been transferred, sold, or otherwise disposed of in accordance with the provisions of Rule 144 promulgated under the Securities Act (or any successor provision); or (iii) the date on which the Original Holder and its Affiliates collectively no longer hold any Registrable Securities.

23

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CELSIUS HOLDINGS, INC.

By:      /s/ John Fieldly
Name:   John Fieldly
Title:    President and Chief Executive Officer

PEPSICO, INC.

By:      /s/ Kirk Tanner
Name:   Kirk Tanner
Title:    Chief Executive Officer, PepsiCo Beverages North America

[Signature Page to Registration Rights Agreement]

24

**Exhibit 10.4**

**CERTAIN INFORMATION IDENTIFIED IN THIS DOCUMENT, MARKED BY BRACKETS AND ASTERISKS ("[***]"), HAS BEEN EXCLUDED PURSUANT TO ITEM 601(B)(10) OF REGULATION S-K UNDER THE SECURITIES ACT OF 1933, AS AMENDED, BECAUSE IT IS (I) NOT MATERIAL AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE REGISTRANT IF PUBLICLY DISCLOSED.**

EXECUTION VERSION

**DISTRIBUTION AGREEMENT**

This Distribution Agreement ("**Agreement**") is made effective as of August 1, 2022 ("**Effective Date**"), by and between Celsius Holdings, Inc., a Nevada corporation ("**Company**"), located at 2424 N Federal Hwy, Suite 208, Boca Raton, FL 33431, and PepsiCo, Inc., a North Carolina corporation ("**Distributor**"), with offices located at 700 Anderson Hill Road, Purchase, NY 10577. Company and Distributor shall sometimes be referred to hereinafter individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Company has developed and exclusively owns certain formulations from which Company authorizes others to sell ready-to-drink beverages and liquid concentrate dietary supplement goods and other beverages under the Marks (as defined below);

WHEREAS, Distributor desires to have the exclusive right to act, directly or through its Subdistributor(s) (as defined below), as the distributor of Licensed Products (as defined below) within the Territory (as defined below);

WHEREAS, Company desires to grant to Distributor the exclusive right to sell and distribute, directly and/or through its Subdistributor(s), Licensed Products in the Territory and in connection therewith will grant Distributor and Subdistributors the right to use the Marks set forth on Schedule 1 in the Territory in accordance with the terms of this Agreement and the Channel Transition Agreement (as defined below);

WHEREAS, in connection herewith, Company and Distributor are entering into the Securities Purchase Agreement (as defined below); and

WHEREAS, in consideration of the foregoing, Company and Distributor have accepted the terms and conditions set forth herein.

NOW THEREFORE, for the consideration hereinafter set forth, together with the premises, mutual promises, and covenants contained herein, and such other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged by each of the Parties to this Agreement, the Parties hereto agree as follows:

**CERTAIN DEFINITIONS**

"**AAA**" has the meaning set forth in Section 9.10(b).

"**Act**" has the meaning set forth in Section 2.2(b).

"**Actual Annual Cases**" has the meaning set forth in Section 5.3(f).

"**Additional Territory**" means [***].

"**Additional Territory Proposal**" has the meaning set forth in Section 2.5(a).

1

"**Additional Territory Second Proposal**" has the meaning set forth in Section 2.5(b).

"**Advertising and Promotional Costs**" has the meaning set forth in Section 5.3(d).

"**Affiliate**" means, with respect to any Person (as defined below), any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such first Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by legally binding contract, indenture, note, bond, lease, license, commitment, instrument or other agreement, whether or not in writing.

"**Annual Review**" has the meaning set forth in Section 5.3(b).

"**Buy-Out**" has the meaning set forth in Section 3.3(a).

"**Case**" means, unless otherwise mutually agreed to by the Parties in writing, each 12-count, 12 fluid oz per container case equivalent of ready-to-drink Licensed Products (144 fluid oz per case). Other sized containers and cases will be based on the foregoing volumes. Current Case configurations are on the stock keeping unit ("**SKU**") list set forth on Schedule 3.

"**Certificate of Designation**" means that certain Certificate of Designation of Preferences, Rights and Limitations of Series A Convertible Preferred Stock issued by Company to Distributor in connection with the Securities Purchase Agreement (defined below).

"**Change of Control**" means: (i) a sale or transfer, directly or indirectly, of all or substantially all of the assets of Company in any transaction or series of related transactions (other than sales in the ordinary course of business); (ii) any merger, consolidation or reorganization of Company with or into any other entity or entities as a result of which the holders of Company's outstanding capital stock (on a fully-diluted basis) immediately prior to the merger, consolidation or reorganization no longer represent at least a majority of the voting power of the surviving or resulting corporation or other entity; or (iii) any sale or series of sales, directly or indirectly, beneficially or of record, of shares of Company's capital stock by the holders thereof which results in any Person or group of Affiliated Persons owning capital stock holding more than 50% of the voting power of Company.

"**Channel Transition Agreement**" means that certain Channel Transition Agreement executed by and between Distributor and Company on even date herewith, a copy of which is attached hereto as Exhibit A.

"**Channels**" means all channels and distribution methods existing as of the Effective Date within the Territory, except as provided in this Agreement, including, without limitation, Schedule 2 attached hereto, which sets forth all Excluded Accounts (as such term is defined on Schedule 2).

"**Claim**" has the meaning set forth in Section 6.1.

"**Club Channel**" means a retail store requiring paid membership and usually selling a wide variety of merchandise, in which customers may buy large, wholesale quantities of the store's products [***].

"**Co-op Fund**" has the meaning set forth in Section 5.3(f).

2

"**Competitor**" means [***].

"**Competitive Change of Control**" means a Change of Control wherein a Competitor is the acquiring or constituent party in such transaction.

"**Confidential Information**" has the meaning set forth in Section 9.1.

"**Contract Committee**" has the meaning set forth in Section 5.3(c).

"**Cruise Lines**" means companies that operate cruise ships on oceans and rivers and which market cruises to the public [***], including any channels of sales for distribution and sale to such companies and/or operators.

"**Damages**" has the meaning set forth in Section 6.1.

"**Distributor's Total Adjusted Field Net Revenue**" means [***].

"**Dollars**", "**dollars**" and "**$**" each mean lawful money of the United States.

"**Ecommerce Channel**" means merchants selling through websites and/or mobile applications which offer various products for sale to consumers [***].

"**Energy Category**" means the total energy category in the Territory as defined and reported by [***].

"**Energy Drink**" means a [***].

"**Escalation Procedure**" has the meaning set forth in Section 5.3(c).

"**Excluded Accounts**" are defined or listed, as applicable, in Schedule 2.

"**Existing Distributor**" has the meaning set forth in Section 1.1(c).

"**Existing Product**" has the meaning set forth in Schedule 4.

"**Expansion Product**" has the meaning set forth in Schedule 5.3(g).

"**Foodservice**" means, except for the Excluded Accounts set forth on Schedule 2, customers and channels serviced by Distributor's Foodservice organization [***].

"**Force Majeure Event**" has the meaning set forth in Section 9.9.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or Orders (as defined below) of such organization or authority have the force of Law (as defined below)), or any arbitrator, court or tribunal of competent jurisdiction, including, without limitation, the United States Food and Drug Administration and the United States Federal Trade Commission.

"**Gross Profits**" means [***].

3

"**Group Presidents**" has the meaning set forth in Section 5.3(c).

"**Indemnitee**" has the meaning set forth in Section 6.3.

"**Indemnitor**" has the meaning set forth in Section 6.3.

"**Intellectual Property**" means all present or future trademarks, trade dress, patents, copyrights, and other intellectual property rights, including, without limitation, trade secrets, designs, packaging and inventions, marketing materials and marketing content, owned by Company or its Affiliate(s), including those associated with Licensed Products (whether or not patented or patentable) and all content, graphics and other works of authorship (including

the Marks) created by Company or on behalf of Company by third parties and used in connection with Licensed Products.

"**Joint Business Plan**" has the meaning set forth in Section 5.3(a).

"**Laws**" means, as applied to any Person, any and all applicable statutes, laws, ordinances, regulations, rules, codes, Orders, constitutions, treaties, common laws, judgments, decrees, and other requirements or rules of law, including, without limitation, those promulgated by any Governmental Authority.

"**Licensed Products**" means: (a) non-alcoholic beverages and/or dietary supplements packaged under the Marks, including (i) ready-to-drink beverages or liquids and (ii) other liquid concentrate products which are not ready-to-drink; (b) [***] packaged under the Marks and which become "Licensed Products" pursuant to the terms of Section 5.3; and (c) any other products which the Parties may, upon mutual written agreement add as Licensed Products, from time to time during the Term of this Agreement. The SKUs for the initial Licensed Products as of the Effective Date are attached on Schedule 3. The Parties will mutually align on pricing for any Licensed Products not specifically priced in this Agreement.

"**Liquidator**" means a retail store in which short-coded, closeout, discontinued or similar products are sold at prices that are in principle lower than an actual or supposed "full retail price" [***].

"**Marks**" means the trademarks set forth on Schedule 1 and any other trademarks, logos, service marks, trade dress, slogans, designs, logos and other source indicators used by Company in connection with Licensed Products, including all trade dress, logos and slogans, whether such are registered or unregistered.

"**Military Channel**" means the channel of sales to the U.S. Military for distribution and/or sale to Qualified Consumers (defined herein) [***].

"**Mutual Performance Objectives**" has the meaning set forth in Section 5.3(b).

"**New [***] Product**" has the meaning set forth in Section 5.3(h)(2).

"**New Channels**" means all channels and distribution methods created after the Effective Date within the Territory.

"**New Channel Proposal**" has the meaning set forth in Section 2.6(a).

"**New Channel Second Proposal**" has the meaning set forth in Section 2.6(b).

4

"**New [***] Accrual Amount**" means an amount accrued by Distributor equal to $[***] of Licensed Products sold by Distributor.

"**New [***] Drink**" means any [***] brand primarily marketed or advertised as a [***] beverage, expressly excluding [***].

"**New [***] Minimum Share Achievement**" has the meaning set forth in Section 2.4(e)(i).

"**New Non-Alcoholic Product**" has the meaning set forth in Section 5.3(h)(1).

"**New Product**" has the meaning set forth in Schedule 5.3(g).

"**Opportunity Territory**" means [***].

"**Order**" means, as applied to any Person, any order, judgment, decree, injunction, stipulation, settlement, or consent of or with any Governmental Authority.

"**Person**" means any individual, partnership, corporation, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"**Product Issue**" has the meaning set forth in Section 8.1.

"**Qualified Consumers**" means members of the active U.S. military, military dependents, retirees and honorably discharged veterans.

"**Quarterly Review**" has the meaning set forth in Section 5.3(e).

"**Restricted Product**" has the meaning set forth in Schedule 5.3(g).

"**Restriction Termination Date**" has the meaning set forth in Schedule 5.3(g).

"**Retail**" means, except for the Excluded Accounts set forth on  Schedule 2, customers and channels serviced by Distributor's Retail Sales and Distribution organization.

"**[\*\*\*] Agreement**" has the meaning set forth in Schedule 4.

"**Sales Fundamentals**" has the meaning set forth in Section 5.3(b).

"**Securities Purchase Agreement**" means that certain Securities Purchase Agreement dated as of the Effective Date between Company and Distributor.

"**Subdistributor(s)**" means any third-party entity appointed and authorized by Distributor in writing to distribute Licensed Products within the Territory, including Distributor's subsidiaries or [\*\*\*].

"**Term**" has the meaning set forth in Section 3.1.

"**Territory**" means: (a) for purposes of this Agreement, the United States and its territories and possessions, excluding (i) the Excluded Accounts and (ii) all customers, accounts and channels in Puerto Rico and US Virgin Islands.

5

"**Triggering Condition**" means any date from and after the [\*\*\*] of the Effective Date upon which the Licensed Products collectively achieve at least [\*\*\*]% of the Energy Category for the immediately preceding [\*\*\*] period.

**SECTION 1 – Exclusive Appointment**

1.1 Grant of Rights.

| | | |
|---|---|---|
| (a) | Scope. This Agreement grants Distributor the right to exclusively distribute the Licensed Products within the Territory on the terms and subject to the conditions stated herein. | |
| (b) | Exclusivity. From the Effective Date and unless and until this Agreement is terminated hereunder, Distributor shall have the exclusive right, directly and/or through a Subdistributor(s), to distribute and sell Licensed Products in the Territory in the Channels, except as provided for in this Agreement, and specifically excluding the Excluded Accounts as set forth in Schedule 2. | |

(c) <u>Appointment</u>. Subject to Company's termination of the rights of each existing distributor of Company (each, an "**Existing Distributor**") in accordance with the terms of the Channel Transition Agreement, Distributor shall have the exclusive right (directly and/or indirectly through a Subdistributor(s)), from and after the later of (i) the Effective Date or (ii) as related only to the specific territory serviced by each Existing Distributor, the date such Existing Distributor's rights to distribute the Licensed Products are terminated, in each case, to distribute and sell Licensed Products in the Territory previously belonging to such Existing Distributor, subject to the limited exceptions as provided for in this Agreement (including the exceptions stated in <u>Schedule 2</u>). With respect to each portion of the Territory which is not serviced by any Existing Distributor as of the Effective Date, Distributor shall have the exclusive right (directly and/or indirectly through a Subdistributor(s)), from and after the Effective Date, to distribute and sell Licensed Products throughout such portion of the Territory, subject to the exceptions as provided for in this Agreement (including the exceptions stated in <u>Schedule 2</u>). Any changes to this Section 1.1(c) shall be done by an amendment pursuant to Section 9.6 of this Agreement. Distributor will ensure the terms set forth on <u>Schedule 4</u> are included in its subdistribution agreements with any of Distributor's [***] For the avoidance of doubt, except as otherwise provided in the Channel Transition Agreement, Company shall have no liability to Distributor if, and to the extent, Company is unable to terminate the rights of any Existing Distributor, including, without limitation, due to franchise or similar Laws.

(d) <u>Existing Distributors</u>. Subject to the terms and conditions of this Agreement and the Channel Transition Agreement, Company believes in good faith that it can lawfully conclude the rights of Existing Distributors to sell and distribute Licensed Products pursuant to and in accordance with its agreements with such Existing Distributors or applicable Law in order to grant Distributor the exclusive right to sell and distribute Licensed Products in the Territory. Company will act promptly to ensure that it complies with the terms of the Channel Transition Agreement. Upon each such termination of an Existing Distributor's distribution rights, Distributor will have the exclusive rights to sell Licensed Products in the portion of the Territory previously covered by such Existing Distributor. As more fully set forth in the Channel Transition Agreement, Company will solely be responsible for paying any amounts payable to Existing Distributors as a result of any such termination, including applicable buyout amounts set forth in Company's agreements with its existing distributors, subject in each case to Distributor's obligation to pay the Transition Payments (as defined in the Channel Transition Agreement) to Company in accordance with the terms of the Channel Transition Agreement.

6

**SECTION 2 – Representations, Warranties and Covenants**

2.1 <u>Products.</u> The Parties agree that, under this Agreement, Company shall manufacture and supply Licensed Products to Distributor and Distributor shall carry such Licensed Products required herein, or otherwise as mutually agreed to in writing between the Parties.

2.2 <u>Representations and Warranties.</u>

(a) <u>Distributor Representations and Warranties</u>. Distributor represents and warrants that (i) it will comply with all Laws, including, without limitation, Laws relating to food, labeling, health, packaging, returnable container Laws, deposit Laws and Laws applicable to Distributor's use of Company's Intellectual Property, (ii) it has the financial resources, infrastructure, equipment, and capability to cover and service the Territory to meet Distributor's obligations contained herein, (iii) it shall organize and maintain an adequate sales force to sell Licensed Products in the Territory to meet Distributor's obligations contained herein, (iv) it is qualified and permitted to enter into this Agreement, and the Channel Transition Agreement, (v) this Agreement and the Channel Transition Agreement do not and will not, individually or as a whole, conflict with any of Distributor's legal or contractual obligations, and (iv) as of the Effective Date, to Distributor's knowledge, this Agreement and the Channel Transition Agreement do not and will not, individually or as a whole, conflict with any antitrust Laws promulgated by the Federal Trade Commission.

(b) <u>Company Representations and Warranties</u>. Company represents and warrants that (i) it will comply with all Laws applicable to its performance hereunder, (ii) the Licensed Products will be merchantable, of good quality and fit for the purpose intended, and will not be impure, contaminated or adulterated, misbranded or mislabeled within the meaning of the Federal Food, Drug and Cosmetic Act ("**Act**") and shall comply in all respects with the Act, as amended, and the Food Additives Amendment of 1968, provided that the foregoing warranty shall not extend to Licensed Products that are changed or improperly stored after delivery to Distributor's delivery location or are damaged due to Distributor's, any Subdistributor's or any other third party's actions or omissions, (iii) it is qualified and permitted to enter into this Agreement and the Channel Transition Agreement, (iv) to the extent written agreements exist, it has the right to terminate its Existing Distributors in accordance with the terms of its agreements with such Existing Distributors, and, to the extent no written agreements exist, it has the right to terminate such Existing Distributors in accordance with applicable Law, (v) this Agreement and the Channel Transition Agreement do not and will not, individually or as a whole, conflict with any of Company's legal or contractual obligations, (vi) as of the Effective Date, to Company's knowledge, this Agreement and the Channel Transition Agreement do not and will not, individually or as a whole, conflict with antitrust Laws promulgated by the Federal Trade Commission, and (vii) the Licensed Products contain [***].

2.3 <u>Covenants.</u>

(a) Distributor hereby covenants that during the Term it will, as it relates to Distributor's obligations under this Agreement:

(i) use commercially reasonable efforts to sell and distribute Licensed Products in all Channels in the Territory during the Term;

(ii) not sell Licensed Products to or solicit any person or entity outside the Territory or any other territory not authorized by Company;

7

(iii) forward to Company all inquiries received regarding potential sales of Licensed Products outside the Territory;

(iv) not, directly or indirectly, knowingly make any misrepresentations or false, disparaging, or misleading statements pertaining to Licensed Products or Company;

(v) not adulterate or misbrand the Licensed Products, or engage in any activity that could or does render the Licensed Products adulterated or misbranded;

(vi) distribute, transport and store the Licensed Products in accordance with all Laws;

(vii)     maintain all necessary records for compliance with the terms of this Agreement and all Laws; and

(viii)     work diligently to have each Subdistributor that is [***] enter into a subdistribution agreement by and between Distributor and the Subdistributor, including terms substantially similar to the terms in <u>Schedule 4</u>.

(b)     Company hereby covenants that during the Term:

(i)     it will use commercially reasonable efforts to market, promote and manufacture the Licensed Products during the Term;

(ii)     it will not, directly or indirectly, knowingly make any misrepresentations or false, disparaging, or misleading statements pertaining to Distributor or Distributor's products;

(iii)     it and its Affiliates will not grant any third party the right to sell or distribute any Licensed Products in the Territory or to use and/or display the Marks and/or Company Intellectual Property in the Territory in connection with the sale or distribution of any Licensed Products, unless otherwise permitted herein or agreed in writing by the Parties;

(iv)     it will comply and the Licensed Products will comply with all applicable federal, state and local Laws and industry standards that may now or hereafter be applicable to any performance hereunder by or on behalf of Company or the Licensed Products, as applicable, provided that the foregoing covenant shall not extend to Licensed Products that are changed or improperly stored after delivery to Distributor's delivery location or are damaged due to Distributor's, any Subdistributor's or third party's actions or omissions; and

(v)     with respect to Company's [***].

2.4 <u>Non-compete.</u>

(a)     During the Term, neither Distributor nor any of its Affiliates will sell or distribute within the [***] an Energy Drink that contains all three (3) of the following elements: (1) it contains [***]; (2) it makes a claim to [***]; and (3) it is primarily marketed or advertised as a [***].

(b)     During the Term, neither Distributor nor any of its Affiliates will sell or distribute within the [***] an Energy Drink that either: (1) (i) is primarily marketed or advertised as a [***] and (ii) is contained in a [***] and containing [***], which trade dress is confusingly similar to [***] (as shown on <u>Exhibit B</u> attached hereto); or (2) incorporates a trademark, product name or logo confusingly similar to Company's registered trademarks as set forth in <u>Schedule 1</u> hereto. In the event that Company modifies the appearance of such [***] to no longer contain such trade dress at any time during the Term, then the foregoing restrictions shall no longer apply to Distributor or any of its Affiliates.

(c)     During the Term, neither Distributor nor any of its Affiliates will sell or distribute within the [***] any Energy Drinks under the following trademarks: [***].

8

(d)     During the Term, except as otherwise expressly provided in Section 2.4(c) and [***], none of Distributor, any of its Affiliates or [***] will distribute any Energy Drinks restricted by the provisions 2.4(a), (b) or (c) above.

(e)    During the Term, until the date which is [***] after the Effective Date, Distributor for itself and on behalf of its Affiliates agrees that it and they will not launch or distribute [***] any New [***] Drink.

(f)    After such [***], Distributor and its Affiliates are permitted to launch any beverages without restriction (including New [***] Drinks), provided, neither Distributor nor any of its Affiliates is restricted by provisions 2.4(a), (b) or (c) above and, provided further, that the following shall apply:

    (i)    If Distributor or any of its Affiliates launches any New [***] Drink that achieves and maintains a market share of [***]% or greater of the Energy Category ("**New [***] Minimum Share Achievement**") for any period of [***], then Distributor will accrue (on an annual basis) the New [***] Accrual Amount for so long as the Energy Category market share of any New [***] Drink(s) distributed by Distributor or any of its Affiliates in the [***] maintains the New [***] Minimum Share Achievement.

(g)    The New [***] Accrual Amount shall be spent by and used by Distributor to incrementally support Company and maintain focus on the Licensed Products within the Distributor's organization, provided that the parties will meet and mutually agree on how the funds are spent which may include but not limited to incremental marketing support, promotional support, cold equipment, staff incentives, etc.

2.5 <u>Right of First Offer – Additional Territory.</u>

(a)    If, during the Term of this Agreement, Company intends to commence manufacturing, distribution or sale of the Licensed Products in any country(ies) in the Additional Territory, Company shall notify Distributor in writing of such intention and Distributor shall have the right of first offer to submit a proposal (the "**Additional Territory Proposal**") detailing the terms and conditions upon which it would be willing to manufacture, sell or distribute the Licensed Products, either directly or through a local sub-distributor for any such country(ies) in the Additional Territory. Distributor shall have [***] days from the date of receipt of such notice to deliver in writing the Additional Territory Proposal to Company. Company shall then have a period of [***] days following its receipt of Distributor's Additional Territory Proposal to review and respond to Distributor's Additional Territory Proposal. If Company accepts Distributor's Additional Territory Proposal, the parties shall use commercially reasonable efforts to enter into a new agreement for such country(ies) reasonably consistent with this Agreement.

(b)    If, within such subsequent [***] day period, Company rejects Distributor's Proposal, then Distributor shall have an additional [***] day period following written notice from Company of its rejection of the Additional Territory Proposal to respond to Company with a second proposal (the "**Additional Territory Second Proposal**") detailing revised terms and conditions under which it would be willing to manufacture, sell or distribute the Licensed Products, either directly or through a local sub-distributor in such country(ies) in the Additional Territory. Company shall then have a further period [***] days following its receipt of Distributor's Additional Territory Second Proposal to review and respond to Distributor's Additional Territory Second Proposal. If Company accepts Distributor's Additional Territory Second Proposal, the parties shall use commercially reasonable efforts to enter into a new agreement for such country(ies) reasonably consistent with this Agreement.

9

(c)    If Company rejects Distributor's Additional Territory Second Proposal, unless otherwise restricted herein, Company shall be entitled to enter into a distribution arrangement with any other third party, other than [***], on terms not materially more favorable to the relevant third-party distributor than the terms specified in the Additional Territory Second Proposal.

2.6 <u>Right of First Offer – New Channel.</u>

    (a)    If, during the Term of this Agreement, Company intends to commence distribution or sale of the Licensed Products in any New Channel(s), Company shall notify Distributor in writing of such intention and Distributor shall have the right of first offer to submit a proposal (the "**New Channel Proposal**") detailing the terms and conditions upon which it would be willing to sell or distribute the Licensed Products, either directly or through a local sub-distributor for such New Channel(s). Distributor shall have [***] days from the date of receipt of such notice to deliver in writing the New Channel Proposal to Company. Company shall then have a period of [***] days following its receipt of Distributor's New Channel Proposal to review and respond to Distributor's Proposal. If Company accepts Distributor's New Channel Proposal, the parties shall use commercially reasonable efforts to enter into a new agreement for such New Channel(s) reasonably consistent with this Agreement.

    (b)    If, within such subsequent [***] day period, Company rejects Distributor's New Channel Proposal, then Distributor shall have an additional [***] day period following written notice from Company of its rejection of the New Channel Proposal to respond to Company with a second proposal (the "**New Channel Second Proposal**") detailing revised terms and conditions under which it would be willing to sell or distribute the Licensed Products, either directly or through a local sub-distributor in such New Channel(s). Company shall then have a further period [***] days following its receipt of Distributor's New Channel Second Proposal to review and respond to Distributor's New Channel Second Proposal. If Company accepts Distributor's New Channel Second Proposal, the parties shall use commercially reasonable efforts to enter into a new agreement for such New Channel(s) reasonably consistent with this Agreement.

    (c)    If Company rejects Distributor's New Channel Second Proposal, Company shall be entitled to enter into a distribution arrangement with any other third party on terms not materially more favorable to the relevant third-party distributor than the terms specified in the New Channel Second Proposal.

2.7 <u>Canada Distribution Agreement</u>. The Parties will use commercially reasonable efforts to negotiate and execute a distribution agreement reasonably consistent with this Agreement for the sale and distribution of Licensed Products in Canada and launch such Licensed Products in Canada by [***], provided that the Licensed Products are compliant with applicable Law and the Parties have determined an estimated launch plan within a reasonable time to execute.

2.8 Distribution in Opportunity Territories. Upon Company's reasonable request, Distributor agrees to meet and confer in good faith with Company regarding the terms and conditions upon which Distributor may be willing to sell or distribute the Licensed Products, either directly or through a local sub-distributor in an Opportunity Territory. Company reserves the right to reject any and all proposals provided in connection therewith and to withdraw from such discussions for any reason.

10

**SECTION 3 – Term and Termination**

3.1 <u>Term</u>. The term of this Agreement shall commence on the Effective Date and will continue for an unlimited period (the "**Term**").

3.2 <u>Termination</u>. Section 3.1, Section 3.2 and Section 9.9 set forth the sole and exclusive mechanisms for termination of this Agreement. The Parties agree and acknowledge that the notice provisions and consideration provided in this Section 3.2 and Section 3.3 (if and to the extent payable) are reasonable and adequate to each Party in the event of termination.

(a) <u>Termination With Cause</u>. Each Party shall have the right to terminate this Agreement "**With Cause**" (as defined below) on the terms and in accordance with the timelines set forth below. Termination of this Agreement pursuant to this Section 3.2(a) shall not in any way terminate, limit or restrict the rights and remedies of either Party against the other Party which has violated, breached or failed to satisfy any of the representations, warranties, covenants, agreements, conditions or other provisions of this Agreement.

(i) <u>Termination by Company With Cause</u>. Company has the right to terminate this Agreement With Cause upon written notice to Distributor on the terms herein. Upon termination of this Agreement by Company With Cause, Distributor shall, within 30 business days of termination, pay to Company any and all amounts owed by Distributor to Company.

a. <u>Definition of Cause</u>. Company shall have the right to terminate this Agreement "**With Cause**" upon written notice to Distributor if or upon, as applicable:

i. Distributor becomes insolvent, or files a voluntary petition, or acquiesces to an involuntary petition, pursuant to any bankruptcy act or Law, or an order is entered in any involuntary proceeding which remains unstayed for more than 30 days, or a petition is filed for, or Distributor consents to the appointment of, or possession is taken by a trustee, receiver or similar official for Distributor of all or a substantial part of its business, or an order is entered appointing any such official which remains unstayed for more than 30 days; or

ii. Distributor ceases all or a material part of its beverage business, or an order is entered by a court of competent jurisdiction decreeing the dissolution of Distributor or Distributor ceases to function as an ongoing concern and/or ceases to conduct its operations in the normal course of business, or the administration or the occurrence of any analogous event; or

iii. Distributor or one of its Affiliates commits a material breach or fails to perform or observe in a material way any of the representations, warranties, covenants or obligations applicable to it hereunder, and fails to cure any such breach or failure to perform or observe such material representations, warranties, covenants or obligations within 30 days after receiving written notice from Company stating the nature and character of such breach or failure; provided that, if the breach cannot be corrected within 30 days, Distributor and its Affiliates will have that additional time to correct the breach as reasonably required (not to exceed 90 days), provided further that Distributor or its applicable Affiliate begins taking the actions necessary to correct the breach during the 30-day cure period and diligently and in good faith pursues those actions to completion; provided, further, that, the occurrence of ordinary course issues and challenges relating to the transition and ramp-up of distribution during the first twelve (12) months following the Effective Date shall not, absent extenuating facts or circumstances (for example, gross negligence or willful misconduct), constitute "material breaches" or "failures to perform" for purposes of this Section 3.2(a)(i)(a)(iii); or

iv. The distribution relationship contemplated by this Agreement is required to be terminated by any Governmental Authority, including, without limitation, the United States Federal Trade Commission.

(ii) <u>Termination by Distributor With Cause</u>. Distributor has the right to terminate this Agreement With Cause (as defined below) upon written notice to Company on the terms herein. Upon termination of this Agreement by Distributor With Cause, Company shall, within 30 business days of termination pay to Distributor, any and all amounts owed by Company to Distributor, other than the Buy-Out, which shall be payable within the timeline set forth in Section 3.3.

    a.   <u>Definition of Cause</u>. Distributor shall have the right to terminate this Agreement "**With Cause**" if:

        i.   Company becomes insolvent, or files a voluntary petition, or acquiesces to an involuntary petition, pursuant to any bankruptcy act or Law, or an order is entered in any involuntary proceeding which remains unstayed for more than 30 days, or a petition is filed for, or Company consents to the appointment of, or possession is taken by, a trustee, receiver or similar for Company of all or a substantial part of its business, or an order is entered appointing any such official which remains unstayed for more than 30 days;

        ii.   Company ceases all or a material part of its business, or an order is entered by a court of competent jurisdiction decreeing the dissolution of Company or Company ceases to function as an ongoing concern and/or ceases to conduct its operations in the normal course of business, or the administration or the occurrence of any analogous event; or

        iii.   Company or one of its Affiliates commits a material breach or fails to perform or observe in a material way any of its material representations, warranties, covenants or obligations hereunder, and fails to cure any such breach or perform or observe its representations, warranties, covenants or obligations within 30 days after receiving written notice from Distributor stating the nature and character of such breach or failure; provided that, if the breach cannot be corrected within 30 days, Company and its Affiliates will have that additional time to correct the breach as reasonably required (not to exceed 90 days), provided further that Company or its applicable Affiliate begins taking the actions necessary to correct the breach during the 30-day cure period and diligently and in good faith pursues those actions to completion;

12

iv.    Company consummates a Competitive Change of Control. In the event Company executes a binding written agreement for a Competitive Change of Control, Company shall notify Distributor in writing within [***] business days of the execution of such binding written agreement for a Competitive Change of Control, and if Distributor wishes to exercise its right to terminate, it shall provide Company with written notice of such termination (the "**Distributor's Notice**") within [***] business days after Distributor receives such written notice from Company; provided that the effective date of any such termination shall be [***] days after the effective date of such Competitive Change of Control if the acquiring or constituent party is [***] and [***] after the effective date of such Competitive Change of Control if the acquiring or constituent party is any [***], provided further that during such [***] day or [***] period, as applicable, after the effective date of a Competitive Change of Control, [***]. In the event that such Competitive Change of Control is not consummated for any reason, then Distributor's termination notice shall be deemed withdrawn and null and void with no further action required on the part of Company or Distributor; or

v.    Company fails to meet the Transition Volume Minimum pursuant to Section 6 of the Channel Transition Agreement.

(iii)    <u>Termination by Company for Change of Control</u>. Company shall have the right to terminate this Agreement in connection with Company's execution of a binding written agreement to consummate a Change of Control (whether to a Competitor or a non-Competitor). In such case, Company shall notify Distributor in writing within [***] business days of the execution of such binding written agreement for a Change of Control, provided the effective date of termination shall be [***] days after the effective date of such Change of Control if the acquiring or constituent party is [***] and [***] after the effective date of such Change of Control if the acquiring or constituent party is [***] or non-Competitor, provided further that during such [***] day or [***] period, as applicable, after the effective date of a Competitive Change of Control, [***], provided further that Company shall pay the Buy-Out pursuant to Section 3.3.

(b)    <u>Termination Without Cause</u>. Provided that the Party wishing to terminate this Agreement is not then in breach of any of the terms and conditions contained in this Agreement beyond any applicable notice and cure periods, beginning in the nineteenth year of the Term (i.e., 2041), either Party shall have the right to terminate this Agreement without cause in its sole discretion by providing written notice on August 1 of such year to the other Party of its intention to terminate, which termination shall be effective in twelve (12) months (i.e., August 1, 2042). Thereafter, beginning in the twenty-ninth year of the Term (i.e., 2051) and each ten (10) year period thereafter (i.e., 2061, 2071, etc.) either Party shall have the right to terminate this Agreement without cause in its sole discretion by providing written notice on August 1 of such year to the other Party of its intention to terminate, which termination shall be effective in twelve (12) months. For clarity, if either Party terminates this Agreement in accordance with this Section 3.2(b), both Parties shall continue to perform their respective obligations under this Agreement after notice of termination until the expiration of the twelve (12) month notice period.

13

(c)    <u>Effect of Termination</u>. In the event of the termination of this Agreement for any reason whatsoever, the Parties shall have the following rights and obligations:

    i.    Distributor shall have the right to sell through the Licensed Products in its possession for a reasonable period of time following the effective date of such termination, not to exceed [***] days. Any remaining Distributor inventory of Licensed Products that are good and salable shall be purchased by Company from Distributor, at Distributor's cost price plus freight;

    ii.    Company shall have the right, at its option, to cancel any or all accepted but undelivered purchase orders for Licensed Product that provide for delivery after the effective date of termination;

    iii.    Termination of this Agreement shall not release either Party from the obligations to make payments of any undisputed amounts then or thereafter due and payable under this Agreement or waive either Party's rights or obligations under this Agreement; and

    iv.    If requested by Company, as appropriate under the circumstances, Distributor will use commercially reasonable efforts to assist Company in the orderly transition of the Territory to one or more new distributors.

3.3 <u>Buy-Out</u>.

    (a)    The compensation to be paid by Company to Distributor in the context of termination shall be as follows (if applicable, the "**Buy-Out**"):

    (i)    In the event of (A) Company's termination of this Agreement pursuant to Section 3.2(b), (B) Company's termination of this Agreement pursuant to Section 3.2(a)(iii) in connection with a Change of Control (other than in connection with a Competitive Change of Control, which shall be governed by Section 3.3(a)(ii) below), or (C) Distributor's termination With Cause pursuant to Section 3.2(a)(ii) (other than in connection with a Competitive Change of Control, which shall be governed by Section 3.3(a)(ii) below), the Buy-Out shall be an amount equal to [***] Distributor's Gross Profits in the [***] period immediately preceding such termination notice date; **<u>or</u>**

    (ii)    In the event of (A) Company's termination of this Agreement pursuant to Section 3.2(a)(iii) in connection with a Competitive Change of Control, or (B) Distributor's termination of this Agreement pursuant to Section 3.2(a)(ii)(a)(iv) in connection with a Competitive Change of Control, the Buy-Out shall be an amount equal to (i) for any Competitive Change of Control to [***], an amount equal to (x) [***] Distributor's Gross Profits in the [***] period immediately preceding such termination notice date *plus* (y) $[***], or (ii) for any Competitive Change of Control to a Competitor [***], [***] Distributor's Gross Profits in the [***] period immediately preceding such termination notice date.

    (b)    Notwithstanding the foregoing, in the event of any termination taking place during the first [***] years of the Term for which the Buy-Out is owed, the amount payable to Distributor shall be at least equal to the amount of the Transition Payment (as defined in the Channel Transition Agreement) previously paid to Company by Distributor.

14

    (c)    Except as otherwise provided in this Section 3.3(c), Company shall pay any Buy-Out owed to Distributor in full no later than the effective date of termination or, if the effective date of termination is less than [***] business days from the date of notice of termination, no later than [***] business days from the date of notice of termination of this Agreement from Distributor.

In the event of a dispute between the Parties regarding the amount of the Buy-Out owed to Distributor, Company shall be obligated to pay the Buy-Out in full to Distributor but may, at its

option, hold back such disputed amount solely if such amount represents a variation of [***]% or less (the "**Disputed Buy-Out Portion**") from the undisputed amount of the Buy-Out (the "**Undisputed Buy-Out Portion**"). Company shall pay the Undisputed Buy-Out Portion to Distributor no later than the effective date of termination (or, if the effective date of termination is less than [***] business days from the date of notice of termination, no later than [***] business days from the date of notice of termination) and the Parties shall in good faith work to settle the Disputed Buy-Out Portion no later than the effective date of termination of this Agreement (or, if the effective date of termination is less than [***] business days from the date of notice, no later than [***] days from the date of notice of termination from Distributor).

Notwithstanding anything contained herein to the contrary, if any portion of the Undisputed Buy-Out Portion due to Distributor remains outstanding from Company as of the effective date of termination, or as of the expiration of the foregoing [***] business day period, as applicable, this Agreement shall remain in full force and effect and shall only be deemed terminated upon Company's payment to Distributor of the Undisputed Buy-Out Portion, in full. For the avoidance of doubt, no Buy-Out shall be payable to Distributor upon (i) Distributor's termination of this Agreement without cause pursuant to Section 3.2(b) or (ii) Company's termination of this Agreement With Cause.

(d)        For the avoidance of doubt, there shall be no Buy-Out owed by Company in connection with (i) any Competitive Change of Control where Distributor does not exercise its right to terminate this Agreement pursuant to Section 3.2(a)(ii)(a)(iv), and provided that such new buyer agrees to assume the obligations of Company under this Agreement, or (ii) any Change of Control where Company does not exercise its right to terminate this Agreement pursuant to Section 3.2(a)(iii).

**SECTION 4 - Intellectual Property**

4.1 <u>Ownership of IP</u>. Company or its Affiliate(s), as applicable, owns and shall retain all right, title and interest in the Marks and the Intellectual Property.

4.2 <u>License</u>. Distributor is hereby granted the exclusive (except as otherwise provided herein, and solely for the purposes set forth in this Agreement), sublicensable (solely to its Subdistributors), non-assignable, and nontransferable right to use the Intellectual Property in the Transitioned Territory (as defined in the Channel Transition Agreement) related to Licensed Product, accordance with the terms hereof, in connection with the promotion, merchandising, marketing, distribution, and sale of Licensed Products as contemplated hereby. The use by Distributor of any of Company's Intellectual Property assets must be in a form and format pre-approved by Company.

4.3 <u>Company Representations</u>. Company represents and warrants that it or its Affiliate(s) owns and possesses adequate authority and rights to grant Distributor the right to use Company's Intellectual Property in the Transitioned Territory as contemplated hereby, and that the use of Company's Intellectual Property by Distributor in the Transitioned Territory in accordance with the terms of this Agreement will not, to the best of Company's knowledge, infringe the trademark or other Intellectual Property rights of any third-party.

15

4.4 <u>Distributor Acknowledgments</u>. Distributor understands and agrees that Company or its Affiliates own full right, title, interest and other valuable property rights in and to the Intellectual Property and Marks. Distributor agrees that it shall not, at any time during the Term, contest the validity of Company's or Affiliate(s)'s ownership, as applicable, of rights or ability to control the Marks or Intellectual Property. Distributor acknowledges and agrees that its right to use the Marks and Intellectual Property derives solely from this Agreement and is limited to the sale, distribution and marketing of Licensed Products in the Territory pursuant to and in compliance with this Agreement. None of these rights are being assigned to Distributor. Distributor shall not represent that it owns any rights in Company's Intellectual Property, and Company's Intellectual Property shall not be used by Distributor in any manner other than as agreed to herein by Company. During the Term, Distributor acknowledges and agrees that, unless otherwise agreed by Company or provided herein:

(a)      Distributor shall only use the Intellectual Property or Marks in connection with the sale and/or marketing of Licensed Products subject to this Agreement;

(b)      Distributor shall promptly discontinue the use of all of the Intellectual Property upon the termination of this Agreement with a reasonable time period for Distributor to sell through the Licensed Products, not to exceed [***] days;

(c)      Distributor shall promptly change the manner in which the Intellectual Property or Marks related to Licensed Products is displayed or used as requested from time to time by Company with adequate advance notice to Distributor;

(d)      None of the Intellectual Property or Marks shall be used as part of the corporate or business entity name under which Distributor's performance of this Agreement is conducted; and

(e)      Distributor will promptly notify Company in writing of any actual or alleged infringement of the Intellectual Property or Marks about which Distributor has knowledge, stating with particularity the facts on which the infringement is based or alleged and, upon request, shall, at the expense of the Company, reasonably assist Company in any action, proceeding or enforcement efforts in respect thereof.

**SECTION 5 - Terms of Purchases and Sales**

5.1 <u>Payment Terms and Right of Offset</u>. Subject to the terms herein, Distributor shall pay Company the full invoice price for the Licensed Products within [***] days of Licensed Products delivery to Distributor's designated facilities. Distributor will have no obligation to pay Company for any Licensed Products unless: (i) Distributor has received such Licensed Products, or (ii) Distributor has received from Company an invoice for such Licensed Products in a form mutually agreed to by the Parties. Distributor has the right to withhold payments due hereunder as an offset against undisputed amounts not paid by Company related to Licensed Products ordered by Distributor, and any and all undisputed balances due and payable to Distributor pursuant to this Agreement.

5.2 <u>Pricing</u>. Pricing for Licensed Products payable by Distributor to Company are as set forth on <u>Schedule 6</u>. Pricing principles for customers are set forth on <u>Schedule 6</u>.

16

5.3 <u>Annual Plan, Quarterly Business Review and Advertising and Promotions</u>.

(a)      *Joint Business Plan*. The Parties will establish by [***] the initial non-binding projected joint business plan ("**Joint Business Plan**" or "**JBP**") for Licensed Products that will be attached hereto as <u>Schedule 7</u>. The Parties will calculate the projections in the Joint Business Plan based on information currently available to both Parties at the time the Joint Business Plan is created. The Parties shall use commercially reasonable efforts to achieve such results; however, neither Company nor Distributor guarantees that the business transactions contemplated by this Agreement will achieve the results projected in the Joint Business Plan or during any Annual Review (as defined below). The Joint Business Plan will also include the initial contact information for each Party's designated personnel.

(b)      *Annual Review*. Company and Distributor will work together to develop a new Joint Business Plan by [***] of each calendar year (the "**Annual Review**") for the ensuing year containing non-binding sales and marketing plans intended to maximize distribution and sales of Licensed Products in the Territory and describing "**Sales Fundamentals**," which includes [***], and the Parties' general plans for developing and promoting Licensed Products during the following year. The Parties' mutual performance objectives criteria is attached in <u>Schedule 9</u> hereto (the "**Mutual Performance Objectives**").

(c)    *Escalation.* If, in any year, the Parties are unable to agree on a new Joint Business Plan, then the most recent Joint Business Plan shall be deemed the effective Joint Business Plan for such year. If at the conclusion of such year the Parties are again unable to agree upon a Joint Business Plan, then, at the request of either Party, such dispute may be elevated for good faith discussion and resolution (the "**Escalation Procedure**"). The Parties will, within [***] days following such request, establish a committee (the "**Contract Committee**"), to be comprised of not less than [***] management-level representatives from each of Distributor and Company. The Contract Committee shall use reasonable efforts to resolve any such dispute in good faith, during a period of [***] days following the establishment of the Contract Committee. Company's president and one of Distributor's presidents of PepsiCo North American Beverages (collectively, the "**Group Presidents**") shall promptly discuss such dispute and shall use reasonable efforts to resolve such dispute within [***] days following the expiration of such [***]-day period.

(d)    *Advertising and Promotion.* The Parties acknowledge the importance of advertising, promoting and merchandising Licensed Products to increase and maintain demand in the Territory. Accordingly, unless otherwise mutually agreed to in writing by the Parties, Company will cover [***]% of the costs related to advertising, merchandising and promotional plans ("**Advertising and Promotional Costs**") within the Territory (including acquiring and using marketing equipment, visi-coolers, equipment placement fees, customer costs for electrical work arising out of equipment installation, point of sale, permanent or temporary merchandising materials, account specific programs, space payments, slotting, display programs, customer incentives, traditional media, social media, etc.). Company shall establish a reserve fund to pay for point-of-sale artwork to be used in the trade ("**POS Fund**"). Company shall share digital files with Distributor who will produce and distribute point-of-sale artwork through Distributor system at costs paid through POS Fund. Either Party may, in connection with the distribution of Licensed Products, elect to spend any of its own funds on a promotional materials, provided it has communicated to the other Party about the activity outside of the Joint Business Plan. Notwithstanding anything contained herein to the contrary, Company will not be required to reimburse the Distributor for equipment and merchandising materials physically placed in market within the Territory as of the Effective Date, such as coolers, vending machines and shelving.

17

(e)    *Quarterly Review.* The Parties shall conduct a business review each calendar quarter (or at such other intervals to which the Parties may agree in writing) during which review Company and Distributor shall review the previous quarter's business results, discuss the then-current Joint Business Plan, and review overall performance ("**Quarterly Review**").

(f)    *Marketing Co-op.* For each year of the Term, each Party agrees to accrue on its own books an amount equal to $[***] per Case (or in such other amount agreed to by the Parties in the Joint Business Plan) for all Cases of Licensed Products actually sold during each year of the Term ("**Actual Annual Cases**"), which accrual will take place by each Party at least quarterly during each year of the Term to remain as current as possible to reflect Actual Annual Cases. Such accrued amount of each Party once combined together is called the "**Co-Op Fund**". On an annual basis, the Parties will mutually agree upon how to deploy any of the Co-Op Fund. Neither party shall unreasonably withhold agreement on how to use the Co-Op Fund. Once the fund reaches $[***] in total, the Parties shall mutually agree as to whether incremental contributions to the fund should be made or if a portion of the available balance should be returned to the respective Parties.

(g)    *Restricted Products.* The terms and conditions related to Restricted Products are attached hereto as <u>Schedule 5.3(g)</u>.

(h)    *Product Innovation.*

1.  *Non-Alcoholic Product Innovation.* Subject to the terms and conditions set forth in <u>Schedule 5.3(g)</u>, Distributor shall launch all commercially reasonable non-alcoholic beverage innovation developed by Company under the Marks (each, a "**New Non-Alcoholic Product**"), either as a test, regional or national distribution, as mutually determined by Company and Distributor, unless Distributor is prohibited from doing so by non-compete obligations contained in [***], provided that any New Non-Alcoholic Product that (a) contains [***] and (b) is not positioned [***] and (c) only refers to [***] shall be deemed excluded from the [***] set forth in Appendix 1 to Schedule 5.3(g) hereto. In the event Distributor is prohibited from taking on any such New Non-Alcoholic Product, it shall certify the same to Company in writing within [***] days following Company's notice to Distributor, in which event (i) such New Non-Alcoholic Product shall not be deemed a "Licensed Product" under this Agreement, (ii) Company shall be free to launch and distribute such New Non-Alcoholic Product with one or more other distributors of its choosing, including, without limitation, a Competitor, and (iii) Distributor shall have no future distribution or other rights with respect to such New Non-Alcoholic Product, even if the non-compete obligation(s) which initially restricted Distributor from launching such New Non-Alcoholic Product eventually no longer apply.

18

2.  [***] *Product Innovation*. Subject to the terms and conditions set forth in <u>Schedule 5.3(g)</u>, with respect to any [***] beverage innovation developed by Company under the Marks (each, if any, a "**New [***] Product**"), one of the following processes shall apply:

    A.  If Company desires that Distributor's Affiliate launch and distribute such New [***] Product, Company will notify Distributor in writing of such desire, and Distributor's Affiliate and Company shall discuss the launch and distribution of such New [***] Product, either as a test, regional or national distribution, as mutually determined by Company and Distributor's Affiliate, unless Distributor or Distributor's Affiliate is prohibited from doing so by non-compete obligations contained in its [***]. In the event Distributor or Distributor's Affiliate determines, in its sole discretion that it is prohibited from taking on any such New [***] Product, it shall certify the same to Company in writing within [***] days following Company's notice to Distributor, in which event (i) such New [***] Product shall not become a "Licensed Product" under this Agreement, (ii) Company shall be free to launch and distribute such New [***] Product with one or more other distributors of its choosing, including, without limitation, a Competitor, and (iii) Distributor shall have no future distribution or other rights with respect to such New [***] Product, even if the non-compete obligation(s) which initially restricted Distributor from launching such New [***] Product eventually no longer apply.

   B. If, on the other hand, Company is unsure whether Distributor is best suited to launch and distribute such New [***] Product, Company will instead notify Distributor in writing of its intent to launch such New [***] Product, and Distributor shall have a right of first negotiation with respect thereto. Thereafter, the parties will commence good faith negotiations with respect to such launch and distribution, which good faith negotiations shall continue for a period of [***] days, or such shorter period of time as may be agreed upon by the Parties. If, at the conclusion of such negotiations, Company does not believe Distributor would be capable of launching and distributing such New [***] Product to Company's satisfaction (for example, if Distributor's [***] is not commensurate with traditional [***], whether from an infrastructure standpoint, service standpoint or otherwise), (i) such New [***] Product shall not become a "Licensed Product" under this Agreement, (ii) Company shall be free to launch such New [***] Product with one or more distributors of its choosing, including, without limitation, a Competitor, and (iii) Distributor shall have no future distribution or other rights with respect to such New [***] Product. For clarification, if, at the conclusion of such negotiations, Company desires that Distributor launch and distribute such New [***] Product, Distributor shall do so pursuant to the terms of Section 5.3(h)(2)(A) above.

  3. *Innovation Process*. With respect to any New Non-Alcoholic Product or New [***] Product which Distributor agrees to launch and distribute pursuant to this Section, 5.3(h), the Parties shall mutually agree upon an innovation process and business plan (including ingredients, product attributes, marketing, positioning and the like). The Parties will mutually agree on the innovation process and business plan but Company shall at all times have the right (in its sole discretion) to determine what ingredients are contained within any New Non-Alcoholic Product or New [***] Product, subject to any restriction stated herein.

19

(i) *SKU Rationalization*. During the annual Joint Business Plan review, the Parties shall meet to mutually determine the Licensed Product SKUs that Distributor will carry. This determination shall be made prior to Distributor's annual SKU rationalization process and in consideration of the lead time to remove the SKU from customer accounts and in consideration of existing customer contracts. Neither Party shall unreasonably withhold its alignment on the SKUs Distributor carries.

(j) *Equipment*.

  1. Company-Branded Coolers. Company shall develop a budget (in its sole discretion) and fund [***]% of all Celsius identifiable/branded coolers delivered to Distributor's and/or Subdistributor's distribution facilities, the type of coolers, including delivery schedule and quantity, shall be mutually determined by the Parties. Upon mutual agreement of the Parties, Distributor may purchase Celsius identifiable/branded coolers on behalf of Company and then bill such costs to Company. Distributor shall place and manage Company-owned coolers as part of its sales process.

  2. Distributor-Owned Energy Portfolio Coolers. Licensed Products may also be included in Distributor-owned energy portfolio coolers based on Distributor's discretion and its field merchandising standards and recommendations, subject to customer acceptance. Distributor will fund [***]% of Distributor-owned energy portfolio coolers.

  3. Equipment Servicing. Upon mutual agreement, Distributor shall service Company equipment at standard rates through Distributor's Service Advantage Program.

(k)     *Reports.* Distributor shall periodically provide Company with access to the extracted sales-related data and other data and reports related to the Licensed Products as set forth in <u>Schedule 5.3(k)</u> attached hereto.

(l)     *Transshipment.*

1.      Other than to Excluded Accounts, Company shall not directly sell or distribute any Licensed Products in the Territory and shall not directly sell or distribute any Licensed Products to any entity it knows has the intention to sell or distribute such Licensed Products in the Territory.

2.      Company will inform its customers and/or Existing Distributors of the limits of their distribution rights, including the territories in which Distributor has the right to distribute the Licensed Products. If Distributor or Company becomes aware that Company's customers and/or Existing Distributors are the source of Licensed Products sold inside the Territory, such Party shall notify the other, including identifying where such transshipment is occurring and providing reasonable details in respect thereof, and Company will use its commercially reasonable efforts to cause such customers and/or Existing Distributors to cease distribution of Licensed Products inside the Territory. Once notified that Company's customers and/or Existing Distributors is the source of Licensed Products sold inside the Territory, Company will use commercially reasonable efforts, based upon its existing agreements with the customers and/or Existing Distributors to cause the customers and/or Existing Distributors to cease transshipping the Licensed Products, which may include remedies available to Company under its agreement with such customers and/or Existing Distributors (e.g., withholding funding and termination of the right to distribute the Licensed Products). If such customers and/or Existing Distributors continue to transship the Licensed Products in violation of the terms of their applicable agreement, Company shall use commercially reasonable efforts to terminate such agreement with the transshipping customer or Existing Distributor, as applicable.

20

5.4 <u>Purchase Orders, Shipment and Title</u>.

(a)     Distributor shall issue all purchase orders to Company in written form via electronic data interface, facsimile or email and cause all purchase orders to list (i) the Licensed Products to be purchased, including SKUs, (ii) the quantities ordered, (iii) the requested delivery date and (iv) the delivery location. Purchase orders shall be submitted at least [***] days in advance of the applicable delivery date. Unless otherwise agreed to by Company in writing, Distributor's purchase orders shall be submitted in full truckload quantities consisting of twenty (20) pallets per truckload of (i) [***] per truckload for deliveries to Distributor's mixing centers and (ii) no more than [***] per truckload for deliveries to Distributor's non-mixing centers. Company may accept any purchase order by confirming the order (whether by written confirmation, invoice, or otherwise) or by delivering the Licensed Products to the deliver location, whichever occurs first. No purchase order is binding on Company unless accepted by Company as provided in this Agreement. From time to time or through the JBP process, the Parties shall, in good faith, discuss purchase order issuance by and invoicing and delivery to Distributor's independent bottler Subdistributors, and upon mutual agreement, may adjust the mechanisms set forth in this Section 5.4 accordingly.

(b)     Unless expressly agreed to by the Parties in writing, Company shall select the carriers for delivery of the Licensed Products. Company shall invoice Distributor upon shipment for the Licensed Products included in such shipment.

(c) Any time quoted for delivery is an estimate only; provided, however, that Company shall use commercially reasonable efforts to deliver all Licensed Products on or before the requested delivery date.

(d) Title to the Licensed Products shipped under any purchase order passes to Distributor on Company's or its carrier's delivery of such Licensed Products to Distributor at the delivery location. Risk of loss to Licensed Products shipped under any purchase order passes to Distributor on Company's or its carrier's delivery of such Licensed Products to Distributor at the delivery location.

**SECTION 6 - Indemnification**

6.1 <u>Company Indemnity</u>. Without limiting any claim for which Distributor is required to indemnify Company pursuant to Section 6.2, Company agrees to indemnify, defend, and hold Distributor, and its Affiliates and its and their respective officers, directors, employees and agents, harmless from and against any and all costs, losses and liabilities, including, without limitation, reasonable fees and disbursements of counsel, costs to investigate and defend, including any appeals, penalties, judgments, Taxes, fees or settlement amounts ("Damages") relating to, resulting from or arising in connection with any civil, criminal, administrative or investigative actions or proceedings commenced or threatened by a third party ("Claim") regarding:

(a) an act or omission on the part of Company that constitutes a material breach of this Agreement or the falsity of, or the failure of the Licensed Products to comply with, as applicable, any of the representations, warranties or covenants of this Agreement;

(b) the death of or injury to any Person or damage to any property (personal, real or otherwise) of third parties which resulted or is alleged to have resulted from any acts or omissions, whether designated as negligent or otherwise, of Company;

21

(c) the death of or injury to any Person or damage to any property (personal, real or otherwise) of third parties which resulted or is alleged to have resulted from Licensed Products, whether due to any alleged defect or any alleged failure in Licensed Products or otherwise, regardless of how the cause of action is stated (including but not limited to negligence, strict liability, or breach of warranty), but excluding any such death, injury or damage which resulted or is alleged to have resulted from any matter which Distributor is required to indemnify Company pursuant to Section 6.2, including, without limitation, Distributor's improper storage or handling of the Licensed Products;

(d) claims of infringement of any third party's patent, copyright, trade secret, trademark, or other Intellectual Property by Distributor's distribution or sale of any Products or licensed use of Marks in accordance with the terms and conditions of this Agreement;

(e) any claims arising out of or in connection with claims, statements and/or information, or an alleged failure to provide information, on the label, or other printed or electronic material of Licensed Products developed or approved by Company; and

(f) any taxes, import duties or other impositions or penalties assessed by Governmental Authorities in the Territory (collectively, "Taxes") that are imposed on (or assessed against) Company under Law with respect to the sale of the Licensed Products to the Distributor, but excluding, for clarity, any Taxes with respect to the distribution and sale of the Licensed Products by the Distributor or any Subdistributor in the Territory in the Channels and imposed on (or assessed against) the Distributor or any Subdistributor under Law.

6.2 <u>Distributor Indemnity</u>. Without limiting any claim for which Company is required to indemnify Distributor pursuant to Section 6.1, Distributor hereby agrees to indemnify, defend, and hold Company, and its Affiliates and its

and their respective officers, directors, employees and agents, harmless from and against any and all Damages relating to, resulting from or arising in connection with any Claim regarding:

(a)    Distributor's or any Subdistributor's actions or omissions regarding merchandising, distribution, sale, handling or storage of the Licensed Products, in any case, to the extent any such action or omission is in violation of this Agreement, Company's approved uses of the Intellectual Property or Law, including the sale of any damaged or unsaleable Licensed Products by Distributor or any Subdistributor, _provided_ that either (i) Distributor knew or reasonably should have known that such Licensed Product was damaged or unsaleable at the time of sale (ii) Distributor or its Subdistributor caused such Licensed Products to be damaged or unsaleable;

(b)    an act or omission on the part of Distributor or any Subdistributor that constitutes a material breach of this Agreement or the falsity of, or the failure to comply with, as applicable, Distributor's representations, warranties or covenants under this Agreement;

(c)    the death of or injury to any Person or damage to any property (personal, real or otherwise) of third parties which resulted or is alleged to have resulted from any acts or omissions, whether designated as negligent or otherwise, of Distributor or any Subdistributor;

(d)    any Taxes with respect to the distribution and sale of the Licensed Products by the Distributor or any Subdistributor in the Territory in the Channels and imposed on (or assessed against) the Distributor or any Subdistributor under Law;

22

(e)    Company's or any of its Affiliates' production, commercialization, marketing or distributing, or entering into any agreement with any other Person to produce, commercialize, market or distribute, or holding any equity or debt interest in, or participating in the management of, any other Person producing, commercializing, marketing or distributing any Restricted Product in the [***]after the Restriction Termination Date while Distributor or any of its Affiliates holds any equity or debt interest in the Company, solely as a result of Distributor's or any of its Affiliate's equity or debt interest in the Company; and

(f)    Company's or any of its Affiliates' production, commercialization, marketing or distribution, or entering into any agreement with any other Person to produce, commercialize, market or distribute, or hold any equity or debt interest in, or participate in the management of, any other Person producing, commercializing, marketing or distributing, (i) any New Product in the [***], or (ii) any Expansion Product outside of the [***], in either case (i) or (ii), after the Restriction Termination Date while Distributor or any of its Affiliates holds any equity or debt interest in the Company, solely as a result of Distributor's or any of its Affiliate's equity or debt interest in the Company.

6.3 _Indemnification Procedures_. If a Claim is commenced against a Party hereto (the "**Indemnitor**"), prompt notice thereof shall be given by the Party initiating the Claim (the "**Indemnitee**") to the Indemnitor. The failure to deliver such notice, however, shall not release the Indemnitor from any of its obligations under this Section 6.3 except to the extent that the Indemnitor is materially prejudiced by such failure. At the Indemnitor's cost and expense: (i) the Indemnitor shall promptly take control of the defense of such Claim and shall engage attorneys reasonably acceptable to the Indemnitee to defend such claim; and (ii) the Indemnitee shall reasonably cooperate with the Indemnitor (and its attorneys) in the defense of such Claim. The Indemnitee may, at its own cost and expense, participate (through its attorneys or otherwise) in such defense. The Indemnitor shall not enter into a settlement of such claim that does not include a full release of the Indemnitee or involves a remedy other than the payment of money, without the Indemnitee's consent. If the Indemnitor does not assume control over the defense of a Claim as provided in this Section 6.3, the Indemnitee may defend the claim in such manner as it may deem appropriate, at the cost and expense of the Indemnitor.

**SECTION 7 – Insurance**

7.1 <u>Type of Insurance</u>. All insurance policies required to be carried by the Parties will be maintained without interruption from the date of this Agreement and written on an occurrence or claims made basis by companies duly licensed to transact the prescribed coverages in each jurisdiction in the Territory in which Distributor operates that have a rating of A-VII or greater. A broad form company's endorsement will be maintained in such insurance policy specifically naming the other Party as an additional insured as its interests may appear on such policy, with respect to comprehensive general liability coverage and automobile liability coverage. Each Party will promptly furnish to the other certificates showing the coverages required by this Agreement. The policies and certificates of insurance will contain provisions requiring the insurer to provide at least 30 days' prior written notice of non-renewal, cancellation or other changes in the coverage that may impair or otherwise affect the other Party's rights hereunder. Each Party will, prior to the effective date of any such change or cancellation, replace such insurance with insurance satisfactory to the other and furnish the other with certificates evidencing such replacement insurance, within 10 days of such change or cancellation. Each Party will not, without sending written notice to the other, settle or compromise any liabilities or consent to the entry of any judgment against the other.

23

7.2 <u>Insurance</u>. Each Party will procure and maintain in full force and effect throughout the Term of this Agreement the following insurance though carriers acceptable to the other Party:

(a)     Long-term disability, as required by Law;

(b)     Unemployment, as required by Law;

(c)     Workers' Compensation Insurance covering injury to or occupational disease or death of the employees of Distributor in accordance with applicable statutory requirements, including Employer's Liability Insurance, with a limit of liability under the Employer's Liability portion of at least $[***] per occurrence or claims made;

(d)     Commercial General Liability Insurance, including limited contractual liability (and including limited contractual liability with respect to the indemnity obligations set forth in Section 6 (Indemnification)), on an occurrence or claims made basis, naming the other Party as an additional insured, as its interests may appear, and having a minimum of the following:

- Bodily Injury & Property Damage
  - Per Occurrence or Claim         $[***]
  - Aggregate         $[***]
- Product Liability Aggregate $[***]
- Auto Liability         $[***]
- Personal Injury         $[***]
- Commercial Auto Liability $[***] (each accident)
- Excess/Umbrella Insurance $[***] (This policy shall provide excess limits for the General Liability, Product Liability, and Automobile Liability policies and follow form or be at least as broad in coverage); and

**SECTION 8 – Product Recalls**

8.1 <u>Communication</u>. Each Party will promptly advise the other Party, in writing, and each Party will communicate to the other all relevant facts known to it, if either Party:

(a)     learns of any issues relating to a potential food safety issue caused by or associated with any Licensed Products purchased from Company hereunder,

(b)     learns of any food safety issue related to the quality of Licensed Products, including, but not limited to, manufacturing defects that may impact the quality of the drinks, labeling, packaging, declared net contents ingredients, or formula, or

(c)     is advised of such a condition by competent authorities of any Governmental Authority having jurisdiction over such Licensed Products (collectively, "**Product Issue(s)**").

The Parties will cooperate in communication with the public and Governmental Authorities and in correcting any such condition that is found to exist. Distributor and Company will consult with one another prior to making any statements to the public or to any Governmental Authority concerning the Product Issue, except in circumstances in which doing so would prevent timely notification that may be required to be given under Law.

24

8.2     <u>Responsibility and Expenses</u>. Without limiting each Party's indemnification obligations under Section 6, with respect to any Product Issue:

(a)     Reasonable expenses actually incurred by Company associated with the correction of a Product Issue caused by or associated with Licensed Products purchased by Distributor that result from: (i) Distributor's or any Subdistributor's failure to comply with the terms of this Agreement or (ii) the negligent act or omission, willful misconduct or fault of Distributor or any Subdistributor will be solely Distributor's responsibility. For such expenses, Distributor will hold harmless and indemnify Company from and against all such reasonable expenses related to any recall or withdrawal, including the actual cost of Licensed Products, as well as the reasonable costs of inspection, investigation, Licensed Products replacement, retrieval, segregation, storage, transportation, destruction and/or disposal, and reasonable attorneys' fees.

(b)     Reasonable expenses actually incurred by Distributor or any Subdistributor associated with the correction of a Product Issue caused by or associated with Licensed Products that result from (i) Company's failure to comply with the terms of this Agreement, or (ii) the negligent act or omission, willful misconduct or fault of Company will be solely Company's responsibility. For such expenses, Company will hold harmless and indemnify Distributor or any Subdistributor from and against all such reasonable expenses related to any recall or withdrawal, including the actual cost of Licensed Products, as well as the reasonable costs of inspection, investigation, Licensed Products replacement, retrieval, segregation, storage, transportation, destruction and/or disposal, and reasonable attorneys' fees.

**SECTION 9 - General Provisions**

9.1 <u>Confidentiality</u>. During the Term of this Agreement, the Parties will disclose to one another non-public information concerning their respective businesses and operations (including, but not limited to plans and trade secrets, and the terms of this Agreement) which is confidential and proprietary ("**Confidential Information**"). Each of the Parties to this Agreement agrees that Confidential Information disclosed by the other will not, without the prior written approval of the other, be disclosed (other than to (i) the Existing Distributors in order to facilitate the transition of distribution rights to Distributor, (ii) necessary parties in connection with Distributor resolving all non-compete restrictions that could prevent it from performing under this Agreement, (iii) regulatory authorities and (iv) the Subdistributors or to those of the Parties' or Subdistributors' employees, agents and representatives with a reasonable need-to-know and who agree to honor the provisions of this Section) or used by it except in connection with this Agreement. Confidential Information does not include information which (x) becomes generally available in the public domain other than as a

result of a breach of this Section, (y) a Party is required to disclose pursuant to Law or judicial order, or (z) was already in the receiving Party's possession at the time disclosed, as evidenced by its written records. Upon termination of this Agreement, neither Party thereafter will use or disclose any Confidential Information received from the other, and will return each copy thereof, whether in written or electronic form, or will promptly destroy the same together with all documents and materials which contain or are based upon such Confidential Information. Notwithstanding the foregoing, each Party may retain copies of Confidential Information that are stored on such Party's IT backup and disaster recovery systems until the ordinary course deletion thereof; provided that such Party shall continue to be bound by the terms and conditions of this Section with respect to such retained Confidential Information. The obligations under this Section will survive termination of this Agreement for a period of five (5) years thereafter; provided, however, that the obligations under this Section shall remain in effect with respect to any trade secrets of the disclosing Party contained within the Confidential Information for so long as such Confidential Information remains a trade secret under applicable Law. Other than as permitted by this Section 9.1, after signing and during the Term of this Agreement, neither Party shall disclose the existence of this Agreement or any prices or terms of purchase under this Agreement to any person or entity, without the prior express written consent of the other Party, which may be withheld in such Party's sole discretion. No press releases, publicity statements or other publicly-issued information regarding this Agreement or the other Party will be released by either Party without the prior written approval of the other Party. The timing and content of such releases or publicity statements will be mutually agreed to in writing between the Parties.

25

9.2 <u>Notices</u>. All notices or other communication required or permitted hereunder (other than routine communications having no legal effect) shall be in writing and sent to the addresses set forth below, and shall be deemed to have been transmitted (i) when sent via email, provided that the sending Party receives a non-automated reply email or other written notice from the recipient confirming receipt, (ii) when delivered in person or (iii) when postmarked, if mailed via a reputable courier service such as DHL, UPS, or FedEx, signature required:

If to Company:
Celsius Holdings, Inc.
2424 N Federal Hwy, Suite 208
Boca Raton, FL 33431
Attn: [***]
Email: [***]
with a required copy to:
Holland & Knight LLP
One Stamford Plaza
263 Tresser Blvd., Suite 1400
Stamford, CT 06901
Attn: Seth Milligan
Email: seth.milligan@hklaw.com
If to Distributor:
PepsiCo, Inc.
700 Anderson Hill Road
Purchase, NY 10577
Attention: [***]
Email: [***]
with a required copy to:
PepsiCo, Inc.

700 Anderson Hill Road
Purchase, NY 10577
Attention: [***]
Email: [***]
Phone No.: [***]

or such other address as may be specified by a Party hereto pursuant to notice given to the other Parties in accordance with the provisions of this paragraph.

9.3 <u>No Agency</u>. Nothing contained in this Agreement shall be construed in any manner as creating an agency, partnership, joint venture, franchise or any type of relationship between Company and Distributor, except that of independent contractors. Distributor shall not have nor shall Distributor hold itself out as having, any authority whatsoever, whether express or implied, to assume, create or incur any obligation or liability whatsoever, contractual or otherwise, on behalf of or in the name of Company or to bind Company in any other manner whatsoever except as expressly set forth in this Agreement. Distributor acknowledges and agrees that Company and/or its Affiliates do not exercise any control with respect to Distributor's operation of its own business or the decision-making process of that business, including, without limitation, (i) the terms of payment by customers, credit practices, warranties, Taxes, and representations in dealings between Distributor and its customers, (ii) the appearances of any of Distributor's business premises and the use of fixtures and equipment utilized therein, and (iii) the uniforms of employees, hours of operation, housekeeping, and similar matters.

26

9.4 <u>No Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.

9.5 <u>Entire Agreement</u>. This Agreement, the Channel Transition Agreement, the Certificate of Designation, and the Securities Purchase Agreement together with any other documents incorporated herein and therein by reference and all related exhibits and schedules, shall constitute the entire agreement between Company and Distributor with respect to the subject matter contained herein and therein. There are no understandings, agreements, representations, or warranties, expressed or implied, not specified herein regarding this Agreement, the Channel Transition Agreement, the Certificate of Designation or the Securities Purchase Agreement. This Agreement, the Channel Transition Agreement, the Certificate of Designation and the Securities Purchase Agreement shall cancel and supersede any provisions, arrangements, and agreements entered into before the Effective Date, including, without limitation, any term sheets or presentations previously exchanged by the Parties with respect to such subject matter. The terms of this Agreement, the Channel Transition Agreement, the Certificate of Designation and the Securities Purchase Agreement shall prevail over any terms or conditions contained in any other documentation related to the subject matter of this Agreement, the Channel Transition Agreement, the Certificate of Designation or the Securities Purchase Agreement and expressly exclude any of Distributor's general terms and conditions contained in any other document issued by Distributor.

9.6 <u>Modification</u>. No amendment or modification of this Agreement shall be valid or binding unless it is in writing and signed by both Parties to this Agreement. With respect to both Parties, only an officer shall have the authority to amend or modify this Agreement.

9.7 <u>Industry Terms</u>. Other than as defined in this Agreement, the words and phrases used herein shall have the meaning generally understood in the dietary supplement and beverage (non-alcohol and, as applicable, [***]) industries. Both Parties have participated in the drafting of this Agreement and this Agreement shall be construed in accordance with its fair meaning and not for or against either Party on account of which Party drafted this Agreement.

9.8 <u>Assignment</u>.

(a) <u>Assignment with Consent</u>. This Agreement is being entered into by the Parties hereto on the basis of careful investigation of the other Party's reputation and experience and the know-how of its personnel. Without the prior written approval of the other Party or unless otherwise permitted in this Agreement in Section 9.8(b) below, this Agreement and a Party's duties, privileges, rights and obligations hereunder may not be transferred, in whole or in part, directly or indirectly.

(b) <u>Assignment without Consent</u>. Notwithstanding the provisions of Section 9.8(a) above, but subject to each Party's termination rights under Section 3.2, either Party may assign this Agreement in its entirety without consent of the other Party, to its subsidiaries or Affiliates, or, in the case of Company, in connection with a Change of Control. Subject to the foregoing, this Agreement will bind and inure to the benefit of the Parties, their respective successors and permitted assigns.

27

9.9 <u>Force Majeure</u>. Neither Party will be in default or breach of this Agreement for any failure or delay in performing any obligation hereunder (other than the payment of money) if such failure results from an event or occurrence beyond its reasonable control, including, fire, lightning, storm, flood, earthquake, governmental Laws, regulations or other acts, sabotage, acts of the public enemy, war, riots or insurrection, pandemic, wide-spread public health emergency, or other acts of God (each a "**Force Majeure Event**"). A Party whose performance under this Agreement is prevented by a Force Majeure Event will give prompt written notice to the other Party, and will devote its commercially reasonable efforts to remedying, to the extent possible, the condition giving rise to such Force Majeure Event, and to resuming performance promptly. Company may make alternative arrangements for the distribution of Licensed Products in the Territory to the extent and for so long as either Party is affected by a Force Majeure Event. Notwithstanding anything contained herein to the contrary, in the event that either Party is prevented from performing any of its material obligations under this Agreement because of a Force Majeure Event, and such failure continues for more than [***], the Party which is not prevented from performance may terminate this Agreement without the payment of any Buy-Out, liquidated damages or other penalty.

9.10 <u>Governing Law; Arbitration</u>.

(a) <u>Governing Law</u>. New York law shall govern all issues relating to the enforcement, interpretation, validity and effect of this Agreement, without regard to choice or conflict of laws principles.

(b) <u>Arbitration</u>.

Any dispute between the Parties arising out of or relating to this Agreement, whether brought forth under breach of contract, tort, restraint of trade or other theory of statutory or common law, will be settled by arbitration before the American Arbitration Association ("**AAA**") under its Commercial Arbitration Rules in New York, New York by [***] arbitrators. One arbitrator will be nominated by Company, one will be nominated by Distributor, with each nomination being made no more than [***] days following the date of notice of the dispute. The [***] arbitrator will be the chairman, and will be nominated by the [***]. If the [***] are unable to agree, the arbitral institution will appoint the [***]. Any arbitrator(s) selected to resolve the dispute will be bound exclusively by the Laws of the State of New York without regard to its principles of choice of law. Notwithstanding this paragraph, nothing herein prevents either Party from seeking interim or injunctive relief in aid of arbitration from an appropriate jurisdiction, or from Company or its Affiliates taking the actions related to the protection of the Intellectual Property contained in Section 9.10(c) below. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof pursuant to Law.

The arbitration panel's fees will be borne equally by the Parties. All other costs and expenses in connection with the arbitration will be borne initially by the Party who incurs such expense or who requests a service (including, without limitation, a transcript of a deposition or of the arbitration proceeding). At the conclusion of the arbitration proceeding, all costs and expenses (including, without limitation, reasonable attorneys' fees) of the prevailing party shall be reimbursed by the

Party that does not prevail at the discretion of the arbitration panel. If a party prevails on some but not all issues, the arbitration panel will determine the manner in which such costs and expenses (including attorneys' fees) will be borne.

28

In connection with the arbitration: (a) the arbitration panel will have no authority to award punitive or exemplary damages (other than in the case of a third party claims for which a Party is indemnified by the other Party under Section 6), or as provided herein; (b) any award will be paid promptly, without deduction or offset and judgment upon the award may be entered by any court of competent jurisdiction; (c) if the award is confirmed by a court of competent jurisdiction, a Party challenging the award or resisting enforcement of a judgment entered upon the award will pay, to the extent permitted by Law, all costs, attorneys' fees and expenses incurred by the other Party in defending the award or seeking enforcement of the judgment; and (d) the decision of the arbitration panel will have no collateral estoppel effect with respect to a claim by or against any Person or business entity who is not a party to the arbitration.

The decision of the arbitration panel will be final and binding on the Parties, and the arbitration panel's award will be the exclusive remedy between the Parties with respect to all claims and issues arising out of the transaction(s) or occurrence(s) at issue, whether or not presented or pled to the arbitration panel.

(c)    <u>Injunctive Relief</u>. Notwithstanding Section 9.10(b) above, each Party recognizes that the failure of the other Party to comply with the terms of this Agreement could cause the non-breaching Party irreparable damage for which monetary damages would be insufficient. Therefore, it is mutually agreed that in the event of a breach or threatened conduct that may cause a Party to breach and is likely to result in any substantial and irreparable loss or damage according to the equity rules (including for a violation of Section 9.1 (Confidentiality)), the non-breaching Party may seek interim injunctive relief from a court, until such time as a final and binding determination is made by the arbitration panel. If interim injunctive relief is sought from a court, it shall be sought in a court of competent jurisdiction. Application to a court for interim injunctive relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. The foregoing right to seek interim injunctive relief is in addition to, and not in lieu of, all other remedies or rights that the non- breaching Party might otherwise have by virtue of any breach of this Agreement by the other Party.

Notwithstanding anything to the contrary in this Agreement, including in this Section 9.10(c) or Section 9.10(b), Company or its Affiliates have the right to commence a civil action in any court of competent jurisdiction against Distributor or take other appropriate action to compel Distributor's compliance with standards related to Intellectual Property owned by Company or its Affiliates or requirements to protect the goodwill of the intellectual property owned by Company or its Affiliates.

(d)    <u>Continuing Performance</u>. Neither Party shall suspend or delay its performance under this Agreement during or pending the resolution of any negotiation, mediation, arbitration or other dispute proceeding. A Party's continued performance hereunder shall not be construed as a waiver or concessions of any claim, defense, issue of fact or other right or remedy provided for hereunder or otherwise available to a Party.

(e)    <u>Limitation of Adjudicative Proceedings</u>. Each of the Parties irrevocably waives trial by jury in any action, proceeding or counterclaim, whether at or in equity, relating to this Agreement, whether or not there are other parties in such action or proceeding.

(f)     <u>Mandatory Mediation</u>. In case of any dispute arising during the Term of this Agreement which cannot be settled by reasonable discussion among the Parties, the Parties agree that, prior to commencing any arbitration proceeding as contemplated by <u>Section 9.10(b)</u> they will first engage the services of a professional mediator agreed upon by the Parties and attempt in good faith to resolve the dispute through confidential non-binding mediation. The mediation shall take place in New York, New York unless otherwise agreed to by the Parties. The Parties agree that any statements made by either Party in any mediation proceeding will not be admissible in any subsequent arbitration or legal proceeding. Except as otherwise agreed to in the context of the mediation, each Party shall bear one-half (1/2) of the mediator's fees and expenses and shall pay all of its own attorneys' fees and expenses related to the mediation. If the dispute has not been settled within [***] days after submission of the dispute to the mediator, then, upon notice by either Party to the other, the dispute shall be submitted for and finally settled by arbitration.

29

(g)     <u>Exclusion of Damages</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY IN CONTRACT, TORT, STRICT LIABILITY OR ON ANY OTHER BASIS, FOR ANY PUNITIVE DAMAGES OF ANY NATURE, PROVIDED, HOWEVER, THAT THE FOREGOING EXCLUSION DOES NOT APPLY TO (I) ANY ACT OF DISHONESTY BY EITHER PARTY, (II) ANY VIOLATION OF COMPANY'S OR ITS AFFILIATE'S INTELLECTUAL PROPERTY RIGHTS COMMITTED BY DISTRIBUTOR, OR (III) ANY AMOUNT OWED BY A PARTY PURSUANT TO ITS INDEMNIFICATION OBLIGATIONS UNDER SECTION 6 (E.G., PUNITIVE DAMAGES AWARDED TO A THIRD PARTY AND REQUIRED TO BE PAID BY AN INDEMNITEE).

9.12 <u>Interpretation</u>. The titles and headings used herein are for convenience only and are not to be considered in construing this Agreement. The provisions of this Agreement were negotiated by both of the Parties hereto and said Agreement shall be deemed to have been drafted by both Parties, each of whom had the opportunity to consult with legal counsel, and shall not be interpreted against either Party as the "drafter" thereof. In this Agreement, references to "includes," "including," "including but not limited to," "including without limitation" and words or phrases of similar import shall be deemed to have the same meaning and the words "includes(s)" and "including" shall not be deemed to be terms of limitation but rather be deemed to be followed by the words "without limitation." Reference to any period of days shall be deemed to be to the relevant number of calendar days unless otherwise specified. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date for calculating such period shall be excluded. If the last day of such period is a non-business day, the period in question shall end on the next succeeding business day. As used herein, "business day" means any day except Saturday, Sunday, or a federal or New York holiday.

9.13 <u>Waiver and Severability</u>. No waiver of any provision of this Agreement or any rights or obligations of a Party shall be effective, except pursuant to a written instrument signed by an officer of such Party, and such waiver shall be effective only in the specific instance and for the specific purpose stated in such writing. The Parties hereto recognize that if, after the date of execution of this Agreement, any provision of this Agreement is held to be illegal, invalid, or unenforceable, such provision will be fully severable and such severance will not affect the validity of the remainder of this Agreement.

9.14 <u>Counterparts and Signatures</u>. This Agreement may be executed in several counterparts, each of which shall constitute an original, but all of which shall constitute one and the same instrument. This Agreement may be signed using electronic signatures, and those signatures will have full legal force and effect.

9.15 <u>Authorization</u>. Each Party executing this Agreement represents that he is an officer of the respective company and is empowered to execute this Agreement and bind the respective company.

30

9.16 <u>Acknowledgement</u>. Each Party acknowledges that they have read this agreement, understand the terms of this Agreement, have had the opportunity to consult and has consulted with independent legal counsel in connection with this Agreement, and has signed this Agreement voluntarily.

9.17 <u>Survival</u>. The provisions of this Agreement which expressly or by their nature are intended to survive the termination of this Agreement will so survive the termination of this Agreement.

9.18 <u>Audit Rights</u>. Each Party shall have the right not more than [***] during each calendar year of the Term, upon no less than [***] days prior written notice to the other, to perform an audit of the other Party's books and records (including financial and internal controls) solely as they relate to the supply and sale of the Licensed Products and the requirements of this Agreement. In addition, Company shall have the right not more than [***] during each calendar year of the Term, upon no less than [***] days prior written notice to Distributor, to perform a physical inventory of Company's property at any of Distributor's [***] on the following terms and conditions: [***]. Distributor agrees to work in good faith in a commercially reasonable manner to try to accommodate an audit request that does not meet the foregoing terms and conditions.

For any audit described in this Section 9.18: (a) any such audit will take place within the other Party's typical business hours; (b) any audit to take place will be only through a reputable independent auditor reasonably acceptable to the other Party; and (c) any independent auditor must sign a confidentiality agreement prior to reviewing any information.

[Remainder of page intentionally left blank; signature page and attachments to follow.]

31

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date in the preamble above.

| **CELSIUS HOLDINGS, INC.** | | **PEPSICO, INC.** | |
|---|---|---|---|
| **(COMPANY)** | | **(DISTRIBUTOR)** | |
| | | | |
| **By:** | /s/ John Fieldly | **By:** | /s/ Kirk Tanner |
| **Name:** | John Fieldly | **Name:** | Kirk Tanner |
| **Title:** | Chief Executive Officer | **Title:** | **Chief Executive Officer,** |
| | | | PepsiCo Beverages North America |

[*Signature page to Distribution Agreement*]

32

**SCHEDULE 1**

**LICENSED PRODUCTS**

<u>Marks</u>: "CELSIUS" or "C" (pictured below) trademark. Additional Marks shall be added as mutually agreed between the Parties.





**SCHEDULE 2**
**EXCLUDED ACCOUNTS**

[***]

**APPENDIX I to SCHEDULE 2**
**ADDITIONAL NAMED ACCOUNTS**

[***]

**SCHEDULE 3**
**LICENSED PRODUCT SKUS**

The SKUs of Licensed Products as of the Effective Date are as follows, which list will be updated from time to time upon mutual written agreement of the Parties during the Term.

[***]

36

**SCHEDULE 4**
**SUBDISTRIBUTOR TERMS**

[***]

37

**SCHEDULE 5.3(G)**
**RESTRICTED PRODUCTS**

[***]

38

**SCHEDULE 5.3(K)**
**REPORTING OBLIGATIONS**

[***]

39

**SCHEDULE 6**
**PRICING**

[***]

40

**SCHEDULE 7**
**JOINT BUSINESS PLAN**

[***]

41

**SCHEDULE 8**
**ILLUSTRATIONS**
**Pricing Principles and Examples:**

[***]

42

**SCHEDULE 9**
**MUTUAL PERFORMANCE**
**OBJECTIVES**

[***]

43

**EXHIBIT A**
**CHANNEL TRANSITION AGREEMENT**
See attached

44

**EXHIBIT B**
**"[***]" TRADE DRESS**

[***]

45

**Exhibit 10.5**
**CERTAIN INFORMATION IDENTIFIED IN THIS DOCUMENT, MARKED BY BRACKETS AND ASTERISKS ("[***]"), HAS BEEN EXCLUDED PURSUANT TO ITEM 601(B)(10) OF REGULATION S-K UNDER THE SECURITIES ACT OF 1933, AS AMENDED, BECAUSE IT IS (I) NOT MATERIAL AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE REGISTRANT IF PUBLICLY DISCLOSED.**
EXECUTION VERSION

## CHANNEL TRANSITION AGREEMENT

This Channel Transition Agreement ("**Agreement**") is made effective as of August 1, 2022 (the "**Effective Date**"), by and between Celsius Holdings, Inc., a Nevada corporation ("**Company**"), located at 2424 N Federal Hwy, Suite 208, Boca Raton, FL 33431, and PepsiCo, Inc., a North Carolina corporation ("**Distributor**"), with offices located at 700 Anderson Hill Road, Purchase, NY 10577, and is being executed concurrently with that certain Distribution Agreement between the Parties relating to the Territory, an executed copy of which is attached hereto as Exhibit A (the "**Distribution Agreement**"). Any capitalized term used herein without definition shall have the meaning ascribed to it in the Distribution Agreement.

WHEREAS, Company desires to grant and Distributor desires to have the exclusive right, directly or through its Subdistributors, to sell and distribute the Licensed Products and use the Marks in the Territory in accordance with the terms of the Distribution Agreement; and

WHEREAS, Company had independently decided to terminate its agreements with Existing Distributors, and desires to grant Distributor the rights contemplated in the Distribution Agreement; and

WHEREAS, Distributor is willing to take the actions and make the financial commitments contemplated by this Agreement, including, without limitation, the Transition Payment (as defined below); and

WHEREAS, in consideration of the foregoing, Company and Distributor have accepted the terms and conditions set forth herein.

NOW THEREFORE, for the consideration set forth, together with the mutual promises, and covenants contained, and such other good and valuable consideration, the receipt, adequacy, and sufficiency of which are acknowledged by each of the Parties to this Agreement, the Parties agree as follows:

1. Company's Existing Distributor Relationships. As contemplated by the Distribution Agreement, where allowable by Law and subject to Company's right to service the Excluded Accounts directly and/or through third parties, Company is granting Distributor the exclusive rights to sell and distribute Licensed Products in the entire Territory, which shall require the transition of certain existing distribution rights in the Territory (which process shall be referred to herein as the "**Transition**"). As part of the Transition, Company covenants that it will not grant to any third party (other than Distributor) any distribution rights held by any existing distributor of the Licensed Products (including expansion of territories granted to existing distributors) in the Territory as of the Effective Date (each, an "**Existing Distributor**"), unless otherwise agreed in writing by Distributor, subject to Company's right to service the Excluded Accounts directly and/or through third parties as stated in the Distribution Agreement. The Parties agree to the process and terms set forth in this Agreement for the Transition. For the avoidance of doubt, this Agreement and the Distribution Agreement shall be in full force and effect as of the Effective Date.

2. Channel Transition.

(a)     Within [***] business days following the Effective Date, Company will take steps to initiate the Existing Distributor Transition Plan. Unless and to the extent otherwise agreed in writing by Distributor with respect to particular Existing Distributors or Existing Distributors identified in Schedule 1 hereto as being excluded from the Initial Transition Payment and Second Transition Payment, as used herein, the "**Existing Distributor Transition Plan**" requires Company to use all commercially reasonable efforts to cause the distribution rights for Licensed Products in the Territory to be waived, resolved, terminated or otherwise transitioned, to the extent allowable by applicable Law. Company will use all commercially reasonable efforts to initiate the Existing Distributor Transition Plan on a timeline that will allow Distributor to commence distribution in the Territory as soon as possible following the Effective Date. For the avoidance of doubt, Distributor acknowledges and agrees that it shall not be permitted to commence distribution in any portion of the Territory unless and until Company confirms to Distributor in writing in accordance with Section 2(c) hereof that the applicable preexisting distribution rights have been waived, resolved, terminated or otherwise transitioned in the form set forth on Schedule 3 ("**Confirmation of Termination Notice**").

(b)     Schedule 1 hereto sets forth Company's Existing Distributors along with, among other information, an estimated Transition Amount for each Existing Distributor based on the contractual or other payments required by applicable Law due to each such Existing Distributor related to the termination of its distribution rights. As used herein, the "**Transition Amount**" means the total contractual or other amount required by applicable Law payable by Company to Existing Distributors to implement the Existing Distributor Transition Plan and includes all Termination Payments payable to Existing Distributors, provided that, unless otherwise agreed in writing by Distributor, in no event shall the Transition Amount exceed, nor shall Distributor be obligated to pay more than $[***] (the "**Transition Payment Cap**"). As of the Effective Date, the Transition Amount is estimated by Company to be approximately $[***].

(c)     As the Transition begins and is ongoing as related to Existing Distributors, Company shall, in a timely manner and on a rolling basis, at least weekly, provide Distributor with (x) written notice identifying each distributor that was previously an Existing Distributor and no longer possesses distribution rights to Licensed Products in the Territory (each, a "**Former Distributor**" and collectively, the "**Former Distributors**"); and (y) a Confirmation of Termination Notice for each Former Distributor. Alternatively, Company may provide Distributor with access to a confidential data portal providing the foregoing written notice and Confirmation of Termination Notice (if applicable, the "**Data Portal**"), notwithstanding the required notice procedures in Section 9.2 of the Distribution Agreement that are incorporated herein.

2

(d)     As part of the Existing Distributor Transition Plan, Company will use commercially reasonable efforts to (x) obtain a release of claims against Company from such Former Distributor arising from the Former Distributor's cessation of distribution rights to Licensed Products in the Territory, and (y) cause future distributors of the Licensed Products in the Territory to be included as third-party beneficiaries in any such release. To the extent obtained, Company will provide Distributor with a copy of each release that corresponds to particular portion of the Territory as part of the Confirmation of Termination Notice for such portion of the Territory.

(e)     If Company becomes aware of any actual or perceived issue with the Transition or as part of the Existing Distributor Transition Plan related to any particular Existing Distributor or otherwise (each, if any, a "**Termination Issue**"), Company will notify Distributor of such Termination Issue in writing within [***] business days by identifying the applicable Existing Distributor and including a reasonable description of the Termination Issue, or Company will update the Data Portal to include such notification. Company and Distributor will work together in good faith to attempt to resolve any such Termination Issue. Notwithstanding the foregoing, termination of Existing Distributors remains solely Company's responsibility.

(f)     Company represents and warrants that all actions taken by Company in respect of its Existing Distributors will be taken in the sole discretion of Company in good faith and are intended to be in accordance with applicable Law.

3. <u>Transition Payment.</u> Distributor hereby agrees to pay the Transition Amount in accordance with the terms of this Section 3. Unless otherwise agreed in writing by Distributor, the Transition Payments shall only be utilized by Company to pay currently existing contractual payments, payments necessary under applicable Law or payments that are otherwise agreed in writing by Distributor, in each case to waive, resolve, terminate or otherwise transition the Existing Distributors' distribution rights or agreements (collectively, "**Termination Payments**").

(a)     <u>Initial Transition Payment</u>. Distributor agrees to pay to Company $[***] representing an estimate of the Transition Amount associated with Existing Distributors with a less than 90 day notice requirement set forth on <u>Schedule 1</u> (the "**Initial Transition Payment**") within [***] business days of the Effective Date. Distributor shall make such payment by wire transfer in accordance with the wire instructions set forth on <u>Schedule 2</u>.

3

(b)     <u>Second Transition Payment</u>. Distributor agrees to pay to Company $[***] representing an estimate of the Transition Amount associated with Existing Distributors with 90 – 120 day notice requirements set forth on <u>Schedule 1</u> (the "**Second Transition Payment**") within [***] days of written notice from Company that, except as otherwise agreed in writing by Distributor in connection with a Termination Issue, (i) Company has paid the entire Initial Transition Payment to Former Distributors in respect of Termination Payments and (ii) Distributor may commence distribution in the Territory formerly serviced by such Former Distributors (in each case, "**Transitioned Territory**").

(c)     <u>Transition Balance Payment.</u> If the Initial Transition Payment and Second Transition Payment are not sufficient to cover the required Termination Payments, then Distributor agrees to pay to Company the remainder of the Transition Amount (the "**Transition Balance Payment**") within [***] days of written notice from Company that, except as otherwise agreed in writing by Distributor in connection with a Termination Issue, (i) Company has paid the entire Second Transition Payment to Former Distributors in respect of Termination Payments and such Second Transition Payment was not sufficient to cover all Termination Payments, (ii) Distributor may commence distribution in the Transitioned Territory and (iii) Company identifies Existing Distributors to be transitioned with Transition Balance Payment.

(d)     <u>Additional Transition Payments</u>. If any Existing Distributor has not been terminated as of the date the Transition Balance Payment is made, including, without limitation, due to a limitation imposed by Law, then, Distributor shall remain obligated to pay the additional Transition Amount, if any, applicable upon the termination of such Existing Distributor, if ever (in each case, if applicable, an "**Additional Transition Payment**"), within [***] days of written notice from Company that, except as otherwise agreed in writing by Distributor in connection with a Termination Issue, (i) Company has paid the applicable Termination Payment to such Existing Distributor, and (ii) Distributor may commence distribution in the applicable Transitioned Territory, provided, further, that, unless otherwise agreed in writing by Distributor, in no event shall Distributor be obligated to pay more than the Transition Payment Cap. The Initial Transition Payment, the Second Transition Payment, the Transition Balance Payment and, if applicable, the Additional Transition Payment(s), are referenced collectively herein as the "**Transition Payment**."

(e)    <u>Unused Transition Payment</u>. Company shall return any unused portion of the Transition Payment to Distributor within [***] days of the earlier of (i) the date upon which the final payment is made to transition the last Existing Distributor identified as part of the Second Transition Payment, (ii) the date upon which Company and Distributor mutually determine that no additional Existing Distributors are capable of being transitioned, or (iii) the date which is [***] from the Effective Date. Company shall make such payment by wire transfer in accordance with the wire instructions set forth on <u>Schedule 2</u>. For the avoidance of doubt, notwithstanding the foregoing, Distributor shall remain obligated to pay any and all Additional Transition Payments, if, as and when owed, in accordance with Section 3(d).

4. <u>Reconciliation and Audit</u>.

(a)    <u>Reporting</u>. During the first [***] of the Term after the Effective Date, Company will deliver on a weekly basis to Distributor a report providing details of the status of the Transition, including for each Existing Distributor and Former Distributor: name, territory, actual sales volume (or estimated sales volume if actual volumes are not available) for latest 12-months based on information reasonably accessible to Company, sales volume percentage of the national sales volume for such Existing Distributor as set forth in <u>Schedule 1</u>, and actual corresponding Transition Payment amount paid in connection with such Former Distributor. Alternatively, Company may upload this information to the Data Portal, notwithstanding the notice procedures in Section 9.2 of the Distribution Agreement that are incorporated herein.

(b)    <u>Reconciliation</u>. On a monthly basis after the Effective Date, the Parties will meet to reconcile the total Termination Payments incurred by Company related to the Transition as compared to the Transition Payment remitted by Distributor to Company as of such date. If by the [***] anniversary of the Effective Date, Company has not transitioned and granted to Distributor exclusive rights to sell and distribute to at least [***]% of the total volume of Licensed Products in the Territory calculated for the 12-month period immediately preceding the Effective Date, excluding (i) volume generated by Excluded Accounts, and (ii) volume generated by Existing Distributors who are otherwise exempted in writing by Distributor, which exemption will be rendered by Distributor on a case-by-case basis in its sole discretion, and will not be unreasonably withheld, delayed, or conditioned (for purposes hereof and under Section 6, clauses (i) and (ii) collectively, "**Exempted Volume**"), then, Company shall promptly return to Distributor by wire transfer in accordance with the wire instructions set forth on <u>Schedule 2</u> any portion of the Transition Payment made in respect of such remaining Existing Distributors that have not been paid a Termination Payment as set forth on <u>Schedule 1</u>; provided, however, that Distributor shall remain obligated to pay any and all Additional Transition Payments, if, as and when owed, in accordance with Section 3(d). Within [***] days after the Effective Date, the Company shall provide Distributor with written confirmation of the total volume of Licensed Products in the Territory for the 12-month period immediately preceding the Effective Date, and identifying such volume excluded in (i) and (ii) above.

(c)    <u>Audit Rights</u>. Distributor shall have the right to review and audit Company's books and records to the extent they are related to the Transition, Termination Payments, and Transition Payments and all other information and documents to the extent required to verify Company's compliance with the terms of this Agreement. Distributor shall provide Company with no less than [***] days prior written notice, to perform such audit, such audit will take place within Company's typical business hours, and will be subject to Distributor's compliance with Section 9.1 of the Distribution Agreement.

5

5. <u>Indemnification</u>. Other than the Transition Payments, Company shall be responsible for all expenses related to the Transition.

    (a)    Company agrees to indemnify, defend, and hold Distributor, and its Affiliates and its or their Subdistributors harmless from and against any and all costs, losses and liabilities, including, reasonable fees and disbursements of counsel, costs to investigate and defend, including any appeals, penalties, judgments, interest, fees or settlement amounts ("**Damages**") relating to, resulting from or arising in connection with any civil, criminal, administrative or investigative actions or proceedings commenced or threatened by a third party ("**Claim**"), including an Existing Distributor, arising from or relating to the Transition, other than Damages and Claims arising due to (i) Distributor's failure to pay the Termination Payment or any portion thereof or (ii) Distributor's, its Affiliate's and/or its and their Subdistributors' gross negligence, willful misconduct or other breach of this Agreement or the Distribution Agreement. Company shall promptly notify Distributor of any Termination Issue and any Claim and shall create and maintain reasonably detailed records and adequate documentation regarding the status of any Claims and shall allow Distributor prompt access to the same upon reasonable advance written notice.

    (b)    Distributor agrees to indemnify, defend, and hold Company harmless from and against any and all Damages relating to, resulting from or arising in connection with any Claims arising from or relating to (i) Distributor's failure to pay the Termination Payment or any portion thereof or (ii) Distributor's, its Affiliate's and/or its and their Subdistributors' gross negligence, willful misconduct or other breach of this Agreement or the Distribution Agreement.

    (c)    Company is entitled exclusively to control, defend, and otherwise resolve any and all Claims.

6. <u>Transition Volume Minimum</u>. If by the [***] of the Effective Date, Company is unable to transition and grant to Distributor exclusive rights to sell and distribute to at least [***]% of Company's total sales volume of the Licensed Products in the Territory calculated for the 12-month period immediately preceding the Effective Date, excluding all Exempted Volume (the "**Transition Volume Minimum**"), Company will notify Distributor in writing that it has not met the Transition Volume Minimum by such second anniversary (the "**Transition Volume Minimum Default**") and will deliver a plan, including a timeline for achieving the Transition Volume Minimum. If, as of [***] after such [***], Company still has not met the Transition Volume Minimum, Company will notify Distributor in writing that the Transition Volume Minimum Default is continuing, and, as set forth in Section 3.2(a)(ii)(a)(v) of the Distribution Agreement, Distributor will have the right to immediately terminate the Distribution Agreement "With Cause" upon delivery of written notice to Company of such termination (the "**Termination Notice**"). For the avoidance of doubt, the Parties agree that a termination of the Distribution Agreement delivered to Company pursuant to the foregoing shall immediately terminate this Agreement, the Distribution Agreement and entitle Distributor to the Buy-Out by Company in accordance with Section 3.3 of the Distribution Agreement. In the event Distributor declines or otherwise fails to deliver the Termination Notice within [***] days of Company's written notification to Distributor of the continued Transition Volume Minimum Default as set forth above, (a) Distributor shall automatically forfeit its right to terminate the Distribution Agreement "With Cause" in respect of the Transition Volume Minimum Default and (b) the Distribution Agreement will continue in full force and effect until otherwise terminated in accordance with its terms.

6

7. <u>Transition of Certain Existing Distributors not part of the Initial Transition Payment</u>. The Parties acknowledge and agree that at least [***] year prior to the expiration of the distribution rights of [***], or as soon as practical if [***] are terminated pursuant to the terms of its distribution agreement with Company or in accordance with applicable Law, the Parties shall meet and discuss in good faith the [***] of such [***] pursuant to the terms of this Agreement or as mutually determined by the Parties. If Distributor chooses not to proceed with the [***] after such good faith discussions, then Distributor shall provide Company with written notice of such determination.

    8.    <u>Assignment</u>.

(a) <u>Assignment with Consent</u>. This Agreement is being entered into by the Parties hereto on the basis of careful investigation of the other Party's reputation and experience and the know-how of its personnel. Without the prior written approval of the other Party or unless otherwise permitted in this Agreement in Section 8(b) below, this Agreement and a Party's duties, privileges, rights and obligations hereunder may not be transferred, in whole or in part, directly or indirectly.

(b) <u>Assignment without Consent</u>. Notwithstanding the provisions of Section 8(a) above, but subject to each Party's termination rights under Section 3.2 of the Distribution Agreement, either Party may assign this Agreement in its entirety without consent of the other Party, to its subsidiaries or Affiliates, or, in the case of Company, in connection with a Change of Control. Subject to the foregoing, this Agreement will bind and inure to the benefit of the Parties, their respective successors and permitted assigns.

9. <u>Other Terms</u>. All of the definitions and other terms of the Distribution Agreement shall be incorporated into this Agreement, including, without limitation, Section 9.1 (Confidentiality) and Section 9.2 (Notice). For the avoidance of doubt, all matters requiring notice or follow-up communication under this Agreement may be handled via email in compliance with Section 9.2 of the Distribution Agreement or via the Data Portal, notwithstanding the required procedures in Section 9.2 of the Distribution Agreement. To the extent of any inconsistency between the terms of the Distribution Agreement and this Agreement, the terms of this Agreement shall control.

[*Remainder of page intentionally left blank; signature page and attachments to follow.*]

7

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date in the preamble above.

**CELSIUS HOLDINGS, INC.**
**(COMPANY)**

**PEPSICO, INC.**
**(DISTRIBUTOR)**

**By:** /s/ John Fieldly
**Name:** John Fieldly
**Title:** President and Chief Executive Officer

**By:** /s/ Kirk Tanner
**Name:** Kirk Tanner
**Title:** Chief Executive Officer,
PepsiCo Beverages North America

[Signature Page to Channel Transition Agreement]

**SCHEDULE 1**
**COMPANY'S EXISTING DISTRIBUTORS, APPLICABLE TERRITORY, ESTIMATED TRANSITION AMOUNTS AND PERCENTAGE OF SALES VOLUME**
[***]

**SCHEDULE 2**
**WIRE TRANSFER INSTRUCTIONS**

| For Payments made to Company | For Payments made to Distributor |
|---|---|
| [***] | [***] |

**SCHEDULE 3**
**CONFIRMATION OF TERMINATION NOTICE**
(attached)
**[FORM OF]**
**CELSIUS EXISTING DISTRIBUTOR**
**CONFIRMATION OF TERMINATION NOTICE**

**Name of Terminated Distributor:** _____

**Territory of Terminated Distributor:** _____

**Date of Termination:** _____

Pursuant to the Channel Transition Agreement made effective as of August 1, 2022 (the "**CTA**"), and the provisions and defined terms therein, this Confirmation of Termination Notice (this "**Notice**") concerns Existing Distributors and the notice required to be delivered by Celsius Holdings, Inc. ("**Company**") to PepsiCo, Inc. or its permitted assignee ("**Distributor**") once an Existing Distributor of Licensed Products becomes a "Former Distributor" under the CTA, and thus permits Distributor, in such Existing Distributor's Territory, to exercise its exclusive distribution rights granted to it by Company in the Distribution Agreement between the parties made effective as of August 1, 2022 ("**Distribution Agreement**"). Capitalized terms used herein without definition have the meanings ascribed in the CTA.

By way of this Notice, Company represents and warrants to Distributor that, as of the date of this Notice:

    (1)   All rights that had been granted to the distributor named above in this Notice relating to the Licensed Products have been terminated as of the termination date listed above, and such named distributor is therefore a "Former Distributor" as defined in the CTA;

    (2)   Company has paid or will pay to the distributor named above in this Notice any amounts due to such distributor in order to terminate its rights as stated in (1) above; **[and]**[1]

    (3)   Distributor has the exclusive distribution rights to distribute the Licensed Products in such Former Distributor's distribution territory, as such rights are stated in the Distribution Agreement, and, therefore Distributor can immediately begin to distribute Licensed Products in the Former Distributor's territory**[./; and]**[2]

    (4)   [Company has obtained the enclosed written release of claims from such Former Distributor.][3]

Notice and Representation Issued _____ ___, 202__:

Celsius Holding, Inc.

By: _____

    Name:

    Title:

[2] [***]

[2] [***]

[3] [***]

**EXHIBIT A**
**DISTRIBUTION AGREEMENT**
See attached.

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, John Fieldly, the Chief Executive Officer of Celsius Holdings, Inc., a Nevada corporation (the "**Registrant**"), certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 of the Registrant;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. I, as the Registrant's Chief Executive Officer and together with Registrant's Chief Financial Officer, am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under my supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. I, as the Registrant's Chief Executive Officer, have disclosed, based on my most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: August 9, 2022                                                **CELSIUS HOLDINGS, INC**.

                                                    By:     /s/ John Fieldly
                                                    John Fieldly, Chief Executive Officer;
                                                    (Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Jarrod Langhans, the Chief Financial Officer of Celsius Holdings, Inc., a Nevada corporation (the "**Registrant**"), certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 of the Registrant;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. I, as the Registrant's Chief Financial Officer, and together with the Registrant's Chief Executive Officer, am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under my supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. I, as the Registrant's Chief Financial Officer, have disclosed, based on my most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: August 9, 2022                                           **CELSIUS HOLDINGS, INC**.

                                                            By:   /s/ Jarrod Langhans
                                                                  _____
                                                                  Jarrod Langhans, Chief Financial Officer;
                                                                  (Principal Financial and Accounting Officer)

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350 AS ADOPTED**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Celsius Holdings, Inc., a Nevada corporation (the "**Company**") on Form 10-Q for the quarter ended June 30, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "**Report**"), I, John Fieldly, the Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

  1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

  2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 9, 2022                                      **CELSIUS HOLDINGS, INC**.

                                                     By:   /s/ John Fieldly
                                                           John Fieldly, Chief Executive Officer
                                                           (Principal Executive Officer)

**Exhibit 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350 AS ADOPTED**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Celsius Holdings, Inc., a Nevada corporation (the "**Company**") on Form 10-Q for the quarter ended June 30, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "**Report**"), I, Jarrod Langhans, the Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 9, 2022            **CELSIUS HOLDINGS, INC**.

By:   /s/ Jarrod Langhans
       Jarrod Langhans, Chief Financial Officer
       (Principal Financial and Accounting Officer)