**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-81472-ROSENBERG-REINHART**


IN RE CELSIUS HOLDINGS, INC.                    <u>CLASS ACTION</u>
SECURITIES LITIGATION

_____/


**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN**
 <u>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I. PRELIMINARY STATEMENT ................................................................................ 1

II. STATEMENT OF FACTS ........................................................................................ 2

III. ARGUMENT ............................................................................................................ 4

    A. LEGAL STANDARD ...................................................................................... 4

    B. PLAINTIFF'S ALLEGATIONS SATISFY THE STANDARD FOR FALSITY ........................ 4

        1. Defendants Falsely Linked Sales to Pepsi with Sales to Consumers.......... 4

        2. Defendants' "Disclosures" Did Not Rectify Their Misleading Statements ........................................................................................ 7

        3. Defendants' Misstatements Were Not Forward-Looking........................... 9

        4. Defendants' Misstatements Were Not Puffery ........................................ 11

    C. THE AMENDED COMPLAINT SUFFICIENTLY PLEADS DEFENDANTS' SCIENTER ...................................................................................... 12

        1. Defendants' Own Statements Support Scienter...................................... 13

        2. Accounts from Former Employees Further Support Scienter................... 14

        3. The Individual Defendants' Suspicious Insider Selling........................... 17

        4. The Distribution Agreement Was Central to Celsius's Business ............. 20

    D. PLAINTIFF'S SECTION 20(A) CLAIM SURVIVES ...................................................... 20

IV. CONCLUSION........................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*In re 21st Century Holding Co. Sec. Litig.*,
    2008 WL 5749572 (S.D. Fla. Nov. 7, 2008)......................................................................15, 16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................................4

*Bryant v. Dupree*,
    252 F.3d 1161 (11th Cir. 2001) ...............................................................................................21

*Carvelli v. Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) .........................................................................................10, 11

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
    2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ...............................................................17, 18, 20

*In re Eagle Building Techs., Inc., Sec. Litig.*,
    319 F.Supp.2d 1318 (S.D. Fla. 2004) ......................................................................................16

*Edge v. Tupperware Brands Corp.*,
    2023 WL 6310236 (M.D. Fla. Sept. 28, 2023).............................................................13, 14, 15

*In re Equifax Inc. Sec. Litig.*,
    357 F.Supp.3d 1189 (N.D. Ga. 2019).......................................................................................11

*In re Faro Tech. Sec. Litig.*,
    534 F.Supp.2d 1248 (M.D. Fla. 2007)......................................................................................17

*FindWhat Investor Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ...............................................................................................10

*Grand Lodge of Pa. v. Peters*,
    550 F.Supp.2d 1363 (M.D. Fla. 2008)......................................................................................15

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) .................................................................................................10

*In re Health Ins. Innovations Sec. Litig.*,
    2019 WL 3940842 (M.D. Fla. June 28, 2019)....................................................................13, 17

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021)......................................................................................16

ii

*Marrari v. Med. Staffing Network Holdings, Inc.*,
    395 F.Supp.2d 1169 (S.D. Fla. 2005) ...................................................................9, 13, 14, 15

*In re Miller Indus., Inc. Sec. Litig.*,
    12 F.Supp.2d 1323 (N.D. Ga. 1998) ...................................................................................18

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ..........................................................................................13

*Mogensen v. Body Cent. Corp.*,
    15 F.Supp.3d 1191 (M.D. Fla. 2014) ...................................................................................11

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC*
    *Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)................................................................18, 19

*In re Paincare Holdings Sec. Litig.*,
    541 F.Supp.2d 1283 (M.D. Fla. 2008) ................................................................................12

*Police & Fire Ret. Sys. of the City of Detroit v. Axogen, Inc.*,
    2020 WL 13547449 (M.D. Fla. Apr. 21, 2020).....................................................................10

*Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
    564 F.Supp.3d 1272 (N.D. Ga. 2021) ..................................................................................16

*Ret. Sys. v. Southern Co.*,
    2018 WL 1558577 (N.D. Ga. Mar. 29, 2018)........................................................................12

*Ret. Sys. v. Teleperformance SE*,
    746 F.Supp.3d 1395 (S.D. Fla. 2024) ...........................................................................4, 6, 20

*In re Royal Caribbean Cruises Ltd., Sec. Litig.*,
    2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) .......................................................................16

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
    239 F.Supp.2d 1351 (N.D. Ga. 2002) ..................................................................................11

*In re Sensormatic Elecs. Corp. Sec. Litig.*,
    2002 WL 1352427 (S.D. Fla. June 10, 2002) .......................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................................12, 13

*Thompson v. RelationServe Media, Inc.*,
    610 F.3d 628 (11th Cir. 2010) ............................................................................................12

*Tung v. Dycom Indus., Inc.*,
    454 F.Supp.3d 1244 (S.D. Fla. 2020) .......................................................................15, 16, 17

iii

*Vitalone v. Logitech International SA.*,
2012 WL 13041992 (N.D. Cal. July 13, 2012)..........................................................................6

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
2010 WL 1332574 (S.D. Fla. Mar. 30, 2010)...........................................................................15

**Rules**

Federal Rule of Civil Procedure 9(b)........................................................................................4

17 C.F.R. § 240.10b-5...............................................................................................................20

**Statutes**

15 U.S.C. § 78u-4(b)............................................................................................... *passim*

15 U.S.C. § 78u-5(i).................................................................................................................9

**Other Authorities**

SEC, Statement of Changes of Beneficial Ownership of Securities (Form 4),
*located at* https://www.sec.gov/files/form4data.pdf................................................................19

Lead Plaintiff the Zarabi Family Trust Dated September 3, 1992 ("Plaintiff") respectfully submits this memorandum of law in opposition to the Motion to Dismiss (ECF No. 64) ("Mot.") of Defendants Celsius Holdings, Inc. ("Celsius" or the "Company"), John Fieldly ("Fieldly"), Jarrod Langhans ("Langhans"), and Toby David ("David," and, together with Celsius, Fieldly, and Langhans, "Defendants").

## I.    PRELIMINARY STATEMENT

Between May 9, 2023 and November 5, 2024 (the "Class Period"), Defendants repeatedly misled Celsius investors about consumer demand supporting a "transformational" deal where PepsiCo., Inc. ("Pepsi") became the Company's primary U.S. distributor and exclusive Canadian distributor (the "Distribution Agreement"). Defendants intentionally misrepresented that Celsius's increased sales were being driven by increased consumer demand and not just Pepsi infilling inventory after inking the Distribution Agreement. This is not, as Defendants argue, a fraud-by-hindsight case and Plaintiff does not allege that Defendants' statements were false because they misrepresented future sales. Rather, Defendants told investors that sales to Pepsi were "not really a pipe fill" and that "sales [were] moving quicker out of the register," all while knowing that in fact Pepsi had amassed a glut of Celsius product that was sitting unsold. Defendants made these repeated representations to the market in response to frequent questions from analysts seeking to distinguish between the Company's reported sales, which were recorded when Pepsi received the product, and sales to consumers at the register indicative of genuine consumer demand.

Despite their misrepresentations, Defendants knew of the oversupply of product because they had direct access to Pepsi's inventory data. Defendants' false statements allowed Fieldly, Langhans, and David (the "Individual Defendants") to engage in extensive insider selling as the price of Celsius common stock soared to new highs, and then stop their insider selling prior to public disclosure that Pepsi had been sitting on "several million more cases over the past 1.5 years than they really needed to hold[.]"

Defendants' challenges to Plaintiff's well-pled allegations are meritless.

First, Defendants' falsity arguments largely sidestep addressing the content of the statements that Plaintiff actually alleges to be false. That Celsius disclosed that it recognized revenue when it sold product to Pepsi and not at the time of sell-through to consumers does not change the fact that Defendants falsely told investors that the increased sales to Pepsi were being "maintained" by increased consumer demand and were not a pipe fill.

1

Second, Defendants' scienter is strongly inferred from the Individual Defendants' own statements and accounts from confidential former employees, which revealed that Celsius accessed Pepsi's inventory management system and saw in real time that the inventory Pepsi bought from Celsius was stagnant, meaning that consumer demand was not driving the increased sales to Pepsi. Scienter is also supported by the Individual Defendants' sale of over $55 million in Celsius common stock at fraud-inflated prices during the Class Period. The core operations doctrine further supports Plaintiff's allegations of scienter, given "the obvious fact that sales to Pepsi were significant to Celsius."

Defendants' motion should be denied and this case should proceed to discovery.

## II.     STATEMENT OF FACTS

Celsius was a penny stock operation that sold diet pills, had a run-in with the FTC, and was dogged by allegations of operating as a Pyramid scheme before it pivoted from selling highly caffeinated diet drinks to selling highly caffeinated energy drinks. ¶¶ 1-6.[1] On August 1, 2022 (almost ten months before the beginning of the Class Period), Celsius announced the Distribution Agreement, which had a significant and immediate impact on the Company. ¶ 58. Between 2022 to 2023, Celsius's revenues grew from $653.6 million to $1.318 billion – an increase of 102%. *Id.* Celsius attributed this growth to its increased revenues from North America, which it in turn attributed to Pepsi. *See*, *e.g.*, ¶ 69. As Celsius's primary U.S. distributor and exclusive Canadian distributor, Pepsi replaced about 80% of the Company's network of roughly 500 distributors. ¶¶ 7, 52. Pepsi used SAP for its Enterprise Resource Planning ("ERP") software and provided Celsius with direct logins to its ERP, enabling Celsius to readily view Pepsi's inventory. ¶ 61.

Throughout the Class Period, and in conjunction with their exhortation of the Distribution Agreement, Defendants repeatedly touted the Company's increase in sales to consumers (also referred to as "sell-out" or "velocity"). For instance, on May 9, 2023 (the first day of the Class Period), the Company reported "record first quarter revenue of $260 million, up 95%[.]" ¶ 69. In the follow-up earnings call, CFO Langhans attributed "the increase in North American sales volume" to "our integration into the Pepsi distribution system[.]" *Id.* He then noted that Celsius had "seen our velocity increase post our significant . . . growth" in distribution coverage. *Id.* During the same call, an analyst questioned how much of the Company's growth was due to "initial

---

[1] References to the Complaint are cited herein as "¶ __." Undefined terms have the same meaning as in the Complaint. All emphasis is added unless otherwise noted.

channel fill . . . versus reorders derived from sell-through at retail." ¶ 71. CEO Fieldly responded that "the increase in distribution didn't slow the overall velocity. The sales are moving quicker out of the register." *Id.* And in response to a similar question later in the call, Fieldly noted that sales to Pepsi were "not really a pipe fill . . . we just to [*sic*] continue to build upon the momentum." ¶ 73. These and similar statements were designed to misrepresent to investors that Celsius's increased sales to Pepsi were supported by a similar increase in consumer demand. In response to these statements, Celsius's stock price shot up from $30 per share in May 2023 to a Class Period high of $90 per share in March 2024. ¶ 11.

The truth, however, was that the sell-in to Pepsi at this time far exceeded sell-out to consumers and represented a one-time buildup of stock, as Fieldly and Langhans would later disclose that Pepsi had overstocked its warehouses with $100 million to $120 million worth of Celsius inventory. ¶¶ 15, 63. The sheer magnitude of inventory sitting unsold in Pepsi warehouses was mind boggling – $100 million worth of inventory would be roughly equivalent to almost 87 million cans, or enough to reach from Boca Raton to New Zealand when stacked end-to-end. ¶ 17.[2] This revelation shocked the market and caused Celsius's stock price to crater, wiping out billions of dollars in market value. ¶¶ 14-15, 18-19, 133.

Defendants, however, were not surprised by the news – in fact, they had been aware of Pepsi's stagnant inventory the entire time because of their access to Pepsi's ERP, as confirmed by former employees and Defendants' own statements. *See*, *e.g.*, ¶ 61 (Celsius "look[s] at [Pepsi's] inventory levels"). But instead of telling the truth to investors, the Individual Defendants seized upon the run-up in the stock price during the Class Period to sell their shares at fraud-inflated prices. ¶¶ 134-68. Fieldly alone sold 70% of his direct holdings not including unexercised options – far more than he ever sold before and representing a life-changing $43 million windfall that was ten times his total annual compensation from the Company. ¶ 143. David – who had not engaged in any insider selling prior to the Class Period – sold 30% of his shares for $10 million, ¶ 149, while Langhans sold 40% of his holdings, ¶ 146.

---

[2] On November 5, 2024 (the last day of the Class Period), Defendants disclosed that the decreased revenue from the inventory glut was actually $124 million. ¶ 130.

### III.    ARGUMENT

#### A.    LEGAL STANDARD

In order to state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff must allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called loss causation." *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 746 F.Supp.3d 1395, 1405 (S.D. Fla. 2024) (quoting *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019)). Defendants' Motion to Dismiss only seeks dismissal of the Complaint based on the first two of these elements.

#### B.    PLAINTIFF'S ALLEGATIONS SATISFY THE STANDARD FOR FALSITY

##### 1.    Defendants Falsely Linked Sales to Pepsi with Sales to Consumers

A plaintiff can successfully plead that a statement was materially false or misleading if she "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Notably, "[w]hile pleading fraud *does* subject Plaintiffs to a heightened pleading standard, it does *not* demand they plead precise, contemporaneous accounts contradicting the alleged misstatements." *Teleperformance*, 746 F.Supp.3d at 1407 (emphases in original). Furthermore, while the pleading standard for alleging falsity must satisfy Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") and the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), one should not "conflate[] the heightened pleading standard for scienter with the lower standard for pleading a false or misleading statement."[3] *Teleperformance*, 746 F.Supp.3d at 1407-08 (*quoting Mogensen v. Body Cent. Corp.*, 15 F.Supp.3d 1191, 1214 (M.D. Fla. 2014)) (alteration in original).

---

[3] Similarly, Plaintiff is not required to *establish* any of its allegations at this early point of the litigation, contrary to Defendants' arguments. *See*, *e.g.*, Mot. at 2 ("[T]he AC *must show* each defendant made the alleged misstatements with the intent to mislead investors."); 18 ("[T]he AC cannot *demonstrate* when or how Defendants knew that Pepsi was placing orders for more inventory than it needed[.]"); 18 n.8 ("[T]he AC cannot even *show* Defendants acted recklessly[.]"). On a motion to dismiss, Plaintiff need only meet the appropriate *pleading* standard.

4

Confronted with the Complaint's allegations that "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading"[4] in compliance with the Exchange Act, 15 U.S.C. § 78u-4(b)(1), Defendants resort to arguments based on a contrived misrepresentation of Plaintiff's allegations. Plaintiff does not allege that investors were unaware of when Celsius recognized revenue, nor does Plaintiff allege that investors did not know that Pepsi filled its inventory with Celsius product at the beginning of the Distribution Agreement. Rather, Plaintiff alleges that Defendants purposefully deceived the market by concealing and otherwise denying that Celsius's sales to Pepsi vastly overshot sales to consumers and misleadingly correlated sell-in to sell-out, tricking investors that the sell-in was supported by consumer demand. *See, e.g.*, ¶¶ 71-72 ("the increase in distribution didn't slow the overall velocity"); 90-92 ("our velocities have really maintained with this massive distribution").

Because investors (unlike Defendants) were in the dark as to how much inventory Pepsi was holding, Defendants' statements that sales to Pepsi were "not really a pipe fill" (¶ 73), that Celsius was "keeping the shelf stocked in order to meet the consumer demand" (¶ 77), and other similar sentiments misrepresented to the market that that the Company's increased sales were "maintained" by a similar rate of increased consumer demand.[5] That Defendants might not have known how much product Pepsi would order in the future is irrelevant. Mot. at 18. Defendants knew how much product they sold to Pepsi, knew how much product was being sold to customers, and misrepresented that the rate of sell-out was supported by the rate of sell-in at the time the alleged misstatements were made.

---

[4] Plaintiff explains the falsity of each of the actionable statements alleged in Paragraphs 70, 72, 74-75, 78, 80, 83, 89, 92, 103-04, 106-07, 109-10, and 112. The statements identified in Paragraphs 94-95 are false for the same reasons that Defendants' other statements were false. *See, e.g.*, ¶¶ 70, 72, 78, 80, 89, 92. Paragraphs 99-101 are not alleged as false and misleading but provide context for the false and misleading statements alleged in Paragraphs 102, 105, 108, and 111. Likewise, Plaintiff alleges that the statements in Paragraphs 117-18 were partial corrective disclosures, not false and misleading statements.

[5] Defendants' argument that allegations of a May 2023 glut of inventory are undermined by later increases in reported revenue is similarly based on a distorted reading of the Complaint (Mot. at 18) and fails to confront Plaintiff's actual theory of fraud or make Defendants' statements any less misleading. The Complaint does not allege that Pepsi's glut of inventory was at its highest point in May 2023 – it asserts that May 2023 was when "Pepsi had already completed *or was in the height of infilling* its inventory." ¶¶ 70, 72. The time period during which Pepsi was ordering the majority of its inventory from Celsius was underway by May 2023 and continued through to the first quarter of 2024, and the Complaint alleges as much. ¶¶ 70, 72, 99-100.

There are ample, well-pled allegations that Defendants knew of Pepsi's inventory surfeit – not least of which being Defendants' *own statements* that they could only have made if they were aware of Pepsi's inventory levels. *See*, *e.g.*, ¶¶ 61 (acknowledging that Celsius "look[s] at [Pepsi's] inventory levels"); 73 (sales to Pepsi were "not really a pipe fill"); 100 (disclosing that revenues were "offset" by "inventory movements" at Pepsi); 101 (discussing "days on hand inventory" at Pepsi); 108 ("[O]ur partners are at really good inventory levels right now."). Plaintiff's confidential witnesses further bolster these allegations. *See*, *e.g.*, ¶¶ 61 (access to Pepsi's inventory data); 66 ("Daily Sales Report" provided to Fieldly and Langhans); 67 (finance department provided with "aged inventory analysis" showing how long product had been sitting unsold, including at Pepsi). Defendants themselves likewise admitted that Pepsi's overfill of inventory manifested prior to Defendants beginning to disclose the truth to the market in 2024, which is far different from *Vitalone v. Logitech International SA.*, 2012 WL 13041992, at *5 (N.D. Cal. July 13, 2012) ("[P]laintiffs cannot rely on defendants' alleged admissions of overstocked channels at the end of FY11 in order to establish the existence of unhealthy inventory months earlier.").[6] *See* ¶ 124 (confessing in September 2024 that Pepsi had been "holding to several million more cases *over the past 1.5 years* than they really needed to hold"). Regardless, Defendants' insistence that Plaintiff provide even greater detail is contrary to the applicable pleading standards. *See Teleperformance*, 746 F.Supp.3d at 1407.

Finally, Defendants note that it is "appropriate for the Court to consider the alleged misstatements in the context of the *complete filings and statements*." Mot. at 15 n.7. Yet Defendants argue that a statement by Langhans did not connect the Company's increased velocity with its growth in sales because Langhans "did not reference velocity in the *sentence* addressing the primary factors [behind the increase in Celsius's sales in North America]." *Id.* at 19. Defendants also contend that Langhans addressed velocity "[s]eparately[.]" *Id.* But review of the actual statement reveals that Defendants' own argument involves more "Frankenstein" manipulation than it accuses Plaintiff of committing,[7] as Defendants excised the portion of

---

[6] *Vitalone* also does not apply because it relies on Ninth Circuit law where allegations of channel stuffing are "viewed with skepticism" and subject to an additional test to successfully plead falsity. *Id.* at *4. That standard has not been adopted by the Eleventh Circuit.

[7] Defendants accuse Plaintiff of taking their statements out of context and engaging in a "Frankenstein pleading strategy." Mot. at 19. In fact, the opposite is true: the Complaint provides

Langhans's statement that explicitly attributes Celsius's growth to the Distribution Agreement. The alleged misstatement is reproduced below in full, as it is pled in the Complaint, with underlines denoting the portions of the statement Defendants selectively quote in their Motion:

> The <u>primary factors behind the increase in North American sales volume</u> were related to our integration into the Pepsi distribution system, where we saw increases across the board, <u>including continued strong growth in traditional distribution channels including SKU increases, as well as distribution across a number of new channels within CNG and foodservice</u>. We've <u>also seen our velocity increase post our significant ACV growth</u>.

¶ 69 (cleaned up). Not only does the statement fully attribute sales growth to the Company's "integration into the Pepsi distribution system," Langhans also addresses an increase in velocity in the *very next* sentence, using the word "also" to link it to the previous sentence that had attributed Celsius's sales growth to Pepsi. Thus, Langhans connected increased velocity to increased sales.

Defendants similarly manipulate Langhans's alleged misstatement in Paragraph 82, arguing that Langhans named Celsius's "integration into Pepsi's distribution network as one of 'several key factors' driving sales . . . ." Mot. at 19. But Langhans's actual statement was that the integration into Pepsi's distribution system was the "primary driver" behind the Company's "acceleration of growth relative to Q1 in North America sales volume . . . ." ¶ 82 (reproducing alleged misstatement in full). Langhans then goes on to describe the ways in which the Distribution Agreement enabled Celsius to penetrate further into traditional distribution channels and make headway in new channels, "further fueling the sales growth." *Id.* Langhans immediately followed that statement by noting that "following substantial growth in our ACV, we have observed a notable increase in product velocity." *Id.* ACV, or "All Commodity Volume," is a measure of distribution coverage to show how deeply a product has penetrated a market (¶ 69 n.5) – *i.e.*, the growth in distribution channels that Langhans had just described and attributed to Pepsi's distribution, thereby linking the increase in product velocity to increased sales resulting from the Distribution Agreement.

### 2. Defendants' "Disclosures" Did Not Rectify Their Misleading Statements

That Defendants disclosed how the Company would record revenue upon the sell-in to Pepsi is unremarkable and irrelevant. Defendants falsely conflated Celsius's growth in sell-in with

---

ample context for each alleged misstatement, and that context further bolsters Plaintiff's well-pled allegations.

sell-out in order to give the market the false impression that the increased sell-in was supported by increased sell-out. To do this, Defendants relied on the fact that, although investors knew that Celsius recognized revenue upon delivery to Pepsi and that Pepsi would have to build inventory at the outset of the Distribution Agreement, investors did not know the degree to which the Company's sales constituted channel fill as opposed to sales to consumers. Consequently, Defendants' disclosure of how Celsius recognized revenue does not undermine the falsity of the alleged misstatements. *See*, *e.g.*, ¶¶ 8 ("Pepsi had frontloaded a *massive* inventory – *over a year's worth* of the Company's drinks – that the Company would immediately report as increased revenue, but would only be distributed by Pepsi and sold to consumers *over a much longer period of time*."); 60 ("[I]nvestors could not have known *the extent to which* this explosion in sales was the result not of organic customer demand[.]"); 70 ("Celsius's increased sales that Langhans was touting overrepresented the demand for Celsius's products at that time and concealed the *massive glut* of inventory that was sitting in Pepsi's warehouses to be sold *over a much longer period of time*."); 123-24 (stating that Pepsi was holding "*several million more cases* over the *past 1.5 years* than they really needed to hold").

Similarly, Defendants' disclosures that Pepsi was building its inventory after entering into the Distribution Agreement do nothing to counteract their misstatements. Analysts knew there would be some amount of pipe fill involved at the outset of the Distribution Agreement and so asked Defendants to differentiate between sales attributable to pipe fill versus sales attributable to sell-through to consumers. In response, Defendants repeatedly downplayed how much of Celsius's increased sales were attributable to initial pipe fill as opposed to consumer demand. For instance, an analyst on Celsius's May 9, 2023 Q1 2023 earnings call asked Defendants to "delve a little bit more into *how much* of the Q1 reacceleration of growth was initial channel fill . . . versus reorders derived from sell through at retail." DX F at 8. Fieldly responded that "we're starting to see velocity increase, that is a really good sign that *we're cycling through whatever pipe fills we had* for the quarter." *Id.*; *see also* ¶ 71 ("[T]he increase in distribution didn't slow the overall velocity. The sales are moving quicker out of the register."). And in response to another analyst question regarding Pepsi's initial stocking of Celsius products, Fieldly explicitly stated that "*It is not really a pipe fill* in the quarter I would say, we just to *continue to build upon the momentum*." ¶ 73.

Defendants' downplaying of the volume of sales due to initial inventory buildup became a pattern throughout the Class Period. During Celsius's shareholder meeting on June 1, 2023, after

8

noting an increase in days inventory outstanding (but failing to quantify the increase), Langhans highlighted the Company's 111% rise in gross profit before adding that "we continue to drive efficiencies and optimization within the system while maintaining our number one goal of *keeping the shelf stocked in order to meet the consumer demand*." DX J at 4; ¶ 77.[8] In each of these instances, Defendants' statements line up squarely with Plaintiff's theory of the fraud.

### 3. Defendants' Misstatements Were Not Forward-Looking

None of the alleged misstatements fall within the PSLRA safe harbor provision for forward-looking statements.[9]

Defendants' statements were false and misleading because they conflated Celsius's sell-in to Pepsi with sell-out to consumers. Neither these statements nor the assumptions underlying or relating to them deal with projected revenues, future operations, or future economic performance. *See* 15 U.S.C. § 78u-5(i). All but one of Defendants' "examples" of forward-looking statements are limited excerpts from Plaintiff's *explanation* of why the alleged statements were false or misleading, not the statements made by Defendants themselves. *See* Mot. at 17. And Defendants ignore allegations that the statements were false or misleading because Defendants "misle[]d investors to believe that the *rate of growth in velocity was the same as the rate of growth in revenue and sales*[,]" when in fact "the volume of sales to Pepsi ("sell-in") *at this time* far exceeded sales to consumers ("sell-out") . . . [,]" resulting in Defendants "overrepresent[ing] the demand for Celsius's products *at that time* and conceal[ing] the massive glut of inventory that *was sitting* in Pepsi's warehouses[.]" ¶ 70. *See also* ¶¶ 72, 75, 78, 80, 83, 89, 92, 103-04, 106, 109-10.

---

[8] Langhans then went a step further during the Company's August 8, 2023 earnings call, when he replied to a question about "distributor inventory levels" by stating that Celsius "felt *inventories were low*." DX G at 15. Finally, on Celsius's November 7, 2023 earnings call, Langhans explicitly told investors that "*inventory was not a significant component* of the year-over-year percentage increase [in inventory held by Pepsi]." DX H at 6.

[9] There are several requirements for the Safe Harbor to apply to forward-looking statements. First, the forward-looking statements must be "accompanied by 'meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F.Supp.2d 1169, 1188 (S.D. Fla. 2005) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)). Second, plaintiffs must sufficiently allege "that the Defendants made the statements with 'actual knowledge' that they were 'false or misleading.'" *Id.* (quoting 15 U.S.C. § 78u-5(c)(1)(B)). Finally, "the safe harbor of the PSLRA only applies to forward-looking statements and not material omissions or misstatements of historical or contemporaneous facts." *Id.*

9

None of these allegations are "dependent upon future events before their truth or falsity could be decided."[10] Mot. at 17.

As for the single alleged misstatement quoted directly, Defendants wrongly characterize Fieldly's statement that "[o]ngoing inventory fluctuations may be expected in subsequent quarters" as "explicitly forward-looking." Mot. at 17 (quoting ¶ 105). This falls flat because Fieldly was misrepresenting the known historical fact that Pepsi had a surplus of inventory and had *already begun* drawing down on that inventory. ¶ 107.[11] And even if the statement was considered forward-looking, the safe harbor does not apply because: (i) Fieldly knew that the statement was false at the time and (ii) the accompanying cautionary language was insufficient. Fieldly knew that Pepsi was sitting on unsold inventory (later revealed to be *over a year's worth* of product, ¶¶ 8, 17, 124) and had begun to draw down on that inventory. ¶ 107. Consequently, he knew that Pepsi would continue its draw down – meaning that Fieldly made a knowingly false statement about "fluctuations" in inventory because he knew the inventory would not "fluctuate" – it would only decrease. *Id.* That the draw down had already begun also meant that cautions to investors that "[i]f the inventory of our products held by our distributors or retailers is too high, they will not place orders for additional products," were insufficient because the risk had already materialized. As the Eleventh Circuit has noted, "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011) (quoting *S.E.C. v. Merchant Cap., LLC*, 483 F.3d 747, 769 (11th Cir. 2007)). Such deceit is not protected under the safe harbor.

---

[10] Plaintiff's allegations are therefore distinguishable from *Harris v. Ivax Corp.*, 182 F.3d 799, 804-06 (11th Cir. 1999) (addressing a theory of fraud based on "hopeful outlooks [that] concealed an intent to write down good will" and finding statements that "[r]eorders are expected to improve," "[o]ur fundamental business and its underlying strategies remain intact," and predicting quarterly results, expectations of returns, and inventories were forward-looking), and *Police & Fire Ret. Sys. of the City of Detroit v. Axogen, Inc.*, 2020 WL 13547449, at *14 (M.D. Fla. Apr. 21, 2020) (rejecting fraud claim where the challenged statement was not itself false but alleged to be misleading "as part of the explanation underlying a forward-looking projection").

[11] Plaintiff also alleges that other parts of Fieldly's statement were false and misleading – namely that the change in inventory year-over-year was "meant to compensate for the fourth quarter 2022 destocking" and that "[a]bsent these effects, we would have seen a higher growth rate." ¶ 105. This portion of the statement is not forward-looking, nor do Defendants argue such. *See Carvelli*, 934 F.3d at 1328 ("To the extent that a lengthy statement includes distinct present-tense and forward-looking components, it makes sense to afford safe-harbor protection to the forward-looking portion (if applicable) and then evaluate the present-tense statement on its own.").

### 4.       Defendants' Misstatements Were Not Puffery

Courts define puffery as "generalized, vague, nonquantifiable statements of corporate optimism." *Carvelli*, 934 F.3d at 1318. Because "[t]o say that a statement is mere 'puffing' is, in essence, to say that it is immaterial," *id.* at 1320 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200-01 (3d Cir. 1990)), "the level of specificity a statement must exhibit to cross the puffery threshold cannot be determined from a bright-line rule." *Mogensen v. Body Cent. Corp.*, 15 F.Supp.3d 1191, 1212 (M.D. Fla. 2014). "A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available." *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F.Supp.2d 1351, 1360 (N.D. Ga. 2002) (quoting *Hoxworth*, 903 F.2d at 200-01). "Statements that do more than offer rosy predictions when a defendant knows that the statements are false can be the basis of a securities fraud action." *Scientific-Atlanta*, 239 F.Supp.2d at 1360. Other factors such as whether the statements "relate to a core aspect of [a company's] business" or "were made repeatedly to assure investors" can also weigh against finding statements to be puffery. *In re Equifax Inc. Sec. Litig.*, 357 F.Supp.3d 1189, 1224 (N.D. Ga. 2019). In other words, "the context of these supposedly 'aspirational' statements matters[.]" *Id.*

Here, the parsed portions of alleged misstatements Defendants assert as puffery, Mot. at 20, are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance to be deemed inactionable puffery." *Equifax*, 357 F. Supp.3d at 1224 (internal quotations omitted). Plaintiff alleges multiple facts supporting a strong inference that Defendants were aware of Pepsi's bloated inventory. *See*, *e.g.*, ¶¶ 61, 63, 67. Additionally, the Distribution Agreement had a significant and outsized "transformational" impact on Celsius's business, thus making it a "core aspect" of the Company's operations that was conveyed to investors repeatedly. *See*, *e.g.*, ¶¶ 52 (Celsius terminated around 80% of its roughly 500 distributor relationships to transition distribution to Pepsi), 69 (attributing record revenue primarily to the Distribution Agreement), 76-77 (same), 82 (same), 87-88 (same), 94-95 (same). Furthermore, many of Defendants' misstatements were in direct response to explicit questions from analysts regarding how the Company's increased sales related to sell-out and the status of Pepsi's inventory. *See*, *e.g.*, ¶¶ 71, 73, 90, 91, 108, 111. All of these elements weigh against finding some parts of the alleged misstatements as immaterial puffery.

11

Additionally, Defendants again resort to crafting a "Frankenstein" version of Plaintiff's allegations by parsing selective phrases without providing context. *See Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 2018 WL 1558577, at *21 (N.D. Ga. Mar. 29, 2018) ("quoted portions are selective phrases within larger statements that, when read in their entirety and in context, are not mere corporate puffery") (footnote omitted). For instance, Defendants point to a statement that Celsius "continued to build upon the momentum[,]" Mot. at 20, but omit the portion of the sentence that sales to Pepsi were "not really a pipe fill," which is what Plaintiff alleges was false and misleading. ¶ 73. Defendants also quote several other phrases that relate to the strength of Pepsi's distribution system with laudatory terms. Mot. at 20. But Plaintiff does not allege that these statements were false because they inaccurately described Pepsi's market prowess. Plaintiff alleges that these statements were false because they misleadingly conflated sell-in to Pepsi's distribution network with increased sell-out to consumers. *See* ¶¶ 90, 91. The remaining excerpts likewise do not "cross the puffery threshold" when considered in the context of the full alleged misstatements.

### C. THE AMENDED COMPLAINT SUFFICIENTLY PLEADS DEFENDANTS' SCIENTER

In order to successfully allege a Section 10(b) violation, "a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010) (quoting 15 U.S.C. § 78u-4(b)(2)). "In this context, a 'strong inference' of scienter is one that is 'more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). In other words, where "the inference of scienter is equal to the inference of non-fraudulent intent, . . . scienter has been adequately pled." *In re Paincare Holdings Sec. Litig.*, 541 F.Supp.2d 1283, 1291 (M.D. Fla. 2008).

A court considering allegations of scienter must "(1) accept all factual allegations in the complaint as true, (2) consider the complaint in its entirety and determine whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, and (3) take into account plausible opposing inferences." *Thompson*, 610 F.3d at 633-34 (quoting *Tellabs*, 551 U.S. at 322-23) (emphasis in original) (internal quotations omitted). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. Furthermore, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. "[F]ar

from perfect" allegations suffice. *In re Health Ins. Innovations Sec. Litig.*, 2019 WL 3940842, at *27 (M.D. Fla. June 28, 2019). And "[a]lthough the PSLRA substantially raised the ***pleading*** standard for scienter, it did not change any ***substantive*** intent requirements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (emphasis in original). That is, a plaintiff must sufficiently plead either an intent to deceive, manipulate, or defraud or severe recklessness. *Id.*

### 1. Defendants' Own Statements Support Scienter

"Where a defendant publishes a statement at a time he is in possession of or has access to facts suggesting that the statement is inaccurate, misleading[], or incomplete . . . a classic fact pattern giving rise to a strong inference of scienter appears." *Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *5 (M.D. Fla. Sept. 28, 2023) (*quoting In re Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *6 (S.D. Fla. June 10, 2002)). Defendants' knowledge of the unsold product sitting in Pepsi's warehouses establishes scienter because it directly contravened Defendants' statements conflating sales to Pepsi with sales to consumers. Had Defendants' statements been true, Pepsi would not have had so much product that "sat and didn't sell." ¶ 63.[12]

Confronted with well-pled allegations of Defendants' access to Pepsi's inventory data – as supported by the Individual Defendants' own admissions and accounts from former employees – Defendants pivot to argue that Plaintiff did not allege that such access included information "about Pepsi's future orders or of its projected sales to retail customers[.]" Mot. at 8. But all the inventory data needed to show in order to strongly infer Defendants' scienter was the amount of Pepsi's current inventory – not projections of future orders – because the severe excess of "several million more cases" of unsold product was immediately evident from the massive inventory numbers alone. ¶ 124. Plaintiff amply alleges that these numbers were contained within the data to which Defendants had access. *See*, *e.g.*, ¶¶ 61 (noting "the importance of providing Celsius personnel with on demand access to Pepsi's SAP in order to monitor inventory" and that Celsius "could monitor Pepsi's on-hand inventory of Celsius products"), 67 (describing analysis performed on

---

[12] Defendants' knowledge of the falsity of their statements shows that Defendants acted with fraudulent intent and did not merely commit mismanagement as Defendants argue. Mot. at 7. *See*, *e.g.*, *Marrari*, 395 F.Supp.2d at 1183 (finding scienter and not mere mismanagement where allegation "seeks redress for misleading statements made to the public by the Defendants concerning the performance of the *de novo* program, rather than recovery based upon mismanagement of the *de novo* program").

13

Pepsi's inventory data).

Fieldly himself told investors that Defendants "look at [Pepsi's] inventory levels[.]" ¶ 61.[13] *Edge*, 2023 WL 6310236, at *6 (crediting allegations that defendants had "made several public statements on [the alleged] topics" in support of scienter). In addition to this direct admission, Fieldly, Langhans, and David all repeatedly spoke of historical and contemporaneous trends in Pepsi's inventory, which information they could have only known through access to and review of Pepsi's data. *See*, *e.g.*, ¶¶ 101 (noting "changes in days on hand inventory by [Pepsi]"), 150 (explaining that change in year-over-year inventory levels "was meant to compensate for the fourth quarter 2022 destocking"), 108 ("[O]ur partners are at really good inventory levels right now. We're maintaining deliveries, we're keeping products in stock. We're seeing scan data."), 117 (discussing sales to Pepsi and noting that "the inventory pullback wasn't in terms of total cases, it's on days on hand of inventory"), 118 ("Pepsi did take their inventory up last year in turn. They took their days on hand up last year. . . . [L]ooking at last week's solid depletions that's depletions out of the Pepsi system grew . . . mid 10s versus Q1."), 124 ("What we are seeing correlate is depletions out of the Pepsi warehouse[.]"). Defendants' knowledge of this information supports Plaintiff's allegations that they were aware of Pepsi's glut of inventory at the time they made their false and misleading statements to investors.

Finally, Defendants also admitted that Pepsi's inventory was overfilled at the time they made false representations to the market. Specifically, David revealed on September 4, 2024 that Pepsi was "holding to several million more cases ***over the past 1.5 years*** than they really needed to hold[.]" ¶ 124. In other words, Pepsi's inventory had been overstocked since March 2023, or two months before the beginning of the Class Period.

### 2. Accounts from Former Employees Further Support Scienter

The accounts of several confidential former employees confirm the Individual Defendants' own admissions of their knowledge and further support a strong inference of scienter. Contrary to Defendants' vague criticism of confidential witnesses, Courts have repeatedly credited such

---

[13] Defendants' argument that Fieldly was talking about current inventory and not projections of future orders (Mot. at 9) fails for the same reason that future orders were irrelevant to Defendants' knowledge of Pepsi's known inventory glut. By stating that "we looked at our number one customer [Pepsi] and we look at their inventory levels," Fieldly acknowledged that Celsius not only had access to Pepsi's inventory data, but that Defendants, including Fieldly himself, actively reviewed that data. *Id.*

witness accounts in upholding scienter allegations. *See*, *e.g.*, *Marrari*, 395 F.Supp.2d at 1188 ("anonymous sources may be used to sustain complaints under the PSLRA so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *Tung v. Dycom Indus., Inc.*, 454 F.Supp.3d 1244, 1258 (S.D. Fla. 2020) ("[T]he absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.") (*quoting Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008)); *contra* Mot. at 6 (disapproving of "nameless former employees"). The Complaint meets this standard by providing descriptions of the positions held by each witness, their job responsibilities, and the dates of their employment at Celsius.[14] ¶¶ 30-32. Each of the confidential witnesses also describe with sufficient particularity facts that support a strong inference of scienter. *See*, *e.g.*, *Grand Lodge of Pa. v. Peters*, 550 F.Supp.2d 1363, 1370 (M.D. Fla. 2008) (crediting accounts of confidential witnesses placing defendants "at daily meetings and teleconferences in which the development of the North Port scheme was discussed").

Two of the witnesses, CW1 and CW2, confirm Celsius's access to Pepsi's ERP data. ¶ 61. CW1 reported that because Celsius's ERP system could not speak with Pepsi's ERP system (SAP), Celsius finance employees were provided with direct "cloud logins for [Pepsi's] SAP." *Id.* CW1, who was part of the Finance Department, (¶ 30), stated that Celsius was able to "monitor Pepsi's on-hand inventory of Celsius products" with its SAP access and that the Company's "Operations Department would provide the Finance Department with an 'aged inventory analysis' that documented product that had been sitting unsold in various distribution centers, including those of Pepsi." *Id.* at ¶¶ 61, 67. CW2, whose position required him to interface with Celsius's finance

---

[14] It is irrelevant that the Complaint does not allege that any of the confidential witnesses "interacted directly with the Individual Defendants." Mot. at 6-7. Courts have repeatedly afforded significant weight to confidential witness accounts even when those witnesses were removed from direct interaction with individual defendants. *See*, *e.g.*, *In re 21st Century Holding Co. Sec. Litig.*, 2008 WL 5749572, at *7 (S.D. Fla. Nov. 7, 2008) (crediting accounts of confidential witnesses who were not alleged to have spoken to the individual defendants); *Edge*, 2023 WL 6310236, at *6 (relying on testimony of confidential witness who met with a defendant's direct report). Defendants' cited authority does not hold otherwise. Rather, it stands for the general and unremarkable position that confidential witnesses must be pled with specificity, which Plaintiff has done. *See Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574, at *15 (S.D. Fla. Mar. 30, 2010) (witness account unreliable where alleged interaction with defendant was provided without any context from the witness).

department, corroborated CW1's account. ¶¶ 31, 61. Celsius's ability to monitor "Pepsi's on-hand inventory" is also corroborated by Defendants' own statements. *See* Section III.C.1, *supra*; *see also Tung*, 454 F.Supp.3d at 1258 (crediting account from confidential witness and noting that witness' account was corroborated by public filings); *21st Century*, 2008 WL 5749572, at *7 (noting corroboration between two confidential witnesses' accounts).

Defendants' criticism that CW1's and CW2's accounts lack sufficient specificity largely repeats their strawman argument that direct knowledge of the glut of inventory does not mean they had knowledge of future orders. Mot. at 8. Again, Defendants' fraud does not relate to knowledge of future orders and it is irrelevant that the Complaint does not allege that the inventory data showed Pepsi's future orders or projected sales.[15] Furthermore, the sheer magnitude of unsold product sitting in Pepsi's warehouses (more than 87 million cans worth of product, resulting in a 31% decline in Celsius's revenue year-over-year between 3Q 2023 and 3Q 2024, ¶¶ 17, 124, 129) supports a strong inference of Defendants' knowledge. *See In re Eagle Building Techs., Inc., Sec. Litig.*, 319 F.Supp.2d 1318, 1327 (S.D. Fla. 2004) ("The more serious the error, the less believable are defendants' protests that they were completely unaware of the [company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy.") (alteration in original) (citation omitted); *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F.Supp.3d 1272, 1304 (N.D. Ga. 2021) ("The type and amount of fraud alleged here would not be hidden from the CEO . . . of the company.") (internal quotations omitted).

Defendants' arguments criticizing the confidential witnesses' allegations of monthly "All Call" meetings, ¶ 65, daily sales reports, ¶ 66, and aged inventory analysis, ¶ 67, fail for similar reasons. Mot. at 8-9. The accounts of each witness provide sufficient particularity to be probative of Defendants' scienter. For instance, CW1 attended monthly "All Call" meetings with Fieldly and Langhans where Celsius's Financial Planning and Analysis Manager, Greg Canton, presented slides containing year-over-year financial data "broken down by distribution channel, including a

---

[15] Because sales reports and inventory age relate directly to (and contradict Defendants' statements about) Pepsi's inventory glut, Defendants' cited authority is once again inapplicable. *See Maloney v. Ollie's Bargain Outlet Holdings, Inc.,* 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (regular sales report did not support scienter where alleged fraud involved "overall sales projections" and "inventory pipeline and deal flow"); *In re Royal Caribbean Cruises Ltd., Sec. Litig.*, 2013 WL 3295951, at *17-18 (S.D. Fla. Apr. 19, 2013) (witness accounts failed to allege "specific facts showing that what was discussed was in direct contrast with what was publicly disclosed").

specific graph for Pepsi." ¶ 65. This is specific enough to be credited when considering scienter. *See, e.g., Tung*, 454 F.Supp.3d at 1258 (crediting account of confidential witness who "sat in on monthly phone calls with [the] CEO and the president of Dycom's subsidiaries" and described the topics that were discussed at the meetings). Similarly, CW2 was copied on "Daily Sales Report" emails sent to Fieldly and Langhans containing data on all of the orders entered into Celsius's ERP each day that included a breakdown by distributor, including Pepsi. ¶ 66. That CW2 was copied on the email only occasionally is of no consequence – it is self-evident from the name "Daily Sales Report" that the email was sent out each day, and CW2 confirmed that Defendants were recipients of the daily correspondence. *Id.* And that CW2 said that the report included a breakout for sales to Pepsi ties CW2's account to the relevant time period because that breakout would not have included Pepsi prior to the start of the Distribution Agreement.

Viewed holistically and in conjunction with Defendants' own statements, the confidential witnesses' accounts demonstrate Defendants' significant and regular involvement in matters related to Pepsi, including consistent review of sales to Pepsi and Pepsi's inventory. Defendants' knowledge of this information contradicted their statements to investors, and therefore supports a strong inference of scienter.

### 3.     The Individual Defendants' Suspicious Insider Selling

"[W]hen determining whether [a defendant's] stock sales are suspicious, the Court considers the following factors (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with their prior trading history." *Davidco Investors, LLC v. Anchor Glass Container Corp.*, 2006 WL 547989, at *20 (M.D. Fla. Mar. 6, 2006). None of these factors are dispositive – they are reviewed holistically. *See, e.g., id.* (insider sales were suspicious "[e]ven though there is no trading history to compare these sales to"); *In re Health Insurance Innovations Sec. Litig.*, 2019 WL 3940842, at *26-27 (M.D. Fla. June 28, 2019) ("viewing the allegation holistically clearly provides a 'cogent' and 'compelling' inference that overtakes any opposing inference of nonfraudulent intent" even in the absence of allegations of trading prior to the class period because "the frequency of the Hershberger's sales during the Class Period, taken together with the details of such sales, sheds some light on whether these sales were 'suspicious' or 'unusual'"); *In re Faro Tech. Sec. Litig.*, 534 F.Supp.2d 1248, 1264 (M.D. Fla. 2007) (rejecting argument that "the broad temporal distance between the sale and the disclosure defeats any inference of scienter"); *In re Miller Indus., Inc. Sec. Litig.*, 12 F.Supp.2d 1323, 1332

17

(N.D. Ga. 1998) (insider trading that "occurred at the beginning of the class period" indicative of scienter). The Complaint includes sufficient allegations regarding all three factors, including trading prior to the Class Period, to provide a strong inference of scienter.[16]

Fieldly's trades during the Class Period were highly suspect for several reasons. First, prior to the Class Period, Fieldly sold shares on several occasions pursuant to a 10b5-1 trading plan, yet *none* of Fieldly's sales during the Class Period were made in accordance with such a plan. ¶ 142. Given that Fieldly was undeniably aware of the ability to shield himself from liability by following a trading plan, this departure from his prior practice weighs in favor of scienter.

Second, the timing of Fieldly's sales were significant. The majority of Fieldly's trades made during the Class Period were executed within two weeks of the issuance of statements alleged as false and misleading. *Compare* ¶ 139 (trades made by Fieldly on August 21, 2023, December 5 and 6, 2023, and March 4, 2024) *with* ¶¶ 81-84 (August 8, 2023), 91-92 (December 6, 2023), 94-95 (February 29, 2024). *See Davidco*, 2006 WL 547989, at *20 (sale of stock shortly after "presenting very strong positive news" was suspicious).[17]

Third, the amount and percentage of shares that Fieldly sold are likewise suspicious. Fieldly sold off 70% of his direct common stock holdings. ¶ 143. Even when accounting for unexercised vested stock options, Fieldly's sales still accounted for approximately 17% of his holdings, an amount which courts have found sufficiently indicative of scienter.[18] *See*, *e.g.*, *In re*

---

[16] Defendants' decision to violate the Lock-Up Agreement does not invalidate Plaintiff's allegations of scienter. Mot. at 10-11. The Complaint alleges that Defendants engaged in purposeful, opportunistic trading in order to reap the benefits of Celsius's fraudulently inflated stock price. ¶¶ 134-50. That Defendants violated the Lock-Up Agreement with smaller trades is just another example of their willingness to flout their obligations. It does not negate Defendants' desire to wrongfully boost (and keep boosted) Celsius's stock price throughout the Class Period, when the vast majority of Defendants' insider selling took place. *See* ¶ 168.

[17] Defendants' cases hold similarly. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 WL 5794774, at *18 (S.D.N.Y. Sept. 30, 2016) ("Whether trading was unusual or suspicious turns on factors including . . . whether sales occurred soon after statements defendants are alleged to know to be misleading[.]") (quotation omitted).

[18] Defendants' argument that Fieldly "would have suffered a significant loss upon the alleged corrective disclosure and subsequent decline in stock value" because "he sold just 17% of his holdings" is misleading. Mot. at 11. The majority of the remaining 83% of holdings that Defendants argue would have suffered this loss was comprised mostly of unexercised stock options. *See* ¶ 143. These were not open-market purchases that Fieldly made with his own money

*Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *7 (S.D. Fla. June 10, 2002) (sales constituting 14.9% of holdings were "significant"). Furthermore, Fieldly's sales constituted a windfall of $43 million – more than ten times his annual cash and stock-based compensation from Celsius. ¶ 143. And contrary to Defendants' assertion, Plaintiff did not include any insider selling by Fieldly (or anyone else) that were designated in SEC filings under transaction code F, which the SEC directs insiders to use to identify a trade legitimately made for the purpose of "[p]ayment of exercise price or tax liability."[19] SEC, Statement of Changes of Beneficial Ownership of Securities (Form 4) at 7, *located at* https://www.sec.gov/files/form4data.pdf.

David's $10.4 million gain from insider sales also supports scienter, as he never sold any Celsius stock prior to or following the Class Period, ¶ 150, his sales accounted for 30% of his total holdings, were worth over ten times his 2023 compensation, ¶ 139, were not made pursuant to a 10b5-1 trading plan, *id.*, and were for the most part made shortly after Defendants' false and misleading statements on August 8, 2023, *id.*

Langhans's trades during the Class Period were likewise suspicious.[20] As with Fieldly and David, Langhans sold a significant amount of stock in the wake of Defendants' false and

---

[19] believing that Celsius's shares would appreciate. In other words, Fieldly would recognize gains even after Defendants' fraud was revealed and Celsius's stock price fell.

[19] Defendants ignore that Plaintiff excluded all code F insider trading (¶ 40 n.9) and assert that "some" of Fieldly's sales were for tax purposes even though Fieldly designated those sales as an ordinary code S ("Open market or private sale of non-derivative or derivative security") transaction. *See* Mot. at 11, 12. *MDC Partners*, cited by Defendants, does not hold differently. 2016 WL 5794774, at *20 (sales designated as code M "involved the exercise of stock appreciation rights"). First, Plaintiff properly excluded code F sales and included code S sales in accordance with SEC regulations (and the designation Defendants themselves selected). Defendants offer no legal authority to disregard the SEC trading code and instead rely on their irregular "disclaimers," Mot. at 11, which were inexplicably used intermittently along with separate trading designated under code F. *See*, *e.g.*, ¶¶ 144, 166. Moreover, at the motion to dismiss stage, the Court cannot take notice of Defendants' disclaimers for the purpose of proving the truth of the disclaimers' contents. Second, Fieldly's only code S transaction that included this irregular tax disclaimer represented just 3.6% of his total Class Period non-code F sales. So if Defendants' argument had merit (it doesn't), Fieldly's Class Period sales would still have amounted to $41.5 million.

[20] Plaintiff acknowledges that it inadvertently misattributed a trade made on August 22, 2023 to Langhans. Mot. at 12. But because the Complaint specifies each trade in detail, the significance of Langhans's trades can still be determined after removing the August 22, 2023 sale using allegations within the four corners of the Complaint. There is thus no basis to disregard all of Plaintiff's allegations regarding Langhans's insider transactions.

misleading statements. *Compare* ¶ 139 (trades made by Langhans on August 21, 2023 and March 4, 2024) *with* ¶¶ 81-84 (August 8, 2023), 94-95 (February 29, 2024). *Davidco*, 2006 WL 547989, at *20. These trades earned Langhans roughly the same amount as his 2023 compensation. *See* ¶¶ 85, 139. None of those sales were made pursuant to a 10b5-1 trading plan. Langhans's sales also accounted for 41% of his Celsius holdings.[21] ¶ 135.

### 4.    The Distribution Agreement Was Central to Celsius's Business

In conjunction with a holistic view of all of Plaintiff's scienter allegations, the significance of the Distribution Agreement to Celsius further weighs in favor of a strong inference of scienter. Defendants themselves concede "the obvious fact that sales to Pepsi were significant to Celsius." Mot. at 9. The Complaint also repeatedly alleges facts highlighting the significance of the deal. *See*, *e.g.*, ¶¶ 52 ("In connection with the Distribution Agreement, Celsius terminated around 80% of its various agreements with existing distributors to transition certain territory rights to Pepsi."), 62 (recounting that "there was "a lot of talk" about Pepsi"). This core operations doctrine, which "allows a court to infer that officers of a company have knowledge of critical facts related to its core operations[,] . . . can bolster the inference [of scienter]." *Teleperformance*, 746 F.Supp.3d at 1412 (citing *In re Flowers Foods, Inc. Sec. Litig.*, No 16-cv-222, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018)). Similarly, in the present case, Plaintiff's substantial allegations – viewed holistically and "bolstered" by the core operations doctrine – present a strong inference of scienter.

### D.    PLAINTIFF'S SECTION 20(A) CLAIM SURVIVES

Defendants' sole argument in support of dismissing Plaintiff's Section 20(a) claim is that the underlying claim of violating Section 10(b) and Rule 10b-5 should be dismissed. Mot. at 20. Because Plaintiff's underlying claim survives, the Section 20(a) claim should not be dismissed.

## IV.    CONCLUSION

The Court should deny Defendants' Motion to Dismiss in its entirety. However, if the Court grants any or all of Defendants' Motion, Plaintiff respectfully requests permission to replead. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (a plaintiff is generally "given at least one chance to amend the complaint").

---

[21] Additionally, Defendants do not contend that the insider sales were not suspicious because they involved exercising stock options that were close to expiration. *Loc. No. 8 IBEW Ret. Plan v. Vertex Pharmaceuticals Inc.* is therefore not relevant. 140 F.Supp.3d 120, 136 (D. Mass. 2015) (noting that it was not unusual for an executive to dispose of shares before retiring, which would likely result in a shortened time frame to exercise options).

Dated: August 1, 2025

Respectfully submitted,

**JOSH DUBIN, P.A.**

By: */s/ Joshua E. Dubin*
Joshua E. Dubin (FL Bar #48865)
201 South Biscayne Boulevard, Suite 1210
Miami, FL 33131
Tel: 212-219-1469
josh@jdubinlaw.com

*Counsel for Lead Plaintiff and*
*Liaison Counsel for the Proposed Class*
**GRANT & EISENHOFER P.A.**
Karin Fisch (*pro hac vice*)
James S. Notis (*pro hac vice*)
Lauren J. Salamon (*pro hac vice*)
Timothy Clark Dauz (*pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: 646-722-8500
kfisch@gelaw.com
jnotis@gelaw.com
lsalamon@gelaw.com
tdauz@gelaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Class*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2025, I caused the foregoing to be filed electronically with the Court's Case Management/Electronic Filing System ("CM/ECF"). Notice of this filing was sent to all parties of record by operation of the Notice of Electronic Filing System, and the parties to this action may access the filing through CM/ECF.

/s/ Joshua E. Dubin
JOSHUA E. DUBIN