2025 WL 2896919
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Fort Myers Division.

Edward M. DOLLER, Individually
and on Behalf of All Others
Similarly Situated, Plaintiff,

v.

HERTZ GLOBAL HOLDINGS, INC., Stephen
M. Scherr and Alexandra Brooks, Defendants.

Case No. 2:24-cv-513-KCD-DNF
|
Signed October 10, 2025

**Attorneys and Law Firms**

Jeremy A. Lieberman, Pro Hac Vice, J. Alexander Hood, II, Pro Hac Vice, Pomerantz LLP, New York, NY, Nathan Zipperian, Jayne Arnold Goldstein, Miller Shah LLP, Ft. Lauderdale, FL, for Plaintiff.

Edmund Polubinski, III, pro hac vice, Andrew Ditchfield, Pro Hac Vice, Deborah S. Mazer, Pro Hac Vice, Davis Polk & Wardwell LLP, New York, NY, Jonathan K. Chang, Davis Polk & Wardwell LLP, Redwood City, CA, Michael P Matthews, Foley & Lardner, LLP, Tampa, FL, for Defendants.

## ORDER

Kyle C. Dudek, United States District Judge

**\*1** Plaintiff Edward M. Doller, individually and on behalf of all others similarly situated, sues Defendants Hertz Global Holdings, Inc., Stephen M. Scherr, and Alexandra Brooks for securities fraud. (Doc. 50.)[1] Defendants move to dismiss the complaint for failure to state a claim. (Doc. 51.) Doller has responded (Doc. 53), making this matter ripe. For the reasons below, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

[1]    Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

## I. Background

Here are the relevant facts taken from the operative complaint, which must be accepted as true at this stage. Hertz is a publicly traded rental car company. (Doc. 50 ¶¶ 15, 16.) Defendant Scherr served as Hertz's Chief Executive Officer and sat on the company's board from February 2022 to April 2024. (*Id.* ¶ 17.) Defendant Brooks was Hertz's Executive Vice President and Chief Financial Officer from July 2023 to June 2024. (*Id.* ¶ 18.)

In 2021, Hertz announced it was making "a significant investment to offer the largest rental fleet" of electric vehicles "in North America and one of the largest in the world." (Doc. 51 at 3.) Hertz consequently purchased 100,000 Teslas and agreed to buy an additional 240,000 EVs. (Doc. 50 ¶¶ 56, 58, 61.) Things didn't quite go as planned.

By 2023, EV rental demand turned out to be far less than Hertz expected. (Doc. 51 at 4.) This led Hertz to sell half of its EV fleet. (Doc. 50 ¶ 8.) It afterward took "a massive write-off of $245 million to account for the inflated carrying values [it] had on its books from acquiring Tesla EVs at top-dollar," and later recorded "an additional $195 million write-off to mark-market its inflated EVs being sold." (*Id*. ¶¶ 6, 8.) The company's stock price ultimately "declined $5.49 per share, or 54% on abnormally high trading volume." (*Id*. ¶ 10.)

Doller now sues Defendants for securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. (*Id*.) He alleges that "[d]espite a lack of demand for EVs, Defendants falsely told investors through the Class Period that EV rental demand is very strong and strong across all aspects of [their] business." (*Id*. ¶ 5.) According to Defendants, however, Doller has not alleged sufficient facts to proceed under either theory. (Doc. 51.)

## II. Legal Standards

"Section 10(b) of the Securities Exchange Act of 1934 prohibits the use or employ, in connection with the purchase or sale of any security...[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Carvelli v. Ocwen*

*Fin. Corp.*, 934 F.3d 1307, 1316 (11th Cir. 2019). Under this authority, the SEC passed Rule 10b-5, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality of interstate commerce, or the mails or of any facility of any national securities exchange,

**\*2** (a) To employ any device scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a securities-fraud claim under Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss[.]" *Carvelli*, 934 F.3d at 1317.

Section 20(a) of the Securities Exchange Act "imposes derivative securities-fraud liability on certain company individuals." *Id.* at 1330. This section "has three elements: (1) a primary violation of the securities laws— here, allegedly, of § 10(b) and Rule 10b-5; (2) individual defendants who had requisite the power to control the general business affairs of the company; and (3) individual defendants who had the power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Id.*

To survive a motion to dismiss, a plaintiff bringing a securities-fraud claim under Rule 10b-5 must satisfy three pleading standards. *See, e.g.*, *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). First is Fed. R. Civ. P. (8)(a)(2)'s "run-of-the-mill federal notice-pleading requirement." *Carvelli*, 934 F.3d at 1317. It requires a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. (8)(a)(2).

Second is Fed. R. Civ. P. 9(b), which requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." *Id.* Under this standard, the complaint must

"allege specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." *Carvelli*, 934 F.3d at 1318.

Lastly, we have the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. § 78u-4. Designed to curb abusive litigation by private parties, the PSLRA requires securities-fraud claimants to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *see also* *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted" with an intent to defraud or severe recklessness. *FindWhat*, 658 F.3d at 1296.

### III. Discussion

**\*3** Defendants press several arguments. (Doc. 51.) They contend Doller's § 10(b) claim fails because he does not explain how any of the underlying statements were false. (*Id.* at 8-11.) But even assuming falsity, they argue the alleged statements are immaterial or lack scienter. (*Id.* at 11, 18-24.) These pleading failures, according to Defendants, also prevent Doller's derivative § 20(b) claim. (*Id.* at 24-25.) The Court largely agrees—with two exceptions discussed below. For organizational purposes, Doller's claims are sorted into three groups: (1) statements lacking falsity, (2) immaterial statements, and (3) the surviving statements.

### a. Falsity

As mentioned, securities-fraud claimants must explain how the defendant's statements were false or misleading. *See, e.g.*, *Gladney v. Consumers Credit Union*, No. 23-13959, 2024 WL 2797914, at \*3 (11th Cir. May 31, 2024). "A statement is misleading if, in light of the facts existing at the time of [the statement]...[a] reasonable investor, in the exercise of due care, would have been misled by such statement." *FindWhat*, 658 F.3d at 1305. So the "appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." *Id.*

According to the complaint, Defendants misled investors by praising the general demand for Hertz's vehicles and EV demand among its corporate clients. (Doc. 50 ¶¶ 100, 104, 106, 108, 116, 118, 121, 123, 125, 127.) Likewise, Defendants falsely claimed Hertz was growing its charging network. (*Id.* ¶¶ 112, 129.) But Doller doesn't adequately demonstrate how any of these statements were false. He cites evidence that overall EV demand was weak; that Hertz's charging network was insufficient; and general allegations that corporate demand for EVs "had not materialized." (*See, e.g.*, *id.* ¶¶ 101, 113, 126, 128.) But these facts do not sufficiently undermine Hertz's statements. Doller's evidence is at best tangential (and at worst irrelevant) to what Defendants said. That won't cut it. *See FindWhat*, 658 F.3d at 1306; *Mulvaney v. GEO Grp., Inc.*, 237 F. Supp. 3d 1308, 1319 (S.D. Fla. 2017). Without an adequate showing of falsity, the above referenced statements cannot proceed. *See Meide v. Pulse Evolution Corp.*, No. 3:18-CV-1037-J-34MCR, 2020 WL 5350325, at *15 (M.D. Fla. Sept. 4, 2020); *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1192-93 (S.D. Fla. 2015).

### b. Materiality

The PSLRA is only concerned with *material* misrepresentations or omissions. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236 (11th Cir. 2008). "A misrepresentation or omission is material if, in the light of the facts existing at the time, a reasonable investor, in the exercise of due care, would have been misled by it." *Carvelli*, 934 F.3d at 1317. "In other words, materiality depends on whether a 'substantial likelihood' exists that a reasonable investor would have viewed a misrepresentation or omission as significantly alter[ing] the 'total mix' of information made available." *Id*.

A statement is immaterial, however, if it qualifies as corporate puffery. *See, e.g.*, *In re Health Ins. Innovations Sec. Litig.*, No. 8:17-CV-2186-T-17SPF, 2019 WL 3940842, at *7 (M.D. Fla. June 28, 2019). Corporate puffery "comprises generalized, vague, nonquantifiable statements of corporate optimism." *Carvelli*, 934 F.3d at 1318. "The puffery doctrine presumes a relatively (but realistically) savvy consumer—the general idea being that some statements are just too boosterish to justify reasonable reliance." *Id*.

Here, paragraphs 100, 102, 114, 116, 119, and 123 all include inactionable puffery. They contain statements like "we will always remain attentive to customer preference," (Doc. 50

¶ 100), and "we are making more fleet available for more revenue earning activities, which better enables us to serve base demand as well as demand across our new ventures," (*id.* ¶ 116). None provide any real substance. Instead, they are the sort of lofty, aspirational comments reasonable investors routinely shrug off. *See, e.g.*, *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 619CV619ORL40LRH, 2019 WL 5394011, at *14 (M.D. Fla. Oct. 16, 2019); *Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901-02 (5th Cir. 2018); *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013) (optimistic discussion of "healthy demands," an "intention to compete successfully," and the " 'encouraging' prospect of early bookings" considered puffery). So these statements must also be dismissed.

### c. The Surviving Statements

**\*4** That leaves paragraphs 98 and 110. Defendants contend neither are actionable since they weren't false, are immaterial, or are protected forward-looking statements. (Doc. 51 at 12-17.) They alternatively argue that Doller has not alleged scienter.

### i. ¶ 98

Paragraph 98 alleges that Defendant Scherr—then Hertz's CEO— stated "EV rental demand is very strong and strong across all aspects of our business." (Doc. 50 ¶ 98.) Defendants claim this statement is not false, and in any event, it's inactionable puffery. Neither argument prevails.

Starting with falsity. A claimant must specifically plead "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). As relevant here, when done through a confidential witness, courts look to "whether, taken as true, the confidential witnesses' accounts are enough to make it 'plausible' that the defendant's statement was false or misleading when made...and whether the complaint provides an adequate foundation for the confidential witnesses' accounts." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1214 (M.D. Fla. 2014).

The complaint checks these boxes. It identifies a confidential witness (CW2) who was Hertz's Revenue Management Analyst for the Midwestern Region "from before the Class Period to February 2023." (Doc. 50 ¶ 20.) And according

to this witness, "EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35%[.]" (*Id*. ¶ 99(d).) Considering this evidence, which comes from a witness with access to Hertz's rental data, it's plausible that EV demand was not in fact "very strong" when Scherr claimed it to be. *See Mogensen*, 15 F. Supp. 3d at 1214-15. Doller has sufficiently shown falsity.

Defendants' puffery argument also fails. To be sure, statements using descriptors like "strong" are often inactionable. *See, e.g.*, *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1029 (11th Cir. 2003) (deeming "strong performance" to be puffery); *Murphy v. Precision Castparts Corp.*, No. 3:16-CV-00521-SB, 2020 WL 4040827, at *16 (D. Or. July 17, 2020); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001). But they can create liability when tied to more concrete facts. *See, e.g.*, *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir.

2015); *Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 669 (E.D. Mich. 2023). That's because "the critical inquiry" isn't what adjective was used, but "whether the statement could have misled a reasonable investor." *In re Harman*, 791 F.3d at 109; *see also Carvelli*, 934 F.3d at 1320 ("[W]hen considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations —puffery or otherwise—are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.").

As relevant here, Hertz had announced that it was betting big on EVs. (Doc. 51-2 at 2.) It touted and doubled down on this bet and even rolled out an ad campaign specifically designed to showcase its EV fleet. (*Id*. at 2-3; Doc. 50 ¶¶ 58-63.) So when Hertz's CEO later characterized EV demand as "very strong," reasonable investors could have interpreted this statement to mean the bet was paying off. Against this backdrop, Scherr's statement is not immaterial puffery. *See In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) (concluding reasonable investors could be misled by statements hailing "strong demand" for company's products); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020).

### ii. ¶ 110

**\*5** As for paragraph 110, it concerns an April 2023 earnings call where Scherr stated:

> Hertz posted strong results in the first quarter, **reflecting continued growth in demand across our customer segments** and a stable pricing environment in both the U.S. and abroad.
>
> * * *
>
> Our fleet acquisition costs are generally aligned with vehicle delivery timing. As a result, we have been benefitting from recent declines from EV OEMS. **We are forecasting nearly 2 million EV rentals in 2023, approximately 5x the number of the prior year.**

(Doc. 50 ¶ 110.)

Defendants argue the first portion is generic and Doller has not pled falsity. (Doc. 51 at 9.). The Court agrees and therefore dismisses the statement about "continued growth in demand." *See FindWhat*, 658 F.3d at 1306; *Mulvaney*, 237 F. Supp. 3d at 1319.

As for the latter portion, Defendants contend it is inactionable since it was forward-looking and accompanied by meaningful cautionary statements. (Doc. 51 at 12-13.) Specifically, Defendants point to their Form 10-K disclosure that "[d]emand for EVs which may be impacted by customer sentiment regarding EVs overall" could impact its EV initiative's success. (*Id*. at 13; Doc. 51-7 at 7.) Doller responds that this cautionary language was meaningless because the risk of insufficient EV demand had already materialized. (Doc. 53 at 14.)

The PSLRA "includes a 'safe harbor' provision that immunizes certain 'forward-looking' statements from liability." *Carvelli*, 934 F.3d at 1324. "A forward-looking statement is what it sounds like—a prediction, projection, or plan." *Carvelli*, 934 F.3d at 1324. This includes "statement[s] containing a projection of revenues" or "statement[s] of future economic performance." 15 U.S.C. § 78u-5(c)(1)(A), (C). Such declarations are inactionable if they "are either immaterial or, if material, are identified as forward-looking and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." *Mogensen*, 15 F. Supp. 3d at 1215. Cautionary

language is "meaningful" "when an investor has been warned of risks of a significance similar to that actually realized, and the cautionary statement is tailored to the risks the business faces." *Id.* at 1216. But "cautionary language can't be 'meaningful' if it is nothing more than a front for present problems." *Carvelli*, 934 F.3d at 1327. After all, "to warn that the untoward may occur when the event is contingent is prudent," but "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *FindWhat*, 658 F.3d at 1299. And so the question becomes: was the cautionary language here meaningful?

The Court doesn't think so. When Scherr forecasted "nearly 2 million EV rentals in 2023," EV demand had been lagging. So it doesn't matter that Defendants disclosed EV demand as a risk. According to Doller's evidence, that risk had already materialized. The cautionary language accompanying Defendants' forecast was thus meaningless. *See FindWhat*, 658 F.3d at 1299; *S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 769 (11th Cir. 2007); *Sec. & Exch. Comm'n v. Quiros*, No. 16-CV-21301, 2016 WL 11578637, at *14 (S.D. Fla. Nov. 21, 2016) ("[C]autionary statements do not render projections about future performance immaterial where the maker of the projections is aware of adverse information about past performance but fails to disclose it."). So, for now, this forecasting statement is actionable.

### iii. Scienter

**\*6**  Finally, Defendants argue Doller hasn't sufficiently pled scienter. The PSLRA requires securities-fraud claimants to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This means the pleadings here must show "either an intent to deceive, manipulate, or defraud or severe recklessness." *Mizzaro*, 544 F.3d at 1238. The Eleventh Circuit has defined "severe recklessness" as

> Limited to those highly unreasonable omission or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyer or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n.18 (11th Cir. 1999).

Additionally, a "strong inference" of scienter is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. This requires courts to ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

The complaint sets forth—in painstaking detail—the internal systems Hertz used to monitor its business. (Doc. 50 ¶¶ 43-54.) These systems "reported, in real-time, on the number and composition of the rental fleet for each location and reservations" and could generate "a slew of reports which could be produced on a very granular level." (*Id*. ¶¶ 44-45.) Hertz could produce "graphical representation[s] of utilization levels for specific fleet categories, such as ICE and EV vehicles." (*Id*. ¶ 48.) Hertz's top brass had access to these internal systems during the class period, which they acknowledged generated crucial data. (*Id*. ¶¶ 50, 53-54, 168, 169, 174.) And, according to Doller's evidence, EV utilization hovered around 55% to 60% for three-fourths of Hertz's domestic markets. Altogether, it seems incredibly unlikely that Defendants had not somehow learned EV demand was low. At a minimum, the inference of scienter here is "at least as compelling as any opposing inference of nonfraudulent intent." *FindWhat*, 658 F.3d at 1300.

Still, Defendants contend that scienter isn't alleged since nothing shows they actually reviewed any reports or data on EV demand. (Doc. 51 at 21-22.) But access to such information alone suffices here. *See Edge v. Tupperware Brands Corp.*, No. 6:22-CV-1518-RBD-LHP, 2023 WL 6310236, at *6 (M.D. Fla. Sept. 28, 2023); *In re Sensormatic Elecs. Corp. Sec. Litig.*, No. 018346CIVHURLEY, 2002 WL 1352427, at *6 (S.D. Fla. June 10, 2002) ("Where a defendant publishes a statement at a time he is in possession of or has access to facts suggesting that the statement is inaccurate, misleading, or incomplete...a classic fact pattern giving rise to a strong inference of scienter appears."); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate."). Doller has alleged sufficient facts, at this stage, to show scienter.

## IV. Conclusion

**\*7**  In sum, Doller's §§ 10(a) and 20(a) claims survive only with respect to the statements alleged in paragraph 98 and in the latter portion of paragraph 110. All other statements are dismissed. Since this case will be proceeding in part, the Clerk is directed to **LIFT THE STAY** previously entered under the PLSRA and remove the stay flag from the docket. The parties are directed to confer and submit a case management report by October 31, 2025.

**ORDERED** in Fort Myers, Florida on October 10, 2025.

## All Citations

Slip Copy, 2025 WL 2896919

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.