UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CV-81472-MD

| | |
|---|---|
| SHELBY TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM, and All Others Similarly Situated, | CLASS ACTION COMPLAINT |
| Plaintiffs, | |
| v. | |
| CELSIUS HOLDINGS, INC., JOHN FIELDLY, JARROD LANGHANS, and TOBY DAVID, | |
| Defendants. | |

---

**REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS (ECF No. 64)**

Defendants, Celsius Holdings, Inc., John Fieldly, Jarrod Langhans, and Toby David move to dismiss the Amended Complaint of Plaintiffs, Shelby Township Police and Fire Retirement System and all others similarly situated, pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 64. The Motion to Dismiss was referred to me by United States District Judge Melissa Damian. ECF No. 70. Lead Plaintiff, the Zarabi Family Trust Dated September 3, 1992, filed a Response on behalf of all Plaintiffs, ECF No. 68, and Defendants filed a Reply. ECF No. 71. For the reasons that follow, I **RECOMMEND** that Defendants' Motion be **GRANTED**.

## I. BACKGROUND AND FACTUAL ALLEGATIONS

The following allegations are taken from the Amended Complaint and accepted as true for purposes of this Motion.

Celsius is company based in Boca Raton, Florida that sells energy drinks and liquid supplements in the United States and internationally. ECF No. 57 ¶25.[1] During the relevant time period, from May 9, 2023, to November 5, 2024, Mr. Fieldly was Celsius' Chairman and Chief Executive Officer; Mr. Langhans was its Chief Financial Officer; and Mr. David was its Executive Vice President until March 2024, at which time he became Celsius' Chief of Staff. ¶¶26–28.

On August 1, 2022, Celsius entered into a Distribution Agreement with PepsiCo, Inc. ("Pepsi"). ¶52. Pursuant to the Distribution Agreement, Pepsi invested $550 million in Celsius and acquired 1.5 million shares of convertible preferred stock, became Celsius' primary distributor in the United States and exclusive distributor in Canada, and took an 8.5 percent ownership interest in Celsius. ¶¶52–54. The Distribution Agreement included "lock-up" provisions under which Celsius executives agreed not to sell any Celsius shares until one year after the Distribution Agreement had been in place. ¶55.

Celsius immediately began promoting to investors how the Distribution Agreement would benefit the company. ¶56. On the day the Distribution Agreement was signed, Celsius issued a press release saying it "provides a strategic partnership

---

[1] Unless otherwise noted, paragraph citations refer to the Amended Complaint, ECF No. 57.

that is expected to accelerate growth for both companies globally." *Id.* Eight days later, Celsius issued another press release saying the Distribution Agreement was a transformational opportunity to increase its market share and accelerate growth. *Id.*

Celsius' relationship with Pepsi contributed to a considerable increase in its revenue, which went from $653.6 million in 2022 to $1.318 billion in 2023. ¶58. Celsius recognizes revenue when it delivers products to Pepsi, not when the products are distributed to retail locations or sold to customers, a fact that Celsius disclosed to investors. ¶60; ECF No. 68 at 10.

According to a Confidential Witness ("CW1") who was a revenue manager in Celsius' Cash Management Department from April 2023 to December 2024, Defendants had access to Pepsi's inventory data through Pepsi's SAP Enterprise Resource Planning ("ERP") software, with Celsius finance employees being provided logins to the program and on-demand access to monitor inventory. ¶¶30, 61. Multiple confidential witnesses also say that Celsius senior accounting employees "could monitor Pepsi's on-hand inventory of Celsius products" and that various other employees such as a customer service manager and Celsius' Vice President of Operations "likely had access to SAP." ¶61. It is not alleged that Mr. Fieldly, Mr. Langhans, or Mr. David had logins or direct access to Pepsi's inventory numbers, nor is it alleged that any specific individuals with access relayed information on Pepsi's inventory to the individual Defendants. Mr. Fieldly stated during a February 29, 2024, earnings call that Celsius "look[s] at [Pepsi's] inventory levels." *Id.*

Confidential Witness 2 ("CW2") worked at Celsius from March 2021 until January 2024. ¶31. CW2 started as an accounts receivable coordinator, but later transferred to the information technology department where he "oversaw programs that coordinated order entry and invoicing functions." *Id.* According to CW2, in or about September or October 2023, a Celsius Customer Service Manager who was responsible for entering Pepsi orders into the Celsius software program mentioned there had been a reduction in Pepsi orders. ¶63. CW1 "confirmed that the 'inventory sat and didn't sell.'" *Id.*

CW1 attended monthly meetings that Mr. Fieldly and Mr. Langhans, among others, attended. ¶65. At these meetings, slides were presented that contained year-over-year financial data "broken down by distribution channel, including a specific graph for Pepsi." *Id.* According to CW2, a "Daily Sales Report," was sent to members of "the 'executive team,' including Fieldly and Langhans." ¶¶31, 66. The Daily Sales Report "included a breakdown of sales by distributor, including Pepsi," and the email that circulated the report occasionally included broader sales data or historical context. ¶66. Celsius' "Operations Department would provide the Finance Department with an 'aged inventory analysis' that documented product that had been sitting unsold in various distribution centers, including those of Pepsi." ¶67.

The Amended Complaint alleges that between Celsius employees' access to Pepsi's inventory through the ERP software, the monthly meetings, and the emails and reports containing financial data, Defendants knew Pepsi's orders had slowed, that "Pepsi was sitting with a glut of inventory," and that Pepsi's orders were likely

to decrease further. ¶¶16, 61–67. But, Defendants made statements that sales were strong and consumer demand was high. ¶68.

The Amended Complaint alleges that beginning May 9, 2023, when Celsius announced earnings and financial results from the first quarter of 2023, Defendants made multiple false and misleading statements regarding Celsius' financial position and outlook. *See generally,* ¶¶69–112. The specific statements alleged to be materially false and misleading are discussed below in the legal analysis of the statements.

The individual Defendants entered into Lock-Up Agreements, under which they agreed not to sell shares of Celsius stock for the first year of the Distribution Agreement. ¶55. On August 21–22, 2023, after the Lock-Up Agreements expired, Fieldly sold 270,000 shares for almost $15.7 million; Langhans sold 15,807 shares for $944,333; and David sold over 164,000 shares for nearly $9.8 million on a split-adjusted basis. ¶85. The stock sales resulted in payments to Defendants that far exceeded their annual salaries and other forms of compensation. *Id.* Defendants sold additional shares of stock in December 2023, January 2024, March 2024, and April 2024. ¶¶139–40. Overall, Mr. Fieldly sold 716,000 shares for a total of $43,134,263, representing 17% of his holdings; Mr. Langhans[2] sold 27,787 shares for a total of

---

[2] Defendants dispute the accuracy of one of the stock sales attributed to Mr. Langhans, stating that there is no accompanying Form-4 for any sale by him on that date. ECF No. 64 at 11–12. Plaintiffs acknowledge that that the Amended Complaint erroneously attributed the stock sale valued at $754,850 on August 21, 2023, to Mr. Langhans. ECF No. 68 at 19 n.20. Thus, it appears that sale did not occur and the alleged percentage of Mr. Langhans' holdings affected is incorrect. Accordingly, the Court disregards that transaction and the percentage of Mr. Langhans' holdings alleged.

$1,834,537, representing 44% of his holdings; and Mr. David sold 175,632 shares, representing 30% of his holdings. *Id.* The stock sales were not conducted pursuant to a Rule 10b5-1 trading plan. ¶85.

In sum, Plaintiffs allege that Pepsi bought unsustainable quantities of Celsius products to build up its inventory, that consumer demand was low, that so much product sat unsold in Pepsi's warehouses that Pepsi's orders from Celsius would inevitably decrease, and that Defendants knew all of this was happening but kept touting the Distribution Agreement's benefits and misleading investors regarding consumer demand and future outlook. Then, when Pepsi's orders significantly declined, Celsius' stock fell and investors suffered considerable losses.

## II.   CLAIMS

Count I asserts all Defendants violated Section 10(b) of the Exchange Act and Rule 10b–5. Count II asserts a claim against Mr. Fieldly and Mr. Langhans ("the Individual Defendants") for control person liability under Section 20(a) of the Exchange Act.

To state a claim under the Securities Exchange Act Section 10(b) and Rule 10b–5, a plaintiff must allege "(1) the existence of a material misrepresentation or omission, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) on which the plaintiff relied, and (5) which was causally connected to (6) the plaintiff's economic loss." *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 789 (11th Cir. 2010) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

Section 20(a) imposes liability "not only on the person who actually commits a securities law violation, but also on an entity or individual that controls the violator." *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008). An underlying primary violation must exist before secondary liability can be imposed under Section 20(a). *Thompson v. RelationServeMedia, Inc.*, 610 F.3d 628, 635–36 (11th Cir. 2010). So, to state a claim under Section 20(a), a plaintiff must plausibly allege (1) a primary violation of the securities laws, (2) that the individual defendant had the power to control the general business affairs of the corporate entity, and (3) that the individual defendants had the power to directly or indirectly control or influence the specific corporate policy that caused the primary liability. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (citation omitted).

## III.    LEGAL PRINCIPLES

On a Rule 12(b)(6) motion to dismiss, the Court views the well-pled factual allegations in the light most favorable to the plaintiff. *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). With limited exceptions, the Court looks only to the allegations in the complaint, any documents appended to the complaint or incorporated by reference into it, and any judicially-noticed facts. *Reed v. Royal Caribbean Cruises Ltd.*, No. 20-CV-24979-RAR, 2022 WL 3027906, at *6 (S.D. Fla. Aug. 1, 2022).

### A.    *Rule 8(a)*

A pleading seeking relief in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

8(a)(2). To satisfy this pleading requirement, a complaint must provide the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). While a claim "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U. S. 662, 678 (2009) (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). Nor can a claim rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the claim are true (even if doubtful in fact). *Twombly*, 550 U.S. at 555 (citations omitted).

The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly,* 550 U.S. at 570). In addition, "courts may infer from factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct that plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citing *Iqbal,* 556 U.S. at 682). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557). When evaluating a motion to dismiss under Rule 12(b)(6):

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 556 U.S. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

B.     *Rule 9(b)*

In addition to pleading a plausible claim for relief under Rule 8, a plaintiff alleging fraud must state "with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b). The Eleventh Circuit has interpreted this requirement to mean that the complaint must say (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

C.     *PSLRA*

The Private Securities Litigation Reform Act ("PSLRA") imposes an even higher pleading requirement on securities fraud claims. *See generally Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317–18 (11th Cir. 2019). It requires the plaintiff

to set forth with particularity "each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, the plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]." 15 U.S.C. § 78u–4(b)(2)(A).

The required state of mind is an "intent to defraud or severe recklessness on the part of the defendant." *FindWhat*, 658 F.3d at 1299 (quoting *Edward J. Goodman*, 594 F.3d at 790). A "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[T]he complaint must allege facts supporting a strong inference of scienter 'for each defendant with respect to each violation.'" *Mizzaro*, 544 F.3d at 1238 (citing *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282 n.18 (11th Cir. 1999) (quotation marks omitted).

In *Mizzaro,* the Eleventh Circuit gave further guidance on evaluating whether a "strong inference" of scienter exists:

> Because the strong-inference inquiry asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." *Tellabs,* 551 U.S. at 2509, 2511. Moreover, the inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Id.* at 2510, 2509. *Tellabs* explained how to balance opposing inferences this way:
>
>> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the "smoking-gun" genre, or even the "most plausible of competing inferences." ... Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. *Id.* at 2510.
>
> "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.
>
> [This test] asks what a reasonable person *would* think, not what a reasonable person *could* think."

*Mizzaro*, 544 F.3d at 1238–39 (emphasis in original).

In sum, to survive a motion to dismiss, a securities fraud plaintiff must (1) plausibly allege that a material false statement or omission was made and (2) that there are particularized facts creating a strong inference the statement or omission was made with intent to defraud or with severe recklessness as to its falsity. *Id.* at 1238. "A misrepresentation or omission is material if, in the light of the facts existing

at the time, a reasonable investor, in the exercise of due care, would have been misled by it." *Carvelli*, 934 F.3d 1307, 1317 (11th Cir. 2017) (internal quotations omitted). "In other words, materiality depends on whether a 'substantial likelihood' exists that a reasonable investor would have viewed a misrepresentation or omission as significantly alter[ing] the 'total mix' of information made available." *Id.* (quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012)). "If these PSLRA pleading requirements are not satisfied, the court 'shall' dismiss the complaint." *FindWhat*, 658 F.3d at 1296–97 (citing 15 U.S.C. § 78u–4(b)(3)(A)).

Statements of opinion generally cannot be the basis for a securities fraud claim because "liability attaches only in the case of an 'untrue statement of a material *fact*.'" *Carvelli*, 934 F.3d at 1326–27 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175, 183 (2015) (quoting 15 U.S.C. § 77k(a)). There are two exceptions to this general rule. First, "a statement of opinion that 'falsely describe[s] [the speaker's] own state of mind' is an untrue statement of fact—as to what the speaker actually believes." *Carvelli,* 934 F.3d at 1322 (citing *Omnicare,* 575 U.S. at 184) (brackets in original). Second, "when statements of opinion 'contain embedded statements of fact,' a speaker may be liable 'if the supporting fact she supplied were untrue.'" *Id.* (citing *Omnicare*, 575 U.S. at 185-86).

Finally, the PSLRA creates a "safe harbor" for "forward-looking" statements, which are predictions, projections, plans, and statements of future performance, with certain limiting factors. 15 U.S.C. § 78u–5(i); *Carvelli*, 934 F.3d at 1324. A forward-looking statement falls under the safe harbor provision if:

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge by that person that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. *Edward J. Goodman*, 594 F.3d at 796.

## IV.    DISCUSSION

Defendants move to dismiss the Amended Complaint on the grounds that (1) it fails to plead scienter adequately; (2) the Amended Complaint does not sufficiently allege that the statements or omissions at issue were false or material; (3) the safe harbor provision precludes liability; and (4) the controlling person liability claim necessarily fails because no primarily violation is plausibly alleged. ECF No. 64. In response, Plaintiffs argue that the allegations meet the standard for falsity and materiality, adequately demonstrate scienter, and do not fall under the safe harbor provision. ECF No. 68.

The Amended Complaint lists multiple statements alleged to be materially false and made with scienter, centering on the contention that Defendants represented that sales to consumers were robust when, in actuality, Pepsi was

accumulating a glut of unsold inventory that vastly outstripped consumer demand. *See* ¶¶70-112.[3] As explained in the Response to the Motion to Dismiss, "Plaintiff alleges that Defendants purposefully deceived the market by concealing and otherwise denying that Celsius's sales to Pepsi vastly overshot sales to consumers and misleadingly correlated sell-in to sell-out, tricking investors that the sell-in was supported by consumer demand." ECF No. 68 at 10.

The Motion to Dismiss argues that these allegations are undercut by Defendants' disclosures that (1) Celsius recognized sales revenue upon delivery to Pepsi, (2) Pepsi was building up its inventory in 2023, and (3) Defendants were unsure how Pepsi would manage the inventory going forward, as that was Pepsi's strategy to determine. ECF No. 64 at 19–21.[4] Plaintiffs respond that these disclosures did nothing to cure any misrepresentations because Defendants repeatedly and severely downplayed the "massive glut of inventory that was sitting in Pepsi's warehouses" and made statements tying Celsius' profits to consumer sales and demand. ECF No. 68 at 13.

In reviewing the statements, the majority fall short of the pleading standards because the facts alleged do not support falsity and materiality. Thus, before

---

[3] Plaintiffs say that paragraphs 99-101 are not independently false or misleading, but provide context for other false and misleading statements. ECF No. 68 at 10 n.4.

[4] Unless otherwise noted, pinpoint citations to the Motion, Response, and Reply refer to the page numbers generated by the CM/ECF system that appear at the top of the page.

analyzing scienter, I will address the statements that lack falsity, materiality, or both.

A.      *Falsity and Materiality*

"A statement is misleading if, in light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it." *FindWhat*, 658 F.3d at 1305 (quoting *Secs. & Exch. Comm'n v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir. 1968)). Thus, the "appropriate primary inquiry" is "into the meaning of the statement to the reasonable investor and its relationship to truth." *Id.* Further, only material misrepresentations or omissions are actionable under the PSLRA. *Mizzaro*, 544 F.3d at 1236. A misstatement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Morgan Keegan*, 678 F.3d at 1245.

A "reasonable" investor does not base an investment decision on "generalized, vague, nonquantifiable statements of corporate optimism," often referenced as puffery. *Carvelli*, 934 F.3d at 1318. "The puffery doctrine presumes a relatively (but realistically) savvy consumer—the general idea being that some statements are just too boosterish to justify reasonable reliance." *Id.* However, "[a] conclusion that a statement constitutes puffery doesn't absolve the reviewing court of the duty to consider the possibility—however remote—that in context and in light of the 'total mix' of available information, a reasonable investor might nonetheless attach importance to the statement." *Id.* at 1320. Still, "Plaintiffs must look beyond these

optimistic characterizations to the specific, verifiable statements made by Defendants if they are to successfully allege a violation of the federal securities laws." *Verzwyvelt v. Terran Orbital Corp.*, No. 24-CV-81191, 2025 WL 2425081, at \*10 (S.D. Fla. Aug. 22, 2025) (quoting *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CV-22572, 2010 WL 1332574, at \*8 (S.D. Fla. Mar. 30, 2010)).

With respect to falsity and materiality, the Motion to Dismiss argues that Defendants' disclosures undercut any allegations that their statements were misleading, that many of the statements amounted to nothing more than corporate optimism or puffery, and that Plaintiffs simply failed to allege that many statements were even false. ECF No. 64 at 19–25. Plaintiffs respond that Defendants' statements falsely linked revenue to consumer sales, that their disclosures did not rectify the misleading statements, and that the statements were not puffery but were concrete assertions calculated to deceive investors. ECF No. 68 at 9–16.

For the statements in paragraphs 69–70, 77–80, 82–83, 88–89, 91–92, and 102–07, the Amended Complaint fails to allege falsity or materiality, either because the statements appear to be true, do not provide facts to show they are false, or amount to non-actionable puffery or opinions. For example, the Amended Complaint alleges that, during an earnings call with investors on May 9, 2023, Mr. Langhans stated:

> *[T]he primary factors behind the increase in North American sales volume were related to our integration into the Pepsi distribution system*, where we saw increases across the board, including continued strong growth in traditional distribution channels including SKU increases, as well as distribution across a number of new

channels within CNG and foodservice. ***We've also seen our velocity increase post our significant ACV growth.***[5]

¶69 (emphasis in original). Plaintiffs interpret this statement as Mr. Langhans attributing the company's growth in North American sales to Pepsi. They contend that the statement was materially false when made because Pepsi "had already completed or was in the height of infilling its inventory" and because the statement was designed to mislead investors to believe the rate of consumer sales was the same as the rate of sales to Pepsi. ¶70. Similarly, the Amended Complaint alleges that Mr. Langhans made the following statement during the Celsius shareholders meeting on June 1, 2023:

> "***The primary factors behind the increase in North American sales volume were related to our integration into the Pepsi distribution system*** where we saw increases across the board, including continued strong growth in traditional distribution channels, including SKU increases as well as distribution across a number of new channels within CNG and foodservice." Langhans continued, "Q1 was the second quarter that we were operating within our new distribution system, and we continue to drive efficiencies and optimization within the system while maintaining our #1 goal of ***keeping the shelf stocked in order to meet the consumer demand***."

¶¶76–77 (emphasis in original). Plaintiffs allege that these statements were false and misleading because Mr. Langhans touted the Pepsi distribution system as a primary factor in earnings growth and then referred to the distribution system when

---

[5] The Amended Complaint alleges that velocity "refers to sales per points of distribution, and is a metric used to measure consumer demand." ¶69 n.5. It also states that "'ACV' means All Commodity Volume, and is a measure of distribution coverage to show how deeply a product has penetrated a particular geographic market." *Id.* Defendants do not dispute these definitions.

referencing consumer demand, knowing that the increased revenue resulted from Pepsi's "one-time buildup of stock that would not be repeated in the future." ¶78.

Plaintiffs have not plausibly alleged that these statements are materially false, that is, false or misleading statements that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See Morgan Keegan*, 678 F.3d at 1245. It is clear that the Pepsi distribution system contributed significantly to Celsius' sales and revenue in 2023, and no one disputes that investors knew Celsius recognized sales revenue at the time Pepsi received the products. Further, the statements reference Celsius' efforts to access new distribution channels and get its products into consumers' hands. There are no allegations that Celsius and Pepsi were not attempting to distribute the products, keep shelves stocked, or drive consumer demand. Likewise, there are no allegations that Celsius products were not being distributed to new channels. Finally, many of these allegations are the types of "generalized, vague, nonquantifiable statements of corporate optimism" that are not actionable in a securities case. *See Carvelli*, 934 F.3d at 1318; *Cambridge Ret. Sys. v. MEDNAX, Inc.*, No. 18-CV-61572, 2019 WL 4893029, at *17 (S.D. Fla. Oct. 3, 2019) (explaining that statements such as having a "robust pipeline" of deals and a strong position in the medical practice acquisition market were non-actionable corporate optimism, and citing additional cases).

The Motion to Dismiss cites additional examples of non-actionable corporate optimism, such as references to Pepsi's "massive distribution," Defendants'

confidence that sales were increasing and growth was strong, that the distribution system was a "key factor" in Celsius' growth, and that Celsius was in a good place. ECF No. 64 at 25; ¶¶77, 90-91, 108, 111, 117. These statements also amount to corporate optimism and opinion, and are not actionable under the PSLRA. *See Carvelli*, 934 F.3d at 1318; *Verzwyvelt*, 2025 WL 2425081, at *10; *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211-13 (M.D. Fla. 2014) (citing numerous cases regarding puffery in securities fraud cases and holding that optimistic statements relating to sales results, performance, drivers, and strategies were inactionable corporate puffery). "Plaintiffs must look beyond these optimistic characterizations to the specific, verifiable statements made by Defendants if they are to successfully allege a violation of the federal securities laws." *In re Royal Caribbean Cruises Ltd. Secs. Litig.*, No. 11-CV-22855, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013) (quoting *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CV-22572, 2010 WL 1332574, at *8 (S.D. Fla. Mar. 30, 2010)). None of these statements is specific or verifiable.

While the above statements are not actionable, others are a closer call. Plaintiffs' theory is that Celsius' significant revenue growth resulted from Pepsi's one-time buildup of inventory, that Pepsi was stockpiling an overabundance of Celsius products, that weak consumer demand resulted in a "glut of inventory" piling up in those warehouses, and that Defendants knew the inventory was sitting unsold and would result in a downturn in Pepsi's orders and Celsius' revenue. Plaintiffs allege that, even with this knowledge, Defendants kept touting the Pepsi relationship

and linking it to strong consumer sales and positive future earnings. For example, the Complaint alleges the following exchange during an earnings call on May 9, 2023:

> [A]n analyst with B. Riley asked Fieldly and Langhans about the Pepsi partnership, questioning, "how much of the Q1 reacceleration of growth was initial channel fill for new stores, new doors call it, added SKUs, etc., ***versus reorders derived from sell-through at retail***." The analyst continued, asking "how much [did] the initial channel fill impact[] new doors, new SKUs in the quarter? And then maybe what impact that phenomenon might have in Q2?" In response, Fieldly asserted that "***the increase in distribution didn't slow the overall velocity. The sales are moving quicker out of the register***."

¶71 (emphasis in original). The Amended Complaint then alleges that Mr. Fieldly's response was false and misleading because "[t]he analyst had directly questioned the differentiation between growth from the sell-in to Pepsi ('channel fill') versus sell-out to consumers ('sell-through at retail')" and "Fieldly's unqualified positive response was designed to mislead investors to believe that the rate of growth in sales was the result of a similar rate of increase in consumer demand, rather than Pepsi building up its inventory." ¶72. Plaintiffs allege that at the time Mr. Fieldly's statement was made, "Pepsi had already completed or was in the height of infilling its inventory," Mr. Fieldly knew it was a one-time buildup of inventory that would not be sustained, and his statement "overrepresented the demand for Celsius's products at that time and concealed the massive glut of inventory that was sitting in Pepsi's warehouses." *Id.* The Amended Complaint then alleges that during the same call, "a Bank of America analyst asked about the impact of Pepsi filling their pipeline on Celsius's first quarter results. Fieldly responded, "***It is not really a pipe fill*** in the quarter I would say, we just to continue to build upon the momentum." ¶73 (emphasis in original). Again, Plaintiffs contend that the statement was false and misleading

because the "sell-in to Pepsi at the time Fieldly made this statement far exceeded sell-out and represented a one-time buildup of stock that would not be repeated in the future, as Fieldly well knew. It was exactly a 'pipe fill.'" ¶74.

Defendants do not address this specific exchange in the body of the Motion to Dismiss, but respond in a footnote in their Reply that Plaintiffs mischaracterize these statements, particularly the statement that "it is not really a pipe fill," and omit important context. ECF No. 71 at 8–9 & n.10. While "addressing legal arguments in footnotes is an incorrect method to present substantive arguments on the merits," *Med-X Global v. SunMed Int'l, LLC*, No. 19-CV-20722, 2022 WL 17486303, at *2 (S.D. Fla. Dec. 7, 2022), the Court has discretion regarding whether to consider arguments raised in footnotes. *See Pinchasov v. Robinhood Fin. LLC*, No. 20-CV-24897, 2021 WL 1991159, at *1-2 (S.D. Fla. Sept. 21, 2021). Considering that the footnote at issue is part of Defendants' global argument regarding Pepsi's inventory and alleged "pipe fills," the Court will exercise that discretion here. For clarity, below are the full question and answer at issue:

> **Bank of America analyst:** I just want to drill into the foodservice commentary you guys had. If I heard you correctly that was 10% of sales in the quarter. And I'm just wondering maybe what the impact, as Pepsi kind of brought in that inventory to sell, what that – what the pipe fill for foodservice might have been in 1Q.
> **Mr. Fieldly:** Yeah. Jon, great question. Just to correct myself there, 10% of our Pepsi sales approximately is coming from the foodservice business. So, we've been working on that since October. So, when we first launched, initially partnered with Pepsi. So, we've been expanding distribution in a variety of outlets, in college, universities, hospitals, just expanded into a variety of hotels. So, it is not really a pipe fill in the quarter, I would say. We just continue to build upon the momentum.

ECF No. 64-7 at 12.[6] Defendants argue that the question at issue related specifically to the foodservice industry, which represented approximately 10% of Celsius sales in that quarter and was an area in which Celsius was attempting to grow. ECF No. 71 at 8–9 & n.10. A factual statement that Pepsi's buildup of inventory was "not a pipe fill" standing alone could rise to the level of a material misrepresentation. However, as discussed more fully below, taken in context and considering the "total mix" of information, particularly Defendants' disclosures and the full context of the statements, the Amended Complaint does not plausibly allege that Mr. Fieldly's response was materially false or misleading.

Defendants argue that their numerous disclosures undermine the allegations that their statements regarding Pepsi's inventory and "pipe fills" were materially misleading. ECF No. 64 at 20–21. In particular, the Motion to Dismiss contends that Celsius' public filings and statements "are replete with examples of discussions by Defendants of Pepsi building and independently managing its inventory in 2023." *Id.* Defendants cite statements from Mr. Fieldly and Mr. Langhans that "***we saw Pepsi***

---

[6] Defendants attach various public filings to the Motion to Dismiss, including quarterly reports, annual reports, earnings call transcripts, and similar documents. In analyzing a motion to dismiss in a securities fraud case, the Court may consider the full text of documents incorporated by reference into the complaint and other documents as to which the Court may take judicial notice. *See Tellabs*, 551 U.S. at 322. In particular, the Court may consider the full text of securities filings that allegedly contain misstatements. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir. 1999) (noticing SEC filings). Documents incorporated by reference may be considered if they are central to a plaintiff's claim and undisputed as to authenticity. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999). No party has disputed the authenticity of these filings, and the Court is free to consider them.

*increase inventory levels*" in 2023; that there was "an increase in the days inventory outstanding within the mixing centers of our primary distributor [Pepsi] relative to the end of 2022"; that Defendants were unsure whether "days inventory outstanding" would change in the fourth quarter of 2023 and into 2024; that Pepsi "*would have to determine if they're going to do any kind of management around the inventory*" going into 2024; and that Celsius "*benefited from some inventory building within [Pepsi]*." *Id.* (emphasis in original). The Motion to Dismiss also cites statements from investors that they understood distributor inventory levels would "remain elevated at least over the next few months" in May 2023, as well as investor questions indicating an understanding that Pepsi was "still trying to find the right inventory levels." *Id.* According to Defendants, these excerpts "show that investors were aware not only of Pepsi building inventory in 2023, but of its positive impact on Celsius's financials" and, therefore, contradict allegations that Defendants "sought to conceal an inevitable sales downturn." *Id.* at 21.

Plaintiffs respond that these disclosures fail to rectify Defendants' statements, arguing that the statements "falsely conflated Celsius's growth in sell-in with sell-out in order to give the market the false impression that the increased sell-in was supported by increased sell-out." ECF No. 68 at 12–13. Plaintiffs contend that even if investors knew Celsius recognized revenue upon delivery to Pepsi and that Pepsi would need to build inventory at the beginning of the relationship, "investors did not know the degree to which the Company's sales constituted channel fill as opposed to sales to consumers," and Defendants "repeatedly downplayed how much of Celsius's

increased sales were attributable to initial pipe fill as opposed to consumer demand." ECF No. 68 at 13.

In their Reply, Defendants further note that Celsius' disclosures "consistently reference[d] third-party scanner data tracking sales to consumers." *Id.* at 8; ECF No. 64; ECF No. 64-7 at 3; ECF No. 64-8 at 3; ECF No. 64-9 at 3. Finally, Defendants argue that, based on these statements, "[t]he market clearly understood these two metrics [sales to Pepsi and sales to consumers] were separate," and would not confuse a reasonable investor. *Id.*

Without context, the above statements, specifically (1) "the increase in distribution didn't slow the overall velocity"; (2) "[t]he sales are moving quicker out of the register"; and (3) "it is not really a pipe fill" could be considered misleading. However, the Court must consider the record as a whole and the "total mix" of information available to investors. In analyzing all available information, even considering it in the light most favorable to Plaintiffs, the Court concludes that these statements do not rise to the level of materially misleading. First, there is no question that investors were well-aware that Celsius recognized revenue when it delivered products to Pepsi, and that the earnings reports were based on sales to Pepsi, not sales to the ultimate consumers. Second, Defendants' disclosures regarding Pepsi's buildup of inventory, increase in the length of time products were sitting in the warehouses, and uncertainty as to how Pepsi would manage the inventory going forward indicate that investors had information relating to the inventory. *See Mogenson*, 15 F. Supp. 3d at 1211; *Verzwyvelt*, 2025 WL 2425081, at *10. Third,

Celsius' disclosures show differentiation between sales to Pepsi and other sales, plus statistics showing large quantities of Celsius products entering the marketplace through large retailers such as Sam's Club and Amazon. Finally, the fact that Defendants mentioned revenue growth in the same dialogue as velocity or other metrics does not conflate these metrics or show that Defendants were trying to bury weak consumer sales under high revenue growth. The SAC does not plausibly allege that a reasonable investor, given the total mix of information, would be misled by Defendants' statements.

In any event, even assuming the statements identified in the Amended Complaint could be classified as materially false and misleading, the Amended Complaint fails to adequately allege that Defendants acted with scienter. I now turn to that issue.

### B.   *Scienter*

Defendants argue that the Amended Complaint "cannot show an intent to mislead based on Defendants' alleged statements and Pepsi's inventory decisions." ECF No. 64 at 7. According to Defendants, the Amended Complaint fails to allege that they knew about Pepsi's future sales forecasts or could have known Pepsi would reduce orders in 2024, and the Amended Complaint "cannot connect the dots" between Pepsi's inventory levels and Defendants' alleged plan to mislead investors about demand for Celsius' products. *Id.* In particular, Defendants argue that Plaintiffs' confidential witnesses cannot fill the gaps because these witnesses had no direct interaction with any individual Defendants and their statements fail to provide

sufficient detail to raise the requisite strong inference of scienter. ECF No. 64 at 11–14. Finally, Defendants also argue that the Amended Complaint fails to allege facts to support a theory that Mr. Fieldly, Mr. Langhans, and Mr. David engaged in suspicious trading. *Id.*

Plaintiffs respond that the Amended Complaint adequately pleads scienter because it alleges Defendants monitored Pepsi's inventory levels and were aware of the "severe excess of 'several million more cases' of unsold product," yet continued to mislead investors. ECF No. 68 at 18. The Response cites Defendants' statements regarding Pepsi's inventory, as well as confidential witness accounts from former employees; it also argues that the individual Defendants engaged in suspicious stock sales that evidence scienter.

1. Confidential Witnesses

A securities fraud plaintiff can rely on confidential sources, with the Court assessing the weight to be given to the evidence derived from those sources:

> We conclude that the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.

*Mizzaro*, 544 F.3d at 1240. Reliance on confidential witnesses is permissible "so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." *Thorpe v. Walter Inv. Mgmt. Corp.*, 111 F. Supp. 3d 1336, 1379 (S.D. Fla. 2015) (quoting *Mizzaro*, 544 F.3d at 1239). When assessing

the statements of confidential witnesses, courts may consider factors such as "the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Mizzaro,* 544 F.3d at 1240. For confidential witness statements to receive weight, they must "flesh out at least some of the details of the conversations, meetings, and internal documents that they describe." *In re Ocwen Fin. Corp. Secs. Litig.*, No. 14-CV-81057, 2015 WL 12780960, at *10 (S.D. Fla. Sept. 4, 2015) (quoting *Mogensen*, 15 F. Supp. 3d at 1219–20).

Here, the Amended Complaint relies on statements from several former Celsius employees. ¶¶30–32. Plaintiffs allege that the employees' statements show Defendants knew about Pepsi's excessive inventory because Celsius employees could directly log into the Pepsi software system through which they "could monitor Pepsi's on-hand inventory of Celsius products." ¶61. However, there are no allegations that the individual Defendants had these logins or accessed these programs, or that any employee provided them with information gained through this access. To show that Defendants knew of the decline in Pepsi orders, the Amended Complaint makes these additional allegations:

> (1) CW1, a former revenue manager two levels below Mr. Langhans, attended meetings that included Mr. Fieldly and Mr. Langhans, and at which financial data was presented, including specific graphs for Pepsi. ¶¶30, 65;
>
> (2) CW2, a former accounts receivable coordinator and IT professional who "interfaced with Finance," recalled that a "Daily Sales Report" was circulated to the "executive team" including Mr. Fieldly and Mr. Langhans. The Daily Sales Report "included a breakdown of sales by distributor, including Pepsi, and the email circulating the report occasionally included broader sales data or historical context." ¶¶31, 66; and

(3) CW1 stated that Celsius' "Operations Department would provide the Finance Department with an 'aged inventory analysis' that documented product that had been sitting unsold in various distribution centers, including those of Pepsi." ¶67. There are no allegations that the individual Defendants received this analysis.

Defendants argue that the confidential witnesses are "low-level Celsius employees" who had little to no contact with senior management, let alone any meaningful contact by which scienter could be inferred. ECF No. 64 at 12. Defendants further argue that the confidential witness statements do not provide enough substance or detail to allege scienter, fail to allege that Defendants actually knew about the "glut" of inventory, or how the information would contradict their public statements. *Id.* at 13. Plaintiffs respond that the allegations are sufficiently particularized because two witnesses confirmed Celsius' access to Pepsi's software system and inventory, that the "aged inventory analysis" documented Celsius products sitting unsold in warehouses, and the "sheer magnitude of unsold product . . . supports a strong inference of Defendants' knowledge." ECF No. 68 at 20–21.

The closest allegation of direct contact is that CW1[7] and Mr. Langhans both attended meetings that involved financial data; however, the Amended Complaint provides little detail regarding the meetings' substance, no conversations, nor any other facts or interactions to show the individual Defendants had actual knowledge of specific inventory levels and could foresee Pepsi's intentions with its inventory. Similarly, the allegations that reports and analyses with sales data were circulated

---

[7] The Amended Complaint does not allege that CW2 or CW3 had direct interaction with any of the individual Defendants.

and that the individual Defendants likely received them, do not provide any specifics regarding the inventory, metrics, projections, data being tracked, or any other tangible facts that could connect Defendants to a massive glut of inventory. Accordingly, these allegations do not rise to the level of a "strong inference" of scienter that is at least as compelling as opposing inferences. *See Ocwen*, 2015 WL 12780960, at \*10 (allegations that Defendant received weekly reports insufficient to allege scienter); *Royal Caribbean*, 2013 WL 3295951, at \*17–18 (allegations that defendants attended meetings in which revenue was discussed and received regular sales reports, without specific facts, did not adequately allege scienter); *In re Mako Surg. Corp. Secs. Litig.*, No. 12-CV-60875, 2013 WL 2145661, at \*12 (S.D. Fla. May 15, 2013) (allegations of CW's attendance at the same meetings and access to software programs were insufficient to plead scienter when there were no facts showing the defendants' actual knowledge).

### 2. Stock Sale Allegations

An inference of scienter can arise from stock sales by insiders if those transactions are suspicious or unusual. *Edward J. Goodman*, 594 F.3d at 793 (citations omitted); *In re AFC Enters., Inc. Secs. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004). Insider sales are suspicious if "the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Edward J. Goodman*, 594 F.3d at 793 (citations omitted). "A stock sale may be deemed unusual when it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from

inside information." *AFC Enters.,* 348 F. Supp. 2d at 1373. Courts may consider "(1) the amount and percentage of shares sold, (2) the timing of the sales, and (3) the consistency between the sales and the insider's prior trading history." *City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*, 649 F. Supp. 3d 1256, 1267 (S.D. Fla. 2023).

The Amended Complaint alleges that the Defendants "started to dump Celsius stock at fraud-inflated stock prices starting in August 2023" after the Lock-Up Agreements expired. ¶85. According to Plaintiffs, the individual Defendants continued providing false and misleading information to inflate the stock price and allow for additional lucrative insider sales. ¶86.

The Motion to Dismiss argues that the stock sales do not support a strong inference of scienter because (1) the Amended Complaint does not show any inconsistency between these stock sales and Defendants' prior trades; (2) allegations concerning the Lock-Up Agreements are contradictory and mischaracterized; and (3) the stock sales are not suspicious, as the timing is appropriate and public filings show other sales were made for tax purposes. ECF No. 64 at 14–18. Plaintiffs respond that, for all three individual Defendants, the stock sales are suspicious because (1) no 10b5-1 trading plan was used, (2) the sales were executed shortly after the alleged false and misleading statements, (3) the sales accounted for high percentages of the Defendants' holdings, and (4) the sales resulted in "windfalls" that vastly exceeded Defendants' compensation. ECF No. 68 at 23–25. In particular, the Response focuses on allegations that the Defendants received tens of millions of dollars and that total

stock sales amounted to 17% of Mr. Fieldly's holdings, 44% of Mr. Langhans' holdings,[8] and 30% of Mr. David's holdings.

First, "[t]he complaint must allege some information about the insider's trading history for us to determine whether 'the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Edward J. Goodman*, 594 F.3d at 793 (quoting *Mizzaro*, 544 F.3d at 1253). In *Edward J. Goodman*, the plaintiffs failed to plead any facts regarding the defendants' trading history, and, as a result, the court concluded "there is no way to determine from the complaint that the sales of large numbers of shares is suspicious enough to add to an inference of scienter." *Id.*; *see also Thorpe*, 111 F. Supp. 3d at 1378 ("Because Plaintiffs have failed to plead any information about [the defendants'] trading history before the Class Period, the Court is unable to determine from the Second Amended Complaint whether their sales of shares are suspicious enough to suggest scienter."). Similarly, in this case, the Amended Complaint does not allege facts regarding the amounts and prices of stocks sold prior to the class period, nor any details about the individual Defendants' trading practices, except for vague and conclusory allegations that previous trades had been executed pursuant to a trading plan and these trades were not. The Response does not address Defendants' arguments regarding these shortcomings, but urges the Court to review the suspicious trading allegations holistically. ECF No. 68 at 22–24.

---

[8] As noted above, Plaintiffs admit that the Amended Complaint erroneously attributed the stock sale valued at $754,850 on August 21, 2023, to Mr. Langhans. Thus, the Court disregards the information surrounding that transaction.

Accordingly, the Amended Complaint fails to allege how the individual Defendants' trading during the class period is "dramatically out of line" with their trading history.

Second, considering all information, the Amended Complaint fails to allege that the timing of the stock sales was suspicious. A graph alleges the fluctuations in the Celsius stock price from September 2022 to April 2025, along with the dates and amounts of Mr. Fieldly's stock sales. ¶140. Most of the sales took place well before the stock price reached its peak of more than $90 sometime around March 14, 2024, and at prices per share ranging from $52.05 to $59.71. *Id.* According to the chart, Mr. Fieldly sold shares on August 21, 2023, at $58.12 per share for $15,691,149; December 5, 2023, at $52.41 per share for $14,997,541; December 6, 2023, at $52.05 per share for $720,476; and January 3, 2024, at $56.72 per share for $1,550,384. *Id.* Mr. Fieldly then sold shares on March 4, 2024, closer to the peak, at $85.07 per share for $10,174,712, which raises more suspicions than his other trades.[9] *Id.* Thus, the vast majority of Mr. Fieldly's gains—approximately 75 percent—came from sales that occurred several months before the stock reached its peak, and for prices $30–$40 lower per share than the peak. In addition, these sales occurred many months before any negative announcements about Celsius, which came in July 2024, when deceleration in sales growth and Pepsi's inventory reductions were noted in industry updates. ¶119. Mr. Langhans' and Mr. David's timing of trades largely mirror that of Mr. Fieldly's. *See Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) (sales of stock at

---

[9] While this transaction is more problematic given the proximity in time to the mid-March peak share price, the full context of the trades and other information minimizes the inference of scienter.

prices approximately 25% below peak share price several months prior were not suspicious) (abrogated on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 315–18 (2007) (specifying that falsity and scienter should be analyzed separately)); *In re Spectrum Brands, Inc. Secs. Litig.*, 461 F. Supp. 2d 1297, 1317 (N.D. Ga. 2006) (sales made two months to six months before negative announcement defeated inference of scienter); *N. Collier Fire Ctrl. & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15-CV-6034, 2016 WL 5794774, at *19 (S.D.N.Y. Sept. 30, 2016) (stating that trades occurring months in advance of a complaint or negative action did not suggest scienter and citing additional cases).

### 3. Safe Harbor Provision

The PSLRA includes a safe harbor provision that "immunizes certain 'forward-looking' statements from liability" when the statement is accompanied by "meaningful cautionary statements." *Carvelli*, 934 F.3d at 1324; 15 U.S.C. § 78u-5(c)(1). Under the statute, a forward-looking statement is defined as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i). If the forward-looking statement has no cautionary language, a plaintiff must still allege that a defendant made the statement with "actual knowledge" that it was "false or misleading." *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1188 (S.D. Fla. 2005) (quoting *Harris*, 182 F.3d at 803). The safe harbor protection can extend to statements that contain a "mixed bag" containing "some sentences that [are] forward-looking and some that [are] not" because "forward-looking conclusions often rest both on historical observations and assumptions about future events." *Carvelli*, 934 F.3d at 1328 (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 805–06 (11th Cir. 1999)).

Defendants argue that Plaintiffs' claims based on certain statements should be dismissed because they fall under the safe harbor provision for forward-looking statements. For example, Defendants cite a statement that the "sell-in . . . represented a one-time buildup of stock *that would not be repeated in the future*." ECF No. 64 at 22 (emphasis in original). However, that text is attributable to Plaintiffs, as it is quoted from the Amended Complaint's explanation as to why Plaintiffs believe Defendants' statements that "the increase in distribution didn't slow the overall velocity" and "[t]he sales are moving quicker out of the register" were materially false. ¶¶71–72. These and Plaintiffs' other explanations cannot be part of the safe harbor analysis. ECF No. 64 at 22; ¶¶14, 78, 107.

To the extent the Motion argues that *Defendants'* statements that were the subject of Plaintiffs' analysis were forward-looking, the Court disagrees, as the statements commented on the circumstances at the time they were made. Other alleged materially misleading statements also appear to be recaps of quarterly revenues and events, and statements of present facts and circumstances such as profits, positive events in distribution and consumer sales, new markets Celsius was entering, and benefits of the relationship with Pepsi. *See, e.g.* ¶¶82, 88, 90, 91, 95.

The alleged statement that "Ongoing inventory fluctuations may be expected in subsequent quarters," ¶105, falls within the safe harbor. In any event, the Court has already determined that statements such as this one are not actionable, as they do not satisfy the elements of falsity, materiality, and scienter.

C. *Count Two*

Because Plaintiffs failed to adequately plead a violation of Section 10(b) and Rule 10b-5, Plaintiffs' second claim, that the Individual Defendants are liable as "control persons" under Section 20(a) of the Securities Exchange Act, necessarily fails as well. *In re KLX, Inc. Secs. Litig.*, 232 F. Supp. 3d 1269, 1283 (S.D. Fla. 2017) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)).

## REPORT AND RECOMMENDATION

For the foregoing reasons, I RECOMMEND that Defendants' Motion to Dismiss [ECF No. 64] be GRANTED.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Melissa Damian, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If parties do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE and SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this 4th day of December 2025.

_____
BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE