**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-81472-ROSENBERG-REINHART**

SHELBY TOWNSHIP POLICE & FIRE
RETIREMENT SYSTEM, and All
Others Similarly Situated,

                Plaintiffs,

      v.

CELSIUS HOLDINGS, INC., JOHN
FIELDLY, JARROD LANGHANS, and
TOBY DAVID,

                Defendants.

CLASS ACTION

**LEAD PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND**
**RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................................... 3

III.    OBJECTIONS ............................................................................................................. 5

        A.    LEGAL STANDARD ....................................................................................... 5

        B.    OBJECTIONS TO FINDINGS ON MATERIAL MISREPRESENTATION ............................. 6

              1.    Defendants' Statements Regarding Pepsi's Pipe Fill Were
                    Materially False and Misleading ................................................ 7

              2.    Plaintiff's Remaining Alleged Misstatements Are Also Materially
                    False and Misleading .................................................................. 10

        C.    OBJECTIONS TO FINDINGS ON SCIENTER .................................................................. 12

              1.    The Report Applies the Wrong Pleading Standard for Scienter ............... 13

              2.    Defendants' Own Statements Support Scienter ...................................... 14

              3.    The Individual Defendants' Insider Selling Was Unusual and
                    "Dramatically Out of Line" with Their Trading History .......................... 16

              4.    Accounts from Former Employees Further Support Scienter ................... 19

        D.    OBJECTION TO FINDING ON SECTION 20(A) CLAIM ................................................. 20

        E.    OBJECTION TO FAILURE TO ADDRESS REQUEST FOR LEAVE TO AMEND ................ 20

IV.     CONCLUSION .......................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*100079 Canada, Inc. v. Stiefel Laboratories, Inc.*,
   2011 WL 13116079 (S.D. Fla. Nov. 30, 2011)......................................................................7, 8

*In re 21st Century Holding Co. Sec. Litig.*,
   2008 WL 5749572 (S.D. Fla. Nov. 7, 2008)............................................................................19

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................................................6

*Bryant v. Dupree*,
   252 F.3d 1161 (11th Cir. 2001) ...............................................................................................20

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) .............................................................................5, 6, 11, 12

*City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*,
   2018 WL 4293143 (N.D. Ga. May 15, 2018)..........................................................................18

*City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*,
   746 F.Supp.3d 1395 (S.D. Fla. 2024) ...........................................................................5, 6, 16

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz
   Cellulose S.A.*,
   41 F.Supp.3d 1369 (S.D. Fla. 2011) ................................................................................13, 16

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
   2006 WL 547989 (Mar. 6, 2006)......................................................................................15, 16, 18

*Doller v. Hertz Global Holdings, Inc.*
   2025 WL 2896919 (M.D. Fla. Oct. 10, 2025) .........................................................................15

*Edge v. Tupperware Brands Corp.*,
   2023 WL 6310236 (M.D. Fla. Sept. 28, 2023)..........................................................14, 15, 20

*In re Equifax Inc. Sec. Litig.*,
   357 F.Supp.3d 1189 (N.D. Ga. 2019) ......................................................................................12

*In re Faro Tech. Sec. Litig.*,
   534 F.Supp.2d 1248 (M.D. Fla. 2007).....................................................................................18

*Grand Lodge of Pa. v. Peters*,
   550 F.Supp.2d 1363 (M.D. Fla. 2008).....................................................................................19

ii

*In re Health Ins. Innovations Sec. Litig.*,
  2019 WL 3940842 (M.D. Fla. June 28, 2019)....................................................................13, 14

*Keippel v. Health Ins. Innovations, Inc.*,
  2019 WL 5698329 (M.D. Fla. Nov. 4, 2019) ...................................................................11, 12

*In re Mako Surgical Corp. Sec. Litig.*,
  2013 WL 2145661 (S.D. Fla. May 15, 2013) .........................................................................16

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702, 712 (7th Cir. 2008) ..........................................................................................19

*Marrari v. Medical Staffing Network Holdings, Inc.*,
  395 F.Supp.2d 1169 (S.D. Fla. 2005) .....................................................................................19

*In re Miller Indus., Inc. Sec. Litig.*,
  12 F.Supp.2d 1323 (N.D. Ga. 1998)........................................................................................18

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ...............................................................................................13

*In re Netbank, Inc. Sec. Litig.*,
  2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)...........................................................................15

*In re Ocwen Fin. Corp. Sec. Litig.*,
  2015 WL 12780960 (S.D. Fla. Sept. 4, 2015) .........................................................................15

*In re Paincare Holdings Sec. Litig.*,
  541 F.Supp.2d 1283 (M.D. Fla. 2008).....................................................................................13

*Palacios v. U.S.*,
  452 Fed. App'x 875 (11th Cir. 2011) ........................................................................................5

*Plumbers, Pipefitters and Apprentices Local No. 112 Pension Fund v. Vestis Corp.*,
  -- F.Supp.3d --, 2025 WL 2797712 (N.D. Ga. Sept. 30, 2025) ..............................................11

*Pritchard v. Apyx Medical Corp.*,
  2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ..................................................................10, 11

*In re Royal Caribbean Cruises Ltd., Sec. Litig.*,
  2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ..........................................................................16

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
  239 F.Supp.2d 1351 (N.D. Ga. 2002)......................................................................................11

*In re Sensormatic Elecs. Corp. Sec. Litig.*,
  2002 WL 1352427 (S.D. Fla. June 10, 2002).............................................................14, 17, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................7, 13

*Thompson v. RelationServe Media, Inc.*,
   610 F.3d 628 (11th Cir. 2010) .....................................................................7, 12, 13

*Tung v. Dycom Indus., Inc.*,
   454 F.Supp.3d 1244 (S.D. Fla. 2020) .................................................................19

**Statutes**

15 U.S.C. § 78j(b) ...............................................................................................5, 12, 20

15 U.S.C. § 78u-4 ...............................................................................................6, 12, 19

**Other Authorities**

Fed. R. Civ. P. 9(b) ....................................................................................................6

Fed. R. Civ. P. 72(b)(3)...............................................................................................5

Lead Plaintiff the Zarabi Family Trust Dated September 3, 1992 ("Plaintiff") respectfully submits these objections to Magistrate Judge Reinhart's Report and Recommendation (ECF No. 74) (the "Report" or "R&R") and asks the Court to deny Defendants'[1] Motion to Dismiss (ECF No. 64) (the "Motion" or "Mot."). In the alternative, Plaintiff respectfully requests that the Court grant Plaintiff the opportunity to amend the pleadings, which relief was requested in Plaintiff's Opposition to the Motion (ECF No. 68 at 20) (the "Opposition" or "Opp.") but was not addressed in the Report.

## I.  PRELIMINARY STATEMENT

Between May 9, 2023 and November 5, 2024 (the "Class Period"), Defendants misled Celsius investors about a "transformational" deal where PepsiCo., Inc. ("Pepsi") became the Company's primary distributor (the "Distribution Agreement") and the subsequent, massive pipe fill of inventory sent to Pepsi that did not correspond to actual consumer demand. Defendants' misstatements included telling investors that sales to Pepsi were "not really a pipe fill" and that "sales [were] moving quicker out of the register," all while knowing that in fact Pepsi had amassed a glut of Celsius product that was sitting unsold. Defendants made these representations in response to frequent questions from analysts seeking to distinguish between the Company's reported sales, which were recorded when Pepsi received the product (the "sell-in"), and sales to consumers at the register indicative of genuine consumer demand (the "sell-out"). But Defendants knew that the sell-in to Pepsi far exceeded the sell-out to consumers and misrepresented the growth in consumer demand by conflating the sell-in with sell-out. Defendants could see the oversupply of product because they had direct access to Pepsi's inventory data and Celsius CEO Fieldly specifically told investors that Defendants "look at [Pepsi's] inventory levels." ¶ 61.[2]

Defendants' false statements allowed Fieldly, Langhans, and David (the "Individual Defendants") to engage in extensive insider selling as the price of Celsius common stock soared to new highs, and then stop their insider selling prior to public disclosure that Pepsi had been sitting on "several million more cases over the past 1.5 years than they really needed to hold[.]" ¶ 124.

---

[1] Defendants are Celsius Holdings, Inc. ("Celsius" or the "Company"), John Fieldly ("Fieldly"), Jarrod Langhans ("Langhans"), and Toby David ("David").

[2] References to the Complaint are cited herein as "¶ __." Undefined terms have the same meaning as in the Complaint. All emphasis is added unless otherwise noted.

1

The Report's recommendation to grant the Motion includes several errors that this Court should not adopt.

First, the Report incorrectly finds that the alleged misstatements are not "materially false," "amount to corporate optimism and opinion," and "do not rise to the level of materially misleading." R&R at 18, 19, 24. But the Report reaches this conclusion by improperly drawing inferences in Defendants' favor. The Report concludes that several false and misleading statements denying or minimizing the volume of sales that were a result of the initial stocking of Celsius product at Pepsi were not materially misleading based on "the record as a whole and the 'total mix' of information available to investors." *Id.* at 24. This conclusion is in error because the Report's analysis includes certain "disclosures" that Defendants made many weeks ***after the alleged misstatements were made*** and were therefore not part of the total mix of information available at the time of the misstatements. This is a plain error in the timing the of the allegedly false statement and the much later timing of other so-called disclosures and should not be repeated by this Court.

The Report also incorrectly finds that other alleged misstatements are not actionable because "the statements appear to be true, do not provide facts to show they are false, or amount to non-actionable puffery or opinions." *Id.* at 16, 18-19. But the Report once again provides improper inferences in Defendants' favor and does not consider the context of the statements—including the significance of the Distribution Agreement to Celsius and the market—and fails to account for statements that are half-truths and thus actionable because they omitted material facts necessary to make the statements not misleading.

Second, the Report wrongly holds that the Complaint "fails to adequately allege that Defendants acted with scienter." R&R at 25. But the Report reaches this conclusion by applying the wrong pleading standard. The Report determines that all but one of the alleged misstatements were not forward-looking within the meaning of the PSLRA's safe harbor—and therefore can be actionable so long as the Complaint sufficiently pleads that Defendants acted with severe recklessness. *See id.* at 33-35 ("To the extent the Motion argues that Defendants' statements that were the subject of Plaintiffs' analysis were forward-looking, the Court disagrees, as the statements commented on the circumstances at the time they were made."). Yet when analyzing the alleged misstatements, the Report incorrectly applies an actual knowledge standard to Defendants' scienter. *Id.* at 28 (allegations were insufficient "to show that the individual Defendants had ***actual knowledge*** of specific inventory levels and ***could foresee Pepsi's intentions*** with its inventory).

2

Having applied the wrong standard, the Report overlooks Plaintiff's well-pled allegations that Defendants' own statements create a strong inference that Defendants at least acted with severe recklessness. *Id.* at 25. Not only did Fieldly himself tell investors that Defendants "look at [Pepsi's] inventory levels," (¶ 61), Defendants also repeatedly spoke to investors about the status of Pepsi's inventory in ways that were consistent with their access to and review of that information.

The Report's scienter analysis is also flawed in concluding that the Complaint "does not allege facts regarding the amounts and prices of stocks sold prior to the class period, nor any details about the individual Defendants' trading practices[.]" R&R at 31-32. This is a blatant error that should not be adopted by the Court. The Complaint includes detailed allegations of Defendants' insider selling and trading practices prior to the Class Period and how the Class Period trading was unusual and suspicious in comparison (including that EVP/Chief of Staff David never engaged in any insider selling prior to or after the Class Period). *See* ¶¶ 135, 150, 165-66.

Finally, the Report errs in failing to address Plaintiff's timely request for leave to replead in the event the Court dismisses the Complaint in whole or in part.

The Court should decline to adopt the Report's findings, Defendants' Motion should be denied, and the case should proceed to discovery.

## II.    STATEMENT OF FACTS

Celsius was a penny stock operation that sold diet pills, had a run-in with the FTC, and was dogged by allegations of operating as a Pyramid scheme before it pivoted from selling highly caffeinated diet drinks to selling highly caffeinated energy drinks. ¶¶ 1-6. On August 1, 2022 (almost ten months before the beginning of the Class Period), Celsius announced the Distribution Agreement, which had a significant and immediate impact on the Company. ¶ 58. Between 2022 and 2023, Celsius's revenues grew from $653.6 million to $1.318 billion—an increase of 102%. *Id.* Celsius attributed this growth to its increased revenues from North America, which it in turn attributed to Pepsi. *See, e.g.,* ¶ 69. As Celsius's primary U.S. distributor and exclusive Canadian distributor, Pepsi replaced about 80% of the Company's network of roughly 500 distributors. ¶¶ 7, 52. Pepsi provided Celsius with direct logins to Pepsi's Enterprise Resource Planning ("ERP") software that it used for inventory management, which enabled Celsius to readily view Pepsi's on-hand inventory of Celsius products. ¶ 61. CEO Fieldly also stated during a February 29, 2024 earnings call that Celsius "***look[s] at [Pepsi's] inventory levels***[.]" *Id.*

3

Throughout the Class Period, and in conjunction with their exhortation of the Distribution Agreement, Defendants repeatedly touted the Company's increase in sell-out/sales to consumers (also referred to as "velocity"). On May 9, 2023 (the first day of the Class Period), the Company reported "record first quarter revenue of $260 million, up 95%[.]" ¶ 69. In the follow-up earnings call, CFO Langhans attributed "the increase in North American sales volume" to "our integration into the Pepsi distribution system[.]" *Id.* He then noted that Celsius had "seen our velocity increase post our significant . . . growth" in distribution coverage. *Id.* During the same call, an analyst questioned how much of the Company's growth was due to "initial channel fill . . . versus reorders derived from sell-through at retail." ¶ 71. CEO Fieldly responded that "the increase in distribution didn't slow the overall velocity. The sales are moving quicker out of the register." *Id.* And in response to a similar question later in the call, Fieldly noted that sales to Pepsi were "***not really a pipe fill*** . . . we just to [*sic*] continue to build upon the momentum." ¶ 73. These and similar statements were designed to misrepresent to investors that Celsius's increased sell-in sales to Pepsi were supported by a similar increase in sell-out sales to consumers. In response to these statements, Celsius's stock price shot up from $30 per share in May 2023 to a Class Period high of $90 per share in March 2024. ¶ 11.

The truth, however, was that the sell-in to Pepsi far exceeded sell-out to consumers. Rather, the sell-in represented a one-time buildup of stock, as Fieldly and Langhans would later disclose that Pepsi had overstocked its warehouses with $100 million to $120 million worth of Celsius inventory. ¶¶ 15, 63. The sheer magnitude of inventory sitting unsold in Pepsi warehouses was mind boggling—$100 million worth of inventory would be roughly equivalent to almost 87 million cans, or enough to reach from Boca Raton to New Zealand when stacked end-to-end. ¶ 17.[3] This revelation shocked the market and caused Celsius's stock price to crater, wiping out billions of dollars in market value. ¶¶ 14-15, 18-19, 133.

Defendants, however, were not surprised by the news—in fact, they had been aware of Pepsi's stagnant inventory the entire time because of their access to Pepsi's ERP, as confirmed by former employees and Fieldly's own statements. *See, e.g.*, ¶ 61. But instead of telling the truth to investors, the Individual Defendants seized upon the run-up in the stock price during the Class

---

[3] On November 5, 2024 (the last day of the Class Period), Defendants disclosed that the decreased revenue from the inventory glut was actually $124 million. ¶ 130.

4

Period to sell their shares at fraud-inflated prices and in volumes inconsistent with their prior trading history. ¶¶ 134-68. Fieldly alone sold 70% of his direct holdings[4] not including unexercised options—far more than he ever sold before and representing a life-changing $43 million windfall that was ten times his total annual compensation from the Company. ¶ 143. David—who had not engaged in *any* insider selling prior to the Class Period—sold 30% of his shares for $10 million (¶ 149), while Langhans sold 40% of his holdings (¶ 146). Fieldly's Class Period sales were a 50% increase over his sales in the ten months leading up to the Class Period (*see* ¶¶ 135, 165), while Langhans's Class Period sales constituted a more than 500% increase of his sales for the same time period (*see* ¶¶ 135, 140, 166; *see also* Opp. at 19 n.20).

## III.  OBJECTIONS

### A.  LEGAL STANDARD

This Court must complete a *de novo* review of the Report based on the Objections contained herein. *See Palacios v. U.S.*, 452 Fed. App'x 875, 877 (11th Cir. 2011) (a "district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to") (quoting Fed. R. Civ. P. 72(b)); *see also* S.D. Fla. Magistrate Judge Rule 4(b). The Court may then choose to "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

The standards applicable to a claim for securities fraud under Section 10(b) of the Exchange Act require the plaintiff to allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called loss causation." *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 746 F.Supp.3d 1395, 1405 (S.D. Fla. 2024) (quoting *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019)). Here, Defendants' Motion challenged only the elements of material misrepresentation and scienter.

---

[4] The Report's recitation of Plaintiff's well-pled facts includes the allegation that Fieldly sold 17% of his holdings during the Class Period. R&R at 5. The Complaint alleges that Fieldly's Class Period sales represented approximately 17% of Fieldly's holdings only when "[i]ncluding common shares underlying unexercised vested stock options[.]" ¶ 143. "Excluding those options, the shares represented 70% of [Fieldly's] direct common stock holdings." *Id.*

### B.  OBJECTIONS TO FINDINGS ON MATERIAL MISREPRESENTATION

Plaintiff objects to the Report's finding that the statements it alleged are not "materially false," "amount to corporate optimism and opinion," and "do not rise to the level of materially misleading." R&R at 18, 19, 24.

A plaintiff can successfully plead that a statement was materially false or misleading if she "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "Materiality is itself a mixed question of law and fact . . . [that] requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him[.]" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2017) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)) (internal quotations omitted). "A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" *Id.* at 1317 (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011)). "In other words, materiality depends on whether a 'substantial likelihood' exists that a reasonable investor would have viewed a misrepresentation or omission as significantly alter[ing] the 'total mix' of information made available." *Id.* (quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012)). "[W]hen considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at 1320 (internal quotations and citation omitted).

Notably, "[w]hile pleading fraud ***does*** subject Plaintiffs to a heightened pleading standard, it does ***not*** demand they plead precise, contemporaneous accounts contradicting the alleged misstatements." *Teleperformance*, 746 F.Supp.3d at 1407 (emphases in original). And while the pleading standard for alleging falsity must satisfy Rule 9(b), the Private Securities Litigation Reform Act ("PSLRA"), and the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Court should not "conflate[] the heightened pleading standard for scienter with the lower standard for pleading a false or misleading statement." *Teleperformance*, 746 F.Supp.3d at 1407-08 (*quoting Mogensen v. Body Cent. Corp.*, 15 F.Supp.3d 1191, 1214 (M.D. Fla. 2014)) (alteration in original). In other words, a court when considering falsity should ***not engage in a***

*comparison of inferences* to determine whether a plaintiff's theory of wrongdoing "is at least as compelling as any opposing inference" in the manner that it does when considering scienter. *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)); *see also 100079 Canada, Inc. v. Stiefel Laboratories, Inc.*, 2011 WL 13116079, at *6 (S.D. Fla. Nov. 30, 2011) ("[T]he Court must accept all of the Complaint's allegations as true, construing them in the light most favorable to the plaintiff.").

### 1. Defendants' Statements Regarding Pepsi's Pipe Fill Were Materially False and Misleading

During the Class Period, Defendants made several statements denying or minimizing the volume of sales that were a result of the initial stocking of Celsius product at Pepsi. Specifically, during the Company's first quarter 2023 earnings call on May 9, 2023, an analyst asked Defendants to elaborate on "how much of the Q1 reacceleration of growth was initial channel fill . . . versus reorders derived from sell-through at retail." ¶ 71. In response, Fieldly stated that "***the increase in distribution didn't slow the overall velocity. The sales are moving quicker out of the register***." Later during the same call, another analyst questioned "what the pipe fill for foodservice might have been in 1Q." DX F at 12. Fieldly replied that "it is not really a pipe fill in the quarter, I would say. We just continue to build upon the momentum." *Id.*[5] These statements were false and misleading because "Pepsi was in fact holding on to over a hundred million dollars' worth of excess inventory. At the time of Fieldly's statement[s], Pepsi had already completed or was in the height of infilling its inventory." ¶ 72; *see also* ¶ 74.

The Report acknowledges that "a factual statement that Pepsi's buildup of inventory was 'not a pipe fill' standing alone could rise to the level of a material misrepresentation." R&R at 22. But the Report then goes on to erroneously conclude that these statements were not misleading based on "the record as a whole and the 'total mix' of information available to investors." R&R at

---

[5] The Report takes note of Defendants' argument—raised for the first time in a footnote on reply (ECF No. 71 at 8-9 n.10)—that this statement is not misleading because it was in response to a question about inventory related to foodservice, and not Pepsi's entire inventory. R&R at 21-22. However, foodservice comprised 10% of Celsius's sales to Pepsi (*id.*), sales to Pepsi were critically important to Celsius (*see generally*, ¶¶ 52-61), and even 10% of such a large deal is a significant amount of sales and does not alter or diminish the falsity of the statement. Additionally, the Report does not include any analysis of whether misrepresenting facts about sales relating to 10% of a business line would be immaterial to investors.

24. In reaching this erroneous conclusion, the Report considers other statements from Defendants, such as "we saw Pepsi increase inventory levels" in 2023. *Id.* at 23-24. However, the Report overlooks the fact that this statement was sandwiched by other misstatements downplaying any pipe fill and touting increased velocity, including that "***we're cycling through whatever pipe fills we had for the quarter. So, the increase in distribution didn't slow the overall velocity. So, the sales are moving quicker out of the register***[,]" and that "***seeing the velocities increase I think we get a really strong feeling that we're seeing repeat purchases out there***." DX F at 8; *see* Opp. at 8; *contra* R&R at 22-23. Thus, although Fieldly mentioned an increase in inventory, he also stated that Pepsi was "cycling through" that product, which falsely downplayed the magnitude of the more than $100 million worth of unsold product in Pepsi's warehouses. As the Complaint alleges, this was materially false and misleading. *See*, *e.g.*, ¶¶ 16, 61, 67.

Similarly, the Report considers Fieldly's response to a question during Celsius's August 8, 2023 earnings call about "distributor inventory levels," where he stated that he was "not sure" whether days of inventory outstanding would change during the fourth quarter of 2023. R&R at 23; DX G at 15. However, the Report erroneously fails to take into account that Fieldly began his reply by saying that Celsius "felt inventories were low" during the fourth quarter of 2022, and that inventory was now "at a level that we would prefer they stay" (DX G at 15)—*i.e.*, "several ***million*** more cases . . . than [Pepsi] really needed to hold." ¶ 124; *see also* Opp. at 9 n.8. The same is true of statements made during the Company's November 7, 2023 earnings call, where Langhans stated that "inventory was not a significant component of the year-over-year percentage increase" in sales volume. Opp. at 9 n.8; DX H at 6; *see* R&R at 23.

Critically, the Report mixes up the timing of the alleged misstatements and certain "disclosures" the Court includes in the total mix of information available to the market, and wrongly includes in the total mix of information disclosures that were made weeks after the alleged false statements. Thus, when Fieldly told investors ***on May 9, 2023*** that ***"the increase in distribution didn't slow the overall velocity[,] . . . the sales are moving quicker out of the register[,]"*** and that sales to Pepsi ***"is not really a pipe fill[,]"*** Defendants had made only one of

***the disclosures the Report relies heavily on when concluding that Defendants' misstatements did not alter the total mix of information available to the market.***[6]

Thus, the Report misattributes disclosures made in June, August, and November 2023 as altering the total mix of information as of May 9, 2023. This is a plain error in the Report. These statements had not yet been made, were not part of the total mix of information available to the market, and yet are erroneously relied on in the Report's determination of the materiality of Fieldly's May 9, 2023 statements.

That Defendants disclosed how the Company would record revenue upon the sell-in to Pepsi is likewise unremarkable and irrelevant. Although investors knew that Celsius recognized revenue upon delivery to Pepsi and that Pepsi would have to build inventory at the outset of the Distribution Agreement, investors did not know the ***degree*** to which the Company's sales constituted channel fill as opposed to sales to consumers. *See*, *e.g.*, ¶¶ 8 ("Pepsi had frontloaded a ***massive*** inventory—***over a year's worth*** of the Company's drinks—that the Company would immediately report as increased revenue, but would only be distributed by Pepsi and sold to consumers ***over a much longer period of time***."); 60 ("[I]nvestors could not have known ***the extent to which*** this explosion in sales was the result not of organic customer demand[.]"); 70 ("Celsius's increased sales that Langhans was touting overrepresented the demand for Celsius's products at that time and concealed the ***massive glut*** of inventory that was sitting in Pepsi's warehouses to be sold ***over a much longer period of time***."); 123-24 (stating that Pepsi was holding "***several million more cases over the past 1.5 years*** than they really needed to hold"); *contra* R&R at 24. The breakdown of sales to Pepsi versus other distributors likewise failed to provide this distinction. *Contra* R&R at 24-25. If it had, Celsius's stock price would not have plummeted when Defendants

---

[6] The Report cites to the following disclosures as altering the total mix of information:

> that there was "an increase in the days inventory outstanding within the mixing centers of our primary distributor [Pepsi] relative to the end of 2022"; that Defendants were unsure whether "days inventory outstanding" would change in the fourth quarter of 2023 and into 2024; that Pepsi "would have to determine if they're going to do any kind of management around the inventory" going into 2024; and that Celsius "benefited from some inventory building within [Pepsi]."

R&R at 23 (quoting Mot. at 15-16) (alterations in original). Again making an inference in favor of Defendants, the Report omits that these statements were made on June 1, 2023, August 8, 2023, and November 7, 2023, and were not part of the total mix of information as of May 9, 2023. *Id.*

revealed that Pepsi had been sitting on more than $100 million of unsold inventory. *See* ¶¶ 121-26. The market's reaction to this information demonstrates the materiality of the misstatements.

Considering the total mix of information available to the market as of May 9, 2023, including that Pepsi was "cycling through whatever pipe fills we had for the quarter" but excluding the disclosures erroneously included in the Report, Plaintiff has sufficiently alleged that a "reasonable investor, in the exercise of due care, would have been misled" by Defendants' statements that "the increase in distribution didn't slow the overall velocity[,] [t]he sales are moving quicker out of the register[,]" and that sales to Pepsi "is not really a pipe fill." ¶¶ 71, 73. The Court should reject the Report's finding that these statements are not material or actionable.

### 2. Plaintiff's Remaining Alleged Misstatements Are Also Materially False and Misleading

Defendants also purposefully deceived the market by misleadingly correlating sell-in to sell-out and tricking investors into believing that the sell-in was supported by consumer demand. *See* ¶¶ 69-70, 77-80, 82-83, 88-92, 94-95, 102-12. Because investors (unlike Defendants) were in the dark as to how much inventory Pepsi was holding, Defendants' statements that Celsius was "keeping the shelf stocked in order to meet the consumer demand" (¶ 77), and other similar sentiments misrepresented to the market that that the Company's increased sales were "maintained" by a similar rate of increased consumer demand. The Report's conclusion that these statements are not actionable either because they are not materially false or constitute puffery is not well founded. R&R at 16, 19.

First, the Report's analysis of certain alleged misstatements (¶¶ 69-70, 77-80, 82-83, 88-89, 91-92, 102-07) finds that the statements are not actionable because "the statements appear to be true, do not provide facts to show they are false, or amount to non-actionable puffery or opinions." R&R at 16. The Report reasons that "the Pepsi distribution system contributed significantly to Celsius' sales and revenue in 2023, . . . [t]here are no allegations that Celsius and Pepsi were not attempting to distribute the products, keep shelves stocked, or drive consumer demand[,]" and "there are no allegations that Celsius products were not being distributed to new channels." *Id.* at 18. But the Report's analysis is wrong under Rule 10b-5, which "prohibits not only literally false statements, but also any omissions of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Pritchard v. Apyx Medical Corp.*, 2020 WL 1180731, at *4 (M.D. Fla. Mar. 11, 2020)

(internal quotations omitted). Instead, there must be an inquiry "into the meaning of the statement to the reasonable investor and its relationship to the truth." *Id.*

Defendants' statements fail to satisfy this inquiry. For instance, when Langhans chose to speak about how "[t]he ***primary factors*** behind the increase in North American sales volume were related to our integration into the ***Pepsi distribution system***" and that Celsius had "seen our ***velocity increase***" following the Company's increase in distribution coverage (¶ 69), he was making "a targeted comment" that would have led a reasonable investor to believe that the increase in sales to Pepsi, and Pepsi's increase in Celsius's distribution coverage, had resulted in similar increased sales to consumers, which was not the case. *See Pritchard*, 2020 WL 1180731, at *5 (CEO's statement that a short seller report on a medical study was "unsubstantiated" was an actionable omission that "misled investors into believing [the study] proved the effectiveness of the [technology]").

Second, the Report's analysis of other alleged misstatements (¶¶ 77, 90-91, 108, 111, and 117) as mere puffery is also mistaken. R&R at 18-19. Courts define puffery as "generalized, vague, nonquantifiable statements of corporate optimism." *Plumbers, Pipefitters and Apprentices Local No. 112 Pension Fund v. Vestis Corp.*, -- F.Supp.3d --, 2025 WL 2797712, at *10 (N.D. Ga. Sept. 30, 2025) (quoting *Carvelli*, 934 F.3d at 1318) (finding actionable statements that customer retention was the company's "single highest growth lever" and the "single most profitable thing" about its business model). Because "[t]o say that a statement is mere 'puffing' is, in essence, to say that it is immaterial," *Carvelli*, 934 F.3d at 1320 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200-01 (3d Cir. 1990)), "the level of specificity a statement must exhibit to cross the puffery threshold cannot be determined from a bright-line rule." *Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at *7 (M.D. Fla. Nov. 4, 2019) (citation omitted) (statements that customer service was "best-in-class" and "market-leading" were actionable). "A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available." *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F.Supp.2d 1351, 1360 (N.D. Ga. 2002) (quoting *Hoxworth*, 903 F.2d at 200-01). Additionally, "while certain statements might be considered puffery in one context, they may be found actionable in another, especially when defendants know or recklessly disregard facts contradicting their statements." *Keippel*, 2019 WL 5698329, at *7.

11

The Report contemplates parsed phrases that favor Defendants' arguments such as "massive distribution" and "key factor" to conclude that the statements are not sufficiently "specific or verifiable" to be actionable. *Id.* However,

> [t]hat a statement smacks of puff is certainly a strong indicator of immateriality. But—and here's the caveat—it's not necessarily a clincher. A conclusion that a statement constitutes puffery doesn't absolve the reviewing court of the duty to consider the possibility—however remote—that in context and in light of the "total mix" of available information, a reasonable investor might nonetheless attach importance to the statement.

*Carvelli*, 934 F.3d at 1320. Other factors such as whether the statements "relate to a core aspect of [a company's] business" or "were made repeatedly to assure investors" can also weigh in favor of finding statements actionable. *In re Equifax Inc. Sec. Litig.*, 357 F.Supp.3d 1189, 1224 (N.D. Ga. 2019). In other words, "the context of these supposedly 'aspirational' statements matters[.]" *Id.* The Distribution Agreement had a "transformational" impact on Celsius's business, making it a "core aspect" of the Company's operations that was conveyed to investors repeatedly. *See, e.g.*, ¶¶ 52 (Distribution Agreement had Pepsi replace around 80% Celsius's roughly 500 distributor relationships), 69 (attributing record revenue primarily to the Distribution Agreement), 76-77 (same), 82 (same), 87-88 (same), 94-95 (same). Furthermore, many of Defendants' misstatements were in direct response to analyst questions about how the Company's increased sales related to sell-out and the status of Pepsi's inventory. *See, e.g.*, ¶¶ 71, 73, 90, 91, 108, 111. So when David told investors that "our velocities have really ***maintained*** with this massive distribution that Pepsi has been able to get us out to" (¶ 90), his statement was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance to be deemed inactionable puffery." *Equifax*, 357 F.Supp.3d at 1224 (internal quotations omitted). Because a reasonable investor would have "attach[ed] importance to [Defendants'] statement[s][,]" the Report's finding that these statements are not actionable is in error and should not be adopted by this Court.

### C. OBJECTIONS TO FINDINGS ON SCIENTER

Plaintiff objects to the Report's finding that the Complaint "fails to adequately allege that Defendants acted with scienter." R&R at 25.

In order to successfully allege a Section 10(b) violation, "a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010) (quoting

15 U.S.C. § 78u-4(b)(2)). "In this context, a 'strong inference' of scienter is one that is 'more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). In other words, where "the inference of scienter is equal to the inference of non-fraudulent intent, . . . scienter has been adequately pled." *In re Paincare Holdings Sec. Litig.*, 541 F.Supp.2d 1283, 1291 (M.D. Fla. 2008).

A court considering allegations of scienter must "(1) accept all factual allegations in the complaint as true, (2) consider the complaint in its entirety and determine whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, and (3) take into account plausible opposing inferences." *Thompson*, 610 F.3d at 633-34 (quoting *Tellabs*, 551 U.S. at 322-23) (emphasis in original) (internal quotations omitted). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. Furthermore, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. "[F]ar from perfect" allegations suffice. *In re Health Ins. Innovations Sec. Litig.*, 2019 WL 3940842, at *27 (M.D. Fla. June 28, 2019). And "[a]lthough the PSLRA substantially raised the ***pleading*** standard for scienter, it did not change any ***substantive*** intent requirements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (emphasis in original). That is, a plaintiff must sufficiently plead either an intent to deceive, manipulate, or defraud or severe recklessness. *Id.* Severe recklessness "involve[s] not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F.Supp.3d 1369, 1396-97 (S.D. Fla. 2011).

### 1. The Report Applies the Wrong Pleading Standard for Scienter

While the Report correctly finds that the severe recklessness standard applies to Defendants' misstatements (R&R at 33-35),[7] it errs in using an actual knowledge standard when analyzing Plaintiffs' allegations of Defendants' scienter. *Id.* at 28. According to the Report, the severe recklessness standard applies because—with the exception of a single statement regarding

---

[7] Defendants have already stated that they "do not object to the Report and Recommendation" (ECF No. 75) and therefore cannot contest this conclusion.

"[o]ngoing inventory fluctuations" (¶ 105)—the alleged misstatements are not forward-looking and therefore do not fall within the PSLRA's statutory safe harbor requiring a plaintiff to plead that forward-looking statements were made with actual knowledge of their falsity. R&R at 33-35. Despite having identified the correct standard, the Report nonetheless finds that the Complaint's allegations were insufficient "to show that the individual Defendants had ***actual knowledge*** of specific inventory levels and ***could foresee Pepsi's intentions*** with its inventory." *Id.* at 28. This is plain error, and the Report applies the wrong scienter pleading standard to Plaintiff's allegations. If the Complaint sufficiently pleads severe recklessness, there is no need for Plaintiff to allege that Defendants had actual knowledge of Pepsi's inventory glut.

Defendants' admissions that Pepsi's inventory was overfilled at the time they made false representations to the market meets the severe recklessness standard. Specifically, David revealed on September 4, 2024 that Pepsi was "holding to ***several million*** more cases ***over the past 1.5 years*** than they really needed to hold[.]" ¶ 124. In other words, Pepsi's inventory had been overstocked since March 2023, or two months before the beginning of the Class Period. Because the statements are not forward-looking and Pepsi's inventory was already overloaded at the time Defendants made their statements, Plaintiff does not need to plead actual knowledge or that Defendants could "foresee Pepsi's intentions" in order to render statements regarding the status of Pepsi's past and current purchases and inventory levels actionable. *See* Opp. at 13.

### 2.     Defendants' Own Statements Support Scienter

"Where a defendant publishes a statement at a time he is in possession of or has access to facts suggesting that the statement is inaccurate, misleading[], or incomplete . . . a classic fact pattern giving rise to a strong inference of scienter appears." *Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *5 (M.D. Fla. Sept. 28, 2023) (*quoting In re Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *6 (S.D. Fla. June 10, 2002)). Defendants' knowledge of the unsold product sitting in Pepsi's warehouses establishes scienter because it directly contravened Defendants' statements that Celsius's increase in sales were not a pipe fill and conflating sales to Pepsi with sales to consumers. Had Defendants' statements been true, Pepsi would not have had such a massive amount of product that "sat and didn't sell." ¶ 63.

The Report finds that the Complaint "fails to adequately allege that Defendants acted with scienter[,]" but overlooks Plaintiff's well-pled allegations that Defendants' own statements create a strong inference that Defendants at least acted with severe recklessness. R&R at 25. Not only

14

did Fieldly himself tell investors that Defendants "look at [Pepsi's] inventory levels" (¶ 61), Defendants also repeatedly spoke to investors about the status of Pepsi's inventory in ways that would not have been possible had they not had access to and reviewed that information. *See*, *e.g.*, ¶¶ 100 (disclosing that revenues were "offset" by "inventory movements" at Pepsi), 101 (noting "changes in days on hand inventory by [Pepsi]"), 102 ("[O]ur first quarter revenue would have been higher, except that it was adversely affected due to inventory movements by our largest customer[.]"), 105 ("The year-over-year inventory variation is attributable to elevated first quarter 2023 restocking, which we believe was meant to compensate for the fourth quarter 2022 destocking . . . ."), 108 ("[O]ur partners are at really good inventory levels right now."), 111 ("So it seems to be like the balancing [of Pepsi's inventory] has been finalized."), 117 (discussing sales to Pepsi and noting that "the inventory pullback wasn't in terms of total cases, it's on days on hand of inventory"), 118 ("Pepsi did take their inventory up last year in turn. They took their days on hand up last year. . . . [L]ooking at last week's solid depletions that's depletions out of the Pepsi system grew . . . mid 10s versus Q1."), 122 ("[W]e're still seeing these inventory levels being reduced."), 124 ("What we are seeing correlate is depletions out of the Pepsi warehouse[.]"). *See also Edge*, 2023 WL 6310236, at *6 (crediting allegations that defendants had "made several public statements on [the alleged] topics" in support of scienter).

The Report's criticism that the Complaint does not have "allegations that the individual Defendants had these logins or accessed these programs, or that any employee provided them with information gained through this access" (R&R at 27) was recently rejected by the decision in *Doller v. Hertz Global Holdings, Inc*. 2025 WL 2896919, at *6 (M.D. Fla. Oct. 10, 2025) (holding that "access to such information alone suffices" to plead a strong inference of scienter and citing cases); *see also Davidco Investors, LLC v. Anchor Glass Container Corp.*, 2006 WL 547989, at *20 (Mar. 6, 2006) (crediting allegation that defendants "had access to Anchor's computer system on which the Connellsville plant costs and expenses were readily available"); *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *12 (N.D. Ga. Jan. 29, 2009) ("[S]evere recklessness can be established by allegations that the defendants had knowledge of facts ***or access to information*** contradicting their public statements.") (internal quotations omitted); *contra* R&R at 27.[8]

---

[8] Cases the Report cites to in support of finding that the CW allegations are insufficient to allege scienter do not hold otherwise. R&R at 29; *see In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL

Even if the Court were to find that these statements were not sufficient to plead the Individual Defendants' actual knowledge of the status of Pepsi's inventory, the allegations are still actionable because Plaintiff has sufficiently alleged that Defendants' choice to speak in detail about Pepsi's inventory would have been severely reckless. The Report recognizes that "[i]t is clear that the Pepsi distribution system contributed significantly to Celsius' sales and revenue in 2023" (R&R at 18), and Defendants themselves concede "the obvious fact that sales to Pepsi were significant to Celsius." Mot. at 9.[9] The Complaint also includes many allegations highlighting the significance of the deal. *See*, *e.g.*, ¶¶ 52 ("In connection with the Distribution Agreement, Celsius terminated around 80% of its various agreements with existing distributors to transition certain territory rights to Pepsi."), 62 (recounting that "there was "a lot of talk" about Pepsi"). Given the significance of Celsius's partnership with Pepsi to the Company, the individual Defendants, and investors, statements that Celsius's increase in sales were not a pipe fill—if made without actual knowledge of the status of Pepsi's inventory—would have "present[ed] a danger of misleading buyers or sellers . . . so obvious that the defendant must have been aware of it." *Aracruz Cellulose*, 41 F.Supp.3d at 1397.

### 3. The Individual Defendants' Insider Selling Was Unusual and "Dramatically Out of Line" with Their Trading History

"[W]hen determining whether [a defendant's] stock sales are suspicious, the Court considers (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with their prior trading history." *Davidco*, 2006 WL 547989, at *20 (timing and amount of shares sold suspicious and supported an inference of scienter even without allegations of prior trading history). The Report concludes that the Complaint "fails to allege that the timing of the stock sales was suspicious" because it "does not allege facts regarding the

---

12780960, at *10 (S.D. Fla. Sept. 4, 2015) (general allegation that "weekly reports were also provided to" one of the defendants without any other detail); *In re Royal Caribbean Cruises Ltd., Sec. Litig.*, 2013 WL 3295951, at *18 (S.D. Fla. Apr. 19, 2013) ("no indication as to what was in those reports or that the individual Defendants actually received"); *In re Mako Surgical Corp. Sec. Litig.*, 2013 WL 2145661, at *12 (S.D. Fla. May 15, 2013) (nonspecific allegations, such as a witness's attendance at meetings without allegations regarding the content of those meetings, insufficient to meet actual knowledge standard as to forward-looking statements).

[9] Despite this finding, the Report also omits any analysis of how "knowledge of critical facts related to [a company's] core operations[,] . . . can bolster the inference [of scienter]." *Teleperformance*, 746 F.Supp.3d at 1412 (citing *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018)).

amounts and prices of stocks sold prior to the class period, nor any details about the individual Defendants' trading practices[.]" R&R at 31-32. This is incorrect. The Complaint alleges every one of the Individual Defendants' insider selling and trading practices prior to the Class Period. The Complaint alleges that Fieldly sold: (i) 240,000 shares for close to $8 million in proceeds on August 1, 2022; (ii) 210,000 shares for $8 million in proceeds on August 24, 2022; and (iii) 27,334 shares for $848,135 in proceeds on January 2, 2023. ¶ 165. That is roughly two-thirds the amount of shares he sold during the Class Period for less than 40% of what he earned from his Class Period insider selling. *See* ¶¶ 135, 165. The Complaint further pleads that Langhans sold 1,851 shares on August 26, 2022 for $66,303 and 1,806 shares on April 18, 2023 for $79,175. ¶ 166. These sales make up less than 15% of the shares he sold during the Class Period for less than 10% of the profits he earned from his Class Period sales. *See* ¶¶ 135, 140, 166. *See also* Opp. at 19 n.20.[10] The Complaint also alleges that ***David never sold any Celsius stock prior to or following the Class Period***. ¶ 150. Thus, the Report's conclusion that the "Amended Complaint does not allege facts regarding the amounts and prices of stocks sold prior to the class period" is a blatant error that should not be adopted by this Court. R&R at 31. Substantively, the allegations regarding insider selling before, during, and after the Class Period show a vast discrepancy in the Individual Defendants' trading history and that their trades made during the Class Period were "dramatically out of line with prior trading practices . . . [,]" thus supporting an inference of scienter. *In re Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *7 (S.D. Fla. Jun. 10, 2002).[11]

The Report also concludes that the Complaint "fails to allege that the timing of the stock sales was suspicious." R&R at 32. That conclusion is wrong because the Complaint alleges that the majority of Fieldly's trades made during the Class Period were executed within two weeks of

---

[10] To the extent that Defendants argue that these allegations are insufficient as to Fieldly and Langhans due to the lock-up period prohibiting sales between August 1, 2022 and August 1, 2023 (*see* ¶¶ 52, 55), such arguments are unavailing. The Complaint alleges that both Fieldly and Langhans sold shares in violation of the lock-up agreement. ¶¶ 163-66. These trades exhibit Defendants' lack of concern for complying with the lock-up agreement, and they cannot cite the agreement now to inoculate themselves.

[11] The cases the Report relies on in finding insufficient allegations of insider trading are inapposite because the plaintiffs in those cases "failed to plead any facts regarding the defendants' trading history," unlike here. R&R at 31 (citing *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.,* 594 F.3d 783, 793 (11th Cir. 2010) and *Thorpe v. Walter Inv. Mgmt. Corp.,* 111 F.Supp.3d 1336, 1378 (S.D. Fla. 2015)).

the issuance of statements alleged as false and misleading. *Compare* ¶ 139 (trades made by Fieldly on August 21, 2023, December 5 and 6, 2023, and March 4, 2024) *with* ¶¶ 81-84 (false statements on August 8, 2023), 91-92 (false statement on December 6, 2023), 94-95 (false statements on February 29, 2024); *see Davidco*, 2006 WL 547989, at *20 (sale shortly after "presenting very strong positive news" was suspicious). The timing of Langhans's and David's trades were likewise suspicious. *Compare* ¶ 139 (Langhans's trades on August 21, 2023 and March 4, 2024 and David's trades on August 22, 2023 and January 3, 2024) *with* ¶¶ 81-84 (false statements on August 8, 2023), 90-91 (false statements on November 15 and December 6, 2023), 94-95 (false statements on February 29, 2024). Even if this were not the case, insider trades are not required to be temporally related to corrective disclosures to be actionable. *In re Faro Tech. Sec. Litig.*, 534 F.Supp.2d 1248, 1264 (M.D. Fla. 2007) (rejecting argument that "the broad temporal distance between the sale and the disclosure defeats any inference of scienter"); *In re Miller Indus., Inc. Sec. Litig.*, 12 F.Supp.2d 1323, 1332 (N.D. Ga. 1998) (trading that "occurred at the beginning of the class period" indicative of scienter).[12] It is also irrelevant that Defendants did not time their sales to perfectly match the highest price of Celsius stock during the Class Period. *See City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *12 (N.D. Ga. May 15, 2018) ("That the stock price later went higher under a different set of facts does not affect whether the Individual Defendants acted with scienter during the Class Period with respect to what was known at the time of the sale."); *contra* R&R at 32.

The amount and percentage of shares that the individual Defendants sold are likewise suspicious. Fieldly sold off 70% of his direct common stock holdings during the Class Period. ¶ 143. Even when including unexercised vested stock options, Fieldly's sales still accounted for approximately 17% of his holdings, an amount which courts have found sufficiently indicative of scienter. *See*, *e.g.*, *Sensormatic*, 2002 WL 1352427, at *7 (sales of 14.9% of holdings were "significant"). Furthermore, Fieldly's sales constituted a windfall of $43 million—more than ten

---

[12] *In re Spectrum Brands, Inc. Securities Litigation*, cited in the Report, does not find otherwise. 461 F.Supp.2d 1297 (N.D. Ga. 2006). In fact, it explicitly states that it "does not hold, expressly or by implication, that a stock sale must be made with any particular temporal proximity to a negative announcement to contribute to an inference of scienter." *Id.* at 1317 n.7. *North Collier Fire Control & Rescue District Firefighter Pension Plan v. MDC Partners, Inc.* likewise holds that sales that "occur[] soon after statements defendants are alleged to know to be misleading" can weigh in favor of finding unusual or suspicious trading. 2016 WL 5794774, at *18 (S.D.N.Y. Sept. 30, 2016).

times his annual cash and stock-based compensation from Celsius. ¶ 143. Langhans's sales accounted for 41% of his Celsius holdings and earned him roughly the same amount as his 2023 compensation. *See* ¶¶ 85, 135, 139. David's sales also support scienter, as they accounted for 30% of his total holdings, and were worth over ten times his 2023 compensation. ¶ 139.

### 4.     Accounts from Former Employees Further Support Scienter

The accounts of several confidential former employees confirm the Individual Defendants' own admissions of their knowledge and further support a strong inference of scienter. Courts have repeatedly credited such witness accounts in upholding scienter allegations. *See*, *e.g.*, *Marrari v. Medical Staffing Network Holdings, Inc.*, 395 F.Supp.2d 1169, 1188 (S.D. Fla. 2005) ("anonymous sources may be used to sustain complaints under the PSLRA so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *Tung v. Dycom Indus., Inc.*, 454 F.Supp.3d 1244, 1258 (S.D. Fla. 2020) ("[T]he absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.") (*quoting Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008)); *contra* Mot. at 6 (disapproving of "nameless former employees"). The Complaint meets this standard by providing descriptions of the positions held by each witness, their job responsibilities, and the dates of their employment at Celsius. ¶¶ 30-32. Each of the confidential witnesses also describe with sufficient particularity facts that support a strong inference of scienter. *See*, *e.g.*, *Grand Lodge of Pa. v. Peters*, 550 F.Supp.2d 1363, 1370 (M.D. Fla. 2008) (crediting accounts of confidential witnesses placing defendants "at daily meetings and teleconferences in which the development of the North Port scheme was discussed").

Despite the Report's finding that only one of the confidential witnesses was alleged to have had direct contact with the Individual Defendants (R&R at 28-29), the confidential witnesses' allegations are still credible and indicative of Defendants' scienter—whether by the actual knowledge standard or the severely reckless standard.[13] Courts have repeatedly afforded significant weight to confidential witness accounts even when those witnesses were removed from direct interaction with individual defendants. *See*, *e.g.*, *In re 21st Century Holding Co. Sec. Litig.*,

---

[13] The Report holds that the Complaint's allegations regarding the meetings that both Langhans and CW1 attended are not sufficiently detailed "to show the individual Defendants had actual knowledge of specific inventory levels and could foresee Pepsi's intentions with its inventory." *Id.* at 28. Again, the holding is in error because the Complaint need not allege actual knowledge to survive a motion to dismiss—severe recklessness is sufficient.

2008 WL 5749572, at *7 (S.D. Fla. Nov. 7, 2008) (crediting accounts of confidential witnesses who were not alleged to have spoken to any of the individual defendants); *Edge*, 2023 WL 6310236, at *6 (relying on testimony of confidential witness who met with a defendant's direct report).

There are ample, well-pled allegations that Defendants knew of Pepsi's inventory glut based on the accounts of Plaintiff's confidential witnesses. *See*, *e.g.*, ¶¶ 61 (access to Pepsi's inventory data); 66 ("Daily Sales Report" provided to Fieldly and Langhans); 67 (finance department provided with "aged inventory analysis" showing how long product had been sitting unsold, including at Pepsi). Viewed holistically and in conjunction with Defendants' own statements, the confidential witnesses' accounts demonstrate Defendants' significant and regular involvement in matters related to Pepsi, including consistent review of sales to Pepsi and Pepsi's inventory. Defendants' knowledge of this information—or severe recklessness as to the veracity of their public statements regarding this information—contradicted their statements to investors, and therefore supports a strong inference of scienter.

### D.    OBJECTION TO FINDING ON SECTION 20(A) CLAIM

Because the Report recommends that Plaintiff's Section 10(b) and Rule 10b-5 claims should be dismissed, it also recommends dismissing the Section 20(a) claim. R&R at 35. Plaintiff objects to this finding as set forth in its objections to dismissal of the underlying 10(b) claims.

### E.    OBJECTION TO FAILURE TO ADDRESS REQUEST FOR LEAVE TO AMEND

Plaintiff objects to the Report's failure to address Plaintiff's request for the opportunity to replead in the event that the Defendants' Motion is granted in whole or in part. Plaintiff timely requested leave to amend its pleadings in its Opposition. Opp. at 20. Should the Court adopt any portion of the Report or grant any or all of Defendants' Motion, Plaintiff should be afforded the opportunity to replead. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (a plaintiff is generally "given at least one chance to amend the complaint").

## IV.    CONCLUSION

The Court should decline to adopt the Report and deny Defendants' Motion to Dismiss in its entirety. However, if the Court adopts any portion of the Report or grants any or all of Defendants' Motion, Plaintiff respectfully requests permission to replead.

Dated: December 18, 2025                          Respectfully submitted,

                                                 **JOSH DUBIN, P.A.**

                                                 By: */s/ Joshua E. Dubin*
                                                 Joshua E. Dubin (FL Bar #48865)
                                                 201 South Biscayne Boulevard, Suite 1210
                                                 Miami, FL 33131
                                                 Tel: 212-219-1469
                                                 josh@jdubinlaw.com

                                                 *Counsel for Lead Plaintiff and*
                                                 *Liaison Counsel for the Proposed Class*

                                                 **GRANT & EISENHOFER P.A.**
                                                 Karin Fisch (*pro hac vice*)
                                                 James S. Notis (*pro hac vice*)
                                                 Lauren J. Salamon (*pro hac vice*)
                                                 Timothy Clark Dauz (*pro hac vice*)
                                                 485 Lexington Avenue, 29th Floor
                                                 New York, NY 10017
                                                 Tel: 646-722-8500
                                                 kfisch@gelaw.com
                                                 jnotis@gelaw.com
                                                 lsalamon@gelaw.com
                                                 tdauz@gelaw.com

                                                 *Counsel for Lead Plaintiff and*
                                                 *Lead Counsel for the Proposed Class*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2025, I caused the foregoing to be filed electronically with the Court's Case Management/Electronic Filing System ("CM/ECF"). Notice of this filing was sent to all parties of record by operation of the Notice of Electronic Filing System, and the parties to this action may access the filing through CM/ECF.

*/s/ Joshua E. Dubin*
JOSHUA E. DUBIN