**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 24-CV-81472-DAMIAN-REINHART

In re CELSIUS HOLDINGS, INC.
SECURITIES LITIGATION                    CLASS ACTION

_____/

**RESPONSE TO LEAD PLAINTIFF'S OBJECTIONS TO**
**REPORT AND RECOMMENDATION ON DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ......................................................................................................... 1

II.  FACTUAL BACKGROUND .......................................................................................... 3

III.  APPLICABLE LEGAL STANDARD ............................................................................ 5

IV.  ARGUMENT ................................................................................................................. 5

A.  The Court Should Adopt the R&R's Holding that the AC Failed to Plead
Material Misstatements or Omissions. ................................................................. 5

1.  The R&R correctly held Defendants' statements regarding the
alleged "pipe fill" were not materially false. ............................................ 6

2.  The R&R correctly identified statements as not materially false or
misleading. ............................................................................................... 9

a)  The R&R correctly found the AC failed to plead falsity
with respect to certain statements. .................................................. 9

b)  The R&R correctly identified nonactionable puffery. .................. 10

B.  The Court Should Adopt the R&R's Holding that the AC Failed to Plead
Scienter. .............................................................................................................. 11

1.  The R&R applied the correct pleading standard for scienter. ................... 12

2.  Defendants' own statements do not demonstrate scienter. ....................... 13

3.  The R&R considered and rejected the insider trading allegations. ........... 15

4.  The R&R correctly held the CW allegations did not contribute to a
strong inference of scienter. ..................................................................... 18

C.  The Court Should Dismiss the Section 20 Claim. ............................................... 20

D.  Lead Plaintiff's Request for Leave to Amend Was Improper. ............................. 20

V.  CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barnes v. Leon Cnty. Sch. Bd.*,
  No. 4:22-cv-78-AW-MAF, 2025 WL 895216 (N.D. Fla. Mar. 24, 2025)...........................5, 16

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) ........................................................................................11

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ................................................................................6, 7, 10

*City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*,
  649 F. Supp. 3d 1256 (S.D. Fla. 2022) ....................................................9, 15, 16, 17

*City of Sunrise General Employees' Retirement Plan v. FleetCor Techs.*,
  No. 1:17-CV-2207-LMM, 2018 WL 4293143 (N.D. Ga. May 15, 2018)...............................18

*City of Warren Gen. Emps. Ret. Sys. v. Teleperformance SE*,
  No. 23-cv-24580, 2024 WL 2320209 (S.D. Fla. May 22, 2024)..............................................14

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
  412 F. Supp. 3d 206 (E.D.N.Y. 2019) ..............................................................................11

*Davidco Invs., LLC v. Anchor Glass Container Corp.*,
  No. 8:04-cv-2561-T-24-EAJ, 2006 WL 547989 (M.D. Fla. Mar. 6, 2006)............................15

*Doller v. Hertz Global Holdings, Inc.*,
  No. 2:24-cv-513-KCD-DNF, 2025 WL 2896919 (M.D. Fla. Oct. 10, 2025)....................14, 15

*Druskin v. Answerthink, Inc.*,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004) .................................................................................16

*Edge v. Tupperware Brands Corp.*,
  No. 07-cv-61057, 2023 WL 6310236 (M.D. Fla. Sept. 28, 2023).........................................19

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
  594 F.3d 783 (11th Cir. 2010) ..............................................................................................16

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ..............................................................................................5

*Grand Lodge of Pennsylvania v. Peters*,
  550 F.Supp.2d 1363 (M.D. Fla. 2008).................................................................................19

*In re 21st Century Holding Co. Sec. Litig.*,
  No. 07-cv-61057, 2008 WL 5749572 (S.D. Fla. Nov. 7, 2008) ...........................................19

*In re Aaron's Sec. Litig.*,
  No. 17-cv-2270, 2018 WL 11343741 (N.D. Ga. Sep. 26, 2018)...........................................13

*In re Astea Int'l Inc. Sec. Litig.*,
  No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 8, 2007) ......................................................18

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) ..................................................................................11

*In re Faro Technologies Sec. Litig.*,
  534 F. Supp. 2d 1248 (M.D. Fla. 2007) ..................................................................................18

*In re Galectin Therapeutics, Inc.*,
  843 F.3d 1257 (11th Cir. 2016) ..............................................................................................20

*In re KLX, Inc. Sec. Litig.*,
  232 F. Supp. 3d 1269 (S.D. Fla. 2017) .................................................................................6, 9

*In re Mako Surgical Corp. Sec. Litig.*,
  No. 12-cv-60875, 2013 WL 2145661 (S.D. Fla. May 15, 2013)......................................13, 20

*In re Miller Industries Sec. Litig.*,
  12 F. Supp. 2d 1323 (N.D. Ga. 1998) .....................................................................................18

*In re Netbank, Inc. Sec. Litig.*,
  No. 1:07-CV-2298-BBM, 2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) .................................15

*In re Ocwen Fin. Corp. Sec. Litig.*,
  No. 14-cv-81057, 2015 WL 12780960 (S.D. Fla. Sep. 4, 2015) ......................................12, 19

*In re Royal Caribbean Cruises Ltd.*,
  No. 11-cv-22855, 2013 WL 3295951 (S.D. Fla. Apr. 18, 2013)......................................12, 19

*Jackson Inv. Grp., LLC v. Thomas*,
  325 F. Supp. 3d 1334 (N.D. Ga. 2017) ...................................................................................11

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)......................................................................................19

*Marlite, Inc. v. Eckenrod*,
  No. 10-cv-23641, 2012 WL 3614212 (S.D. Fla. Aug. 20, 2012) .....................................13, 18

*Martin v. Kijakazi*,
  No. 22-cv-20469, 2023 WL 2623315 (S.D. Fla. Mar. 24, 2023) .......................................5, 10

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ........................................................................11, 12, 13, 20

*Mogensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014) ...........................................................10, 19

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
  No. 15-cv-6034, 2016 WL 5794774 (S.D.N.Y. Sep. 30, 2016) ...............................17

*Next Century Commc'ns. Corp. v. Ellis*,
  318 F.3d 1023 (11th Cir. 2013) ..................................................................10

*Patel v. Ga. Dep't BHDD*,
  485 F. App'x 982 (11th Cir. 2012) ...............................................................20

*Phillips v. Scientific-Atlanta, Inc.*,
  374 F.3d 1015 (11th Cir. 2004) ..................................................................11

*Pritchard v. Apyx Medical Corp.*,
  No. 8:19-cv-00919-SCB-AEP, 2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ....................10

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ....................................................................17

*S.E.C. v. Morgan Keegan & Co.*,
  678 F.3d 1233 (11th Cir. 2012) .................................................................6, 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...........................................................................11, 17

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015) ...........................................................12

*Vitalone v. Logitech Int'l*,
  No. C 11-03855 RS, 2012 WL 13041992 (N.D. Cal. July 13, 2012) ...............................10

*Williams v. McNeil*,
  557 F.3d 1287 (11th Cir. 2009) .................................................................5, 9

*Willis v. Bowman*,
  No. 4:23-cv-40, 2023 WL 3337247 (S.D. Ga. May 10, 2023) .........................................8

*Woods v. Barnett Bank of Ft. Lauderdale*,
  765 F.2d 1004 (11th Cir. 1985) ..................................................................11

**RULES**

17 CFR 240.10b-5.................................................................................20

Fed. R. Civ. P. 9(b) ...........................................................................1, 5

Fed. R. Civ. P. 72(b)(3)..........................................................................5

S.D. Fla. Mag. J. R. 4(b) ...............................................................................................5

**STATUTES**

15 U.S.C. § 78u-4(b)(1) .................................................................................................5

28 U.S.C. § 636(b)(1) ....................................................................................................5

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* ........................1, 5, 19

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) .................................20

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).................................20

Defendants John Fieldly, Jarrod Langhans, and Toby David (together, the "Individual Defendants") and Celsius Holdings, Inc. ("Celsius") submit this response to Lead Plaintiff's Objections (the "Objections" or "Obj.") (ECF No. [76]) to Magistrate Judge Reinhart's Report and Recommendation (the "R&R") (ECF No. [74]) on Defendants' Motion to Dismiss (ECF No. [64]) (the "Motion") the Amended Complaint for Violations of the Federal Securities Laws (ECF No. [57]) (the "AC").[1]

## I.      INTRODUCTION

On December 4, 2025, Magistrate Judge Bruce Reinhart issued a thorough, thirty-five-page opinion recommending this Court dismiss Lead Plaintiff's claims that Celsius and the Individual Defendants violated the federal securities laws.  The R&R rejected the AC's theory of alleged fraud, based on statements made by Defendants concerning a distribution agreement announced August 1, 2022 (the "Distribution Agreement") between Celsius and an independent distributor of Celsius beverages, PepsiCo, Inc. ("Pepsi").  The AC alleges that Defendants' statements misled the market by conflating sales of product to Pepsi under the Distribution Agreement ("sell-in") and sales to end consumers ("sell-out" or "velocity"), thereby misrepresenting demand for Celsius products.  The AC also alleges that Defendants represented robust sales but were purportedly aware of a glut of Celsius product in Pepsi's warehouses that would result in a downturn in future Pepsi orders.

In addition to the particularity requirements for pleading fraud under Federal Rule of Civil Procedure 9(b), the AC's securities fraud claims are subject to heightened pleading standards under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq*. (the "PSLRA"). The R&R faithfully applied these heightened pleading requirements, and Eleventh Circuit precedent, to conclude the AC warranted dismissal because it failed to plead falsity or scienter.

On December 18, 2025, Lead Plaintiff filed the Objections, mischaracterizing the R&R's holdings and its careful analysis.  The Court should reject the Objections and adopt the R&R.

***The Court should adopt the R&R's holding that the AC fails to plead falsity.***  The R&R held that the alleged misstatements were not actionable because they were not materially false or misleading.  (R&R at 15–25).  The R&R considered the challenged statements in context, as the PSLRA requires, and concluded that investors were "well aware" that Celsius recognized revenue

---

[1] The AC is cited herein as ("¶ _").  Pinpoint citations to the R&R, the parties' briefing, and exhibits refer to the page numbers generated by the CM/ECF system that appear at the top of each page.

when product was delivered to Pepsi, as Celsius reports each quarter in its public filings, not to the ultimate retail consumer, and that Celsius disclosed information about Pepsi's initial inventory build and Pepsi's responsibility for inventory management. *Id*. at 18, 24. The R&R also concluded that Defendants' statements concerning revenue growth and velocity did not conflate those two metrics. *Id*. at 25. Finally, the R&R held the remaining alleged misstatements concerned mere expressions of corporate optimism, not actionable as a matter of law. *Id*. at 18–19.

In the face of this careful analysis, the Objections argue the R&R erred by considering disclosures made after the date of challenged May 9, 2023 statements, in its assessment of whether they were misleading in light of the "total mix" of information known to investors. (Obj. at 12–14). But this is a blatant distortion of the R&R, which limits its analysis of the May 9, 2023 statements to information contemporaneously disclosed. (R&R at 24–25). The Objections similarly misconstrue the R&R's analysis of statements it deemed not adequately alleged to be false, as well as its consideration of immaterial "puffery" statements, or corporate optimism, arguing the R&R failed to consider the statements in context. (Obj. at 15–17). In reality, the R&R did just that, considering the contested statements in the light of Celsius's robust disclosures, the statements in their entirety, and the AC's allegations. (R&R at 16–19). The Objections also raise a new theory, claiming the R&R failed to consider certain statements as actionable omissions, rather than misstatements. (Obj. at 15–16). But omissions must still be material, and there is no duty to disclose information already known to the market. The R&R held that investors were aware of the allegedly omitted facts, including the distinction between sales to Pepsi and sales to consumers. (R&R at 24). Thus, the Objections fail to undermine the R&R's well-reasoned rulings on falsity.

As discussed further below, the R&R thoroughly applied Eleventh Circuit precedent to view the challenged statements in context and concluded they were not actionable.

***The Court should adopt the R&R's holding that the AC does not plead scienter.*** The R&R also held that the AC did not plead, for each of the Defendants, particularized facts giving rise to scienter, the requisite strong inference of a culpable state of mind. (R&R at 25–35). The R&R concluded the AC failed to allege any facts to show that Defendants had access to information contradicting their public statements. *Id*. at 28–29. In reaching this conclusion, the R&R conducted a holistic inquiry, considering allegations by former employee confidential witnesses ("CWs") and allegations of insider stock sales, to conclude those allegations did not give

rise to a strong inference of severe recklessness for each Defendant that is at least as compelling as opposing inferences, as is required in this Circuit. *Id*. at 26–33.

In response, the Objections claim the R&R applied an erroneous "actual knowledge" standard to scienter, based on a single sentence in which the R&R rejected Lead Plaintiff's own argument that the CW allegations demonstrated Defendants were "aware" of a glut of inventory in Pepsi warehouses. (Obj. at 18–19). The R&R's 10-page discussion of scienter, however, repeatedly references and applies this Circuit's severe recklessness precedent, and conducts a thorough inquiry of the AC's insider trading and CW allegations to conclude the scienter element was not well pled. (R&R at 25–35). As discussed in detail below, the Objections' remaining arguments on scienter are also unavailing, and primarily amount to an improper attempt to rehash arguments the R&R properly considered and rejected. (Obj. at 19–25).

For these reasons, and the reasons set forth in Defendants' Motion and below, the Court should overrule Lead Plaintiff's Objections, adopt the R&R, and dismiss the AC in its entirety.

## II.  FACTUAL BACKGROUND

Celsius is an energy drink company based in Boca Raton, Florida, and sells its products in the U.S. and internationally.[2] (Ex. A at 2, 6).[3] The Individual Defendants are current Celsius executives. Mr. Fieldly has served as Celsius's Chief Executive Officer since 2018, and as Chairman of the Board of Directors of Celsius since 2020. (¶ 26). Mr. Langhans is Celsius's Chief Financial Officer and has served in that role since April 2022. (¶ 27). Mr. David is Celsius's Chief of Staff, a position he assumed in March 2024. (¶ 28).

On August 1, 2022, after rigorous arm's-length negotiations, Celsius announced the Distribution Agreement, making Pepsi Celsius's primary customer and distributor in the U.S., and its preferred distributor internationally. (Ex. B at 2, 6, 15). The Distribution Agreement positioned Celsius to gain immediate scale and accelerate market share through access to Pepsi's well-developed distribution network. *Id*. at 5–8. In other words, access to Pepsi's distribution network would expand the availability of Celsius products in various channels, including food service,

---

[2] Lead Plaintiff again represents to the Court that Celsius "sold diet pills, had a run-in with the FTC, and was dogged by allegations of operating as a Pyramid scheme." (Obj. at 8). This brazen mischaracterization is not even alleged in the AC, which attributes the same allegations to a separate company. (¶ 38).

[3] Unless otherwise noted, referenced exhibits are those filed with the Declaration of Elizabeth Clark accompanying Defendants' Motion to Dismiss. (ECF No. [64-1]).

3

convenience, vending, college campuses, concession, and military installations. *Id*.

From the start, Celsius disclosed how revenue from sales to Pepsi would be recognized. Celsius attached a copy of the Distribution Agreement to its quarterly filing following the transaction and explained in subsequent filings that Celsius would "recognize revenues when control of the underlying goods are transferred to Pepsi." (Ex. C at 16); (Ex. L at 221). The terms of the Distribution Agreement also made clear that Pepsi alone determined how much Celsius product it needed. (Ex. L at 240). Put simply, the market was aware that Pepsi was responsible for ordering the amount of product that it deemed appropriate based on its knowledge of its own distribution network and of that network's future demand for product; Celsius was tasked with filling the orders but had no control over Pepsi's inventory levels or ordering practices.

In addition, Celsius's public filings with the Securities and Exchange Commission (the "SEC"), press releases, and earnings calls throughout 2023 disclosed that the new Distribution Agreement empowered Pepsi to exercise sole control of Pepsi's inventory, and made clear Pepsi would need time to determine the appropriate level of inventory to meet the demands of Pepsi's customers. (Ex. L at 240); (Ex. G. at 16). Celsius also disclosed that it benefited from "inventory building" by Pepsi because Celsius revenue increased as Pepsi filled its warehouses and distribution chain with Celsius product. (Ex. F at 4, 15); (Ex. H at 7). Because of these public statements the market knew:

- Celsius benefited from Pepsi increasing inventory levels in Q1 2023, and the market expected "distributor inventory levels" to "remain elevated at least over the next few months" (Ex. F at 9, 14);

- Pepsi, as an independent distributor, was responsible for "find[ing] the right inventory levels" (Ex. G at 16);

- Pepsi engaged in an "inventory build" in Q3 2023 that boosted Celsius's reported revenue (Ex. H at 7);

- Pepsi was responsible for determining whether it would engage in any "management around the inventory [] going into Q1 [2024]" *Id*. at 10; and

- Celsius did not control how Pepsi managed its inventory and could not make any "guarantees" to the market around its inventory levels as a result. *Id*.

On May 28, 2024, Nielsen released a report on weekly retail data. (¶ 113). Analysts digesting that report noted that the data indicated a slowdown in consumer sales (sell-out) and perceived that Pepsi might reduce its Celsius inventory as a result. (¶¶ 113–114). Celsius disclosed on September 4, 2024, that Pepsi orders for the third quarter had declined. (¶¶ 121–124).

4

Celsius's gross and operating margins allegedly fell as a result, as reflected in its third quarter 2024 financial results.  (¶¶ 128–129).  Seizing on the stock drop that followed, the present action was filed a few weeks later on November 22, 2024.  (ECF No. [57]).

## III.   APPLICABLE LEGAL STANDARD

A district court reviews de novo those portions of a report and recommendation to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  "Objections must specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." S.D. Fla. Mag. J. R. 4(b).  But "portions of a magistrate judge's report and recommendation to which no proper objection has been made are reviewed for clear error." *Martin v. Kijakazi*, No. 22-cv-20469, 2023 WL 2623315, at *2 (S.D. Fla. Mar. 24, 2023). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

The District Court "need not consider new evidence or arguments submitted after a report and recommendation issues." *Barnes v. Leon Cnty. Sch. Bd.*, No. 4:22-cv-78-AW-MAF, 2025 WL 895216, at *1 n.2 (N.D. Fla. Mar. 24, 2025) (*citing Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009)).  The Eleventh Circuit has observed that "[t]o require a district court to consider evidence not previously presented to the magistrate judge would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court." *Williams*, 557 F.3d at 1292 (internal quotation marks omitted).

## IV.   ARGUMENT

### A.   The Court Should Adopt the R&R's Holding that the AC Failed to Plead Material Misstatements or Omissions.

Lead Plaintiff objects to the R&R's conclusions that the statements alleged in the AC are not "materially false," "amount to corporate optimism and opinion," and "do not rise to the level of materially misleading." (Obj. at 11).  As discussed below, these objections are unfounded and should be rejected by the Court.

To successfully plead falsity, a complaint "must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (quoting 15 U.S.C. § 78u-4(b)(1)).  Because securities fraud claims must satisfy the pleading requirements of Rule 9(b) and the PSLRA, they must be pled "in detail," including the "who, what, when, where, and how." *Id*. (citation omitted). A misrepresentation or omission is only actionable if it is material, meaning, "in the light of the

5

facts existing at the time, a reasonable investor, in the exercise of due care, would have been misled by it." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019) (internal quotations omitted). "In other words, materiality depends on whether a 'substantial likelihood' exists that a reasonable investor would have viewed a misrepresentation or omission as significantly alter[ing] the 'total mix' of information made available." *Id.* (quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012)). To assess materiality, the Court must consider the alleged misstatements and omissions in the full context of the company's public disclosures. *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1276–77 (S.D. Fla. 2017).

### 1. The R&R correctly held Defendants' statements regarding the alleged "pipe fill" were not materially false.

Lead Plaintiff objects to the R&R's conclusions concerning the following statements made during Celsius's May 9, 2023 first quarter earnings call: "the increase in distribution didn't slow the overall velocity"; "[t]he sales are moving quicker out of the register"; and "it is not really a pipe fill." (Obj. at 12–15). Lead Plaintiff claims the R&R erroneously relied on disclosures made after May 9, 2023, to determine the challenged statements were not misleading in light of the "total mix" of information available to the market. *Id.* at 12–13. This misreads the R&R, which discusses these later-in-time disclosures in its summation of Defendants' broader arguments on falsity. (R&R at 22–23). In fact, the R&R quotes the June 1, 2023, August 8, 2023, and November 7, 2023 disclosures in its discussion of alleged misstatements concerning Pepsi's inventory generally (*id.*) but does not cite them in its analysis of the May 9, 2023 statements. (*Id.* at 24–25).

Instead, the R&R correctly identified information ***contemporaneously disclosed*** to investors at the time of the May 9, 2023 statements, undercutting any allegation that the market was misled. First, the R&R noted that "investors were well-aware that Celsius recognized revenue when it delivered products to Pepsi, and that the earnings reports were based on sales to Pepsi, not sales to the ultimate consumers." (R&R at 24). There is no question that those disclosures had been in place, and known to the market, since the Distribution Agreement was announced in 2022.[4] Second, the R&R concluded "disclosures regarding Pepsi's buildup of inventory, increase in the length of time products were sitting in the warehouses, and uncertainty as to how Pepsi would

---

[4] (*See, e.g.,* Ex. K at 72) ("For product sales under the Distribution Agreement, the Company will recognize revenues when control of the underlying goods are transferred to Pepsi based on the contractual terms of noncancellable purchase orders issued by Pepsi."); (Ex. L at 240).

manage the inventory going forward indicate that investors had information relating to the inventory." *Id*. These disclosures were similarly made prior to, or on the same date as, the contested May 2023 statements.[5] Third, the R&R concluded that "Celsius' disclosures show differentiation between sales to Pepsi and other sales, plus statistics showing large quantities of Celsius products entering the marketplace through large retailers such as Sam's Club and Amazon." (R&R at 25). These disclosures were also made at the same time as the contested statements.[6] (R&R at 24–25). Finally, the R&R concluded "the fact that Defendants mentioned revenue growth in the same dialogue as velocity or other metrics does not conflate these metrics or show that Defendants were trying to bury weak consumer sales under high revenue growth." *Id*. Accordingly, each of these concurrent facts was appropriate for the R&R to cite in the discussion of whether the May 9, 2023 statements were materially misleading given the "total mix" of information available. *See Carvelli*, 934 F.3d at 1317. In addition, the statement that sales were "not really a pipe fill" was made in response to an analyst question about the foodservice industry specifically, and not sales to Pepsi as a whole.[7]

---

[5] As reflected in the May 9, 2023 Earnings Call Transcript, analysts distinguished between an "initial channel fill . . . versus reorders derived from sell through at retail" and said they understood "distributor inventory levels [were] going to remain elevated at least over the next few months." (Ex. F at 9, 14). Celsius also disclosed that it "experienced an inventory build" due to "anticipated retailer resets and to build inventory levels," it "saw Pepsi increase inventory levels," it "continue[d] to see opportunities for future efficiencies" around inventory, and it "saw an increase in the days inventory outstanding within the mixing centers." *Id*. at 4, 5. Similarly, Celsius's March 1, 2023 10-K specifically cautioned that, "[i]f the inventory of our products held by our distributors and/or retailers is too high, they will not place orders for additional products, which could unfavorably impact our future sales and adversely affect our operating results." (Ex. K at 20).

[6] An analyst asked Mr. Fieldly if data showed "the same kind of like the lag between scanned and reported" or whether there was "any line of sight [Celsius had] to some lumpiness or more or less or any kind of swings in that regard?" (Ex. F at 13). In response, Mr. Fieldly stated, "I think there's probably some lumpiness in regards to kind of the value chain as it's going through the Pepsi mixing centers, and then into their sales barns, and then into the customers and then cycling through. . . . You also have the mix of our Amazon business as well as our club business, and that's in there. It didn't grow at those faster rates." *Id*. Similarly, Celsius's Q1 2023 financials explicitly distinguish sales to Pepsi, Amazon, and others, and note the total amount of net sales to Pepsi separately. (*See, e.g.,* Ex. C at 10, 20).

[7] (*See* Ex. F at 9, 13). Lead Plaintiff has not objected to Judge Reinhart's exercise of discretion to consider the footnote with Defendants' argument on this point. Instead, Lead Plaintiff suggests the fact that foodservice accounted for 10% of sales to Pepsi could make this statement material. But this overlooks the R&R's detailed analysis that, given all of the information available to the

Lead Plaintiff now attempts to reframe its argument by claiming the revenue recognition disclosures are irrelevant because investors "did not know the degree to which the Company's sales constituted channel fill as opposed to sales to consumers." (Obj. at 14). But this argument also fails. Investors knew exactly how much of the Company's sales were to Pepsi, because Celsius disclosed this information in its financials.[8] Furthermore, as the R&R concluded, none of the challenged statements "conflate" sales to Pepsi with sales to consumers, or otherwise suggest that they were the same. (R&R at 25). In fact, Celsius's disclosures consistently **distinguished** between the two metrics, and frequently referenced third-party scanner data tracking sales to consumers, separate and apart from Celsius's reported revenue. (R&R at 24–26); (Ex. F at 4–5, Ex. G at 4–5, Ex. H at 5).

Finally, Lead Plaintiff quotes specific statements made by Mr. Fieldly during the August 8, 2023 earnings call, and by Mr. Langhans during the November 7, 2023 earnings call, seemingly to suggest the R&R failed to correctly assess their falsity when it considered them in its analysis of disclosures. (Obj. at 13); (R&R at 22–23). But Lead Plaintiff quotes snippets out of context to try to distort the R&R's careful analysis.[9] More importantly, the AC **does not allege** that either of these statements is false or misleading. *Compare* (¶¶ 82, 88), *with* (Obj. at 13). Lead Plaintiff cannot amend the AC's allegations through argument in its Objections. *Willis v. Bowman*, No. 4:23-cv-40, 2023 WL 3337247, at *1 (S.D. Ga. May 10, 2023) ("Attempts to amend pleadings in objections are ineffective.").

---

market, a reasonable investor would not have been misled by this statement, notwithstanding the amount of foodservice sales attributable to Pepsi as a whole.

[8] (*See, e.g.,* Ex. C at 20) ("Net sales to Pepsi amounted to $156.5 million for three months ended March 31, 2023 and are included in revenue on the accompanying consolidated statements of operations and comprehensive income.").

[9] For example, Mr. Fieldly's response to the analyst question about days in inventory ("DIO") and whether Pepsi was still trying to find the right inventory levels speaks for itself: "So, the DIO is very consistent quarter-over-quarter. And that goes back to in Q4 [2022], we felt inventories were low. So, they are at a level that we would prefer they stay. But obviously it's part of the partnership, so it's not just us. Now, will that change? It could. **Again, right now, Q1 and Q2 has been consistent from a DIO perspective.** We'd expect that to continue on into Q3. When we get to Q4, **I'm not sure that'll stay at its kind of, what I'll call, preferred run rate or if it would go down, that's something that our partner will have to make that decision in terms of how they want to kind of end the year prior to moving into the Q1 2024."** (Ex. G at 16) (emphasis added). The fact that Celsius felt Pepsi's levels were low in Q4 2022, the earliest days of the Distribution Agreement, is unremarkable, and consistent with Defendants' other statements on this issue.

Thus, the R&R correctly concluded that, in light of the "total mix" of information available to the market, a reasonable investor would not have been misled by the May 9, 2023 statements. The Court should adopt the R&R's holdings finding these statements non-actionable.

### 2. The R&R correctly identified statements as not materially false or misleading.

As to the remaining alleged misstatements, the Objections challenge two aspects of the R&R's holdings: the determination that certain statements did not plead falsity, and the conclusion that other statements constitute non-actionable puffery. The R&R's holdings with respect to each are supported by thorough analysis and well-settled precedent, as addressed separately below.

#### a. The R&R correctly found the AC failed to plead falsity with respect to certain statements.

Lead Plaintiff objects to the R&R's holding that the AC failed to plead falsity with respect to certain statements by Mr. Langhans. (R&R at 16–17). This objection focuses solely on Mr. Langhans's statements that "[t]he primary factors behind the increase in North American sales volume were related to our integration into the Pepsi distribution system" and that Celsius had "seen [] velocity increase" (¶ 69). (Obj. at 16).

Lead Plaintiff complains that the R&R should have conducted an inquiry "into the meaning of" these statements. (Obj. at 16). The R&R did just that. The R&R assessed these statements in detail to conclude they would not have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available. (R&R at 18) *(citing Morgan Keegan*, 678 F.3d at 1245). The R&R also considered the full text of the statements (rather than the AC's sliced and diced version), along with the actual allegations of falsity in the AC, to conclude Lead Plaintiff had not met its burden to "specify each allegedly misleading statement and explain **why** it is misleading." *City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*, 649 F. Supp. 3d 1256, 1265 (S.D. Fla. 2022) (emphasis added).

Lead Plaintiff now appears to argue that these statements were actionable under an omissions theory. (Obj. at 15). As an initial matter, new arguments such as this need not be considered by the Court. *Williams,* 557 F.3d at 1291. Moreover, it is well settled that "a duty of disclosure only arises when an omitted fact was necessary to render a preexisting statement not misleading, or because securities law otherwise required its disclosure." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d at 1276 (internal quotation marks omitted). As the R&R noted, investors knew at this time that the sales to Pepsi "contributed significantly to Celsius' sales and revenue" and that

9

"Celsius recognized sales revenue at the time Pepsi received the products." (R&R at 18). Thus, Lead Plaintiff cannot advance a theory of fraud when the allegedly omitted fact (the distinction between sales to Pepsi and sales to consumers) was already known to the market. The facts alleged in the AC are thus distinguishable from *Pritchard v. Apyx Medical Corp.*, No. 8:19-cv-00919-SCB-AEP, 2020 WL 1180731, at *4–5 (M.D. Fla. Mar. 11, 2020), which concerned alleged misrepresentations about the status of the company's products with federal regulators. There, the court expressly noted the statements were "targeted" to the alleged fraud and not "wide-ranging statement[s]" about the company's health. *Id*. Accordingly, the Court should adopt the R&R's holdings as to these statements.

> b.       *The R&R correctly identified nonactionable puffery.*

Lead Plaintiff objects to the R&R's conclusion that certain statements were non-actionable puffery as "mistaken." (Obj. at 16). The Court should reject this argument because the R&R's well-reasoned analysis of statements of corporate optimism, or puffery, comports with well-settled Eleventh Circuit precedent.

Puffery is defined as "generalized, vague, nonquantifiable statements of corporate optimism" that the Eleventh Circuit and other courts have held inactionable, because it is immaterial to a reasonable investor as a matter of law. *Carvelli*, 934 F.3d at 1318. The R&R identified as corporate optimism statements "referencing Pepsi's 'massive distribution,' Defendants' confidence that sales were increasing and growth was strong, that the distribution system was a 'key factor' in Celsius' growth, and that Celsius was in a good place." (R&R at 19) (citing ¶¶ 77, 90–91, 108, 111, 117).[10] These statements mirror language routinely held immaterial as a matter of law. *Next Century Commc'ns. Corp. v. Ellis*, 318 F.3d 1023, 1028–29 (11th Cir. 2013) ("characterization of a company's performance as 'strong' constitutes puffery"); *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211–13 (M.D. Fla. 2014) (holding that optimistic statements relating to sales results, performance, drivers, and strategies were puffery); *Vitalone v. Logitech Int'l*, No. C 11-03855 RS, 2012 WL 13041992, at *6 (N.D. Cal. July 13, 2012) (allegations that consumer demand was "strong" and inventory levels were "healthy" were

---

[10] These are the only puffery statements addressed in the Objections. (Obj. at 16). Defendants respond only to the challenged statements, and the R&R's findings on remaining statements are reviewed only for clear error. *Martin*, 2023 WL 2623315, at *2.

10

puffery); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 223–24 (E.D.N.Y. 2019) (descriptions of relationships with "world-class" vendors puffery).

The authority cited by Lead Plaintiff is unavailing.  In *In re Equifax Inc. Securities Litigation*, the court rejected arguments that specific statements and representations concerning that company's cybersecurity efforts and its commitment to data security were not puffery, against a backdrop of a later data breach.  357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019).  The *Equifax* court concluded that statements concerning cybersecurity made specifically "to assure investors that Equifax's systems were secure" could be material to a reasonable investor.  *Id*.  In contrast, the general statements by Defendants here expressing confidence around Celsius's growth and sales overall would not have misled a reasonable investor and fall far short of the standard for materiality.  Thus, the R&R correctly identified these statements as puffery, and the District Court should adopt the R&R's holding.

## B.   The Court Should Adopt the R&R's Holding that the AC Failed to Plead Scienter.

The Objections to the R&R's holding that the AC "fails to adequately allege that Defendants acted with scienter" distort the R&R's analysis and should be rejected by the Court. (Obj. at 17).  As the R&R recognized, to satisfy the PSLRA's scienter pleading requirements, a complaint must allege "particular facts that give rise to a ***strong inference*** that the defendant acted in a severely reckless manner."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999) (emphasis added).  Statements made with "[s]evere recklessness" involve "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Jackson Inv. Grp., LLC v. Thomas*, 325 F. Supp. 3d 1334, 1349 (N.D. Ga. 2017) (citing *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985)).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Notably, a "complaint must allege facts supporting a strong inference of scienter 'for ***each*** defendant with respect to ***each*** violation.'"  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (emphasis added) (*quoting Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)).

11

### 1.      The R&R applied the correct pleading standard for scienter.

From the R&R's robust, 10-page discussion of scienter, Lead Plaintiff cherry-picks a single sentence to argue the R&R applied the incorrect standard.  (Obj. at 18–19).  In that sentence, the Court noted that the CW allegations failed to "show the individual Defendants had actual knowledge of specific inventory levels and could foresee Pepsi's intentions with its inventory." (R&R at 28).  Contrary to Lead Plaintiff's assertion, the R&R was *not* applying an "actual knowledge" standard to its assessment of scienter, as evidenced by its discussion of the Eleventh Circuit's "severe recklessness" standard.  (R&R at 10).  Instead, the R&R referenced "actual knowledge" merely in response to Lead Plaintiff's own argument that the CW allegations demonstrated "Defendants monitored Pepsi's inventory levels and *were aware of*" supposed excess inventory sitting in Pepsi's warehouses.  (R&R at 26) (emphasis added).  The R&R disagreed, concluding that the CW allegations concerning inventory levels were too attenuated, and unspecific, to link the Individual Defendants to any awareness of a "glut" at Pepsi.  (R&R at 28–29).  The R&R's statements on "actual knowledge" were directly limited to its rejection of Lead Plaintiff's argument that the CW allegations show the Individual Defendants were aware of facts rebutting their public statements.

In addition, the bulk of authority cited by the R&R in its consideration of the CW allegations applies the Eleventh Circuit's severe recklessness standard, supporting the R&R's holdings.  *See In re Royal Caribbean Cruises Ltd.*, No. 11-cv-22855, 2013 WL 3295951, at *18 (S.D. Fla. Apr. 18, 2013) (holding scienter not pled under severe recklessness standard where confidential witness allegations of "sales reports" and "meetings" lacked "specific facts" to show that the defendants "had specific information that contradicted the public statements"); *see Mizzaro,* 544 F.3d at 1247–48 (applying severe recklessness scienter standard to hold confidential witness allegations inadequate where they did not "say that any one of the individual defendants ever discussed the alleged fraud" and did not "even claim[] to know" the individual defendants); *In re Ocwen Fin. Corp. Sec. Litig.*, No. 14-cv-81057, 2015 WL 12780960, at *8–10 (S.D. Fla. Sep. 4, 2015) (deeming confidential witness allegations deficient under a severe recklessness pleading standard); *see Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1379 (S.D. Fla. 2015) (holding confidential witness allegations inadequate under severe recklessness standard where

they were "devoid of any allegations showing" the confidential witnesses communicated with the individual defendants).[11]

Accordingly, the R&R was unequivocal in its application of the Eleventh Circuit's severe recklessness standard to conclude scienter had not been adequately pled, and the Court should reject the Objections' distortion of this analysis.

### 2. Defendants' own statements do not demonstrate scienter.

Lead Plaintiff asserts that the R&R overlooks its allegations that Defendants' own statements give rise to an inference of scienter. (Obj. at 19). As an initial matter, this objection amounts to an improper attempt by Lead Plaintiff to rehash an argument that was already fully briefed. But it "is improper for an objecting party to submit papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted." *Marlite, Inc. v. Eckenrod*, No. 10-cv-23641, 2012 WL 3614212, at *2 (S.D. Fla. Aug. 20, 2012) (internal citations and punctuation omitted). The Court need not consider it for that reason alone.

In any event, Defendants' statements do not support scienter, and the R&R was right to disregard this argument. Lead Plaintiff again mischaracterizes a February 29, 2024 statement by Mr. Fieldly to argue that Defendants admitted to "look[ing] at [Pepsi's] inventory levels." (Obj. at 20). But as Defendants previously explained in their briefing on the Motion, this statement from Celsius's fourth quarter 2024 earnings call discussed a lookback at Pepsi's historic inventory levels, quarter-over-quarter: "I think when we looked at our number one customer [Pepsi] and we look at their inventory levels, *they're fairly consistent with Q3 to Q4*." (Ex. I at 8) (emphasis added). Nor can Mr. David's September 4, 2024 statement that Pepsi was holding "several million more cases over the past 1.5 years than they really needed to hold" (¶ 124) demonstrate that he possessed the requisite state of mind, as Lead Plaintiff contends. This statement, expressing Mr. David's opinion about Pepsi's past inventory levels, with the full benefit of hindsight, sheds no light on Defendants' contemporaneous knowledge of Pepsi's inventory levels during the Class Period. *See In re Aaron's Sec. Litig.*, No. 17-cv-2270, 2018 WL 11343741, at *7 (N.D. Ga. Sep.

---

[11] In the sole case cited by the R&R that applied an "actual knowledge" standard to forward-looking statements, the court also discussed the standard Eleventh Circuit courts use to assess confidential witness allegations generally. *See In re Mako Surgical Corp. Sec. Litig.*, No. 12-cv-60875, 2013 WL 2145661, at *12 (S.D. Fla. May 15, 2013) (*citing Mizzaro*, 544 F.3d at 1240).

26, 2018) (reliance on statements defendants made at the end of the class period amounted to fraud by hindsight and failed to plead scienter).

Lead Plaintiff misrepresents the remaining statements (Obj. at 19–20), which discuss the impact of Pepsi's historical inventory levels (¶¶ 100–02, 105, 112, 117, 118) or optimism concerning Pepsi's ability to maintain sufficient inventory to service retailers.  (¶ 108).  None of these statements demonstrate a real-time knowledge of an alleged "glut" of inventory in Pepsi warehouses, much less show how Defendants could have known that Pepsi would reduce orders of product from Celsius in the future.

Grasping for straws, Lead Plaintiff claims that Defendants' choice to speak about inventory, in combination with the significance of the Distribution Agreement to Celsius, evidences scienter. (Obj. at 21).  This argument also fails.[12]  As discussed above, Defendants never purported to possess knowledge of Pepsi's real-time inventory needs or its plans for future orders. In fact, Defendants were transparent with investors that Pepsi alone was responsible for determining whether it would engage in any "management around the inventory" and that Celsius did not control how Pepsi managed its inventory and could not make any "guarantees" to the market around its inventory levels as a result. (Ex. H at 10).  Accordingly, none of these statements demonstrate that Defendants acted with the requisite state of mind.

Finally, Lead Plaintiff takes issue with the R&R's conclusion that allegations certain employees at Celsius could access Pepsi inventory data are too attenuated to show the Defendants acted with the requisite state of mind.  (Obj. at 20–21).  Lead Plaintiff again cites *Doller v. Hertz Global Holdings, Inc.*, No. 2:24-cv-513-KCD-DNF, 2025 WL 2896919 (M.D. Fla. Oct. 10, 2025), a non-binding opinion Lead Plaintiff raised in an earlier-filed Notice of Supplemental Authority (ECF No. [72]).  *Doller* does not support Lead Plaintiff's position.

In *Doller*, the court concluded that allegations defendants had access to "internal systems" containing information contradicting their challenged statements "in painstaking detail"

---

[12] Lead Plaintiff also attempts to resurrect its core operations argument to assert that, because sales to Pepsi were significant to Celsius, this contributes to an inference of scienter. (Obj. at 16).  But the "Eleventh Circuit has never adopted" the core operations doctrine, holding "it very rarely can create a strong inference of scienter on its own," and may only be used in limited instances to support otherwise sufficient scienter allegations.  *City of Warren Gen. Emps. Ret. Sys. v. Teleperformance SE*, No. 23-cv-24580, 2024 WL 2320209, at *18 (S.D. Fla. May 22, 2024) (citations omitted).

sufficiently pled scienter. 2025 WL 2896919, at *6. In contrast, the AC fails to allege that the Individual Defendants even **could** access the data at issue. The only alleged source of "on hand inventory" data—Pepsi's SAP system—is not alleged to have been accessible by the Individual Defendants. (¶ 61). More importantly, the information that the *Doller* individual defendants were alleged to have had access to directly contradicted their public statements. 2025 WL 2896919, at *6. Here, there are no allegations showing Defendants had access to information that demonstrated Pepsi held a glut of product. As a result, even if the AC had alleged the Individual Defendants could access or were otherwise aware of Pepsi's real-time inventory data, it did not plead Defendants could have known Pepsi was purchasing "too much" and would reduce future orders, the issue at the heart of Lead Plaintiff's fraud claim.

The other cases Lead Plaintiff cites also concern distinguishable situations when defendants were alleged to have had access to information directly contradicting their public statements. *In re Netbank, Inc. Sec. Litig.*, No. 1:07-CV-2298-BBM, 2009 WL 2432359, at *8 (N.D. Ga. Jan. 29, 2009) (holding scienter pled when the company's auditor resigned and the SEC notified defendants of related accounting misstatements but defendants failed to publicly disclose that information); *Davidco Invs., LLC v. Anchor Glass Container Corp.*, No. 8:04-cv-2561-T-24-EAJ, 2006 WL 547989, at *20 (M.D. Fla. Mar. 6, 2006) (individual defendants were alleged to have had access to information that directly contradicted their public statements).

Accordingly, pointing to Defendants' own statements cannot save the AC's deficient scienter allegations, and the Court should reject this argument.

### 3.   The R&R considered and rejected the insider trading allegations.

Lead Plaintiff claims the R&R erred by failing to consider certain alleged stock sales that occurred prior to the start of the Class Period in its assessment of whether the Individual Defendants' trades were suspicious. (Obj. at 21–22). This objection is another distortion of the R&R, which conducted a thorough review of the alleged insider stock sales and concluded that, even in light of certain "vague and conclusory" allegations of earlier trades, the AC did not allege "details about the Individual Defendants' trading practices," and failed to show scienter. (R&R at 31).

In this Circuit, "[s]tock sales by insiders are only relevant to scienter when they are suspicious." *Citrix Sys., Inc.*, 649 F. Supp. 3d at 1266. "And they are suspicious if the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the

15

personal benefit from undisclosed inside information." *Id*. (internal quotation marks omitted). A plaintiff has "the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing." *Druskin v. Answerthink, Inc.,* 299 F. Supp. 2d 1307, 1335 (S.D. Fla. 2004). The R&R held that Lead Plaintiff failed to carry that burden because the AC pleads insufficient information about the Individual Defendants' pre-Class Period trading. (R&R at 31). Thus, it is impossible to "determine from the complaint that the sales of [even] large numbers of shares [were] suspicious enough to add to an inference of scienter." *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 793 (11th Cir. 2010).

Lead Plaintiff now argues, for the first time, that the AC alleges a small subset of trades that present a comparative trading history for the Individual Defendants, and that the R&R overlooked these trades when it ruled the AC failed to allege pre-Class Period trades, "nor any details about the individual Defendants' trading practices."[13]  (R&R at 22).  Lead Plaintiff is wrong.

Defendants discussed the AC's contradictory lock-up trading allegations and lack of sufficient trading history at length in their Motion. (Motion at 14–17). Lead Plaintiff's Opposition did ***not*** argue that the lock-up trading allegations demonstrated the Individual Defendants' pre-Class Period trading patterns.  In fact, as the R&R noted, Lead Plaintiff's "Response [did] not address Defendants' arguments regarding these shortcomings" at all. (R&R at 31). For Lead Plaintiff to raise this new argument now, at this stage in the proceedings, is improper, and the Court need not consider it. *See Barnes*, 2025 WL 895216, at *1 n.2.  At any rate, the R&R noted in its assessment of the alleged insider trades that it considered and rejected what it viewed as "vague and conclusory allegations" of earlier trades by the Individual Defendants. (R&R at 31). Thus, although the R&R did not expressly cite these trades in its stock sales analysis, it is obvious

---

[13] These stock sales are referenced in the AC in connection with contradictory allegations concerning the lock-up agreements executed in parallel with the Distribution Agreement.  The AC alleges that stock sales that occurred "in violation" of the Lock-Up Agreements evidence scienter, (¶¶ 163–68), but also alleges that the Individual Defendants "had motive to keep Celsius's stock price inflated through the end of the lock-up period, when they would be able to sell their shares" (¶ 55) and that they made false statements during the first and second quarters of 2023 for the express purpose of inflating the market in advance of the expiration of the lock-up period. (¶¶ 84– 85).  These allegations are illogical, as Defendants cannot have been both motivated to keep Celsius stock artificially inflated through the expiration of an alleged lock-up period while also allegedly trading in violation of the lock-up period.

the R&R weighed them.

Moreover, the R&R's ultimate conclusion that the insider trading allegations failed to establish the requisite strong inference of scienter is correct.  The Objections point to just three (3) pre-Class Period trades by Mr. Fieldly, and two (2) pre-Class Period trades by Mr. Langhans, to argue that the AC shows a discrepancy in the Individual Defendants' trading history.  (Obj. at 22).  But the AC does not allege that these trades represent a complete picture of their pre-Class Period trading activity.  For Lead Plaintiff to now suggest that this small subset of stock sales somehow provides a sufficient pattern of activity to assess the Individual Defendants' trading practices strains credulity.  Even if the R&R did not address the alleged pre-Class Period stock sales in detail, this isolated data cannot establish a baseline for the Individual Defendants' trading history, let alone show that their Class Period trades were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Citrix Sys., Inc.*, 649 F. Supp. 3d at 1267.

Similarly, the fact that the AC alleges Mr. David did not trade before the Class Period does not support Lead Plaintiff's argument.  The AC alleges Mr. David made just two (2) trades during the Class Period, and one of them was made to pay tax liabilities, undercutting any inference of suspicion.  (Ex. O at 2); s*ee N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15-cv-6034, 2016 WL 5794774, at *20 (S.D.N.Y. Sep. 30, 2016).  Mr. David also maintained **70%** of his Celsius stock.   *See Citrix Sys., Inc.*, 649 F. Supp. 3d at 1268.  Thus, the allegation that he did not trade prior to the Class Period cannot support an inference of scienter, and the R&R's conclusion that the AC lacked sufficient "details about the individual Defendants' trading practices" to identify suspicious stock sales was correct.  (R&R at 31).

Finally, the R&R's thorough analysis of the timing of the alleged insider stock sales demonstrates that they were not suspicious.  The R&R relied on the AC's stock price graph to conclude the overwhelming majority of the Individual Defendants' sales occurred several months before Celsius stock reached peak prices.  (R&R at 32).  Courts have routinely held that sales, such as these, occurring well before stock prices peak are not suspicious.  *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (sales of stock at prices approximately 25% below peak share price several months prior were not suspicious) (*abrogated on other grounds by Tellabs, Inc.*, 551 U.S. at 315–18); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan*, 2016 WL 5794774, at *19

17

("[S]tock sales occurring even a few months before the alleged revelation of the fraud do not raise a strong inference of scienter."); *In re Astea Int'l Inc. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, at *15 (E.D. Pa. Aug. 8, 2007) (gap between sale and corrective disclosure of "five months weakens the inference that the individual defendants were motivated to cash out before [the relevant disclosure]").

The authority cited by Lead Plaintiff does not hold otherwise. In *In re Faro Technologies Securities Litigation*, the court deemed scienter pled based on "much more" than the allegations of insider stocks sales, because the plaintiff in that case pled "specific allegations that [the individual defendants] knew of the true nature" of the alleged fraud. 534 F. Supp. 2d 1248, 1264 (M.D. Fla. 2007). Similarly, in *In re Miller Industries Securities Litigation*, the court held the trading at the beginning of the class period supported an inference of scienter where the plaintiff had shown the stock sales alleged were "dramatically out of line with prior trading practices." 12 F. Supp. 2d 1323, 1332 (N.D. Ga. 1998). And in *City of Sunrise General Employees' Retirement Plan v. FleetCor Techs.*, the court rejected arguments that if the individual defendants had waited until six months after the class period to sell shares, they would have made more money, limiting its ruling to whether they "acted with scienter during the Class Period." No. 1:17-CV-2207-LMM, 2018 WL 4293143, at *12 (N.D. Ga. May 15, 2018). None of these cases hold, or even suggest, that the R&R's analysis of the timing of the stock sales alleged in the AC was incorrect or otherwise inappropriate.

Accordingly, the Court should adopt the R&R's holding that the insider stock sales do not contribute to a strong inference of scienter.

> **4.    The R&R correctly held the CW allegations did not contribute to a strong inference of scienter.**

Lead Plaintiff rehashes an argument fully briefed by the parties and considered in the R&R to conclude its assessment of the CW allegations was wrong. (Obj. at 24). This improper attempt at a second bite at the apple should be rejected by the Court. *Marlite, Inc.*, 2012 WL 3614212, at *2.

Lead Plaintiff makes the unremarkable point that allegations by confidential former employees generally have been credited by courts in upholding scienter allegations. (Obj. at 24–25). This misses the mark. There is no dispute that allegations by anonymous former employees

18

may be considered under the PSLRA, and Defendants have not argued otherwise.[14]  As the R&R recognized, however, confidential witness allegations must "flesh out at least some of the details of the conversations, meetings, and internal documents that they describe" to be afforded weight. *In re Ocwen Fin. Corp. Secs. Litig.*, 2015 WL 12780960 at *10 (*quoting Mogensen*, 15 F. Supp. 3d at 1219–20).  The CW allegations at issue here fall far short of that standard, failing to connect Defendants to ***any*** information contradicting their public statements.

At most, the CW allegations show that Celsius was tracking its sales to Pepsi (¶¶ 65–66), and that certain low-level, non-party employees at Celsius (not the Individual Defendants) had the ability to access snapshots of Pepsi's inventory through its SAP systems.  (¶¶ 61, 67).  The AC's remaining conclusory allegations concerning meetings where "year-over-year financial data" was presented (¶ 65), along with a  supposed "daily sales report" (¶ 66), and "aged inventory analysis" (¶ 67) are similarly insufficient, as they "fail to specify exactly what information was contained in the report or how said information contradicted Defendants' public statements, as is required to show scienter."  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021); *see also In re Royal Caribbean Cruises Ltd.*, 2013 WL 3295951, at *17–18.

The cases cited by Lead Plaintiff do not hold otherwise.  In *Grand Lodge of Pennsylvania v. Peters,* the court concluded the CW allegations placed individual defendants in meetings and in teleconference "***in which the . . . scheme was discussed***." 550 F.Supp.2d 1363, 1370 (M.D. Fla. 2008) (emphasis added).  In contrast, even construed in the most generous light, the CWs allege only that Messrs. Fieldly and Langhans attended monthly meetings where slides were presented containing "year-over-year financial data, including revenue, EBITDA, and adjusted EBITDA," broken down by distribution channel.  (¶ 65).  Unlike *Grand Lodge*, there are no allegations in the AC to show how this historic financial data made Defendants aware that Pepsi would reduce its orders of Celsius product, or otherwise contradicted their public statements.  Similarly, Defendants previously distinguished *In re 21st Century Holding Co. Securities Litigation*, No. 07-cv-61057, 2008 WL 5749572, at *9 (S.D. Fla. Nov. 7, 2008), and *Edge v. Tupperware Brands Corp*., No. 07-cv-61057, 2023 WL 6310236, at *6 (M.D. Fla. Sept. 28, 2023), in their Reply in support of the Motion.  (Reply at 8–9) (ECF No. [71]).  Both of those cases discussed allegations linking defendants to information directly contrary to their public statements, unlike the CW allegations

---

[14] In fact, in their Reply in support of the Motion, Defendants specifically noted they "do not quibble with the credibility of confidential witnesses generally."  (Reply at 7 n.6).

here.

Accordingly, the R&R properly held the CW allegations, taken together, cannot give rise to the requisite strong inference of scienter that is at least as compelling as opposing inferences, and the Court should adopt the R&R's holding.

### C.    The Court Should Dismiss the Section 20 Claim.

Where, such as here, a complaint fails to adequately allege a primary violation of Section 10(b) or Rule 10b-5, the claim for controlling person liability under Section 20(a) must also be dismissed. *See In re Galectin Therapeutics, Inc.,* 843 F.3d 1257, 1276 (11th Cir. 2016) ("Control person liability . . . cannot exist in the absence of a primary violation.") (internal quotation marks omitted); *Mizzaro*, 544 F.3d at 1237.  The Court should dismiss the Section 20(a) claim.

### D.    Lead Plaintiff's Request for Leave to Amend Was Improper.

In the Response in Opposition to Defendants' Motion, Lead Plaintiff included a single sentence requesting permission to replead if the Motion were granted.  (Opposition at 25) (ECF No. [68]).  Lead Plaintiff now objects on the basis that the R&R did not discuss its request for leave to amend.  Such a "bare request is not sufficient to raise the issue of whether [it] should be granted leave to amend their complaint further." *In re Mako Surgical Corp. Sec. Litig.*, 2013 WL 2145661, at *13.  "Instead, when requesting leave to amend, a plaintiff must either attach a proposed amended complaint or describe the substance of the proposed amendments." *Id*.  Lead Plaintiff did not include any such information with its original request and has not attempted to do so here.  Moreover, as discussed in Defendants' Motion and the R&R, Lead Plaintiff's entire theory of fraud is flawed, and amendment would be futile. *See Patel v. Ga. Dep't BHDD*, 485 F. App'x 982, 982 (11th Cir. 2012) ("Futility justifies the denial of leave to amend where the complaint, as amended, would still be subject to dismissal.").

Accordingly, Lead Plaintiff's request to amend was improper and futile, and the Court should dismiss the AC with prejudice.

## V.    CONCLUSION

For the foregoing reasons, and the reasons discussed in Defendants' Motion, the Court should adopt the R&R in its entirety and dismiss the AC with prejudice.

20

Date: January 2, 2026

Respectfully submitted,

**JONES FOSTER P.A.**


_BY /s/ Scott G. Hawkins_
SCOTT G. HAWKINS
Florida Bar No. 460117
505 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401
Telephone: (561) 659-3000
SHawkins@jonesfoster.com

   and

_Additional Counsel (Admitted Pro Hac Vice)_

**ALSTON & BIRD**
JOSEPH G. TULLY
ELIZABETH GINGOLD CLARK
COURTNEY QUIRÓS
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
joe.tully@alston.com
elizabeth.clark@alston.com
courtney.quiros@alston.com

_Attorneys for Defendants Celsius Holdings, Inc., John
Fieldly, Jarrod Langhans, and Toby David_


## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2026, I caused the foregoing to be filed electronically with the Court's Case Management/Electronic Filing System ("CM/ECF").  Notice of this filing was sent to all parties of record by operation of the Notice of Electronic Filing System, and the parties to this action may access the filing through CM/ECF.


      _/s/ Scott G. Hawkins_
      SCOTT G. HAWKINS

#7544000 v2 33851-00001